APPEAL NO. 22-3003

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

---

**JANELL BRAXTON**

APPELLANT

v.

**WALMART, INC.**

APPELLEE

---

Appeal from the United States District Court
For the District of Kansas
District Case No. 20-2287-DDC-GEB
Daniel D. Crabtree, United States District Judge

---

**APPENDIX**
**Volume I**
**1 - 300**

---

Kenneth D. Kinney – D.Kan. #78544
RALSTON KINNEY, LLC
4717 Grand Avenue, Suite 300
Kansas City, MO 64112
816-298-0086
**Attorney for Appellant Janell Braxton**

---

# **TABLE OF CONTENTS**

Civil Docket ................................................................................................ 5

Doc.20, First Amended Complaint ............................................................ 13

Doc.25, Answer and Affirmative Defenses .............................................. 19

Doc.47, Plaintiff's Motion for Partial Summary Judgment...................... 26

Doc.48, <u>Suggestions in Support of Plaintiff's Motion
        for Partial Summary Judgment</u> .................................................. 29

    Doc.48-1, Exhibit 1, Walmart's Answers to Braxton's
        First Interrogatories............................................................34

    Doc.48-2, Exhibit 2, Deposition of Quincy Usry (01/06/21)
        30(b)(6) Representative for Walmart ..................................41

    Doc.48-3, Exhibit 3, Second Amended Notice of Videotaped
        Deposition of Walmart, Inc. (Usry) ...................................56

Doc.55, <u>Defendant's Brief in Opposition to
        Motion for Partial Summary Judgment</u> ................................... 61

    Doc.55-1, Exhibit 1, Deposition of Quincy Usry (01/06/21)
        30(b)(6) Representative for Walmart .................................74

    Doc.55-2, Exhibit 2, Declaration of David Whitenack .....................86

    Doc.55-3, Exhibit 3, Declaration of Quincy Usry .............................89

    Doc.55-4, Exhibit A, Walmart General Safe Work Practices
        (WMW-763e)......................................................................92

    Doc.55-5, Exhibit B, Safety & Compliance Rule Violation Form
        (WMW-670e)....................................................................103

    Doc.55-6, Exhibit C, Text Messages ..............................................104

Doc.55-7, Exhibit 4, Declaration of Morgan Medaris ......................................105

Doc.55-8, Exhibit D, Conduct Disciplinary Guidelines....................................107

Doc.59, <u>Reply in Further Support of Plaintiff's
     Motion for Partial Summary Judgment</u>  ...................................................108

    Doc.59-1, Appendix to Reply ........................................................................120

    Doc.59-2, Exhibit 4, JetFlex Disciplinary Action Guidelines.........................131

    Doc.59-3, Exhibit 5, Text Messages ..............................................................133

Doc.87, <u>Memorandum and Order</u>
     (Denying Plaintiff's Motion for Partial Summary Judgment)..................136

Doc.93, Pretrial Order………………………….........................................155

Doc.94, Defendant's Motion for Summary Judgment...........................................171

Doc.95 - <u>Defendant's Brief in Support of
     Motion for Summary Judgment</u>...............................................................173

    Doc.95-1, Exhibit 1, Declaration of Christopher Hedican ..............................195

    Doc.95-2, Exhibit A, Deposition of Janell Braxton..........................................198

    Doc.95-3, Exhibit B, Exhibit 2, Deposition of Quincy Usry (01/06/21)
        30(b)(6) Representative for Walmart...................................................245

    Doc.95-4, Exhibit C, Deposition of Ammie Wilbur .......................................250

    Doc.95-5, Exhibit D, Deposition of David Whitenack.................................... 255

    Doc.95-6, Exhibit E, Deposition of Morgan Medaris .....................................270

    Doc.95-7, Exhibit F, Deposition of Quincy Usry (04/30/21)
        30(b)(6) Representative for Walmart ...............................................278

Doc.95-8, Exhibit G, Jet Statement Form
      (Deposition Exhibit 28)....................................................................283

Doc.95-9, Exhibit H, Safety & Compliance Rule Violation Form
      (WMW-670e) (Deposition Exhibit 24) ..........................................284

Doc.95-10, Exhibit I, General Safe Work Practices
      (Policy 763e) (Deposition Exhibit 25) ..........................................285

Doc.95-11, Exhibit J, Text Messages
      (Deposition Exhibit 7) .................................................................296

Doc.95-12, Exhibit K, Declaration of Quincy Usry .......................................298

CLOSED,APPEAL,ETT-5D,MEDIATION,PROTO

**U.S. District Court**
**DISTRICT OF KANSAS (Kansas City)**
**CIVIL DOCKET FOR CASE #: 2:20-cv-02287-DDC**

Braxton v. Walmart, Inc.
Assigned to: District Judge Daniel D. Crabtree
Case in other court: 10CCA, 22-03003
Cause: 28:1332 Diversity-Tort/Non-Motor Vehicle

Date Filed: 06/10/2020
Date Terminated: 12/08/2021
Jury Demand: Both
Nature of Suit: 442 Civil Rights: Jobs
Jurisdiction: Diversity

| Date Filed | # | Docket Text |
|---|---|---|
| 06/10/2020 | 1 | COMPLAINT with trial location of Kansas City ( Filing fee $400, Internet Payment Receipt Number AKSDC-5163726.), filed by Janell Braxton.(Ralston, Thomas) (Entered: 06/10/2020) |
| 06/10/2020 | 2 | CIVIL COVER SHEET by Plaintiff Janell Braxton. (Ralston, Thomas) (Entered: 06/10/2020) |
| 06/10/2020 | 3 | DESIGNATION OF PLACE OF TRIAL filed by Plaintiff Janell Braxton - trial to be held in Kansas City. (Ralston, Thomas) (Entered: 06/10/2020) |
| 06/10/2020 | | NOTICE OF JUDGE ASSIGNMENT: Case assigned to District Judge Daniel D. Crabtree and Magistrate Judge Gwynne E. Birzer for all proceedings. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (ca) (Entered: 06/10/2020) |
| 06/10/2020 | | SUMMONS ISSUED as to Jet.com, Inc. (issued to Attorney for service) (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry) (ca) (Entered: 06/10/2020) |
| 06/22/2020 | 4 | SUMMONS RETURNED EXECUTED -- Personal Service by Janell Braxton upon Jet.com, Inc. served on 6/15/2020, answer due 7/6/2020 (Kinney, Kenneth) (Entered: 06/22/2020) |
| 06/30/2020 | 5 | CLERKS ORDER EXTENDING TIME until 7/20/2020 for Defendant Jet.com, Inc. to answer or otherwise plead. Signed by deputy clerk on 6/30/2020. (ca) (Entered: 06/30/2020) |
| 07/20/2020 | 6 | ANSWER to Complaint by Jet.com, Inc..(Goldsmith, Mark) (Entered: 07/20/2020) |
| 07/20/2020 | 7 | ***PLEASE DISREGARD. WRONG DOCUMENT ATTACHED. SEE DE 9 FOR CORRECT FILING.*** CORPORATE DISCLOSURE STATEMENT by Jet.com, Inc. identifying None as corporate parent . (Goldsmith, Mark) Modified on 7/27/2020 (ca). (Entered: 07/20/2020) |
| 07/24/2020 | 8 | INITIAL ORDER REGARDING PLANNING AND SCHEDULING: Scheduling Conference set for 9/9/2020 at 10:00 AM by telephone before Magistrate Judge Gwynne E. Birzer. Participants shall dial into the conference call at 888-363-4749, enter access code 9686294#, and follow the prompts to join the call. Report of Parties Planning Conference and Rule 26 Initial Disclosures due 9/2/2020. Signed by Magistrate Judge Gwynne E. Birzer on 7/24/2020. (ala) (Entered: 07/24/2020) |
| 07/27/2020 | 9 | CORPORATE DISCLOSURE STATEMENT by Jet.com, Inc. identifying None as corporate parent *(Amended)*. (Goldsmith, Mark) (Entered: 07/27/2020) |
| 08/18/2020 | 10 | CERTIFICATE OF SERVICE of Plaintiff's First RFAs, RFPs, and ROGs to Defendant by Janell Braxton. (Ralston, Thomas) (Entered: 08/18/2020) |
| 09/02/2020 | 11 | NOTICE OF SERVICE by Jet.com, Inc. of Initial Disclosures (Goldsmith, Mark) (Entered: |

| | | |
|---|---|---|
| 09/02/2020 | 12 | CERTIFICATE OF SERVICE of Plaintiff's Initial Disclosures and Documents Braxton000001-000021 by Janell Braxton. (Kinney, Kenneth) (Entered: 09/02/2020) |
| 09/09/2020 | 13 | MINUTE ENTRY for proceedings held before Magistrate Judge Gwynne E. Birzer: SCHEDULING CONFERENCE held on 9/9/2020. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (adc) (Entered: 09/09/2020) |
| 09/09/2020 | 14 | NOTICE of withdraw of Plaintiff's 1st Rule 36 Requests for Admissions to Jet.com, Inc. by Janell Braxton (Ralston, Thomas) (Entered: 09/09/2020) |
| 09/09/2020 | 15 | SCHEDULING ORDER: Mediation Notice or Confidential Settlement Report Due to Magistrate Judge on 10/20/2020. Mediation deadline 2/5/2021. Discovery deadline 4/30/2021. Proposed Pretrial Order due by 5/12/2021. Final Pretrial Conference set for 5/19/2021 at 10:00 AM by Telephone before Magistrate Judge Gwynne E. Birzer. Participants must call the CONFERENCE LINE at 1-888-363-4749 using ACCESS CODE 9686294. Dispositive motion deadline 6/4/2021. Jury Trial set for 2/1/2022 at 09:00 AM in KC Courtroom 476 (DDC) before District Judge Daniel D. Crabtree. Estimated trial time: 5 days. See order for other deadlines. Signed by Magistrate Judge Gwynne E. Birzer on 9/9/20. (adc) (Entered: 09/09/2020) |
| 09/09/2020 | 16 | CERTIFICATE OF SERVICE of Plaintiff's Request for Defendant's Consent to Amend her Pleadings and Proposed Filings by Janell Braxton. (Ralston, Thomas) (Entered: 09/09/2020) |
| 09/17/2020 | 17 | CERTIFICATE OF SERVICE of Plaintiff's First Supplemental Disclosures and Document Braxton000022 by Janell Braxton. (Kinney, Kenneth) (Entered: 09/17/2020) |
| 09/17/2020 | 18 | NOTICE OF SERVICE by Jet.com, Inc. of Discovery Responses (Goldsmith, Mark) (Entered: 09/17/2020) |
| 09/29/2020 | 19 | STIPULATION *and Joint Motion for Leave to Amend Complaint* by Janell Braxton. (Ralston, Thomas) (Entered: 09/29/2020) |
| 09/29/2020 | 20 | AMENDED COMPLAINT against Walmart Inc., filed by Janell Braxton.(Ralston, Thomas) Modified on 10/2/2020 to correct defendant (smc). (Entered: 09/29/2020) |
| 10/01/2020 | 21 | PROTECTIVE ORDER. Signed by Magistrate Judge Gwynne E. Birzer on 10/1/20. (adc) (Entered: 10/01/2020) |
| 10/01/2020 | 22 | ORDER re 19 Stipulation and Joint Motion for Leave to Amend Complaint filed by Janell Braxton Signed by Magistrate Judge Gwynne E. Birzer on 10/1/2020. (kf) (Entered: 10/01/2020) |
| 10/02/2020 | 23 | MOTION to Enforce *Discovery* by Plaintiff Janell Braxton (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(Ralston, Thomas) (Entered: 10/02/2020) |
| 10/13/2020 | 24 | NOTICE OF SERVICE by Walmart Inc. of Supplemental Initial Disclosures (Goldsmith, Mark) (Entered: 10/13/2020) |
| 10/13/2020 | 25 | ANSWER to 20 Amended Complaint by Walmart Inc..(Goldsmith, Mark) (Entered: 10/13/2020) |
| 10/15/2020 | 26 | NOTICE of Withdraw of Plaintiff's Motion to Enforce Discovery (Doc.23) by Janell Braxton (Ralston, Thomas) (Entered: 10/15/2020) |
| 10/16/2020 | 27 | ORDER finding as moot 23 Motion to Enforce due to Plaintiff's Notice of Withdrawal of Motion (ECF No. 26). Signed by Magistrate Judge Gwynne E. Birzer on 10/16/2020. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (kf) (Entered: 10/16/2020) |
| 10/18/2020 | 28 | Unopposed MOTION for extension of time *to file Motion to Compel Discovery* by Plaintiff Janell Braxton (referred to Magistrate Judge Gwynne E. Birzer) (Ralston, Thomas) (Entered: |

10/18/2020)

| 10/19/2020 | 29 | ORDER granting 28 Plaintiff's Unopposed Motion for Extension of Time to File Motion to Compel. Plaintiff's deadline to file any necessary Motion to Compel is extended through 11/18/2020. Signed by Magistrate Judge Gwynne E. Birzer on 10/19/2020. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (kf) (Entered: 10/19/2020) |
|---|---|---|
| 10/20/2020 | 30 | JOINT MEDIATION NOTICE - Mediation to be held 02/05/2021 by Janell Braxton (Ralston, Thomas) (Entered: 10/20/2020) |
| 11/06/2020 | 31 | NOTICE of Hearing: THIS IS AN OFFICIAL NOTICE FOR THIS HEARING (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) Discovery Hearing before Magistrate Judge Gwynne E. Birzer set for 11/12/2020 09:00 AM by telephone. Participants shall call 1-888-363-4749 and use ACCESS CODE 9686294. (kf) (Entered: 11/06/2020) |
| 11/12/2020 | 32 | MINUTE ENTRY for proceedings held before Magistrate Judge Gwynne E. Birzer: DISCOVERY HEARING held on 11/12/2020. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (kf) (Entered: 11/12/2020) |
| 12/13/2020 | 33 | NOTICE by Plaintiff Janell Braxton of taking deposition of David Whitenack on 12/18/2020 (Ralston, Thomas) (Entered: 12/13/2020) |
| 12/29/2020 | 34 | NOTICE by Plaintiff Janell Braxton of taking deposition of Ammie Wilbur on 01/06/2021 (Ralston, Thomas) (Entered: 12/29/2020) |
| 12/29/2020 | 35 | NOTICE by Plaintiff Janell Braxton of taking deposition of Walmart, Inc. on 01/06/2021 (Ralston, Thomas) (Entered: 12/29/2020) |
| 12/31/2020 | 36 | AMENDED NOTICE by Plaintiff Janell Braxton of taking deposition of Walmart, Inc. (Quincy Usry) on 01/06/2021 (Ralston, Thomas) (Entered: 12/31/2020) |
| 12/31/2020 | 37 | AMENDED NOTICE by Plaintiff Janell Braxton of taking deposition of Walmart, Inc. (Quincy Usry) on 01/06/2021 (Ralston, Thomas) (Entered: 12/31/2020) |
| 12/31/2020 | 38 | AMENDED NOTICE by Plaintiff Janell Braxton of taking deposition of Ammie Wilbur on 01/06/2021 (Ralston, Thomas) (Entered: 12/31/2020) |
| 12/31/2020 | 39 | NOTICE by Plaintiff Janell Braxton of taking deposition of Walmart, Inc. (Morgan Medaris) on 01/11/2021 (Ralston, Thomas) (Entered: 12/31/2020) |
| 12/31/2020 | 40 | NOTICE by Plaintiff Janell Braxton of taking deposition of Mark Tuazon on 01/11/2021 (Ralston, Thomas) (Entered: 12/31/2020) |
| 01/14/2021 | 41 | CERTIFICATE OF SERVICE of Second Rule 34 Requests by Janell Braxton. (Ralston, Thomas) (Entered: 01/14/2021) |
| 01/14/2021 | 42 | CERTIFICATE OF SERVICE of Third Rule 34 Requests by Janell Braxton. (Ralston, Thomas) (Entered: 01/14/2021) |
| 01/19/2021 | 43 | NOTICE by Plaintiff Janell Braxton of taking deposition of Mark Tuazon on 1/25/2021 (Ralston, Thomas) (Entered: 01/19/2021) |
| 01/20/2021 | 44 | AMENDED NOTICE by Defendant Walmart Inc. of taking deposition of Janell Braxton on 01/25/2021 (Goldsmith, Mark) (Entered: 01/20/2021) |
| 01/29/2021 | 45 | NOTICE OF SERVICE by Walmart Inc. of Discovery requests (Goldsmith, Mark) (Entered: 01/29/2021) |
| 02/02/2021 | 46 | NOTICE OF SERVICE by Walmart Inc. of discovery responses (Goldsmith, Mark) (Entered: 02/02/2021) |
| 02/03/2021 | 47 | MOTION for Partial Summary Judgment by Plaintiff Janell Braxton (Kinney, Kenneth) |

| | | |
|---|---|---|
| | | (Entered: 02/03/2021) |
| 02/03/2021 | 48 | MEMORANDUM IN SUPPORT of 47 MOTION for Partial Summary Judgment by Plaintiff Janell Braxton (Attachments: # 1 Exhibit 1 - Interrogatory Answers, # 2 Exhibit 2 - Walmart 30(b)(6), # 3 Exhibit 3 - 30(b)(6) Notice)(Kinney, Kenneth) (Entered: 02/03/2021) |
| 02/05/2021 | 49 | NOTICE OF SERVICE by Walmart Inc. of discovery responses (Goldsmith, Mark) (Entered: 02/05/2021) |
| 02/09/2021 | 50 | NOTICE OF SERVICE by Walmart Inc. of discovery responses (Goldsmith, Mark) (Entered: 02/09/2021) |
| 02/22/2021 | 51 | NOTICE by Plaintiff Janell Braxton of taking deposition of Morgan Medaris on March 4, 2021 (Ralston, Thomas) (Entered: 02/22/2021) |
| 02/22/2021 | 52 | NOTICE by Plaintiff Janell Braxton of taking deposition of David Whitenack on April 1, 2021 (Attachments: # 1 Exhibit Subpoena)(Ralston, Thomas) (Entered: 02/22/2021) |
| 02/24/2021 | 53 | ADR REPORT by Walmart Inc.. ADR session held on: 2/5/21 and conducted by Jay Daugherty. Results of ADR: Case did not settle. Status of litigation at time of ADR: Partial Discovery(Hedican, Christopher) (Entered: 02/24/2021) |
| 02/24/2021 | 54 | ENTRY OF APPEARANCE by Christopher R. Hedican on behalf of Walmart Inc.. (Hedican, Christopher) (Entered: 02/24/2021) |
| 02/24/2021 | 55 | MEMORANDUM IN OPPOSITION by Defendant Walmart Inc. re 47 MOTION for Partial Summary Judgment (Attachments: # 1 Exhibit 1, Deposition Transcript of Quincy Usry, # 2 Exhibit 2, Declaration of David Whitenack, # 3 Exhibit 3, Declaration of Quincy Usry, # 4 Exhibit A, Policy 763e, # 5 Exhibit B, Policy 670e, # 6 Exhibit C, Text Message, # 7 Exhibit 4, Declaration of Morgan Medaris, # 8 Exhibit D, Conduct Disciplinary Action Guidelines) (Hedican, Christopher) (Entered: 02/24/2021) |
| 03/04/2021 | 56 | Unopposed MOTION for Extension of Time to File Reply as to 47 Motion for Partial Summary Judgment by Plaintiff Janell Braxton. (Kinney, Kenneth) Modified on 3/5/2021 to remove referral information. (mam) (Entered: 03/04/2021) |
| 03/04/2021 | | **MOTION REFERRAL to Magistrate Judge REMOVED as to: 56 Unopposed MOTION for Extension of Time to File Reply as to 47 MOTION for Partial Summary Judgment . The motion will be resolved by the District Judge. (kf)** (Entered: 03/04/2021) |
| 03/05/2021 | 57 | ORDER granting 56 Plaintiff's Unopposed Motion for Extension of Time to File Reply re 47 MOTION for Partial Summary Judgment. Reply deadline extended to 3/19/2021. Signed by District Judge Daniel D. Crabtree on 03/05/2021. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (mig) (Entered: 03/05/2021) |
| 03/15/2021 | 58 | CERTIFICATE OF SERVICE of Plaintiff's discovery responses and documents by Janell Braxton. (Ralston, Thomas) (Entered: 03/15/2021) |
| 03/18/2021 | 59 | REPLY TO RESPONSE TO MOTION by Plaintiff Janell Braxton re: 47 Motion for Partial Summary Judgment (Attachments: # 1 Appendix with Facts, # 2 Exhibit 4 - JetFlex Discipline, # 3 Exhibit 5 - Texts)(Kinney, Kenneth) (Entered: 03/18/2021) |
| 03/19/2021 | 60 | CERTIFICATE OF SERVICE of Second Supplemental Disclosures by Walmart Inc.. (Hedican, Christopher) (Entered: 03/19/2021) |
| 03/22/2021 | 61 | CERTIFICATE OF SERVICE of Supplemental Disclosures by Janell Braxton. (Ralston, Thomas) (Entered: 03/22/2021) |
| 03/24/2021 | 62 | CERTIFICATE OF SERVICE of supplemental requests and documents by Janell Braxton. (Ralston, Thomas) (Entered: 03/24/2021) |
| 03/29/2021 | 63 | CERTIFICATE OF SERVICE of Answers to Plaintiff's Second Set of Interrogatories by Walmart Inc.. (Hedican, Christopher) (Entered: 03/29/2021) |

| 03/30/2021 | 64 | MOTION for Leave to file Sur-Reply Brief by Defendant Walmart Inc. (Attachments: # 1 Exhibit A)(Hedican, Christopher) (Entered: 03/30/2021) |
| 03/30/2021 | 65 | MEMORANDUM IN SUPPORT of 64 MOTION for Leave to file Sur-Reply Brief by Defendant Walmart Inc.(Hedican, Christopher) (Entered: 03/30/2021) |
| 03/30/2021 | | **MOTION REFERRAL to Magistrate Judge REMOVED as to: 64 MOTION for Leave to file Sur-Reply Brief. The motion will be resolved by the District Judge. (kf)** (Entered: 03/30/2021) |
| 03/30/2021 | 66 | CERTIFICATE OF SERVICE of First Set of RFAs and Second Set of Interrogatories to Plaintiff by Walmart Inc.. (Hedican, Christopher) (Entered: 03/30/2021) |
| 03/30/2021 | 67 | CERTIFICATE OF SERVICE of Request for Admissions by Janell Braxton. (Ralston, Thomas) (Entered: 03/30/2021) |
| 03/31/2021 | 68 | NOTICE by Plaintiff Janell Braxton of taking deposition of Sue Sooialo on 04/08/2021 (Ralston, Thomas) (Entered: 03/31/2021) |
| 03/31/2021 | 69 | NOTICE by Plaintiff Janell Braxton of taking deposition of Sue Sooialo on April 8, 2021 (Ralston, Thomas) (Entered: 03/31/2021) |
| 04/12/2021 | 70 | Unopposed MOTION for extension of time *to File Motion to Compel* by Defendant Walmart Inc. (referred to Magistrate Judge Gwynne E. Birzer) (Hedican, Christopher) (Entered: 04/12/2021) |
| 04/13/2021 | 71 | ORDER granting 70 Defendant's Unopposed Motion for Extension of Time to File Motion to Compel. Defendant's deadline to file any motion to compel regarding Plaintiff's responses to Defendant's First Set of Interrogatories and First Requests for Production of documents is extended up to and including 4/30/21. Signed by Magistrate Judge Gwynne E. Birzer on 4/13/2021. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (kf) (Entered: 04/13/2021) |
| 04/15/2021 | 72 | AMENDED NOTICE by Plaintiff Janell Braxton of taking deposition of Sue Sooialo on April 30, 2021, 4:00 PM (Kinney, Kenneth) (Entered: 04/15/2021) |
| 04/20/2021 | 73 | NOTICE by Plaintiff Janell Braxton of taking deposition of Walmart, Inc. - Topic 3 on April 30, 2021,10:30 AM (Kinney, Kenneth) (Entered: 04/20/2021) |
| 04/20/2021 | 74 | NOTICE by Plaintiff Janell Braxton of taking deposition of Chelsea Davidson on April 30, 2021, 2:00 PM (Kinney, Kenneth) (Entered: 04/20/2021) |
| 04/20/2021 | 75 | AMENDED NOTICE by Plaintiff Janell Braxton of taking deposition of Chelsea Davidson on April 30, 2021, 2:00 PM (Kinney, Kenneth) (Entered: 04/20/2021) |
| 04/22/2021 | 76 | NOTICE by Defendant Walmart Inc. of taking deposition of Ryan McClinton on April 26, 2021 (Hedican, Christopher) (Entered: 04/22/2021) |
| 04/27/2021 | 77 | (WITHDRAWN per 82 ) -- UNOPPOSED MOTION for extension of time to file a Motion to Compel Discovery by Plaintiff Janell Braxton. (Ralston, Thomas) Modified on 5/4/2021, see 82 . (mam) (Entered: 04/27/2021) |
| 04/28/2021 | 78 | NOTICE OF TELEPHONE CONFERENCE: (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) Telephone Conference before Magistrate Judge Gwynne E. Birzer is set for 4/28/2021 at 02:15 PM by telephone. Participants shall call 1-888-363-4749, use access code 9686294, and follow prompts to join conference. (kf) (Entered: 04/28/2021) |
| 04/28/2021 | 79 | MINUTE ENTRY for proceedings held before Magistrate Judge Gwynne E. Birzer: TELEPHONE CONFERENCE held on 4/28/2021. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (kf) (Entered: 04/28/2021) |
| 04/29/2021 | 80 | CERTIFICATE OF SERVICE of Response to Plaintiff's Requests for Admissions by |

Walmart Inc.. (Hedican, Christopher) (Entered: 04/29/2021)

| | | |
|---|---|---|
| 04/29/2021 | 81 | CERTIFICATE OF SERVICE of Plaintiff's Responses to 2nd Interrogatories and 1st Request for Admissions by Janell Braxton. (Kinney, Kenneth) (Entered: 04/29/2021) |
| 05/04/2021 | 82 | NOTICE of Withdrawal of Plaintiff's Motion for Extension of Time to File Motion to Compel by Janell Braxton (Ralston, Thomas) (Entered: 05/04/2021) |
| 05/04/2021 | 83 | ORDER. Following a telephone conference with counsel on 4/28/2021 and upon review of the Notice of Withdrawal of Plaintiff's Unopposed Motion for Extension of Time to File Motion to Compel (ECF No. 82), the Court extended the deadline for the parties to submit their Proposed Pretrial Order up to and including 5/28/2021 and has CANCELLED the Pretrial Conference previously scheduled for 5/19/2021 at 10:00 a.m. IT IS SO ORDERED. Signed by Magistrate Judge Gwynne E. Birzer on 5/4/2021. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (kf) (Entered: 05/04/2021) |
| 05/06/2021 | 84 | NOTICE AND ORDER TO SHOW CAUSE - plaintiff is required to show good cause in writing, on or before May 13, 2021, why the court should not dismiss this action for lack of subject matter jurisdiction. Signed by District Judge Daniel D. Crabtree on 5/6/2021. (ca) (Entered: 05/06/2021) |
| 05/13/2021 | 85 | RESPONSE re 84 Order to Show Cause, by Plaintiff Janell Braxton (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Proposed Amended Complaint Second Amended Complaint) (Kinney, Kenneth) (Entered: 05/13/2021) |
| 05/17/2021 | 86 | ORDER. On May 6, 2021, the court ordered plaintiff to show cause why the court should not dismiss this action for lack of subject matter jurisdiction because the Complaint fails to allege an amount in controversy sufficient to establish that diversity of citizenship exists here. Doc. 84. On May 13, 2021, plaintiff filed a Response to the court's show cause order. Doc. 85. The Response sufficiently establishes that the amount in controversy in this case exceeds $75,000. So, the court finds that plaintiff now has alleged facts sufficient to establish diversity jurisdiction under 28 U.S.C. § 1332. Plaintiff thus has shown good cause why the court should not dismiss this action for lack of subject matter jurisdiction. Signed by District Judge Daniel D. Crabtree on 05/17/2021. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.)(mig) (Entered: 05/17/2021) |
| 05/18/2021 | 87 | MEMORANDUM AND ORDER denying 47 Motion for Partial Summary Judgment; denying 64 Motion for Leave to File a Sur-reply. Signed by District Judge Daniel D. Crabtree on 5/18/2021. (ca) (Entered: 05/18/2021) |
| 05/28/2021 | 88 | MOTION to Amend Complaint re 20 Amended Complaint *paragraph 55 only* by Plaintiff Janell Braxton (referred to Magistrate Judge Gwynne E. Birzer) (Kinney, Kenneth) (Entered: 05/28/2021) |
| 05/28/2021 | 89 | CERTIFICATE OF SERVICE of Objections to Defendant's Second Requests for Admission by Janell Braxton. (Kinney, Kenneth) (Entered: 05/28/2021) |
| 06/01/2021 | 90 | NOTICE OF CONFERENCE: (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) A Conference before Magistrate Judge Gwynne E. Birzer is set for 6/1/2021 at 04:00 PM by Video Conference - Zoom. A Zoom invitation will be sent to counsel by email. (kf) (Entered: 06/01/2021) |
| 06/01/2021 | 91 | MINUTE ENTRY for proceedings held before Magistrate Judge Gwynne E. Birzer: TELEPHONE CONFERENCE held on 6/1/2021. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (kf) (Entered: 06/01/2021) |
| 06/03/2021 | 92 | ORDER finding as moot 88 Plaintiff's Motion for Leave to Amend First Amended Complaint. Signed by Magistrate Judge Gwynne E. Birzer on 6/3/2021. (kf) (Entered: 06/03/2021) |
| 06/03/2021 | 93 | PRETRIAL ORDER ENTERED Dispositive motion deadline 6/9/2021. Jury Trial set for 2/1/2022 at 09:00 AM in KC Courtroom 476 (DDC) before District Judge Daniel D. |

| | | |
|---|---|---|
| | | Crabtree. Estimated trial time 5 days. Signed by Magistrate Judge Gwynne E. Birzer on 6/3/2021. (kf) (Entered: 06/03/2021) |
| 06/09/2021 | 94 | MOTION for Summary Judgment by Defendant Walmart Inc. (Hedican, Christopher) (Entered: 06/09/2021) |
| 06/09/2021 | 95 | MEMORANDUM IN SUPPORT of 94 MOTION for Summary Judgment by Defendant Walmart Inc. (Attachments: # 1 Declaration of Christopher R. Hedican, # 2 Ex. A - Janell Braxton Deposition Excerpts, # 3 Ex. B - Quincy Usry (first) Deposition Excerpts, # 4 Ex. C - Ammie Wilbur Deposition Excerpts, # 5 Ex. D - David Whitenack Deposition Excerpts, # 6 Ex. E - Morgan Medaris Deposition Excerpts, # 7 Ex. F - Quincy Usry (second) Deposition Excerpts, # 8 Ex. G - Braxton Deposition Ex. 28, # 9 Ex. H - Braxton Deposition Ex. 24, # 10 Ex. I - Braxton Deposition Ex. 25, # 11 Ex. J - Whitenack Deposition Ex. 7, # 12 Ex. K - Declaration of Quincy Usry in Opp. to Plf. SJ Motion, # 13 Ex. L - Declaration of Morgan Medaris in Opp. to Plf. SJ Motion, # 14 Ex. M - Braxton Deposition Ex. 29, # 15 Ex. N - Usry Deposition Ex. 5, # 16 Ex. O - WM_Braxton_000181, # 17 Ex. P - Declaration of Chelsea Davidson, # 18 Ex. Q - WM_Braxton_000176, # 19 Ex. R - WM_Braxton_000102)(Hedican, Christopher) (Entered: 06/09/2021) |
| 06/25/2021 | 96 | Unopposed MOTION for Extension of Time to File Response as to 94 MOTION for Summary Judgment by Plaintiff Janell Braxton (Kinney, Kenneth) (Entered: 06/25/2021) |
| 06/29/2021 | 97 | ORDER granting 96 Motion for Extension of Time to File Response re 94 MOTION for Summary Judgment. Response deadline extended to 7/9/2021. Signed by District Judge Daniel D. Crabtree on 06/29/2021. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (mig) (Entered: 06/29/2021) |
| 07/09/2021 | 98 | RESPONSE by Plaintiff Janell Braxton re 94 Motion for Summary Judgment (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15, # 16 Exhibit 16, # 17 Exhibit 17, # 18 Exhibit 18, # 19 Exhibit 19, # 20 Exhibit List)(Kinney, Kenneth) (Entered: 07/09/2021) |
| 07/16/2021 | 99 | UNOPPOSED MOTION for Extension of Time to File a Reply as to 94 Motion for Summary Judgment by Defendant Walmart Inc. (Hedican, Christopher) Modified on 7/22/2021, now linked to 94 . (mam) (Entered: 07/16/2021) |
| 07/16/2021 | 100 | ORDER granting 99 Defendant's Unopposed Motion for Extension of Time to file its reply brief in support of its Motion for Summary Judgment. Reply deadline extended to 7/30/2021. Signed by District Judge Daniel D. Crabtree on 07/16/2021. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.) (mig) (Entered: 07/16/2021) |
| 07/30/2021 | 101 | REPLY TO RESPONSE TO MOTION by Defendant Walmart Inc. re: 94 Motion for Summary Judgment (Attachments: # 1 Exhibit A - Second Declaration of Chelsea Davidson) (Hedican, Christopher) (Entered: 07/30/2021) |
| 07/30/2021 | 102 | EXHIBIT(S) IN SUPPORT of 101 Reply to Response to Motion by Defendant Walmart Inc. *Ex. A2 - Def. Answers to Plf. Second Set of Interrogatories*. (Hedican, Christopher) (Entered: 07/30/2021) |
| 12/06/2021 | 103 | ORDER. On its own motion, the court VACATES the February 1, 2022 Jury Trial setting. Currently, the court has a jury trial set to begin on January 24, 2022 that is estimated to last five days. For that reason, the court vacates the February 1, 2022 trial date in this case and will set a new trial date at a later time. Signed by District Judge Daniel D. Crabtree on 12/06/2021. (This is a TEXT ENTRY ONLY. There is no.pdf document associated with this entry.)(mig) (Entered: 12/06/2021) |
| 12/08/2021 | 104 | MEMORANDUM AND ORDER granting 94 Motion for Summary Judgment. The court directs the Clerk to enter Judgment in defendant's favor against plaintiff's claim and close the case. Signed by District Judge Daniel D. Crabtree on 12/8/2021. (ca) (Entered: 12/08/2021) |

| 12/08/2021 | 105 | JUDGMENT. Signed by deputy clerk on 12/8/2021. (ca) (Entered: 12/08/2021) |
|---|---|---|
| 01/07/2022 | 106 | NOTICE OF APPEAL by Plaintiff Janell Braxton as to 104 Memorandum and Order and 105 Judgment. Filing fee $ 505, Internet Payment Receipt Number AKSDC-5679144. (Kinney, Kenneth) Modified on 1/7/2022 to add docket relationship (ca). (Entered: 01/07/2022) |
| 01/07/2022 | 107 | PRELIMINARY RECORD ON APPEAL transmitted to 10CCA re 106 Notice of Appeal. (Attachments: # 1 Preliminary Packet)(ca) (Entered: 01/07/2022) |
| 01/07/2022 | 108 | APPEAL DOCKETED in 10CCA on 1/7/2022 and assigned Appeal No. 22-3003 re 106 Notice of Appeal filed by Janell Braxton. (ca) (Entered: 01/07/2022) |
| 01/13/2022 | 109 | BILL OF COSTS by Walmart Inc.. (Attachments: # 1 Declaration of Christopher R. Hedican, # 2 Exhibit A - Invoices and Proofs of Payment)(Hedican, Christopher) (Entered: 01/13/2022) |
| 01/13/2022 | 110 | MEMORANDUM IN SUPPORT of 109 Bill of Costs by Walmart Inc.. (Hedican, Christopher) (Entered: 01/13/2022) |
| 01/21/2022 | 111 | TRANSCRIPT ORDER FORM: No Transcript Required filed by Janell Braxton re 106 Notice of Appeal - Final Judgment (Kinney, Kenneth) (Entered: 01/21/2022) |
| 01/21/2022 | 112 | LETTER TO 10CCA stating record is complete re 106 Notice of Appeal. (Appeal No. 22-3003) (ca) (Entered: 01/21/2022) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 02/23/2022 11:51:05 | | |
| **PACER Login:** | tomralston | **Client Code:** | Braxton |
| **Description:** | Docket Report | **Search Criteria:** | 2:20-cv-02287-DDC |
| **Billable Pages:** | 8 | **Cost:** | 0.80 |

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

JANELL BRAXTON )
                *Plaintiff* )
vs. )
              )    Case No. 2:20-cv-02287-DDC-GEB
WALMART INC. )
           *Defendant* )

## FIRST AMENDED COMPLAINT

COMES NOW Plaintiff Janell Braxton ("Plaintiff"), through her attorneys, to allege the following against Defendant Walmart Inc.

## JURY TRIAL DEMAND & DESIGNATION OF PLACE OF TRIAL

Plaintiff hereby demands a trial by jury of all triable issues alleged herein and designates the Robert J. Dole Federal Courthouse in Kansas City, Kansas as the place of trial.

## NATURE OF THE CLAIM

1.     This is a retaliatory discharge case arising from Plaintiff's employment with Defendant.

2.     In violation of Kansas law, Defendants terminated Plaintiff's employment because Plaintiff invoked her rights under the workers' compensation laws of Kansas.

3.     Plaintiff seeks all legal and equitable relief available under Kansas law.

## PARTIES

4.     **PLAINTIFF** is a female resident and citizen of Missouri.

5.     From approximately March 7, 2020, until her involuntary termination on April 14, 2020, Defendant employed Plaintiff as a packer at its shipping facility in Johnson County, Kansas located at 19351 Montrose Street, Edgerton, Kansas 66021.

6.     **DEFENDANT** is a citizen of Delaware and Arkansas.

7.    Defendant is incorporated in Delaware.

8.    Defendant is incorporated under Delaware law.

9.    Defendant maintains its principal place of business at 702 SW 8th Street, Bentonville, AR 72716.

10.    Defendant conducts substantial, ongoing business in Kansas.

11.    Defendant is an artificial entity incapable of acting alone and therefore acts through agents. It is liable for the conduct of its agents acting within the course and scope of their agency, its own negligence, the acts of its agents which it ratifies, injuries incurred by agents' performance of its non-delegable duties, and acts its agents take which are aided by their agency with Defendant.

12.    Defendant is liable the acts of its agents which is knowingly ratifies.

### SUBJECT MATTER JURISDICTION

13.    Pursuant to 28 USC § 1332, this Court has original jurisdiction over this case because it is a civil action between citizens of different States.

### PERSONAL JURISDICTION

14.    Plaintiff submits to the jurisdiction of this Court for this lawsuit.

15.    Defendant is subject to personal jurisdiction in this Court for the specific purposes of this lawsuit because the acts and omissions alleged herein took place in Kansas, and because there is a nexus between the injury alleged herein and Defendant's ongoing business in Kansas.

### VENUE

16.    Venue is proper in this District pursuant to 28 USC § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred within this District.

## FACTUAL ALLEGATIONS

17.     On March 7, 2020, Plaintiff began employment Defendant as an *ICQA Singles* employee assigned to package customer orders.

18.     On April 12, 2020, Plaintiff worked the night shift which ran from 6:30 p.m. to 5:00 a.m. the next day.

19.     In the early morning of April 13, 2020, Plaintiff felt a throbbing pain in her wrist while performing repetitive work duties.

20.     In the early morning of April 13, 2020, Plaintiff told her manager/lead that her wrist was hurting while working.

21.     Plaintiff's manager/lead did not tell her to report the pain as an injury.

22.     Plaintiff's manager/lead did not tell Plaintiff that she needed to report her wrist pain with the safety department or human resources department.

23.      Plaintiff's manager/lead did not tell Plaintiff to fill out an incident report.

24.     On the evening of April 13, 2020, Plaintiff returned to work.

25.     During the evening of April 13, 2020, Plaintiff told her manager/lead that her wrist was hurting while performing her duties.

26.     Plaintiff's manager/lead did not instruct Plaintiff to report her wrist pain with the safety department or human resources department and did not instruct Plaintiff to fill out an incident report.

27.     The following day, April 14, 2020, Plaintiff told her manager/lead that her wrist was hurting and that she needed to go the safety department to see about getting a wrist brace.

28.     Plaintiff's manager/lead told her to log off her station and go to the safety department.

29.     In the safety department, Plaintiff asked if she could have a wrist brace or ace bandage for her wrist because the repetitive nature of her duties was causing her wrist pain.

30.     Defendant gave Plaintiff ointment (icy-hot) and returned her to work.

31.     While in the safety department getting ointment, Defendant did not instruct Plaintiff to report her injury in any other way and did not instruct Plaintiff to fill out an incident report.

32.     After Plaintiff returned to her station, she told her manager/lead that the safety department gave her ointment.

33.     Plaintiff's manager/lead then asked Plaintiff if her wrist first started hurting while carrying out her work duties for Defendant.

34.     Plaintiff told her manager/lead that her wrist first started hurting while carrying out her work duties for Defendant.

35.     Plaintiff's manager/lead asked her if she thought her wrist was injured on job and, if so, how the injury occurred.

36.     Plaintiff told her manager/lead that she thought her wrist was injured on the job.

37.     Plaintiff told her manager/lead that there was not one, specific incident of trauma.

38.     Plaintiff told her manager/lead that she believed the injury to her wrist was caused by the repetitive nature of her work duties she did for Defendant.

39.     Plaintiff's manager/lead did not instruct Plaintiff to report her injury/pain in any other way than the way she reported it and did not instruct Plaintiff to fill out an incident report.

40.     Then another manager told Plaintiff that her manager/lead informed him of Plaintiff's wrist injury.

41.     This manager instructed Plaintiff to log off her station and go with him to the safety department.

42.     At Defendant's safety department, Plaintiff was instructed to complete workplace injury paperwork/an incident report.

43.     Plaintiff completed the workplace injury paperwork and indicated that she wanted a doctor to look at her wrist.

44.     Plaintiff was then instructed to go to the human resources department.

45.     When Plaintiff got to the human resources office, Defendant terminated her employment.

46.     Defendant terminated Plaintiff's employment on April 14, 2020.

47.     Defendant told Plaintiff it was terminating her employment for not reporting her injury during the shift it started hurting.

48.     Defendant's reason for firing Plaintiff was false.

49.     Plaintiff reported her wrist injury the shift she became of aware it.

50.     At all times mentioned herein, before and after, the above described perpetrators were agents, servants and employees of Defendant and were at all such times acting within the scope and course of their agency and employment, or their actions were expressly authorized or ratified by Defendant. Therefore, Defendant is liable for the actions of said persons and/or other perpetrators under all theories pled herein.

## COUNT I
## RETALIATORY DISCHARGE
### Kansas Law

51.     Plaintiff incorporates by reference every other allegation made in this Complaint.

52.     The public policy of the state of Kansas is that all employees have the right to utilize the workers' compensation laws of Kansas, KSA §44-501 *et seq.* without suffering adverse employment consequences in retaliation for doing so.

5

**App-I**

53.   Plaintiff availed herself of the workers' compensation laws of Kansas by reporting a workplace injury and requesting medical treatment for the injury.

54.   Defendant fired Plaintiff.

55.   Defendant fired Plaintiff because she availed herself of her rights under the workers' compensation laws of Kansas as alleged above.

56.   Defendant termination of Plaintiff's employment directly and proximately caused Plaintiff to suffer damages, including lost wages, lost benefits, emotional distress, humiliation, embarrassment, and frustration.

57.   Defendant decision to fire Plaintiff was done with malice or reckless indifference to Plaintiff's protected rights. Defendant is therefore liable for punitive damages in an amount sufficient to punish Defendant and to deter it and other employers from engaging in similar conduct

WHEREFORE, Plaintiff prays for judgment against Defendant, for a finding that she was unlawfully discharged in retaliation for invoking her rights under the workers' compensation laws of Kansas and for all relief available under Kansas law including compensatory and punitive damages, costs, interest, and all other relief the Court deems fair, reasonable, and equitable.

*Respectfully Submitted by*,

**RALSTON KINNEY, LLC**


 /s/ *Thomas F. Ralston*
Thomas F. Ralston, D.Kan. #78212
Kenneth D. Kinney, D.Kan. #78544
4717 Grand Avenue, Suite 300
Kansas City, Missouri 64112
Telephone: (816) 298.0086
Facsimile: (816) 298.9455
Email: tom@rklawllc.com
Email: ken@rklawllc.com

**ATTORNEYS FOR PLAINTIFF**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

---

JANELL BRAXTON,

          Plaintiff,

v.

WALMART INC.,

          Defendant.

---

Case No. 2:20-cv-02287

**ANSWER AND AFFIRMATIVE**
**DEFENSES**

Defendant, Walmart Inc. ("Defendant") answers the First Amended Complaint filed by Janell Braxton ("Plaintiff") paragraph by paragraph as follows:

**NATURE OF THE CLAIM**

1.      Paragraph No. 1 calls for a legal conclusion to which no response is required, and Defendant therefore denies the allegations contained therein.

2.      Defendant denies the allegations set forth in Paragraph No. 2.

3.      Paragraph No. 3 calls for a legal conclusion to which no response is required, and Defendant therefore denies the allegations contained therein.

**PARTIES**

4.      Defendant is without sufficient information to admit or deny the allegations in Paragraph No. 4 and therefore denies them.

5.      Defendant admits that Defendant previously employed Plaintiff in its Edgerton facility, but Defendant denies the remaining allegations contained in Paragraph No. 5.

6.      Defendant admits the allegations contained in Paragraph No. 6.

7.      Defendant admits the allegations contained in Paragraph No. 7.

8.      Defendant admits the allegations contained in Paragraph No. 8.

9.      Defendant denies the allegations set forth in Paragraph No. 9.

10.     Defendant admits the allegations contained in Paragraph No. 10, in that it conducts business in the state of Kansas.

11.     Defendant admits that it acts through agents and associates[1] but denies Plaintiff's claims of such officers' and associates' alleged misconduct.

12.     Defendant admits that it acts through agents and associates but denies Plaintiff's claims of such agents' and associates' alleged misconduct.

**SUBJECT MATTER JURISDICTION**

13.     The allegations in Paragraph No. 13 state a legal conclusion to which no response is required.  To the extent a response is required, Defendant does not dispute jurisdiction of this Court.

**PERSONAL JURISDICTION**

14.     The allegations in Paragraph No. 14 state a legal conclusion to which no response is required.  To the extent a response is required, Defendant does not dispute jurisdiction of this Court.

15.     Defendant admits that it conducts ongoing business in the state of Kansas and does not dispute jurisdiction of this Court, but Defendant denies the remaining allegations contained in Paragraph No. 15.

---

[1] An "associate," for purposes of this pleading, is a Walmart employee.

**App-I**
**20**

**VENUE**

16.     The allegations in Paragraph No. 16 state a legal conclusion to which no response is required.  To the extent a response is required, Defendant does not dispute that the venue in this District is proper.

**FACTUAL ALLEGATIONS**

17.     Defendant denies the allegations set forth in Paragraph No. 17.

18.     Defendant admits the allegations contained in Paragraph No. 18.

19.     Defendant is without sufficient information to admit or deny the allegations in Paragraph No. 19 and therefore denies them.

20.     Defendant denies the allegations set forth in Paragraph No. 20.

21.     Because Defendant denies the allegations set forth in Paragraph No. 20, Defendant also denies the allegations set forth in Paragraph No. 21.

22.     Because Defendant denies the allegations set forth in Paragraph No. 20, Defendant also denies the allegations set forth in Paragraph No. 22.

23.     Because Defendant denies the allegations set forth in Paragraph No. 20, Defendant also denies the allegations set forth in Paragraph No. 23.

24.     Defendant admits the allegations contained in Paragraph No. 24.

25.     Defendant denies the allegations set forth in Paragraph No. 25.

26.     Because Defendant denies the allegations set forth in Paragraph No. 25, Defendant also denies the allegations set forth in Paragraph No. 26.

27.     Defendant admits that, on April 14, 2020, Plaintiff informed Defendant that her wrist was bothering her and that Plaintiff then went to the safety department.

28.     Defendant admits the allegations contained in Paragraph No. 28.

29.     Defendant denies the allegations set forth in Paragraph No. 29.

30.     Defendant admits that Plaintiff received muscle-rub ointment from the safety department and returned to work.

31.     Because Defendant denies the allegations set forth in Paragraph No. 29, Defendant also denies the allegations set forth in Paragraph No. 31.

32.     Defendant admits the allegations contained in Paragraph No. 32.

33.     Defendant admits the allegations contained in Paragraph No. 33.

34.     Defendant admits that Plaintiff stated that her wrist first started hurting at work during Plaintiff's April 12-13, 2020 shift.

35.     Defendant admits the allegations contained in Paragraph No. 35.

36.     Defendant admits the allegations contained in Paragraph No. 36.

37.     Defendant admits the allegations contained in Paragraph No. 37.

38.     Defendant admits that Plaintiff stated that she believed her wrist injury occurred at work during the early morning hours of April 13, 2020, but Defendant is without sufficient information to admit or deny the remaining allegations in Paragraph No. 38 and therefore denies them.

39.     Defendant admits the allegations contained in Paragraph No. 39.

40.     Defendant is without sufficient information to admit or deny the allegations in Paragraph No. 40 and therefore denies them.

41.     Defendant admits the allegations contained in Paragraph No. 41.

42.     Defendant admits that Plaintiff was asked at the safety department to complete a statement form, but Defendant denies the remaining allegations of Paragraph No. 42.

43.     Defendant admits that Plaintiff completed a statement form, but Defendant denies the remaining allegations of Paragraph No. 43.

44.     Defendant admits the allegations contained in Paragraph No. 44.

45.     Defendant admits the allegations contained in Paragraph No. 45.

46.     Defendant admits the allegations contained in Paragraph No. 46.

47.     Defendant admits that it informed Plaintiff that her employment was being terminated for violating company policy, which written policy required her to report her injury during the shift that such injury began hurting.

48.     Defendant denies the allegations set forth in Paragraph No. 48.

49.     Defendant denies the allegations set forth in Paragraph No. 49.

50.     Defendant admits that it acts through agents and associates, but Defendant denies Plaintiff's claims of such agents' and associates' alleged misconduct.

**COUNT I**
**RETALIATORY DISCHARGE**
**Kansas Law**

51.     Defendant hereby restates and incorporates its responses to Paragraphs 1-50 above as fully set forth herein.

52.     Paragraph No. 52 calls for a legal conclusion to which no response is required, and Defendant therefore denies the allegations contained therein.

53.     Defendant admits that, on April 14, 2020, Plaintiff reported an injury, but Defendant denies the remaining allegations of Paragraph No. 53.

54.     Defendant admits that it terminated Plaintiff's employment.

55.     Defendant denies the allegations set forth in Paragraph No. 55.

56.     Defendant denies the allegations set forth in Paragraph No. 56.

57.     Defendant denies the allegations set forth in Paragraph No. 57.

WHEREFORE, Defendant requests that Court dismiss Plaintiff's First Amended Complaint with prejudice at Plaintiff's costs and award Defendant the reasonable attorney fees incurred in defending this matter.

### AFFIRMATIVE DEFENSES

1.     Plaintiff's First Amended Complaint fails to state a claim upon which relief may be granted.

2.     Plaintiff has suffered no damages and/or has failed to mitigate her alleged damages.

3.     Defendant at all times acted in good faith to comply with all applicable laws and acted with reasonable grounds to believe that its actions did not violate the statutes, laws, or public policies cited in the First Amended Complaint, and Defendant asserts a lack of willfulness or intent to violate those statutes, laws, or public policies as a defense to any claim by Plaintiff for punitive damages.

4.     Plaintiff's claims are barred by the doctrine of after-acquired evidence.

5.     Plaintiff's claims are barred by the doctrines of waiver, consent, estoppel, and/or unclean hands.

6.     If Plaintiff establishes by a preponderance of the evidence that Defendant's actions towards Plaintiff were based on a retaliatory or unlawful motive, Defendant would have taken the same action despite any such unlawful motive.

7.     To the extent that the Court determines that any of Defendant's agents acted maliciously or with reckless indifference to Plaintiff's rights, such acts were contrary

App-I

to the employer's good faith efforts to comply with the law, and Defendant therefore cannot be held vicariously liable for any award of punitive damages.

8.      Plaintiff's claims are barred because any harm or damages she allegedly sustained were caused by her own actions and decisions.

Dated this 13th day of October 2020.

WALMART INC., Defendant,

By:   /s/ Mark J. Goldsmith
       Mark J. Goldsmith (KS# 28446)
of     BAIRD HOLM LLP
       1700 Farnam Street Ste. 1500
       Omaha, NE  68102-2068
       Phone: 402-344-0500
       Fax: 402-344-0588
       Email: mgoldsmith@bairdholm.com

## CERTIFICATE OF SERVICE

I hereby certify that on this 13th day of October 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which sent notification of such filing to the following:

Thomas F. Ralston (KS# 78212)        tom@rklawllc.com
Kenneth D. Kinney (KS# 78544)        ken@rklawllc.com

/s/ Mark J. Goldsmith

DOCS/2539836.1

7

**App-I**
**25**

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

JANELL BRAXTON            )
              *Plaintiff*     )
vs.                  )     Case No. 2:20-cv-02287-DDC-GEB
                  )
WALMART INC.            )
         *Defendant*   )

## PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

PLAINTIFF HEREBY MOVES the Court for a summary judgment establishing liability in Plaintiff's favor pursuant to Fed.R.Civ.P. 56 and Local Rule 56.1.

1. **Summary of the Motion:** This is an employment case. Plaintiff alleges she was wrongfully terminated because she was fired in retaliation for reporting a workplace injury. The Complaint (Doc.1) alleges one count for retaliatory discharge under the common law of Kansas. Plaintiff moves for summary judgment on liability, leaving only the issues of damages and liability for punitive damages for the jury. Undisputed material facts prove each essential element of Plaintiff's claim and therefore show she is entitled to judgment as a matter of law.

2. **Plaintiff's Motion is Proper:** A party to a civil action may file a motion for summary judgment for an entire claim or defense or a specific part of a claim or defense. Fed.R.Civ.P. 56(a).

3. **Plaintiff's Motion is Timely:** The dispositive motion deadline is June 4, 2021. *Scheduling Order* (Doc.15), 10, ¶3(c).

4. **The Basis for the Motion:** Plaintiff seeks summary judgment on liability because the Rule 30(b)(6) witness who testified on behalf of Defendant provided testimony showing there is no dispute to the material facts establishing any essential element of Plaintiff's claim.

5. The elements of Plaintiff's claim for retaliatory discharge are

    i.     Plaintiff suffered a workplace injury;

    ii.    Defendant had knowledge of Plaintiff's workplace injury;

    iii.   Defendant terminated Plaintiff's employment; and

    iv.   There is a causal connection between the protected activity (reporting a workplace injury) and the termination.

*See Rebarcheck v. Farmers Co-op. Elevator*, 35 P.3d 892, 553-54 (Kan.2001).

6.     On January 6, 2021, Plaintiff took the deposition of Safety Manager Quincy Usry, who testified on behalf of Defendant pursuant to Rule 30(b)(6) regarding "Plaintiff's report(s) of a workplace injury, all actions taken by Walmart in response, the Walmart employees involved, and related documents including … [identifying specific documents]." *See Second Amended Notice of Videotaped Deposition of Walmart, Inc.* (Doc.37), Topic 5; *Deposition of Quincy Usry*, 16:4-12, *attached to* <u>Suggestions in Support</u> *as* **Exhibit 2.**

7.     As Defendant's designated spokesperson, Usry admitted that Plaintiff reported a workplace injury to Defendant during her employment, and there was a causal connection between Plaintiff reporting a workplace injury and her being fired. Specifically, Defendant's testimony (through its chosen spokesperson on the topic of all actions taken in response to Plaintiff reporting a workplace injury), over objection, was:

Q.    There is a causal connection between Mrs. Braxton's report of a workplace injury and her termination?

Mr. Goldsmith: Vague and ambiguous.

A.    Generally speaking, yes.

*Deposition of Quincy Usry*, 38:15-19, *attached to* <u>Suggestions in Support</u> *as* **Exhibit 2**.

8.      Without objection, Walmart provided the following testimony:

Q.      So but for Ms. Braxton's report of a workplace injury to Walmart, Walmart would not have terminated her as it did, correct?

A.      Correct.

*Deposition of Quincy Usry*, 55:24 – 56:2, *attached to Suggestions in Support as* **Exhibit 2**.

9.      Plaintiff contemporaneously files *Suggestions in Support* with a statement of material facts, evidence, and exhibits, which are hereby incorporated by reference. Each essential element of Plaintiff's claim is established by undisputed material facts, showing that Plaintiff is entitled to judgment as a matter of law; accordingly, this motion should be GRANTED.

WHEREFORE, Plaintiff respectfully requests the Court enter an Order granting this motion, finding Defendant liable for retaliatory discharge under Kansas law, and for such other relief the Court finds fair and reasonable.

*Respectfully submitted by:*

**RALSTON KINNEY, LLC**

/s/ *Kenneth D. Kinney*
Kenneth D. Kinney, D.Kan. #78544
4717 Grand Avenue, Suite 300
Kansas City, Missouri 64112
Tel: (816) 298-0086
Fax: (816) 298-9455
Email: ken@rklawllc.com
**ATTORNEYS FOR PLAINTIFF**

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on February 3, 2021, a PDF copy of the foregoing was filed through the Court's ECF system, which will serve Defendant by emailing notice and a copy to Defendant's attorney of record, to wit: Mark J. Goldsmith mgoldsmith@bairdholm.com

/s/ *Kenneth D. Kinney*
**ATTORNEY FOR PLAINTIFF**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

JANELL BRAXTON )
          *Plaintiff* )
   vs. )      Case No. 2:20-cv-02287-DDC-GEB
      )
WALMART INC. )
       *Defendant* )

### SUGGESTIONS IN SUPPORT OF
### <u>PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT</u>

PLAINTIFF HEREBY PROVIDES the following facts, evidence, authorities and argument to show why <u>Plaintiff's Motion for Partial Summary Judgment</u> should be GRANTED.

### <u>INTRODUCTION</u>

Plaintiff's one-count <u>Complaint</u> alleges that under Kansas law, Walmart committed the tort of retaliatory discharge by terminating Plaintiff's employment in retaliation for Plaintiff reporting a workplace injury to Walmart. Undisputed material facts establish every essential element of Plaintiff's claim. Therefore, Plaintiff is entitled to judgment as a matter of law. Only the issues of damages and liability for punitive damages should be left for a jury to decide.

### <u>SUMMARY JUDGMENT STANDARD</u>

Summary judgment may be entered on any "claim or defense" or even a "part of each claim or defense." *See* Fed.R.Civ.P. 56(a). Rule 56 *requires* the Court to "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.* A material fact is one which has a direct bearing on the legal issue. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Whether a fact is material depends on the substantive law governing the case. *See id*. Although the evidence must be viewed against the moving party, summary judgment may be granted where the facts establishing the right to judgment are undisputed. *See id.* Such is the case here.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

Pursuant to Local Rule 56.01(a), Plaintiff provides the following:

1.      Plaintiff was employed by Defendant Walmart, Inc. from March 23, 2020 to April 14, 2020. *Exhibit 1*, *Defendant's Answers to Plaintiff's First Set of Interrogatories*, 2-3, ¶5.

2.      On January 6, 2021, Quincy Usry testified on behalf of Defendant Walmart, Inc. for certain topics set forth in the applicable deposition notice. *Exhibit 2, Deposition of Quincy Usry*, 6:20-24; *Exhibit 3, Second Amended Notice of Videotaped Deposition of Walmart, Inc.* (Depo.Ex.1).

3.      Walmart, Inc. designated Usry to testify on its behalf regarding Topic 5 set forth in the deposition notice. *Ex.2*, 16:4-12. Topic 5 was:

> "Plaintiff's report(s) of a workplace injury, all actions taken by Walmart in response, the Walmart employees involved, and related documents including without limitation emails, text messages (WM_Braxton_000103-104), and the "Statement Form" produced as WM_Braxton_000105."

*Ex.3* at 2, ¶5.

4.      Plaintiff was an employee of Walmart. *Ex.2*, 20:20-22.

5.      While employed, Plaintiff reported a work injury to Walmart. *Ex.2*, 20:23-25.

6.      On April 14, 2020, Plaintiff provided a written statement regarding her work injury to Walmart, at Walmart's request. *Ex.2*, 21:1-7.

7.      Walmart knew that Plaintiff had reported a workplace injury. *Ex.2*, 21:8-15.

8.      Immediately after Plaintiff filled out a Statement Form about her workplace injury, she was terminated from her employment with Walmart. *Ex.2*, 27:25 – 28:5.

9.      Walmart fired Plaintiff the same day she filled out a written document regarding the nature of her workplace injury. *Ex.2*, 34:14-18.

10.     Walmart admits there is a causal connection between Plaintiff's report of a workplace injury and her termination. *Ex.2*, 38:15-19.

11.     Walmart admits that but for Plaintiff's report of a workplace injury to Walmart, Walmart would not have terminated her employment. *Ex.2*, 55:24 - 56:2.

## AUTHORITIES AND ARGUMENT

The material facts show there is no dispute that Walmart fired Plaintiff for reporting a workplace injury to Walmart. Accordingly, the material facts establish Walmart's liability as a matter of law on the tort of retaliatory discharge.

Since 1981, Kansas has recognized the tort of retaliatory discharge where an employer fires an employee for exercising their rights under the Kansas Workmen's Compensation Act. *See Murphy v. City of Topeka-Shawnee Cnty. Dept. of Labor Servs.*, 630 P.2d 186, 192-93 (Kan.App.1981). Even though employment in Kansas is at-will, an employer cannot fire an employee for claiming a workers' compensation injury. *See Jones v United Parcel Service, Inc.*, 674 F.3d 1187, 1196 (10th Cir. 2012). An employee who suffers a retaliatory discharge may proceed with an action in tort for actual and punitive damages. *Ortega v. IBP, Inc.*, 874 P.2d 1188, 1191 (Kan.1994).

To prove her claim of retaliatory discharge, Plaintiff must prove:

1.   She reported a workplace injury to Walmart;

2.   Walmart had knowledge of Plaintiff's workers' compensation injury;

3.   Walmart terminated Plaintiff's employment; and

4.   A causal connection existed between the injury and the termination.

*Sanjuan v. IBP, Inc.*, 160 F.3d 1291, 1298 (10th Cir. 1998). The material facts establishing each of these elements is undisputed.

Each essential element of Plaintiff's claim of retaliatory discharge is undisputed. It is undisputed that during Plaintiff's employment, she reported a workplace injury to Walmart. SOF ¶¶4-6. Walmart admits that it knew of Plaintiff's report. SOF ¶7. It is undisputed that Walmart fired Plaintiff immediately after she submitted a "Statement Form" for her injury. SOF ¶¶8-9. These facts establish the first three elements of Plaintiff's claim, and Plaintiff does not anticipate any resistance from Walmart regarding these elements. While it is likely that Walmart will dispute the fourth element (causal connection), its arguments will be unavailing considering the admissions made by its Rule 30(b)(6) deposition witness.

Pursuant to Rule 30(b)(6), Quincy Usry testified on behalf of Walmart, Inc. on Plaintiff's reports of a workplace injury and all actions taken in response. SOF ¶¶2-3. His testimony establishes that one of the actions Walmart took in response to Plaintiff reporting a workplace injury was terminating her employment. SOF ¶¶10-11. Walmart might try to point to some other reason for firing Plaintiff, but Plaintiff does "not need to show that retaliation was the employer's sole motive or reason for the termination." *Sanjuan*, 160 F.3d at 1298. Here, Walmart admits that if Plaintiff would not have reported her workplace injury, she would not have been fired. That is sufficient to establish Walmart's liability.

"Employees [alleging a retaliatory discharge for worker's compensation] can recover by proving that the discharge was 'based on,' 'because of,' 'motivated by,' or 'due to' the employer's intent to retaliate." *Sanjuan*, 160 F.3d at 1298. Notably, Usry, on behalf of Walmart, admitted there was a causal connection between Plaintiff's report and her termination, SOF ¶10, and further, that Plaintiff would not have been fired "but for" her report. SOF ¶11. Without objection, Walmart's official 30(b)(6) spokesperson regarding all actions Walmart took "in response" to Plaintiff reporting a workplace injury provided the following testimony:

Q.      So but for Ms. Braxton's report of a workplace injury to Walmart,

Walmart would not have terminated her as it did, correct?

A.      Correct.

*Ex.2*, *Deposition of Quincy Usry*, 55:24 – 56:2. This testimony from Walmart shows there is no

dispute that the termination of Plaintiff's employment was 'based on,' 'because of,' 'motivated

by,' and 'due to' Plaintiff's act of reporting a workplace injury. Therefore, Walmart committed

the tort of retaliatory discharge when it fired Plaintiff in response to reporting a workplace injury.

WHEREFORE, Plaintiff respectfully requests the Court enter an Order granting

*Plaintiff's Motion for Partial Summary Judgment*, finding Defendant liable for retaliatory

discharge under Kansas law, and for such other relief the Court finds fair and reasonable

*Respectfully submitted by:*

**RALSTON KINNEY, LLC**

/s/ *Kenneth D. Kinney*
Kenneth D. Kinney, D.Kan. #78544
Thomas F. Ralston, D.Kan. #78212
4717 Grand Avenue, Suite 300
Kansas City, Missouri 64112
Tel: (816) 298-0086
Fax: (816) 298-9455
Email: ken@rklawllc.com
Email: tom@rklawllc.com
**ATTORNEYS FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

I hereby certify that on February 3, 2021, a PDF copy of the foregoing was filed through
the Court's ECF system, which will serve Defendant by emailing notice and a copy to
Defendant's attorney of record, to wit: Mark J. Goldsmith mgoldsmith@bairdholm.com

/s/ *Kenneth D. Kinney*
**ATTORNEY FOR PLAINTIFF**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

JANELL BRAXTON          )
        *Plaintiff*    )
      vs.        )     Case No. 2:20-cv-02287-DDC-GEB
             )
WALMART INC.       )
    *Defendant*   )

**SUGGESTIONS IN SUPPORT OF**
**<u>PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT</u>**

# EXHIBIT 1

*Defendant's Answers to Plaintiff's First Set of Interrogatories*

(served September 22, 2020)

**EXHIBIT 1**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

_____

JANELL BRAXTON,

              Plaintiff,                      Case No. 2:20-cv-02287

v.

JET.COM, INC.,

              Defendant.         ==DEFENDANT'S ANSWERS TO==
                                        ==PLAINTIFF'S FIRST SET OF==
                                          ==INTERROGATORIES==

_____

TO:    Plaintiff Janell Braxton, in the care her attorney, Thomas Ralston, Esq.

**<u>INTERROGATORIES</u>**

      1.    Identify each person making answers herein and identify which interrogatories each person answered.

      **ANSWER**:  Morgan Medaris, Human Resources Business Partner, may be contacted only through Defense counsel.

      2.    Identify each person Defendant expects to call as an expert witness in the manner set forth in Rule 26(a)(2)(A)-(C).

      **ANSWER**:  Defendant has not yet identified its experts but will disclose in accordance with the Court's scheduling order.

      3.    Identify the number of individuals Defendant employed on the following dates:

- Jan. 1, 2019:    _____
- July 1, 2019:    _____
- Jan. 1, 2020:    _____

**EXHIBIT 1**

- March 7, 2020: _____

- April 14, 2020: _____

- July 1, 2020: _____

- Date of this Answer:_____

**ANSWER**:  Defendant objects to this interrogatory as overly broad, unduly burdensome, irrelevant, and not proportional to the needs of this case.  In particular, this interrogatory seeks information related to all Walmart associates; without geographic limitation; without any limitation for a relationship to Plaintiff or Plaintiff's position; and for a period of five years, although Plaintiff worked for Defendant for approximately three weeks.  Defendant currently employs more than one million associates in the United States. Of those associates, the majority of them would not have been in contact with Plaintiff; the majority of them would have no relationship to the Edgerton, Kansas facility; and almost all such associates held positions unrelated to Plaintiff's job.

4.      For each employee that was involved in the decision to hire Plaintiff, please state their name, employer, telephone number, address, job title, dates of employment, and describe their involvement in detail, and state with specificity why Plaintiff was hired and the date on which the decision was made to offer her employment.

**ANSWER**:  Defendant objects to this interrogatory on the grounds that it lacks foundation and assumes the false premise that any associate of Defendant was involved in the decision to hire Plaintiff.

5.      State the dates of Plaintiff's employment, each job title she held with or performed for Defendant, and the dates she held or performed each job title.

2

**EXHIBIT 1**

**ANSWER**: Plaintiff was employed as a QC singles seasonal associate from March 23, 2020 to April 14, 2020.

6.      State Plaintiff's rates of pay, the dates she held each rate of pay, and all benefits she was eligible for or receiving at the time she was fired.

**ANSWER**:  Pursuant to Federal Rules of Civil Procedure, Rule 33(d), Defendant directs Plaintiff to Plaintiff's earnings history, which will be produced by Defendant.

7.      Identify each person who had managerial or supervisory responsibility over Plaintiff during her employment with Defendant by providing each person's full name, address, telephone number, job title, employer, and dates of employment.

**ANSWER**: Defendant objects to this interrogatory on the grounds that "managerial or supervisory responsibility over Plaintiff" is vague and ambiguous.  Subject to and without waiving the foregoing objection, Defendant responds as follows:  Plaintiff reported directly to Operations Lead Ammie Wilbur, who may be contacted only through defense counsel.

8.      Identify each instance that Plaintiff reported she was injured or experiencing physical pain by providing the date; the shift; the name and job title of the person(s) who received the report; the specific nature of the pain or injury reported; and identify each document created as a result of the report, that reference the report, or that are related to the report.

**ANSWER**:  Defendant objects to this interrogatory on the grounds that "reported," "injured," and "experiencing physical pain" are vague and ambiguous.  Subject to and without waiving the foregoing objection, Defendant responds as follows:  Pursuant to

EXHIBIT 1

discharge cause of action in Plaintiff's complaint, and for a period of five years, although Plaintiff worked for Defendant for approximately three weeks.  Defendant further objects to this interrogatory as overly broad, unduly burdensome, irrelevant, and not proportional to the needs of this case because it seeks complaints, charges, claims, or civil actions against persons other than Defendant, and since 2015, Defendant has employed more than one million associates in the United States. Of those associates, the majority of them would not have been in contact with Plaintiff; the majority of them would have no relationship to the Edgerton, Kansas facility; and almost all such associates held positions unrelated to Plaintiff's job.

Dated this 17th day of September 2020.

JET.COM, INC. Defendant,

By:  /s/ Mark Goldsmith
      Mark Goldsmith (KS #28446)
of   BAIRD HOLM LLP
    1700 Farnam St, Ste 1500
    Omaha, NE  68102-2068
    Phone: 402-344-0500
    Facsimile:  402-344-0588
    mgoldsmith@bairdholm.com

10

**EXHIBIT 1**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the above and foregoing document was sent via email this 17th day of September, 2020 to the following:

Thomas Ralston – tom@rklawllc.com

/s/Mark J. Goldsmith _____

DOCS/2525517.1

**EXHIBIT 1**

## VERIFICATION

STATE OF KANSAS      )
                        ) SS
COUNTY OF JOHNSON   )

      Morgan Medaris, being first duly sworn according to law, and upon oath, declares:

      1.     That Affiant is Morgan Medaris, Human Resources Business Partner for Walmart, upon which the Plaintiff's First Set of Interrogatories were served and upon whose behalf Affiant makes this declaration.

      2.     That Affiant is authorized on behalf of Defendant to make this declaration and that Affiant has read the foregoing Discovery propounded to Defendant in the action originally entitled *Janell Braxton v. Jet.com, Inc.*

      3.     That the Discovery seeks information from Defendant and that no one individual associate of this entity has personal knowledge of the information so as to permit that one individual to respond fully and completely to all subjects addressed within this Discovery.

      4.     That while Affiant does not have personal knowledge of the facts cited therein, the information was collected and the responses were made only after a reasonable search for information relating to the subject Discovery.

      5.     Therefore, on information and belief, Affiant believes the attached Responses to the subject Interrogatories to be complete and accurate to the best of Affiant's knowledge, based upon the information available at this time.

      FURTHER AFFIANT SAYETH NAUGHT.

      IN WITNESS HEREOF, Defendants have caused the attached Responses to be executed on its behalf this 22 day of September 2020 by:

_____
on behalf of Defendant

Subscribed to and sworn before me this 22 day of September 2020.

_____
Notary Public

MEGAN SHIELDS
Notary Public, State of Kansas
My Appointment Expires
02/14/2022

DOCS/2532585.1

**EXHIBIT 1**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

JANELL BRAXTON )
*Plaintiff* )
vs. )   Case No. 2:20-cv-02287-DDC-GEB
)
WALMART INC. )
*Defendant* )

**SUGGESTIONS IN SUPPORT OF**
**PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

# EXHIBIT 2

*Deposition of Walmart, Inc.*
*by Quincy Usry pursuant to Rule 30(b)(6)*

(January 6, 2021)

**EXHIBIT 2**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS


JANELL BRAXTON,                    )
                                  )
        Plaintiff,                )
                                  )
vs.                               )     No. 2:20-cv-02287-DDC-GEB
                                  )
WALMART INC.,                     )
                                  )
        Defendant.                )




VIDEOTAPED DEPOSITION OF

QUINCY USRY,

(30(b)(6) Deposition)


a witness, being produced, sworn and examined on

Wednesday, January 6, 2021, pursuant to Second Amended

Notice of Videotaped Deposition of Walmart, Inc. Safety

Manager Quincy Usry, at the offices of Ralston Kinney,

LLC, Suite 300, 4717 Grand Avenue in Kansas City,

Missouri, before

           SHARON L. CRAWFORD, CCR, RPR,

a Certified Court Reporter in Missouri and Kansas.

Taken on behalf of the Plaintiff.

**EXHIBIT 2**

Quincy Usry                    Braxton vs. Walmart                  1/6/2021

6

1      Q.   The most important thing I think is that if you

2   do not understand one of my questions let me know and

3   I'll rephrase it.  Okay?

4      A.   Okay.

5      Q.   We can't talk at the same time.  So there may be

6   times where I ask you to wait until I finish my question.

7   I am not trying to be rude.  It's just because everything

8   that we are saying is being taken down by the court

9   reporter.  Do you understand that?

10     A.   Yes, sir.

11     Q.   She can't take two people down talking at the

12  same time.  Does that make sense?

13     A.   Yes, sir.

14     Q.   Along the same lines, if you say uh-huh or

15  huh-uh, or if you just shake your head or nod your head,

16  I'm going to ask you to clarify with a verbal response,

17  because uh-huh and huh-uh look very similar in a

18  transcript.  Okay?

19     A.   Okay.

20     Q.   Would you please give us your full name,

21  including your middle name, spelling each individual name

22  as you go?

23     A.   Quincy, Q-u-i-n-c-y, Alexander,

24  A-l-e-x-a-n-d-e-r, Usry, U-s-r-y.

25     Q.   Are you employed?

CRAWFORD REPORTING -- CrawfordReporting@gmail.com

EXHIBIT 2

Quincy Usry                    Braxton vs. Walmart                    1/6/2021

11

1      Q.   Yeah.   Were you aware that Kansas, in April of

2   2020, had a law regarding an employer's duty to report

3   work injuries?

4      A.   Yes.

5      Q.   Were you aware in April of 2020 that under the

6   duty to report law for employers, when an employer

7   receives a work injury report from one of its employees,

8   it has 28 days to report that to the state?   Are you

9   aware of that?

10      A.   Yes.

11      Q.   Okay.   Now, other than the duty to report law in

12   Kansas, are you aware of any other laws having to do with

13   workers' compensation claims under Kansas law?

14      A.   Not that I could quote.

15      Q.   Okay.   So, Mr. Usry -- is that how you pronounce

16   it?

17      A.   Yes, sir.

18      Q.   You have been designated as the official

19   spokesperson to give testimony on behalf of Walmart; is

20   that correct?

21      A.   Yes, sir.

22      Q.   You have been designated as Walmart's official

23   spokesperson to give testimony on certain topics; is that

24   correct?

25      A.   Yes, sir.

Quincy Usry                    Braxton vs. Walmart                    1/6/2021

                                                                        12

1        Q.    I will show you what I will mark as Exhibit 1.

2                   (Exhibit 1 is marked for identification.)

3        Q.    (BY MR. RALSTON)   Exhibit 1 is the Second

4    Amended Notice of Videotaped Deposition of Walmart, Inc.

5    Safety Manager Quincy Usry.   Do you see that?

6        A.    Yes.

7        Q.    And Exhibit 1 also has topics for which you have

8    been designated by Walmart to give testimony on the

9    second and third pages.   Do you see that?

10       A.    Yes.

11       Q.    You have been designated by Walmart to give

12   testimony on all the topics that are listed in Exhibit 1.

13   Is that fair?

14                  MR. GOLDSMITH:   I will object to the

15   extent that this witness knows.   Obviously it is

16   Walmart's duty to designate and we discussed that,

17   Counsel.   As we discussed, he is here to talk about the

18   safety issues in 2 and 3, as well as the other things we

19   discussed in -- via e-mail.

20                  So if it is easier, I can identify specifically

21   which among the topics he is here to talk about.   But I

22   don't know that this witness personally knows the topics.

23       Q.    (BY MR. RALSTON)   So you understand that I am

24   not asking for your personal knowledge today.   Do you

25   understand that?

Quincy Usry                     Braxton vs. Walmart                  1/6/2021

16

1    the safety document.  He can probably talk a little bit

2    about disciplinary action guidelines, but that's an HR

3    document.

4         Q.  (BY MR. RALSTON)  Okay.  And you're here to

5    testify today on behalf of Walmart concerning

6    Mrs. Braxton's report of her workplace injury; is that

7    correct?

8         A.  Yes.

9         Q.  Topic 5, you are here to talk on behalf of

10   Walmart or give testimony on behalf of Walmart on topic

11   5; is that right?

12        A.  Yes.

13             MR. GOLDSMITH:  Again -- we talked about

14   this, too -- but Ammie Wilbur, to the extent that she had

15   any reports given to her, Ammie Wilbur is to be here this

16   afternoon.  Janell Braxton's communications with Ammie

17   Wilbur can cover that.

18             MR. RALSTON:  Is Mr. Usry here to give any

19   testimony on behalf of Walmart regarding topic 5?

20             MR. GOLDSMITH:  Yes.  Everything except

21   for the communications with Ammie Wilbur, which can be

22   covered this afternoon.

23        Q.  (BY MR. RALSTON)  So, Mr. Usry, you're here to

24   give testimony on behalf of Walmart regarding topic 5; is

25   that correct?

Quincy Usry                    Braxton vs. Walmart                    1/6/2021

20

1   injury that she had sustained and that Walmart had fired

2   her for reporting that concern.  Is that your

3   understanding of her allegation?

4              MR. GOLDSMITH:  Lacks foundation and

5   misstates the evidence.  But to the extent you

6   understand, you can answer.

7       A.   Can you repeat that?

8       Q.   (BY MR. RALSTON)  Yes.  Do you understand

9   that -- what's your understanding of Ms. Braxton's

10  allegations against Walmart?

11      A.   My understanding of the allegations generally is

12  that she reported a claim to management.  Her claim was

13  that she reported on a certain day to a certain manager

14  and our understanding is different.

15      Q.   When you say "claim" what are you talking about?

16  Is it your understanding that Ms. Braxton reported a work

17  injury while she was working for Walmart?

18      A.    In the course of her employment, yes.

19      Q.   Okay.  So let's see if there's a few things

20  that we just can generally agree on.  First, Mrs. Braxton

21  was employed by Walmart; is that accurate?

22      A.   Right.

23      Q.   Ms. Braxton, during her employment with Walmart,

24  reported a work injury; is that correct?

25      A.   Correct.

Quincy Usry                    Braxton vs. Walmart                 1/6/2021

21

1       Q.    On April 14th, Walmart asked Mrs. Braxton to

2    provide a written statement regarding her injury; is that

3    correct?

4       A.    Correct.

5       Q.    On April 14th, 2020, Mrs. Braxton provided her

6    written statement regarding her injury to Walmart.

7       A.    Correct.

8       Q.    Walmart had knowledge, obviously, of

9    Mrs. Braxton's report of a workplace injury.

10      A.    Is that a question?

11      Q.    I can ask it as a question if you like.  Did you

12   not understand?

13            Did Walmart have knowledge of Mrs. Braxton's

14   report of a workplace injury?

15      A.    On the 14th.

16      Q.    When did Walmart terminate Ms. Braxton's

17   employment?

18      A.    On the 14th.

19      Q.    Okay.

20      A.    Into the 15th.

21            (Exhibit 9 is marked for identification.)

22      Q.    (BY MR. RALSTON)  So I will show you what I've

23   marked as Exhibit 9.  Exhibit 9 is a document that was

24   produced by document WM_Braxton_105.  Do you see that?

25      A.    Yes.

EXHIBIT 2

Quincy Usry                    Braxton vs. Walmart                    1/6/2021

                                                                      27

1       Q.    (BY MR. RALSTON)  Walmart chose not to ask

2   Mrs. Braxton for a written statement from her concerning

3   when, how, or with who she had previously reported her

4   workplace injury prior to April 14th of 2020, correct?

5                   MR. GOLDSMITH:   Lacks foundation.

6       A.    Correct.

7       Q.    (BY MR. RALSTON)  Walmart didn't ask Ammie

8   Wilbur, your lead over Mrs. Braxton, to provide a written

9   statement regarding whether or not Mrs. Braxton had

10  reported her workplace injury to her prior to April 14th

11  of 2020, correct?

12      A.    Correct.

13      Q.    What we know is April 14th, 2020, Mrs. Braxton

14  was given Exhibit 9, this Statement Form, correct?

15      A.    Correct.

16      Q.    She was asked to fill it out, correct?

17      A.    Correct.

18      Q.    She was asked to fill it out with respect to the

19  nature of her injury, correct?

20      A.    Correct.

21      Q.    This Statement Form actually says that Jet.com

22  or Walmart strictly prohibits retaliation for reporting a

23  concern, correct?

24      A.    Correct.

25      Q.    Immediately after Mrs. Braxton filling out this

Quincy Usry                    Braxton vs. Walmart                    1/6/2021

28

1    Statement Form which concerns her workplace injury and

2    also states that she will not be retaliated against for

3    reporting a concern, she was terminated from her

4    employment with Walmart, correct?

5        A.    Correct.

6        Q.    Walmart chose not to ask Mrs. Braxton for any

7    kind of written statement from her, signed by her, dated

8    by her, that had to do with when and how she had made

9    reports of a workplace injury, correct?

10            MR. GOLDSMITH:  Lacks foundation.

11       A.    There is no written documentation, correct.

12       Q.    (BY MR. RALSTON)  That is not my question.  My

13   question is, Walmart did not ask Mrs. Braxton to provide

14   a written statement concerning whether or not she had

15   reported her workplace injury prior to April 14th of

16   2020?

17            MR. GOLDSMITH:  Lacks foundation.

18       A.    Correct.

19       Q.    (BY MR. RALSTON)  Walmart chose not to ask

20   Mrs. Braxton or instruct her to provide a written

21   statement listing out the times prior to April 14th that

22   she had reported her workplace injury, correct?

23            MR. GOLDSMITH:  Lacks foundation.

24       A.    Correct.

25       Q.    (BY MR. RALSTON)  It chose not to ask -- Walmart

Quincy Usry                  Braxton vs. Walmart                    1/6/2021

34

1      Q.   (BY MR. RALSTON)  Yeah.  Did Walmart ever -- in

2   response to Ms. Braxton's report of a workplace injury,

3   did Walmart go to David Whitenack and ask him for a

4   written statement regarding the times that Mrs. Braxton

5   had reported the injury to him?

6      A.   No.

7      Q.   It could have though, correct?

8              MR. GOLDSMITH:  Lacks foundation, form.

9      A.   It could have.

10     Q.   (BY MR. RALSTON)  David Whitenack was a

11  managerial employee of Walmart's during Mrs. Braxton's

12  employment, right?

13     A.   Correct.

14     Q.   We can agree that the very day that Mrs. Braxton

15  filled out her written statement regarding the nature of

16  her injury is the same day that Walmart terminated her,

17  correct?

18     A.   Correct.

19     Q.   And Walmart's official position or contention in

20  this lawsuit is that it fired Mrs. Braxton because she

21  did not report her injury pursuant to some training that

22  she had gotten; is that correct?

23              MR. GOLDSMITH:  Lacks foundation, form.

24     A.   No.

25     Q.   (BY MR. RALSTON)  No?  Walmart's official

EXHIBIT 2

Quincy Usry                    Braxton vs. Walmart                    1/6/2021

38

1    I understand Walmart's position in this case.  You've --

2    Ms. Braxton was employed by Walmart, correct?

3        A.    Correct.

4        Q.    During her employment, specifically at the end

5    of her employment, she reported a workplace injury to

6    Walmart; is that correct?

7        A.    Correct.

8        Q.    Walmart had knowledge of her report of a

9    workplace injury, correct?

10       A.    Correct.

11       Q.    Walmart then involuntarily terminated

12   Mrs. Braxton employment the day that she submitted a

13   written report of her injury, correct?

14       A.    Correct.

15       Q.    There is a causal connection between

16   Mrs. Braxton's report of a workplace injury and her

17   termination?

18             MR. GOLDSMITH:  Vague and ambiguous.

19       A.    Generally speaking, yes.

20       Q.    (BY MR. RALSTON)  After Mrs. Braxton was

21   terminated on April 14th of 2020, Walmart had no more

22   contact with Mrs. Braxton?

23       A.    Not that I'm aware of.

24       Q.    After Mrs. Braxton was involuntarily terminated

25   on April 14th of 2020, Walmart -- after Mrs. Braxton was

EXHIBIT 2

Quincy Usry          Braxton vs. Walmart          1/6/2021

55

1      A.    Correct.

2              MR. GOLDSMITH:  Lacks foundation.

3      Q.   (BY MR. RALSTON)  And there is a connection

4    between her report of a workplace injury and her

5    termination that same day?

6              MR. GOLDSMITH:  Vague and ambiguous.

7      A.    Simplistically, yes.

8      Q.   (BY MR. RALSTON)  Meaning but for her report of

9    an injury, she would not have been fired when and how she

10   was fired, correct?

11             MR. GOLDSMITH:  Lacks foundation, vague

12   and ambiguous.

13     A.    But for her timely report, yes.

14     Q.   (BY MR. RALSTON)  "But for" means had she have

15   not.  I'm sure you know that.  If you don't understand

16   one of my questions, let me know before you answer, okay?

17     A.    Yes.

18     Q.    Earlier I asked you if Mrs. Braxton hadn't

19   reported her workplace injury, she wouldn't have been

20   fired by Walmart as she was, meaning the same day and

21   same time.  And you agreed with that statement.  Do you

22   remember that testimony?

23     A.    Yes.

24     Q.    So but for Mrs. Braxton's report of a workplace

25   injury to Walmart, Walmart would not have terminated her

Quincy Usry                    Braxton vs. Walmart                  1/6/2021

56

1    as it did, correct?

2         A.    Correct.

3         Q.    And as the person in charge of compliance of

4    this health and safety policy, it is your understanding

5    that these employees have to be trained on the health and

6    safety policy contained in this Global Statement of

7    Ethics at the beginning of their employment.

8         A.    Correct.

9         Q.    That training is mandatory.

10        A.    Correct.

11        Q.    Walmart pays its employees for its mandatory

12   training.

13        A.    Correct.

14        Q.    Earlier you testified that it's Walmart's

15   position in this lawsuit that she was fired for

16   violating -- I think you said an acknowledgement.  Did I

17   understand your testimony correctly?

18              MR. GOLDSMITH:  Form.

19              MR. RALSTON:  Make proper objections.  I

20   didn't hear what you said, but it is sounded like you

21   were just talking, Mr. Goldsmith.

22              MR. GOLDSMITH:  I said, "Form."

23              MR. RALSTON:  I'm sorry.

24              MR. GOLDSMTIH:  That's okay.

25        Q.    (BY MR. RALSTON)  Earlier you testified that it

EXHIBIT 2

Case 2:20-cv-02287-DDC-GEB   Document 48-2   Filed 02/03/21   Page 15 of 15

Appellate Case: 22-3003   Document: 010110660653   Date Filed: 03/21/2022   Page: 55
Quincy Usry                    Braxton vs. Walmart                    1/6/2021

164

1              MR. RALSTON:  Back on the record.

2                   (Exhibit 16 is marked for identification.)

3      Q.   (BY MR. RALSTON)  Sir, I'm showing you what was

4   marked as Exhibit 16.  It's an Employer's Report of

5   Accident.  Do you see that?

6      A.   Yes, sir.

7      Q.   This is a document that was produced by Walmart

8   as a part of this lawsuit, correct?

9      A.   Yes, sir.

10     Q.   This is the Employer's Report of Accident form

11   that was submitted by Walmart for Cheyanne Daniels,

12   correct?

13     A.   Yes, sir.

14     Q.   Walmart submitted it to the State of Kansas

15   Department of Labor, correct?

16     A.   Yes, sir.

17     Q.   And Walmart retained this document as a part of

18   its business record; is that correct?

19     A.   Correct.

20             MR. RALSTON:  I don't have any other

21   questions.

22                   (Off the record at 2:33 p.m.)

23                        # # # # #

24

25

**EXHIBIT 2**

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

JANELL BRAXTON          )
         *Plaintiff*    )
     vs.         )     Case No. 2:20-cv-02287-DDC-GEB
             )
WALMART INC.       )
      *Defendant*   )

**SUGGESTIONS IN SUPPORT OF
PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

# EXHIBIT 3

*Second Amended Notice of Videotaped Deposition of Walmart,
Inc. Safety Manager Quincy Usry*

(Doc.37)

(Deposition Exhibit 1)

Case 2:20-cv-02287-DDC-GEB  Document 48-3  Filed 02/03/21  Page 2 of 5
Case 2:20-cv-02287-DDC-GEB  Document 37  Filed 12/31/20  Page 1 of 4
Appellate Case: 22-3003  Document: 010110660653  Date Filed: 03/21/2022  Page: 57

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| JANELL BRAXTON | | ) |
| | *Plaintiff* | ) |
| vs. | | ) |
| | | ) Case No. 2:20-cv-02287-DDC-GEB |
| WALMART INC. | | ) |
| | *Defendant* | ) |

## SECOND AMENDED NOTICE OF VIDEOTAPED DEPOSITION OF WALMART, INC. SAFETY MANAGER QUINCY USRY

PLEASE TAKE NOTICE that Plaintiff, pursuant to Fed.R.Civ.P. 30(b)(6), will take the

videotaped deposition of Walmart, Inc. under the following conditions:

Date:           Jan. 6, 2021

Time:           10:00 AM

Location:       Ralston Kinney, LLC
                4717 Grand Avenue, Suite 300
                Kansas City, MO 64112

Court Reporter: Sharon L. Crawford, CCR, RPR
                Crawford Reporting
                29009 East 117th Street
                Lee's Summit, MO 64086
                (816) 507-9630

The record will be made by stenographic means by a certified court reporter who is an officer of

the Court with the power to administer oaths. The deposition will be videotaped by TBC Video,

415 SE Douglas St suite a, Lee's Summit, MO 64063, (816) 221-3376. It will be used for all

purposes provided in the Federal Rules of Civil Procedure.

Pursuant to Fed.R.Civ.P. 30(b)(6), Walmart, Inc. has designated Safety Manager Quincy

Usry to testify on its behalf about information known or reasonably available to Walmart Inc.

regarding the following topics:

1

**App-I**

57



Case 2:20-cv-02287-DDC-GEB   Document 48-3   Filed 02/03/21   Page 3 of 5
Case 2:20-cv-02287-DDC-GEB   Document 37   Filed 12/31/20   Page 2 of 4
Appellate Case: 22-3003   Document: 010110660653   Date Filed: 03/21/2022   Page: 58

## TOPICS for the RULE 30(b)(6) DEPOSITION of WALMART, INC.

### Walmart's Policies

2. Walmart's implementation and enforcement of the following policies during Plaintiff's employment:

   **Walmart's *Global Statement of Ethics***
   - "Our Beliefs," (WM_Braxton_000005)
   - "Introduction" (WM_Braxton_000006)
   - "Additional Responsibilities for Management" (WM_Braxton000007)
   - "Raising Concerns & Speaking Up" (WM_Braxton_000008-12)
   - "Health & Safety in the Workplace" (WM_Braxton_000026)
   **Walmart's Specific Policies**
   - "Disciplinary Action Policy"
   - "Disciplinary Action Management Guidelines"
   - "Record retention"
   - "Safety and Health in the workplace Policy"
   - "Accommodations in employment"
   - "Discrimination & harassment Prevention Policy English"
   - "Discrimination & Harassment Prevention Management Guidelines."

3. Walmart's implementation and enforcement of its policies regarding reporting work injuries during Plaintiff's employment including Walmart's "WMW-670e Safety & Compliance Rule Violation Form" and "Conduct Disciplinary Action Guidelines" policy.

### Janell Braxton's Report(s) of a Work Injury

5. Plaintiff's report(s) of a workplace injury, all actions taken by Walmart in response, the Walmart employees involved, and related documents including without limitation emails, text messages (WM_Braxton_000103-104), and the "Statement Form" produced as WM_Braxton_000105.

### Other Employee Work Injury Reports

7. The factual support for Defendant's Supplemental Answer to Interrogatory No. 13 including without limitation the exact nature of the "Gross misconduct" Ms. Daniels is claimed to have engaged in, and Defendant's supplement response to Plaintiff's Rule 34 Request No. 4 and the facts connected with WM_Braxton_000131.

**EXHIBIT 3**

Case 2:20-cv-02287-DDC-GEB  Document 48-3  Filed 02/03/21  Page 4 of 5
Case 2:20-cv-02287-DDC-GEB  Document 37  Filed 12/31/20  Page 3 of 4
Appellate Case: 22-3003  Document: 010110660653  Date Filed: 03/21/2022  Page: 59

### Notice of Training Gaps or Failures

8.  Reports to Walmart that its Safety training did not include the protocol for reporting work injuries during Plaintiff's employment.

9.  Documented notice that Walmart employees were not aware of its injury-report policy during Plaintiff's employment.

### Defendants' Answer & Defenses

10. The basis for, persons involved in, and documents related to, Defendant's admission or denial of paragraphs 2, 20, 25, 27-46, and 52-55 of Plaintiff's First Amended Complaint (Sept. 29, 2020).

11. The factual basis for and documents related to the following AFFIRMATIVE DEFENSES:

   a.  Defendant's second affirmative defense of its ANSWER AND AFFIRMATIVE DEFENSES (filed Oct. 13, 2020) which states: **Plaintiff has suffered no damages and/or has failed to mitigate her alleged damages.**

   b.  Defendant's third affirmative defense of its ANSWER AND AFFIRMATIVE DEFENSES (filed Oct. 13, 2020) which states: **Defendant at all times acted in good faith to comply with all applicable laws and acted with reasonable grounds to believe that its actions did not violate the statutes, laws, or public policies cited in the First Amended Complaint, and Defendant asserts a lack of willfulness or intent to violate those statutes, laws, or public policies as a defense to any claim by Plaintiff for punitive damages.**

   c.  Defendant's fourth affirmative defense of its ANSWER AND AFFIRMATIVE DEFENSES (filed Oct. 13, 2020) which states: **Plaintiff's claims are barred by the doctrine of after-acquired evidence.**

**EXHIBIT 3**

Case 2:20-cv-02287-DDC-GEB Document 48-3 Filed 02/03/21 Page 5 of 5
Case 2:20-cv-02287-DDC-GEB Document 37 Filed 12/31/20 Page 4 of 4
Appellate Case: 22-3003 Document: 010110660653 Date Filed: 03/21/2022 Page: 60

*Respectfully submitted by,*
**RALSTON KINNEY, LLC**

/s/ *Thomas F. Ralston*
Thomas F. Ralston, D.Kan. No. 78212
4717 Grand Avenue, Suite 300
Kansas City, MO 64112
Tel: (816) 298-0086
Fax: (816) 298-9455
Email: ken@rklawllc.com
Email: tom@rklawllc.com

**ATTORNEYS FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

I hereby certify that on December 31, 2020 I filed the foregoing through the Court's ECF system, which will serve Defendants by emailing notice and a copy to Defendants' attorneys of record, whom I also emailed a copy to:

**BAIRD HOLM LLP**
Mark J. Goldsmith
1700 Farnam Street, Suite 1500
Omaha, NE 68102-2068
TEL: (402) 344-0500
FAX: (402) 344-0588
mgoldsmith@bairdholm.com
**ATTORNEY FOR DEFENDANT**

/s/ *Thomas F. Ralston*
**ATTORNEY FOR PLAINTIFF**

**EXHIBIT 3**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

JANELL BRAXTON,

               Plaintiff,

v.

WALMART, INC.,

               Defendant.

Case No. 2:20-cv-02287

**DEFENDANT'S BRIEF IN OPPOSITION TO MOTION FOR PARTIAL SUMMARY JUDGMENT**

## I.    <u>INTRODUCTION</u>

Plaintiff Janell Braxton's ("Plaintiff") motion is based upon the improper and deliberate use of incomplete deposition testimony that has been taken out of context, and withheld from the Court.  Contrary to Plaintiff's misrepresentations, Defendant Walmart, Inc. ("Walmart") did *not* terminate Plaintiff because she reported an injury on the job. Rather, Walmart terminated Plaintiff's employment because she did not *timely* report her injury, thereby violating Walmart's written policies.  In particular, Walmart policies like many other companies, required its associates to report an injury during the shift that the injury occurred.  Plaintiff, however, reported her injury *two shifts after* she sustained her injury.  This is precisely the deposition testimony repeatedly provided by Walmart's 30(b)(6) designation, yet Plaintiff's motion willfully omits the full context of the very evidence upon which she relies.

## II.    <u>RESPONSE TO PLAINTIFF'S STATEMENT OF UNDISPUTED FACTS</u>

Pursuant to Fed. R. Civ. P. 56 and Local Rule 56.1(b), Walmart hereby responds to Plaintiff's statement of material facts; such response is made for the purposes of and in opposition to Plaintiff's Motion for Partial Summary Judgment.

1.    Walmart does not dispute the statement in ¶ 1.

2.    Walmart does not dispute the statement in ¶ 2.

3.    Walmart does not dispute the statement in ¶ 3.

4.    Walmart does not dispute the statement in ¶ 4.

5.    Walmart does not dispute the statement in ¶ 5, but denies that Plaintiff reported an injury timely. See Exhibit 2, Declaration of David Whitenack at ¶ 7, Exhibit 3, Declaration of Quincy Usry at ¶¶ 6-8, Exhibit 4, Declaration of Morgan Medaris at ¶ 6.

6.    Walmart does not dispute the statement in ¶ 6.

7.    Walmart does not dispute the statement in ¶ 7

8.    Walmart does not dispute that it terminated Plaintiff's employment after she provided a written statement but denies the characterization "immediately."

9.    Walmart does not dispute the statement in ¶ 9.

10.   Walmart denies the statement that there is a causal connection between the fact that Plaintiff reported a workplace injury and her termination.  Rather, there is a connection between *the timing* of Plaintiff's report of a workplace injury, her corresponding violation of Walmart's work rule and her termination.  (Exhibit 1, Deposition Transcript of Quincy Usry at 35:12-36:23, 40:5-9; 45:4-7, 45:19-23, 55:3-56:2, 141:15-142:1)

Objection: Walmart further objects to Plaintiff's statement in ¶ 10 on the grounds that the deposition testimony cited by Plaintiff was in response to an improperly vague and ambiguous question which further called for a legal conclusion, to which counsel objected during the deposition:

Q:    There is a causal connection between Mrs. Braxton's
        report of a workplace injury and her termination.

MR. GOLDSMITH:  Vague and ambiguous.

A:    Generally speaking, yes.

(Usry Depo. 38:15-19).   In particular, the question did not explain the term "causal connection," rendering the inquiry unclear, especially in light of the preceding testimony that the "connection" the deponent was referencing was the "timeliness of the report":

> Q:   Can we agree that there is some connection between Mrs. Braxton's report of a workplace injury and then her termination the same day?
>
> A:   The timeliness of report, yes.

(Usry Depo. 36:18-23)

Objection:  Walmart further objects to Plaintiff's statement in ¶ 10 on the grounds that Plaintiff intentionally presents incomplete evidence to the Court in support of its motion  that is also out of context and therefore misstates the contents of the evidence. The three lines of testimony cited by Plaintiff were preceded by more than a page of deposition transcript testimony Plaintiff omits confirming that the "causal connection" at issue was the *timing* of Plaintiff's report:

> Q:   So what is -- why was Mrs. Braxton terminated according to Walmart?
>
> A:    For failure to report an incident by end of shift according to the 670e.
>
> Q:   So Walmart's official position or contention in this lawsuit is that Mrs. Braxton was fired because she didn't report a workplace injury in the very shift that she first became aware of the injury; is that right?
>
> A:    By end of shift, correct.
>
> …
>
> **Q:   Can we agree that there is a connection between Mrs. Braxton's report of a work injury and her termination?**
>
> **A:    When she reported the workplace injury.**

3

**App-I**

63

> Q:      Can we agree that had Mrs. Braxton never reported
> her workplace injury, Walmart wouldn't have fired her
> as it did?
>
> A:      Correct.
>
> **Q:      Can we agree that there is some connection
> between Mrs. Braxton's report of a workplace
> injury and then her termination the same day?**
>
> **A:      The timeliness of report, yes.**

(Usry Depo. 35:12-36:23 (emphasis added); see also Usry Depo 40:5-9; 45:4-7, 45:19-

23, 55:3-56:2, 141:15-142:1)

11.    Walmart denies the statement that but for Plaintiff's report of a workplace

injury to Walmart, Walmart would not have terminated her employment.  Rather, but for

Plaintiff's *failure to timely report her workplace injury* which violated its work rule, Walmart

would not have terminated her employment *as it did*.  (Usry Depo 35:12-36:23, 40:5-9;

45:4-7, 45:19-23, 55:8-56:2, 141:15-142:1)

Objection:  Walmart further objects to Plaintiff's statement in ¶ 11 on the grounds

that it intentionally misstates the cited testimony.  The cited deposition testimony reads

as follows:

> Q:      So but for Mrs. Braxton's report of a workplace injury
> to Walmart, Walmart would not have terminated her
> **as it did**, correct?
>
> A:      Correct.

(Usry Depo. 55:24-56:2, emphasis added).  Plaintiff's statement in ¶ 11 *omits* the qualifier

"as it did," thereby altering the meaning of the testimony.  As repeatedly explained at

length in deposition, Walmart terminated Plaintiff's employment based upon her failure to

report her injury during the shift that the injury occurred.  (Usry Depo 35:12-36:23, 40:5-

9; 45:4-7, 45:19-23, 55:3-56:2, 141:15-142:1)  Thus, if Plaintiff had not reported her

workplace injury, then the circumstances and basis for her termination would not have

existed, and Walmart would not have terminated her employment "as it did."

Objection:   Walmart additionally objects to Plaintiff's statement in ¶ 11 on the grounds that Plaintiff omits the complete witness testimony and presents it out of context and therefore distorts the contents of the evidence.   The four lines of testimony cited by Plaintiff were immediately preceded by testimony confirming that, but for Plaintiff's *failure to timely report her workplace injury*, Walmart would not have terminated her employment as it did:

> Q:   Meaning but for her report of an injury, she would not have been fired when and how she was fired, correct?
>
> A:   But for her timely report, yes.
>
> Q:   "But for" means had she have not. I'm sure you know that. If you don't understand one of my questions, let me know before you answer, okay?
>
> A:    Yes.
>
> Q:   Earlier I asked you if Mrs. Braxton hadn't reported her workplace injury, she wouldn't have been fired by Walmart as she was, meaning the same day and same time. And you agreed with that statement. Do you remember that testimony?
>
> A:   Yes.
>
> Q:   So but for Mrs. Braxton's report of a workplace injury to Walmart, Walmart would not have terminated her as it did, correct?
>
> A:   Correct.

(Usry Depo. 55:8-56:2; see also Usry Depo 35:12-36:23, 40:5-9; 45:4-7, 45:19-23, 141:15-142:1)

## III.   WALMART'S STATEMENT OF UNDISPUTED MATERIAL FACTS

1.    At all times relevant to this action, Walmart maintained a written Policy 763e, which stated in pertinent part: "All known injuries, no matter how slight, will be reported to

a member of management immediately.  At a minimum, these must be reported to a member of management by the end of the shift."  (Exhibit A, authenticated by Exhibit 3, Usry Decl at ¶ 3).

2.     At all times relevant to this action, Walmart maintained a written Policy 670e, which stated in pertinent part that "[f]ailure to report any known injury before the end of the shift" would result in a First Written formal disciplinary action.  (Exhibit B, authenticated by Exhibit 3, Usry Decl at ¶ 4).

3.     At all times relevant to this action, Walmart maintained written Conduct Disciplinary Action Guidelines, which stated in pertinent part that "Jetflex and Jet Seasonal [associates] should be terminated when their coaching has progressed to a formal written."  (Exhibit D, authenticated by Exhibit 4, Medaris Decl at ¶3).

4.     During Plaintiff's employment with Walmart, she was a Jet Seasonal associate.  (Medaris Decl ¶ 4).

5.     During her April 12-13, 2020 overnight shift, at approximately 1:00 a.m. on April 13th, Plaintiff sustained an injury to her left wrist.  (Whitenack Decl ¶3)

6.     Quincy Usry had reason to believe and understood that Plaintiff first reported her April 13th injury to Walmart during her April 14-15, 2020 overnight shift.  (Usry Decl ¶ 7).

7.     David Whitenack had reason to believe and understood that Plaintiff first reported her April 13th injury to Walmart during her April 14-15, 2020 overnight shift. (Whitenack Decl ¶ 5).

8.     Morgan Medaris had reason to believe and understood that Plaintiff first reported her April 13th injury to Walmart during her April 14-15, 2020 overnight shift.

(Medaris Decl ¶ 5).

9.     Based upon Usry, Whitenack, and Medaris's understanding that Plaintiff failed to report her injury during the April 12-13, 2020 shift during which the injury occurred, Usry, Whitenack, and Medaris concluded that Plaintiff violated Policy 670e. (Usry Decl ¶ 8, Whitenack Decl ¶ 7, Medaris Decl ¶ 6).

10.    Based upon Usry, Whitenack, and Medaris's conclusion that Plaintiff had violated Policy 670e, Plaintiff's employment was terminated for her violation of Policy 670e and pursuant to Walmart's written Conduct Disciplinary Action Guidelines.  (Usry Decl ¶¶ 8-9, Whitenack Decl ¶¶ 8-9, Medaris Decl ¶¶ 7-8.

## IV.    ARGUMENT

As noted by the very authorities cited in Plaintiff's Brief, Plaintiff bears the initial burden to prove "that a causal connection existed between the protected activity or injury, and the termination."  Sanjuan v. IBP, Inc., 160 F.3d 1291, 1298 (10th Cir. 1998).  If a plaintiff is able to carry this *prima facie* burden, however, the inquiry does not end.  Rather, the burden then shifts to the defendant to articulate a non-retaliatory reason for the discharge.  Id.; Hysten v. Burlington N. Santa Fe Ry. Co., 530 F.3d 1260, 1268 (10th Cir. 2008) ("Kansas applies the familiar McDonnell Douglas burden-shifting framework for analyzing retaliatory discharge claims.").  Upon such a showing, the burden shifts back to the employee to "show clear and convincing evidence that he or she was terminated in retaliation for exercising rights under the Workers' Compensation Act."  Sanjuan, 160 F.3d at 1288-1289; Rebarchek v. Farmers Co-op. Elevator, 272 Kan. 546, 551 (2001) ("In Kansas, claimants are required to prove a claim for retaliatory discharge by clear and convincing evidence."); In the Interest of B.D.-Y, 286 Kan. 686, 698 (2008) *disapproving* Ortega v. IBP, Inc. 255 Kan. 513 (1994).

Here, Plaintiff argues for partial summary judgment based solely upon the contention that she can carry her initial *prima facie* burden.  But, Walmart can and has articulated its non-discriminatory basis for the termination of Plaintiff's employment.  In particular, Walmart terminated Plaintiff's employment based upon the conclusion that Plaintiff violated Policy 670e, which required the imposition of a First Written formal disciplinary action.  (Walmart's Statement of Undisputed Material Fact ("SUF") 2); <u>Vaughn v. Epworth Villa</u>, 537 F.3d 1147, 1152 n. 3 (10th Cir. 2008) ("When an employee violates an employer's policies . . . it will often be the case that the employer can assert a legitimate, non-retaliatory reason for taking an adverse employment action against the employee."); <u>Grant v. Crystal Lake Partners, Inc.</u>, 460 F.Supp.3d 1155, 1163 (D. Kan. 2020) (Robinson, J.) (employer articulated legitimate, non-retaliatory reason where the plaintiff "was terminated for violating its . . . policy").  Because Plaintiff was a seasonal associate, the imposition of a First Written formal disciplinary action required Plaintiff's termination pursuant to Walmart's written Conduct Disciplinary Action Guidelines.  (SUF 3, 10).

Plaintiff has not carried her burden to show by clear and convincing evidence that she was terminated in retaliation for reporting her injury.  Instead, Plaintiff cites to a total of seven lines of testimony, omitting the full context, to suggest falsely that Walmart terminated Plaintiff merely because she reported an injury.  Plaintiff ignores, as she must, that the report itself was not the cause of her termination.  Rather, as repeated several times throughout Usry's deposition, Plaintiff's *failure to report the injury timely* (i.e., by the end of the shift during which the injury occurred) was the cause for her termination.

> Q:   So what is -- why was Mrs. Braxton terminated according to Walmart?

A:     For failure to report an incident by end of shift according to the 670e.

Q:     So Walmart's official position or contention in this lawsuit is that Mrs. Braxton was fired because she didn't report a workplace injury in the very shift that she first became aware of the injury; is that right?

A:     By end of shift, correct.

…

Q:     Can we agree that there is a connection between Mrs. Braxton's report of a work injury and her termination?

A:     When she reported the workplace injury.

Q:     Can we agree that had Mrs. Braxton never reported her workplace injury, Walmart wouldn't have fired her as it did?

A:     Correct.

Q:     Can we agree that there is some connection between Mrs. Braxton's report of a workplace injury and then her termination the same day?

A:     The timeliness of report, yes.

(Usry Depo 35:12-36:23).

Q:     And there is a connection between her report of a workplace injury and her termination that same day?

A:     Simplistically, yes.

Q:     Meaning but for her report of an injury, she would not have been fired when and how she was fired, correct?

A:     But for her timely report, yes.

(Usry Depo. 55:3-56:2).

Q:     Walmart's official position in this lawsuit is that it terminated Mrs. Braxton because, according to Walmart, she did not report her workplace injury in the shift that she first became aware of it?

A:     According to what she provided, yes.

**App-I**

(Usry Depo. 40:5-9).

> Q:   And Walmart's contention is that had Mrs. Braxton actually reported her injury on April 13th of 2020, it would not have fired her; is that correct?

> A:   If she would have reported it by end of shift, correct.

(Usry Depo. 45:4-7).

> Q:   Walmart's contention or position in this lawsuit is that it would not have fired her had she reported her workplace injury in the shift she first noticed it, correct?

> A:   Correct.

(Usry Depo. 45:19-23).

> Q:   So Walmart's contention is that it terminated Mrs. Braxton because of the timeliness or untimeliness of her injury report, correct?

> A:   Correct.

> Q:   Walmart in this lawsuit is contending that Mrs. Braxton knew about her injury on April 13th of 2020, right?

> A:   Correct.

> Q:   And Walmart's position in this lawsuit is that it fired Mrs. Braxton because she reported her workplace injury on April 14th of 2020, correct?

> A:   Correct.

(Usry Depo. 141:15-142:1).

A party engages in "deceitful behavior" when it "flagrantly misrepresents the record" as Plaintiff does here.  In re Johnson, 294 Kan. 575, 591 (2012).  Likewise, in Qualls v. Apfel, 206 F.3d 1368, 1371 (10th Cir. 2000), the Tenth Circuit held that it "does not look favorably upon arguments founded on misrepresentations of the record."  Id. at 1371.  See also Nelson v. Safeco Ins. Co. of N. Am., 396 F.Supp.2d 1274, 1279 n. 5 (D. Utah 2005) ("It bears noting that the court is deeply troubled by the repeated

10

**App-I**

mischaracterizations of the evidence by Defendant."); <u>Hearron v. Vioth Indus. Servs., Inc.</u>, No. 10-2422-KHV, 2011 WL 5080261, * n. 1 (D. Kan. Oct. 25, 2011) ("disregard[ing] . . . purported facts" where the "defendant's factual statements misrepresent or mischaracterize the portions of the record to which they cite"); <u>Biby v. Halstead Hosp., Inc.</u>, No. 92-1042-JTR, 1994 WL 542083, *2 (D. Kan. Apr. 4, 1994) (rejecting argument that "unequivocally misstates the record" as being "without merit").  Plaintiff's decision to misrepresent the factual record warrants denial of her summary judgment motion.

Not only does Plaintiff misstate the record in support of her Motion for Summary Judgment but Plaintiff also misstates its primary authority <u>Sanjuan</u> v. IBP, 160 F.3d 1291, 1298 (10th Cir. 1998) (Dkt. 48 at 5).  In particular, Plaintiff claims that Usry's testimony "shows there is no dispute that the termination of Plaintiff's employment was 'based on,' 'because of,' 'motivated by,' and 'due to' Plaintiff's act of reporting a workplace injury." (Dkt. 48 at 5).  In the pretext stage of the <u>*McDonnell Douglas*</u> burden-shifting analysis, however, the plaintiff must show a causal relationship *to the employer's alleged intent to retaliate,* not simply to a report of a workplace injury.  <u>Sanjuan</u>, 160 F.3d at 1298 ("Employees can recover by proving that the discharge was 'based on,' 'because of,' 'motivated by' or 'due to' the employer's intent to retaliate.")

Additionally, for purposes of the instant motion, *Plaintiff* bears the ultimate burden to prove by clear and convincing evidence that there exists no triable issue of material fact that Walmart's stated reason for the termination decision was a pretext for retaliation. Here, Plaintiff has presented *no* evidence – let alone *clear and convincing* evidence – that her termination was based on an intent to retaliate.  <u>Sanjuan</u>, 160 F.3d at 1298. "Summary judgment is rarely granted when the moving party is the one that bears the burden of proof at trial."  <u>Hussey v. Quebecor Printing Providence Inc.</u>, 2

F.Supp.2d 217, 225 (D.R.I. 1998).  This rule applies with even greater force where the moving party is subject to the clear and convincing evidence standard, particularly where the motion is based on omitted testimony and misrepresentations.  Indeed, Walmart has not located any authority in the 10th Circuit in which a court has granted summary judgment for a party bearing the burden of proof by clear and convincing evidence.

For evidence to be "clear and convincing," it must be "sufficient to establish that the truth of the facts asserted is 'highly probable.'"  In re B.D.-Y., 286 Kan. 686, 696 (2008).  The Tenth Circuit has described this standard as setting "a high bar."  United States v. Seaton, 773 Fed. Appx. 1013, 1021 (10th Cir. 2019) (unpublished); see also Commil USA, LLC v. Cisco Sys., Inc., 575 U.S. 632, 135 S.Ct. 1920, 1929 (2015) (noting "the high bar Congress is presumed to have chosen:  the clear and convincing standard"). In Mann v. Hanil Bank, 920 F.Supp. 944 (E.D. Wis. 1996), the plaintiff moved for summary judgment on claims subject to clear and convincing evidence.  The court denied summary judgment, emphasizing that the clear and convincing evidence "standard places an extraordinary high bar before the plaintiffs; to clear it, they must introduce compelling evidence to support their version of events."  Id. at 950-51.  Moreover, the court noted that "[e]ven if the plaintiffs succeed in introducing such compelling evidence, if the [defendants] can point to some evidence—beyond a mere 'scintilla'—to support their version of events, summary judgment will nevertheless be denied."  Id. at 951.  Because Plaintiff has not shown and cannot possibly establish the absence of a dispute of material fact, Plaintiff's motion must be denied.

V.   **CONCLUSION**

For the reasons set forth herein, Plaintiff's motion fails to establish her worker's compensation retaliation claim; under the burden-shifting framework, Plaintiff has not

**App-I**

addressed – let alone carried – her burden to prove pretext.  Instead, the instant motion

is grounded upon two snippets of deposition testimony that have been taken wildly out of

context, to imply a false concession of liability.  However, no amount of artful drafting can

alter Usry's repeated testimony that Plaintiff's termination was based on her failure to

make a timely report of her injury.  Indeed, Plaintiff counsel's deposition questioning itself

confirms that Plaintiff fully understands the state of the evidence and the *temporal*

foundation for Walmart's termination decision.

Because Plaintiff cannot establish the absence of a triable issue of material fact,

the instant motion must be denied.

Dated this 24th day of February, 2021.

WALMART, INC. Defendant,

By:  /s/ Christopher R. Hedican

Christopher R. Hedican (KS #14542)
of    BAIRD HOLM LLP
1700 Farnam St, Ste 1500
Omaha, NE  68102-2068
Phone: 402-344-0500
Facsimile:  402-344-0588
chedican@bairdholm.com

### CERTIFICATE OF SERVICE

I hereby certify that on February 24th, 2021, the undersigned electronically filed
the foregoing with the Clerk of the Court using the CM/ECF system which sent
notification of such filing to the following:

Thomas F. Ralston (KS# 78212)      tom@rklawllc.com
Kenneth D. Kinney (KS# 78544)      ken@rklawllc.com

/s/ Christopher R. Hedican

DOCS/2592023.3

Case 2:20-cv-02287-DDC-GEB  Document 55-1  Filed 02/24/21  Page 1 of 12

Appellate Case: 22-3003  Document: 010110660653  Date Filed: 03/21/2022  Page: 74

Quincy Usry                    Braxton vs. Walmart                    1/6/2021

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS


JANELL BRAXTON,              )
                            )
          Plaintiff,        )
                            )
vs.                         )        No. 2:20-cv-02287-DDC-GEB
                            )
WALMART INC.,               )
                            )
          Defendant.        )




VIDEOTAPED DEPOSITION OF

QUINCY USRY,

(30(b)(6) Deposition)


a witness, being produced, sworn and examined on

Wednesday, January 6, 2021, pursuant to Second Amended

Notice of Videotaped Deposition of Walmart, Inc. Safety

Manager Quincy Usry, at the offices of Ralston Kinney,

LLC, Suite 300, 4717 Grand Avenue in Kansas City,

Missouri, before

          SHARON L. CRAWFORD, CCR, RPR,

a Certified Court Reporter in Missouri and Kansas.

Taken on behalf of the Plaintiff.

**EXHIBIT
1**

Case 2:20-cv-02287-DDC-GEB   Document 55-1   Filed 02/24/21   Page 2 of 12

Appellate Case: 22-3003   Document: 010110660653   Date Filed: 03/21/2022   Page: 75
Quincy Usry               Braxton vs. Walmart                1/6/2021

5

                    THE VIDEOGRAPHER:  Let the record reflect
the time is 9:57 a.m.  Today is Wednesday, January 6th,
year 2021.  Will counsel please voice identify themselves
and state whom you represent.

                    MR. RALSTON:  Tom Ralston for Janell
Braxton.

                    MR. GOLDSMITH:  Mark Goldsmith for the
Defendant, Walmart.

                    THE VIDEOGRAPHER:  Would the court
reporter now administer the oath to the witness.

                         QUINCY USRY,
a witness, having been produced, sworn and examined,
testified as follows on:

EXAMINATION BY MR. RALSTON:

    Q.   Sir, you understand you just took an oath to
tell the truth?

    A.   Yes.

    Q.   You understand that now that you have taken that
oath from or with an officer of the court who has the
power to administer oaths, all your testimony is subject
to what we call the penalty of perjury.  Do you
understand that?

    A.   Yes.

    Q.   Have you ever given deposition testimony before?

    A.   No.

Quincy Usry                    Braxton vs. Walmart                    1/6/2021

35

1    position in this lawsuit is that it terminated -- is that

2    it terminated Mrs. Braxton, but not pursuant to some

3    training that Walmart thought that she had gotten?

4              MR. GOLDSMITH:  Vague and ambiguous,

5    foundation.

6         A.   It was due to the documents that were

7    acknowledged within Workday.

8         Q.   Okay.  It was training?

9              MR. GOLDSMITH:  Foundation, form.

10        A.   Not considered a training, but documentation's

11   acknowledged within Workday.

12        Q.   (BY MR. RALSTON)  I don't understand your

13   answer.  So what is -- why was Mrs. Braxton terminated

14   according to Walmart?

15        A.   For failure to report an incident by end of

16   shift according to the 670e.

17        Q.   So Walmart's official position or contention in

18   this lawsuit is that Mrs. Braxton was fired because she

19   didn't report a workplace injury in the very shift that

20   she first became aware of the injury; is that right?

21        A.   By end of shift, correct.

22        Q.   Can we agree there is some kind of connection

23   between Mrs. Braxton's report of a workplace injury and

24   her termination?

25              MR. GOLDSMITH:  Vague and ambiguous,

Quincy Usry                    Braxton vs. Walmart                    1/6/2021

                                                                        36

1    foundation.

2         A.    Can you rephrase that?

3         Q.    (BY MR. RALSTON)  Can we agree that there is a

4    connection between Mrs. Braxton's report of a work injury

5    and her termination?

6                    MR. GOLDSMITH:  Vague and ambiguous.

7         A.    When she reported the workplace injury.

8         Q.    (BY MR. RALSTON)  Can we agree that if

9    Mrs. Braxton had never reported her workplace injury, she

10   wouldn't have been fired by Walmart as she was?

11                   MR. GOLDSMITH:  Foundation, form.

12        A.    Could you repeat?

13        Q.    (BY MR. RALSTON)  Can we agree that had

14   Mrs. Braxton never reported her workplace injury, Walmart

15   wouldn't have fired her as it did?

16                   MR. GOLDSMITH:  Foundation, form.

17        A.    Correct.

18        Q.    (BY MR. RALSTON)  Can we agree that there is

19   some connection between Mrs. Braxton's report of a

20   workplace injury and then her termination the same day?

21                   MR. GOLDSMITH:  Asked and answered,

22   foundation, form.

23        A.    The timeliness of report, yes.

24        Q.    (BY MR. RALSTON)  Okay.  Walmart gained

25   knowledge of Mrs. Braxton's alleged workplace injury from

Quincy Usry                    Braxton vs. Walmart                  1/6/2021

38

1    I understand Walmart's position in this case.  You've --

2    Ms. Braxton was employed by Walmart, correct?

3        A.    Correct.

4        Q.    During her employment, specifically at the end

5    of her employment, she reported a workplace injury to

6    Walmart; is that correct?

7        A.    Correct.

8        Q.    Walmart had knowledge of her report of a

9    workplace injury, correct?

10       A.    Correct.

11       Q.    Walmart then involuntarily terminated

12   Mrs. Braxton employment the day that she submitted a

13   written report of her injury, correct?

14       A.    Correct.

15       Q.    There is a causal connection between

16   Mrs. Braxton's report of a workplace injury and her

17   termination?

18             MR. GOLDSMITH:  Vague and ambiguous.

19       A.    Generally speaking, yes.

20       Q.    (BY MR. RALSTON)  After Mrs. Braxton was

21   terminated on April 14th of 2020, Walmart had no more

22   contact with Mrs. Braxton?

23       A.    Not that I'm aware of.

24       Q.    After Mrs. Braxton was involuntarily terminated

25   on April 14th of 2020, Walmart -- after Mrs. Braxton was

Quincy Usry                    Braxton vs. Walmart                1/6/2021

40

1   14th of 2020, Walmart was aware that it would be a

2   violation of the law to terminate Mrs. Braxton for

3   reporting a workplace injury.

4        A.   Correct.

5        Q.   Walmart's official position in this lawsuit is

6   that it terminated Mrs. Braxton because, according to

7   Walmart, she did not report her workplace injury in the

8   shift that she first became aware of it?

9        A.   According to what she provided, yes.

10       Q.   "According to what she provided."  Are you

11  talking about a written statement?

12       A.   I am talking about a verbal conversation with

13  David Whitenack, the operations manager on shift.

14       Q.   Again, just to make sure I understand where we

15  are at, so far in your testimony, Walmart -- did it

16  conduct an investigation that actually led to

17  Mrs. Braxton's termination?

18            MR. GOLDSMITH:  Vague and ambiguous.

19       A.   Could you repeat?

20       Q.   (BY MR. RALSTON)  Did Walmart ever investigate

21  exactly when Mrs. Braxton first reported her workplace

22  injury?

23            MR. GOLDSMITH:  Lacks foundation.

24       A.   It was included in text messages from David

25  Whitenack.

Case 2:20-cv-02287-DDC-GEB  Document 55-1  Filed 02/24/21  Page 7 of 12

Appellate Case: 22-3003    Document: 010110660653    Date Filed: 03/21/2022    Page: 80
Quincy Usry                    Braxton vs. Walmart                    1/6/2021

45

1      Q.   And this is the paragraph or a fact that Walmart

2    denies, correct?

3      A.   Correct.

4      Q.   And Walmart's contention is that had

5    Mrs. Braxton actually reported her injury on April 13th

6    of 2020, it would not have fired her; is that correct?

7      A.   If she would have reported it by end of shift,

8    correct.

9      Q.   And so the disagreement about -- between

10   Mrs. Braxton and Walmart about when she reported her

11   workplace injury is material, meaning that according to

12   Walmart it makes a difference in the outcome of their

13   decisions with respect to her employment.  Does that make

14   sense?

15     A.   No, I'm sorry.  Could you repeat it?

16     Q.   That's okay.  Mrs. Braxton and Walmart dispute

17   when she first reported her workplace injury.

18     A.   Correct.

19     Q.   Walmart's contention or position in this lawsuit

20   is that it would not have fired her had she reported her

21   workplace injury in the shift she first noticed it,

22   correct?

23     A.   Correct.

24     Q.   Mrs. Braxton denies that she did not report her

25   workplace injury in the shift she first noticed it,

Quincy Usry                    Braxton vs. Walmart                    1/6/2021

55

1      A.    Correct.

2                  MR. GOLDSMITH:  Lacks foundation.

3      Q.    (BY MR. RALSTON)  And there is a connection

4  between her report of a workplace injury and her

5  termination that same day?

6                  MR. GOLDSMITH:  Vague and ambiguous.

7      A.    Simplistically, yes.

8      Q.    (BY MR. RALSTON)  Meaning but for her report of

9  an injury, she would not have been fired when and how she

10  was fired, correct?

11                  MR. GOLDSMITH:  Lacks foundation, vague

12  and ambiguous.

13      A.    But for her timely report, yes.

14      Q.    (BY MR. RALSTON)  "But for" means had she have

15  not.  I'm sure you know that.  If you don't understand

16  one of my questions, let me know before you answer, okay?

17      A.    Yes.

18      Q.    Earlier I asked you if Mrs. Braxton hadn't

19  reported her workplace injury, she wouldn't have been

20  fired by Walmart as she was, meaning the same day and

21  same time.  And you agreed with that statement.  Do you

22  remember that testimony?

23      A.    Yes.

24      Q.    So but for Mrs. Braxton's report of a workplace

25  injury to Walmart, Walmart would not have terminated her

Quincy Usry                    Braxton vs. Walmart                1/6/2021

                                                                        56

1   as it did, correct?

2       A.   Correct.

3       Q.   And as the person in charge of compliance of

4   this health and safety policy, it is your understanding

5   that these employees have to be trained on the health and

6   safety policy contained in this Global Statement of

7   Ethics at the beginning of their employment.

8       A.   Correct.

9       Q.   That training is mandatory.

10      A.   Correct.

11      Q.   Walmart pays its employees for its mandatory

12  training.

13      A.   Correct.

14      Q.   Earlier you testified that it's Walmart's

15  position in this lawsuit that she was fired for

16  violating -- I think you said an acknowledgement.  Did I

17  understand your testimony correctly?

18              MR. GOLDSMITH:  Form.

19              MR. RALSTON:  Make proper objections.  I

20  didn't hear what you said, but it is sounded like you

21  were just talking, Mr. Goldsmith.

22              MR. GOLDSMITH:  I said, "Form."

23              MR. RALSTON:  I'm sorry.

24              MR. GOLDSMTIH:  That's okay.

25      Q.   (BY MR. RALSTON)  Earlier you testified that it

Quincy Usry                Braxton vs. Walmart              1/6/2021

                                                                    141

1        A.    Correct.

2        Q.    And listed nowhere in Walmart's responses to

3   Mrs. Braxton's interrogatory asking for all the times

4   that she had reported her workplace injury is the name

5   Mark Tuazon, correct?

6        A.    Correct.

7        Q.    And yet David Whitenack is telling you on April

8   15th, 2020 -- just to make sure I understand, Walmart's

9   contention is that it fired Mrs. Braxton based on when

10  Walmart believes it reported her workplace injury

11  relative to when she first knew about it; that's

12  Walmart's contention?

13       A.    I'm sorry, I got confused.

14       Q.    That's quite all right.  I will ask it again.

15  So Walmart's contention is that it terminated

16  Mrs. Braxton because of the timeliness or untimeliness of

17  her injury report, correct?

18       A.    Correct.

19       Q.    Walmart in this lawsuit is contending that

20  Mrs. Braxton knew about her injury on April 13th of 2020,

21  right?

22       A.    Correct.

23       Q.    And Walmart's position in this lawsuit is that

24  it fired Mrs. Braxton because she reported her workplace

25  injury on April 14th of 2020, correct?

Case 2:20-cv-02287-DDC-GEB  Document 55-1  Filed 02/24/21  Page 11 of 12

Appellate Case: 22-3003    Document: 010110660653    Date Filed: 03/21/2022    Page: 84
Quincy Usry                    Braxton vs. Walmart                    1/6/2021

142

1       A.    Correct.

2       Q.    Mr. Whitenack's e-mail in Exhibit 6 says, "At

3  approximately 21:09, Janell Braxton (JetFlex) reported

4  pain in her wrist to Mark Tuazon from her shift on Sunday

5  night."

6             Do you see that?

7       A.    Yes, sir.

8       Q.    And Sunday night would be April 12th, correct?

9       A.    Correct.

10      Q.    And so did you understand this to mean that on

11 April 12th Mrs. Braxton reported her pain in her wrist to

12 Mark Tuazon on Sunday night?

13      A.    I did not.

14      Q.    Okay.  How did you interpret this e-mail?

15      A.    I interpreted it that she reported an incident

16 on the 14th based on what occurred Sunday.

17      Q.    You interpreted this e-mail that states "At

18 approximately 21:09 Janell Braxton reported pain in her

19 wrist to Mark Tuazon from her shift on Sunday night."

20            You interpreted that sentence to mean that she

21 had reported her workplace injury on April 14th?

22      A.    At the time this e-mail is coming, that's the

23 way I perceived it, is that the incident took place or we

24 heard about it tonight from an incident that occurred

25 Sunday night.

Case 2:20-cv-02287-DDC-GEB  Document 55-1  Filed 02/24/21  Page 12 of 12

Appellate Case: 22-3003    Document: 010110660653    Date Filed: 03/21/2022    Page: 85
Quincy Usry                    Braxton vs. Walmart                    1/6/2021

168

C E R T I F I C A T E


I, SHARON L. CRAWFORD, CCR, RPR, a Certified Court Reporter in and for the states of Missouri and Kansas, do hereby certify that prior to being examined the witness was by me duly sworn; that said deposition was taken down by me in shorthand at the time and place hereinbefore stated and was thereafter reduced to writing under my direction and accurately records the witness' testimony; that I am not a relative or employee or attorney or counsel of any of the parties, or a relative or employee of such attorney or counsel, or financially interested in the action.

WITNESS my hand and seal this _____ day of _____, 2021.


_____
SHARON L. CRAWFORD
MO CCR 164, KS CCR 487, RPR

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

---

JANELL BRAXTON,

          Plaintiff,

v.

WALMART, INC.,

          Defendant.

---

Case No. 2:20-cv-02287

**DECLARATION OF DAVID WHITENACK IN SUPPORT OF DEFENDANT'S OPPOSITION TO MOTION FOR PARTIAL SUMMARY JUDGMENT**

I, David Whitenack, hereby declare and state as follows:

      1.     My name is David Whitenack.  I am over the age of 18 and have personal knowledge of the facts contained in this declaration.

      2.     In March and April 2020, I held the position of Operations Manager of Walmart's Fulfillment Center in Edgerton, Kansas.

      3.     On Tuesday, April 14, 2020, I spoke with seasonal associate Janell Braxton ("Braxton"), who informed me that she had previously injured her wrist during the April 12-13, 2020 overnight shift.  During my conversation with Braxton on April 14, 2020, she further stated that she did not tell anyone during the April 12-13, 2020 shift that she had sustained an injury.

      4.     Based on my communications with Braxton on April 14, 2020, I believed and understood that Braxton first injured her wrist during her April 12-13, 2020 overnight shift.

**EXHIBIT

2**

5.      Based on my communications with Braxton on April 14, 2020, I believed and understood that Braxton first reported her injury to Walmart during her April 14-15, 2020 overnight shift.

6.      On Tuesday, April 14, 2020, I sent a text communication to Walmart Environmental Health and Safety Operations Manager Quincy Usry ("Usry").  My text message on April 14, 2020 stated: "Just talked to [J]anell.  She said she hurt her wrist Sunday (doesn't know how) and didn't tell anyone."  A true and correct copy of my April 14, 2020 text communications to Usry is attached hereto as Exhibit C.

7.      After I sent the text to Usry on April 14, 2020, I spoke with Human Resources Business Partner Morgan Medaris ("Medaris"), who confirmed that Braxton's failure to report her injury during the April 12-13, 2020 overnight shift violated Policy 670e.

8.      Based upon my communications with Usry and Medaris, I supported the decision that Braxton's violation of Policy 670e warranted a First Written disciplinary action.

9.      Based upon my understanding that Braxton was a seasonal associate, and based upon my communications with Usry and Medaris, I supported the decision to terminate Braxton's employment pursuant to Policy 670e and Walmart's Conduct Disciplinary Action Guidelines.

*I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.*

Executed this 22nd day of February 2021.


  /s/ David Whitenack_____
DAVID WHITENACK

DOCS/2596270.3

App-I
87

5.      Based on my communications with Braxton on April 14, 2020, I believed and understood that Braxton first reported her injury to Walmart during her April 14-15, 2020 overnight shift.

6.      On Tuesday, April 14, 2020, I sent a text communication to Walmart Environmental Health and Safety Operations Manager Quincy Usry ("Usry"). My text message on April 14, 2020 stated: "Just talked to [J]anell. She said she hurt her wrist Sunday (doesn't know how) and didn't tell anyone." A true and correct copy of my April 14, 2020 text communications to Usry is attached hereto as Exhibit C.

7.      After I sent the text to Usry on April 14, 2020, I spoke with Human Resources Business Partner Morgan Medaris ("Medaris"), who confirmed that Braxton's failure to report her injury during the April 12-13, 2020 overnight shift violated Policy 670e.

8.      Based upon my communications with Usry and Medaris, I supported the decision that Braxton's violation of Policy 670e warranted a First Written disciplinary action.

9.      Based upon my understanding that Braxton was a seasonal associate, and based upon my communications with Usry and Medaris, I supported the decision to terminate Braxton's employment pursuant to Policy 670e and Walmart's Conduct Disciplinary Action Guidelines.

*I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.*

Executed this 22 day of February 2021.

DAVID WHITENACK

DOCS/2596270.3

2

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

JANELL BRAXTON,

        Plaintiff,

                                     Case No. 2:20-cv-02287

v.

WALMART, INC.,

        Defendant.

**DECLARATION OF QUINCY USRY IN
SUPPORT OF DEFENDANT'S
OPPOSITION TO MOTION FOR
PARTIAL SUMMARY JUDGMENT**

I, Quincy Usry, hereby declare and state as follows:

      1.      My name is Quincy Usry. I am over the age of 18 and have personal knowledge of the facts contained in this declaration.

      2.      Since May 2017, I have been held the position of Operations Manager of the Walmart's Fulfillment Center in Edgerton, Kansas.

      3.      In March and April 2020, Walmart maintained a written Policy 763e, which stated in pertinent part: "All known injuries, no matter how slight, will be reported to a member of management immediately. At a minimum, these must be reported to a member of management by the end of the shift." A true and correct copy of Walmart's Policy 763e is attached hereto as Exhibit A.

      4.      In March and April 2020, Walmart maintained a written Policy 670e, which stated in pertinent part that "[f]ailure to report any known injury before the end of the shift" would result in a First Written formal disciplinary action. A true and correct copy of Walmart's Policy 670e is attached hereto as Exhibit B.

**EXHIBIT
3**

5. On Tuesday April 14, 2020, I received a text communication from Walmart Operations Manager David Whitenack ("Whitenack"). Whitenack's text message on April 14, 2020 stated: "Just talked to [J]anell. She said she hurt her wrist Sunday (doesn't know how) and didn't tell anyone." A true and correct copy of Whitenack's April 14, 2020 text communications to me is attached hereto as Exhibit C.

6. Based on receipt of the text message from Whitenack on April 14, 2020, I believed and understood that Janell Braxton first injured her wrist during her April 12-13, 2020 overnight shift.

7. Based on receipt of the text message from Whitenack on April 14, 2020, I believed and understood that Braxton first reported her injury to Walmart during her April 14-15, 2020 overnight shift.

8. Based upon my belief and understanding that Braxton failed to report her injury to Walmart before the end of her April 12-13, 2020 shift, I concluded that Braxton had violated Policy 763e and Policy 670e.

9. Based upon my conclusion that Braxton had violated Policy 670e, I supported the decision that Braxton's violation warranted a First Written disciplinary action.

10. Based upon my understanding that Braxton was a seasonal associate, and based upon my communications with Whitenack, I supported the decision to terminate Braxton's employment pursuant to Policy 670e and Walmart's Conduct Disciplinary Action Guidelines.

*I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.*

2

Executed this 19th day of February 2021.

QUINCY USRY

DOCS/2596205.4

WMW-763e  Rev. 10/19
**General Safe Work Practices**
eCommerce



Associates must adhere to eCommerce Safety, Compliance, Trust, and Emergency Procedures, to include the DC-11 Dot Com Safety Manual, eEP Dot Com Emergency Procedures, and DC-28 Environmental Regulatory Compliance Manual. This includes being attentive and responsive to the safety and health of fellow associates.  Associates are empowered to share and contribute suggestions and ideas for improving the safety in the fulfillment center (FC). Participation in safety and health programs is a condition of employment. The list below of Safe Work Practices is not all inclusive but serves as a general guideline for ensuring the safety and health of our associates.

**Dress Code:**
- Closed toe and heel shoes that do not expose the top of the foot will be worn.  Platform, wedges, "Shape-Up", and Minimalist / Five toe shoes and/or shoes with a heel in excess of 1 ½ inch high or less than 1 inch wide are prohibited.
- Nails (Natural or Artificial) will not exceed 1/2 inch beyond the finger-tip.
- To eliminate potential hazards when working in areas where conveyors are present:
  - Hair past your shoulders must be put up in bun style, in a hair net, and/or a cap.
  - Baggy and loose clothing, jewelry and accessories are not permitted and/or veils and scarves that hang more the 3 inches beyond the neckline must be tucked in and/or removed.  Hooded clothing (i.e. "hoodies") and/or other clothing items that may create a choking hazard are prohibited.  (Note: Hoodies may be worn in work areas where conveyors are not present, however strings must be tucked in they must remain off the head and cannot restrict peripheral vision.)
  - Beards exceeding 3 inches from the face will be tied up or netted.
- The following items are not permitted to be worn inside the FC:
  - Sunglasses, Mirrored, or Tinted lenses
    - Exception: Authorized associates wearing approved and tinted PPE for welding operations or associates with proper medical accommodation-contact Human Resources).
  - Lanyards worn will be equipped with "break away" device.

**Safety Related Incidents:**
- All known injuries, no matter how slight, will be reported to a member of management immediately.  At a minimum, these must be reported to a member of management by the end of the shift.
- All Powered Industrial Trucks (PIT) and/or Property Damage incidents will be reported to a member of management immediately.
- Associates will discretely report to Human Resources any:
  - Personal medications or conditions that may affect their ability to safely perform their job.
  - Non-work related or pre-existing conditions that may affect their ability to safely perform their job.
- When needed, associates will cooperate in incident investigations.

**General Safety:**
- Associates will actively and cooperatively participate in facility safety and health initiatives.
- Associates will correct unsafe conditions when they are identified.  If the associate is unable to immediately correct the condition, he/she will report it immediately to their manager.
- "Clean as you go"- All areas will be kept clean so that the area does not create a safety hazard.  Associates will immediately clean any discovery of trash, debris, or a spill (i.e. cardboard, wood, oil, damaged product, etc.).
- Horseplay of any kind is strictly forbidden.

App-I
92

CONFIDENTIAL;
SUBJECT TO PROTECTIVE ORDER



EXHIBIT A

WM_Braxton_000144

WMW-763e  Rev. 10/19
**General Safe Work Practices**
eCommerce



- Personal firearms and illegal weapons are not permitted on company property.  Refer to the Violence-Free Workplace Policy for more information on state exceptions that permit firearms in a locked vehicle on company property.
- Associates are not permitted on company property while under the influence or in possession of intoxicants or non-prescribed drugs (narcotics).  Refer to the Alcohol and Drug Free Workplace Policy for further information.
- Associates must have a valid license and/or certification to operate a powered industrial truck or specially designated equipment. Associates must be licensed and certified through the approved training processes.
- All exterior doors, to include dock doors, will be kept shut when not in use.  If left opened, an approved screen that meets food safety criteria is put in place.
- Only authorized associates are permitted to perform Lockout Tagout activities.  All safety procedures will be followed when clearing jams on conveyors, operating equipment, etc.
- Only authorized and licensed associates may access the yard.
  - Exception: In the event of an emergency, associates may have to access the yard to reach the appropriate safety/ evacuation zone. During this time, normal operations of the yard will stop, allowing individuals to seek safety.
- Associates will wear approved material handling gloves when handling product, freight, boxes, or pallets, using or handling equipment, tools, and metal seals and/or opening and closing trailers doors.

**Pedestrians:**
- Associates will only walk in approved and designated walk areas.
- Associates will not enter unauthorized areas (i.e. signed, active construction, PIT only).
- Associates will only cross PIT traffic lanes at approved and designated locations.
- Pedestrians must maintain a safe distance around operating powered industrial trucks (minimum 8 feet) and/or powered industrial trucks when the load is moved up or down or there is an overhead load (minimum 20 feet).  This also applies to stock pickers.
- Associates will not stand or walk under the forks of a loaded or unloaded forklift.
- Associates will use hand-rails when climbing stairs, crossovers, etc.  A minimum of three points of contact will be maintained.
- Associates will only use approved doors for entry and exit. Emergency Fire Doors, Dock doors, Fire Wall Doors that are not designated for general entry and exit will not be used.
- Never walk into an aisle from a blocked or blind location without stopping and looking for other traffic.
- Associates will not jump from elevated working/ walking surface.  The designated steps or rungs will be used.
- Pedestrian doors that open to an active PIT aisle will be guarded (i.e. bollards, guardrails, chains and/or railing) to protect pedestrians. Pedestrians must walk within this guarded area.
- Hi Visibility Safety Vests:
  - Will be worn by selected associates and contractors in the Walmart Fulfillment Center (Refer to Standard Safety Equipment Procedure).
  - Vests will be worn over the last layer of clothing and donned before entering the floor of operation or beginning work activity (whichever comes first).

**Parking Lot:**
- Associates must obey all posted traffic rules and signs when driving personal vehicles on the parking lot.  Parking lots will not be posted with speed limits that exceed 10 mph.
- Associates will not run on Walmart owned, leased or occupied property.
- Vehicles must be properly parked within a single parking space. Associates will only park in a single space.
- Associates will not park in a specially selected and signed location (i.e. Visitor, Disabled Zone, or Associate of the Month) unless authorized.

**App-I**
**93**

CONFIDENTIAL;
SUBJECT TO PROTECTIVE ORDER

WM_Braxton_000145

WMW-763e  Rev. 10/19
**General Safe Work Practices**
eCommerce



- During inclement weather, associates will follow designated walking paths to and from the facility.  These paths will be properly treated for associate safety.

**Pallet Handling and Product Storage:**
- Before using, associates will verify pallets are in good condition.  Damaged pallets will be removed from service immediately.
- Associates will only physically handle one pallet at a time.
- When transporting, empty pallets will not be stacked more than 12 high. The stack height will not exceed the height of the mast for stand-up counterbalanced trucks (i.e. Crown RR/RM, Crown RC) and/or the backrest of a front-rider or center-rider (i.e. Crown PC4500).
- Associates are not permitted to climb on, up, under, or through pallet racking.
- Associates will not stand, walk, or step on pallets in elevated or non-pickable locations unless fall protection is properly donned. (Note: Associates that are fully outside the confines of elevated equipment must have approval form the FC Director and it must be planned event.).
- When picking from pickable floor pallet locations only, Associates will be allowed to place one foot on the top slat of the front of the pallet (middle support beam) to gain access to pickable locations.  If the middle support location is inaccessible a standard reach tool shall be utilized to gain access to pickable locations.
- Associates should use leverage when possible to physically maneuver pallets.  However, when not possible, the chart below will be followed when physically lifting to stack and/or de-stack pallets:

| "White Wood" | $1^{st} - 5^{th}$ pallet in stack | One handler may physically handle |
| | $6^{th} - 10^{th}$ pallet in stack | Team lift is required for physical lift |
| | 11th pallet in stack and above | Powered Industrial Truck (PIT) required to mechanically handle |
| Plastic, Blue CHEP, & Red PECO | $1^{st} - 4^{th}$ pallet in stack | Team lift is required for physical lift. |
| | 5th pallet in stack and above | Powered Industrial Truck (PIT) required to mechanically handle |

- Pallets will only be stored in a flat position.  A pallet will not be stored on its side, edge, end and/or in a leaning position.
- Pallets will only be stored in approved locations.  A single pallet, not located in a pallet return, pick location and/or a designated area, will have product, an empty tote, or a safety cone placed on top to visually identify the potential trip hazard.
- Pallets will only be stored in approved storage locations.
- Pallet storage locations may not extend into pedestrian walkways.
- Pallets must be stably stacked.  Only pallets of like size and material will be stacked together. Pallet sizes should not be mixed.  In the rare event pallet sizes must be mixed, the recommended max stack height will be reduced by half.
- In elevated pallet storage locations, empty pallet stacks or product on pallets shall not exceed the height of the outward-facing guardrail.
- Pallets will not be stacked within 20 feet of workstations or walkways. Safety nets to prevent items from falling onto pedestrians will be used for pallet racking storage within 20 feet of workstations or walkways.
- Pallets of product stored in pallet racking above floor level and not in active pick locations will be secured with at least two layers of shrink wrap, banding, and/or filament tape to prevent items from falling off the pallet.
- When storing pallets (to include empty pallets and pallets of product) in racking, the pallet and product shall not exceed a maximum of 3 inches overhanding the front of the rack.

**Carts & Cages:**

**App-I**

**CONFIDENTIAL;
SUBJECT TO PROTECTIVE ORDER**

WM_Braxton_000146

WMW-763e  Rev. 10/19
**General Safe Work Practices**
eCommerce



- Carts/ cages will be parked and stored in designated areas.
- Carts/ cages must be inspected before each use.  Damaged carts and cages will be immediately removed from service if defects are found.
- Associates will push carts and cages (not pull) with both hands keeping elbows in.  Carts/ cages will be pushed using handles.
- Associates will maintain physical control of the cart/ cage until it comes to a complete stop.
- Associates will only push one cart/ cage at a time.
- Associates will not ride on carts/ cages.
- Product stacked on carts/ cages will not be stacked above eye-level and/or obstruct the associate's view while pushing.
- Associates will stop at the end of every aisle, intersection, and/or designated stop area. When at these locations in the module, associates will shout "in" or "out" and/or use an approved safety device (i.e. bell, etc.) to announce presence.

**Transporting Loads and Materials:**
- Pallet jacks will be inspected before each use.  Damaged jacks will be immediately removed from service if defects are found.
- Pallet jack operators will pull pallet jacks when transporting loads.
- When not in use, pallet jacks will be parked and stored in designated areas. The pallet jack forks will be fully lowered and stored under a pallet with the handle in the locked position.
- Associates will not stand on and/or attempt to ride pallet jacks.
- All loads will be straight, stable, and secure before transporting.
- When transporting loads, the height will not exceed the mast of the equipment.
- When transporting loads on mastless equipment (i.e. Center Rider/ Front Rider) the following practices will be followed:
  - When Single pallet loads extend past the backrest of the equipment the top of the load will be secured with shrink wrap to prevent the load from shifting during transport.
  - Stacked pallet loads may be transported as long as the top load's pallet does not exceed the backrest of the equipment. The top load will be secured with shrink wrap to prevent the load from shifting during transport.
  - When backing a load that exceeds 6 feet a spotter will be used.
- Associates will not physically reach to greater than 6 feet to stack a load.  If a load greater than 6 feet is necessary (i.e. upstacking loads on the dock to maximum trailer cube) it must be stacked mechanically.
- When stacking loads, ensure they are straight and stable.
- Never block or place objects in front of fire extinguishers, hoses, fire risers, emergency exits, eye wash stations, automated external defibrillators (AED), electrical cabinets and/or other emergency equipment.  Notify a manager i**mmediately** if any emergency equipment becomes damaged.

**Ergonomics / Body Mechanics:**
- Associates will participate in the facility's designated warm-up program.
- Associates will practice safe lifting techniques:
  - *Face Work* – Square up to what is being lifted to eliminate twist and stress.  Also, square up to the delivery point prior to setting the product down.
  - *Lead with the Feet* – After case is lifted, move feet to eliminate twisting at the waist. Square up to the delivery point prior to delivering product to end point.  Always move your feet to stay in front of the work being done.
  - *Shoulders Square* – Eliminate side to side twist of shoulders.  Use handholds in product or reach under the product to securely and evenly lift load.  Tip large cases on a 45-degree angle and lift with shoulders even.  Move case instead of shoulders.

CONFIDENTIAL;
SUBJECT TO PROTECTIVE ORDER

**App-I**
**95**

WM_Braxton_000147

WMW-763e  Rev. 10/19
**General Safe Work Practices**
eCommerce



- o *Keep It Close* – Slide case as close as possible prior to lifting. When placing product on a conveyor or pallet don't over-extend. Place case on edge of pallet and slide into position.
- o *Don't Fly Like a Bird* – Keep elbows down and in a position of strength instead of up and out. Watch for the elbows being extended up and out.
- o *90 Degree Bend* – Bend at the knees vs. bending at the waist. Use the legs and keep the back as straight as possible when lifting.
- o *Don't Hold* – Know where you are going to place the product prior to lifting. Plan where the product is going prior to picking it up.
- o *Use Momentum Lift* – The weight of the product helps deliver it to the end point. With elbows slightly bent, pick up the case. Take a short step and use the momentum of the step to start the product moving. Guide to the delivery point and release as it touches down. This must be a smooth, controlled motion from pick-up to delivery point. Do not attempt to throw freight.
- o *Leverage Transfer* – Use a planned lift when moving large, bulky items. Slide the case part of the way off the pallet and stand it on end. Walk it to the take-away pallet and lower to the ground. Make certain the take away pallet is correctly positioned so it is not too close or too far away.
- o *Wrist Straight* – When picking up small items with one hand, use caution to keep the wrist in a neutral position. The wrist is designed to flex up and down, like shaking hands. The thumb should be pointed up as much as possible to eliminate stress on the wrist.
- When using hand-held equipment (i.e. scanners, tools, etc.) wrists should be kept in a neutral position.
- Ergonomic mats will be use in locations where associates are expected to stand for periods of 15 minutes or longer. Associates will stand on approved ergonomic mats when working in applicable areas.

**Box Knives**:
- When using box cutters, associates will:
  - o Only use an approved box knife(s).
  - o Retract the razor blade into the box knife handle when not using the knife (retractable blades).
  - o Replace the razor blade when it becomes dull or broken.
  - o Hold the item securely when cutting so it cannot shift or move.
  - o Concentrate on the item to be cut and watch the blade at all times.
  - o Apply a consistent, firm (but not excessive) pressure while performing the cut.
  - o Always cut away from the body and be mindful of the opposite hand placement and ensure it is out of the cut path.

**Conveyors and Material Handling Equipment (MHE)**:
- Associates will not step, sit, stand or climb on non-approved walking surfaces (i.e. conveyors, pallets, merchandise, carts, racks). Additionally, associates are not permitted to walk, ride, stand, or climb on, under or over any machine or equipment.
  - o Exception: With proper preparation and planning, "Authorized associates" may have a need to step, sit, stand or climb on these areas. In these instances, the appropriate and applicable procedures will be followed (i.e. Lockout Tagout, Personal Protective Equipment- Fall Protection).
- Associates will not work at conveyor transition zones.
  - o Exception: With proper preparation and planning, "Authorized associates" may have a need to step, sit, stand or climb on these areas. In these instances, the appropriate and applicable procedures will be followed (i.e. Lockout Tagout, Personal Protective Equipment- Fall Protection).

App-I
96

CONFIDENTIAL;
SUBJECT TO PROTECTIVE ORDER

WM_Braxton_000148

WMW-763e  Rev. 10/19
**General Safe Work Practices**
eCommerce



- Associates will not walk or work under platforms, structures or elevated equipment that is less than 6 feet 8 inches.
  - Exception: With proper preparation and planning, "Authorized associates" may have a need work in these areas. In these instances, the appropriate and applicable procedures will be followed (i.e. Lockout Tagout, Personal Protective Equipment- Fall Protection).
- Associates will not crawl under, between, or over and/or lean over conveyors.
- Conveyors and MHE, such as belts, pullies, and rollers under 7 feet, will be properly guarded.
- Emergency stop buttons and cabling at work station areas will not be obstructed and remain accessible at all times.

**Ladders (Portable & Fixed):**
- Associates will select the correct ladder for the job. When selecting a step ladder, only use a ladder OSHA rated as a "Type I – Industrial Step Ladder".
- All fixed ladders built in-house must conform to OSHA standard 29 CFR 1910.27.
- When climbing, descending, or working from a ladder, associates will not overload themselves or the ladder. If needed, associates will ask a partner to hand them the load once in the proper position.
- Only wood or fiberglass ladders will be used when working on electrical equipment or lighting.
- Associates will face the ladder when ascending or descending a ladder.
- Ladders will be ascended/ descended one step at a time using at least one hand to grasp the ladder when moving up or down the ladder (maintaining 3 points of contact).
- Ladders will be maintained to be free of oil, grease, and other slipping hazards. Make sure footwear is free of oil, grease, or another slipping hazard.
- Never climb or jump off the ladder onto a rack, piece of equipment, etc. Always work from the ladder.
- When portable ladders are used for access to an upper landing surface, the side rails will extend at least three feet above the upper landing surface. When such an extension is not possible, the ladder must be secured. A grasping device, such as a grab rail, must be provided to assist the associate in mounting and dismounting the ladder. A ladder extension must not deflect under a load that would cause the ladder to slip off its support.
- When moving or using a portable ladder, watch for overhead objects, lights, sprinkler heads, and electrical wires. Two or more associates may be required to move a large ladder.
- When using a Portable Ladder:
  - Make sure a step ladder is fully spread (extended) and locked.
  - Standing on the first step, rock the ladder back and forth to ensure that it is in a stable position.
  - Do not push a ladder through a swinging door to open it. Open the door, brace it and post an associate to prevent a collision.
  - Never overreach. Reposition the ladder closer to the work area.
  - Never climb past the second step (rung) from the top unless it is a platform ladder.
  - If the ladder is positioned by a door or walkway, block the door or walkway to prevent collisions.
  - Use the non-self-supporting ladders at an angle where the horizontal distance from the top support to the foot of the ladder is approximately one-quarter of the working length of the ladder.
  - Ladders will not be used on slippery surfaces unless secured or provided with slip resistant feet to prevent accidental movement. Slip resistant feet will not be used as a substitute for the care in placing, lashing or holding a ladder upon slippery surfaces.
  - Areas around the top and bottom of the ladder will be kept clear.
- The top of a non-self-supporting ladder will be placed with two rails supported equally, unless the ladder is equipped with a single support attachment.

App-I
97

CONFIDENTIAL;
SUBJECT TO PROTECTIVE ORDER

WM_Braxton_000149

WMW-763e  Rev. 10/19
**General Safe Work Practices**
eCommerce



- Do not use cross-bracing on the rear section of step ladders for climbing unless the ladder is designed and provided with a step for climbing on both front and rear sections.
- Ladders will not be used by more than one associate at a time.
- Ladders will not be placed on boxes, barrels, or other unstable bases to obtain additional height.
- Ladders will not be tied or fastened together to provide longer sections.
- Ladders will be inspected by a qualified associate for visible defects.  A qualified associate is someone who has reviewed these safe work practices.
- Associates will inspect the ladder for defects before use.  Defective ladders will be tagged with "Danger – Do Not Use" and withdrawn from service.
- Ladders will be maintained in good condition.  The joint between the steps and side rails must be tight, all hardware and fittings securely attached, and the movable parts must operate freely without binding or undue play.
- A ladder will be inspected ladder after any incident that could affect its safe use.  If a ladder tips over, immediately inspect the ladder for side rail dents, bends, and excessively dented rungs.  Check all rung-to-side-rail connections, hardware connections, and rivets for shears.
- The steps to inspect a ladder are as follows:
  - Look at the feet (the portion that touches the ground) for cracks.
  - Look for missing or faulty rubber safety treads (if equipped).
  - Look for uneven edges, bent or broken rails, and missing braces.
  - Look at steps (rungs) for cracks or broken sections.
  - If it is a step-ladder, spread and check the spreader bars.  Determine if they are straight or if the ladder wobbles.
  - Check for stability by opening the ladder and stand on the first step.  Shake the ladder and determine if you would feel comfortable working on the ladder.  If the ladder moves around too much, tag it out, and follow the procedures below.
  - For wooden ladders, all wood parts shall be free from sharp edges and splinters; sound and free from accepted visual inspection from shake, wane, compression failures, decay, or other irregularities.

**Step Stands/ Stools:**
- Only industrial rated step stands/ stools with manufacturer's stated load capacity will be used.  The manufacturer's stated load capacity of the stand must not be exceeded.
- Inspect step stand/ stool to ensure it is in good repair before use.  If there are cracks or damage, do not use the stand.
- Ensure proper placement of the step stand/ stool to prevent overreach while working.
- When the step stand is not in use, store it where it will not interfere with egress, the loading/unloading of trailers, extendable conveyor operation, and powered industrial truck operation.

**eCommerce FC Orderfilling Module:**
- All replenishment gates kept in the replenish position unless being utilized.
- Associates will not step into an unguarded transfer gate location.
- Associates will not stand in front of slot locations being replenished.
- Associates will not lean on the guard rails on the exterior of the module.
- The quantity of empty pallets in a module pallet return will not exceed 6.
- Be sure pallet load is stable before breaking tape or cutting shrink wrap.

**eCommerce FC Pallet Module:**
- Associates will not step into elevated pallet locations in the first level of the module.  Pallet pull hooks will be used as needed to pull pallets forward.
- Associates are strictly prohibited from placing any body part(s) beyond the first pallet position when on the second floor (or higher) of the module.  A visible line will be present to depict this

CONFIDENTIAL;
SUBJECT TO PROTECTIVE ORDER

WM_Braxton_000150

**General Safe Work Practices**
eCommerce



zone.  Fall protection must be worn and/or proper guarding (Top rail, mid rail, and toe board) must be present to physically access this location.
- Associates will not stand in front of slot locations being replenished.
- Associates will not lean on the guard rails on the exterior of the module.
- The quantity of empty pallets in a pallet module pallet return will not exceed 3.
- Be sure pallet load is stable before breaking tape or cutting shrink wrap.

**Baler Safety:**
- Associates will not overfill the baler.
- Keep the baler door gates closed while cycling the machine.
- It is never acceptable to enter the baler or place a part of your body into the baler.
- The area around the baler will be clear of obstructions, to include the emergency disconnect switch.
- Balers have a red emergency stop button which immediately stops the equipment.  Locate this button so it can be used in case of an emergency.
- Personal protective equipment (PPE) to include safety glasses and gloves, will be worn when opening the chamber door of the baler and/or ejecting and preparing the final bale.
- If cardboard gets caught in parts of the baler or in the openings for the tie wire, dislodge it with a broom handle or bar, but do not do this while the baler is cycling.
- If unable to dislodge material that is stuck inside the baler or otherwise cannot operate the baler, immediately contact the Maintenance Department for repair.
- Visually verify that the area is clear, and no associates have entered the baler door area before cycling the machine.

**Compactor Safety:**
- Associates will not use the compactor for containers of chemicals or liquids, either full or partially empty.  Compacting these items can contribute to potential fires.
- Compactors will not be used to compress cardboard.  Cardboard should be placed into the baler.
- Associates will not overload the compactor chute.  To reduce the potential for jams, break down large items before placing them in the compactor chute.
- The compactor chute door must be closed during operation.
- A safety interlock is located on the compactor door.  The interlock ensures the compactor does not operate when the door is in the open position.  If it is not operating properly, immediately stop the cycle and contact the Maintenance Department.
- Associates will not overload the compactor.  If it is full or it malfunctions, immediately contact the Maintenance Department.
- Keep the area around the compactor clear to include the emergency disconnect switch.
- Never place any part of your body in the compactor or climb into the trash compactor chute
- Compactors have a red emergency stop button, which immediately stops the equipment.  Locate this button so it can be used in case of an emergency.
- In the event of a compactor chute jam, attempt to dislodge the jammed item with a broom handle or bar after the compactor has finished the cycle in progress.

**Tier Racking Safety:**
- All tier racks must be visually inspected prior to being used.  Never use bent or damaged components (uprights or base unit).
- Loaded tier racks are to be transported one high with a powered industrial truck or equipment with forks.  Clamps cannot be used to transport tier racks.
- No shrink wrap is to be used outside of the uprights.
- Loads shall not exceed the tier rack load capacity rating and/or the recommended stack height of the manufacturer.

App-I
99

CONFIDENTIAL;
SUBJECT TO PROTECTIVE ORDER                                      WM_Braxton_000151

WMW-763e  Rev. 10/19
**General Safe Work Practices**
eCommerce



- When hauling empty stacked (non-spiral) tier rack, the stack should not exceed 8 (height that would fit in a trailer) and be shorter than their mast.
- If any component is found to be damaged notify your Manager immediately.
- Orderfilling should occur from the top to the bottom of the slot.  Never pick from a bottom slot with loaded tier rack above.
- Loaded tier racks will be unstacked one rack at a time when stacked without a powered industrial truck.
- Overhang should be avoided whenever possible.  Freight will be stacked parallel to the tier rack support cross bars allowing overhang on the sides not to the front and back.

**Reliability Maintenance Engineering (RME):**
- Non-portable equipment will be secured to a floor and/or workstation when the ability to secure the equipment is present.
- RME associates will only use approved equipment and tools and will store them safely in approved locations.  Equipment & tools will only be used for their intended purposes.  Only tools provided by the company are permitted for use.  Personal tools strictly prohibited.
- All equipment and tools will be inspected before use.  Damaged tools will be tagged and immediately removed from service.
- Safety glasses, gloves or other Personal Protective Equipment (PPE) will be worn as required with tools and equipment.
- Drill Press Operation:
  o Guarding will be present over the motor, belts, and pulleys.
  o An adjustable guard will be installed to cover the unused portion of the bit and chuck above the material being worked. Before starting the drill press, the guard will be functional and in place.
  o Only authorized associates will operate the drill press.
  o Before drilling, materials will be secured to the drill press bed with clamps so that the material will not spin and/or strike the operator. The operator will not attempt to adjust the drill press, work platform or stock while the drill bit is still rotating.
  o The drill press will only be used for its intended purposes.
  o The drill press will be shut off when not in use or when left unattended for any period of time.
  o Remove the chuck immediately after removing a drill bit.
  o Lockout Tagout procedures will be followed if drill press is hardwired or un-plug if drill press is cord/plug type prior to servicing or adjusting the drive belts. Refer to Lockout Tagout procedures for specific information.
  o The drill press will be secured to the floor if it is a pedestal type or to the bench if it is a bench top model prior to operation.
  o Drill bits will be sharp and designed for the product being drilled (i.e. wood, metal, ceramic, masonry, etc).
- Battery Room:
  o Care will be taken in the Battery Room to prevent explosions or spills of acids.
  o Batteries will not be overfilled. Battery acid should be treated as hazardous and disposed of accordingly. Emergency showers should be accessible and properly marked in the Maintenance area. Access to emergency showers will be kept clear at all times.
  o The Battery Change Personnel will wear required PPE (i.e. face shields, goggles, apron, gloves, etc.) while changing or servicing batteries.
- Flammable/Hazardous Chemicals:
  o Care will be taken in handling and storage of any flammable or hazardous chemicals.
  o Chemicals will not be mixed unless they are intended to be mixed.  If mixed, the manufacturer's mixing directions will be followed.
  o Material Safety Data Sheets must be made available for review in the facility's MSDSOnline eBinder.

**App-I**
**100**

CONFIDENTIAL;
SUBJECT TO PROTECTIVE ORDER

WM_Braxton_000152

WMW-763e  Rev. 10/19
**General Safe Work Practices**
eCommerce



- o   Any flammable or hazardous chemical not being used will be stored in the flammable cabinet.
- Welding, Cutting, and/or Brazing:
  - o   Welding, cutting and brazing will be performed according to the DC-11 Dot Com Safety Manual, 0601 Hot Works procedure.
  - o   Welding, cutting, and brazing will occur in the shop area when possible. If welding is to be performed elsewhere, the Hot Works Procedure must be followed, to include:
    - ▪   Obtaining a Hot Works Permit from Safety, Compliance, & Trust (SCT).
    - ▪   A trained fire watch associate must be present at all times during the process with a fully charged fire extinguisher.
    - ▪   Flash reduction screens will be used to protect associates working in the area. Caution associates to avoid welder flash and sparks.
  - o   Personal Protective Equipment, according to the DC-11 Dot Com Safety Manual, 0601 Hot Works procedure will be worn.
- Housekeeping in the Maintenance area is important.  The area will be kept clean and 5S standards (where applicable) followed to prevent slips, trips and falls.
- Storage areas will be kept organized and clean. Flammable liquids will be stored in a U.L. approved cabinet and grounded (as applicable).
- Electrical Safety:
  - o   Grounding prongs must never be removed from electrical devices.
  - o   Do not perform equipment modification that could adversely affect grounding.
  - o   Use portable fiberglass ladders when working on electrical circuits.
  - o   Do not wear conductive jewelry, materials, or clothing when working on energized circuits.
  - o   Treat non-locked/non-tagged electrical equipment as conductive or energized parts.
  - o   De-energize equipment except when testing or troubleshooting is being performed.
  - o   Conduct tests or visual inspections before energizing electrical equipment.
  - o   Warn associates to stand clear before energizing electrical equipment.
  - o   Update electrical prints after completing any modifications.
  - o   Before using a voltage detector:
    - ▪   Review process for selecting appropriate voltage detector.
    - ▪   Review how to use a device to verify an absence of voltage and interpreting indications from the device.
    - ▪   Examine how to understand all limitations of each voltage detector that may be used.
- NFPA 70e – Arc Flash:
  - o   RME associates will follow the 2301 Arc Flash/ Electrical Safety Program procedure as outlined in the DC-11 Dot Com Safety Manual.
  - o   RME associates will follow guidelines for Limited Approach Boundary and Restricted Approach Boundary.
  - o   Only trained and qualified RME associates work on energized electrical equipment.
  - o   Before performing work, RME associates will:
    - ▪   Examine skills and techniques for distinguishing exposed energized electrical conductors and circuit parts from other parts of electrical equipment.
    - ▪   Review how the degree and extent of a hazard is determined as well as PPE and job planning necessary to perform tasks.
  - o   Understand proper use of special precautionary techniques, including Arc Flash Personal Protective Equipment (PPE), insulated materials, and tools.
  - o   Housekeeping duties will not be conducted near live electrical parts, unless safeguards are provided.
  - o   Never reach blindly into areas that may contain live electrical components.
  - o   Qualified RME associates will not enter spaces containing exposed energized parts unless illumination is provided.

CONFIDENTIAL;
SUBJECT TO PROTECTIVE ORDER

WM_Braxton_000153

WMW-763e  Rev. 10/19
**General Safe Work Practices**
eCommerce



- Lockout Tagout:
  - RME associates will follow the 2201 Lockout Tagout Program procedure as outlined in the DC-11 Dot Com Safety Manual.
  - Only trained and authorized RME associates will perform Lockout Tagout activities.
  - RME associates will de-energize electrical components and verify that it is de-energized before working on or near them.
  - RME associates will properly Lock/Tag electrical circuits or equipment that have been de-energized. When LOTO placard is provided, the RME associate will follow it.
  - Any stored energy will be relieved before work begins.
  - Interlocks will not be used as a substitute for Lockout Tagout procedures.

App-I

CONFIDENTIAL;
SUBJECT TO PROTECTIVE ORDER

WM_Braxton_000154

WMW-670e 11/2019

**Safety & Compliance Rule Violation Form**
eCommerce



Associate Name: _____ Associate #: _____ DOH: _____ Reference #: _____

Date of Violation: _____ Time: _____ Manager Name: _____

---

**Documented Coaching** (Note: Any repeat of the same violation within 180 calendar days will result in a Step.)

- Safety
    - Not actively participating in a start-up exercise program.
    - Failure to follow General Safe Work Practices not otherwise covered specifically within this guideline.
    - Failure to follow Powered Industrial Truck Safe Work Practices not otherwise covered specifically within this guideline.
- Compliance
    - Failure to follow stacking directional arrows on regulated items.
    - Failure to close hazardous waste drum properly.
    - Failure to follow spill cleanup procedures.

---

**Step 1** (Note: Any repeat of the same violation within 180 calendar days will result in a minimum of a Step 3, up to and including, termination.)

- Safety
    - Failure to report any known injury before the end of the shift.
    - Failure to report a non-reckless and/or careless powered industrial truck accident at the time it occurs.
    - Failure to properly complete a WMW-118 or WMW-119.
    - Careless personal behavior regardless whether this resulted in an incident.
    - Entering or exiting through an unauthorized door or entry/exit way.
    - Jumping from an elevated working/walking surface.
    - Failure to use appropriate jack stabilizer.
    - Blocking a Fire Exit or Path of Egress.
    - Powered Industrial Truck Operator and Battery Changer failure to verify Battery Plate replacement after Battery Exchange.
    - Failure to wear required personal protective equipment (PPE) not otherwise covered specifically within this guideline.
- Compliance
    - Covering hazardous material carton coverings.
    - Improper processing of compromised regulatory cartons.
    - Failure to secure all shipments.
    - Shipping fully regulated cartons that are damaged, opened, or considered unsecure.
    - Failure to apply the proper hazardous material shipment label (e.g. lithium ion, lithium metal).
    - Improper classification or disposal of product.
    - Failure to provide proper outbound paperwork for regulated shipments.

---

**Step 3**

- Safety
    - Stepping on the pallet position/location within the module without safety gate in place.
    - Reckless personal behavior regardless whether this resulted in an incident.
    - Using tobacco in unauthorized area.
    - Authorized Associate – Yard Safety Access/Trailer Procedure Control Rule Violation.
- Compliance
    - Unauthorized signature on Haz-Waste Manifest or Bill of Lading.
    - Disposal of unauthorized liquids or chemicals down drains.

---

**Termination**

- Safety
    - Willful disregard for Safety and Compliance.
    - Lockout Tagout/Access Procedure Violation.
    - Hot Works Violation.
    - Arc Flash (NFPA 70E) Violation.
    - Failure to wear and/or Properly Utilize Fall Protection.
    - Horseplay
    - Unauthorized Associate – Yard Safety Access/Trailer Procedure Control Rule Violation.
    - Modifications and additions to equipment which affect capacity and safe operation.
    - Stepping over/under an unguarded conveyor where proper handrails are not in place.
    - Operating equipment without the proper license, certification, and/or training.
    - Bypassing or unauthorized removal of a safeguarding safety device.
- Compliance
    - Improper disposal of hazardous waste (EC-03).
    - Willful violation of DC-28 Environmental Regulatory Compliance Manual, Supply Chain Hazardous Waste Management procedures.

App-I
103

EXHIBIT

B

WM_Braxton_000097

DW

David >

Tue, Apr 14, 10:36 PM

Are you awake?

Yea what's up

Just talked to janell. She said she hurt her wrist Sunday (doesn't know how) and didn't tell anyone

Hurt how? Can she write a statement. She only get coached if she describes pain

Yes I'll have her write a statement

Thank you. When you get it send me a picture of it.

Will do.  IR and 5 why?

How long do they have to report? EOS?

I will send you the line. I want to see the statement first

You got it.

Should have it in a minute or two

iMessage

**EXHIBIT C**

CONFIDENTIAL;
SUBJECT TO PROTECTIVE ORDER                                                          WM_Braxton_000103

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

JANELL BRAXTON,

      Plaintiff,

v.

WALMART, INC.,

      Defendant.

Case No. 2:20-cv-02287

**DECLARATION OF MORGAN MEDARIS IN SUPPORT OF DEFENDANT'S OPPOSITION TO MOTION FOR PARTIAL SUMMARY JUDGMENT**

I, Morgan Medaris, hereby declare and state as follows:

    1.    My name is Morgan Medaris.  I am over the age of 18 and have personal knowledge of the facts contained in this declaration.

    2.    In March and April 2020, I held the position of Human Resources Business Partner at Walmart's facility in Edgerton, Kansas.

    3.    In March and April 2020, Walmart maintained written Conduct Disciplinary Action Guidelines, which stated in pertinent part that "Jetflex and Jet Seasonal [associates] should be terminated when their coaching has progressed to a formal written."  A true and correct copy of Walmart's Conduct Disciplinary Action Guidelines attached hereto as Exhibit D.

    4.    During Janell Braxton's employment with Walmart, she was a Jet Seasonal associate.

    5.    On April 14, 2020, I spoke with Operations Manager David Whitenack, who informed me that Braxton had injured her wrist during her April 12-13, 2020 overnight shift.  Whitenack further informed me that Braxton first reported her injury to Walmart

EXHIBIT

4

during her April 14-15, 2020 overnight shift.

6.      Based upon my communications with Whitenack, I confirmed that Braxton's failure to report her injury during the April 12-13, 2020 overnight shift violated Policy 670e.

7.      Based upon my conclusion that Braxton had violated Policy 670e, I further confirmed that the violation warranted a First Written disciplinary action.

8.      Based upon my conclusion that Braxton's violation of Policy 670e warranted a First Written disciplinary action, and because Braxton was a Jet Seasonal associate, I concluded that Braxton's employment was to be terminated pursuant to Policy 670e and Walmart's Conduct Disciplinary Action Guidelines.

*I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.*

Executed this 22 day of February 2021.

MORGAN MEDARIS

DOCS/2596278 1

# Conduct Disciplinary Action Guidelines

**_Quick Coach_**
- **Quick Coach conversations are initial conversations about conduct concerns**
  - A verbal conversation about current state and conduct expectations should occur
  - Manager should document this conversation immediately in Workday
  - If conduct issues continue, proceed to next level of disciplinary action
  - **** Jetflex and Jet Seasonal should be terminated when their coaching has progressed to a formal written

**_First Written_**
- **Any conduct that does not meet expectations warrants a conversation**
  - _Documented conversation about current state and minimum expectations should occur_
  - _Manager should document this conversation as **First Written** in Workday_
  - _A First Written will remain active for 6 months_

**_Second Written_**
- **Conduct has continued to be below expectations since the First Written**
  - _Documented conversation about current state and minimum expectations should occur_
  - _Manager should document this conversation as **Second Written** in Workday_
  - _A Second Written will remain active for six months_
  - _Any associate on a Second Written is not considered to be in good standing, and therefore ineligible for transfer or promotion for six months following_

**_Third Written (Final)_**
- **Conduct has continued to be below expectations since the last coaching or conduct is severe enough to begin at Final**
  - _Documented conversation about current state and minimum expectations should occur_
  - _Manager should document this conversation as a **Final** in Workday/Form.com_
  - _The Final will remain active for six months_
  - _Any associate on a Final is not considered to be in good standing, and therefore ineligible for transfer or promotion for six months following_
  - _An associate with two active Finals will be terminated_

EXHIBIT
D

WM_Braxton_000102

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| JANELL BRAXTON | ) | |
| *Plaintiff* | ) | |
| vs. | ) | Case No. 2:20-cv-02287-DDC-GEB |
| | ) | |
| WALMART INC. | ) | |
| *Defendant* | ) | |

## REPLY IN FURTHER SUPPORT OF
## PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Kansas law makes it illegal to fire an employee for suffering a workplace injury. Summary judgment is appropriate because Walmart's 30(b)(6) deposition witness admitted that but for Plaintiff's report of a workplace injury, she would not have been fired. Walmart's _Opposition_ makes serious, unfortunate, and unfounded accusations that Plaintiff's counsel misrepresented the facts and the law. However, Walmart cannot dispute the ultimate fact that it maintains and enforces company practice of firing employees for suffering workplace injuries and reporting them after the shift in which they occur. Walmart's policy violates Kansas law. Walmart cannot legitimize an unlawful practice through the enactment of policy. Company policies do not have legislative authority. There is no sovereign state of Walmart.

Plaintiff has not misrepresented the facts. The deposition excerpts provided by Walmart confirm that Plaintiff would not have been fired on April 14, 2020 if she did not suffer and report a workplace injury. *See* _Opposition_, Doc.55, 5. Even Walmart's _Opposition_ admits, "**if Plaintiff had not reported her workplace injury, then the circumstances and basis for her termination would not have existed, and Walmart would not have terminated her employment 'as it did'.**" *Id.* at 4-5 (bold added). This admission is consistent with Plaintiff's presentation of Walmart's testimony. Despite its harsh tone, Walmart's _Opposition_ supports the factual basis for _Plaintiff's Motion_.

Plaintiff has also not misrepresented the law. Walmart argues that by not discussing burden shifting, Plaintiff has intentionally misled the Court. However, it is well-established that *McDonnell Douglas* burden-shifting does not apply when there is direct evidence. Walmart's 30(b)(6) deposition testimony is direct evidence of a causal link between Plaintiff's protected status and her termination. Walmart has overlooked this long-standing, well-established precedent regarding the application of burden shifting.

Even if burden-shifting did apply, Walmart has not articulated a *legitimate, non-discriminatory* reason for firing Plaintiff. Kansas law makes it illegal to fire someone for suffering a workplace injury or reporting it in accordance with Kansas law. Walmart says it fired Plaintiff because she reported a workplace injury the day after it occurred.[1] By statute, an employee in Kansas has 20 days to report a workplace injury. Notwithstanding any other dispute, it is undisputed Plaintiff suffered a workplace injury on April 13, 2020, gave Walmart a written report of her injury on April 14, 2020, and was fired on April 14, 2020. Walmart's reason for firing Plaintiff is directly related to her status as an injured worker. Under Kansas law, Plaintiff had 20 days to report her workplace injury and cannot be fired for doing so. Walmart's policy and practice of firing employees for reporting a workplace injury outside the shift in which it occurred is illegal. Even if burden-shifting applied, Walmart has not articulated a *legitimate, non-discriminatory* reason for firing Plaintiff.

Based on the material facts,[2] evidence, authority, and argument before the Court, *Plaintiff's Motion for Partial Summary Judgment* (Doc.47) should be GRANTED.

---

[1] Walmart's allegation of late reporting is genuinely disputed because Plaintiff told her manager her wrists were hurting during the same shift they started hurting. This dispute is immaterial because either way, Plaintiff's report was timely as a matter of law. *See* K.S.A. 44-520(a)(1)(A-C) (20 days to report).

[2] Plaintiff's *Appendix*, being filed separately, contains the parties' material facts and responses.

## AUTHORITIES AND ARGUMENT

The material facts demonstrating Plaintiff is entitled to judgment as a matter of law are undisputed. The parties agree that if Plaintiff would not have reported a workplace injury to Walmart, Walmart would not have fired Plaintiff on April 14, 2020. Walmart has failed to demonstrate a genuine dispute regarding any material fact.

## I.   The Public Policy of Kansas, Established by the Legislature and Courts

Under Kansas law, firing an employee for suffering a workplace injury is illegal. Walmart's policy and practice of disciplining and discharging employees for reporting workplace injuries after the shift in which the injuries occur violates the public policy of Kansas, as established by the legislature and courts of Kansas. Employees are not even required to report an injury when the employer has actual knowledge of it. The law prohibiting employers from firing employees who suffer workplace injuries has a 40-year history.

In 1981, the Kansas Court of Appeals decided whether to recognize a cause of action for at-will employees who were fired for filing a workers' compensation claim. *See Murphy v. City of Topeka-Shawnee County Dept. of Labor Servs*., 630 P.2d 186, 189 (Kan.App. 1981). The Court decided to recognize the tort of retaliatory discharge based on "public policy." *Id.* at 192. The Court explained:

> The Workmen's Compensation Act provides efficient remedies and protection for employees, and is designed to promote the welfare of the people in this state. It is the exclusive remedy afforded the injured employee, regardless of the nature of the employer's negligence. **To allow an employer to coerce employees in the free exercise of their rights under the act would substantially subvert the purpose of the act.**

*Id.* (bold added). The holding was intended to protect the full rights and remedies provided to employees under the Workmen's Compensation Act of Kansas. A company that fires an employee in a manner that subverts those rights has acted unlawfully.

"A state tort action for retaliatory discharge for filing a workers' compensation claim[3] is a claim for a violation of state public policy…." *Coleman v. Safeway Stores, Inc.*, 752 P.2d 645, 650 (Kan.1988). In this context, "Public policy" means "a principle of law which holds that no citizen can lawfully do that which injures the public good." *Id.* at 647. An employer cannot fire an employee for a reason that is "violative of an established or statutorily declared public policy." *Id. at* 648. The Kansas Supreme Court described the Workmen's Compensation Act as being a "state public policy conferring on all employees and employers certain nonnegotiable rights and imposing certain nonnegotiable duties and obligations…." *Id.* at 650-51. Included is the right to be free from being fired for suffering a workplace injury.

When analyzing public policy claims of retaliatory discharge, Kansas Courts look to the "state public policy clearly declared by the legislature or by the courts." *Hysten v. Burlington Northern Santa Fe Ry. Co.*, 108 P.3d 437, 440 (Kan.2004). Since 1981, the public policy of Kansas, as recognized by the courts, has been that an employee cannot be fired for exercising rights under the Workmen's Compensation Act. *Id.* The public policy of providing compensation to injured employees "would be undermined if the worker could be fired for the exercise of his or her statutory right." *Id*. at 441. Requiring employees to choose between reporting a workplace injury and being fired would "effectively release[] an employer from the obligation of the statute." *Id.* The case law is clear - an employee cannot be fired for making a claim for workers' compensation or for suffering a workplace injury that might result in such a claim. *See Pilcher v. Bd. of Cnty. Comm'rs of Wyandotte Cnty.*, 787 P.2d 1204, 1211 (Kan.App.1990). This tort claim serves to protect the public policy established by the legislature.

---

[3] An employee does not have to file a workers' compensation claim to be protected; this cause of action also protects employees who have suffered an injury that might result in a future claim. *See Pilcher v. Bd. of Cnty. Comm'rs of Wyandotte Cnty.*, 787 P.2d 1204, 1211 (Kan.App.1990).

Walmart is not allowed to circumvent the law of Kansas by establishing a company policy of firing employees for not reporting workplace injuries during the same shift in which they occur. "Under the Kansas Constitution, the primary lawmaking body is the legislature." *Coleman*, 752 P.2d at 648. The public policy of Kansas, as established by the legislature, is that an employee has "20 calendar days" to report a workplace injury to their employer. K.S.A. § 44-520(a)(1)(A). If an employer has actual knowledge of the injury, the notice requirement is waived. § 44-520(b). According to the Kansas legislature, an employee has the statutory right to report a workplace injury for up to 20 calendar days, and there is no need to report an injury the employer knows about. According to the Kansas courts, an employer may not fire an employee for suffering or reporting a workplace injury. Walmart chooses to do business in Kansas and therefore is subject to Kansas law.

Under Walmart's policy, if an employee goes home from work and realizes they were injured at work, they are forced to choose between reporting their injury upon returning to work or giving up their nonnegotiable workers' compensation rights. This Hobson's choice is exactly what the Kansas Courts intended to avoid by recognizing a claim of retaliatory discharge. Walmart's policy is unlawful and contravenes the public policy of Kansas.

**II.    Burden-Shifting Does Not Apply because Walmart's 30(b)(6) Deposition Testimony is Direct Evidence of a Causal Link between Protected Activity and the Discharge**

Walmart accuses Plaintiff of misrepresenting the law by not discussing *McDonnell Douglas* burden-shifting framework. Generally, burden-shifting applies to claims of retaliatory discharge. *See Rebarchek v. Farmers Co-Op Elevator*, 35 P.3d 892, 898-99 (Kan.2001). While most cases require a burden-shifting analysis, it depends on the evidence in each case. Here, burden shifting is inapplicable because Walmart admits a causal link between Plaintiff's protected class and her discharge, *i.e.*, this case has "direct evidence."

"When direct evidence is presented, *McDonnell Douglas's* burden-shifting scheme is inapplicable." *Fischer v. Forestwood Co., Inc.*, 525 F.3d 972, 983 (CA10 2008); *accord Tomsic v. State Farm Auto Ins.*, 85 F.3d 1472, 1477 (CA10 1996) ("direct evidence of discrimination makes the *McDonnell Douglas* approach unnecessary). The US Supreme Court agrees. *See Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985) ("the *McDonnell Douglas* test is inapplicable where the plaintiff presents direct evidence of discrimination). Walmart's deposition testimony is direct evidence because it shows a nexus between Plaintiff's protected status as an injured worker and her termination. Therefore, burden shifting is in applicable.

Direct evidence does not mean an admission of liability. Direct evidence is evidence showing a "nexus" between a protected class and an adverse employment action. *See Perry v. Woodward*, 199 F.3d 1126, 1134 (CA10 1999). Direct evidence is evidence showing that a protected class was "actually relied on" when making an employment decision. *Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1217 (CA10 2013). In *Tabor*, the Tenth Circuit held that an interviewer saying women have inferior knowledge about tools, when interviewing a female candidate for a tool salesperson job, was direct evidence that the female interviewee was not selected for the position based on her sex. *Id.* Similarly, the US Supreme Court found direct evidence of age discrimination where a company policy treated employees over 60 different than those under 60. *See Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985). The Supreme Court held the policy "discriminated against disqualified captains on the basis of age…." *Id.* Here, there is evidence that Plaintiff's termination was directly related to her status as an injured worker.

In Kansas, suffering a workplace injury that might lead to a workers' compensation claim is considered a protected class. *Pilcher*, 787 P.2d at 1211. Walmart's 30(b)(6) deposition witness

testified that "but for" Plaintiff's act of reporting a workplace injury, Plaintiff would not have been fired:

> Q.    So but for Ms. Braxton's report of a workplace injury to Walmart,
>        Walmart would not have terminated her as it did, correct?
>
> A.    Correct.

***Plaintiff's Exhibit 2***, Doc.48-2, 13-14 (55:24 – 56:2). Walmart argues Plaintiff "intentionally misstates the cited testimony," <u>Opposition</u> (Doc.55) at 4, even though the citation is a verbatim cut-and-paste quote from the transcript. Despite this clear admission of a causal link between Plaintiff's protected class and being fired, Walmart argues that the phrase "as it did" somehow alters the meaning of the testimony. *See* <u>Opposition</u> at 4. Walmart's argument is confusing and ignores the context in which the question was asked.

Immediately prior to asking the quoted question, Plaintiff's counsel made sure he and the witness were on the same page:

> 18    Q.    Earlier I asked you if Mrs. Braxton hadn't
> 19    reported her workplace injury, she wouldn't have been
> 20    fired by Walmart **as she was, meaning the same day and**
> 21    **same time**. And you agreed with that statement. Do you
> 22    remember that testimony?
> 23    A.    Yes.

***Plaintiff's Exhibit 2***, Doc.48-2, 13 (55:18-23) (bold added). Plaintiff was asking about the reason Walmart fired Plaintiff when it did, *i.e.*, "as it did." Plaintiff's counsel clarified he was asking whether, in the absence of Plaintiff reporting a workplace injury, would Plaintiff have been fired **on the same day and at the same time**. Notably, at the outset of the deposition, Plaintiff's counsel told the witness, "The most important thing I think is that if you do not understand one of my questions let me know and I'll rephrase it," which the witness acknowledged. ***Plaintiff's Exhibit 2***, Doc.48-2 at 3 (6:1-4). The witness did not express any lack

of understanding. *Id.* at 13-14. Accordingly, the causal link between Plaintiff's status as an injured worker and her termination is not genuinely disputed.

Although Walmart purports to dispute that Plaintiff would not have been fired "but for" her workplace injury, its simultaneously admits this fact is true. Within Walmart's purported disputation of SOF ¶11, Walmart's admits, "**if Plaintiff had not reported her workplace injury, then the circumstances and basis for her termination would not have existed, and Walmart would not have terminated her employment 'as it did'.**" *Id.* at 4-5 (bold added). So without Plaintiff suffering and reporting a workplace injury, she would not have been fired. That is precisely why Plaintiff's termination qualifies as a retaliatory discharge under the public policy exception to at-will employment in Kansas.

Walmart argues it has a different reason for firing Plaintiff, *i.e.,* her failure to report her workplace injury as required by Walmart company policy. Walmart's argument is immaterial. A plaintiff alleging retaliatory discharge does "not need to show that retaliation was the employer's sole motive or reason for the termination." *Sanjuan v. IBP, Inc.*, 160 F.3d 1291, 1298 (10th Cir. 1998). "Employees can recover by proving that the discharge was 'based on,' 'because of,' 'motivated by,' or 'due to' the employer's intent to retaliate." *Id.* Notably, Kansas law does not only prohibit employers from firing employees who *report* workplace injuries, employers are prohibited from firing employees for *suffering* workplace injuries that *might* result in a claim for workers' compensation. *See Pilcher*, 787 P.2d at 1211. In any event, the Kansas legislature gave Plaintiff the right to report a workplace injury for up to 20 days. *See* KSA 44-520(a)(1)(A-C). For 40 years, Kansas Courts have consistently held that employers cannot fire employees for exercising that right. Walmart is not free to enforce a policy that runs afoul of Kansas policy as established by the legislature and courts.

The evidence in this case is that notwithstanding Kansas law – as declared by the Kansas legislature and the Courts of Kansas – Walmart fired Plaintiff for suffering a workplace injury and reporting it one calendar day later. Walmart's 30(b)(6) witness testified there is a causal connection between Walmart's knowledge of Plaintiff's injury and her termination, and that "but for" Plaintiff's act of reporting a workplace injury, Plaintiff would not have been fired on April 14, 2020. There is direct evidence in this case, which makes *McDonnell Douglas* inapplicable. Plaintiff did not misrepresent the law in seeking partial summary judgment.

**III.     Walmart does not have a *Legitimate, Non-Discriminatory Reason* for Firing Plaintiff**

Even if *McDonnell Douglas* burden shifting was applicable under the facts of this case, Walmart has not articulated a legitimate, non-discriminatory reason for firing Plaintiff. Under burden-shifting, once the employee makes a *prima facie* case, the burden shifts to the employer to "articulate some legitimate, nondiscriminatory reason for [taking the action alleged to be discriminatory]." *McDonnell Douglas Corp. v. Green*, 411 US 792, 802-803 (1973). The reason proffered by the employer must provide a reason for its action that is wholly separate from the protected class alleged to be the basis for the adverse employment action. *See, e.g., Jaramillo v. Colorado Judicial Dept.*, 427 F.3d 1303, 1307 (CA10 2005). For example, when a plaintiff alleges she is not chosen for a job based on her sex, the employer must provide a sex-neutral reason for its action. *See id*. Walmart has failed to meet this burden of production.

The protected class alleged by Plaintiff is that of injured worker. Walmart's proffered reason for firing Plaintiff is directly related to her status as an injured worker. Without Walmart's knowledge of Plaintiff suffering a workplace injury, Walmart would not have fired Plaintiff. This fact was admitted by Walmart's 30(b)(6) witness and confirmed by Walmart in its *Opposition*. Just because Walmart maintains a policy that it says required Plaintiff's termination does not make its decision "legitimate" or "nondiscriminatory." Walmart's policy conflicts with the

public policy of Kansas, as clearly established by the Kansas legislature, Court of Appeals, and Supreme Court. This would not be the first time a company has been hauled into court for acting under an illegal company policy.

## IV.   Courts have found Company Policies to be Illegal as a Matter of Law

Companies cannot circumvent the law by establishing policies that violate employees' legal rights. Federal courts do not shy away from enforcing the law notwithstanding company policy to the contrary. In *Thurston*, the US Supreme Court noted "TWA's transfer policy is discriminatory on its face" because it put captains over the age of 60 in their own class and denied them rights afforded to younger captains. *Trans World Airlines v. Thurston*, 469 U.S. 111, 121 (1985). The policy violated the ADEA, the federal law prohibiting age discrimination. *See id*. Accordingly, the Supreme Court did not even consider the company's argument that the plaintiff could not establish a typical "prima facie case of age discrimination." *Id.* at 121. When a policy is illegal, there is no need for the typical burden-shifting analysis. Similar findings have been made in cases under the Americans with Disabilities Act ("ADA").

The ADA requires employers to make reasonable accommodations for disabled employees. *See* 42 USC § 12112(b)(5) (defining "discriminate against a qualified individual on the basis of disability" to include failure to provide reasonable accommodations). If an employer maintains a policy of excluding employees with work restrictions, their policy violates the law. Such policies, referred to as "100% healed policies are *per se* violations of the ADA." *See, e.g., McGregor v. Nat'l RR Passenger Corp.*, 187 F.3d 1113, 1116 (CA9 1999). Similar findings have been made in cases under the National Labor Relations Act ("NLRA").

Company policies that prohibit employees from discussing their wages are "presumptively invalid" under the NLRA. *Wilson Trophy Co. v. NLRB*, 989 F.2d 1502, 1510 (CA8 1993). The DC Circuit affirmed a finding by the National Labor Relations Board that a

company handbook containing a confidentiality clause violated the NLRA because it could reasonably be construed as prohibiting conversations about the terms and conditions of employment, which is a right afforded to employees under the NLRA. *Cintas Corp. v. NLRB*, 482 F.3d 463, 464, 467-68 (DC Cir. 2007). The Tenth Circuit affirmed a finding that a casino's rule prohibiting employees from discussing a tip-splitting rule violated the NLRA. *See Double Eagle Hotel & Casino v. NLRB*, 414 F.3d 1249, 1256 (CA10 2005). Company policies prohibiting employees from discussing wages are unfair labor practices as a matter of law. *NLRB v. Main Street Terrace Care Ctr.*, 218 F.3d 531, 538-39 (CA6 2000). Of course, this case was not filed under the ADEA, ADA, or NLRA; however, these cases demonstrate that just because a company acts according to its policies or practices does not mean its conduct is lawful.

## <u>CONCLUSION</u>

For 40 years, the public policy of Kansas has made it illegal to fire an employee for suffering a workplace injury. Kansas law gives employees 20 days to report injuries to their employers, and the reporting requirement is waived if the employer has actual notice. The law is clear – an employer may not fire an employee for suffering a workplace injury. Walmart's 30(b)(6) witness admitted that happened here. Walmart's <u>*Opposition*</u> confirms that "if Plaintiff had not reported her workplace injury … Walmart would not have fired her 'as it did.'" But Plaintiff did report her workplace injury, and Walmart fired her as a direct result. The facts, law, and evidence made by Plaintiff are fair and properly before the Court, showing Plaintiff is entitled to judgment as a matter of law.

WHEREFORE, Plaintiff respectfully requests the Court enter an Order granting <u>*Plaintiff's Motion for Partial Summary Judgment*</u>, Doc.47, finding Walmart liable for retaliatory discharge under Kansas law, and for such other relief the Court finds fair and reasonable.

*Respectfully submitted by:*

**RALSTON KINNEY, LLC**

/s/ *Kenneth D. Kinney*
Kenneth D. Kinney, D.Kan. #78544
Thomas F. Ralston, D.Kan. #78212
4717 Grand Avenue, Suite 300
Kansas City, Missouri 64112
Tel: (816) 298-0086
Fax: (816) 298-9455
Email: ken@rklawllc.com
Email: tom@rklawllc.com
**ATTORNEYS FOR PLAINTIFF**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 18, 2021, a PDF copy of the foregoing was filed through the Court's ECF system, which will serve Defendant by emailing notice and a copy to Defendant's attorneys of record.

/s/ *Kenneth D. Kinney*
**ATTORNEY FOR PLAINTIFF**

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

JANELL BRAXTON )
      *Plaintiff* )
   vs. )    Case No. 2:20-cv-02287-DDC-GEB
          )
WALMART INC. )
      *Defendant* )

## APPENDIX TO REPLY IN FURTHER SUPPORT OF
## <u>PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT</u>

### I.  PLAINTIFF'S MATERIAL FACTS, DEFENDANT'S RESPONSES, and PLAINTIFF'S REPLY

1.  Plaintiff was employed by Defendant Walmart, Inc. from March 23, 2020 to April 14, 2020. ***Exhibit 1***, *Defendant's Answers to Plaintiff's First Set of Interrogatories*, 2-3, ¶5.

**Defendant's Response (Doc.55):** Walmart does not dispute the statement in ¶1.

2.  On January 6, 2021, Quincy Usry testified on behalf of Defendant Walmart, Inc. for certain topics set forth in the applicable deposition notice. ***Exhibit 2***, *Deposition of Quincy Usry*, 6:20-24; ***Exhibit 3***, *Second Amended Notice of Videotaped Deposition of Walmart, Inc.* (Depo.Ex.1).

**Defendant's Response (Doc.55):** Walmart does not dispute the statement in ¶2.

3.  Walmart, Inc. designated Usry to testify on its behalf regarding Topic 5 set forth in the deposition notice. ***Ex.2***, 16:4-12. Topic 5 was:

> "Plaintiff's report(s) of a workplace injury, all actions taken by Walmart in response, the Walmart employees involved, and related documents including without limitation emails, text messages (WM_Braxton_000103-104), and the "Statement Form" produced as WM_Braxton_000105."

***Ex.3*** at 2, ¶5.

**Defendant's Response (Doc.55):** Walmart does not dispute the statement in ¶3.

4.      Plaintiff was an employee of Walmart. *Ex.2*, 20:20-22.

**Defendant's Response (Doc.55):** Walmart does not dispute the statement in ¶4.

5.      While employed, Plaintiff reported a work injury to Walmart. *Ex.2*, 20:23-25.

**Defendant's Response (Doc.55):** Walmart does not dispute the statement in ¶5, but denies that

Plaintiff reported a timely injury. See Exhibit 2, Declaration of David Whitenack at ¶7, Exhibit 3,

Declaration of Quincy Usry at ¶¶6-8, Exhibit 4, Declaration of Morgan Medaris at ¶6.

> *Plaintiff's Reply*: **It is undisputed that Plaintiff timely reported her workplace injury.**
>
> **Under Kansas law, Plaintiff had twenty (20) days to report her workplace**
>
> **injury. K.S.A. 44-520(a)(1)(A-C). According to Walmart, Plaintiff suffered a**
>
> **workplace injury at 1:00 AM on April 13, 2020, and reported it to Walmart**
>
> **during her April 14-15 shift.** *See Opposition* **(Doc.55) at 6,** *Defendant's Facts*,
>
> **¶¶5-8. Plaintiff's report was timely as a matter of law.**

6.      On April 14, 2020, Plaintiff provided a written statement regarding her work injury

to Walmart, at Walmart's request. *Ex.2*, 21:1-7.

**Defendant's Response (Doc.55):** Walmart does not dispute the statement in ¶6.

7.      Walmart knew that Plaintiff had reported a workplace injury. *Ex.2*, 21:8-15.

**Defendant's Response (Doc.55):** Walmart does not dispute the statement in ¶7.

8.      Immediately after Plaintiff filled out a Statement Form about her workplace injury,

she was terminated from her employment with Walmart. *Ex.2*, 27:25 – 28:5.

**Defendant's Response (Doc.55):** "Walmart does not dispute that it terminated Plaintiff's

employment after she provided a written statement but denied the characterization 'immediately.'"

Doc.55 at 2.

9.     Walmart fired Plaintiff the same day she filled out a written document regarding the nature of her workplace injury. ***Ex.2***, 34:14-18.

**Defendant's Response (Doc.55):** Walmart does not dispute the statement in ¶9.

10.     Walmart admits there is a causal connection between Plaintiff's report of a workplace injury and her termination. ***Ex.2***, 38:15-19.

**Defendant's Response:** Walmart denies the statement that there is a causal connection between the fact that Plaintiff reported a workplace injury and her termination. Rather, there is a connection between *the timing* of Plaintiff's report of a workplace injury, her corresponding violation of Walmart's work rule and her termination. (Exhibit 1, Deposition Transcript of Quincy Usry at 35:12-36:23, 40:5-9; 45:4-7, 45:19-23, 55:3-56:2, 141:15-142:1).

Objection: Walmart further objects to Plaintiff's statement in ¶ 10 on the grounds that the deposition testimony cited by Plaintiff was in response to an improperly vague and ambiguous question which further called for a legal conclusion, to which counsel objected during the deposition:

Q:     There is a causal connection between Mrs. Braxton's
       report of a workplace injury and her termination.

MR. GOLDSMITH: Vague and ambiguous.

A:     Generally speaking, yes.

(Usry Depo. 38:15-19). In particular, the question did not explain the term "causal connection," rendering the inquiry unclear, especially in light of the preceding testimony that the "connection" the deponent was referencing was the "timeliness of the report":

Q:     Can we agree that there is some connection between
       Mrs. Braxton's report of a workplace injury and then
       her termination the same day?

A:     The timeliness of report, yes.

(Usry Depo. 36:18-23)

Objection: Walmart further objects to Plaintiff's statement in ¶ 10 on the grounds that Plaintiff intentionally presents incomplete evidence to the Court in support of its motion that is also out of context and therefore misstates the contents of the evidence. The three lines of testimony cited by Plaintiff were preceded by more than a page of deposition transcript testimony Plaintiff omits confirming that the "causal connection" at issue was the *timing* of Plaintiff's report:

Q:    So what is -- why was Mrs. Braxton terminated according to Walmart?

A:    For failure to report an incident by end of shift according to the 670e.

Q:    So Walmart's official position or contention in this lawsuit is that Mrs. Braxton was fired because she didn't report a workplace injury in the very shift that she first became aware of the injury; is that right?

A:    By end of shift, correct.

…

**Q:    Can we agree that there is a connection between Mrs. Braxton's report of a work injury and her termination?**

**A:    When she reported the workplace injury.**

Q:    Can we agree that had Mrs. Braxton never reported her workplace injury, Walmart wouldn't have fired her as it did?

A:    Correct.

**Q:    Can we agree that there is some connection between Mrs. Braxton's report of a workplace injury and then her termination the same day?**

**A:    The timeliness of report, yes.**

(Usry Depo. 35:12-36:23 (emphasis added); see also Usry Depo 40:5-9; 45:4-7, 45:19-23, 55:3-56:2, 141:15-142:1).

> ***Plaintiff's Reply*: Walmart has not genuinely disputed ¶10. Wal-Mart's testimony was, "Generally speaking, yes" there was a "causal connection between Mrs. Braxton's report of a workplace injury and her termination." The question was not vague or ambiguous. The question was clear and easy to understand, and so was the answer.**
>
> **Walmart providing an alternative reason for Plaintiff's termination does not create a genuine dispute. Plaintiff is not required to prove her injury report was the "sole motive or reason for the termination." *See Sanjuan v. IBP, Inc.*, 160 F.3d 1291, 1298 (CA10 1998).**

11.     Walmart admits that but for Plaintiff's report of a workplace injury to Walmart, Walmart would not have terminated her employment. ***Ex.2***, 55:24 - 56:2.

**Defendant's Response (Doc.55):**  Walmart denies the statement that but for Plaintiff's report of a workplace injury to Walmart, Walmart would not have terminated her employment. Rather, but for Plaintiff's *failure to timely report her workplace injury* which violated its work rule, Walmart would not have terminated her employment *as it did*. (Usry Depo 35:12-36:23, 40:5-9; 45:4-7, 45:19-23, 55:8-56:2, 141:15-142:1).

Objection: Walmart further objects to Plaintiff's statement in ¶ 11 on the grounds that it intentionally misstates the cited testimony. The cited deposition testimony reads as follows:

> Q:     So but for Mrs. Braxton's report of a workplace injury
>
>          to Walmart, Walmart would not have terminated her
>
>          **as it did**, correct?

A:      Correct.

(Usry Depo. 55:24-56:2, emphasis added). Plaintiff's statement in ¶ 11 *omits* the qualifier "as it did," thereby altering the meaning of the testimony. As repeatedly explained at length in deposition, Walmart terminated Plaintiff's employment based upon her failure to report her injury during the shift that the injury occurred. (Usry Depo 35:12-36:23, 40:5-9; 45:4-7, 45:19-23, 55:3-56:2, 141:15-142:1) Thus, if Plaintiff had not reported her workplace injury, then the circumstances and basis for her termination would not have existed, and Walmart would not have terminated her employment "as it did."

Objection: Walmart additionally objects to Plaintiff's statement in ¶ 11 on the grounds that Plaintiff omits the complete witness testimony and presents it out of context and therefore distorts the contents of the evidence. The four lines of testimony cited by Plaintiff were immediately preceded by testimony confirming that, but for Plaintiff's *failure to timely report her workplace injury*, Walmart would not have terminated her employment as it did:

Q:      Meaning but for her report of an injury, she would not have been fired when and how she was fired, correct?

A:      But for her timely report, yes.

Q:      "But for" means had she have not. I'm sure you know that. If you don't understand one of my questions, let me know before you answer, okay?

A:      Yes.

Q:      Earlier I asked you if Mrs. Braxton hadn't reported her workplace injury, she wouldn't have been fired by Walmart as she was, meaning the same day and

same time. And you agreed with that statement. Do

you remember that testimony?

A:    Yes.

Q:    So but for Mrs. Braxton's report of a workplace injury

to Walmart, Walmart would not have terminated her

as it did, correct?

A:    Correct.

(Usry Depo. 55:8-56:2; see also Usry Depo 35:12-36:23, 40:5-9; 45:4-7, 45:19-23, 141:15-142:1).

**_Plaintiff's Reply_: Walmart has not genuinely disputed ¶11. Its 30(b)(6) witness agreed Plaintiff would not have been fired but for her act of reporting a workplace injury. Walmart argues the phrase "as it did" changes the meaning of the testimony. But the deposition testimony Walmart cites above shows that Plaintiff's counsel clarified that the question meant "the same day and same time." With that mutual understanding, Walmart agreed that but for Plaintiff's report of a workplace injury, Walmart would not have fired her "as it did." The transcript shows that "as it did" meant "the same day and same time."**

**Walmart's admits, "Thus, if Plaintiff had not reported her workplace injury, then the circumstances and basis for her termination would not have existed, and Walmart would not have terminated her employment 'as it did'." _Opposition_ (Doc.55) 4-5. This admission further shows that this material fact is not genuinely disputed.**

## II.   PLAINTIFF'S RESPONSES TO WALMART'S STATEMENT OF UNDISPUTED MATERIAL FACTS

1.      At all times relevant to this action, Walmart maintained a written Policy 763e,which stated in pertinent part: "All known injuries, no matter how slight, will be reported to a member of management immediately. At a minimum, these must be reported to a member of management by the end of the shift." (Exhibit A, authenticated by Exhibit 3, Usry Decl at ¶ 3).

**Plaintiff's Response: UNCONTROVERTED, but the Kansas legislature gave Plaintiff a statutory right to report a workplace injury for up to 20 days after it happened. *See* KSA 44-520(a)(1)(A-C).**

2.      At all times relevant to this action, Walmart maintained a written Policy 670e, which stated in pertinent part that "[f]ailure to report any known injury before the end of the shift" would result in a First Written formal disciplinary action. (Exhibit B, authenticated by Exhibit 3, Usry Decl at ¶ 4).

**Plaintiff's Response: UNCONTROVERTED that Walmart has a Form identified as 670e. The rest is CONTROVERTED.**

**Form 670e is not a "policy." Form 670e self-identifies as a "Safety & Compliance Rule Violation Form." It is clearly a template used to record violations of some other policy.**

**Form 670e Form does not state that "Failure to report any known injury before the end of the shift" would result in a "First Written formal disciplinary action." Form 670e does not contain the following words:**

- **"First"**
- **"Written"**
- **"Formal"**
- **"Discipline"**
- **"Disciplinary"**
- **"Action"**

3.      At all times relevant to this action, Walmart maintained written Conduct Disciplinary Action Guidelines, which stated in pertinent part that "Jetflex and Jet Seasonal [associates] should be terminated when their coaching has progressed to a formal written." (Exhibit D, authenticated by Exhibit 4, Medaris Decl at ¶3).

**Plaintiff's Response**: **UNCONTROVERTED that Walmart has a document called "Conduct Disciplinary Action Guidelines."**

**IMMATERIAL because Walmart's policy that specifically relates specifically to JetFlex associates, called "JetFlex Disciplinary Action Guidelines" requires "A minimum of two Quick Coach conversations should occur before releasing a JetFlex associate for performance or conduct."** *Exhibit 4.*

4.      During Plaintiff's employment with Walmart, she was a Jet Seasonal associate. (Medaris Decl ¶ 4).

**Plaintiff's Response**: **UNCONTROVERTED.**

5.      During her April 12-13, 2020 overnight shift, at approximately 1:00 a.m. on April 13th, Plaintiff sustained an injury to her left wrist. (Whitenack Decl ¶3).

**Plaintiff's Response**: **UNCONTROVERTED.**

6.      Quincy Usry had reason to believe and understood that Plaintiff first reported her April 13th injury to Walmart during her April 14-15, 2020 overnight shift. (Usry Decl ¶ 7).

**Plaintiff's Response**: **UNCONTROVERTED for purposes of *Plaintiff's Motion*.**

7.      David Whitenack had reason to believe and understood that Plaintiff first reported her April 13th injury to Walmart during her April 14-15, 2020 overnight shift. (Whitenack Decl ¶ 5).

**Plaintiff's Response**: **UNCONTROVERTED for purposes of _Plaintiff's Motion_.**

8.       Morgan Medaris had reason to believe and understood that Plaintiff first reported her April 13th injury to Walmart during her April 14-15, 2020 overnight shift. (Medaris Decl ¶ 5).

**Plaintiff's Response**: **UNCONTROVERTED for purposes of _Plaintiff's Motion_.**

9.       Based upon Usry, Whitenack, and Medaris's understanding that Plaintiff failed to report her injury during the April 12-13, 2020 shift during which the injury occurred, Usry, Whitenack, and Medaris concluded that Plaintiff violated Policy 670e. (Usry Decl ¶ 8, Whitenack Decl ¶ 7, Medaris Decl ¶ 6).

**Plaintiff's Response**: **UNCONTROVERTED for purposes of _Plaintiff's Motion_.**

10.       Based upon Usry, Whitenack, and Medaris's conclusion that Plaintiff had violated Policy 670e, Plaintiff's employment was terminated for her violation of Policy 670e and pursuant to Walmart's written Conduct Disciplinary Action Guidelines. (Usry Decl ¶¶ 8-9, Whitenack Decl ¶¶ 8-9, Medaris Decl ¶¶ 7-8.

**Plaintiff's Response**: **UNCONTROVERTED that Usry, Whitenack, and Madaris concluded that Plaintiff did not report her workplace injury during the same shift that her wrists first started hurting.**

**CONTROVERTED that Walmart had a written policy that required her termination. According to Defendant's "JetFlex Disciplinary Action Guidelines," Plaintiff should not have been fired unless she had received, "A minimum of two Quick Coach conversations…." _Exhibit 4_.**

**According to Defendant's Exhibit C (Doc.55-6), Quincy Usry advised David Whitenack that Plaintiff would "only get coached if she describes pain." (Doc.55-6)**

(underline added). **In the remainder of the text messages, Usry wrote, "Yea, that would be a** **coaching." (underline added).** *See Exhibit 5.* **Unless she had "A minimum" of two previous** **coachings, Plaintiff should not have been fired.** *Exhibit 4.* **Walmart has provided no evidence** **that Plaintiff ever had a Quick Coach conversation before being fired.**

*Respectfully submitted by:*

**RALSTON KINNEY, LLC**

/s/ *Kenneth D. Kinney*
Kenneth D. Kinney, D.Kan. #78544
Thomas F. Ralston, D.Kan. #78212
4717 Grand Avenue, Suite 300
Kansas City, Missouri 64112
Tel: (816) 298-0086
Fax: (816) 298-9455
Email: ken@rklawllc.com
Email: tom@rklawllc.com
**ATTORNEYS FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

I hereby certify that on March 18, a PDF copy of the foregoing was filed through the Court's ECF system, which will serve Defendant by emailing notice and a copy to Defendant's attorneys of record.

/s/ *Kenneth D. Kinney*
**ATTORNEY FOR PLAINTIFF**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| JANELL BRAXTON | ) | |
| *Plaintiff* | ) | |
| vs. | ) | Case No. 2:20-cv-02287-DDC-GEB |
| | ) | |
| WALMART INC. | ) | |
| *Defendant* | ) | |

**APPENDIX TO REPLY IN FURTHER SUPPORT OF**
**<u>PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT</u>**

# EXHIBIT 4

JetFlex Disciplinary Action Guidelines

WM_Braxton_000134



# JetFlex Disciplinary Action Guidelines

The following guidelines exist to help managers coach up or coach out underperforming associates.

## *When to partner and with whom to partner…*

- *   **HR Takes the Lead:** Ethics concerns (including sexual harassment, discrimination, threats, etc.)
- *   **Partner with HR:** Final warnings, terminations, safety incidents (also partner with CSAP)
- *   **Loop in HR:** Culture/attitude corrective conversations, all Lead corrective actions, corrective action conversations gone wrong, safety incidents (in house)
- *   **You've Got This:** Performance conversations First Written and employee disputes
- *   **3PL/Onsite Manager:** All contingent workforce concerns

### *Process*

- *   A minimum of two Quick Coach conversations should occur before releasing a JetFlex associate for performance or conduct
- *   If the associate's conduct is severe enough for a written coaching, the JetFlex associate should be released immediately

**WM_Braxton_000134**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

JANELL BRAXTON                )
                 *Plaintiff*    )
       vs.                  )     Case No. 2:20-cv-02287-DDC-GEB
                 )
WALMART INC.             )
              *Defendant*  )

**APPENDIX TO REPLY IN FURTHER SUPPORT OF**
**<u>PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT</u>**

# EXHIBIT 5

Text Messages

WM_Braxton_000103 – WM_Braxton_104

**David**

Tue, Apr 14, 10:36 PM

Are you awake?

Yea what's up

Just talked to janell. She said she hurt her wrist Sunday (doesn't know how) and didn't tell anyone

Hurt how? Can she write a statement. She only get coached if she describes pain

Yes I'll have her write a statement

Thank you. When you get it send me a picture of it.

Will do.  IR and 5 why?

How long do they have to report? EOS?

I will send you the line. I want to see the statement first

You got it.

Should have it in a minute or two

iMessage

12:09

DW

David >

Awesome. Slacked you the line

Mary is taking a point after the IR. She decided that before the IR because she didn't want to be around the other associate



Yea, that would be a coaching. Is HR on site? Would she be termed with a written coaching?

Let me ask

iMessage

CONFIDENTIAL;
SUBJECT TO PROTECTIVE ORDER

WM_Braxton_000104

## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF KANSAS

JANELL BRAXTON,

          **Plaintiff,**

v.

WALMART INC.,

          **Defendant.**

Case No. 20-2287-DDC-GEB

## <u>MEMORANDUM AND ORDER</u>

Plaintiff Janell Braxton asserts a Kansas state law claim of retaliatory discharge against defendant Walmart.[1]  Plaintiff alleges that defendant retaliated against her because defendant terminated plaintiff's employment shortly after she submitted a report for a workplace injury. Doc. 20 at 1 (First Am. Comp. ¶¶ 1–2).  This matter comes before the court on plaintiff Janell Braxton's Motion for Partial Summary Judgment (Doc. 47) and defendant's Motion for Leave to File a Sur-reply (Doc. 64).  Plaintiff filed Suggestions in Support of her Motion for Partial Summary Judgment (Doc. 48).  Defendant responded (Doc. 55) and plaintiff replied (Doc. 59). For reasons explained below, the court denies plaintiff's Motion for Partial Summary Judgment and denies defendant's Motion for Leave to File a Sur-reply.

### I.     Uncontroverted Facts

The following facts are uncontroverted, or, if controverted, are stated in the light most favorable to defendant as the non-moving party.  *Scott v. Harris*, 550 U.S. 372, 378 (2007).

---

[1]     Title 28 U.S.C. § 1332 confers subject matter diversity jurisdiction over this action because plaintiff and defendant are citizens of different states and the amount in controversy exceeds $75,000. Doc. 20 at 1–2 (First Am. Comp. ¶¶ 4, 6–9, 13); *see also* Doc. 85 (Pls.' Resp. to Show Cause Order) (alleging amount in controversy exceeds $75,000).

### A.  Defendant's Employee Policies

Defendant maintains a written policy, Policy 763e.  In pertinent part, it provides:  "All known injuries, no matter how slight, will be reported to a member of management immediately. At a minimum, these must be reported to a member of management by the end of the shift." Doc. 55-4 at 1.  Defendant also maintains a written Policy 670e, which states, as relevant here, that "[f]ailure to report any known injury before the end of the shift" will result in a First Written formal disciplinary action.  Doc. 55-5 at 1.  Defendant also has adopted written Conduct Disciplinary Action Guidelines, which provide that "Jetflex and Jet Seasonal [associates] should be terminated when their coaching has progressed to a formal written" disciplinary action.  Doc. 55-8 at 1.

### B.  Plaintiff's Employment and Injury

Plaintiff was employed by defendant from March 23, 2020 to April 14, 2020.  Doc. 48-1 at 4–5.  During plaintiff's employment with defendant, she was a Jet Seasonal associate.  Doc. 55-7 at 1.  Around 1:00 a.m. on April 13th, 2020 during plaintiff's April 12–13 overnight shift, plaintiff sustained an injury to her left wrist.  Doc. 55-2 at 1.  On April 14, 2020, plaintiff provided to defendant, at defendant's request, a written statement about her work injury.  Doc. 48-2 at 8.  And, as of April 14, 2020, defendant knew plaintiff had reported her injury.  *Id*. Quincy Usry (Operations Manager at defendant's Fulfillment Center in Edgerton, Kansas), David Whitenack (Operations Manager at defendant's Fulfillment Center in Edgerton, Kansas), and Morgan Medaris (Human Resources Business Partner at defendant's facility in Edgerton, Kansas) had reason to believe and understood that plaintiff first reported her April 13th injury to Walmart during her April 14–15, 2020 overnight shift.  Docs. 55-3 at 1–2, 55-2 at 1–2, 55-7 at 1–2.

2

App-I
137

**C. Plaintiff's Termination**

Based upon Mr. Usry, Mr. Whitenack, and Ms. Medaris's understanding that plaintiff failed to report her injury during the April 12–13, 2020 shift when the injury occurred, Mr. Usry, Mr. Whitenack, and Ms. Medaris concluded that plaintiff violated Policy 670e. Docs. 55-3 at 2, 55-2 at 2, 55-7 at 2. Defendant terminated plaintiff's employment. Docs. 55-3 at 2, 55-2 at 2, 55-7 at 2.

**D. Relevant Testimony**

On January 6, 2021, Quincy Usry testified on defendant's behalf about certain topics specified in plaintiff's Fed. R. Civ. P. 30(b)(6) deposition notice. Docs. 48-2 at 2–3, 48-3 at 2. Mr. Usry's testimony on defendant's behalf included testimony about Topic 5 in the deposition notice. Doc. 48-3 at 3. Topic 5 asked defendant to designate a witness to testify about:

> Plaintiff's report(s) of a workplace injury, all actions taken by Walmart in response, the Walmart employees involved, and related documents including without limitation emails, text messages (WM_Braxton_000103-104), and the "Statement Form" produced as WM_Braxton_000105.

*Id.*

**II. Summary Judgment Standard**

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine dispute [about] any material fact" and that it "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When applying this standard, the court views the evidence and draws inferences in the light most favorable to the non-moving party. *Nahno-Lopez v. Houser*, 625 F.3d 1279, 1283 (10th Cir. 2010) (citing *Oldenkamp v. United Am. Ins. Co.*, 619 F.3d 1243, 1245–46 (10th Cir. 2010)). A disputed "issue of fact is 'genuine' 'if the evidence is such that a reasonable jury could return a verdict for the non-moving party' on the issue." *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). And an "issue of fact is 'material'

'if under the substantive law it is essential to the proper disposition of the claim' or defense." *Id.* (quoting *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Anderson*, 477 U.S. at 248)).

The moving party bears "'both the initial burden of production on a motion for summary judgment and the burden of establishing that summary judgment is appropriate as a matter of law.'" *Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010) (quoting *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002)). To meet this burden, the moving party "'need not negate the non-movant's claim, but need only point to an absence of evidence to support the non-movant's claim.'" *Id.* (quoting *Sigmon v. CommunityCare HMO, Inc.*, 234 F.3d 1121, 1125 (10th Cir. 2000)).

If the moving party satisfies its initial burden, the non-moving party "'may not rest on its pleadings, but must bring forward specific facts showing a genuine issue for trial [for] those dispositive matters for which it carries the burden of proof.'" *Id.* (quoting *Jenkins v. Wood*, 81 F.3d 988, 990 (10th Cir. 1996)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Anderson*, 477 U.S. at 248–49. "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Adler*, 144 F.3d at 671 (citing *Thomas v. Wichita Coca-Cola Bottling Co.*, 968 F.2d 1022, 1024 (10th Cir.), *cert. denied*, 506 U.S. 1013 (1992)).

## III.   Analysis

Plaintiff has asserted a Kansas retaliatory discharge claim against defendant arising from plaintiff's employment with defendant. Doc. 20 at 1. Specifically, plaintiff alleges that defendant unlawfully terminated plaintiff's employment because plaintiff invoked her rights under the workers' compensation laws of Kansas. *Id.* Plaintiff filed a Motion for Partial

Summary Judgment, asking the court to find defendant liable as a matter of law for retaliatory

discharge under Kansas law.  Doc. 47.

Before turning to the parties' arguments for and against granting partial summary

judgment, the court first addresses defendant's Motion for Leave to File a Sur-reply to plaintiff's

Reply.  Doc. 64.  The court then considers whether to grant the Motion for Partial Summary

Judgment.

### A.  Defendant's Sur-reply

Defendant seeks leave to file a sur-reply to plaintiff's Reply, as additional support for her

Motion for Partial Summary Judgment.  Under D. Kan. Rule 7.1(c), briefing on motions is

limited to the motion (with memorandum in support), a response, and a reply.  Sur-replies

typically aren't allowed.  *Taylor v. Sebelius*, 350 F. Supp. 2d 888, 900 (D. Kan. 2004), *aff'd on

other grounds*, 189 F. App'x 752 (10th Cir. 2006).

Instead, sur-replies are permitted only with leave of court and under "rare circumstances"

after good cause is shown.  *Humphries v. Williams Nat. Gas Co.*, No. 96-4196-SAC, 1998 WL

982903, at *1 (D. Kan. Sept. 23, 1998) (citations and internal quotation marks omitted); *see also

Ambac Assurance Corp. v. Fort Leavenworth Frontier Heritage Cmtys., II, LLC*, No. 15-CV-

9596-DDC-JPO, 2017 WL 1035953, at *1 (D. Kan. Mar. 17, 2017).  For example, when a

moving party uses its reply to present new material—*i.e.*, new evidence or new legal

arguments—and if the court plans to rely on that new material to decide the motion, the court

should give the nonmoving party an opportunity to respond.  *Green v. New Mexico*, 420 F.3d

1189, 1196 (10th Cir. 2005); *Doebele v. Sprint/United Mgmt. Co.*, 342 F.3d 1117, 1139 n.13

(10th Cir. 2003); *see also EEOC v. Int'l Paper Co.*, No. 91-2017-L, 1992 WL 370850, at *10 (D.

Kan. Oct. 28, 1992).

The rules governing sur-replies "are not only fair and reasonable, but they assist the court in defining when briefed matters are finally submitted and in minimizing the battles over which side should have the last word." *Humphries*, 1998 WL 982903, at \*1 (citation and internal quotation marks omitted); *see also Int'l Paper Co.*, 1992 WL 370850, at \*10 (explaining that briefing between parties "must have an end point and cannot be permitted to become self perpetuating").

Defendant contends a sur-reply is warranted here because plaintiff raised new arguments in her Reply. Doc. 64 at 1. Specifically, defendant argues that plaintiff's Reply asserts for the first time that: (1) her workers' compensation retaliation claim is not subject to the *McDonnell Douglas* burden-shifting framework because she has alleged direct evidence of retaliation; and, (2) defendant's injury reporting policy is per se unlawful. The court will address the two topics in dispute below.

**(1)** In its Response, defendant assumes that the *McDonnell Douglas* burden-shifting framework applies in this case and discusses why it would prevail under a *McDonnell Douglas* analysis. Doc. 55 at 7. Defendant did not include an argument in its Response under the direct evidence standard, or explain why a direct evidence standard does not apply. *Id.* Plaintiff argues in her Reply that the *McDonnell Douglas* framework does not apply because she has presented direct evidence of retaliation. Doc. 59 at 2. In sum, plaintiff has presented a counterargument responding to defendant's assertion that it should prevail under a *McDonnell Douglas* analysis. This situation appears often in spirited litigation and is something opposing counsel could anticipate. The court is unwilling to allow a sur-reply simply to respond to a counterargument that defendant could have anticipated. The court thus denies defendant's request for leave to file

the proposed sur-reply to respond to plaintiff's argument that the *McDonnell Douglas* burden-shifting framework does not apply.

**(2)** Second, defendant argues that plaintiff's Reply makes a new legal argument that defendant's injury reporting policy is per se unlawful.  Doc. 64 at 1.  Plaintiff argues in her Reply that defendant cannot satisfy its burden under the *McDonnell Douglas* framework to articulate a legitimate, non-discriminatory reason for firing plaintiff because defendant's injury reporting policy conflicts with Kansas law.  Doc. 59 at 2.

Defendant's Memorandum in Opposition argues that plaintiff fails her burden under the *McDonnell Douglas* analysis because she hasn't cited summary judgment facts showing that defendant's legitimate, non-retaliatory reason for plaintiff's termination was pretext for retaliation.  Doc. 55 at 8, 11–13.  Plaintiff's Reply responds to that argument by asserting that defendant has failed to fulfill its burden under the *McDonnell Douglas* analysis because defendant hasn't articulated a legitimate, nondiscriminatory reason for plaintiff's termination, thereby making the prima facie case the only element that plaintiff must prove.  Doc. 59 at 9.  This is argument is not new.  Instead, it responds to an argument defendant made in its Memorandum in Opposition.  Defendant contends that it has not had an opportunity to oppose plaintiff's argument on this point (Doc. 64 at 1), but allowing defendant to file a sur-reply in response to an argument that is not "new" contradicts our standing rules governing briefing on motions.  *See* D. Kan. Rule 7.1(c) (limiting briefing on motions to the motion (with memorandum in support), a response, and a reply); *see also Humphries*, 1998 WL 982903, at *1 (the rules "assist the court in defining when briefed matters are finally submitted and in minimizing the battles over which side should have the last word." (citation and internal quotation marks omitted)).

For these reasons, the court denies defendant's Motion for Leave to File a Sur-reply to respond to plaintiff's argument that defendant's policy is unlawful.

### B. Motion for Partial Summary Judgment

Now, the court turns to plaintiff's Motion for Partial Summary Judgment. Plaintiff asks for summary judgment in her favor on the liability issue because, she contends, she has adduced direct evidence of retaliation and it entitles her to judgment as a matter of law on her retaliatory discharge claim. Doc. 48 at 1. Plaintiff asserts that the *McDonnell Douglas* framework doesn't apply because she has come forward with direct evidence of retaliation. And, plaintiff adds, even if the *McDonnell Douglas* framework did apply, defendant fails under the framework because it cannot articulate a legitimate, nonretaliatory reason for terminating her employment. Doc. 59 at 1–2. So, she contends, these summary judgment facts establish as a matter of law that defendant is liable for retaliatory discharge under Kansas law. The court addresses these arguments below.

### 1. Direct Evidence

This court first must consider whether the *McDonnell Douglas* burden-shifting framework applies. Our Circuit has recognized: "Because [Kansas workers compensation retaliation claims] are rarely proven by direct evidence, the Kansas courts have adopted the *McDonnell Douglas* burden-shifting framework for analyzing retaliatory discharge cases." *Foster v. Alliedsignal, Inc.*, 293 F.3d 1187, 1193 (10th Cir. 2002) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) (further citations omitted)). Here, plaintiff asserts that she can prove her retaliatory discharge claim with direct evidence. And so, she claims, the court need not apply the *McDonnell Douglas* burden-shifting test.

As our Circuit has noted in the Title VII context, a "plaintiff bringing a retaliation claim must establish that retaliation played a part in the employment decision and may choose to satisfy this burden in two ways." *Lounds v. Lincare, Inc.*, 812 F.3d 1208, 1233 (10th Cir. 2015) (internal citations, quotation marks, and alteration omitted).  Plaintiff "may either (1) offer direct evidence that retaliation 'played a motivating part' in an employment decision adverse to her interests, or (2) rely upon circumstantial evidence under 'the familiar three-part *McDonnell Douglas* framework to prove that the employer's proffered reason for its decision is a pretext for retaliation.'"  *Id.* (quoting *Fye v. Okla. Corp. Comm'n*, 516 F.3d 1217, 1225 (10th Cir. 2008) (further citations omitted)).

"Direct evidence is evidence that, on its face, demonstrates that the employment decision was reached for discriminatory reasons." *Didier v. Abbott Labs.*, 614 F. App'x 366, 372 (10th Cir. 2015) (citing *Danville v. Reg'l Lab Corp.*, 292 F.3d 1246, 1249 (10th Cir. 2002)).  "The classic example of direct evidence of discrimination comes from *Trans World Airlines*, where the Supreme Court held that an explicit, mandatory age requirement was direct evidence of age discrimination." *Tabor v. Hilti*, 703 F.3d 1206, 1216 (10th Cir. 2013) (citing *Trans World Airlines Inc. v. Thurston*, 469 U.S. 111, 121 (1985)).

Plaintiff argues she has adduced direct evidence of retaliation.  Her argument relies on the following testimony from Mr. Usry's deposition.  Specifically, he testified:

> Q.   So but for Ms. Braxton's report of a workplace injury to Walmart, Walmart would not have terminated her as it did, correct?
>
> A.   Correct.

Doc. 48-2 at 13–14 (Usry Dep. 55:24–56:2).  Plaintiff argues that this statement is direct evidence of retaliation because it shows a nexus between plaintiff's protected status as an injured worker and her termination.  Doc. 59 at 2.

9

App-I
144

Defendant responds, arguing that plaintiff takes this testimony out of context, and that Mr. Usry made it clear many times throughout his testimony that defendant terminated plaintiff's employment because she did not submit a *timely* report of her injury. Doc. 55 at 1. Defendant directs the court to the four preceding lines from Mr. Usry's deposition. There, defendant argues, he confirmed that but for plaintiff's failure to report her workplace injury in a timely fashion, defendant would not have terminated plaintiff's employment. Doc. 55 at 4. The relevant deposition testimony reads as follows:

> Q: Meaning but for her report of an injury, she would not have been fired when and how she was fired, correct?
>
> A: But for her timely report, yes.
>
> Q: "But for" means had she have not. I'm sure you know that. If you don't understand one of my questions, let me know before you answer, okay?
>
> A: Yes.
>
> Q: Earlier I asked you if Mrs. Braxton hadn't reported her workplace injury, she wouldn't have been fired by Walmart as she was, meaning the same day and same time. And you agreed with that statement. Do you remember that testimony?
>
> A: Yes.
>
> Q: So but for Mrs. Braxton's report of a workplace injury to Walmart, Walmart would not have terminated her as it did, correct?
>
> A: Correct.

Doc. 55-1 at 8–9 (Usry Dep. 55:8–56:2). And, as defendant correctly asserts, Mr. Usry testified many more times about the reason for plaintiff's discharge. That testimony includes the following:

> Q: So what is—why was Mrs. Braxton terminated according to Walmart?

A:  For failure to report an incident by end of shift according to the 670e.

Q:  So Walmart's official position or contention in this lawsuit is that Mrs. Braxton was fired because she didn't report a workplace injury in the very shift that she first became aware of the injury; is that right?

A:  By end of shift, correct.

. . .

Q:  Can we agree that there is a connection between Mrs. Braxton's report of a work injury and her termination?

A:  When she reported the workplace injury.

. . .

Q:  Can we agree that had Mrs. Braxton never reported her workplace injury, Walmart wouldn't have fired her as it did?

A:  Correct.

Q:  Can we agree that there is some connection between Mrs. Braxton's report of a workplace injury and then her termination the same day?

A:  The timeliness of report, yes.

*Id.* at 3–4 (Usry Dep. 35:12–36:23).

Q:  And there is a connection between her report of a workplace injury and her termination that same day?

A:  Simplistically, yes.

Q:  Meaning but for her report of an injury, she would not have been fired when and  how she was fired, correct?

A:  But for her timely report, yes.

*Id.* at 8 (Usry Dep. 55:3–55:13).

11

**App-I
146**

> Q:     Walmart's official position in this lawsuit is that it terminated Mrs. Braxton because, according to Walmart, she did not report her workplace injury in the shift that she first became aware of it?
>
> A:     According to what she provided, yes.

*Id.* at 6 (Usry Dep. 40:5–9).

> Q:     And Walmart's contention is that had Mrs. Braxton actually reported her injury on April 13th of 2020, it would not have fired her; is that correct?
>
> A:     If she would have reported it by end of shift, correct.

*Id.* at 7 (Usry Dep. 45:4–8).

> Q:     Walmart's contention or position in this lawsuit is that it would not have fired her had she reported her workplace injury in the shift she first noticed it, correct?
>
> A:     Correct.

*Id.* (Usry Dep. 45:19–23).

> Q:     So Walmart's contention is that it terminated Mrs. Braxton because of the timeliness or untimeliness of her injury report, correct?
>
> A:     Correct.
>
> Q:     Walmart in this lawsuit is contending that Mrs. Braxton knew about her injury on April 13th of 2020, right?
>
> A:     Correct.
>
> Q:     And Walmart's position in this lawsuit is that it fired Mrs. Braxton because she reported her workplace injury on April 14th of 2020, correct?
>
> A:     Correct.

*Id.* at 10–11 (Usry Dep. 141:15–142:1).

"'Direct evidence is evidence, which if believed, proves the existence of a fact in issue without inference or presumption.'" *Riggs v. AirTran Airways, Inc.*, 497 F.3d 1108, 1117 (10th

Cir. 2007) (quoting *Hall v. U.S. Dep't of Labor*, 476 F.3d 847, 855 (10th Cir. 2007)). Plaintiff

urges the court to focus on three lines of testimony, ignoring the overall context of that

testimony. This argument suggests that no other testimony from the deposition contradicts or

even amplifies the referenced testimony and that no other testimony is necessary to understand

the given testimony adequately. But, the court must consider the entirety of the summary

judgment record, viewing the evidence and drawing inferences from it in the light most favorable

to the non-moving party. *Nahno-Lopez v. Houser*, 625 F.3d 1279, 1283 (10th Cir.

2010) (citing *Oldenkamp v. United Am. Ins. Co.*, 619 F.3d 1243, 1245-46 (10th Cir. 2010)).

After reviewing the testimony as a whole, defendant's designated representative

repeatedly testified that defendant terminated plaintiff because she failed to report her workplace

injury in a timely fashion, thereby violating Policy 670e. Mr. Usry failed to note this distinction

just once, and that is the testimony that plaintiff chooses to cite to support her motion. "A

statement that can plausibly be interpreted two different ways—one discriminatory and the other

benign—does not directly reflect illegal animus, and, thus, does not constitute direct evidence."

*Hall v. U.S. Dep't of Labor*, 476 F.3d 847, 855 (10th Cir. 2007) (citation and internal quotation

marks omitted). One reasonably can interpret Mr. Usry's statements benignly to mean that

defendant terminated plaintiff because of the timing of her injury report—and not because she

reported a work injury.

After reviewing the facts in the light most favorable to defendant as the non-movant, the

court concludes that plaintiff has not shown as a matter of law that she has established retaliatory

treatment by direct evidence. As a consequence, the court cannot conclude that plaintiff has

adduced uncontroverted direct evidence of retaliatory treatment. It thus cannot grant plaintiff

summary judgment by using the direct evidence standard.

### 2. *McDonnell Douglas* Framework

Having concluded that direct evidence does not entitle plaintiff to summary judgment on the liability issue, the court now turns to the alternative basis advanced by plaintiff's motion—the *McDonnell Douglas* framework. As discussed, "Kansas applies the familiar *McDonnell Douglas* burden-shifting framework for analyzing retaliatory discharge claims." *Hysten v. Burlington N. Santa Fe Ry. Co.*, 530 F.3d 1260, 1268 (10th Cir. 2008) (citations omitted). In retaliation cases, this framework begins with the prima facie case. A "plaintiff makes a prima facie claim by showing (1) that he filed a claim for workers compensation benefits or sustained an injury for which he might assert a future claim for such benefits; (2) that the employer had knowledge of the compensation claim or the fact that he sustained a work-related injury for which the plaintiff might file a future claim for benefits; (3) that the employer terminated the plaintiff's employment; and (4) that a causal connection existed between the protected activity or injury and the termination." *Sanjuan v. IBP, Inc.*, 275 F.3d 1290, 1294 (10th Cir. 2002) (citations omitted).

If plaintiff makes the showing for a prima facie case, the "burden then shifts to the employer to show [a] non-retaliatory reason for the discharge." *Id.* (citation and internal quotation marks omitted). "If the employer meets this burden, the burden shifts back to the plaintiff but the plaintiff must show clear and convincing evidence that he or she was terminated in retaliation for exercising rights under the Workers' Compensation Act." *Id.* (citation and internal quotation marks omitted); *see also Foster v. Alliedsignal, Inc.*, 293 F.3d 1187, (10th Cir. 2002) ("Although the presumption of discrimination drops out of the picture once the defendant meets its burden of production, the trier of fact may still consider the evidence establishing the

plaintiff's prima facie case and inferences properly drawn therefrom . . . on the issue of whether the defendant's explanation is pretextual." (citations and internal quotation marks omitted)).

### a.   Prima Facie Case

Here, plaintiff asserts that she has established, as a matter of law, all four elements for a prima facie case of retaliation.  First, plaintiff sustained a work place injury, a fact undisputed by both parties.  Second, defendant knew that plaintiff sustained a work place injury.  Third, defendant terminated plaintiff after she reported a workplace injury.  Job termination constitutes an adverse employment action.  *See Sanchez v. Denver Pub. Schs.*, 164 F.3d 527, 533 (10th Cir. 1998) (holding that a "materially adverse employment action" requires evidence that employee's employment status was affected).  Plaintiff thus has satisfied the first, second, and third parts of her prima facie case.

The final element of the prima facie case requires a causal connection between plaintiff's protected action (reporting a workplace injury to defendant) and her termination.  To prove this element, plaintiff relies primarily on the following deposition testimony from defendant's 30(b)(6) witness, Quincy Usry:

> Q.   There is a causal connection between Mrs. Braxton's report of a workplace injury and her termination?
>
> A.   Generally speaking, yes.

Doc. 48-2 at 12 (Usry Dep. 38:15–19).

Defendant argues that no causal connection exists between the fact that plaintiff reported a workplace injury and her termination.  Rather, defendant argues that a connection exists between the *timing* of plaintiff's report of a workplace injury, her corresponding violation of Walmart's work rule, and her termination.  But, defendant argues, these facts are not sufficient to prove causation as a matter of law sufficient to warrant summary judgment.

15

App-I
150

"A retaliatory motive may be inferred when an adverse action closely follows protected activity." *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999) (citing *Chavez v. City of Arvada*, 88 F.3d 861, 866 (10th Cir. 1996)); *see also Meiners v. Univ. of Kan.*, 239 F. Supp. 2d 1175, 1195 (D. Kan. 2002), *aff'd*, 359 F.3d 1222 (10th Cir. 2004) (holding that timing of protected activity and adverse employment action "can provide sufficient support for plaintiff's prima facie case"). Defendant terminated plaintiff's employment within 24 hours after she submitted a workplace injury report. A one-day period between protected activity and adverse action easily can establish causation. *See Meiners*, 359 F.3d at 1231 (holding that a six-week period between protected activity and adverse action, standing alone, may suffice to show causation).

Based on these undisputed summary judgment facts, the court assumes, without deciding, that plaintiff could shoulder her burden to establish her prima facie case.

### b.  Legitimate, Nonretaliatory Reason

Next, the *McDonnell Douglas* test shifts the burden to defendant to articulate a legitimate, nonretaliatory reason for terminating plaintiff. Defendant argues that it has come forward with a legitimate, nonretaliatory basis for its actions—namely, defendant's own policies governing the duty to report workplace injuries. "When an employee violates an employer's policies . . . it will often be the case that the employer can assert a legitimate, non-retaliatory reason for taking an adverse employment action against the employee." *Vaughn v. Epworth Villa*, 537 F.3d 1147, 1152 n.3 (10th Cir. 2008).

Defendant asserts that the summary judgment facts provide a basis for a reasonable jury to find that plaintiff violated defendant's Policy 670e. It required defendant to impose a First Written formal disciplinary action when plaintiff failed to report her injury by the end of the shift

16

in which it occurred.  Doc. 55 at 8.  Defendant argues that because plaintiff was a seasonal associate, her First Written formal disciplinary action required plaintiff's termination under defendant's written Conduct Disciplinary Guidelines.  *Id.*

Plaintiff argues that defendant's policy is unlawful and conflicts with the public policy of Kansas.  She asserts that the public policy of Kansas has made it illegal to fire an employee for sustaining a workplace injury.  Plaintiff points to Kansas law, saying it gives employees 20 days to report injuries to their employers, and the reporting requirement is waived if the employer has actual notice.  Plaintiff references Kan. Stat. Ann. § 44-520, which states in pertinent part:

> Proceedings for compensation under the workers compensation act shall not be maintainable unless notice of injury by accident or repetitive trauma is given to the employer by the earliest of the following dates:  (A) 20 calendar days from the date of accident or the date of injury by repetitive trauma[.]

Kan. Stat. Ann. § 44-520(a)(1)(A).

Plaintiff's argument misconstrues this statute.  Section 44-520 requires employees, if they wish to preserve their right to recover under Kansas's workers compensation laws, to report their injuries within 20 days after they occur.  It does not forbid employers from adopting, however, workplace policies requiring their employees to report workplace injuries on a prompter basis.  Defendant's policy here required employees to report their injuries within the shift they occur.  It does not conflict with the Kansas statute.  The court thus finds that defendant has come forward with a legitimate, nonretaliatory reason for terminating plaintiff's employment.  This conclusion doesn't end the summary judgment analysis, and so, the next section addresses the final piece of the *McDonnell Douglas* framework.

### c.  Pretextual Motives

Because defendant has established a legitimate, nonretaliatory reason for plaintiff's termination, the *McDonnell Douglas* test shifts the burden back to plaintiff to show that a

rational jury could find that the stated reason is pretextual.  "Pretext can be inferred from evidence revealing 'weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions' in the employer's explanation for the termination."  *Macon v. United Parcel Serv., Inc.*, 743 F.3d 708, 714 (10th Cir. 2014) (quoting *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997)).

The court concludes that plaintiff has not carried her burden on this last part of the analysis.  Indeed, plaintiff hasn't even tried to do so.  She never identifies any basis to find that defendant's articulated reason is a pretext, designed to obscure defendant's discriminatory motive.  In sum, plaintiff's summary judgment showing falls far short of the showing she has to make to deserve summary judgment in her favor on this part of the framework; *i.e.*, she hasn't demonstrated that a reasonable jury only could conclude that defendant's articulated, non-retaliatory reason is pretextual.

### d.   Summary

While plaintiff's retaliation claim may survive for trial, she has not demonstrated that she deserves summary judgment under the *McDonnell Douglas* framework.

## IV.   Conclusion

For all these reasons, the court concludes that the summary judgment facts, when viewed in defendant's favor as the nonmovant, do not entitle plaintiff to summary judgment on the liability aspect of her Kansas common law retaliation claim.  The court thus denies plaintiff's Partial Summary Judgment Motion (Doc. 47).  Defendant's Motion for Leave to File a Sur-reply (Doc. 64) also is denied.

**IT IS THEREFORE ORDERED BY THE COURT THAT** plaintiff's Motion for Partial Summary Judgment (Doc. 47) is denied.

**IT IS FURTHER ORDERED THAT** defendant's Motion for Leave to File a Sur-reply (Doc. 64) is denied.

**IT IS SO ORDERED.**

**Dated this 18th day of May, 2021, at Kansas City, Kansas.**

<u>**s/ Daniel D. Crabtree**</u>
**Daniel D. Crabtree**
**United States District Judge**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| **JANELL BRAXTON** | ) | |
| *Plaintiff* | ) | |
| vs. | ) | Case No. 2:20-cv-02287-DDC-GEB |
| | ) | |
| **WALMART, INC.** | ) | |
| *Defendant* | ) | |
| | ) | |

### PRETRIAL ORDER

A conference to discuss the proposed Pretrial Order and Plaintiff's Motion for Leave to Amend First Amended Complaint (ECF No. 88) was conducted in this case on June 1, 2021 by U.S. Magistrate Judge Gwynne E. Birzer. The plaintiff, Janelle Braxton, appeared through counsel, Thomas F. Ralston. The defendant, Walmart, Inc., appeared through counsel, Christopher Hedican.

This pretrial order supersedes all pleadings and controls the subsequent course of this case. It will not be modified except by consent of the parties and the court's approval, or by order of the court to prevent manifest injustice. Fed. R. Civ. P. 16(d) & (e); D. Kan. Rule 16.2(b).

1. **PRELIMINARY MATTERS.**

    a. **Subject-Matter Jurisdiction.** Subject-matter jurisdiction is invoked under 28 U.S.C. § 1332 and is not disputed.

    b. **Personal Jurisdiction.** The court's personal jurisdiction over the parties is not disputed.

    c. **Venue.** Venue in this court is not disputed.

     **d.**    **Governing Law.** Subject to the court's determination of the law that applies to the case, the parties believe and agree that the substantive issues in this case are governed by the following law: The common law of Kansas regarding retaliatory discharge.

**2.**    **STIPULATIONS.**

     **a.**    The following facts are stipulated:

1. Walmart employed Janell Braxton from March 23, 2020 until April 14, 2020.

2. Prior to April 14, 2020, Walmart never issued Janell Braxton any discipline, reprimands, or disciplinary coaching pursuant to company policy.

3. On April 14, 2020, Plaintiff's Operations Lead told her to log off her station and go to the safety department, which she did.

4. Plaintiff received muscle-rub ointment from a Safety Lead in the safety department and returned to work.

5. After Plaintiff returned to her station, she told her Operations Lead that the safety department gave her ointment.

6. On April 14, 2020, Walmart instructed Janell Braxton to fill out a "Statement Form" regarding her work injury.

7. The "Statement Form" Walmart instructed Janell Braxton to fill out and sign said "Jet.com strictly prohibits retaliation for reporting a concern or cooperating in an investigation."

8. On April 14, 2020, Janell Braxton filled out the "Statement Form" which included a description of the pain in her wrist and provided the "Statement Form" to Walmart.

9.  Janell Braxton filled out the "Statement Form" on April 14, 2020, between 10:55 PM and 11:32 PM.

10. On April 14, 2020, Walmart fired Janell Braxton before 11:32 PM.

11. While employed by Walmart, Plaintiff earned $17.00 hour working full time hours.

12. Following the termination of her employment with Walmart, Plaintiff worked for Amazon, the United States Postal Service ("USPS") and Best Buy where she is currently employed.

13. Plaintiff has worked full time for Best Buy since September 14, 2020 earning $17.00 per hour plus benefits.

14. Between the date her employment terminated with Walmart and the date she began fulltime employment with Best Buy, Plaintiff had lost wages and benefits in the amount of $11,858.00.

   **b.**      The parties have stipulated to the authenticity of the following exhibits for purposes of summary judgment and trial:

1.  Exhibits 1 – 55, & 57 as marked during Depositions

2.  Plaintiff's pay records (Braxton000001-22, 55-73)

3.  Discrimination & Harassment Prevention Policy (WM_Braxton_000052-55)

4.  Usry emails to Medaris (WM_Braxton_000116-126)

5.  4/15/20 Email re: Releases (WM_Braxton_000127-128)

6.  Cheyenne Daniels documents (WM_Braxton_000155-159, 163)

7.  Termination records re: other associates (WM_Braxton_000164-175, 181-187)

8.  Monthly Hires for 2018-2020 (WM_Braxton_000188)

9. Termination record re: Jeffrey Cook (WM_Braxton_000162)

10. Defendant's United States Security and Exchange Commission Form 10-K filing for years 2018, 2019, and 2020, as referenced in *Defendant's Response to Plaintiff's Second Rule 34 Requests* (Feb.5, 2021).

## 3. FACTUAL CONTENTIONS.[1]

### a. Contentions of Plaintiff.

Walmart, Inc. ("Walmart") has a division called Jet.com that does business at a facility in Edgerton, Kansas. Walmart employs the individuals who work at the facility in Edgerton. Walmart controls the policies and procedures governing the terms, conditions, and privileges of employment for the individuals who work at the Edgerton facility. The management employees at the Edgerton facility report to employees at Walmart's corporate headquarters. Walmart employed Plaintiff to work at the Edgerton facility from March 23, 2020 until it fired her on April 14, 2020. Before being fired, Plaintiff did not receive any reprimands, coaching, counseling, warnings, or any other disciplinary or corrective action.

In early March 2020, Plaintiff went to the Edgerton facility, applied, was offered a job, accepted it, and was instructed to go online and acknowledge policies before her first day of work. On March 20, 2020, Plaintiff used her phone to click through policy acknowledgments, but did not receive training on the content, meaning, or enforcement of

---

[1] In accordance with the Court's standard instructions included in its example Pretrial Order form, the following is an overview of the Parties' factual contentions. It is not intended to be a recitation of every fact or argument that either party may present in dispositive briefs or at trial. The Parties reserve the right to present facts and evidence not included herein.

the policies. Plaintiff was not paid for her time on March 20, 2020. The first day Walmart paid Plaintiff for was March 23, 2020.

At the outset of Plaintiff's employment, she went through orientation and safety training. At that time, Walmart did not provide training on its written or unwritten policies or practices on workplace injuries. Walmart did not train employees on what qualifies as a workplace injury, when a workplace injury should be reported, who a workplace injury should be reported to, or the consequences for not reporting an injury during the shift in which it occurs.

While working, Plaintiff suffered wrist pain from doing her job, i.e., she suffered a workplace injury. Plaintiff reported the workplace injury to Walmart, requested medical treatment for the workplace injury, and was fired. Walmart contends it fired Plaintiff because she failed to report her workplace injury during the shift in which it occurred, but Plaintiff reported her wrist pain to her Operations Lead during the same shift the wrist pain started. Walmart contends that company policy required Plaintiff to be fired, but Walmart's policy makes disciplinary action discretionary where an employee fails to report a workplace injury during the shift in which it happens. The unwritten policy or practice Walmart acted on conflicts with Walmart's written policy. Walmart knew Plaintiff was not trained on the written or the unwritten policies and practices regarding workplace injuries.

The first time Plaintiff learned Walmart supposedly has a policy requiring employees to be fired for not reporting a workplace injury during the shift in which is occurs was when she was fired. Two other Walmart employees - an Operations Lead and a Safety Lead - also knew about Plaintiff's workplace injury and failed to report it during

the shift in which they learned of it. Walmart says that is the same violation committed by Plaintiff, but neither of them was disciplined or fired. Unlike the Operations Lead and Safety Lead, Plaintiff was fired because she was the one who suffered the workplace injury, reported it, and sought medical treatment.

If Plaintiff would not have reported her workplace injury, she would not have been fired on April 14, 2020. Three Walmart employees were involved in the decision to fire Plaintiff. None of them could testify to any reason that Plaintiff would have been fired on April 14, 2020 in the absence of her suffering and reporting a workplace injury. Plaintiff's termination caused Plaintiff to suffer lost wages and emotional distress, pain, and suffering.

At the time Walmart fired Plaintiff, Walmart knew it was illegal to fire an employee for reporting a workplace injury. Walmart's anti-discrimination policy prohibits Walmart from firing someone based on their status as an injured worker. Walmart's policies regarding workplace injuries contain mandatory, non-discretionary rules that Walmart is supposed to follow in response to learning of a workplace injury. Walmart failed to follow those mandatory rules after learning Plaintiff was an injured worker. Walmart admits it did not keep an Incident Report filled out by Plaintiff, it did not conduct a safety investigation, it did not tell Plaintiff she had the right to seek medical attention from a Work Comp provider at Walmart's expense, it did not ask Plaintiff if she wanted to seek medical treatment, it did not provide Plaintiff with the documents required by the Kansas Department of Labor and by Kansas law, it did not ask Plaintiff whether she could continue working without restrictions, it did not record the injury in its internal recording system, and it did not report Plaintiff's injury to the State of Kansas as required by law. Instead, it

fired her. Conversely, the Walmart employees who violated the mandatory rules referenced above were not disciplined or fired. These actions show Walmart intentionally acted to undermine the public policy of the workers' compensation law, warranting a large award of punitive damages.

### b. Contentions of Defendant.

On March 23, 2020, Plaintiff Janell Braxton began her employment as an overnight seasonal QC-singles packer. After working for approximately one week, Plaintiff took a leave of absence related to Covid-19 beginning March 29, 2020.  She returned to work on April 12, 2020.

Plaintiff's first shift back from her LOA began at 6:30 pm, on the evening of Sunday, April 12th; and she worked the full shift until 5:00 am on Monday, April 13th. Plaintiff claims that her left wrist began to ache around 1:00 am; that the pain escalated to "throbbing" throughout the remainder of her shift; and that she was in "excruciating" pain by the time her shift ended at 5:00 am. During this shift, operations lead Ammie Wilbur was Braxton's immediate supervisor.  According to Wilbur, this shift was uneventful, and at no time did Plaintiff report that she was experiencing pain of any kind.

Braxton appeared at work for her next shift at 6:30 pm, on Monday, April 13th. Wilbur was Plaintiff's operations lead during this shift as well, and Wilbur maintains that Braxton made no mention of any injury or pain during this 4/13/20-4/14/20 shift.

On April 14th, Plaintiff returned for her regular 6:30 pm - 5:00 am shift. At approximately 9:00 pm, Wilbur was making her typical rounds through the facility and informing the QC-singles of their productivity numbers. Wilbur spoke with Braxton, and

for the first time, Plaintiff informed Wilbur that her arm was bothering her. Wilbur instructed Braxton to go to the safety department, and Wilbur contacted the safety lead (Mark Tuazon) to inform him that Braxton was going to the safety department and that she needed muscle rub/ointment. Tuazon was in another part of the facility, so he walked to the safety department where he found Plaintiff sitting on the couch, and not showing any sign of pain or discomfort. Tuazon asked Braxton if she needed any pain medication other than muscle rub, but Plaintiff declined and stated that the ointment would be sufficient. Tuazon provided Braxton the ointment, and she returned to her position. No written report of the pain or provision of the muscle rub was made at this time. Walmart's time-tracking system shows that Plaintiff clocked in at the safety department at 9:07 pm; that she clocked out of safety at 9:09 pm; and that she clocked back in at her work station at 9:10 pm.

When Braxton returned to her station, Wilbur inquired about Plaintiff's injury – when and how her wrist began hurting. Braxton stated that she began to feel pain "previously," but she did not offer anything more specific and she could not identify a particular incident or occurrence as the cause of the pain. Upon learning that Plaintiff's injury began two shifts ago, Wilbur informed Operations Manager David Whitenack.

Whitenack approached Plaintiff at her workstation to follow-up regarding the details of Braxton's injured wrist. Braxton reiterated that her wrist was hurting, but she could not provide further specifics. Whitenack then texted Safety Manager Quincy Usry: "Just talked to Janell. She said she hurt her wrist Sunday (doesn't know how) and didn't tell anyone." Usry asked if Braxton could write a statement, noting that she would only get coached if she described pain. At 10:54 pm, Plaintiff logged off her work station, and Whitenack

walked Plaintiff back to the safety department. Given the vague description Braxton had provided, and following his texts with Usry, Whitenack instructed her to fill out a "Statement Form." Braxton handwrote and signed the form, which reads as follows:

> "1:00 am 4/13/2020 On Monday morning I noticed that my wrist began to ache. It progressed to throbbing pain and by the time I left at 5:00 am it was excruciating.  I took a 500 mg Tylenol & went to sleep. It is swollen & sometimes feels warm to the touch. There is a little bruising. It is hard for me to work fast when putting items in the mailers & it hurts to pick up semi heavy items with that wrist. I can only pick up the totes if they are partially full. It is my left wrist that is injured. I am trying not to use it. The pain progresses throughout the shift."

Upon receiving Braxton's written statement, he texted Usry a photo of the written statement. Per Walmart's written policy (670e), the failure to report an injury during the shift that it occurs is grounds for a First Written coaching. In addition, per written "Conduct Disciplinary Action Guidelines," seasonal workers (such as Braxton) were subject to termination upon receipt of any First Written. Thus, Usry advised that Plaintiff's failure to report her injury during the 4/12/20-4/13/20 shift should result in a coaching, and Whitenack texted he would ask HR if the coaching should result in termination. Whitenack informed the HR business partner (Morgan Medaris) of the situation, and the decision was made, per Walmart policy, to terminate Plaintiff's employment. Whitenack returned to Braxton at the safety department and walked her to the human resources office, where Medaris was waiting.

The meeting with Braxton in the HR office was led by both Medaris and Whitenack. They informed Plaintiff that, per company policy, her employment was being terminated because she failed to report her injury during the shift that her wrist first began hurting.

Although Plaintiff was upset and surprised, Medaris and Whitenack both report that Braxton did *not* claim or imply that she had informed Wilbur (or anyone else) of her injury during the initial 4/12/20-4/13/20 shift.   Stated differently, Plaintiff did not dispute the basis for her termination. Plaintiff likewise admits she did not tell them she had reported her injury previously. This termination meeting concluded at 11:32 pm on April 14th, at which time Braxton was escorted out of the facility.

According to text messages produced by the Plaintiff, she texted Sue Sooialo three minutes after being terminated stating, "I just got fired for not reporting my wrist on the night it started hurting." The text messages continued throughout the evening and into the early morning hours and the communications strongly suggest that it was understood between the two of them that Plaintiff did *not* report her work injury. Instead, Braxton was upset because she allegedly did not know she was supposed to report it right away, and Sooialo was upset because she knew that information was not covered during Safety School.

Thereafter, Sooialo contacted Medaris and informed Medaris that Safety School was not covering injury-reporting. In turn, Medaris relayed this information to Usry via email, suggesting that safety compliance was being overlooked during training, and that injury reporting should be a mandatory part of the safety training. In response, Usry noted that Braxton had acknowledged policy 670e, which specifically states that injuries must be reported during the shift that they happen, and failure to do so is an automatic First Written. Medaris replied that associates do not always read the acknowledgements and re-covering injury reporting in safety school would help ensure that associates understand the policy.

In Usry's final response, he stated in pertinent part: "We can hand them out or read over them in safety school, but I think we are trying to save time to push more acknowledgements. I'm not saying there wouldn't be value added, but we are getting pushed on how long it takes us to get them to the floor, so we are trying to find a middle ground." Usry thereafter ordered an enlargement of 670e which was posted in the safety training room approximately two weeks later and addressed in safety meetings.

In that last few years, the Edgerton, Kansas ecommerce facility, which is the only such Walmart facility in Kansas, has terminated 112 seasonal associates for receiving a first written warning. Plaintiff was the only associate one discharged for failure to timely report a work injury.  Eight full time associates violated the rule and received a first written warning.

## 4.     LEGAL CLAIMS AND DEFENSES.

### a.  Legal Claims of Plaintiffs.

Plaintiff Janelle Braxton asserts that she is entitled to recover upon the following theory:

Walmart violated the common law of Kansas prohibiting retaliatory discharge when it fired Plaintiff. Walmart fired Plaintiff based on her status as an injured worker, i.e., because she suffered a workplace injury, because she reported a workplace injury, and/or because she requested medical treatment for a workplace injury. Accordingly, Walmart

committed the tort of retaliatory discharge and is liable for actual/compensatory and punitive damages.[2]

**b. Defenses of Defendants.**

Defendant Walmart, Inc. asserts the following defenses:

i.   Plaintiff has suffered no damages and/or has failed to mitigate her alleged damages.

ii.  At all times acted in good faith to comply with all applicable laws and acted with reasonable grounds to believe that its actions did not violate the statutes, laws, or public policies cited in the First Amended Complaint, and Defendant asserts a lack of willfulness or intent to violate those statutes, laws, or public policies as a defense to any claim by Plaintiff for punitive damages.

iii. Plaintiff's claims are barred by the doctrines of waiver, consent, estoppel, and/or unclean hands.

iv.  If Plaintiff establishes by a preponderance of the evidence that Defendant's actions toward Plaintiff were based on a retaliatory or unlawful motive, Defendant would have taken the same action despite any such unlawful motive.

---

2. Defendant objects to this framing of the issue and believes Plaintiff's legal claim should be as stated in her Amended Complaint: Defendant Walmart, Inc. violated the common law of Kansas when it fired Plaintiff because Plaintiff exercised her rights under the workers' compensation laws of Kansas.

v.   To the extent the Court determines that any of Defendant's agents acted maliciously or with reckless indifference to Plaintiff's rights, such acts were contrary to the employer's good faith efforts to comply with the law, and Defendant therefore cannot be held vicariously liable for any award of punitive damages.

**5.   DAMAGES AND NON-MONETARY RELIEF REQUESTED.**

Plaintiff seeks lost wages for backpay in the amount of $11,858.00.

Plaintiff seeks emotional distress damages and pain and suffering of approximately $60,000 - $100,000, but will ask the jury to award these damages in an amount it determines to be sufficient based on the evidence.

Plaintiff seeks punitive damages in an amount that the jury determines will be sufficient to cause Walmart, Inc. to change its policy, to punish Defendant and discourage it and others from repeating the unlawful acts alleged herein, which Plaintiff will suggest should be at least $1,000,000.

Plaintiff seeks costs.

There is no basis for statutory attorney fees in this case.

**6.   AMENDMENTS TO PLEADINGS.**

Plaintiff filed a motion to amend paragraph 55 of the *First Amended Complaint*, which currently says, "Defendant fired Plaintiff because she availed herself of her rights under the workers' compensation laws of Kansas as alleged above."

Plaintiff moved to amend paragraph 55 to say, "Defendant fired Plaintiff based on her status as an injured worker, i.e., because she suffered a workplace injury, because she

reported a workplace injury, and/or because she requested medical treatment for a workplace injury."[3]

The Motion for Leave to Amend Complaint was found to be moot as the undersigned found the language in paragraph 4(a) Legal Claims of Plaintiff of the Pretrial Order is fair based upon the pleadings; it is not a new claim. Thus, the amendment of paragraph 55 of the First Amended Complaint is not necessary for the proposed language to be included in the Pretrial Order.

No additional amendments are sought.

## 7.   DISCOVERY.

Under the scheduling order and any amendments, all discovery was to have been completed by April 30, 2021. Discovery is complete.

Unopposed discovery may continue after the deadline for completion of discovery so long as it does not delay the briefing of or ruling on dispositive motions or other pretrial preparations.  Although discovery may be conducted beyond the deadline for completion of discovery if all parties are in agreement to do so, under these circumstances the court will not be available to resolve any disputes that arise during the course of such extended discovery.

## 8.   MOTIONS.

### a.  Pending Motions.

None.

---

[3] Defendant objected to Plaintiff being granted leave to amend as requested.

**b.  Additional Pretrial Motions.**

After the pretrial conference, the parties intend to file the following motions:

> Defendant intends to file a motion for summary judgment and motions in limine. Plaintiff intends to file motions in limine.

The dispositive-motion deadline, as established in the scheduling order and any amendments, is **June 9, 2021**.

The parties should follow the summary-judgment guidelines available on the court's website:

http://ksd.uscourts.gov/wp-content/uploads/2015/10/Summary-Judgment-Guidelines.pdf

Consistent with the scheduling order filed earlier in this case, the arguments and authorities section of briefs or memoranda must not exceed 30 pages, absent an order of the court.

**c.      Motions Regarding Expert Testimony.** Not applicable, i.e., the parties have stipulated that no expert testimony will be used in this case.

**9.      TRIAL.**

The trial docket setting, as established in the scheduling order and any amendments, is <u>**February 1, 2022, at 9:00 a.m., in Kansas City, Kansas.**</u>  This case will be tried by jury. Trial is expected to take approximately 5 days. The court will attempt to decide any timely filed dispositive motions approximately 60 days before trial. If no dispositive motions are timely filed, or if the case remains at issue after timely dispositive motions have been decided, then the trial judge may enter an order or convene another pretrial conference to set deadlines for filing final witness and exhibit disclosures, exchanging and

marking trial exhibits, designating deposition testimony for presentation at trial, motions in limine, proposed instructions in jury trials, and proposed findings of fact and conclusions of law in bench trials.

IT IS SO ORDERED.

Dated June 3, 2021, at Wichita, Kansas.

s/ Gwynne E. Birzer
Gwynne E. Birzer
U. S. Magistrate Judge

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

JANELL BRAXTON,

       Plaintiff,

v.

WALMART, INC.,

       Defendant.

Case No. 2:20-cv-02287

**DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT**

Defendant Walmart, Inc. ("Walmart") pursuant to Federal Rule of Civil Procedure 56 moves for summary judgment against Plaintiff Janell Braxton's ("Plaintiff") workers' compensation retaliation claim, the only claim asserted in this lawsuit.   Summary judgment is warranted because there is no genuine dispute of material fact, and the undisputed facts show that Walmart terminated Braxton's employment because it believed in good faith that she violated Walmart policy by failing to report a workplace injury during the same shift in which it occurred.   In support of this Motion, Walmart refers the Court to its Memorandum of Points and Authorities filed herewith.

WHEREFORE, Walmart respectfully requests that the Court grant its motion, and dismiss Plaintiff's claim with prejudice at Plaintiff's costs and other relief the Court considers appropriate.

   Dated this 9th day of June, 2021.

WALMART, INC. Defendant,

By:  /s/ Christopher R. Hedican
     Christopher R. Hedican (KS #14542)
of  BAIRD HOLM LLP
     1700 Farnam St, Ste 1500
     Omaha, NE  68102-2068
     Phone: 402-344-0500
     Facsimile:  402-344-0588
     chedican@bairdholm.com

## CERTIFICATE OF SERVICE

I hereby certify that on June 9, 2021, the undersigned served the foregoing via electronic mail pursuant to Fed. R. Civ. P. 11(c)(2):

Thomas F. Ralston (KS# 78212)    tom@rklawllc.com
Kenneth D. Kinney (KS# 78544)    ken@rklawllc.com

/s/ Christopher R. Hedican

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

---

JANELL BRAXTON,

          Plaintiff,

v.

WALMART, INC.,

          Defendant.

Case No. 2:20-cv-02287

**DEFENDANT'S BRIEF IN SUPPORT**
**OF MOTION FOR SUMMARY**
**JUDGMENT**

---

## I.     <u>INTRODUCTION</u>

Defendant Walmart, Inc. ("Walmart") maintains two policies relevant to this litigation.  The first policy requires associates[1] who suffer a workplace injury to report that injury during the same shift in which it happens.  Associates who violate this policy receive written discipline.  The second policy states that seasonal associates, like Plaintiff Janell Braxton ("Braxton"), are subject to automatic termination if they receive any written discipline.

During Braxton's overnight shift on April 12-13, 2020, she began experiencing wrist pain.  Braxton claims she reported this pain to her manager during that same shift, but her manager denies receiving this report.  Two shifts later, Braxton asserts she again complained of her wrist pain to her manager, who informed her own superior, David Whitenack ("Whitenack").   In Braxton's subsequent written statement she never mentioned having reported her injury the same shift it occurred and further concedes she never told anyone else.  Thus, Whitenack and two other managers—believing in good faith that Braxton failed to comply with the reporting policy—terminated her employment.

---

[1] Walmart refers to its employees as associates.

Braxton now alleges she was terminated in retaliation for reporting a workplace injury, in violation of Kansas's common law exception to at-will employment.   The undisputed evidence shows that Walmart actually terminated her employment because it believed she had violated company policy in untimely reporting her injury.   Braxton was a seasonal associate, so this first violation resulted in termination.   Braxton's workers' compensation retaliation claim therefore fails as a matter of law.

## II.   STATEMENT OF UNDISPUTED FACTS

Pursuant to Fed. R. Civ. P. 56 and Local Rule 56.1, Walmart sets forth the following statement of undisputed facts for purposes of this motion only.

### A.   Walmart Employs Braxton as a Seasonal Associate

1.   Walmart hired Braxton in March 2020, to work at its facility in Edgerton, Kansas.   (Ex. A, Deposition of Janell Braxton at 11:16-18, 12:9-11).

2.   The Edgerton facility is associated with Jet.com, a company Walmart owns. (*Id.* at 12:1-8; Ex. B, Deposition of Quincy Usry at 126:5-7).

3.   Braxton's first day of work was March 23, 2020.   (Ex. A, Braxton Depo. at 26:3-6).

4.   She worked as a QC Singles Associate.   (*Id.* at 26:7-10).

5.   Braxton worked in a warehouse and helped to ship customer orders.   Her job involved taking products to her work station, scanning the products on a computer system, packaging those products and placing them on a conveyor belt.   (*Id.* at 26:17-22; 31:25-32:4).

6.   Braxton was a seasonal associate.   (*Id.* at 26:23-25).

7.    Braxton was hired as a seasonal associate on a temporary basis due to a surge of customer demand.  As a seasonal associate, Braxton had no guarantee of regular employment.  (*Id.* at 27:6-20).

8.    Braxton worked an overnight shift that began at 6:30 p.m. and ended at 5:00 a.m.  (*Id.* at 32:18-22).

9.    Walmart maintained a safety cubicle in the middle of the Edgerton facility, which associates could go to if they required first aid or needed safety-related assistance. (*Id.* at 34:11-25).

10.    Braxton knew that she was supposed to visit the safety cubicle if she required medical attention.  (*Id.* at 36:18-21).

11.    She also knew that she could go to the safety cubicle on her own, even if her manager had not instructed her to do so.  (*Id.* at 36:22-25).

**B.    Braxton Suffers a Wrist Injury on April 13**

12.    Braxton worked three consecutive shifts, on April 12 through April 15, 2020.[2] (*Id.* at 39:4-12).

13.    On April 12, 2020, (a Sunday) she arrived for her shift at around 6:10 p.m. or 6:20 p.m.  (*Id.* at 46:8-11).

14.    Braxton started to work.  Then, at about 1:00 a.m. on the morning of April 13, 2020, Braxton felt throbbing pain in her left wrist.  (*Id.* at 48:12-23).

15.    The throbbing pain got progressively worse as Braxton continued to work. (*Id.* at 51:1-5).

16.    According to Braxton, at about 5:00 a.m., which was the end of her shift, Braxton's manager, Ammie Wilbur ("Wilbur"), came over to Braxton to praise her for doing

---

[2] Braxton never actually worked on April 15, because Walmart terminated her on April 14.

3

**App-I**

a good job during the shift.  Braxton claims that she told Wilbur her wrist was hurting.  (*Id.* at 51:17-23).

17.    Braxton says she did not elaborate on why her wrist was hurting, did not say that she had injured her wrist earlier in the shift, and did not ask to visit the safety cubicle. (*Id.* at 53:1-7).

18.    Braxton likewise had not visited the safety cubicle during the four hour period between when her wrist started hurting at 1:00 a.m. on April 13, and when she allegedly spoke to Wilbur at 5:00 a.m.  (*Id.* at 53:12-16).

19.    Wilbur denies that Braxton reported the wrist pain to her at the end of the April 12-13 shift.  (Ex. C, Wilbur Dep. at 16:4-7; 18:15-17).

20.    Braxton finished working and went to her boyfriend's home after her shift ended.  (Ex. A, Braxton Depo. at 56:12-20).

21.    She reported for her next shift, which began on the evening of Monday, April 13 and ended on April 14.  (*Id.* at 57:14-18).

22.    Her wrist was still hurting at this point.  (*Id.* at 58:21-24).

23.    At the beginning of this shift, Braxton claims that she told a manager that her wrist was hurting.[3]  (*Id.* at 61:17-20).

24.    Braxton did not visit the safety cubicle during the April 13-14 shift.  (*Id.* at 64:22-65:2).

25.    Braxton completed this shift, and then went to her boyfriend's house.  (*Id.* at 66:20-67:1).

---

[3] Braxton does not remember whether this manager was Wilbur or a different person.

**C.    Walmart Terminates Braxton's Employment**

26.    Braxton next reported to work for her April 14-15, 2020 shift.  (*Id.* at 68:20-22).

27.    About two or two and a half hours into her shift, Braxton approached Wilbur to talk about her wrist pain.  (*Id.* at 72:11-73:7).

28.    Braxton asked if she could get a brace or a wrap to help with the pain.  (*Id.* at 75:5-14).

29.    Wilbur told Braxton to go to the safety cubicle.  (*Id.* at 73:8-10).

30.    Braxton went to the safety cubicle and spoke with the safety associate stationed there.  (*Id.* at 77:1-4).

31.    She asked the safety associate whether he had a wrap or brace for her wrist. (*Id.* at 77:21-24).

32.    The safety associate told Braxton that he did not have a wrap or brace, and instead gave her ointment to put on her wrist.  (*Id.* at 78:2-11).

33.    Braxton returned to her station at 9:10 p.m.  (*Id.* at 81:9-16).

34.    At about 10:34 p.m., Braxton had another conversation with Wilbur, in which Wilbur asked Braxton whether she thought her wrist pain was due to something that happened at work.  Braxton said yes.   (*Id.* at 83:24-84:13).

35.    After this conversation, Wilbur reported what Braxton had told her to David Whitenack ("Whitenack"), an Operations Manager whose job duties involved supervising other managers and overseeing the Edgerton facility.   (Ex. D, Deposition of David Whitenack at 8:22, 9:15-19, 79:2-7).

36.    Then, Whitenack, whom Braxton did not know,[4] came to her work station, and asked her how she had hurt her wrist.  (Ex. A, Braxton Dep. at 86:1-16; 87:2-9). Braxton responded that she had been doing her job duties, and realized her wrist was hurting.  (*Id.* at 87:7-9).

37.    Braxton logged off from her work station at 10:54 p.m., and Whitenack escorted Braxton to the safety cubicle.  (*Id.* at 88:8-10; 89:18-21).

38.    At the safety cubicle, Whitenack asked Braxton to fill out a statement to record "everything [she] was feeling, that was going on with [her] wrist."  (*Id.* at 90:19-91:1).

39.    Whitenack told Braxton to write down when she suffered her injury and when and to whom she reported it.  (Ex. D, Whitenack Dep. at 79:24-80:3).

40.    In her statement, Braxton wrote as follows:

On Monday morning [i.e., April 13] I noticed that my wrist began to ache.  It progressed to throbbing pain and by the time I left at 5:00 am it was excruciating.  I took a 500mg Tylenol & went to sleep.  It is swollen & sometimes feels warm to the touch.  There is a little bruising.  It is hard for me to work fast when putting items in the mailers & it hurts to pick up semi heavy items with that wrist.  I can only pick up the totes if they are partially full.  It is my left wrist that is injured.  I am trying not to use it.  The pain progresses throughout the shift.

(Ex. G, Braxton Dep. Exhibit 28); (Ex. A, Braxton Dep. at 92:10-21) (authenticating this exhibit).

41.    In her statement, Braxton did not mention reporting the wrist injury to Wilbur the same shift it occurred.  (*See, generally, id.*).

---

[4] Braxton refers to Whitenack throughout her deposition as the "male manager," since she did not know him personally.

42.    Braxton handed the statement to Whitenack, who thanked her and told her he would be back soon.  He then walked away from the safety cubicle.  (Ex. A, Braxton Dep. at 103:9-12; 104:1-6).

43.    Whitenack understood Braxton's statement to mean that she had failed to report a workplace injury during the same shift in which it occurred.  (Ex. D, Whitenack Dep. at 14:12-14).

44.    Whitenack shared Braxton's statement with Quincy Usry, the Environmental Health and Safety Operations Manager ("Usry") and Morgan Medaris, a Human Resources Coordinator ("Medaris").  (*Id.* at 15:10-18; Ex. B, Usry Dep. at 7:7-8).

45.    Walmart has a company policy, Policy 670e, that requires associates to report "any known injury before the end of the shift" in which the injury was suffered.  Failure to do so results in a First Written formal disciplinary action.  (Ex. H, Braxton Dep. Exhibit 24).

46.    Walmart also maintained a second policy, Policy 763e, which stated in pertinent part:  "All known injuries, no matter how slight, will be reported to a member of management immediately.  At a minimum, these must be reported to a member of management by the end of the shift."  (Ex. I at 1, Braxton Dep. Exhibit 25).

47.    These policies exist so that Walmart can investigate the cause of an associate's injury, and make sure that whatever caused the injury does not harm other associates.  (Ex. D, Whitenack Dep. at 103:6-10).

48.    Braxton had an opportunity to review both of these policies at the outset of her employment, and on March 20, 2020, at 11:07:30 p.m., she electronically acknowledged that she had read each policy, and agreed to abide by them.  (Ex. Q,

WM_Braxton_000176);  (Ex.  E,  Medaris  Dep.  at  84:9-22)  (authenticating  Braxton's electronic acknowledgment).

49.    Walmart also maintained a written Conduct Disciplinary Action Guidelines, which stated in relevant part that "Jet Seasonal [associates] should be terminated when their coaching has progressed to a formal written."  (Ex. R, WM_Braxton_000102); (Ex. E,  Medaris  Dep.  at  78:25-79:18)  (authenticating  the  Conduct  Disciplinary  Action Guidelines, and discussing how they mandated Braxton's termination).

50.    Whitenack  therefore  texted  Usry,  who  was  not  working  at  the  time,  and informed him that Braxton "said she hurt her wrist Sunday (doesn't know how) and didn't tell anyone."  (Ex. J, Exhibit 7 to Whitenack Deposition).

51.    Whitenack asked Usry "How long do they have to report?   EOS [End of shift]?"  (*Id.*).

52.    Usry texted back to ask for a copy of Braxton's statement, which Whitenack sent him and further sent a copy of the reporting language from 670e.  (*Id.* at 2).

53.    Whitenack asked, "Would she be termed with a written coaching?"  (*Id.*).

54.    Nowhere  in  these  texts  did  Whitenack  indicate  a  belief  that  Braxton  had reported her wrist injury on the shift it happened.  (*See, generally, id.*).

55.    About 15 minutes later, Whitenack returned to the safety cubicle, and took Braxton to the human resources office.  (Ex. A, Braxton Dep. at 104:24-105:6).

56.    In the human resources office, Braxton met with Whitenack and Medaris.  (*Id.* at 105:7-9; Ex. E, Deposition of Morgan Medaris at 6:15-17).

57.    Whitenack reminded Braxton about Walmart's policies, telling her that she should  have  reported  her  wrist  injury  shortly  after  it  happened,  and  since  she  was  a

seasonal associate Walmart policy required that she be terminated for this infraction.  (Ex. A, Braxton Dep. at 105:7-20).[5]

58.    Braxton did not tell Whitenack or Medaris that she had reported her wrist injury to Wilbur at the end of her April 12-13 shift.  (*Id.* at 108:22-109:1).

59.    Whitenack, Medaris and Usry made the decision to terminate Braxton, based on their belief that she had failed to comply with Policy 670e, and her status as a seasonal associate.  (Ex. D, Whitenack Dep. at 20:3-6; 90:16-18; 97:13-14); (Ex. E, Medaris Dep. at 21:14-16; 23:5-9); (Ex. K, Declaration of Quincy Usry in Opposition to Pl's SJ at ¶¶ 6-10).

60.    At the time Walmart terminated Braxton's employment, Whitenack did not know that Braxton allegedly reported her wrist injury to Wilbur at the end of the April 12-13 shift.  (Ex. D, Whitenack Dep. at 77:17-20; 78:7-9).

61.    At the time Walmart terminated Braxton's employment, Medaris did not know that Braxton allegedly reported her wrist injury to Wilbur at the end of the April 12-13 shift.  (Ex. L, Declaration of Morgan Medaris in Opposition to Pl's SJ at ¶¶ 5-6).

62.    At the time Walmart terminated Braxton's employment, Usry did not know that Braxton allegedly reported her wrist injury to Wilbur at the end of the April 12-13 shift.  (Ex. K, Declaration of Quincy Usry in Opposition to Pl's SJ at ¶¶ 5-7).

63.    Whitenack testified at deposition that Walmart made the decision to fire Braxton because she violated Policy 670e, and that he was not trying to prevent her from exercising her rights under the workers' compensation system.  (Ex. D, Whitenack Dep. at 20:3-6; 90:16-18).

---

[5] Braxton recalled that Whitenack told her that she had to report workplace injuries within 24 hours of their occurrence.  (Ex. A, Braxton Dep. at 108:5-11).

64.   On April 14, 2020, shortly after her termination, Braxton exchanged text messages with Sue Sooialo, a Walmart associate who had trained her for the QC Singles position.  (Ex. M, Exhibit 29 to Braxton Depo.).

65.   In these texts, Braxton stated that she "just got fired for not reporting my wrist on the night it start[ed] hurting."  (*Id.* at 1).  She did not mention having reported the injury the shift it happened, or otherwise express a belief that Walmart had gotten the facts wrong.  (*See, generally, id.*).

66.   Sooialo expressed her sympathy with Braxton, and stated she disagreed with the termination decision.  (*Id.*).

67.   On April 15 at 12:15 a.m.—just a few hours after Braxton's termination—Medaris sent an email to Usry confirming that "[w]e have completed Janell's termination for late reporting."  (Ex. N, Usry Dep. Exhibit 5 at 1).  Medaris's email reflected her belief that the policy violation, and not the report of injury itself, was the reason for Braxton's termination.  (*See id.*).

68.   Medaris also expressed concern that associates were not receiving training on incident reporting.  (*Id.*).

69.   In response to this concern, Usry modified associate training at the Edgerton facility, to make sure that newly hired associates receive training on Policy 670e.  (Ex. F, Second Usry Depo. at 61:20-62:12).

70.   He made sure that a copy of Policy 670e was posted at the training school associates attend during orientation.  (*Id.* at 61:24-62:6).

71.   Braxton did not seek medical treatment for her wrist pain, and the pain went away about a week after her April 14 termination.  (Ex. A, Braxton Dep. at 117:2-16).

72.   Braxton also did not ask about medical treatment during her termination meeting.  (*See, generally, id.*).

73.   Braxton acknowledged that at the termination meeting, no one mentioned workers' compensation.  (*Id.* at 119:1-5).

74.   From 2018 to 2020, Walmart terminated 113 seasonal associates from the Edgerton facility because they received a first written discipline.   (Ex. O, WM_Braxton_000181); (Ex. P, Declaration of Chelsea Davidson) (authenticating Ex. O as a business record).  Plaintiff was the only one who was discharged for failure to report her injury timely.

## III.   STANDARD OF REVIEW

Summary judgment is appropriate when the evidence viewed in the light most favorable to the nonmoving party "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Finley v. Hewlett-Packard Co. Employee Benefits Org. Income Protection Plan*, 379 F.3d 1168, 1172 (10th Cir. 2004.  Because there is no genuine issue as to any material fact in this case, Walmart is entitled to judgment as a matter of law, and this motion should be granted.

## IV.   ARGUMENT

Braxton's sole claim, for workers' compensation retaliation, fails as a matter of law. The undisputed facts show that Walmart fired Braxton, a seasonal associate, based on a good faith belief that she violated Policy 670e and 763e.    Braxton has no evidence— much less the clear and convincing evidence Kansas law requires—that Walmart actually fired her because she suffered an on-the-job injury.  Her claim, therefore, cannot survive summary judgment.

## A.    Legal Framework

"In order to establish a claim of retaliatory discharge, Braxton has the initial burden to show: (1) he or she filed a claim for workers' compensation benefits, or sustained an injury for which he might assert a future claim for such benefits; (2) that the employer had knowledge of plaintiff's compensation claim, or the fact that she had sustained a work-related injury for which Braxton might file a future claim for benefits; (3) that the employer terminated Braxton's employment; and (4) that a causal connection existed between the protected activity or injury, and the termination." *Sanjuan v. IBP, Inc.*, 160 F.3d 1291, 1298 (10th Cir. 1998). If a plaintiff is able to carry this *prima facie* burden, however, the inquiry does not end.

Rather, the burden then shifts to the defendant to articulate a non-retaliatory reason for the discharge. *Id.*; *Hysten v. Burlington N. Santa Fe Ry. Co.*, 530 F.3d 1260, 1268 (10th Cir. 2008) ("Kansas applies the familiar *McDonnell Douglas* burden-shifting framework for analyzing retaliatory discharge claims."). Upon such a showing, the burden shifts back to the employee to "show clear and convincing evidence that he or she was terminated in retaliation for exercising rights under the Workers' Compensation Act." *Sanjuan*, 160 F.3d at 1288-1289; *Rebarchek v. Farmers Co-op. Elevator*, 272 Kan. 546, 551 (2001) ("In Kansas, claimants are required to prove a claim for retaliatory discharge by clear and convincing evidence."). The Court applied this burden-shifting standard in its order denying Braxton's motion for partial summary judgment. (Dkt. 84 at 8).

Walmart assumes for purposes of summary judgment that Braxton can satisfy her prima facie burden. Her claim fails because Walmart had a legitimate, non-retaliatory reason for terminating Braxton because it believed that she violated company policy, and Braxton has no evidence of pretext.

### B.    Walmart Terminated Braxton for her Policy Violation

Walmart terminated Braxton's employment based on the good faith belief that Braxton violated Policy 670e and 763e; she violated the policies because she did not report a workplace injury by the end of the shift in which it happened.  None of the associates involved with the termination decision knew of Braxton's claim that she reported her wrist injury to her manager, Wilbur, during the April 12-13 shift when she started feeling pain.  (SUF 60-62).

Text messages exchanged between Whitenack and Usry the night of Braxton's termination confirm that they believed Braxton had violated Policy 670e and 763e.  Whitenack texted Usry that Braxton "said she hurt her wrist Sunday (doesn't know how) and didn't tell anyone."  (SUF 50).  Whitenack then texted Usry to ask whether Braxton's failure to report her injury the same shift it happened required "she be termed with a written coaching" because she was a seasonal associate.  (SUF 51-53).  Similarly, Braxton's written statement clearly indicated that her wrist began to hurt "[o]n Monday morning," i.e., April 13, but contained no indication that Braxton reported her injury that same shift.  (SUF 42).  Braxton did not tell Whitenack and Medaris she had timely reported her injury during the meeting in the human resources office when they terminated her.  (SUF 58).    Additionally, Braxton's post-termination texts to Sue Sooialo were devoid of any objection to Walmart's conclusion that Braxton broke company policy.  (SUF 65).

Consistent with the communication between Whitenack and Usry, Medaris emailed Usry on April 15 at 12:15 a.m., and confirmed her understanding that "[w]e have completed Janell's termination for late reporting."  (SUF 67).  These texts and Medaris's email unambiguously demonstrate that Whitenack, Medaris and Usry's concern was not with Braxton's injury itself, or Walmart's potential workers' compensation liability.  Instead,

they authorized Braxton's termination because they thought that Braxton had violated a policy that prescribed written discipline, which in turn required Walmart to terminate Braxton due to her status as a seasonal associate. Braxton has no evidence that calls into question that Whitenack, Usry and Medaris believed in good faith that Braxton had violated Policy 670e and 763e.[6]

As the Court acknowledged in its order denying Braxton's summary judgment motion, Braxton's policy violation supplies a legitimate, non-retaliatory reason for the termination decision.  (Dkt. 87 at 16); *see also Frappied v. Affinity Gaming Black Hawk, LLC*, 966 F.3d 1038, 1058 (10th Cir. 2020) ("violations of company policy" a legitimate reason to discharge employee); *Mayfield v. Target Corp.*, 5:18-cv-04036-HLT, 2019 WL 5576938, *6 (D. Kan. Oct., 29, 2019) (Teeter, J.)  ("Such violations of company policy are legitimate reasons for an adverse employment action."); *Vaughn v. Epworth*, 537 F.3d 1147, 1152 n. 3 (10th Cir. 2007) ("When an employee violates an employer's policies . . . it will often be the case that the employer can assert a legitimate, non-retaliatory reason for taking an adverse employment action against the employee."). For her claim to survive summary judgment, Braxton must come forward with clear and convincing evidence of pretext—something she cannot do.  *Sanjuan*, 160 F.3d at 1298-99 ("If the defendant meets its burden [to articulate a non-retaliatory reason], the burden shifts back to Braxton but Braxton must show clear and convincing evidence that he or she was terminated in retaliation for exercising rights under the Workers' Compensation Act.").

---

[6] Comparator evidence shows that Walmart treated Braxton the same way it treated other seasonal associates.  From 2018 to 2020, Walmart terminated 113 seasonal associates from the Edgerton facility because they received a first written discipline.  (SUF 70).

### C.      Braxton Lacks Clear and Convincing Evidence of Pretext

Braxton does not have any evidence of pretext.  An employee "shows pretext by demonstrating such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted nondiscriminatory reasons."  *Swackhammer v. Sprint/United Mgmt. Co.*, 493 F.3d 1160, 1167 (10th Cir. 2007).  Thus, the employee "should show more than 'mere conjecture' that her employer's reason for termination" is a fabrication.  *Coleman v. Blue Cross Blue Shield of Kan.*, 487 F.Supp.2d 1225, 1256 (D. Kan. 2007).  When analyzing pretext, courts "examine the facts as they appear *to the person making the decision*, and do not look to Braxton's subjective evaluation of the situation."  *Jackson v. Kan. City Kan. Public Sch. Unified Sch. Dist. No. 500*, 378 F.Supp.3d 1016, 1039 (D. Kan. 2019) (Crabtree, J.) (emphasis in original).

Here, Braxton's burden to show pretext is a heightened one, because Kansas law holds her to the clear and convincing evidence standard.  Kansas "define[s] clear and convincing evidence as that which is sufficient to establish that the truth of the facts asserted is 'highly probable.'"  *In re B.D.-Y.*, 286 Kan. 686, 696 (2008).  As such, the clear and convincing standard imposes a "high bar" on plaintiffs.  *Commil USA, LLC v. Cisco Sys., Inc.*, 575 U.S. 632, 644 (2015); *United States v. Seaton*, 773 Fed. Appx. 1013, 1021 (10th Cir. 2019) (unpublished) ("The government in this case was required to prove all necessary facts by clear and convincing evidence—a high bar.").

Crucially, evidence "that the employer should not have made the termination decision—for example, that the employer was mistaken or used poor business judgment—is not sufficient to show that the employer's explanation is unworthy of

15

**App-I**

187

credibility." *DePaula*, 859 F.3d at 970-71 (quoting *Swackhammer*, 493 F.3d at 1169-70).

For that reason, "[t]he mere fact that an employer failed to follow its own internal procedures does not necessarily suggest that the substantive reasons given by the employer for its employment decision were pretextual." *Berry v. T-Mobile USA, Inc.*, 490 F.3d 1211, 1222 (10th Cir. 2007).

For example, in *Rivera v. City and County of Denver*, 365 F.3d 912 (10th Cir. 2004), the Tenth Circuit affirmed summary judgment despite significant evidence that the employer treated the plaintiff unfairly when it terminated him.  The *Rivera* plaintiff was a public works employee responsible for cleaning the "catch basins" of sewers.  *Id.* at 915.  In a work ticket, the plaintiff claimed he had cleaned 27 catch basins in a 25-minute period, which made his supervisors suspicious since the daily quota is to clean 40 catch basins.  *Id.* at 916.  The plaintiff later clarified that he had actually cleaned only 17 catch basins during that period.  *Id.*  His supervisors were still suspicious, so they ran "a test to determine how quickly a work crew could clean the 17 basins" the plaintiff claimed he cleaned.  *Id.* at 917.  The work crew brought on for this test cleaned the 17 catch basins in 24 minutes, confirming the plausibility of the plaintiff's story.  *Id.*  In a follow-up test, the work crew cleaned the basins in 29 minutes.  *Id.* at 918.

Notwithstanding this evidence that the *Rivera* plaintiff may have told the truth, his supervisors still did not believe his story, so the city fired the plaintiff on grounds that he had "been dishonest with the Division regarding his work assignments." *Id.* at 919.[7]  The plaintiff sued, alleging race and age discrimination, but the district court granted summary judgment for lack of pretext, and the Tenth Circuit affirmed.  The Tenth Circuit agreed

---

[7] The termination decision was also based on the city's belief that the plaintiff induced a co-worker to lie about the number of catch basins cleaned.  *Id.*

with the city that a plaintiff "must show that there is a dispute or genuine issue concerning the sincerity of the [employer's] proffered reason for his termination, and not simply that the decision was, in retrospect, erroneous or ill-advised." *Id.* at 924. The plaintiff had not called his employer's sincerity into question, and he therefore could not show pretext. *Id.*

Similarly, in *Brown v. South Central Kansas Education Service Center*, 16-1314-EFM, 2018 WL 1942271 (D. Kan. Apr. 25, 2018), the plaintiff alleged race discrimination after his employer, a private school, laid him off during a reduction in force ("RIF") and then declined to rehire him, allegedly in violation of its policies. Specifically, the school's employee handbook stated that any employee who was laid off due to a RIF "shall be considered for re-employment if a vacancy exists for which the certified/licensed employee would be qualified." *Id.* at \*2. After the school laid the plaintiff off, he applied for a vacant social studies position for which he "met the minimum requirements." *Id.* The school nonetheless declined to hire him to that position, because "he did not have a certification in science or social studies," despite being otherwise qualified to teach. *Id.* The court rejected the plaintiff's contention that the school's "alleged failure to follow its written policy regarding the rehiring of employees terminated as part of a RIF demonstrates pretext." *Id.* at \*5. It did so because "[i]t is undisputed that [the school] did not consider Plaintiff qualified for the vacant position—whether correct in that determination or not." *Id.* The school's alleged failure to follow its policies did not show pretext in light of its good faith belief that the plaintiff was unqualified for re-employment under those policies.

And in *Hysten v. Burlington N. Santa Fe Ry. Co.*, 415 Fed.Appx. 897, 904 (10th Cir. 2011) (unpublished), the plaintiff alleged retaliation and race discrimination after his employer terminated him. The termination occurred following an investigative hearing in

which the plaintiff's co-workers testified that he had made threatening statements to them, and the plaintiff denied having done so. *Id.* at 901. The Tenth Circuit held that, even accepting the plaintiff's contention that he had not violated company policy, he still could not show pretext. *Id.* at 905 ("It matters not whether [plaintiff] *actually made* a threatening statement—what matters is whether BNSF decision-makers *believed* in good faith that he did. [Plaintiff] presents no evidence demonstrating that [the decision-makers] did anything other than read the transcript of the investigative hearing and honestly conclude—as one reasonably might—that [plaintiff] threatened another employee with violence.") (emphases in original). *See also Swackhammer*, 493 F.3d at 1170 (No pretext where plaintiff "does not draw into question whether Sprint or [plaintiff's supervisor] actually relied, honestly and in good faith, upon the appearance of improprieties arising from the evidence gathered in Corporate Security's investigations."); *Macon v. United Parcel Serv., Inc.*, 10-2327-JAR, 2012 WL 781002, *9 (D. Kan. Mar. 6, 2012) ("The inquiry for the Court is whether UPS terminated [plaintiff] under a reasonable belief that he violated the rules and policy of UPS.").

Here, the good faith belief of Walmart's decisionmakers that Braxton violated Policy 670e and 763e means that there is no dispute of material fact regarding pretext. Even crediting Braxton's claim that she complied with these policies, there is no dispute that Whitenack, Medaris and Usry were unaware that Braxton reported her wrist injury during the shift that it happened. Braxton, therefore, cannot show pretext on this basis. *See Forbes v. Kinder Morgan, Inc.*, 686 Fed.Appx. 552, 555 (10th Cir. 2017) (unpublished) ("Even if [the employer] violated its own policies, its decision is untethered from and unconnected to both [the employee's] allegations of discrimination and of pretext."); *Young v. Dillon Cos., Inc.*, 468 F.3d 1243, 1250 (10th Cir. 2006) (The "inquiry

18

**App-I**
**190**

is whether the employer's stated reasons were held in good faith at the time of the discharge, even if they later prove to be untrue.").

In fact, Braxton's claim to pretext is even weaker than in *Rivera, Brown* or *Hysten* because Kansas law holds her to a clear and convincing evidence standard. *Sanjuan*, 160 F.3d at 1288-1289; *Foster v. Alliedsignal, Inc.*, 293 F.3d 1187, 1195 (10th Cir. 2002) ("[W]e hold that a plaintiff in federal court who opposes a summary judgment in a retaliatory discharge case based on Kansas law must set forth evidence of a clear and convincing nature that, if believed by the ultimate factfinder, would establish that plaintiff was more likely than not the victim of illegal retaliation by her employer."). Under this standard, Braxton must show it is "highly probable" that Walmart lied about its reasons for firing her. *In re B.D.-Y.*, 286 Kan. at 696. She falls well short of this mark. *Pfeifer v. Fed. Exp. Corp.*, 09-cv-1248-EFM-KMH, 2014 WL 4294957, *8 (D. Kan. Aug. 29, 2014) ("The Court grants summary judgment to FedEx on this ground. Plaintiffs have failed to come forward with clear and convincing evidence that Hummelsheim, Holfrichter, and Malone did not believe their reasons for terminating [plaintiff] were fair or correct").

Braxton also cannot prove pretext by challenging the reasonableness of policies 670e and 763e. The Court has already rejected Braxton's assertion that these policies conflict with Kansas law or public policy. (Dkt. 87 at 17) (Kansas "does not forbid employers from adopting, however, workplace policies requiring their employees to report workplace injuries on a prompter basis."). Many companies other than Walmart require prompt reporting of workplace injuries, and these policies do not give rise to legal liability. In *Alires v. Amoco Production Co.*, 774 F.2d 409 (10th Cir. 1985), the Tenth Circuit affirmed dismissal where the plaintiff "injured himself and failed to report it to the plant supervisor," and "[c]ompany policy clearly required employees to promptly report all

injuries, regardless of their apparent severity." *Id.* at 410.  Many other courts have reached the same conclusion. *See, e.g.*, *Yowell v. Admin. Review Bd.*, 993 F.3d 418, 428-29 (1st Cir. 2021) ("There was no error in the ARB's decision to allow [the employer] to end Yowell's employment for his failure to report his work injury promptly," where company had "policy of prompt reporting."); *id.* at 929 ("The protected activity provision cannot be interpreted to shield an employee from proper disciplinary action when the employee breaches a valid, established, and unchallenged work rule, and no legal legerdemain can make it otherwise.") (Jolly, J. concurring); *Charney v. United Airlines, Inc.*, 19-cv-01700, 2020 WL 6450445, *14 (D. Colo. Nov. 2, 2020) (employer had "legitimate, nonretaliatory reason for [plaintiff's] termination" where employee violated employer policies, including policy "to timely report any workplace injury to her supervisor"); *Ramirez v. Goodyear Tire & Rubber Co.*, CV-13,85-R, 2014 WL 3744166, *2 (W.D. Okla. July 30, 2014) (granting summary judgment where plaintiff was terminated "for her failure to promptly report her injury," where "Defendant's policy requires that on-the-job injuries be reported immediately after discovered"); *Welch v. Veolia ES Solid Waste Midwest, LLC*, 11 CV 7685, 2013 WL 5408646, *9 (N.D. Ill. Sept. 26, 2013) (policy of prompt reporting advances "goal of . . . ensuring that the injury occurred on company time, and ensuring that employee injuries are treated promptly"); *Rizzo v. Niagara Mohawk Power Corp.*, 1:04-CV-1507, 2006 WL 1742487 (N.D.N.Y. June 22, 2006) ("With respect to Plaintiff's failure to report an on-the-job injury and her failure to timely report the March 18 injury, Defendants also proffer a legitimate, non-discriminatory reason for its actions (company policy requires prompt reporting of injuries) to which Plaintiff has failed to submit any evidence tending to prove that Defendants' explanation is false or a pretext for unlawful retaliation.").

Finally, Braxton cannot show pretext through the temporal proximity between reporting her injury (alleged by her to have occurred in the early morning hours of April 13 and Walmart asserts that the reporting occurred nearly two days later), and her termination.  The Tenth Circuit has repeatedly held that "temporal proximity alone is insufficient to raise a genuine issue of material fact concerning pretext."  *DePaula*, 859 F.3d at 976; *Peterson v. Exide Techs.*, 09-4122-SAC, 2011 WL 677150, *8 (D. Kan. Feb. 16, 2011) ("But the Tenth Circuit has repeatedly held that 'temporal proximity alone is not sufficient to defeat summary judgment by showing that the employer's proffered reason is actually pretext for retaliation.'") (collecting cases).[8]   Braxton therefore cannot demonstrate pretext.

## V.    **CONCLUSION**

For the reasons set forth herein, Braxton's claim fails because she cannot show that Walmart's legitimate, non-retaliatory reason for terminating her employment was a pretext for workers' compensation retaliation.

Dated this 9th day of June, 2021.

WALMART, INC. Defendant,

By:  /s/ Christopher R. Hedican
       Christopher R. Hedican (KS #14542)
of    BAIRD HOLM LLP
       1700 Farnam St, Ste 1500
       Omaha, NE  68102-2068
       Phone: 402-344-0500
       Facsimile:  402-344-0588
       chedican@bairdholm.com

---

[8] The Kansas Court of Appeals recently acknowledged this same principle.  *Lumry v. State*, 427 P.3d 1014 (2018) (unpublished) ("Although temporal proximity is one of many relevant factors to be considered by the courts in determining whether the employer's explanation is a pretext for retaliation, even very close temporal proximity cannot operate as a proxy for the evidentiary requirement that the plaintiff demonstrate pretext.").  In *Bailey v. American Phoenix, Inc.*, 2017 WL 3723267 (D. Kan. Aug. 29, 2017) (Crabtree, J.), this Court held that Kansas courts would require more than temporal proximity to support pretext in a workers' compensation retaliation case.  *Id.* at *7.

21
**App-I**
**193**

**CERTIFICATE OF SERVICE**

I hereby certify that on June 9, 2021, the undersigned served the foregoing via electronic mail pursuant to Fed. R. Civ. P. 11(c)(2):

Thomas F. Ralston (KS# 78212)     tom@rklawllc.com
Kenneth D. Kinney (KS# 78544)     ken@rklawllc.com


/s/ Christopher R. Hedican


DOCS/2640567.4

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

---

JANELL BRAXTON,

        Plaintiff,

v.

WALMART, INC.,

        Defendant.

Case No. 2:20-cv-02287

**DECLARATION OF**
**CHRISTOPHER R. HEDICAN**

---

I, Christopher R. Hedican, hereby state as follows:

1.      I am one of the attorneys of record for Defendant herein.  I am over the age of 21 and make this declaration on personal knowledge.  This declaration is being submitted in support of Defendant's Motion for Summary Judgment.

2.      Attached as Exhibit A is a true and correct copy of the relevant excerpts from the deposition of Janell Braxton.

3.      Attached as Exhibit B is a true and correct copy of the relevant excerpts from the first deposition of Quincy Usry.

4.      Attached as Exhibit C is a true and correct copy of the relevant excerpts from the deposition of Ammie Wilbur.

5.      Attached as Exhibit D is a true and correct copy of the relevant excerpts from the deposition of David Whitenack.

6.      Attached as Exhibit E is a true and correct copy of the relevant excerpts from the deposition of Morgan Medaris.

7.      Attached as Exhibit F is a true and correct copy of the relevant excerpts from the second deposition of Quincy Usry.

1

8.      Attached as Exhibit G is a true and correct copy of Exhibit 28 from the deposition of Janell Braxton.

9.      Attached as Exhibit H is a true and correct copy of Exhibit 24 from the deposition of Janell Braxton.

10.     Attached as Exhibit I is a true and correct copy of Exhibit 25 from the deposition of Janell Braxton.

11.     Attached as Exhibit J is a true and correct copy of Exhibit 7 from the deposition of David Whitenack.

12.     Attached as Exhibit K is a true and correct copy of the Declaration of Quincy Usry in Opposition to Plaintiff's Summary Judgment Motion.

13.     Attached as Exhibit L is a true and correct copy of the Declaration of Morgan Medaris in Opposition to Plaintiff's Summary Judgment Motion.

14.     Attached as Exhibit M is a true and correct copy of Exhibit 29 from the deposition of Janell Braxton.

15.     Attached as Exhibit N is a true and correct copy of Exhibit 5 from the first deposition of Quincy Usry.

16.     Attached as Exhibit O is a true and correct copy of WM_Braxton_000181.

17.     Attached as Exhibit P is a true and correct copy of the Declaration of Chelsea Davidson, authenticating Exhibit O as a business record.

18.     Attached as Exhibit Q is a true and correct copy of WM_Braxton_000176.

19.     Attached as Exhibit R is a true and correct copy of WM_Braxton_000102.

I certify under penalty of perjury under the law of the United States of America that the foregoing is true and correct.

Dated: <u>June 9, 2021</u>

_____

Christopher R. Hedican

DOCS/2648127.1

Janell Braxton - January 25, 2021

1

1        IN THE UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF KANSAS
2
JANELL BRAXTON,                    )
3                                  )
        Plaintiff,                 )
4                                  )
        -vs-                       )   No. 2:20-CV-02287
5                                  )
WAL-MART, INC.,                    )
6                                  )
        Defendant.                 )
7

8

9

10

11

12

13

14          DEPOSITION OF JANELL N. BRAXTON

15       TAKEN ON BEHALF OF THE DEFENDANT

16              JANUARY 25, 2021

17

18

19

20

21

22

23

24                                    ┌─────────────┐
                                      │  EXHIBIT    │
25                                    │     A       │
                                      └─────────────┘

Janell Braxton - January 25, 2021

                                                                        6

1           Q.   Since this would be your first time,

2    I'd like to go over some of the ground rules.  Even

3    though we're in an informal setting, just a

4    conference room, the oath that you took is the same

5    oath that you would take under penalty of perjury as

6    though you were sitting in a courtroom, do you

7    understand that?

8           A.   Yes.

9           Q.   And the court reporter will be taking

10   down everything we say and at the conclusion of the

11   deposition she'll put together a transcript, you'll

12   have an opportunity to review it to make any changes.

13   But I want to caution you, if you do make any changes

14   that are substantive that could reflect on

15   credibility down the road.  Do you understand that?

16          A.   Yes.

17          Q.   And since the court reporter's going

18   to be taking down everything that we say it's

19   important not talk over each.  So I will do my level

20   best not to talk over you and I'd just ask that you

21   allow me to finish my questions before you answer

22   them, okay?

23          A.   Yes.

24          Q.   You've been doing great so far but we

25   need verbal responses, yeses and noes, instead of

Janell Braxton - January 25, 2021

11

```
 1              A.   Yes.

 2              Q.   Is Ryan McClinton employed today?

 3              A.   Yes.

 4              Q.   With whom is Mr. McClinton employed?

 5              A.   He's employed through Titan Security.

 6              Q.   And Mr. McClinton was previously

 7    employed by Wal-Mart, correct?

 8              A.   Yes.

 9              Q.   Do you remember when he separated

10    from Wal-Mart?

11              A.   He separated from Wal-Mart the night

12    that I was fired.

13              Q.   And that was April 14th, 2020,

14    correct?

15              A.   Yes.

16              Q.   Now, in March and April 2020, you

17    worked at the facility in Edgerton, Kansas, correct?

18              A.   Yes.

19              Q.   In March and April 2020, who did you

20    understand to be your employer?

21              A.   Wal-Mart.

22              Q.   In March and April 2020, did you have

23    an understanding of the relationship between Jet dot

24    com and Wal-Mart?

25              A.   Yes.
```

Janell Braxton - January 25, 2021

12

```
1              Q.    What was your understanding?

2              A.    My understanding was that Jet dot com

3    shipped -- was basically like a web site for some of

4    the Wal-Mart products to be shipped out of -- if I

5    can remember correctly, those were supposed to be

6    more higher end products in some what, shape, or

7    form.  A different selection than what was on

8    Wal-Mart dot com.

9              Q.    When were you hired by Wal-Mart?

10             A.    I was hired by Wal-Mart, would have

11   been mid-March.

12             Q.    And your employment with Wal-Mart

13   lasted continuously from mid-March till April 14th,

14   2020, correct?

15             MR. RALSTON:  Objection, vague.

16             BY:  MR. GOLDSMITH

17             Q.    You can answer.

18             A.    Yes.

19             Q.    What was the process by which you

20   were hired by Wal-Mart?

21             A.    The process was you go into their --

22   the front of like their location that I worked out of

23   and there was a talent acquisition representative

24   that took, like, your ID information and just did

25   like a quick overview of basically hiring you on the
```

Janell Braxton - January 25, 2021

26

1          A.   She -- she explained to me that they

2    were needed in order to start your first day.

3          Q.   My understanding is your first day of

4    work at Wal-Mart was March 23rd, 2020.  Does that

5    sound right?

6          A.   Yes.

7          Q.   During your employment from

8    March 23rd, 2020 to April 14th, 2020, you held the

9    position of a QC singles associate, correct?

10         A.   Yes.

11         Q.   Is that also known as a packer?

12         A.   I think so but I'm not sure.  I was

13   packing items so that would make sense.

14         Q.   I'll simply refer to your position as

15   a QC singles just so there's no confusion, okay?

16         A.   Okay.

17         Q.   What were your job responsibilities

18   as a QC singles associate?

19         A.   My job responsibilities were to take

20   product that was already picked in a location and

21   take it back to my work station and package it and

22   put it on a conveyor belt.

23         Q.   And you were a seasonal QC singles

24   associate, correct?

25         A.   Yes.

Janell Braxton - January 25, 2021

27

1          Q.   Do you know if the job

2    responsibilities for a seasonal QC singles associate

3    was any different from the job responsibilities of a

4    permanent QC singles associate?

5          A.   No, I do not, no.

6          Q.   During your onboarding process, all

7    the way up through your first day of work, what was

8    your understanding of what the distinction was

9    between the permanent and a seasonal QC singles

10   associate?

11         A.   My understanding was that basically

12   they -- because of everything that was going on with

13   the Coronavirus at that time they needed to get

14   workers in.  And this is how -- usually like in and

15   around Christmastime this is how they would staff the

16   extra help that they needed.  And that if you -- it's

17   not stated that you would end up with a permanent

18   position but if you did well, you know, in the

19   position more than likely you would be able to stay

20   and become permanent.

21         Q.   Did you have an understanding of what

22   the probationary period for a seasonal association to

23   become a permanent associate was?

24         A.   No.

25         Q.   Was it your intention to become a

Janell Braxton - January 25, 2021

31

1          A.   Like my direct manager or the

2     trainers from the first day at work.  Like Sue, for

3     instance, she helped new employees get familiar with

4     the location and tell them, you know, where to put

5     your belongings when you come in and how to use the

6     clock in and out system.

7          Q.   Who was your direct manager that you

8     referenced?

9          A.   My lead was Amy.

10         Q.   Do you remember Amy's last name?

11         A.   No.

12         Q.   And when you said direct manager,

13    were you referencing Amy?

14         A.   Yes.

15         Q.   And you mentioned that you learned of

16    these policies through management.  Was there anybody

17    besides Amy that you would have been talking about

18    when you referenced management?

19         A.   No.

20         Q.   My understanding is that as a QC

21    singles associate you worked at an individual work

22    station next to a conveyor belt, is that generally

23    correct?

24         A.   Yes.

25         Q.   And generally speaking, your job was

Janell Braxton - January 25, 2021

                                                              32

1    to take items from a cart, scan them into a computer

2    system at your station, pack the items, and place

3    them on the conveyor belt, did I get that correct?

4              A.   Yes.

5              Q.   Did you have one set station within

6    the facility for the entire time that you were a

7    seasonal QC associate?

8              A.   No.

9              Q.   Were there simply QC single associate

10   stations and everybody just took whichever one was

11   most convenient to them that particular night?

12             A.   Well, actually the managers assigned

13   you to your station.

14             Q.   And did that happen before every

15   shift that you worked?

16             A.   Yes.  Sometimes they would change

17   them half -- midway through the shift.

18             Q.   And during your entire tenure as a QC

19   singles associate, you only worked the overnight

20   shift from about 6:30 p.m. to 5:00 a.m. the next

21   morning, correct?

22             A.   Yes.

23             Q.   And sometimes that's referenced as

24   the second shift; is that correct?

25             A.   Yes.

Janell Braxton - January 25, 2021

34

1          Q.    During your time as a seasonal QC

2    associate -- singles associate, the Edgerton facility

3    had a safety department, correct?

4          A.    They had a safety cubicle.

5          Q.    And there were safety personnel that

6    worked in or with the cubicle, correct?

7          MR. RALSTON:  Objection, assumes facts,

8    calls for speculation, lacks foundation.

9          THE WITNESS:  Yes.

10         BY:  MR. GOLDSMITH

11         Q.    And the safety cubicle at the

12   Edgerton facility was, roughly speaking, in the

13   middle of the floor; is that accurate?

14         A.    Yes.

15         Q.    What was your understanding of the

16   purpose of the safety cubicle?

17         A.    My understanding was that basically,

18   you know, if you needed like Ibuprofen or something

19   or you needed some gloves, something to help you with

20   your job, you could go to the safety cubicle.  Or,

21   you know, if something -- if you needed assistance

22   with something to help perform better or more safely.

23         Q.    Did you understand the safety cubicle

24   to be something similar to a first aid station?

25         A.    Yes.

Janell Braxton - January 25, 2021

36

1    the Edgerton facility, from March 23rd, 2020 to

2    April 14th, 2020, did you ever personally, physically

3    go to the safety cubicle?

4              A.   Yes.

5              Q.   On how many occasions?

6              A.   Let's see.  I went there, I think,

7    two times.

8              Q.   Did both of those visits to the

9    safety cubicle occur on April 14th, 2020?

10             A.   I think so, yes.

11             Q.   Did you know what the chain of

12   command was among the safety personnel, or safety

13   related associates at Wal-Mart's Edgerton facility?

14             MR. RALSTON:  Objection, assumes facts,

15   lacks foundation.

16             THE WITNESS:  No.

17             BY:  MR. GOLDSMITH

18             Q.   As a seasonal QC singles associate,

19   if you required medical attention of some sort you

20   were instructed to go to the safety cubicle, correct?

21             A.   Yes.

22             Q.   And if you thought you needed medical

23   attention, did you have to be instructed to go to the

24   safety cubicle or could you go on your own?

25             A.   I -- we could go on our own.

Janell Braxton - January 25, 2021

                                                              39

1              Q.   How long had you been symptom free?

2              A.   Symptom free for at least, I would

3    say, a week or so.

4              Q.   And when you returned from your leave

5    of absence, you then worked three consecutive shifts,

6    second shifts, until your termination on the night of

7    April 14th, 2020, correct?

8              A.   Yes.

9              Q.   So that first shift would have

10   started the evening of April 12th, 2020 and gone to

11   the morning of April 13th, 2020, correct?

12             A.   Yes.

13             Q.   And then the next shift would have

14   been evening of April 13th, 2020 to the morning of

15   April 14th, 2020, correct?

16             A.   Yes.

17             Q.   And then the final shift that you

18   worked would have been the evening of April 14th,

19   2020 until your termination shortly before midnight

20   during that shift, correct?

21             A.   Yes.

22             MR. RALSTON:  Hey Mark, is it okay if we

23   take a really short break?

24             MR. GOLDSMITH:  Absolutely.

25             MR. RALSTON:  Okay.

Janell Braxton - January 25, 2021

46

1   from April 12th at 6:30 p.m. to April 13th at

2   5:00 a.m., correct?

3           A.   Yes.

4           Q.   I will represent to you that that was

5   a Sunday night to Monday morning.  Does that sound

6   correct?

7           A.   Yes.

8           Q.   What time did you arrive for your

9   shift on April 12th?

10          A.   That would have been somewhere around

11  6:10, maybe 6:20.

12          Q.   Who was your lead for that April 12th

13  to 13th shift?

14          A.   Amy.

15          Q.   So Amy was your direct supervisor for

16  the April 12th through 13th shift, correct?

17          A.   Yes.

18          Q.   When you arrived around 6:10 to

19  6:20 p.m. on April 12th, what did you do for the next

20  10 to 20 minutes before your shift actually started?

21          A.   I probably had some food that I was

22  eating in my car before I went into the workplace.

23          Q.   Is there -- or strike that.  Was

24  there a general routine as to how a shift started?

25  Meaning, you know, did you have a group meeting or

Janell Braxton - January 25, 2021

48

```
 1              A.   Yes.
 2              Q.   Did you review Exhibit 26 before it
 3    was filed in this case?
 4              A.   Yes.
 5              Q.   And if you turn to Page 3.
 6    Throughout the complaint there's reference to a
 7    manager, slash, lead.  An example of that would be in
 8    Paragraph 20 on Page 3.  Do you see that?
 9              A.   Yes.
10              Q.   By that do you mean your lead, Amy?
11              A.   Yes.
12              Q.   Now, if you look at Paragraph 19 on
13    Page 3 it says that you felt throbbing pain in your
14    wrist early morning hours of April 13th, 2020.  Do
15    you see that?
16              A.   Yes.
17              Q.   Is that an accurate statement?
18              A.   Yes.
19              Q.   Which wrist?
20              A.   My left wrist.
21              Q.   Can you give me a more specific
22    timeframe for early morning hours?
23              A.   Early morning, one a.m. or so.
24              Q.   So am I correct that you first began
25    to feel some sort of discomfort in your wrist on
```

Janell Braxton - January 25, 2021

51

1          Q.    Am I correct that the throbbing in

2    your wrist got progressively worse as your shift went

3    on until your shift ended at five a.m. on April 13th,

4    2020?

5          A.    Yes.

6          Q.    My understanding is that two shifts

7    later, on the evening of April 14th, 2020, was the

8    first time that you informed management about the

9    pain in your wrist; is that correct?

10         A.    That's not correct because I informed

11   my lead Amy on April 13th.

12         Q.    How many times did you tell Amy that

13   you were feeling some kind of discomfort in your

14   wrist on April 13th, 2020?

15         A.    On April 13th.  At least two times.

16         Q.    When did those two times occur?

17         A.    The first time occurred towards the

18   end of my shift on April the 13th in the morning --

19   early morning hours.  She came over to tell me how

20   well I was doing and I was pretty much doing better

21   than anyone on the team at that time.  And I stopped

22   her and I said, well, I don't know how that's

23   possible because my wrist's really hurting me.

24         And then the second time would have been

25   on April the 13th in the evening of my next shift, I

Janell Braxton - January 25, 2021

53

1          Q.    Did you elaborate at all on what you

2     meant by my wrist is really hurting me?

3          A.    No.  Just my wrist is really hurting

4     me.  So, you know, I can't believe I'm doing so well.

5          Q.    Did you ask at that time to go to the

6     safety cube?

7          A.    No.  It was at the end of the shift.

8          Q.    And if your shift ended around five

9     then your wrist had been bothering you for about four

10    hours, correct?

11         A.    Yes.

12         Q.    At any time during those four hours

13    between one a.m. and five a.m. on April 13th, 2020,

14    did you ask anybody to be able to go to the safety

15    cube?

16         A.    No.

17         Q.    Is there any reason that you didn't

18    ask anybody to go to the safety cube on April 13th,

19    between one and five a.m.?

20         A.    I'm thinking I was just trying to

21    work through, you know, I wasn't really sure what was

22    going on and I didn't -- it wasn't -- I wasn't to the

23    point to where I couldn't work.  So I just was

24    working through it.

25         Q.    Was there any reason why you simply

Janell Braxton - January 25, 2021

56

```
 1    hurting me a little bit.

 2              Q.    Prior to leaving the Edgerton

 3    facility on the morning of April 13th, 2020, did you

 4    tell anybody else besides your lead Amy and Mr.

 5    McClinton that your wrist had been bothering you?

 6              A.    No.

 7              Q.    And you worked your entire shift on

 8    April 12th through the 13th of 2020, correct?

 9              A.    Yes.

10              Q.    You didn't leave early?

11              A.    No.

12              Q.    After completing your April 12th

13    through the 13th shift you left the Edgerton

14    facility, correct?

15              A.    Yes.

16              Q.    Where'd you go?

17              A.    I went to where Ryan lives.

18              Q.    Did you go straight to your

19    boyfriend's home?

20              A.    I think so.

21              Q.    And then you were off work from about

22    five a.m. until 6:30 p.m. on April 13th, correct?

23              A.    Yes.

24              Q.    What did you do -- strike that.  What

25    did you do during that time?
```

Janell Braxton - January 25, 2021

57

1       A.   First thing I ate some food and took

2   some Ibuprofen for my wrist and then I went to sleep.

3   And I'm not for sure what I did after that but then

4   it was probably time for the next shift.

5       Q.   Do you recall if you left your

6   boyfriend's home for any reason other than to go back

7   to work for the shift that was starting at 6:30 p.m.

8   on April 13th?

9       A.   No.

10      Q.   During your time off between shifts

11  on April 13th, did you do any chores around the

12  house?

13      A.   No.

14      Q.   And then following your April 12th to

15  13th shift, the next shift you had was from

16  April 13th at 6:30 p.m. to April 14th at 5:00 a.m.,

17  correct?

18      A.   Yes.

19      Q.   And that would have been a Monday

20  night to Tuesday morning, right?

21      A.   Correct.

22      Q.   What time did you arrive for your

23  April 13th to 14th shift?

24      A.   It would have been anywhere between

25  6:10 and 6:20.

Janell Braxton - January 25, 2021

58

1          Q.    Was Amy your lead for the April 13th
2     to 14th shift as well?
3          A.    I think so.  But there was also
4     another woman similar to Amy but I think that was
5     Amy.
6          Q.    Is it your recollection that it was
7     either one or the other?
8          A.    Yes.
9          Q.    There was only one lead working on
10    April 13th or 14th as far as you know, correct?
11         A.    One was a lead and the other was -- I
12    feel like they were both leads but I'm not sure.
13         Q.    Is it possible that they were both
14    working for the April 13th to 14th shift or was it
15    one or the other?
16         A.    It's possible that they were both
17    working.
18         Q.    And you think it was Amy but it might
19    have been this other woman, correct?
20         A.    Yes.
21         Q.    When you arrived at the Edgerton
22    facility on the evening of April 13th, was your wrist
23    already bothering you?
24         A.    Yes.
25         Q.    And on a scale of one to ten, you

Janell Braxton - January 25, 2021

61

1              (At this point in the proceedings, the

2    Court Reporter read aloud the aforesaid question and

3    answer.)

4              BY:  MR. GOLDSMITH

5              Q.   And when you say the other one, you

6    mean the other lead, the other woman lead that you

7    just don't remember her name right now?

8              A.   Yes.

9              MR. RALSTON:  That was good.  You

10   definitely changed the volume.

11             BY:  MR. GOLDSMITH

12             Q.   At what time did you tell Amy or this

13   other lead about your wrist on the evening of April

14   13th?

15             A.   It would have been close to the

16   beginning portion of my shift.

17             Q.   What exactly did you say to your lead

18   about your wrist on the evening of April 13th, 2020?

19             A.   I just said that my wrist is hurting

20   me.  I don't remember exactly what I said.

21             Q.   And I believe you said you told your

22   lead this close to the start of the shift on

23   April 13th, correct?

24             A.   Yes.

25             Q.   At any other point during this same

Janell Braxton - January 25, 2021

64

1          Q.    You said that you started feeling

2    discomfort around one a.m., correct?

3          A.    Yes.

4          Q.    Was that before or after lunch?

5          A.    That would have been -- I'm not sure.

6    It's probably right around that time.

7          Q.    Do you remember how many breaks you

8    got every shift?

9          A.    Two breaks and one lunch.

10          Q.    Okay.  So am I correct that you would

11   start a shift, at some point you would take a break,

12   and then your next break after that would be a lunch

13   break?

14          A.    Yes.

15          Q.    And then you'd have another break

16   after that and then it would be your end of shift?

17          A.    Yes.

18          Q.    Okay.  During this April 13th to 14th

19   shift, did you ever go to the safety cubicle?

20          A.    I went to the safety cubicle on the

21   first part of the April 14th shift.

22          Q.    Okay.  So just so we have a clear

23   record, I'll ask it again so we make sure we

24   understand each other.  At any time during your April

25   13th 6:30 p.m. to your April 14th 5:00 a.m. shift,

Janell Braxton - January 25, 2021

65

1   did you go to the safety cubicle?

2           A.   No.

3           Q.   At any time during the April 13th to

4   14th shift, did you ask anybody to be able to go to

5   the safety cubicle?

6           A.   No.

7           Q.   At any time during the April 13th to

8   14th shift did the discomfort in your left wrist ever

9   go away completely?

10          A.   No.

11          Q.   Is there any reason why you did not

12  ask anybody to be able to go to the safety cube

13  during the April 13th to 14th shift?

14          A.   I just probably wasn't thinking that

15  it was -- it was causing problems but it wasn't

16  causing enough for me to say, hey, I really want to

17  go figure out what's going on.

18          Q.   Other than either Amy or the other

19  female lead towards the beginning of the shift on

20  April 13th, in the evening, did you tell anybody else

21  at Wal-Mart that your wrist was bothering you from --

22  during the April 13th to 14th shift?

23          A.   No.

24          Q.   During the -- strike that.  From one

25  a.m. to five a.m. on April 13th, was the discomfort

Janell Braxton - January 25, 2021

66

```
 1   in your wrist ever severe enough to bring you to

 2   tears?

 3           A.   No.

 4           Q.   Okay.  And during the April 13th to

 5   14th shift, was the discomfort in your wrist ever

 6   severe enough to bring you to tears?

 7           A.   April 13th to 14th shift?

 8           Q.   Correct.

 9           A.   No.

10           Q.   And you worked your entire shift on

11   April 13th to 14th, correct?

12           A.   Yes.

13           Q.   You didn't leave early, did you?

14           A.   No.

15           Q.   Once you had finished your shift in

16   the early morning hours on April 14th, but before you

17   left the facility, did you inform anybody about the

18   discomfort in your wrist?

19           A.   No.

20           Q.   And then after completing your

21   April 13th to 14th shift, you left the Edgerton

22   facility, correct?

23           A.   Yes.

24           Q.   Where did you go?

25           A.   I'm thinking I went back to where
```

Janell Braxton - January 25, 2021

67

1    Ryan lived.

2            Q.   Did you go straight to Mr.

3    McClinton's residence?

4            A.   I think so but I don't -- I don't

5    remember.

6            Q.   And then you were off work from about

7    5:00 a.m. to 6:30 p.m. on April 14th, correct?

8            A.   Yes.

9            Q.   What did you do during that time?

10           A.   I would have ate some food in the

11   morning and took some more medicine, went to sleep,

12   and then got ready for work again.

13           Q.   What medicine did you take on

14   April 14th, 2020?

15           A.   I think Ibuprofen.

16           Q.   And you took Ibuprofen on April 13th

17   in between your shifts, correct?

18           A.   Yes.

19           Q.   And on April 13th, did the Ibuprofen

20   help?

21           A.   Yes.

22           Q.   And on April 14th, did the Ibuprofen

23   help?

24           A.   I'm not sure.

25           Q.   Other than leaving to go back to work

Janell Braxton - January 25, 2021

68

1    on the evening of the 14th, did you leave the house

2    in between your shifts?

3              A.   I don't think so.

4              Q.   Did you do any chores around the

5    house?

6              A.   No.

7              MR. GOLDSMITH:   We can go off the record

8    for a second.

9              (At this point in the proceedings, a short

10   recess was taken.)

11             BY:  MR. GOLDSMITH

12             Q.   Ms. Braxton, following your

13   April 13th to 14th shift, your next shift was from

14   April 14th at 6:30 a.m. to April 15th at 5:00 a.m.,

15   correct?

16             A.   Yes.

17             Q.   And that was a Tuesday night to

18   Wednesday morning, correct?

19             A.   Correct.

20             Q.   What time did you arrive for the

21   April 14th to 15th shift?

22             A.   Somewhere in between 6:10 and 6:20.

23             Q.   Was Amy your lead during the

24   April 14th to 15th shift?

25             A.   Yes.

Janell Braxton - January 25, 2021

72

1          A.   We drove one vehicle together, like

2   we carpooled.  So I was the one driving us to work

3   that evening.

4          Q.   When you arrived for work on the

5   evening of April 14th, did you believe that you could

6   perform your job even though your wrist was bothering

7   you?

8          A.   I believed I could but with -- it

9   would be -- I wouldn't be as fast or as good as I had

10  been previously.

11         Q.   Do you recall that about two or two

12  and a half hours into your April 14th to 15th shift

13  you had a discussion with Amy, your lead?

14         A.   Yes.

15         Q.   Did you approach Amy or did Amy

16  approach you?

17         A.   I approached Amy.

18         Q.   And where were you when you

19  approached Amy?

20         A.   I was walking down like the aisle

21  where all of our work stations were, right before you

22  get to where the work stations are, it was like an

23  open area right there.  And she had, like, a portable

24  work station cart that she would -- she would walk

25  around with -- it would roll, a rolling cart.  And I

Janell Braxton - January 25, 2021

73

1    approached her.

2              Q.    Was there a specific reason that you

3    approached her at that time?

4              A.    Yes.  It was because my wrist was

5    bothering me and I wanted to know if I could -- if

6    there was some type of brace or wrap or something

7    that I could use to help me get through my shift.

8              Q.    What did Amy say in response?

9              A.    She said she wasn't sure but to go

10   ahead and log off and go to the safety cubicle.

11             Q.    Would you estimate that this was

12   about nine p.m. on April 14th?

13             A.    I think so.

14             Q.    How would you describe the discomfort

15   in your wrist as of this time, nine p.m. April 14th?

16             A.    I would describe it at probably like

17   an eight or so.

18             Q.    And I'm sorry, did you say ache or

19   eight, like the number scale?

20             A.    Eight, like the number scale.

21             Q.    And that's the same scale we're

22   talking about where it's a scale of one to ten,

23   correct?

24             A.    Yes.

25             Q.    Was that time that you approached Amy

Janell Braxton - January 25, 2021

75

1          A.    No.

2          Q.    Did you tell Amy at that time that

3    your wrist was hurting?

4          A.    Yes.

5          Q.    What exactly did you tell Amy

6    regarding the discomfort in your wrist?

7          A.    I told Amy that my wrist was hurting

8    and I just wanted to know if there was anything that

9    I could get to help it, like a brace or a wrap.

10         Q.    During this April 14th, approximately

11   nine p.m. conversation with Amy, did you mention the

12   fact that your wrist was still hurting from your same

13   complaint in -- on the morning of April 13th?

14         A.    I think so.

15         Q.    Okay.  When you say you think so, do

16   you have a specific recollection one way or the

17   other?

18         A.    I feel like I told her that it was

19   still bothering me.

20         Q.    Okay.  And when you said you feel

21   like, I just need to know.  Do you have a specific

22   recollection that you told Amy that your wrist was

23   still bothering you from the comments you made on

24   April 13th?

25         A.    No, I can't say I do.

Janell Braxton - January 25, 2021

77

1          Q.   When you arrived at the safety

2     cubicle, was somebody present or did you have to

3     wait?

4          A.   Someone was present.

5          Q.   Do you know who that person was?

6          A.   I don't know his name.  He was -- he

7     had darker hair and he was probably either of Asian

8     or Hispanic descent possibly.

9          Q.   Even if you don't know his name, do

10    you know what his job was?

11         A.   No.

12         Q.   When you arrived at the safety

13    cubicle, was it your impression that this individual

14    was expecting you or did you have an impression at

15    all?

16         A.   I didn't have an impression at all.

17         Q.   And when you arrived at the safety

18    cubicle, did you speak to this individual first or

19    did he speak to you?

20         A.   I don't remember.

21         Q.   But among the first things that was

22    communicated was your request for a brace or a wrap;

23    is that correct?

24         A.   Yes.

25         Q.   What was this person's response to

Janell Braxton - January 25, 2021

78

1   that request?

2          A.   He said they don't have a brace or a

3   wrap but they could possibly give me some, like,

4   ointment to rub on it.

5          Q.   And what was your response to that

6   comment?

7          A.   I said, okay, I'll take that.

8          Q.   And when you say ointment, are we

9   talking about like muscle rub, Ben-Gay, or something

10   like that?

11          A.   Yes.

12          Q.   And when you said, okay, I'll take

13   that, did he provide that to you?

14          A.   Yes.

15          Q.   Did he give you, like, a whole tube

16   itself?

17          A.   No.  It was just like a little piece

18   of -- it was like a little paper packet, like a

19   sample pack of something, of the ointment.

20          Q.   When he provided that to you, did you

21   say anything else?

22          A.   Thank you.

23          Q.   Did he say anything else?

24          A.   Not that I can remember.

25          Q.   And at that point did you leave the

Janell Braxton - January 25, 2021

81

1    department from 9:07 p.m. to 9:09 p.m.  Do you see

2    that?

3              A.   Yes.

4              Q.   And then if you look at the second

5    entry down it shows that you were logged back into

6    your QC singles station at 9:10 p.m.  Do you see

7    that?

8              A.   Yes.

9              Q.   Are these time entries that we see on

10   Exhibit 27 consistent with your recollection that you

11   logged into your work station at 6:25, that you

12   logged out of your work station at 9:06 and went to

13   the safety department, that you stayed at the safety

14   department from 9:07 to 9:09 and then returned back

15   to your QC singles station at 9:10?

16             A.   Yes.

17             Q.   Now, going back to your conversation

18   with Amy around nine o'clock on the evening of April

19   14th.  You asked her if you could get a brace or a

20   wrap, correct?

21             A.   Correct.

22             Q.   And she said she wasn't sure but that

23   you should go to the safety cube on -- to get

24   attention, correct?

25             A.   Yes.

Janell Braxton - January 25, 2021

83

1          Q.    When you returned to your work

2    station -- strike that.  You got back to your work

3    station after the safety cube around 9:10 p.m.,

4    correct?

5          A.    Yes.

6          Q.    After you returned to your work

7    station around 9:10 p.m., did you at some point after

8    that have a second conversation with Amy?

9          A.    When I returned -- when I was on my

10   way back to my work station I stopped her and I said,

11   hey, they didn't have a brace but they gave me some

12   ointment.  And she was -- and I remember her saying,

13   okay.  And then I went back to my work station.

14         Q.    During this second conversation with

15   Amy on April 14th, 2020, did you say anything other

16   than they didn't have a brace and they gave me

17   ointment?

18         A.    No.

19         Q.    At some point after you returned to

20   your station around 9:10 p.m. on April 14th, 2020,

21   did you have a third conversation with Amy regarding

22   your wrist?

23         A.    Yes.

24         Q.    Using the 9:10 mark as the time that

25   you got back to your station following the safety

Janell Braxton - January 25, 2021

84

1  cube, can you tell me when that third conversation

2  with Amy occurred?

3          A.   It would have been somewhere between

4  9:30 and when I clocked out again, which is like 10

5  -- I guess that says 10:34.

6          Q.   What did you discuss with Amy during

7  this third conversation that you had with her on

8  April 14th, 2020?

9          A.   She asked me if I thought it was a

10 work -- my wrist was hurting because of something

11 with work.

12         Q.   What did you say in response?

13         A.   Yes.

14         Q.   Did you elaborate when you responded

15 to Amy?

16         A.   Not that I can remember.

17         Q.   What did Amy say next?

18         A.   I think she said okay.

19         Q.   During this third conversation with

20 Amy, did you discuss anything else related to your

21 wrist?

22         A.   No.

23         Q.   Was it just a quick one question

24 conversation that made up this third interaction that

25 you had with Amy on April 14th?

Janell Braxton - January 25, 2021

86

1          Q.   After this third conversation with

2    Amy on April 14th, 2020, what was the next thing that

3    happened relative to your wrist?

4          A.   The next thing was an upper

5    management type man came and got me and mentioned

6    that Amy had told him I was having issues with my

7    wrist.  And then he told me he wanted me to log off

8    so that I could do an incident report.

9          Q.   Do you know who this man was?

10         A.   No.

11         Q.   Do you know what his job title was?

12         A.   No.

13         Q.   During this conversation -- well,

14   strike that.  Where did this conversation with the

15   male manager take place?

16         A.   At my work station.

17         Q.   Was anybody else present during this

18   conversation?

19         A.   Not that I can remember.

20         Q.   Did this male manager ask how you

21   hurt your wrist?

22         A.   I think he asked me if it was

23   something that happened at work, and I said yes.

24         Q.   Did this male manager ask you when

25   you started feeling discomfort in your wrist?

Janell Braxton - January 25, 2021

87

1          A.   No.

2               Q.   Did this male manager ask you to

3     elaborate how or why you began to feel discomfort in

4     your wrist?

5          A.   Yes.  I think he wanted to know -- I

6     feel like he said can you explain to me what you were

7     doing when your wrist started to hurt.  And I just,

8     you know, said I was packaging the -- I was doing my

9     job duties and I realized it was hurting.

10              Q.   Did he ask you if there was a

11    specific incident that occurred that caused this?

12         A.   Yes.

13              Q.   What did you say?

14         A.   I said no.

15              Q.   Did this male manager ask you how

16    long you had been feeling discomfort in your wrist?

17         A.   No.

18              Q.   Did this male manager ask you if you

19    had told anybody else -- anybody else about the

20    discomfort you were feeling in your wrist?

21         A.   No.

22              Q.   Can you give me a rough estimate as

23    to how long this interaction with the male manager

24    took place at your work station?

25              A.   Maybe one minute.

Janell Braxton - January 25, 2021

                                                                    88
1              MR. RALSTON:  I seriously feel like this

2    guy manages the mail at the facility.

3              BY:  MR. GOLDSMITH

4         Q.   After about a minute of talking with

5    this individual, did you then log off your work

6    station?

7         A.   Yes.

8         Q.   Did you walk with him to the safety

9    cube?

10        A.   Yes.

11        Q.   And I assume you arrived at the

12   safety cubicle with this person, correct?

13        A.   Yes.

14        Q.   From the time that your conversation

15   with this male manager started at your work station

16   to the time you got to the safety cube, was there

17   anybody else present or involved in the conversation

18   that you had?

19        A.   No.

20        Q.   Do you know if this male manager

21   spoke on the phone with anybody or texted anybody on

22   his phone between the time that your conversation

23   started and the time the two of you arrived at the

24   safety cube?

25        A.   No.

Janell Braxton - January 25, 2021

89

1          Q.    Had you ever spoken to this male

2    manager before?

3          A.    No.

4          Q.    Before this male manager arrived at

5    your work station, did you know that Amy was going to

6    tell somebody that your wrist was bothering you?

7          A.    No.

8          Q.    Did this male manager, during your

9    conversation at the work station, ask you about the

10   level of discomfort you were feeling in your wrist?

11         A.    I don't remember.

12         Q.    Have you now told me everything that

13   either you said to this male manager or he said to

14   you from the time he arrived at your work station on

15   the evening of April 14th to the time that you got to

16   the safety cube?

17         A.    Yes.

18         Q.    And if you look at Exhibit 27, it

19   appears that you logged off your work station at

20   10:54, do you see that?

21         A.    Yes.

22         Q.    Is that consistent with your

23   recollection of when you left your work station with

24   this male manager to go to the safety cube?

25         A.    Yes.

Janell Braxton - January 25, 2021

90

1          Q.   When you and this male manager

2    arrived at the safety cube, was anybody else present

3    at the safety cube?

4          A.   There was someone in the safety cube,

5    yes.

6          Q.   Was it the same person that had given

7    you ointment earlier?

8          A.   I think so.

9          Q.   And when you say you think so, do you

10   have a specific recollection either way?

11         A.   No.

12         Q.   Even though this other person was

13   present, did you have any interaction with this

14   individual that was already at the safety cube?

15         A.   I'm not sure.

16         Q.   And is the reason that you're not

17   sure you just don't remember?

18         A.   Yes.

19         Q.   What happened when you got to the

20   safety cube with the male manager?

21         A.   When I got to the safety cube, he

22   told me he was going to have me fill out the incident

23   report and he handed me the piece of paper that was

24   just like a blank paragraph form.  And he told me to

25   write down everything that I was feeling, that was

Janell Braxton - January 25, 2021

91

1   going on with my wrist.

2              Q.    Did he use the phrase incident report

3   or did he use another word or phrase to describe the

4   form?

5              A.    Incident report is what I remember.

6              Q.    Was the safety -- strike that.  Was

7   this male manager the one that handed you the blank

8   form for you to fill out?

9              A.    Yes.

10             Q.    Did the male manager get that form

11  from somewhere in the safety cube?

12             A.    Yes.

13             Q.    To the best of your recollection, can

14  you tell me exactly what he said when he instructed

15  you to complete the form?

16             A.    He said I want you to complete this

17  form and I want you to just write down everything

18  that's going on with your wrist, everything that's

19  wrong with it.

20             Q.    Did he tell you to include a timeline

21  of when you started experiencing discomfort in your

22  wrist?

23             A.    No.

24             Q.    Did you have any questions about the

25  form or how you were supposed to fill it out?

Janell Braxton - January 25, 2021

92

1            A.   No.

2            Q.   Did you fill out the form in your own

3    handwriting?

4            A.   Yes.

5            Q.   Are you right handed or left handed?

6            A.    Right handed.

7            (WHEREIN, Exhibit 28 was marked for

8    identification by the Court Reporter.)

9            BY:  MR. GOLDSMITH

10           Q.   Ms. Braxton, you've been handed

11   what's been marked Exhibit 28.  It's Bates stamped WM

12   Braxton 25.  Take a look at Exhibit 28 and let me

13   know when you've had a chance to review it.

14           A.   Okay.  Okay.

15           Q.   Ms. Braxton, do you recognize

16   Exhibit 28?

17           A.   Yes.

18           Q.   Is Exhibit 28 the statement form that

19   you filled out in your own handwriting and signed on

20   the night of April 14th, 2020?

21           A.   Yes.

22           Q.   Did you write Exhibit 28 on your own?

23           A.   Yes.

24           Q.   Did you receive any input on what to

25   write from anybody?

Janell Braxton - January 25, 2021

103

1    of throbbing to excruciating.

2                Q.   When you completed and signed the

3    written statement we see in Exhibit 28, what did you

4    do with it?

5                A.   I handed it back to upper management.

6                Q.   Did you have any questions before you

7    handed it to him?

8                A.   No.

9                Q.   Do you know if he read it right then

10   and there?

11               A.   I feel like he took a quick look and

12   said thank you and that he would be back.

13               Q.   Up until this point in time when you

14   handed him the statement form, took a quick look at

15   it and said thank you, he told you he'd be back, up

16   until that point in time had you had any discussion

17   with this male manager about when you first began

18   experiencing discomfort in your wrist?

19               A.   No.

20               Q.   Up until this same point in time when

21   you handed your statement form to the male manager,

22   had you had any discussions with that male manager

23   regarding whether or not you had told anybody about

24   the discomfort you were feeling in your wrist?

25               A.   No.

Janell Braxton - January 25, 2021

104

```
 1          Q.   When he told you thank you and told
 2   you that he would be back, did that occur at the
 3   safety cube?
 4          A.   Yes.
 5          Q.   And then he left the safety cube?
 6          A.   Yes.
 7          Q.   You stayed in the safety cube?
 8          A.   Yes.
 9          Q.   Do you know where this male manager
10   went when he left the safety cube?
11          A.   I thought he was going -- I think --
12   I thought he told me he was going to HR but I'm not
13   positive.
14          Q.   Did you watch him go to HR?
15          A.   No.
16          Q.   Aside from what he might have said,
17   do you know where he went when he left the safety
18   cube?
19          A.   No.
20          Q.   When he left the safety cube, do you
21   know if he spoke to anybody about your statement
22   form?
23          A.   No.
24          Q.   What happened next?
25          A.   He came back.  It took a while, like
```

Janell Braxton - January 25, 2021

105

1    -- it seemed like maybe 15 minutes, it was getting

2    close to lunch.  And he came back with -- he came

3    back, I don't know if he still had the form in his

4    hand.  But he came back and got me and said, hey,

5    we're going to go to HR real fast, something along

6    that line.

7              And then we went to -- he took me into HR

8    and then there was a lady in there, an HR

9    representative, her name was Morgan.  She was sitting

10   in the chair.  And he sat down in a seat next to her

11   and closed the door and he started to tell me that,

12   you know, we don't have to give you any warnings

13   because you're a temporary employee.  You're supposed

14   to report your work injury, I think he said within

15   24 hours of having it, but since you're a temporary

16   employee and we don't have to give you any warnings,

17   we can just fire you, we don't have to give you any

18   written warnings.  And that that's what they were

19   doing and that they wanted to protect themselves and

20   that they hoped that I could understand.

21             And when he told me that I was completely

22   confused and at first didn't believe that that's --

23   that it was true that he was saying that.  And then I

24   just got real emotional once I realized that it was

25   the truth.  They were just kind of both staring at me

Janell Braxton - January 25, 2021

108

1              BY:  MR. GOLDSMITH

2              Q.   What did the male manager say to you

3    regarding the requirement to report an injury on the

4    job?

5              A.   He said that you're supposed to

6    report it within the first 24 hours and that because

7    of this they don't have to give me any warnings

8    because I am a temporary employee and that they are

9    going to terminate me at this time.  And that they're

10   just -- hope I can understand, they're just trying to

11   protect themselves.

12             Q.   When the male manager told you that

13   you were supposed to report an injury within

14   24 hours, what did you say in response to that

15   comment?

16             A.   I didn't say anything in response to

17   that comment because I was -- I got emotional at that

18   time.  And I was thinking in my head like I know I

19   reported -- I know I reported it because I spoke to

20   my lead on the night that it actually happened, the

21   morning.

22             Q.   Did you tell the male manager or

23   Morgan, the HR representative in the office, that you

24   had reported your injury on the morning of April

25   13th?

Janell Braxton - January 25, 2021

109

1          A.    No.

2              Q.    When the male manager told you that

3    you were supposed to report an injury within

4    24 hours, was that the first time that you had ever

5    been informed of any kind of a requirement like that?

6          A.    Yes.

7              Q.    When the male manager said that

8    because you're a seasonal associate you don't have to

9    get a written warning, did you understand that to

10   mean that your employment could be terminated without

11   first having any form of discipline enforced upon

12   you?

13         A.    Yes.

14             Q.    Before the male manager made that

15   comment, did you have an understanding that as a

16   seasonal associate your employment could be

17   terminated without first getting any written formal

18   discipline?

19         A.    No.

20             Q.    I think you said something to the

21   effect of the male manager said that they were just

22   trying to protect themselves.  Did I get that

23   correct?

24         A.    Yes.

25             Q.    What did you understand him to mean

Janell Braxton - January 25, 2021

117

1          A.   No.  She didn't ask.

2          Q.   Did you ever seek medical treatment

3    from a medical professional related to the injury you

4    reported on April 14th, 2020?

5          A.   No.

6          Q.   As you sit here today, are you fully

7    recovered from whatever the injury was that is

8    discussed in the statement form that's been marked as

9    Exhibit 28?

10         A.   Yes.

11         Q.   When was the last time you

12   experienced any pain or discomfort related to the

13   injury you referenced in the statement form that we

14   marked as Exhibit 28?

15         A.   I would say about a week after I was

16   fired.

17         Q.   Did the discomfort just lessen and

18   lessen gradually and then after about a week it was

19   gone?

20         A.   Yes.

21         Q.   And has it come back at any time

22   since April of 2020?

23         A.   No.

24         Q.   Are you aware of any other associates

25   who work or worked at the Edgerton facility that were

Janell Braxton - January 25, 2021

                                                                    119

1            Q.    During the meeting that you had with

2    the male manager and Morgan from HR on the night of

3    April 14th, 2020, did anybody say anything about

4    workers' compensation?

5            A.    No, not that I can remember.

6            Q.    You worked as a driver for Amazon

7    from April 19th, 2020 to May 22nd, 2020; is that

8    correct?

9            A.    Yes.

10           Q.    Were you an independent contractor or

11   an employee of Amazon?

12           A.    Can you repeat those dates?

13           Q.    Sure.  And we're talking about

14   Amazon, when you were a driver for Amazon.

15           A.    Driver, okay.  I was an independent

16   contractor.  I was hired through a company that was

17   contracted with Amazon.

18           Q.    And your hourly rate of pay at Amazon

19   was 18.56, does that sound right?

20           A.    Yes.

21           Q.    How were your hours determined?

22           A.    I mean, they were just set hours.

23           Q.    Did you have a set schedule?

24           A.    Yes.

25           Q.    What was your schedule?

Janell Braxton - January 25, 2021

                                                                    149

1                      CERTIFICATE OF REPORTER

2    STATE OF MISSOURI          )
                                )  ss.
3    CITY OF KANSAS CITY         )

4

5

6

7          I, JILL A. BLESKEY, a Registered

8    Professional Reporter, Certified Shorthand Reporter

9    (IL), and Certified Court Reporter (MO), do hereby

10   certify that the witness whose testimony appears in

11   the foregoing deposition was duly sworn by me; that

12   the testimony of said witness was taken by me to the

13   best of my ability and thereafter reduced to

14   typewriting under my direction; that I am neither

15   counsel for, related to, nor employed by any of the

16   parties to the action in which this deposition was

17   taken, and further that I am not a relative or

18   employee of any attorney or counsel employed by the

19   parties thereto, nor financially or otherwise

20   interested in the outcome of this action.

21

22

23   _____

24            Jill A. Bleskey, RPR, CSR, CCR

25

Case 2:20-cv-02287-DDC   Document 95-3   Filed 06/09/21   Page 1 of 5

Appellate Case: 22-3003   Document: 010110660653   Date Filed: 03/21/2022   Page: 245
Quincy Usry                 Braxton vs. Walmart                 1/6/2021

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS


JANELL BRAXTON,            )
                          )
          Plaintiff,      )
                          )
vs.                       )     No. 2:20-cv-02287-DDC-GEB
                          )
WALMART INC.,             )
                          )
          Defendant.      )




VIDEOTAPED DEPOSITION OF

QUINCY USRY,

(30(b)(6) Deposition)


a witness, being produced, sworn and examined on

Wednesday, January 6, 2021, pursuant to Second Amended

Notice of Videotaped Deposition of Walmart, Inc. Safety

Manager Quincy Usry, at the offices of Ralston Kinney,

LLC, Suite 300, 4717 Grand Avenue in Kansas City,

Missouri, before

          SHARON L. CRAWFORD, CCR, RPR,

a Certified Court Reporter in Missouri and Kansas.

Taken on behalf of the Plaintiff.

**EXHIBIT**

**B**

Quincy Usry                Braxton vs. Walmart              1/6/2021

5

              THE VIDEOGRAPHER:  Let the record reflect
the time is 9:57 a.m.  Today is Wednesday, January 6th,
year 2021.  Will counsel please voice identify themselves
and state whom you represent.

              MR. RALSTON:  Tom Ralston for Janell
Braxton.

              MR. GOLDSMITH:  Mark Goldsmith for the
Defendant, Walmart.

              THE VIDEOGRAPHER:  Would the court
reporter now administer the oath to the witness.

                    QUINCY USRY,
a witness, having been produced, sworn and examined,
testified as follows on:
EXAMINATION BY MR. RALSTON:

    Q.   Sir, you understand you just took an oath to
tell the truth?

    A.   Yes.

    Q.   You understand that now that you have taken that
oath from or with an officer of the court who has the
power to administer oaths, all your testimony is subject
to what we call the penalty of perjury.  Do you
understand that?

    A.   Yes.

    Q.   Have you ever given deposition testimony before?

    A.   No.

```
        Quincy Usry              Braxton vs. Walmart              1/6/2021
```

                                                                    7

 1      A.   Yes.

 2      Q.   Who is your employer?

 3      A.   Walmart.

 4      Q.   When did you start working with Walmart?

 5      A.   May of 2016.

 6      Q.   What is your current job title?

 7      A.   Environmental health and safety operations

 8   manager.

 9      Q.   And how long have you been the environmental

10   health and safety operations manager for Walmart?

11      A.   Since 2018.

12      Q.   Did you take any training through school to

13   become an environmental health and safety operations

14   manager?

15      A.   I went to school for safety management.  That

16   was my degree.

17      Q.   Okay.  Where did you go to school?

18      A.   University of Central Missouri.

19      Q.   And what is your degree in?

20      A.   Safety management.

21      Q.   And have you lived in Kansas or Missouri all

22   your life?

23      A.   Yes.

24      Q.   What are your current duties as the

25   environmental health and safety operations manager for

Quincy Usry                 Braxton vs. Walmart                 1/6/2021

                                                                      126

1        Q.    This is the form that says that "Jet.com

2    strictly prohibits retaliation for reporting a concern,"

3    correct?

4        A.    Correct.

5        Q.    This form says that Jet.com -- which in essence,

6    that is Walmart, right?

7        A.    Yes.

8        Q.    And the Statement Form that says, "Jet.com

9    strictly prohibits retaliation for reporting a concern"

10   was actually given to Mrs. Braxton to report a concern,

11   correct?

12       A.    Correct.

13       Q.    Mrs. Braxton reported the concern, correct?

14       A.    Correct.

15       Q.    She did it on this form that I marked as Exhibit

16   9, correct?

17       A.    Correct.

18       Q.    In her statement, she talks about having pain in

19   her wrist, correct?

20       A.    Correct.

21       Q.    Is this an incident report?

22       A.    No, this is a Statement Form.

23       Q.    Okay.  Was an incident report actually filled

24   out for Mrs. Braxton?

25       A.    No, sir.

Case 2:20-cv-02287-DDC   Document 95-3   Filed 06/09/21   Page 5 of 5

Appellate Case: 22-3003   Document: 010110660653   Date Filed: 03/21/2022   Page: 249
Quincy Usry                    Braxton vs. Walmart                    1/6/2021

168

C E R T I F I C A T E

    I, SHARON L. CRAWFORD, CCR, RPR, a Certified Court
Reporter in and for the states of Missouri and Kansas, do
hereby certify that prior to being examined the witness
was by me duly sworn; that said deposition was taken down
by me in shorthand at the time and place hereinbefore
stated and was thereafter reduced to writing under my
direction and accurately records the witness' testimony;
that I am not a relative or employee or attorney or
counsel of any of the parties, or a relative or employee
of such attorney or counsel, or financially interested in
the action.

    WITNESS my hand and seal this _____ day of _____,
2021.


_____
SHARON L. CRAWFORD
MO CCR 164, KS CCR 487, RPR

Case 2:20-cv-02287-DDC   Document 95-4   Filed 06/09/21   Page 1 of 5

Appellate Case: 22-3003   Document: 010110660653   Date Filed: 03/21/2022   Page: 250
Ammie Wilbur                    Braxton vs. Walmart                    1/6/2021

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS


JANELL BRAXTON,                )
                              )
          Plaintiff,           )
                              )
vs.                           )    No. 2:20-cv-02287-DDC-GEB
                              )
WALMART INC.,                 )
                              )
          Defendant.          )




DEPOSITION OF

AMMIE WILBUR



a witness, being produced, sworn and examined on

Wednesday, January 6, 2021, pursuant to Notice to Take

the Deposition of Ammie Wilbur, at the offices of Ralston

Kinney, LLC, Suite 300, 4717 Grand Avenue in Kansas City,

Missouri, before

          SHARON L. CRAWFORD, CCR, RPR,

a Certified Court Reporter in Missouri and Kansas.

Taken on behalf of the Plaintiff.

**EXHIBIT**

**C**

```
     Ammie Wilbur              Braxton vs. Walmart           1/6/2021
```
                                                                    16

1    with Mrs. Braxton about the pain to her wrist and you

2    actually advised her to go to the Safety Department?

3         A.    Correct.

4         Q.    Do you remember in the evening of the April 12th

5    to April 13th shift telling Mrs. Braxton that she was

6    performing well?

7         A.    I do not remember.

8         Q.    Okay.  Are there some sort of documents that

9    record the QC associates' performance?

10        A.    At that time we would have been using what's

11   called Klip, Klipfolio, that recorded associates'

12   performance.

13        Q.    Klipfolio, is that correct?

14        A.    Yes.

15        Q.    Are you saying you believe these Klipfolio

16   documents would be able to show Mrs. Braxton's

17   performance during her shift between April 12th and April

18   13th?

19        A.    I don't know.  We are no longer using Klip.  I

20   don't know if they still have access to it.

21        Q.    What is Klipfolio?  Is it something to document

22   associates' performance?

23        A.    Yes.  It has dashboards for performance, but

24   also for other things.

25        Q.    How did Klipfolio in April of 2020 document

Ammie Wilbur            Braxton vs. Walmart            1/6/2021

18

1      Q.    Thank you, singles associate.  Actually, I think

2   it is the mask a little bit.  But that's okay, you don't

3   have to take it off if you don't want to.  But if you

4   don't mind, that would be great.

5          QC singles associate was Mrs. Braxton's job

6   title during her employment with Walmart, correct?

7      A.    Correct.

8      Q.    Describe the duties of a QC singles associate.

9      A.    You ship single-item orders.

10     Q.    And so the throughput per hour statistic, would

11  that show how many items that a QC sales associate had

12  shipped out during their shift?

13     A.    No, that would be total units.  The TPH is their

14  average per hour.

15     Q.    When is it that you first remember Mrs. Braxton

16  reporting pain in her wrist to you?

17     A.    That would have been the 14th.

18     Q.    Okay.  And then when Mrs. Braxton reported her

19  workplace injury to you who did you tell, if anyone?

20     A.    After our second conversation I reported to

21  Brady Kells.

22     Q.    To Brady Kellis?

23     A.    Kells, K-e-l-l-s.

24     Q.    And after you reported Mrs. Braxton's concern

25  that she had regarding the pain in her wrist to Brady

Ammie Wilbur                    Braxton vs. Walmart                    1/6/2021

38

1    break, right?

2         A.   Yes.

3         Q.   And then you went outside with the lawyer for

4    Walmart, correct?

5         A.   Yes.

6         Q.   And then you came back and you testified that

7    Mrs. Braxton told you on April 14th that she had hurt her

8    wrist previously, something that you did not mention in

9    your testimony in response to my questions.

10        A.   Yes.

11        Q.   I don't have any other questions, other than do

12   you understand that you took an oath to tell the truth?

13        A.   Yes.

14        Q.   Okay.  Do you understand that the person that

15   administered the oath is an officer of the court?

16        A.   Yes.

17        Q.   Do you understand that the person that

18   administered that oath has the power through the court to

19   administer oaths and make your testimony subject to the

20   penalty of perjury?

21        A.   Yes.

22        Q.   Okay.  And did Mrs. Braxton ever, ever indicate

23   to you when, as far as a time line goes, she had actually

24   hurt her wrist?

25        A.   Just that she hurt it before our conversation.

Ammie Wilbur                    Braxton vs. Walmart                    1/6/2021

43


C E R T I F I C A T E


I, SHARON L. CRAWFORD, CCR, RPR, a Certified Court
Reporter in and for the states of Missouri and Kansas, do
hereby certify that prior to being examined the witness
was by me duly sworn; that said deposition was taken down
by me in shorthand at the time and place hereinbefore
stated and was thereafter reduced to writing under my
direction and accurately records the witness' testimony;
that I am not a relative or employee or attorney or
counsel of any of the parties, or a relative or employee
of such attorney or counsel, or financially interested in
the action.

WITNESS my hand and seal this _____ day of _____,
2021.


_____
SHARON L. CRAWFORD
MO CCR 164, KS CCR 487, RPR

David Whitenack          Braxton vs. Walmart          4/1/2021

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

JANELL BRAXTON,                )

               Plaintiff, )   Case No. 2:20-cv-02287-DDC-GEB

vs.                           )

WALMART INC.,                 )

               Defendant. )

VIDEOTAPED ZOOM DEPOSITION OF

DAVID WHITENACK,

being produced via Zoom, sworn and examined on Thursday,

April 1, 2021, pursuant to notice to take the deposition

of David Whitenack, before Deborah K. McLaughlin, MO-CCR,

IL-CSR, KS-CCR.  Taken on behalf of Plaintiff.

**EXHIBIT**

**D**

David Whitenack          Braxton vs. Walmart          4/1/2021

7

1    in the decision to terminate Ms. Braxton, you're not a

2    Defendant in the case because Kansas law doesn't allow

3    individuals to be sued for wrongful termination.  You

4    understand that?

5         A    Yes.

6         Q    All right.

7              And you're testifying today, even though you're

8    on -- at Zoom, are you at your home right now?

9         A    I am.

10        Q    So even though you're on Zoom, this deposition

11   is being taken inside of a lawsuit filed in federal court

12   in the District of Kansas.

13             You understand?

14        A    Understood.

15        Q    And your testimony here today is under penalty

16   of perjury, just like it would be if you were sitting

17   inside the courtroom in front of the judge and a jury,

18   does that make sense?

19        A    It does.

20        Q    And what does that phrase "penalty of perjury"

21   mean to you?

22        A    That I could face charges for potential

23   imprisonment or a fine.

24        Q    Okay.

25             So you understand that if you were to lie under

David Whitenack            Braxton vs. Walmart              4/1/2021

                                                              8

 1   oath when you're subject to penalty of perjury, those

 2   consequences would fall on you personally, unlike in this

 3   lawsuit where the liability would fall on to Walmart?

 4        A     Correct.

 5        Q     Okay.

 6              And do you swear to tell the truth today, even

 7   if it helps Ms. Braxton's lawsuit and it hurts Walmart's

 8   defense of the lawsuit?

 9        A     Yes.

10        Q     All right.

11              Can you state your full name, please.

12        A     David Wesley Whitenack.

13        Q     What is your current address?

14        A     4131 Park Crossings Drive, Chelsea, Alabama.

15        Q     Are you currently employed?

16        A     Yes.

17        Q     With whom?

18        A     Amazon.com.

19        Q     Were you formerly employed by Walmart?

20        A     Yes.

21        Q     What was your last job title with Walmart?

22        A     Operations manager.

23        Q     When did you first become employed by Walmart?

24        A     October of 2018.

25        Q     When did you stop working for Walmart?

David Whitenack          Braxton vs. Walmart          4/1/2021

                                                                    9
1          A     July of 2020.

2          Q     Was your -- was the end of your employment with

3    Walmart voluntary or involuntary?

4          A     Voluntary.

5          Q     All right.

6                So did you leave Walmart to go work at

7    Amazon.com?

8          A     Correct.

9          Q     All right.

10               When you worked as operations manager, did you

11   work at a facility in Edgerton, Kansas?

12         A     Yes.

13         Q     And what, generally, could you tell me what --

14   what does an operations manager do at Walmart?

15         A     Operations manager at Walmart would be

16   responsible for the -- the production of orders,

17   typically, supervising anywhere from two to five area

18   managers, and overseeing the -- the safety and well-being

19   of around 200 hourly associates.

20         Q     You physically worked inside the facility at

21   Edgerton, Kansas?

22         A     Correct.

23         Q     And you said there was two to five area managers

24   under your supervision?

25         A     Yes.

    David Whitenack          Braxton vs. Walmart              4/1/2021

                                                                  14
1        A    No.

2        Q    And it's -- it's -- I believe it's Walmart's

3    position, and part of your decision was that the reason

4    Ms. Braxton was fired was for the timing of which she

5    reported a workplace injury.  Was that your conclusion

6    before firing Ms. Braxton?

7        A    Yes.

8        Q    So, at the time that you decided to fire

9    Ms. Braxton, was it your impression that she was reporting

10   that she suffered a injury from the work she was providing

11   for Walmart?

12       A    Based on her statement, which I don't have the

13   statement in front of me, I was under the impression that

14   she was reporting an injury late for a workplace injury.

15       Q    All right.

16            So you would agree that Ms. Braxton at least

17   reported to Walmart that she had suffered a workplace

18   injury?

19       A    Correct.

20       Q    Okay.

21            And you spoke with Ms. Braxton one-on-one about

22   that workplace injury, correct?

23       A    Correct.

24       Q    You asked Ms. Braxton to fill out a statement

25   form about that workplace injury, correct?

David Whitenack          Braxton vs. Walmart          4/1/2021

15

1        A    Yes.

2        Q    And she cooperated with your request, didn't

3    she?

4        A    She did.

5        Q    She wrote a statement and handed it to you?

6        A    Correct.

7        Q    And you took that statement and reviewed it,

8    correct?

9        A    Yes.

10       Q    You shared that statement with a couple over

11   management employees at Walmart, correct?

12       A    With the safety operations manager and HR.

13       Q    Okay.

14            So the safety operations manager would be Quincy

15   Usry?

16       A    Correct.

17       Q    And HR would be Morgan Medaris, correct?

18       A    That's correct.

19       Q    The next time you talked to Ms. Braxton was when

20   you terminated her employment, correct?

21       A    I don't recall if there was any other

22   conversation in between then, but it was pretty -- the

23   time -- the timeline was pretty close.

24       Q    Okay.

25            Would you agree that approximately

Case 2:20-cv-02287-DDC  Document 95-5  Filed 06/09/21  Page 7 of 15

Appellate Case: 22-3003  Document: 010110660653  Date Filed: 03/21/2022  Page: 261
David Whitenack          Braxton vs. Walmart          4/1/2021

                                                                    20

1        A    Can you specify the two documents that you're

2   referring to?

3        Q    Right.  You said that you supported the decision

4   to terminate Braxton's employment pursuant to Policy 670e.

5   That's a document that Walmart has, correct?

6        A    Correct.

7        Q    And the second, you said you supported the

8   decision to terminate Ms. Braxton's employment pursuant to

9   Walmart's Conduct Disciplinary Action Guidelines, correct?

10       A    Yes.

11       Q    Now, that's another document that Walmart has

12  and uses in its operation of the Edgerton facility,

13  correct?

14       A    Yes.

15       Q    And those are the only two documents that -- or

16  policies, if you will, that you say in your declaration

17  you relied on in coming to the decision to fire

18  Ms. Braxton, is that accurate?

19       A    From a policy standpoint, yes.

20       Q    Okay.

21            In Paragraph Eight, you wrote that -- whoops --

22  you wrote that you supported the decision that Braxton's

23  violation of Policy 670e warranted a first written

24  disciplinary action.

25            Did I read that correctly?

David Whitenack          Braxton vs. Walmart          4/1/2021

77

1          A     Any lead or manager or member of leadership

2     would be required to escalate that up to myself

3     immediately after learning that somebody reported an

4     injury.

5          Q     Okay.

6                And if someone reported an injury to one of the

7     operations leads or area managers, in your experience, if

8     you were working, would they tell you?

9          A     Yes.  I absolutely think that they would tell

10    us, because they would be held accountable to the

11    reporting structure, same as a level one associate who was

12    responsible for reporting their own injury.

13         Q     Okay.

14               Did you ever know Ms. Wilber to not inform

15    management of a work injury when she learned about it?

16         A     No, never.

17         Q     Did Ms. Wilber ever inform you that Ms. Braxton

18    told her that she had reported her injury to her?

19         A     She -- she never told me that she had reported

20    it other than the shift on the 14th.

21         Q     Okay.

22               And so let's talk a little bit more about that.

23               During the entire time that you interacted with

24    Ms. Braxton, did she ever tell you that she had reported

25    her injury previously to Ms. Wilber?

David Whitenack          Braxton vs. Walmart                4/1/2021

                                                                      78

1        A     No.

2        Q     When you met with her, with Ms. Medaris, and

3   informed her that her employment was going to be

4   terminated, did she ever tell you that she had reported

5   her injury to Ms. Wilber?

6        A     Not that I recall, no.

7        Q     Did Ms. Braxton, at any time, tell you she

8   reported her injury to Ms. Wilber or anyone else?

9        A     Not that I recall, no.

10       Q     And during the time that you met with her when

11  you told her that she was going to be terminated because

12  she had not timely reported her injury, did she, in

13  response, say, but I did report it on my -- my shift when

14  I got hurt?

15       A     Not to my knowledge, no.

16       Q     Did she ever say words to that effect?

17       A     Not to my knowledge, no.

18       Q     And in your experience dealing with Ms. Wilber

19  had Ms. Braxton, in fact, told her on her April 12th to

20  13th shift, the day that she alleges she hurt herself, in

21  your experience, would Ms. Wilber have told you?

22             MR. KINNEY:  Objection.  Leading.  Calls for

23  speculation.

24       Q     (By Mr. Hedican) You can go ahead.

25       A     Ms. Wilber would have escalated the concern,

        David Whitenack          Braxton vs. Walmart              4/1/2021

                                                                      79
 1   yes.

 2       Q    And who was the first person you learned from

 3   that Ms. Braxton was indicating that she had gotten hurt

 4   at work?

 5       A    I learned that information from Ammie Wilber.

 6       Q    And that was on the evening of April 14th?

 7       A    Correct.

 8       Q    Now, let's talk about Exhibit 9.

 9            You recall Exhibit 9?  Well, I apologize, you

10   probably don't remember it as Exhibit 9.

11            Give me a minute here, cause I need to get mine.

12       A    Would that be the statement form?

13       Q    Yeah.  It's the statement form.

14       A    Yes.

15       Q    Do you recall the statement form now --

16       A    Yes.

17       Q    -- at the top of this statement form, do you

18   recall that what's written there was 1 a.m., April 13th,

19   do you recall that?

20       A    Correct.

21       Q    And when you gave Ms. Braxton that form,

22   Exhibit 9, to fill out, did you talk with her at all about

23   information that she should include in that form?

24       A    Yes, I always instructed everybody who was

25   filling out a safety form to include when the injury

David Whitenack          Braxton vs. Walmart          4/1/2021

80

1     occurred.  And then I would ask them if they reported it

2     to anyone, to ensure that we were able to -- to follow-up

3     with any leaders who -- who were involved in that.

4          Q    Okay.

5               And when you spoke with her, did Ms. Braxton

6     tell you that she told anyone about her injury on the

7     shift that had occurred?

8          A    No, she did not.

9          Q    And as far as your asking her to put a timeline

10    down there, why did you ask her to put the timeline down?

11         A    I asked her to put the timeline on there to note

12    when the injury occurred for both, investigation purposes

13    and to make sure that we were able to follow-up with any

14    leadership who was on site that day that could have --

15    could have been reported to.

16         Q    Now, Ms. -- Ms. Braxton, in her deposition, said

17    that when she met with you that you had said to her that

18    you did not have to give her any additional -- or a

19    warning for termination as a seasonal employee.

20              Do you recall having any such discussion with

21    her?

22              MR. KINNEY:  Object to form.

23         A    Could you repeat?

24         Q    (By Mr. Hedican) Let me just ask that -- let me

25    just ask that again.

David Whitenack          Braxton vs. Walmart          4/1/2021

                                                              90

1    violated that honor code.

2         Q    Sir, do you continue to live by that code?

3         A    Yes, I do.

4         Q    You were asked some questions about

5    Ms. Braxton's condition and information that was provided

6    or not provided.

7              Were there postings of any kind at -- at Walmart

8    identifying the various rights of employees or associates?

9         A    I believe so, yes.

10        Q    Okay.

11             And, sir, when you met with Ms. Braxton, and you

12   and Ms. Medaris made the decision to terminate her

13   employment, did you terminate her employment so that she

14   could not get medical care?

15        A    No, we did not.

16        Q    And were you trying to prevent her from

17   exercising her workers' compensation rights?

18        A    Absolutely not.

19        Q    And, sir, have you told the jury and told

20   Mr. Kenny and all of us here the truth here today?

21        A    Yes, I have.

22        Q    And if Ms. Braxton had been subject to

23   retaliation for seeking workers' compensation benefits or

24   reporting an injury, would you tell this jury that that's

25   what happened?

David Whitenack          Braxton vs. Walmart              4/1/2021

97

1   the IR and the 5 Why is because Quincy Usry told you that

2   he wanted to see the statement form first?

3       A    Yes.

4       Q    And after you provided the statement form to

5   Quincy Usry, the next step was to fire Ms. Braxton,

6   correct?

7       A    That came after collaboration between Quincy,

8   Morgan and myself, yes.

9       Q    Right.

10           And was that a decision that you independently

11  came up with, or were you following instructions from

12  Quincy Usry related to that situation?

13      A    It was a decision that was jointly made between

14  Quincy, Morgan and myself.

15      Q    Okay.

16           No one ever asked Ms. Braxton to fill out the

17  incident report, true?

18      A    Not to my knowledge, no.

19      Q    No one ever provided Ms. Braxton about

20  information to inform her of her rights to seek medical

21  treatment for her workplace injury, true?

22      A    I couldn't answer that question.

23      Q    Okay.  You didn't?

24      A    I did not, no.

25      Q    Did you witness anyone else provide that

    David Whitenack          Braxton vs. Walmart              4/1/2021

                                                                   103

 1              So, without speculating, can you tell us why

 2     Walmart had the rule that you say in this case required

 3     Ms. Braxton to be fired?

 4              MR. HEDICAN:  Objection.  Asked and answered.

 5              Go ahead.

 6        A     Based on my training that I have had, the

 7     reasoning behind it would be failure to report the injury

 8     by the end of shift would not give the company enough time

 9     to investigate and be able to mitigate that risk for other

10     employees.

11        Q     (By Mr. Kinney) So, did you investigate the

12     injury that Ms. Braxton suffered?

13        A     Not in this case, no.

14        Q     Did you take any action in response to

15     Ms. Braxton's injury to prevent other employees from

16     suffering the same injury?

17        A     Ms. Braxton didn't know exactly how she was

18     injured, so it would have been impossible to prevent other

19     employees from repeating that same injury --

20        Q     So --

21        A     -- that's why there was no investigation.

22        Q     Okay.  I'm going to object to your question

23     [sic] and move to strike it as non-responsive.

24              MR. HEDICAN:  Objection.

25              Go ahead.

Case 2:20-cv-02287-DDC   Document 95-5   Filed 06/09/21   Page 15 of 15

Appellate Case: 22-3003   Document: 010110660653   Date Filed: 03/21/2022   Page: 269
David Whitenack            Braxton vs. Walmart            4/1/2021

113

C E R T I F I C A T E

I, Deborah K. McLaughlin, Missouri Certified Court Reporter, Illinois Certified Shorthand Reporter and Kansas Certified Court Reporter, do hereby certify:

That prior to being examined the witness was by me duly sworn;

That said deposition was taken down by me in shorthand at the time, via Zoom, and was thereafter reduced to writing by me and accurately records the witness' testimony;

That I am not a relative or employee or attorney or counsel of any parties, or a relative or employee of such attorney or counsel, or financially interested in the action.

WITNESS my hand this 21st day of April, 2021.

_____

Deborah K. McLaughlin,

MO-CCR #314, IL-CSR #084.004566, KS-CCR #1614

Case 2:20-cv-02287-DDC   Document 95-6   Filed 06/09/21   Page 1 of 8

Appellate Case: 22-3003   Document: 010110660653   Date Filed: 03/21/2022   Page: 270
Morgan Medaris          Braxton vs. Walmart          3/4/2021

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS


JANELL BRAXTON,               )

              Plaintiff, )  Case No. 2:20-cv-02287-DDC-GEB

vs.                          )

WALMART INC.,                )

              Defendant. )



ZOOM DEPOSITION OF

MORGAN MEDARIS,


being produced via Zoom, sworn and examined on Thursday,

March 4, 2021, pursuant to notice to take the deposition

of Morgan Medaris, before Deborah K. McLaughlin, MO-CCR,

IL-CSR, KS-CCR.  Taken on behalf of Plaintiff.


EXHIBIT
E

Morgan Medaris          Braxton vs. Walmart          3/4/2021

6

1      A    Yes, sir.

2      Q    Miss, would you give me your full name,

3  including your middle name.

4      A    Morgan Nicole Medaris.

5      Q    Are you employed?

6      A    Yes.

7      Q    And who is your employer?

8      A    Walmart Fulfillment Center.

9      Q    And how long have you worked for Walmart?

10     A    Three years.  Sorry.  Three years.

11     Q    Three years?

12     A    Yes, sir.

13     Q    Have you held the same position the whole time

14  that you've been with Walmart?

15     A    No, sir.  I was a HR coordinator for that first

16  year, and then got promoted to HR business partner in

17  2018.

18     Q    What were your job responsibilities as an HR

19  coordinator for Walmart?

20     A    Basically, managing our HRIS system, handling

21  on-boarding presentations, and then really being a liaison

22  between our associates and management team and trying to

23  answer any questions they may have regarding their

24  employment.

25     Q    And was your job changed from coordinator to HR

Morgan Medaris              Braxton vs. Walmart              3/4/2021

                                                                      19

1   signed?

2        A    I have read her incident report, the emails sent

3   out, not only from myself, but from Quincy Usry and David

4   Whitenack, who were also involved in the situation.  I

5   read that as well to be prepared.

6        Q    If you don't understand one of my questions

7   today, let me know before you answer, okay.  I'd be happy

8   to rephrase them for you, all right?

9        A    Okay.

10        Q    Now, if anybody's told you to testify in a way

11   that's inconsistent with the truth as you know it, forget

12   that and just tell the truth, okay?

13        A    Yes, sir.

14        Q    You understand that your testimony is subject to

15   the penalty of perjury?

16        A    Yes, sir, I do.

17        Q    Okay.

18        A    Yes, sir, I do.

19        Q    And just because we're on Zoom, you're still

20   giving testimony under oath, just as you would in front of

21   a judge, do you understand that?

22        A    Yes, sir.

23        Q    Walmart gained knowledge of Braxton's work

24   injury from Braxton, correct?

25        A    That's correct.

Case 2:20-cv-02287-DDC   Document 95-6   Filed 06/09/21   Page 4 of 8

Appellate Case: 22-3003   Document: 010110660653   Date Filed: 03/21/2022   Page: 273
Morgan Medaris              Braxton vs. Walmart              3/4/2021

21

1    Calls for speculation.

2            Go ahead.

3        A    Because we learned about the injury from

4    Ms. Braxton, we would not have known and, therefore, could

5    not have -- could not have terminated her had we not known

6    that injury.

7        Q    (By By Mr. Ralston) Right.  It was based

8    on the information that Walmart provided Ms. Braxton

9    concerning her suffering a workplace injury that

10   prompted Walmart to fire her, true?

11           MR. HEDICAN:  Objection.  Asked and answered.

12   Form.

13           Go ahead.

14       A    No.  She was actually terminated for violating

15   our policy regarding late reporting, not regarding the

16   injury itself.

17       Q    (By By Mr. Ralston) Well, my question is,

18   if Mrs. Braxton had not of reported her workplace

19   injury, Walmart wouldn't have fired her on

20   April 14th, 2020?

21           MR. HEDICAN:  Objection.  Asked and answered.

22           Go ahead.

23       A    Had she not reported that, we would have never

24   known an injury would have occurred.

25       Q    (By Mr. Ralston) My question was, if

Morgan Medaris          Braxton vs. Walmart                3/4/2021

23

1      A    Yeah.  I can't confirm knowing who she was

2    employed or not knowing about any kind of injury or late

3    reporting, we would not have grounds to terminate her

4    employment.

5      Q    (By Mr. Ralston) Who made the decision to

6    terminate Ms. Braxton?

7      A    It was a joint agreement between myself and

8    David Whitenack, who is our operations manager, with

9    advice from Quincy Usry.

10     Q    Okay.

11          Have you seen the declaration of David Whitenack

12   that is attached to Walmart's opposition to Ms. Braxton's

13   motion for summary judgment?

14     A    I cannot remember if I've seen that.

15          Could you clarify?

16     Q    How about this.

17          You have, in this case, filled out a declaration

18   under oath, correct?

19     A    Correct.

20     Q    And in that declaration you state that you made

21   the decision to terminate Ms. Braxton?

22     A    So in that, I jointly made that decision.

23     Q    Nonetheless, you were involved in the decision

24   to terminate Ms. Braxton, correct?

25     A    Yes, sir.

Case 2:20-cv-02287-DDC   Document 95-6   Filed 06/09/21   Page 6 of 8

Appellate Case: 22-3003   Document: 010110660653   Date Filed: 03/21/2022   Page: 275
Morgan Medaris              Braxton vs. Walmart              3/4/2021

79

1  document that's previously been marked as Exhibit 12.

2          Do you recognize this document?

3      A    Yes, sir.

4      Q    What is it?

5      A    This is the Conduct Disciplinary Action

6  Guidelines for managers.

7      Q    Is this a document that was something you relied

8  on in making the termination decision for Ms. Braxton?

9      A    Yes, sir.

10     Q    And I notice something here in red.  Would you

11  please read that.

12     A    Yes.

13          "JetFlex and Jet seasonal should be terminated

14  when their coaching has progressed to a formal written."

15     Q    And did you consider the failure to timely

16  report any injury pursuant to 67e [sic] to warrant a first

17  written?

18     A    Yes, sir.

19     Q    Okay.

20          And if your regular employee would have first

21  written for failure to timely report an injury result in

22  termination?

23     A    No, it would not.

24     Q    And the coaching, you were asked some questions

25  about Quick Coach conversations where two would be

Case 2:20-cv-02287-DDC   Document 95-6   Filed 06/09/21   Page 7 of 8

Appellate Case: 22-3003   Document: 010110660653   Date Filed: 03/21/2022   Page: 276
Morgan Medaris            Braxton vs. Walmart              3/4/2021

84

1        Q    How do you know that?  Have you read her

2   testimony?

3        A    No, I've not read her testimony, however, we do

4   have that acknowledgment and workday specifying that she

5   agreed she has seen the policy and agreed to adhere by it.

6        Q    Those acknowledgments, there were many of them,

7   correct?

8        A    That's correct.

9        Q    They were all acknowledged on April 20th of

10  2020, correct?

11       A    Yes, sir, that's correct.

12            MR. HEDICAN:  I think you got the date wrong,

13  Tom, I think you meant March, right?

14            MR. RALSTON:  Yes, I did, March 20th.

15       Q    (By Mr. Ralston) Can you see it up --

16       A    Okay.

17       Q    -- on your screen right now?

18       A    Yes, sir, I can.

19       Q    Yeah.

20            They were all acknowledged 1107 and 30

21  seconds --

22       A    Yes, sir.

23       Q    Correct.

24       A    Yes.

25       Q    Every acknowledgment that Ms. Braxton signed was

Morgan Medaris              Braxton vs. Walmart              3/4/2021

96

C E R T I F I C A T E

     I, Deborah K. McLaughlin, Missouri Certified
Court Reporter, Illinois Certified Shorthand Reporter and
Kansas Certified Court Reporter, do hereby certify:

     That prior to being examined the witness was by
me duly sworn;

     That said deposition was taken down by me in
shorthand at the time, via Zoom, and was thereafter
reduced to writing by me and accurately records the
witness' testimony;

     That I am not a relative or employee or attorney
or counsel of any parties, or a relative or employee of
such attorney or counsel, or financially interested in the
action.

     WITNESS my hand this 15th day of March, 2021.


_____

Deborah K. McLaughlin,

MO-CCR #314, IL-CSR #084.004566, KS-CCR #1614

Case 2:20-cv-02287-DDC   Document 95-7   Filed 06/09/21   Page 1 of 5

Appellate Case: 22-3003   Document: 010110660653   Date Filed: 03/21/2022   Page: 278
Quincy Usry                    Braxton vs. Walmart                    4/30/2021

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS


JANELL BRAXTON,                    )
                                  )
          Plaintiff,              )
                                  )
vs.                               )    No. 2:20-cv-02287-DDC-GEB
                                  )
WALMART INC.,                     )
                                  )
          Defendant.             )




VIDEOTAPED DEPOSITION OF

QUINCY USRY




a witness, being produced, sworn and examined on Friday,

April 30, 2021, pursuant to Notice to Retake Deposition

of Walmart, Inc. Safety Manager Quincy Usry, at the

offices of Ralston Kinney, LLC, Suite 300, 4717 Grand

Avenue in Kansas City, Missouri, before

          SHARON L. CRAWFORD, CCR, RPR,

a Certified Court Reporter in Missouri and Kansas.

Taken on behalf of the Plaintiff.

EXHIBIT

F

Case 2:20-cv-02287-DDC  Document 95-7  Filed 06/09/21  Page 2 of 5

Appellate Case: 22-3003  Document: 010110660653  Date Filed: 03/21/2022  Page: 279
    Quincy Usry              Braxton vs. Walmart              4/30/2021

7

1        A.   No.

2        Q.   Okay.  So, for instance, you should be answering

3    my question based on your own -- what you think is true.

4    So if you understand my question, you provide a true

5    answer because you're under oath to testify here today.

6    Does that make sense?

7        A.   Yes.

8        Q.   And if Mr. Hedican makes an objection for the

9    record, you still answer the question unless he tells you

10   not to answer.  Does that make sense?

11       A.   Yes.

12       Q.   And you shouldn't change what you're testifying

13   to under oath being influenced by an objection.  Does

14   that make sense?

15       A.   Yes.

16       Q.   Okay.  What's your date of birth?

17       A.   10-8-93.

18       Q.   Okay.  And that makes you how old today?

19       A.   27.

20       Q.   What's your current address?

21       A.   12112 East 78th Street, Kansas City, Missouri,

22   64138.

23       Q.   Is that a single-family home?

24       A.   Yes.

25       Q.   Who do you live there were?

Quincy Usry                 Braxton vs. Walmart                4/30/2021

                                                                    61

1        A.    She is a Human Resources employee at Walmart.

2        Q.    Okay.  So this is an e-mail between three

3    employees of Human Resources and you about

4    Janell Braxton, correct?

5        A.    Correct.

6        Q.    At least the subject line is about Janell

7    Braxton, correct?

8        A.    Correct.

9        Q.    But the actual subject matter of the e-mails are

10   HR's concerned about employees during the safety school

11   not being specifically instructed about reporting

12   workplace injuries; is that fair?

13       A.    Correct.

14       Q.    And your final response on April 15th, 2020 at

15   1:06 a.m., the first sentence says, "We can hand them out

16   or read over them in safety school, but I think we are

17   trying to save time to push more acknowledgements."  Did

18   I read that correctly?

19       A.    Correct.

20       Q.    Now, since April 15th, 2020, are you aware of

21   any changes that Walmart has made at the Edgerton, Kansas

22   facility regarding training employees about workplace

23   injuries?

24       A.    Yes.

25       Q.    What's the change been?

Quincy Usry            Braxton vs. Walmart              4/30/2021

                                                              62

1     A.   We have posted the 670e in safety school at

2  Station 1.

3     Q.   Okay.  So is that a direct response to the

4  situation with Ms. Braxton?

5     A.   It's in direct response to the issue raised by

6  Morgan Medaris.

7     Q.   Okay.  So is the reason that Walmart did that is

8  because they wanted to make their training better?

9            MR. HEDICAN:   I object to foundation.  Go

10  ahead.

11     A.   Correct.  We've tried to focus with a continuous

12  improvement mindset.

13     Q.   (BY MR. KINNEY)  Okay.  So that part of training

14  that was there after Ms. Braxton was fired, was not part

15  of training before Ms. Braxton was fired, correct?

16     A.   Correct.

17     Q.   And when you talked in your e-mail about being

18  pushed to save time during the safety school, was it your

19  supervisors that were trying to encourage you to save

20  time?

21     A.   It was a conversation that I was aware of

22  amongst building leadership.

23     Q.   And was that building leadership just in

24  Edgerton, Kansas?  Or building leadership for multiple

25  facilities across the country?

Quincy Usry                    Braxton vs. Walmart                4/30/2021

125


                      C E R T I F I C A T E


        I, SHARON L. CRAWFORD, CCR, RPR, a Certified Court

Reporter in and for the states of Missouri and Kansas, do

hereby certify that prior to being examined the witness

was by me duly sworn; that said deposition was taken down

by me in shorthand at the time and place hereinbefore

stated and was thereafter reduced to writing under my

direction and accurately records the witness' testimony;

that I am not a relative or employee or attorney or

counsel of any of the parties, or a relative or employee

of such attorney or counsel, or financially interested in

the action.

        WITNESS my hand and seal this 12th day of May, 2021.


                      _____
                      SHARON L. CRAWFORD
                      MO CCR 164, KS CCR 487, RPR

# jet
## Statement Form

Case Number

1:00am 4/13/20 On Monday morning I noticed that my wrist began to ache. It progressed to throbbing pain and by the time I left at 5:00am it was excruciating. I took a 500mg tylenol & went to sleep. It is swollen + sometimes feels warm to the touch. There is a little bruising. It is hard for me to work fast when putting items in the mailers + it hurts to pick up semi heavy items with that wrist. I can only pick up the totes if they are partially full. It is my left wrist that is injured. I am trying not to use it. The pain progresses throughout the shift

Jet.com will make every reasonable effort to maintain the confidentiality of all parties involved in any investigation. Jet.com will disclose information only to those who have a need to know to further the investigation or make an employment decision. Jet.com strictly prohibits retaliation for reporting a concern or cooperating in an investigation. You can and should immediately report any perceived retaliation to a salaried member of management.

I acknowledge the signature below is my own and that the information I have submitted in this report is true, correct and complete to the best of my knowledge.

Signature: _Janell Braxton_     Date: 4-14-2020

Location (City, State)

Δ π EXHIBIT #28
Deponent Braxton
Date 1/25/21 Rptr. JB
WWW.DEPOBOOK.COM

**EXHIBIT G**

WM_Braxton_000105

App-I
283

WMW-670e 11/2019
## Safety & Compliance Rule Violation Form
eCommerce



Associate Name: _____ Associate #: _____ DOH: _____ Reference #: _____

Date of Violation: _____ Time: _____ Manager Name: _____

**Documented Coaching** (Note: Any repeat of the same violation within 180 calendar days will result in a Step.)
- Safety
  - Not actively participating in a start-up exercise program.
  - Failure to follow General Safe Work Practices not otherwise covered specifically within this guideline.
  - Failure to follow Powered Industrial Truck Safe Work Practices not otherwise covered specifically within this guideline.
- Compliance
  - Failure to follow stacking directional arrows on regulated items.
  - Failure to close hazardous waste drum properly.
  - Failure to follow spill cleanup procedures.

**Step 1** (Note: Any repeat of the same violation within 180 calendar days will result in a minimum of a Step 3, up to and including, termination.)
- Safety
  - Failure to report any known injury before the end of the shift.
  - Failure to report a non-reckless and/or careless powered industrial truck accident at the time it occurs.
  - Failure to properly complete a WMW-118 or WMW-119.
  - Careless personal behavior regardless whether this resulted in an incident.
  - Entering or exiting through an unauthorized door or entry/exit way.
  - Jumping from an elevated working/walking surface.
  - Failure to use appropriate jack stabilizer.
  - Blocking a Fire Exit or Path of Egress.
  - Powered Industrial Truck Operator and Battery Changer failure to verify Battery Plate replacement after Battery Exchange.
  - Failure to wear required personal protective equipment (PPE) not otherwise covered specifically within this guideline.
- Compliance
  - Covering hazardous material carton coverings.
  - Improper processing of compromised regulatory cartons.
  - Failure to secure all shipments.
  - Shipping fully regulated cartons that are damaged, opened, or considered unsecure.
  - Failure to apply the proper hazardous material shipment label (e.g. lithium ion, lithium metal)
  - Improper classification or disposal of product.
  - Failure to provide proper outbound paperwork for regulated shipments.

**Step 3**
- Safety
  - Stepping on the pallet position/location within the module without safety gate in place.
  - Reckless personal behavior regardless whether this resulted in an incident.
  - Using tobacco in unauthorized area.
  - Authorized Associate – Yard Safety Access/Trailer Procedure Control Rule Violation.
- Compliance
  - Unauthorized signature on Haz-Waste Manifest or Bill of Lading.
  - Disposal of unauthorized liquids or chemicals down drains.

**Termination**
- Safety
  - Willful disregard for Safety and Compliance.
  - Lockout Tagout/Access Procedure Violation.
  - Hot Works Violation.
  - Arc Flash (NFPA 70E) Violation.
  - Failure to wear and/or Properly Utilize Fall Protection.
  - Horseplay
  - Unauthorized Associate – Yard Safety Access/Trailer Procedure Control Rule Violation.
  - Modifications and additions to equipment which affect capacity and safe operation.
  - Stepping over/under an unguarded conveyor where proper handrails are not in place.
  - Operating equipment without the proper license, certification, and/or training.
  - Bypassing or unauthorized removal of a safeguarding safety device.
- Compliance
  - Improper disposal of hazardous waste (EC-03).
  - Willful violation of DC-28 Environmental Regulatory Compliance Manual, Supply Chain Hazardous Waste Management procedures.





**EXHIBIT H**
WM_Braxton_000097

WMW-763e  Rev. 10/19
**General Safe Work Practices**
eCommerce



Associates must adhere to eCommerce Safety, Compliance, Trust, and Emergency Procedures, to include the DC-11 Dot Com Safety Manual, eEP Dot Com Emergency Procedures, and DC-28 Environmental Regulatory Compliance Manual. This includes being attentive and responsive to the safety and health of fellow associates. Associates are empowered to share and contribute suggestions and ideas for improving the safety in the fulfillment center (FC). Participation in safety and health programs is a condition of employment. The list below of Safe Work Practices is not all inclusive but serves as a general guideline for ensuring the safety and health of our associates.

**Dress Code:**
- Closed toe and heel shoes that do not expose the top of the foot will be worn. Platform, wedges, "Shape-Up", and Minimalist / Five toe shoes and/or shoes with a heel in excess of 1 ½ inch high or less than 1 inch wide are prohibited.
- Nails (Natural or Artificial) will not exceed 1/2 inch beyond the finger-tip.
- To eliminate potential hazards when working in areas where conveyors are present:
  - Hair past your shoulders must be put up in bun style, in a hair net, and/or a cap.
  - Baggy and loose clothing, jewelry and accessories are not permitted and/or veils and scarves that hang more the 3 inches beyond the neckline must be tucked in and/or removed. Hooded clothing (i.e. "hoodies") and/or other clothing items that may create a choking hazard are prohibited. (Note: Hoodies may be worn in work areas where conveyors are not present, however strings must be tucked in they must remain off the head and cannot restrict peripheral vision.)
  - Beards exceeding 3 inches from the face will be tied up or netted.
- The following items are not permitted to be worn inside the FC:
  - Sunglasses, Mirrored, or Tinted lenses
    - Exception: Authorized associates wearing approved and tinted PPE for welding operations or associates with proper medical accommodation-contact Human Resources).
  - Lanyards worn will be equipped with "break away" device.

**Safety Related Incidents:**
- All known injuries, no matter how slight, will be reported to a member of management immediately. At a minimum, these must be reported to a member of management by the end of the shift.
- All Powered Industrial Trucks (PIT) and/or Property Damage incidents will be reported to a member of management immediately.
- Associates will discretely report to Human Resources any:
  - Personal medications or conditions that may affect their ability to safely perform their job.
  - Non-work related or pre-existing conditions that may affect their ability to safely perform their job.
- When needed, associates will cooperate in incident investigations.

**General Safety:**
- Associates will actively and cooperatively participate in facility safety and health initiatives.
- Associates will correct unsafe conditions when they are identified. If the associate is unable to immediately correct the condition, he/she will report it immediately to their manager.
- "Clean as you go"- All areas will be kept clean so that the area does not create a safety hazard. Associates will immediately clean any discovery of trash, debris, or a spill (i.e. cardboard, wood, oil, damaged product, etc.).
- Horseplay of any kind is strictly forbidden.

CONFIDENTIAL;
SUBJECT TO PROTECTIVE ORDER

Δ π EXHIBIT #25
Deponent Braxton
Date 1/25/21 Rptr JB
WWW.DEPOBOOK.COM

**EXHIBIT
I**

WM_Braxton_000144

**App-I
285**

WMW-763e Rev. 10/19
**General Safe Work Practices**
eCommerce



- Personal firearms and illegal weapons are not permitted on company property. Refer to the Violence-Free Workplace Policy for more information on state exceptions that permit firearms in a locked vehicle on company property.
- Associates are not permitted on company property while under the influence or in possession of intoxicants or non-prescribed drugs (narcotics). Refer to the Alcohol and Drug Free Workplace Policy for further information.
- Associates must have a valid license and/or certification to operate a powered industrial truck or specially designated equipment. Associates must be licensed and certified through the approved training processes.
- All exterior doors, to include dock doors, will be kept shut when not in use. If left opened, an approved screen that meets food safety criteria is put in place.
- Only authorized associates are permitted to perform Lockout Tagout activities. All safety procedures will be followed when clearing jams on conveyors, operating equipment, etc.
- Only authorized and licensed associates may access the yard.
  - Exception: In the event of an emergency, associates may have to access the yard to reach the appropriate safety/ evacuation zone. During this time, normal operations of the yard will stop, allowing individuals to seek safety.
- Associates will wear approved material handling gloves when handling product, freight, boxes, or pallets, using or handling equipment, tools, and metal seals and/or opening and closing trailers doors.

**Pedestrians:**
- Associates will only walk in approved and designated walk areas.
- Associates will not enter unauthorized areas (i.e. signed, active construction, PIT only).
- Associates will only cross PIT traffic lanes at approved and designated locations.
- Pedestrians must maintain a safe distance around operating powered industrial trucks (minimum 8 feet) and/or powered industrial trucks when the load is moved up or down or there is an overhead load (minimum 20 feet). This also applies to stock pickers.
- Associates will not stand or walk under the forks of a loaded or unloaded forklift.
- Associates will use hand-rails when climbing stairs, crossovers, etc. A minimum of three points of contact will be maintained.
- Associates will only use approved doors for entry and exit. Emergency Fire Doors, Dock doors, Fire Wall Doors that are not designated for general entry and exit will not be used.
- Never walk into an aisle from a blocked or blind location without stopping and looking for other traffic.
- Associates will not jump from elevated working/ walking surface. The designated steps or rungs will be used.
- Pedestrian doors that open to an active PIT aisle will be guarded (i.e. bollards, guardrails, chains and/or railing) to protect pedestrians. Pedestrians must walk within this guarded area.
- Hi Visibility Safety Vests:
  - Will be worn by selected associates and contractors in the Walmart Fulfillment Center (Refer to Standard Safety Equipment Procedure).
  - Vests will be worn over the last layer of clothing and donned before entering the floor of operation or beginning work activity (whichever comes first).

**Parking Lot:**
- Associates must obey all posted traffic rules and signs when driving personal vehicles on the parking lot. Parking lots will not be posted with speed limits that exceed 10 mph.
- Associates will not run on Walmart owned, leased or occupied property.
- Vehicles must be properly parked within a single parking space. Associates will only park in a single space.
- Associates will not park in a specially selected and signed location (i.e. Visitor, Disabled Zone, or Associate of the Month) unless authorized.

CONFIDENTIAL;
SUBJECT TO PROTECTIVE ORDER

WM_Braxton_000145

**App-I**
**286**

WMW-763e Rev. 10/19
**General Safe Work Practices**
eCommerce



- During inclement weather, associates will follow designated walking paths to and from the facility. These paths will be properly treated for associate safety.

**Pallet Handling and Product Storage:**
- Before using, associates will verify pallets are in good condition. Damaged pallets will be removed from service immediately.
- Associates will only physically handle one pallet at a time.
- When transporting, empty pallets will not be stacked more than 12 high. The stack height will not exceed the height of the mast for stand-up counterbalanced trucks (i.e. Crown RR/RM, Crown RC) and/or the backrest of a front-rider or center-rider (i.e. Crown PC4500).
- Associates are not permitted to climb on, up, under, or through pallet racking.
- Associates will not stand, walk, or step on pallets in elevated or non-pickable locations unless fall protection is properly donned. (Note: Associates that are fully outside the confines of elevated equipment must have approval form the FC Director and it must be planned event.).
- When picking from pickable floor pallet locations only, Associates will be allowed to place one foot on the top slat of the front of the pallet (middle support beam) to gain access to pickable locations. If the middle support location is inaccessible a standard reach tool shall be utilized to gain access to pickable locations.
- Associates should use leverage when possible to physically maneuver pallets. However, when not possible, the chart below will be followed when physically lifting to stack and/or de-stack pallets:

| "White Wood" | 1st – 5th pallet in stack | One handler may physically handle |
| | 6th – 10th pallet in stack | Team lift is required for physical lift |
| | 11th pallet in stack and above | Powered Industrial Truck (PIT) required to mechanically handle |
| Plastic, Blue CHEP, & Red PECO | 1st –4th pallet in stack | Team lift is required for physical lift. |
| | 5th pallet in stack and above | Powered Industrial Truck (PIT) required to mechanically handle |

- Pallets will only be stored in a flat position. A pallet will not be stored on its side, edge, end and/or in a leaning position.
- Pallets will only be stored in approved locations. A single pallet, not located in a pallet return, pick location and/or a designated area, will have product, an empty tote, or a safety cone placed on top to visually identify the potential trip hazard.
- Pallets will only be stored in approved storage locations.
- Pallet storage locations may not extend into pedestrian walkways.
- Pallets must be stably stacked. Only pallets of like size and material will be stacked together. Pallet sizes should not be mixed. In the rare event pallet sizes must be mixed, the recommended max stack height will be reduced by half.
- In elevated pallet storage locations, empty pallet stacks or product on pallets shall not exceed the height of the outward-facing guardrail.
- Pallets will not be stacked within 20 feet of workstations or walkways. Safety nets to prevent items from falling onto pedestrians will be used for pallet racking storage within 20 feet of workstations or walkways.
- Pallets of product stored in pallet racking above floor level and not in active pick locations will be secured with at least two layers of shrink wrap, banding, and/or filament tape to prevent items from falling off the pallet.
- When storing pallets (to include empty pallets and pallets of product) in racking, the pallet and product shall not exceed a maximum of 3 inches overhanding the front of the rack.

**Carts & Cages:**

CONFIDENTIAL;
SUBJECT TO PROTECTIVE ORDER

WM_Braxton_000146

WMW-763e Rev. 10/19
**General Safe Work Practices**
eCommerce



- Carts/ cages will be parked and stored in designated areas.
- Carts/ cages must be inspected before each use. Damaged carts and cages will be immediately removed from service if defects are found.
- Associates will push carts and cages (not pull) with both hands keeping elbows in. Carts/ cages will be pushed using handles.
- Associates will maintain physical control of the cart/ cage until it comes to a complete stop.
- Associates will only push one cart/ cage at a time.
- Associates will not ride on carts/ cages.
- Product stacked on carts/ cages will not be stacked above eye-level and/or obstruct the associate's view while pushing.
- Associates will stop at the end of every aisle, intersection, and/or designated stop area. When at these locations in the module, associates will shout "in" or "out" and/or use an approved safety device (i.e. bell, etc.) to announce presence.

**Transporting Loads and Materials:**
- Pallet jacks will be inspected before each use. Damaged jacks will be immediately removed from service if defects are found.
- Pallet jack operators will pull pallet jacks when transporting loads.
- When not in use, pallet jacks will be parked and stored in designated areas. The pallet jack forks will be fully lowered and stored under a pallet with the handle in the locked position.
- Associates will not stand on and/or attempt to ride pallet jacks.
- All loads will be straight, stable, and secure before transporting.
- When transporting loads, the height will not exceed the mast of the equipment.
- When transporting loads on mastless equipment (i.e. Center Rider/ Front Rider) the following practices will be followed:
    - When Single pallet loads extend past the backrest of the equipment the top of the load will be secured with shrink wrap to prevent the load from shifting during transport.
    - Stacked pallet loads may be transported as long as the top load's pallet does not exceed the backrest of the equipment. The top load will be secured with shrink wrap to prevent the load from shifting during transport.
    - When backing a load that exceeds 6 feet a spotter will be used.
- Associates will not physically reach to greater than 6 feet to stack a load. If a load greater than 6 feet is necessary (i.e. upstacking loads on the dock to maximum trailer cube) it must be stacked mechanically.
- When stacking loads, ensure they are straight and stable.
- Never block or place objects in front of fire extinguishers, hoses, fire risers, emergency exits, eye wash stations, automated external defibrillators (AED), electrical cabinets and/or other emergency equipment. Notify a manager **immediately** if any emergency equipment becomes damaged.

**Ergonomics / Body Mechanics:**
- Associates will participate in the facility's designated warm-up program.
- Associates will practice safe lifting techniques:
    - *Face Work* – Square up to what is being lifted to eliminate twist and stress. Also, square up to the delivery point prior to setting the product down.
    - *Lead with the Feet* – After case is lifted, move feet to eliminate twisting at the waist. Square up to the delivery prior to delivering product to end point. Always move your feet to stay in front of the work being done.
    - *Shoulders Square* – Eliminate side to side twist of shoulders. Use handholds in product or reach under the product to securely and evenly lift load. Tip large cases on a 45-degree angle and lift with shoulders even. Move case instead of shoulders.

CONFIDENTIAL;
SUBJECT TO PROTECTIVE ORDER

WM_Braxton_000147

WMW-763e Rev. 10/19
**General Safe Work Practices**
eCommerce



- ○ *Keep It Close* – Slide case as close as possible prior to lifting. When placing product on a conveyor or pallet don't over-extend. Place case on edge of pallet and slide into position.
- ○ *Don't Fly Like a Bird* – Keep elbows down and in a position of strength instead of up and out. Watch for the elbows being extended up and out.
- ○ *90 Degree Bend* – Bend at the knees vs. bending at the waist. Use the legs and keep the back as straight as possible when lifting.
- ○ *Don't Hold* – Know where you are going to place the product prior to lifting. Plan where the product is going prior to picking it up.
- ○ *Use Momentum Lift* – The weight of the product helps deliver it to the end point. With elbows slightly bent, pick up the case. Take a short step and use the momentum of the step to start the product moving. Guide to the delivery point and release as it touches down. This must be a smooth, controlled motion from pick-up to delivery point. Do not attempt to throw freight.
- ○ *Leverage Transfer* – Use a planned lift when moving large, bulky items. Slide the case part of the way off the pallet and stand it on end. Walk it to the take-away pallet and lower to the ground. Make certain the take away pallet is correctly positioned so it is not too close or too far away.
- ○ *Wrist Straight* – When picking up small items with one hand, use caution to keep the wrist in a neutral position. The wrist is designed to flex up and down, like shaking hands. The thumb should be pointed up as much as possible to eliminate stress on the wrist.
- When using hand-held equipment (i.e. scanners, tools, etc.) wrists should be kept in a neutral position.
- Ergonomic mats will be use in locations where associates are expected to stand for periods of 15 minutes or longer. Associates will stand on approved ergonomic mats when working in applicable areas.

**Box Knives**:
- When using box cutters, associates will:
  - ○ Only use an approved box knife(s).
  - ○ Retract the razor blade into the box knife handle when not using the knife (retractable blades).
  - ○ Replace the razor blade when it becomes dull or broken.
  - ○ Hold the item securely when cutting so it cannot shift or move.
  - ○ Concentrate on the item to be cut and watch the blade at all times.
  - ○ Apply a consistent, firm (but not excessive) pressure while performing the cut.
  - ○ Always cut away from the body and be mindful of the opposite hand placement and ensure it is out of the cut path.

**Conveyors and Material Handling Equipment (MHE):**
- Associates will not step, sit, stand or climb on non-approved walking surfaces (i.e. conveyors, pallets, merchandise, carts, racks). Additionally, associates are not permitted to walk, ride, stand, or climb on, under or over any machine or equipment.
  - ○ Exception: With proper preparation and planning, "Authorized associates" may have a need to step, sit, stand or climb on these areas. In these instances, the appropriate and applicable procedures will be followed (i.e. Lockout Tagout, Personal Protective Equipment- Fall Protection).
- Associates will not work at conveyor transition zones.
  - ○ Exception: With proper preparation and planning, "Authorized associates" may have a need to step, sit, stand or climb on these areas. In these instances, the appropriate and applicable procedures will be followed (i.e. Lockout Tagout, Personal Protective Equipment- Fall Protection).

CONFIDENTIAL;
SUBJECT TO PROTECTIVE ORDER

WM_Braxton_000148

WMW-763e  Rev. 10/19
**General Safe Work Practices**
eCommerce



- Associates will not walk or work under platforms, structures or elevated equipment that is less than 6 feet 8 inches.
  - Exception: With proper preparation and planning, "Authorized associates" may have a need work in these areas. In these instances, the appropriate and applicable procedures will be followed (i.e. Lockout Tagout, Personal Protective Equipment- Fall Protection).
- Associates will not crawl under, between, or over and/or lean over conveyors.
- Conveyors and MHE, such as belts, pullies, and rollers under 7 feet, will be properly guarded.
- Emergency stop buttons and cabling at work station areas will not be obstructed and remain accessible at all times.

**Ladders (Portable & Fixed):**
- Associates will select the correct ladder for the job. When selecting a step ladder, only use a ladder OSHA rated as a "Type I – Industrial Step Ladder".
- All fixed ladders built in-house must conform to OSHA standard 29 CFR 1910.27.
- When climbing, descending, or working from a ladder, associates will not overload themselves or the ladder. If needed, associates will ask a partner to hand them the load once in the proper position.
- Only wood or fiberglass ladders will be used when working on electrical equipment or lighting.
- Associates will face the ladder when ascending or descending a ladder.
- Ladders will be ascended/ descended one step at a time using at least one hand to grasp the ladder when moving up or down the ladder (maintaining 3 points of contact).
- Ladders will be maintained to be free of oil, grease, and other slipping hazards. Make sure footwear is free of oil, grease, or another slipping hazard.
- Never climb or jump off the ladder onto a rack, piece of equipment, etc. Always work from the ladder.
- When portable ladders are used for access to an upper landing surface, the side rails will extend at least three feet above the upper landing surface. When such an extension is not possible, the ladder must be secured. A grasping device, such as a grab rail, must be provided to assist the associate in mounting and dismounting the ladder. A ladder extension must not deflect under a load that would cause the ladder to slip off its support.
- When moving or using a portable ladder, watch for overhead objects, lights, sprinkler heads, and electrical wires. Two or more associates may be required to move a large ladder.
- When using a Portable Ladder:
  - Make sure a step ladder is fully spread (extended) and locked.
  - Standing on the first step, rock the ladder back and forth to ensure that it is in a stable position.
  - Do not push a ladder through a swinging door to open it. Open the door, brace it and post an associate to prevent a collision.
  - Never overreach. Reposition the ladder closer to the work area.
  - Never climb past the second step (rung) from the top unless it is a platform ladder.
  - If the ladder is positioned by a door or walkway, block the door or walkway to prevent collisions.
  - Use the non-self-supporting ladders at an angle where the horizontal distance from the top support to the foot of the ladder is approximately one-quarter of the working length of the ladder.
  - Ladders will not be used on slippery surfaces unless secured or provided with slip resistant feet to prevent accidental movement. Slip resistant feet will not be used as a substitute for the care in placing, lashing or holding a ladder upon slippery surfaces.
  - Areas around the top and bottom of the ladder will be kept clear.
- The top of a non-self-supporting ladder will be placed with two rails supported equally, unless the ladder is equipped with a single support attachment.

CONFIDENTIAL;
SUBJECT TO PROTECTIVE ORDER

WM_Braxton_000149

WMW-763e Rev. 10/19
## General Safe Work Practices
eCommerce



- Do not use cross-bracing on the rear section of step ladders for climbing unless the ladder is designed and provided with a step for climbing on both front and rear sections.
- Ladders will not be used by more than one associate at a time.
- Ladders will not be placed on boxes, barrels, or other unstable bases to obtain additional height.
- Ladders will not be tied or fastened together to provide longer sections.
- Ladders will be inspected by a qualified associate for visible defects. A qualified associate is someone who has reviewed these safe work practices.
- Associates will inspect the ladder for defects before use. Defective ladders will be tagged with "Danger – Do Not Use" and withdrawn from service.
- Ladders will be maintained in good condition. The joint between the steps and side rails must be tight, all hardware and fittings securely attached, and the movable parts must operate freely without binding or undue play.
- A ladder will be inspected after any incident that could affect its safe use. If a ladder tips over, immediately inspect the ladder for side rail dents, bends, and excessively dented rungs. Check all rung-to-side-rail connections, hardware connections, and rivets for shears.
- The steps to inspect a ladder are as follows:
  - Look at the feet (the portion that touches the ground) for cracks.
  - Look for missing or faulty rubber safety treads (if equipped).
  - Look for uneven edges, bent or broken rails, and missing braces.
  - Look at steps (rungs) for cracks or broken sections.
  - If it is a step-ladder, spread and check the spreader bars. Determine if they are straight or if the ladder wobbles.
  - Check for stability by opening the ladder and stand on the first step. Shake the ladder and determine if you would feel comfortable working on the ladder. If the ladder moves around too much, tag it out, and follow the procedures below.
  - For wooden ladders, all wood parts shall be free from sharp edges and splinters; sound and free from accepted visual inspection from shake, wane, compression failures, decay, or other irregularities.

### Step Stands/ Stools:
- Only industrial rated step stands/ stools with manufacturer's stated load capacity will be used. The manufacturer's stated load capacity of the stand must not be exceeded.
- Inspect step stand/ stool to ensure it is in good repair before use. If there are cracks or damage, do not use the stand.
- Ensure proper placement of the step stand/ stool to prevent overreach while working.
- When the step stand is not in use, store it where it will not interfere with egress, the loading/unloading of trailers, extendable conveyor operation, and powered industrial truck operation.

### eCommerce FC Orderfilling Module:
- All replenishment gates kept in the replenish position unless being utilized.
- Associates will not step into an unguarded transfer gate location.
- Associates will not stand in front of slot locations being replenished.
- Associates will not lean on the guard rails on the exterior of the module.
- The quantity of empty pallets in a module pallet return will not exceed 6.
- Be sure pallet load is stable before breaking tape or cutting shrink wrap.

### eCommerce FC Pallet Module:
- Associates will not step into elevated pallet locations in the first level of the module. Pallet pull hooks will be used as needed to pull pallets forward.
- Associates are strictly prohibited from placing any body part(s) beyond the first pallet position when on the second floor (or higher) of the module. A visible line will be present to depict this

CONFIDENTIAL;
SUBJECT TO PROTECTIVE ORDER

WM_Braxton_000150

WMW-763e Rev. 10/19
## General Safe Work Practices
eCommerce



zone. Fall protection must be worn and/or proper guarding (Top rail, mid rail, and toe board) must be present to physically access this location.
- Associates will not stand in front of slot locations being replenished.
- Associates will not lean on the guard rails on the exterior of the module.
- The quantity of empty pallets in a pallet module pallet return will not exceed 3.
- Be sure pallet load is stable before breaking tape or cutting shrink wrap.

### Baler Safety:
- Associates will not overfill the baler.
- Keep the baler door gates closed while cycling the machine.
- It is never acceptable to enter the baler or place a part of your body into the baler.
- The area around the baler will be clear of obstructions, to include the emergency disconnect switch.
- Balers have a red emergency stop button which immediately stops the equipment. Locate this button so it can be used in case of an emergency.
- Personal protective equipment (PPE) to include safety glasses and gloves, will be worn when opening the chamber door of the baler and/or ejecting and preparing the final bale.
- If cardboard gets caught in parts of the baler or in the openings for the tie wire, dislodge it with a broom handle or bar, but do not do this while the baler is cycling.
- If unable to dislodge material that is stuck inside the baler or otherwise cannot operate the baler, immediately contact the Maintenance Department for repair.
- Visually verify that the area is clear, and no associates have entered the baler door area before cycling the machine.

### Compactor Safety:
- Associates will not use the compactor for containers of chemicals or liquids, either full or partially empty. Compacting these items can contribute to potential fires.
- Compactors will not be used to compress cardboard. Cardboard should be placed into the baler.
- Associates will not overload the compactor chute. To reduce the potential for jams, break down large items before placing them in the compactor chute.
- The compactor chute door must be closed during operation.
- A safety interlock is located on the compactor door. The interlock ensures the compactor does not operate when the door is in the open position. If it is not operating properly, immediately stop the cycle and contact the Maintenance Department.
- Associates will not overload the compactor. If it is full or it malfunctions, immediately contact the Maintenance Department.
- Keep the area around the compactor clear to include the emergency disconnect switch.
- Never place any part of your body in the compactor or climb into the trash compactor chute.
- Compactors have a red emergency stop button, which immediately stops the equipment. Locate this button so it can be used in case of an emergency.
- In the event of a compactor chute jam, attempt to dislodge the jammed item with a broom handle or bar after the compactor has finished the cycle in progress.

### Tier Racking Safety:
- All tier racks must be visually inspected prior to being used. Never use bent or damaged components (uprights or base unit).
- Loaded tier racks are to be transported one high with a powered industrial truck or equipment with forks. Clamps cannot be used to transport tier racks.
- No shrink wrap is to be used outside of the uprights.
- Loads shall not exceed the tier rack load capacity rating and/or the recommended stack height of the manufacturer.

CONFIDENTIAL;
SUBJECT TO PROTECTIVE ORDER

WM_Braxton_000151

WMW-763e  Rev. 10/19
**General Safe Work Practices**
eCommerce



- When hauling empty stacked (non-spiral) tier rack, the stack should not exceed 8 (height that would fit in a trailer) and be shorter than their mast.
- If any component is found to be damaged notify your Manager immediately.
- Orderfilling should occur from the top to the bottom of the slot. Never pick from a bottom slot with loaded tier rack above.
- Loaded tier racks will be unstacked one rack at a time when stacked without a powered industrial truck.
- Overhang should be avoided whenever possible. Freight will be stacked parallel to the tier rack support cross bars allowing overhang on the sides not to the front and back.

**Reliability Maintenance Engineering (RME):**
- Non-portable equipment will be secured to a floor and/or workstation when the ability to secure the equipment is present.
- RME associates will only use approved equipment and tools and will store them safely in approved locations. Equipment & tools will only be used for their intended purposes. Only tools provided by the company are permitted for use. Personal tools strictly prohibited.
- All equipment and tools will be inspected before use. Damaged tools will be tagged and immediately removed from service.
- Safety glasses, gloves or other Personal Protective Equipment (PPE) will be worn as required with tools and equipment.
- Drill Press Operation:
  - Guarding will be present over the motor, belts, and pulleys.
  - An adjustable guard will be installed to cover the unused portion of the bit and chuck above the material being worked. Before starting the drill press, the guard will be functional and in place.
  - Only authorized associates will operate the drill press.
  - Before drilling, materials will be secured to the drill press bed with clamps so that the material will not spin and/or strike the operator. The operator will not attempt to adjust the drill press, work platform or stock while the drill bit is still rotating.
  - The drill press will only be used for its intended purposes.
  - The drill press will be shut off when not in use or when left unattended for any period of time.
  - Remove the chuck immediately after removing a drill bit.
  - Lockout Tagout procedures will be followed if drill press is hardwired or un-plug if drill press is cord/plug type prior to servicing or adjusting the drive belts. Refer to Lockout Tagout procedures for specific information.
  - The drill press will be secured to the floor if it is a pedestal type or to the bench if it is a bench top model prior to operation.
  - Drill bits will be sharp and designed for the product being drilled (i.e. wood, metal, ceramic, masonry, etc).
- Battery Room:
  - Care will be taken in the Battery Room to prevent explosions or spills of acids.
  - Batteries will not be overfilled. Battery acid should be treated as hazardous and disposed of accordingly. Emergency showers should be accessible and properly marked in the Maintenance area. Access to emergency showers will be kept clear at all times.
  - The Battery Change Personnel will wear required PPE (i.e. face shields, goggles, apron, gloves, etc.) while changing or servicing batteries.
- Flammable/Hazardous Chemicals:
  - Care will be taken in handling and storage of any flammable or hazardous chemicals.
  - Chemicals will not be mixed unless they are intended to be mixed. If mixed, the manufacturer's mixing directions will be followed.
  - Material Safety Data Sheets must be made available for review in the facility's MSDSOnline eBinder.

CONFIDENTIAL;
SUBJECT TO PROTECTIVE ORDER

WM_Braxton_000152

**App-I**
**293**

WMW-763e Rev. 10/19
**General Safe Work Practices**
eCommerce



- o Any flammable or hazardous chemical not being used will be stored in the flammable cabinet.
- Welding, Cutting, and/or Brazing:
  - o Welding, cutting and brazing will be performed according to the DC-11 Dot Com Safety Manual, 0601 Hot Works procedure.
  - o Welding, cutting, and brazing will occur in the shop area when possible. If welding is to be performed elsewhere, the Hot Works Procedure must be followed, to include:
    - • Obtaining a Hot Works Permit from Safety, Compliance, & Trust (SCT).
    - • A trained fire watch associate must be present at all times during the process with a fully charged fire extinguisher.
    - • Flash reduction screens will be used to protect associates working in the area. Caution associates to avoid welder flash and sparks.
  - o Personal Protective Equipment, according to the DC-11 Dot Com Safety Manual, 0601 Hot Works procedure will be worn.
- Housekeeping in the Maintenance area is important. The area will be kept clean and 5S standards (where applicable) followed to prevent slips, trips and falls.
- Storage areas will be kept organized and clean. Flammable liquids will be stored in a U.L. approved cabinet and grounded (as applicable).
- Electrical Safety:
  - o Grounding prongs must never be removed from electrical devices.
  - o Do not perform equipment modification that could adversely affect grounding.
  - o Use portable fiberglass ladders when working on electrical circuits.
  - o Do not wear conductive jewelry, materials, or clothing when working on energized circuits.
  - o Treat non-locked/non-tagged electrical equipment as conductive or energized parts.
  - o De-energize equipment except when testing or troubleshooting is being performed.
  - o Conduct tests or visual inspections before energizing electrical equipment.
  - o Warn associates to stand clear before energizing electrical equipment.
  - o Update electrical prints after completing any modifications.
  - o Before using a voltage detector:
    - • Review process for selecting appropriate voltage detector.
    - • Review how to use a device to verify an absence of voltage and interpreting indications from the device.
    - • Examine how to understand all limitations of each voltage detector that may be used.
- NFPA 70e – Arc Flash:
  - o RME associates will follow the 2301 Arc Flash/ Electrical Safety Program procedure as outlined in the DC-11 Dot Com Safety Manual.
  - o RME associates will follow guidelines for Limited Approach Boundary and Restricted Approach Boundary.
  - o Only trained and qualified RME associates work on energized electrical equipment.
  - o Before performing work, RME associates will:
    - • Examine skills and techniques for distinguishing exposed energized electrical conductors and circuit parts from other parts of electrical equipment.
    - • Review how the degree and extent of a hazard is determined as well as PPE and job planning necessary to perform tasks.
  - o Understand proper use of special precautionary techniques, including Arc Flash Personal Protective Equipment (PPE), insulated materials, and tools.
  - o Housekeeping duties will not be conducted near live electrical parts, unless safeguards are provided.
  - o Never reach blindly into areas that may contain live electrical components.
  - o Qualified RME associates will not enter spaces containing exposed energized parts unless illumination is provided.

CONFIDENTIAL;
SUBJECT TO PROTECTIVE ORDER

WM_Braxton_000153

WMW-763e Rev. 10/19
**General Safe Work Practices**
eCommerce



- Lockout Tagout:
  - RME associates will follow the 2201 Lockout Tagout Program procedure as outlined in the DC-11 Dot Com Safety Manual.
  - Only trained and authorized RME associates will perform Lockout Tagout activities.
  - RME associates will de-energize electrical components and verify that it is de-energized before working on or near them.
  - RME associates will properly Lock/Tag electrical circuits or equipment that have been de-energized. When LOTO placard is provided, the RME associate will follow it.
  - Any stored energy will be relieved before work begins.
  - Interlocks will not be used as a substitute for Lockout Tagout procedures.

CONFIDENTIAL;
SUBJECT TO PROTECTIVE ORDER

WM_Braxton_000154

12:09

< 4

**DW**

David >

Tue, Apr 14, 10:36 PM

Are you awake?

Yea what's up

Just talked to janell. She said she hurt her wrist Sunday (doesn't know how) and didn't tell anyone

Hurt how? Can she write a statement. She only get coached if she describes pain

Yes I'll have her write a statement

Thank you. When you get it send me a picture of it.

Will do.  IR and 5 why?

How long do they have to report? EOS?

I will send you the line. I want to see the statement first

You got it.

Should have it in a minute or two

iMessage

**EXHIBIT
J**

**EXHIBIT
7**
1-6-21

CONFIDENTIAL;
SUBJECT TO PROTECTIVE ORDER

WM_Braxton_000103

CONFIDENTIAL;
SUBJECT TO PROTECTIVE ORDER

WM_Braxton_000104

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

JANELL BRAXTON,

        Plaintiff,

        Case No. 2:20-cv-02287

v.

WALMART, INC.,

        Defendant.

**DECLARATION OF QUINCY USRY IN SUPPORT OF DEFENDANT'S OPPOSITION TO MOTION FOR PARTIAL SUMMARY JUDGMENT**

I, Quincy Usry, hereby declare and state as follows:

1.    My name is Quincy Usry. I am over the age of 18 and have personal knowledge of the facts contained in this declaration.

2.    Since May 2017, I have been held the position of Operations Manager of the Walmart's Fulfillment Center in Edgerton, Kansas.

3.    In March and April 2020, Walmart maintained a written Policy 763e, which stated in pertinent part: "All known injuries, no matter how slight, will be reported to a member of management immediately. At a minimum, these must be reported to a member of management by the end of the shift." A true and correct copy of Walmart's Policy 763e is attached hereto as Exhibit A.

4.    In March and April 2020, Walmart maintained a written Policy 670e, which stated in pertinent part that "[f]ailure to report any known injury before the end of the shift" would result in a First Written formal disciplinary action. A true and correct copy of Walmart's Policy 670e is attached hereto as Exhibit B.

**EXHIBIT K**

5.    On Tuesday April 14, 2020, I received a text communication from Walmart Operations Manager David Whitenack ("Whitenack"). Whitenack's text message on April 14, 2020 stated: "Just talked to [J]anell. She said she hurt her wrist Sunday (doesn't know how) and didn't tell anyone." A true and correct copy of Whitenack's April 14, 2020 text communications to me is attached hereto as Exhibit C.

6.    Based on receipt of the text message from Whitenack on April 14, 2020, I believed and understood that Janell Braxton first injured her wrist during her April 12-13, 2020 overnight shift.

7.    Based on receipt of the text message from Whitenack on April 14, 2020, I believed and understood that Braxton first reported her injury to Walmart during her April 14-15, 2020 overnight shift.

8.    Based upon my belief and understanding that Braxton failed to report her injury to Walmart before the end of her April 12-13, 2020 shift, I concluded that Braxton had violated Policy 763e and Policy 670e.

9.    Based upon my conclusion that Braxton had violated Policy 670e, I supported the decision that Braxton's violation warranted a First Written disciplinary action.

10.    Based upon my understanding that Braxton was a seasonal associate, and based upon my communications with Whitenack, I supported the decision to terminate Braxton's employment pursuant to Policy 670e and Walmart's Conduct Disciplinary Action Guidelines.

*I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.*

2

**App-I**
**299**

Executed this 14th day of February 2021.

QUINCY USRY

DOCS/2596205.4

## **<u>PROOF OF SERVICE</u>**

I certify that on March 21, 2022, a copy of the foregoing (Appendix Volume I) was filed electronically with the Clerk of Court using the CM/ECF system, which will automatically send email notification of same to the following attorneys of record.

/s/ *Kenneth D. Kinney*
Kenneth D. Kinney – D.Kan. #78544
RALSTON KINNEY, LLC
4717 Grand Avenue, Suite 300
Kansas City, Missouri 64112
(816) 298-0086; Fax: (816) 298-9455
Email: ken@rklawllc.com
*Attorney for Appellant Janell Braxton*
