APPEAL NO. 22-3003

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

---

## JANELL BRAXTON

APPELLANT

v.

## WALMART, INC.

APPELLEE

---

Appeal from the United States District Court
For the District of Kansas
District Case No. 20-2287-DDC-GEB
Daniel D. Crabtree, United States District Judge

---

**APPENDIX**
**Volume II**
**1 - 281**

---

Kenneth D. Kinney – D.Kan. #78544
RALSTON KINNEY, LLC
4717 Grand Avenue, Suite 300
Kansas City, MO 64112
816-298-0086
**Attorney for Appellant Janell Braxton**

---

## <u>TABLE OF CONTENTS</u>

Doc.95-13, Exhibit L, Declaration of Morgan Medaris ................................... 5

Doc.95-14, Exhibit M, Text Messages
        (Deposition Exhibit 29) .................................................... 7

Doc.95-15, Exhibit N, Safety School Email
        (Deposition Exhibit 5) ..................................................... 16

Doc.95-16, Exhibit O, Employee Termination Details .................................... 17

Doc.95-17, Exhibit P, Declaration of Chelsea Davidson ................................. 24

Doc.95-18, Exhibit Q, Policy Acknowledgement ........................................... 27

Doc.95-19, Exhibit R, Conduct Disciplinary Guidelines ................................ 28

Doc.98, <u>Plaintiff Response to Defendant's Motion
        for Summary Judgment</u>............................................................ 29

Doc.98-1, Exhibit 1, Braxton's Job Description
        (Deposition Exhibit 21)..................................................... 90

Doc.98-2, Exhibit 2, Deposition of Janell Braxton .......................................... 93

Doc.98-3, Exhibit 3, Braxton's Time Punches
        (Deposition Exhibit 27).................................................... 115

Doc.98-4, Exhibit 4, Deposition of Quincy Usry (04/30/21)
        30(b)(6) Representative for Walmart................................ 117

Doc.98-5, Exhibit 5, General Safe Work Practices
        (WMW-763e) (Deposition Exhibit 25)........................... 147

Doc.98-6, Exhibit 6, Deposition of David Whitenack ..................................... 159

Doc.98-7, Exhibit 7, Safety & Compliance Rule Violation Form
        (WMW-670e) (Deposition Exhibit 11)............................ 179

Doc.98-8, Exhibit 8, Deposition of Chelsea Davidson....................................181

Doc.98-9, Exhibit 9, Walmart's Answers to Braxton's
      First Request for Admissions............................................189

Doc.98-10, Exhibit 10, JetFlex Disciplinary Action Guidelines
      (Deposition Exhibit 37)....................................194

Doc.98-11, Exhibit 11, Walmart Dot Com Safety Manual
      (Deposition Exhibit 51)....................................196

Doc.98-12, Exhibit 12, Deposition of Quincy Usry (01/06/21)
      30(b)(6) Representative for Walmart ............................................208

Doc.98-13, Exhibit 13, Deposition of Morgan Medaris..................................218

Doc.98-14, Exhibit 14, Jet Statement Form
      Statement by Braxton (Deposition Exhibit 9) ..............................222

Doc.98-15, Exhibit 15, Walmart Associate Incident Report
      (Deposition Exhibit 40)....................................224

Doc.98-16, Exhibit 16, Walmart Procedure 19-0902
      Associate Work-Related Injury Management Guidelines
      (Deposition Exhibit 41)....................................226

Doc.98- 17, Exhibit 17, Kansas Department of Labor (K-WC- 27-A)
      Information for Injured Employees (Deposition Exhibit 44).......229

Doc.98-18, Exhibit 18, Deposition of Mark Tuazon........................................232

Doc.98-19, Exhibit 19, Discrimination & Harassment Prevention Policy
      (Deposition Exhibit 48)....................................239

Doc.98-20, Index of Exhibits
      (for Plaintiff's Response)............................................244

Doc.101, Defendant's Reply Brief in Support
      of Motion for Summary Judgment .........................................246

Doc.101-1, Exhibit A, Second Declaration of Chelsea Davidson.....................276

Doc.102, Exhibit A2, Walmart's Answers to Braxton's
        Second Set of Interrogatories ................................................................278

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

JANELL BRAXTON,

      Plaintiff,

v.

WALMART, INC.,

      Defendant.

Case No. 2:20-cv-02287

**DECLARATION OF MORGAN
MEDARIS IN SUPPORT OF
DEFENDANT'S OPPOSITION TO
MOTION FOR PARTIAL SUMMARY
JUDGMENT**

I, Morgan Medaris, hereby declare and state as follows:

    1.    My name is Morgan Medaris. I am over the age of 18 and have personal knowledge of the facts contained in this declaration.

    2.    In March and April 2020, I held the position of Human Resources Business Partner at Walmart's facility in Edgerton, Kansas.

    3.    In March and April 2020, Walmart maintained written Conduct Disciplinary Action Guidelines, which stated in pertinent part that "Jetflex and Jet Seasonal [associates] should be terminated when their coaching has progressed to a formal written." A true and correct copy of Walmart's Conduct Disciplinary Action Guidelines attached hereto as Exhibit D.

    4.    During Janell Braxton's employment with Walmart, she was a Jet Seasonal associate.

    5.    On April 14, 2020, I spoke with Operations Manager David Whitenack, who informed me that Braxton had injured her wrist during her April 12-13, 2020 overnight shift. Whitenack further informed me that Braxton first reported her injury to Walmart

**EXHIBIT
L**

during her April 14-15, 2020 overnight shift.

6.      Based upon my communications with Whitenack, I confirmed that Braxton's failure to report her injury during the April 12-13, 2020 overnight shift violated Policy 670e.

7.      Based upon my conclusion that Braxton had violated Policy 670e, I further confirmed that the violation warranted a First Written disciplinary action.

8.      Based upon my conclusion that Braxton's violation of Policy 670e warranted a First Written disciplinary action, and because Braxton was a Jet Seasonal associate, I concluded that Braxton's employment was to be terminated pursuant to Policy 670e and Walmart's Conduct Disciplinary Action Guidelines.

*I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.*

Executed this **22** day of February 2021.

MORGAN MEDARIS

DOCS/2596278.1







Braxton000049



Braxton000050



Braxton000051



Braxton000049



Braxton000050

App-II
11



Braxton000051



Braxton000052



Braxton000053



Braxton000054

**From:** Quincy Usry <Quincy.Usry@walmart.com>
**Sent:** Wednesday, April 15, 2020 1:06 AM CDT
**To:** Morgan Medaris <Morgan.Medaris@walmart.com>
**CC:** Chelsea Heath <Chelsea.Heath@walmart.com>; Heather Williams <Heather.Williams0@walmart.com>
**Subject:** Re: Janell Braxton
**Attachment(s):** "image006.jpg","image005.jpg","image004.png"

We can hand them out or read over them in safety school, but I think we are trying to save time to push more acknowledgements. I'm not saying there wouldn't be value added, but we are getting pushed on how long it takes us to get them to the floor, so we are trying to find a middle ground. Safety school is owned by Training now though as FCLD owns the script and everything else related to it. Tyler was given direction to be hands off unless Justin wanted/needed help. We will meet about it tomorrow though.

Sent from my iPhone

> On Apr 15, 2020, at 12:47 AM, Morgan Medaris <Morgan.Medaris@walmart.com> wrote:

> Absolutely. However, I think we can acknowledge that associates don't always read the acknowledgments before agreeing. Does that make the acknowledgment void? Of course not. However, I think it is important that we are setting our associates up for success when they come into the building. By communicating through more than one avenue, it ensures the associate truly understands the policy. Wouldn't you agree?

> **From:** Quincy Usry <Quincy.Usry@walmart.com>
> **Sent:** Wednesday, April 15, 2020 12:36 AM
> **To:** Morgan Medaris <Morgan.Medaris@walmart.com>
> **Cc:** Chelsea Heath <Chelsea.Heath@walmart.com>; Heather Williams <Heather.Williams0@walmart.com>
> **Subject:** Re: Janell Braxton

> However, I would point out, that she did acknowledge the documents and in two different documents it mentions it, the 670 even has the line we used under first written.

> **Quincy Usry**, **Operations Manager, CSAP**
> **eCommerce**

> <image004.png>

> **From:** Morgan Medaris <Morgan.Medaris@walmart.com>
> **Date:** Wednesday, April 15, 2020 at 12:15 AM
> **To:** Quincy Usry <Quincy.Usry@walmart.com>
> **Cc:** Chelsea Heath <Chelsea.Heath@walmart.com>, Heather Williams <Heather.Williams0@walmart.com>
> **Subject:** Janell Braxton

> Quincy,

> We have completed Janell's termination for late reporting. However, I wanted to bring something to your attention. I don't know if you are aware, but Tyler has the trainers delivering the majority of safety school since we've been without a safety lead on 2nd shift. Tonight, one of the training specialists, Sue Sooialo, came by after lunch concerned about Janell's release. It is my assumption that Janell stopped her during lunch to tell her the details, as she knew the reason by she was released. Sue specified that at no time were JetFlex associates, or Sovereign for that matter, do they cover incident reporting in Safety school. I asked her to clarify to make sure I was understanding. She stated that the trainers only go over proper lifting techniques during Safety school, and that Sue herself was never told to report when they felt they were possibly injured. My concern is that the compliance portion of safety is being overlooked. Even though it is an acknowledgment during onboarding, covering this during orientation should be mandatory.

> Do we plan to continue to utilize training to deliver this information? If so, I believe we need to touch base with them so that we are all aligned with the expectations.

> Thanks,

> <image005.jpg>





**CONFIDENTIAL;**
**SUBJECT TO PROTECTIVE ORDER**

| | Legal Name | Hire Date | Termination Date | Primary Termination Reason | Job Profile | Associate Type | Organization | Manager |
|---|---|---|---|---|---|---|---|---|
| | A | B | C | D | E | F | G | H |
| 2 | M█ R C█ | 11/9/2020 | 11/17/2020 | Terminate Associate > Involuntary > Dishonesty | 187c - Seasonal Warehouse Associate | Seasonal | Company (Doug McMillon) >> Putaway - LPN (T█ Pr█ | T█ P█ |
| 3 | J█ M█ | 4/13/2020 | 4/22/2020 | Terminate Associate > Involuntary > Drugs or Alcohol | 187c - Jet Seasonal Warehouse Associate | Seasonal | Company (Doug McMillon) >> QC Singles - Front (B█ D█ | Br█ Da█ |
| 4 | D█ E█ | 3/30/2020 | 4/29/2020 | Terminate Associate > Involuntary > Drugs or Alcohol | 187c - Jet Seasonal Warehouse Associate | Seasonal | Company (Doug McMillon) >> Case Receiving (K█ M█ | Ke█ M█ |
| 5 | R█ G█ | 5/28/2018 | 6/27/2018 | Terminate Associate > Involuntary > Misconduct | 187 - Associate - Supply Chain & Fulfillment | Seasonal | Company (Doug McMillon) >> Picking- Front (M█ D█ | M█ D█ |
| 6 | J█ Y█ | 7/23/2018 | 9/17/2018 | Terminate Associate > Involuntary > Misconduct | 187 - Associate - Supply Chain & Fulfillment | Seasonal | Company (Doug McMillon) >> QC Singles - Front (G█ H█ | G█ H█ |
| 7 | T█ P█ | 7/25/2018 | 9/17/2018 | Terminate Associate > Involuntary > Misconduct | 187 - Associate - Supply Chain & Fulfillment | Seasonal | Company (Doug McMillon) >> QC- Back (L█ W█ | L█ W█ |
| 8 | S█ K█ | 8/1/2018 | 10/8/2018 | Terminate Associate > Involuntary > Misconduct | 187 - Associate - Supply Chain & Fulfillment | Seasonal | Company (Doug McMillon) >> Picking- Back (J█ H█ | Je█ H█ |
| 9 | G█ R█ | 9/26/2018 | 11/5/2018 | Terminate Associate > Involuntary > Misconduct | 187 - Associate - Supply Chain & Fulfillment | Seasonal | Company (Doug McMillon) >> Picking- Back (J█ H█ | Je█ H█ |
| 10 | C█ M█ | 8/22/2018 | 11/16/2018 | Terminate Associate > Involuntary > Misconduct | 187 - Associate - Supply Chain & Fulfillment | Seasonal | Company (Doug McMillon) >> Picking- Front (M█ D█ | M█ D█ |
| 11 | M█ A█ | 9/10/2018 | 12/5/2018 | Terminate Associate > Involuntary > Misconduct | 187 - Associate - Supply Chain & Fulfillment | Seasonal | Company (Doug McMillon) >> Picking- Front (M█ D█ | Mi█ D█ |
| 12 | J█ C█ | 8/28/2019 | 10/11/2019 | Terminate Associate > Involuntary > Misconduct | 187 - Associate - Supply Chain & Fulfillment | Seasonal | Company (Doug McMillon) >> Picking- Back (J█ Hu█ | J█ H█ |
| 13 | C█ H█ | 10/22/2019 | 12/13/2019 | Terminate Associate > Involuntary > Misconduct | 187 - Associate - Supply Chain & Fulfillment | Seasonal | Company (Doug McMillon) >> QC- Front (C█ W█ | C█ W█ |
| 14 | L█ L█ | 3/23/2020 | 3/30/2020 | Terminate Associate > Involuntary > Misconduct | 187c - Jet Seasonal Warehouse Associate | Seasonal | Company (Doug McMillon) >> QC Singles - Back (L█ S█ | L█ S█ |
| 15 | R█ C█ | 4/6/2020 | 4/10/2020 | Terminate Associate > Involuntary > Misconduct | 187c - Jet Seasonal Warehouse Associate | Seasonal | Company (Doug McMillon) >> Picking- Back (S█ S█ | S█ S█ |
| 16 | S█ R█ S█ | 4/17/2020 | 4/29/2020 | Terminate Associate > Involuntary > Misconduct | 187c - Jet Seasonal Warehouse Associate | Seasonal | Company (Doug McMillon) >> Picking Singles - Back (L█ S█ | L█ S█ |
| 17 | C█ D█ | 4/27/2020 | 5/1/2020 | Terminate Associate > Involuntary > Misconduct | 187c - Jet Seasonal Warehouse Associate | Seasonal | Company (Doug McMillon) >> Picking- Front (K█ Wi█ | Ka█ W█ |
| 18 | D█ M█ | 5/1/2020 | 5/8/2020 | Terminate Associate > Involuntary > Misconduct | 187c - Jet Seasonal Warehouse Associate | Seasonal | Company (Doug McMillon) >> Picking Singles - Back (C█ M█ | C█ M█ |

**EXHIBIT O**

CONFIDENTIAL; SUBJECT TO PROTECTIVE ORDER

**App-II**
**17**

WM_Braxton_000181

| | A | B | C | D | E | F | G | H |
|---|---|---|---|---|---|---|---|---|
| 19 | C▮▮P▮▮ | 3/23/2020 | 5/19/2020 | Terminate Associate > Involuntary > Misconduct | 187 - Associate - Supply Chain & Fulfillment | Seasonal | Company (Doug McMillon) >> Picking Singles - Front (Brady Kells) | Brady Kells |
| 20 | L▮▮L▮▮ | 5/4/2020 | 6/11/2020 | Terminate Associate > Involuntary > Misconduct | 187c - Seasonal Warehouse Associate | Seasonal | Company (Doug McMillon) >> QC Singles - Donut (M▮▮A▮) | Ma▮▮A▮▮ |
| 21 | D▮▮S▮ | 10/19/2020 | 10/23/2020 | Terminate Associate > Involuntary > Misconduct | 187c - Seasonal Warehouse Associate | Seasonal | Company (Doug McMillon) >> Picking- Front (B▮▮ D▮) | Br▮▮D▮▮ |
| 22 | D▮He▮ | 10/5/2020 | 10/27/2020 | Terminate Associate > Involuntary > Misconduct | 187c - Seasonal Warehouse Associate | Seasonal | Company (Doug McMillon) >> Picking Singles - Front (C▮▮ F▮) | Ch▮▮F▮▮ |
| 23 | M▮▮H▮ | 10/2/2020 | 11/9/2020 | Terminate Associate > Involuntary > Misconduct | 187c - Seasonal Warehouse Associate | Seasonal | Company (Doug McMillon) >> Picking Singles - front (C▮▮ F▮) | C▮▮F▮▮ |
| 24 | C▮▮R▮ | 10/19/2020 | 11/13/2020 | Terminate Associate > Involuntary > Misconduct | 187c - Seasonal Warehouse Associate | Seasonal | Company (Doug McMillon) >> Putaway (K▮▮Me▮) | Ka▮▮M▮▮ |
| 25 | M▮▮D▮ | 11/16/2020 | 11/17/2020 | Terminate Associate > Involuntary > Misconduct | 187c - Seasonal Warehouse Associate | Seasonal | Company (Doug McMillon) >> Picking Singles - Front (C▮▮ F▮) | C▮▮F▮▮ |
| 26 | S▮H▮▮ | 11/9/2020 | 11/24/2020 | Terminate Associate > Involuntary > Misconduct | 100015368 - Seasonal Warehouse Associate-LOGS | Seasonal | Company (Doug McMillon) >> Picking Singles - Donut (M▮▮A▮) | M▮▮A▮▮ |
| 27 | J▮K▮▮ | 6/4/2018 | 6/7/2018 | Terminate Associate > Involuntary > Performance | 187 - Associate - Supply Chain & Fulfillment | Seasonal | Company (Doug McMillon) >> Picking- Front (S▮▮ P▮) | S▮▮P▮▮ |
| 28 | K▮M▮▮ | 6/18/2018 | 7/2/2018 | Terminate Associate > Involuntary > Performance | 187 - Associate - Supply Chain & Fulfillment | Seasonal | Company (Doug McMillon) >> QC- Front (J▮▮ P▮) | J▮▮F▮▮ |
| 29 | A▮C▮ | 6/25/2018 | 8/6/2018 | Terminate Associate > Involuntary > Performance | 187 - Associate - Supply Chain & Fulfillment | Seasonal | Company (Doug McMillon) >> QC- Front (J▮▮ P▮) | J▮▮P▮▮ |
| 30 | D▮▮S▮▮ | 7/25/2018 | 8/9/2018 | Terminate Associate > Involuntary > Performance | 187 - Associate - Supply Chain & Fulfillment | Seasonal | Company (Doug McMillon) >> QC- Back (P▮▮ R▮) | P▮▮R▮▮ |
| 31 | A▮B▮ | 7/4/2018 | 8/10/2018 | Terminate Associate > Involuntary > Performance | 187 - Associate - Supply Chain & Fulfillment | Seasonal | Company (Doug McMillon) >> QC- Back (C▮▮ Wi▮) | C▮▮W▮▮ |
| 32 | S▮▮A▮▮ | 6/25/2018 | 8/30/2018 | Terminate Associate > Involuntary > Performance | 187 - Associate - Supply Chain & Fulfillment | Seasonal | Company (Doug McMillon) >> QC- Front (C▮▮▮▮ Wa▮) | Ch▮▮Wa▮▮ |
| 33 | S▮▮M▮ | 7/16/2018 | 9/4/2018 | Terminate Associate > Involuntary > Performance | 187 - Associate - Supply Chain & Fulfillment | Seasonal | Company (Doug McMillon) >> Picking- Front (S▮▮ P▮) | S▮▮P▮▮ |
| 34 | E▮V▮T▮ | 8/8/2018 | 9/6/2018 | Terminate Associate > Involuntary > Performance | 187 - Associate - Supply Chain & Fulfillment | Seasonal | Company (Doug McMillon) >> Picking- Back (L▮▮ S▮) | L▮S▮ |
| 35 | M▮Cr▮ | 8/8/2018 | 9/7/2018 | Terminate Associate > Involuntary > Performance | 187 - Associate - Supply Chain & Fulfillment | Seasonal | Company (Doug McMillon) >> Receiving (G▮▮ S▮) | Ga▮S▮ |
| 36 | H▮M▮ | 8/1/2018 | 9/12/2018 | Terminate Associate > Involuntary > Performance | 187 - Associate - Supply Chain & Fulfillment | Seasonal | Company (Doug McMillon) >> Receiving (G▮▮ S▮) | Ga▮S▮ |

Termination Details

App-II

18

CONFIDENTIAL;
SUBJECT TO PROTECTIVE ORDER

| | A | B | C | D | E | F | G | H |
|---|---|---|---|---|---|---|---|---|
| 37 | L█ A█ | 7/11/2018 | 9/20/2018 | Terminate Associate > Involuntary > Performance | 187 - Associate - Supply Chain & Fulfillment | Seasonal | Company (Doug McMillon) >> Receiving (G█ S█ | G█ S█ |
| 38 | B█ R█ M█ | 8/8/2018 | 9/27/2018 | Terminate Associate > Involuntary > Performance | 187 - Associate - Supply Chain & Fulfillment | Seasonal | Company (Doug McMillon) >> Putaway (K█ M█ | K█ M█ |
| 39 | J█ H█ | 8/15/2018 | 10/4/2018 | Terminate Associate > Involuntary > Performance | 187 - Associate - Supply Chain & Fulfillment | Seasonal | Company (Doug McMillon) >> Putaway (K█ M█ | K█ M█ |
| 40 | K█ B█ | 9/3/2018 | 10/9/2018 | Terminate Associate > Involuntary > Performance | 187 - Associate - Supply Chain & Fulfillment | Seasonal | Company (Doug McMillon) >> Picking - Front (M█ D█ | M█ D█ |
| 41 | C█ J█ | 8/8/2018 | 11/2/2018 | Terminate Associate > Involuntary > Performance | 187 - Associate - Supply Chain & Fulfillment | Seasonal | Company (Doug McMillon) >> Receiving (Ga█ S█ | Ga█ S█ |
| 42 | B█ B█ | 8/29/2018 | 11/9/2018 | Terminate Associate > Involuntary > Performance | 187 - Associate - Supply Chain & Fulfillment | Seasonal | Company (Doug McMillon) >> Receiving (G█ S█ | G█ S█ |
| 43 | T█ W█ | 8/15/2018 | 11/9/2018 | Terminate Associate > Involuntary > Performance | 187 - Associate - Supply Chain & Fulfillment | Seasonal | Company (Doug McMillon) >> Receiving (G█ S█ | G█ S█ |
| 44 | S█ H█ | 10/24/2018 | 11/23/2018 | Terminate Associate > Involuntary > Performance | 187 - Associate - Supply Chain & Fulfillment | Seasonal | Company (Doug McMillon) >> Picking - Back (C█ M█ | C█ M█ |
| 45 | N█ E█ | 10/3/2018 | 12/6/2018 | Terminate Associate > Involuntary > Performance | 187 - Associate - Supply Chain & Fulfillment | Seasonal | Company (Doug McMillon) >> QC-Singles - Back (L█ Wa█ | L█ W█ |
| 46 | R█ F█ | 10/17/2018 | 12/7/2018 | Terminate Associate > Involuntary > Performance | 187 - Associate - Supply Chain & Fulfillment | Seasonal | Company (Doug McMillon) >> Picking - Back (C█ M█ | C█ M█ |
| 47 | T█ A█ | 9/24/2018 | 12/9/2018 | Terminate Associate > Involuntary > Performance | 187 - Associate - Supply Chain & Fulfillment | Seasonal | Company (Doug McMillon) >> Picking- Front (M█ D█ | M█ D█ |
| 48 | K█ S█ | 9/17/2018 | 12/16/2018 | Terminate Associate > Involuntary > Performance | 187 - Associate - Supply Chain & Fulfillment | Seasonal | Company (Doug McMillon) >> Picking- Front (M█ D█ | M█ D█ |
| 49 | H█ F█ | 10/15/2018 | 1/6/2019 | Terminate Associate > Involuntary > Performance | 187 - Associate - Supply Chain & Fulfillment | Seasonal | Company (Doug McMillon) >> QC- Front (C█ W█ | C█ W█ |
| 50 | M█ Ur█ | 12/3/2018 | 1/21/2019 | Terminate Associate > Involuntary > Performance | 187 - Associate - Supply Chain & Fulfillment | Seasonal | Company (Doug McMillon) >> Picking- Front (M█ D█ | M█ D█ |
| 51 | T█ Jo█ | 12/3/2018 | 1/22/2019 | Terminate Associate > Involuntary > Performance | 187 - Associate - Supply Chain & Fulfillment | Seasonal | Company (Doug McMillon) >> Picking- Front (M█ D█ | Mi█ D█ |
| 52 | J█ B█ | 11/12/2018 | 1/30/2019 | Terminate Associate > Involuntary > Performance | 187 - Associate - Supply Chain & Fulfillment | Seasonal | Company (Doug McMillon) >> Picking- Front (M█ D█ | M█ D█ |
| 53 | J█ D█ | 2/18/2019 | 5/6/2019 | Terminate Associate > Involuntary > Performance | 187 - Associate - Supply Chain & Fulfillment | Seasonal | Company (Doug McMillon) >> Picking- Front (M█ D█ | M█ D█ |
| 54 | L█ W█ | 5/15/2019 | 7/10/2019 | Terminate Associate > Involuntary > Performance | 187 - Associate - Supply Chain & Fulfillment | Seasonal | Company (Doug McMillon) >> Picking- Back (J█ H█ | J█ H█ |

Termination Details

CONFIDENTIAL;
SUBJECT TO PROTECTIVE ORDER

| | A | B | C | D | E | F | G | H |
|---|---|---|---|---|---|---|---|---|
| 55 | Ma█ W█████ | 5/29/2019 | 7/10/2019 | Terminate Associate > Involuntary > Performance | 187 - Associate - Supply Chain & Fulfillment | Seasonal | Company (Doug McMillon) >> Picking- Back (J███ H█ | J███ H████ |
| 56 | D██ Ba████ | 5/15/2019 | 7/10/2019 | Terminate Associate > Involuntary > Performance | 187 - Associate - Supply Chain & Fulfillment | Seasonal | Company (Doug McMillon) >> Picking- Back (J███ H█ | J███ H████ |
| 57 | A█ N███ | 5/15/2019 | 7/10/2019 | Terminate Associate > Involuntary > Performance | 187 - Associate - Supply Chain & Fulfillment | Seasonal | Company (Doug McMillon) >> Picking- Back (J███ H█ | J███ H████ |
| 58 | M███ Sa███ | 7/1/2019 | 8/4/2019 | Terminate Associate > Involuntary > Performance | 187 - Associate - Supply Chain & Fulfillment | Seasonal | Company (Doug McMillon) >> Picking- Front (J F█ | J███ F████ |
| 59 | C███ C██ | 7/10/2019 | 8/23/2019 | Terminate Associate > Involuntary > Performance | 187 - Associate - Supply Chain & Fulfillment | Seasonal | Company (Doug McMillon) >> Picking- Back (J█ H█ | J███ H████ |
| 60 | J████ Wi██ | 6/26/2019 | 9/4/2019 | Terminate Associate > Involuntary > Performance | 187 - Associate - Supply Chain & Fulfillment | Seasonal | Company (Doug McMillon) >> Picking- Back (J█ H█ | J███ H████ |
| 61 | N████ D██ S███ | 9/11/2019 | 9/20/2019 | Terminate Associate > Involuntary > Performance | 187 - Associate - Supply Chain & Fulfillment | Seasonal | Company (Doug McMillon) >> Picking- Back (J█ H█ | █████ H████ |
| 62 | P███ D████ | 10/22/2019 | 11/5/2019 | Terminate Associate > Involuntary > Performance | 187 - Associate - Supply Chain & Fulfillment | Seasonal | Company (Doug McMillon) >> Picking- Front (K█ W█ | K██ W█████ |
| 63 | S███ Ha██ | 3/23/2020 | 3/28/2020 | Terminate Associate > Involuntary > Performance | 187 - Associate - Supply Chain & Fulfillment | Seasonal | Company (Doug McMillon) >> Picking Singles - Front (Brady Kells) | Brady Kells |
| 64 | T████ L█ | 3/23/2020 | 3/30/2020 | Terminate Associate > Involuntary > Performance | 187 - Associate - Supply Chain & Fulfillment | Seasonal | Company (Doug McMillon) >> QC Singles - Front (David Whitenack) | David Whitenack |
| 65 | J███ T█ | 4/6/2020 | 4/13/2020 | Terminate Associate > Involuntary > Performance | 187c - Jet Seasonal Warehouse Associate | Seasonal | Company (Doug McMillon) >> Picking- Front (K█ W█ | K██ W█████ |
| 66 | R██ H███ | 4/6/2020 | 4/16/2020 | Terminate Associate > Involuntary > Performance | 187c - Jet Seasonal Warehouse Associate | Seasonal | Company (Doug McMillon) >> QC Singles - Front (David Whitenack) | David Whitenack |
| 67 | P██ U██ | 4/13/2020 | 4/22/2020 | Terminate Associate > Involuntary > Performance | 187c - Jet Seasonal Warehouse Associate | Seasonal | Company (Doug McMillon) >> Picking Singles - Back (L█ S█ | L█ S█ |
| 68 | C██ K█ | 4/13/2020 | 4/22/2020 | Terminate Associate > Involuntary > Performance | 187c - Jet Seasonal Warehouse Associate | Seasonal | Company (Doug McMillon) >> QC Singles - Front (B█ D█ | B███ Da██ |
| 69 | M███ D█ | 4/6/2020 | 4/26/2020 | Terminate Associate > Involuntary > Performance | 187c - Jet Seasonal Warehouse Associate | Seasonal | Company (Doug McMillon) >> Picking- Front (K█ W█ | K██ W█████ |
| 70 | S████ B████ | 4/13/2020 | 4/26/2020 | Terminate Associate > Involuntary > Performance | 187c - Jet Seasonal Warehouse Associate | Seasonal | Company (Doug McMillon) >> Picking Singles - Front (B█ D█ | B███ D███ |
| 71 | D██ C█ | 4/17/2020 | 4/27/2020 | Terminate Associate > Involuntary > Performance | 187c - Jet Seasonal Warehouse Associate | Seasonal | Company (Doug McMillon) >> Picking- Front (K█ Wi█ | Ka██ W██ |
| 72 | Y█ C█ | 4/15/2020 | 4/30/2020 | Terminate Associate > Involuntary > Performance | 187c - Jet Seasonal Warehouse Associate | Seasonal | Company (Doug McMillon) >> Picking- Back (S█ S█ | S█ S█ |

Termination Details

CONFIDENTIAL;
SUBJECT TO PROTECTIVE ORDER

**App-II**

WM_Braxton_000184

| | A | B | C | D | E | F | G | H |
|---|---|---|---|---|---|---|---|---|
| 73 | D⬛ ⬛ B⬛⬛ | 4/22/2020 | 5/18/2020 | Terminate Associate > Involuntary > Performance | 187c - Jet Seasonal Warehouse Associate | Seasonal | Company (Doug McMillon) >> Picking Singles - Front (⬛⬛⬛ D⬛⬛) | Br⬛ D⬛⬛ |
| 74 | J⬛⬛ R⬛⬛ | 4/17/2020 | 5/26/2020 | Terminate Associate > Involuntary > Performance | 187c - Seasonal Warehouse Associate | Seasonal | Company (Doug McMillon) >> Picking- Front (K⬛ W⬛) | Ka⬛ W⬛ |
| 75 | S⬛ H⬛ | 4/22/2020 | 5/27/2020 | Terminate Associate > Involuntary > Performance | 187c - Seasonal Warehouse Associate | Seasonal | Company (Doug McMillon) >> Dock- Front (C⬛⬛ W⬛) | C⬛⬛ W⬛ |
| 76 | M⬛ H⬛ | 3/25/2020 | 6/3/2020 | Terminate Associate > Involuntary > Performance | 187c - Seasonal Warehouse Associate | Seasonal | Company (Doug McMillon) >> QC Singles - Back (C⬛ M⬛) | C⬛ M⬛⬛ |
| 77 | T⬛ s⬛ | 4/1/2020 | 6/4/2020 | Terminate Associate > Involuntary > Performance | 187c - Seasonal Warehouse Associate | Seasonal | Company (Doug McMillon) >> QC Singles - Back (L⬛ S⬛) | L⬛ S⬛ |
| 78 | R⬛ B⬛ | 5/13/2020 | 6/16/2020 | Terminate Associate > Involuntary > Performance | 187c - Seasonal Warehouse Associate | Seasonal | Company (Doug McMillon) >> QC Singles - Donut (M⬛ A⬛) | M⬛ A⬛ |
| 79 | K⬛ ⬛ | 3/23/2020 | 6/22/2020 | Terminate Associate > Involuntary > Performance | 187 - Associate - Supply Chain & Fulfillment | Seasonal | Company (Doug McMillon) >> QC Singles - Front (L⬛ G⬛) | L⬛ G⬛ |
| 80 | M⬛ D⬛ | 4/1/2020 | 6/23/2020 | Terminate Associate > Involuntary > Performance | 187c - Seasonal Warehouse Associate | Seasonal | Company (Doug McMillon) >> QC Singles - Back (L⬛ S⬛) | L⬛ S⬛ |
| 81 | J⬛ V⬛ | 9/28/2020 | 11/5/2020 | Terminate Associate > Involuntary > Performance | 187c - Seasonal Warehouse Associate | Seasonal | Company (Doug McMillon) >> Case Receiving (K⬛ M⬛) | K⬛ M⬛ |
| 82 | K⬛ J⬛ | 9/28/2020 | 11/12/2020 | Terminate Associate > Involuntary > Performance | 187c - Seasonal Warehouse Associate | Seasonal | Company (Doug McMillon) >> Case Receiving (K⬛ M⬛) | K⬛ M⬛ |
| 83 | N⬛ D⬛ | 10/28/2020 | 11/13/2020 | Terminate Associate > Involuntary > Performance | 187c - Seasonal Warehouse Associate | Seasonal | Company (Doug McMillon) >> Picking Singles - Back (L⬛ S⬛) | L⬛ S⬛ |
| 84 | C⬛ S⬛ | 10/21/2020 | 11/19/2020 | Terminate Associate > Involuntary > Performance | 187c - Seasonal Warehouse Associate | Seasonal | Company (Doug McMillon) >> QC Singles - Back (C⬛ M⬛) | C⬛ M⬛ |
| 85 | H⬛ M⬛ | 10/20/2020 | 11/23/2020 | Terminate Associate > Involuntary > Performance | 100015368 - Seasonal Warehouse Associate- LOGS | Seasonal | Company (Doug McMillon) >> Picking- Front (J⬛ K⬛) | J⬛ Ka⬛ |
| 86 | T⬛ S⬛ | 11/4/2020 | 11/26/2020 | Terminate Associate > Involuntary > Performance | 100015368 - Seasonal Warehouse Associate- LOGS | Seasonal | Company (Doug McMillon) >> Picking - Back (L⬛ P⬛) | L⬛ P⬛ |
| 87 | C⬛ M⬛ | 11/13/2020 | 11/29/2020 | Terminate Associate > Involuntary > Performance | 100015368 - Seasonal Warehouse Associate- LOGS | Seasonal | Company (Doug McMillon) >> Picking- Front (B⬛⬛ D⬛) | B⬛ D⬛⬛ |
| 88 | A⬛ W⬛ | 11/13/2020 | 11/29/2020 | Terminate Associate > Involuntary > Performance | 100015368 - Seasonal Warehouse Associate- LOGS | Seasonal | Company (Doug McMillon) >> Picking- Front (B⬛⬛ D⬛) | Br⬛ D⬛ |
| 89 | C⬛ M⬛ | 7/4/2018 | 8/31/2018 | Terminate Associate > Involuntary > Rules Violation | 187 - Associate - Supply Chain & Fulfillment | Seasonal | Company (Doug McMillon) >> QC- Back (C⬛ W⬛) | C⬛⬛ W⬛ |
| 90 | S⬛ Ca⬛ | 3/23/2020 | 3/26/2020 | Terminate Associate > Involuntary > Rules Violation | 187 - Associate - Supply Chain & Fulfillment | Seasonal | Company (Doug McMillon) >> Picking Singles - Back (L⬛ S⬛) | L⬛ S⬛ |

Termination Details

CONFIDENTIAL;
SUBJECT TO PROTECTIVE ORDER

WM_Braxton_000185

| | A | B | C | D | E | F | G | H |
|---|---|---|---|---|---|---|---|---|
| 91 | R██ R██ | 3/30/2020 | 4/3/2020 | Terminate Associate > Involuntary > Rules Violation | 187c - Jet Seasonal Warehouse Associate | Seasonal | Company (Doug McMillon) >> QC Singles - Front (B███ D████) | B██ D████ |
| 92 | A███ K█ | 3/23/2020 | 4/7/2020 | Terminate Associate > Involuntary > Rules Violation | 187c - Jet Seasonal Warehouse Associate | Seasonal | Company (Doug McMillon) >> QC Singles - Front (David Whitenack) | David Whitenack |
| 93 | Janell Braxton | 3/23/2020 | 4/14/2020 | Terminate Associate > Involuntary > Rules Violation | 187c - Jet Seasonal Warehouse Associate | Seasonal | Company (Doug McMillon) >> Picking- Front (Brady Kells) | Brady Kells |
| 94 | J████ W████ | 4/13/2020 | 4/16/2020 | Terminate Associate > Involuntary > Rules Violation | 187c - Jet Seasonal Warehouse Associate | Seasonal | Company (Doug McMillon) >> Picking Singles - Front (B███ D████) | B██ D████ |
| 95 | D████ A█ | 4/13/2020 | 4/16/2020 | Terminate Associate > Involuntary > Rules Violation | 187c - Jet Seasonal Warehouse Associate | Seasonal | Company (Doug McMillon) >> Picking- Front (Brady Kells) | Brady Kells |
| 96 | J█████ S█ | 4/6/2020 | 4/22/2020 | Terminate Associate > Involuntary > Rules Violation | 187c - Jet Seasonal Warehouse Associate | Seasonal | Company (Doug McMillon) >> QC- Back (C████ M█████) | Cr███ M█████ |
| 97 | M███ M████ L██ | 4/20/2020 | 4/23/2020 | Terminate Associate > Involuntary > Rules Violation | 187c - Jet Seasonal Warehouse Associate | Seasonal | Company (Doug McMillon) >> QC Singles - Front (B███ D████) | B██ D████ |
| 98 | M████ M█████ | 5/4/2020 | 5/12/2020 | Terminate Associate > Involuntary > Rules Violation | 187c - Jet Seasonal Warehouse Associate | Seasonal | Company (Doug McMillon) >> QC Singles - Front (David Whitenack) | David Whitenack |
| 99 | C████ H██ | 5/1/2020 | 5/13/2020 | Terminate Associate > Involuntary > Rules Violation | 187c - Jet Seasonal Warehouse Associate | Seasonal | Company (Doug McMillon) >> Picking Singles - Front (Brady Kells) | Brady Kells |
| 100 | J███ J█ | 5/15/2020 | 5/28/2020 | Terminate Associate > Involuntary > Rules Violation | 187c - Seasonal Warehouse Associate | Seasonal | Company (Doug McMillon) >> QC Singles - Back (C████ M█████) | C████ M█████ |
| 101 | K████ F█ | 10/19/2020 | 10/30/2020 | Terminate Associate > Involuntary > Rules Violation | 187c - Seasonal Warehouse Associate | Seasonal | Company (Doug McMillon) >> Putaway (K██ M████) | Ka██ M████ |
| 102 | R████ W██ | 8/15/2018 | 8/15/2018 | Terminate Associate > Involuntary > Safety | 187 - Associate - Supply Chain & Fulfillment | Seasonal | Company (Doug McMillon) >> JetFlex Trainees (T██ D████) | T██ D████ |
| 103 | A███ K█ | 5/15/2019 | 5/30/2019 | Terminate Associate > Involuntary > Safety | 187 - Associate - Supply Chain & Fulfillment | Seasonal | Company (Doug McMillon) >> Picking- Back (J█ H█) | J█████ H█ |
| 104 | Z████ P█ | 5/15/2019 | 6/7/2019 | Terminate Associate > Involuntary > Safety | 187 - Associate - Supply Chain & Fulfillment | Seasonal | Company (Doug McMillon) >> Picking- Back (J█ H█) | J█████ H█ |
| 105 | W███ C█ | 3/23/2020 | 4/7/2020 | Terminate Associate > Involuntary > Safety | 187c - Jet Seasonal Warehouse Associate | Seasonal | Company (Doug McMillon) >> Picking- Back (S██ S█) | S██ S█ |
| 106 | E████ G████ | 3/30/2020 | 4/30/2020 | Terminate Associate > Involuntary > Safety | 187c - Jet Seasonal Warehouse Associate | Seasonal | Company (Doug McMillon) >> Dock- Back (D██ M████) | Da██ M████ |
| 107 | B████ L█ | 5/15/2020 | 5/20/2020 | Terminate Associate > Involuntary > Safety | 187c - Seasonal Warehouse Associate | Seasonal | Company (Doug McMillon) >> QC Singles - Front (B███ D████) | B██ D████ |
| 108 | L███ S█ | 4/13/2020 | 7/23/2020 | Terminate Associate > Involuntary > Safety | 187c - Seasonal Warehouse Associate | Seasonal | Company (Doug McMillon) >> Picking- Front (Brady Kells) | Brady Kells |

Termination Details

**App-II**

**22**

CONFIDENTIAL; SUBJECT TO PROTECTIVE ORDER

|  | A | B | C | D | E | F | G | H |
|---|---|---|---|---|---|---|---|---|
| 109 | T█ T█████ | 10/24/2018 | 12/3/2018 | Terminate Associate > Involuntary > Theft | 187 - Associate - Supply Chain & Fulfillment | Seasonal | Company (Doug McMillon) >> Putaway (K███ M█████ | K█ M█████ |
| 110 | T█ C█████ | 11/19/2018 | 12/4/2018 | Terminate Associate > Involuntary > Theft | 187 - Associate - Supply Chain & Fulfillment | Seasonal | Company (Doug McMillon) >> QC- Front (J█████ P█████ | J█████ P█████ |
| 111 | J█ B█████ | 8/28/2019 | 10/11/2019 | Terminate Associate > Involuntary > Theft | 187 - Associate - Supply Chain & Fulfillment | Seasonal | Company (Doug McMillon) >> Picking Singles - Back (J██████ H█████ | J█████ H█████ |
| 112 | A█ M█████ | 5/6/2020 | 5/8/2020 | Terminate Associate > Involuntary > Theft | 187c - Jet Seasonal Warehouse Associate | Seasonal | Company (Doug McMillon) >> Picking Singles - Front (B██████ D█████ | B█████ D█████ |
| 113 | D█ K█████ | 3/26/2020 | 6/1/2020 | Terminate Associate > Involuntary > Theft | 187c - Seasonal Warehouse Associate | Seasonal | Company (Doug McMillon) >> QC Singles - Front (R█████ W█████ | R█████ W█████ |

Termination Details

**App-II**

**23**

CONFIDENTIAL;
SUBJECT TO PROTECTIVE ORDER

WM_Braxton_000187

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

_____

JANELL BRAXTON,

      Plaintiff,

v.

WALMART, INC.,

      Defendant.

Case No. 2:20-cv-02287

**DECLARATION OF CHELSEA DAVIDSON IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

_____

I, Chelsea Davidson, hereby declare and state as follows:

1.     My name is Chelsea Davidson.  I am over the age of 18 and have personal knowledge of the facts contained in this declaration.

2.     Since 2018, I have held the position of Senior Manager of Human Resources for Walmart's Edgerton, Kansas fulfillment center. I am the senior most human resource professional at the Walmart ecommerce fulfillment center in Edgerton, Kansas (the "Edgerton Facility").

3.     I am a custodian of the records for the Workday system that Walmart uses at its Edgerton Facility.

4.     Until December 2020, Workday was Walmart's human resource information system (HRIS) for the Edgerton Facility.  Workday is a computer database used to collect and store employment data about the associates including their personal information, date of hire, compensation, benefits, attendance, pay, discipline, supervisor, termination date and reasons for the termination among other information.

5.     I regularly ran reports of various human resource information from the Workday

system and relied on such reports as part of my job responsibilities.

6.      On February 18, 2021, I personally used Walmart's Workday system to generate the report called "Termination Details," Exhibit A to this declaration submitted in support of Defendant Walmart, Inc.'s ("Walmart") summary judgment brief.

7.      This document lists the 113 seasonal associates whom Walmart terminated from the Edgerton Facility between the months of March 1, 2017 and December 18, 2020, upon receiving a first written discipline.

8.      The information stored in Workday for associates at the Edgerton Facility, including the information contained in Exhibit A, is kept by me and other human resources personnel that I supervise (the "HR Department")  in the ordinary course of business at the Edgerton Facility. The HR Department has as part of their duties the obligation to record the facts in Workday at or near the time it occurs based on their personal knowledge.

9.      Among other points of data, the HR Department inputs the associate name, hire date, employment termination date, reason for termination, and supervisor.

10.      Specifically, until Walmart stopped using Workday in December 2020, the HR Department recorded in Workday include each instance of regular and seasonal associate terminations and the reason for the termination as well as date and supervisor. Walmart discharged from employment all seasonal associates at the Edgerton, Kansas facility upon their receiving a first written discipline.

11.      Exhibit A is one type of report that I regularly ran from the Workday system and relied upon as part of my work duties at the Edgerton Facility.

12.      To preserve the confidentiality of its associates, Walmart redacted the

2

EXHIBIT

P

names of all associates listed in Exhibit A who are not involved in the instant lawsuit.

*I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.*

      Executed this ⸱⸱⸱ day of June 2021.

                                   CHELSEA DAVIDSON

**App-II**
**26**

| wmw670e | 11/15/2019 | PDF | wmw670e.pdf | Acknowledgment | Janell Braxton (Terminated) | 03/20/2020 11:07:30 PM | I acknowledge that I've read this entire agreement and agree to comply with its terms.<br><br>I agree that this agreement is effective on and after the first day of my employment with Jet. |
| wmw0770e | 11/15/2019 | PDF | wmw0770e.pdf | Acknowledgment | Janell Braxton (Terminated) | 03/20/2020 11:07:30 PM | I acknowledge that I've read this entire agreement and agree to comply with its terms.<br><br>I agree that this agreement is effective on and after the first day of my employment with Jet. |
| wmw0763e | 11/15/2019 | PDF | wmw0763e.pdf | Acknowledgment | Janell Braxton (Terminated) | 03/20/2020 11:07:30 PM | I acknowledge that I've read this entire agreement and agree to comply with its terms.<br><br>I agree that this agreement is effective on and after the first day of my |

**App-II**

27

```
EXHIBIT
Q
```

# Conduct Disciplinary Action Guidelines

**_Quick Coach_**
- **Quick Coach conversations are initial conversations about conduct concerns**
    - A verbal conversation about current state and conduct expectations should occur
    - Manager should document this conversation immediately in Workday
    - If conduct issues continue, proceed to next level of disciplinary action
    - **** Jetflex and Jet Seasonal should be terminated when their coaching has progressed to a formal written

**_First Written_**
- **Any conduct that does not meet expectations warrants a conversation**
    - _Documented conversation about current state and minimum expectations should occur_
    - _Manager should document this conversation as **First Written** in Workday_
    - _A First Written will remain active for 6 months_

**_Second Written_**
- **Conduct has continued to be below expectations since the First Written**
    - _Documented conversation about current state and minimum expectations should occur_
    - _Manager should document this conversation as **Second Written** in Workday_
    - _A Second Written will remain active for six months_
    - _Any associate on a Second Written is not considered to be in good standing, and therefore ineligible for transfer or promotion for six months following_

**_Third Written (Final)_**
- **Conduct has continued to be below expectations since the last coaching or conduct is severe enough to begin at Final**
    - _Documented conversation about current state and minimum expectations should occur_
    - _Manager should document this conversation as a **Final** in Workday/Form.com_
    - _The Final will remain active for six months_
    - _Any associate on a Final is not considered to be in good standing, and therefore ineligible for transfer or promotion for six months following_
    - _An associate with two active Finals will be terminated_



EXHIBIT
R

WM_Braxton_000102

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

JANELL BRAXTON )
        *Plaintiff* )
      v. )    Case No. 2:20-cv-02287
     )
WALMART, INC. )
        *Defendant* )

## PLAINTIFF'S RESPONSE TO
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

    COMES NOW Plaintiff Janell Braxton, providing the following facts, arguments, and

authorities to show why Defendant's *Motion for Summary Judgment* (Doc. 94), should be

DENIED.

### SUBMITTED BY:

Kenneth D. Kinney – D.Kan. #78544
Thomas F. Ralston – D.Kan. #
RALSTON KINNEY, LLC
4717 Grand Avenue, Suite 300
Kansas City, Missouri 64112
Telephone: (816) 298-0086
Fax: (816) 2978-9455
Email: ken@rklawllc.com
Email: tom@rklawllc.com

### ATTORNEYS FOR PLAINTIFF

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ...................................................................................................................1

LEGAL STANDARD.............................................................................................................2

PLAINTIFF'S RESPONSES TO WALMART'S STATEMENT OF MATERIAL FACTS ........3

PLAINTIFF'S STATEMENT OF ADDITIONAL MATERIAL FACTS ...................................25

ARGUMENT AND AUTHORITIES ......................................................................................42

CONCLUSION......................................................................................................................59

## INTRODUCTION

Kansas law protects the public policy established by the legislature by making it illegal to fire employees who engage in certain behaviors. It is illegal to fire an employee for suffering a workplace injury, reporting it, seeking medical treatment, or for claiming workers' compensation. Firing an employee for any of these reasons undermines the public policy of protecting workers' compensation rights. An employer who interferes with these rights by firing an employee has broken the law. That is precisely what Walmart did in this case.

Walmart fired Plaintiff approximately thirty minutes after she filled out a Statement Form describing her workplace injury – on a form that said Plaintiff would not be retaliated against. All three Walmart employees involved in the decision to fire Plaintiff agree they would not have fired her if she did not suffer a workplace injury or report it. That is precisely what the law forbids. These same three Walmart employees wholly disregarded several policies they were required to follow in response to learning an employee has become injured.

Walmart refused to offer Plaintiff medical treatment, to record her workplace injury, to report her injury to the State, to investigate the injury, to complete the required paperwork, and to provide Plaintiff documents about her rights. Instead of following the policies and laws that protect workers' compensation rights, Walmart exercised its discretionary right to issue discipline. But instead of issuing the level of discipline required by Walmart policy, they fired her. Walmart fired Plaintiff for allegedly not timely reporting her workplace injury (even though she did timely report it) despite knowing it never trained her on when to report a workplace injury, what constitutes a workplace injury, or who to report it to. Based on the evidence, a jury could find that the reason Walmart disregarded its own policies was to prevent Plaintiff from exercising her workers' compensation rights. Accordingly, Walmart's Motion should be DENIED.

## **LEGAL STANDARD**

Summary judgment is only proper where there are no disputed material facts and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). When deciding a summary judgment motion, the Court must adhere to the "fundamental principle[s]" that govern the analysis. *Tolan v. Cotton*, 134 S.Ct. 1861, 1863; 1868 (U.S. 2014). Failure to do so warrants reversal. *See id.*

To obtain summary judgment, the movant must prove all its material facts are undisputed. *Golleher v. Aerospace Dist. Lodge*, 122 F. Supp.2d 1053, 1056 (8th Cir. 2000). When evaluating the facts, the Court "may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000). All the evidence must be viewed in favor of the non-moving party. *Tolan*, 134 S.Ct. at 1866. All "the evidence of the nonmovant [must] be believed" and every "justifiable inference" must be drawn in the nonmovant's favor. *Id.* at 1863. Conversely, inferences in movant's favor are forbidden. *See id.* at 1866-67 (discussing inferences the trial court impermissibly drew in movant's favor).

The Court should be cautious of granting summary judgment based on testimony from interested witnesses. *Reeves*, 530 U.S. at 151. Any evidence favoring Walmart that a jury *might* not believe must be disregarded, such as evidence that is contradicted, impeached, or comes solely from interested witnesses. *See id.* Ultimately, summary judgment must be denied when the evidence and inferences drawn therefrom *could* allow a reasonable jury to return a verdict for the plaintiff. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Under this framework, Walmart is not entitled to summary judgment. The material facts Walmart relies on are disputed, and Plaintiff's additional facts show a countervailing story, upon which a jury could find Walmart broke the law as alleged by Plaintiff.

<u>**PLAINTIFF'S RESPONSES TO WALMART'S STATEMENT OF MATERIAL FACTS**</u>

      A.     <u>**Walmart Employs Braxton as a Seasonal Associate**</u>

      1.     Walmart hired Braxton in March 2020, to work at its facility in Edgerton, Kansas. (Ex. A, Deposition of Janell Braxton at 11:16-18, 12:9-11).

**RESPONSE: UNCONTROVERTED.**

      2.     The Edgerton facility is associated with Jet.com, a company Walmart owns. *(Id.* at 12:1-8; Ex. B, Deposition of Quincy Usry at 126:5-7).

**RESPONSE: UNCONTROVERTED.**

      3.     Braxton's first day of work was March 23, 2020. (Ex. A, Braxton Depo. at 26:3-6).

**RESPONSE: UNCONTROVERTED.**

      4.     She worked as a QC Singles Associate. *(Id.* at 26:7-10).

**RESPONSE: UNCONTROVERTED.**

      a.   **Plaintiff's job title was "Associate, Warehouse Fulfillment."** *See Exhibit 1***, Job Description, WM_Braxton_000132-33, Depo. Ex.21;** *See also Exhibit 2***, Deposition of Janelle Braxton, 28:3-11; 29:20-24.**

      5.     Braxton worked in a warehouse and helped to ship customer orders. Her job involved taking products to her work station, scanning the products  on a computer system, packaging those products and placing them on a conveyor belt. *(Id.* at 26:17-22; 31:25-32:4).

**RESPONSE: UNCONTROVERTED.**

      6.     Braxton was a seasonal associate. *(Id.* at 26:23-25).

**RESPONSE: UNCONTROVERTED.**

      7.     Braxton was hired as a seasonal associate on a temporary basis due to a surge of customer demand.  As a seasonal associate, Braxton had no guarantee of regular employment. *(Id.* at 27:6-20).

**RESPONSE: CONTROVERTED IN PART, and IMMATERIAL.**

a. **Plaintiff was initially hired because Defendant's business (online shopping) was growing due to coronavirus. Although Plaintiff was not guaranteed permanent employment, she was told if she performed well, then "more than likely you would be able to stay and become permanent." *Exhibit 2*, 27:16-20.**

b. **Plaintiff intended on working until she became a permanent employee. *Exhibit 2*, 27:25 – 28:2.**

c. **It is IMMATERIAL that Plaintiff's employment was at-will, *i.e.,* not guaranteed for a fixed duration.**

   **The doctrine of retaliatory discharge is an exception to the at-will employment doctrine. *See Murphy v. City of Topeka-Shawnee County Dept. of Labor Servs.,* 630 P.2d 186, 189 (Kan.App. 1981). The doctrine makes it illegal for an employer to fire an employee for suffering a workplace injury that might lead to a workers' compensation claim in the future. *See Pilcher v. Bd. of Cnty. Comm'rs of Wyandotte Cnty.*, 787 P.2d 1204, 1211 (Kan.App.1990). Therefore, Plaintiff's status as an at-will employee is not a defense to a claim of retaliatory discharge.**

8.      Braxton worked an overnight shift that began at 6:30 p.m. and ended at 5:00 a.m. *(Id.* at 32:18-22).

**RESPONSE: UNCONTROVERTED.**

9.      Walmart maintained a safety cubicle in the middle of the Edgerton facility, which associates could go to if they required first aid or needed safety-related assistance.*(Id.* at 34:11-25).

**RESPONSE: UNCONTROVERTED.**

10.      Braxton knew that she was supposed to visit the safety cubicle if she required medical attention. *(Id.* at 36:18-21).

**RESPONSE: UNCONTROVERTED.**

11.      She also knew that she could go to the safety cubicle on her own, even if her manager had not instructed her to do so.  *(Id.* at 36:22-25).

**RESPONSE: UNCONTROVERTED.**

B.      **Braxton Suffers a Wrist Injury on April 13**

12.      Braxton worked three consecutive shifts, on April 12 through April 15, 2020. *(Id.*

at 39:4-12).

**RESPONSE: UNCONTROVERTED.**

13.      On April 12, 2020, (a Sunday) she arrived for her shift at around 6:10 p.m. or 6:20

p.m.  *(Id.* at 46:8-11).

**RESPONSE: UNCONTROVERTED.**

   a.  **Braxton clocked into work at 6:26 PM on April 13, 2020.** *Exhibit 3***, Employee Activity, WM_Braxton_000106; Depo.Ex.27.**

14.      Braxton started to work.   Then, at about 1:00 a.m. on the morning of April 13,

2020, Braxton felt throbbing pain in her left wrist. *(Id.* at 48:12-23).

**RESPONSE: UNCONTROVERTED.**

   a.  **Notably, Walmart previously denied this fact.** *See Exhibit 9, Defendant's Response to Plaintiff's First Requests for Admission***, ¶9 (denying "At approximately 1:00 AM on April 13, 2020, Janell Braxton began experiencing pain in her left wrist."). This inconsistency should be considered when assessing whether Walmart is credible.**

15.      The throbbing pain got progressively worse as Braxton continued to work. *(Id.*

at 51:1-5).

**RESPONSE: UNCONTROVERTED.**

16.      According to Braxton, at about 5:00 a.m., which was the end of her shift, Braxton's

manager, Ammie Wilbur ("Wilbur"), came over to Braxton to praise her for doing a good job during

the shift.  Braxton claims that she told Wilbur her wrist was hurting. *(Id.* at 51:17-23).

**RESPONSE: CONTROVERTED due to Walmart's mischaracterization of the testimony cited.**

   a.  **On April 13, 2020, Plaintiff told her Manager, Ammie Wilbur that her wrist was really hurting her.** *Exhibit 2***, 51:21-23.**

   b.  **Plaintiff's testimony is not a "claim" – it must be accepted as true for purposes of**

summary judgment. ***Tolan v. Cotton***, 134 S.Ct. 1861, 1863 (U.S. 2014) ("The evidence of the nonmovant is to be believed…").

17.     Braxton says she did not elaborate on why her wrist was hurting, did not say that she had injured her wrist earlier in the shift, and did not ask to visit the safety cubicle.*(Id.* at 53:1-7).

**RESPONSE: UNCONTROVERTED IN PART.**

   a.  **Walmart's suggestions that Braxton "did not say that she had injured her wrist earlier in the shift" is not supported by the cited testimony. *Exhibit 2*, 53:1-7. Walmart might believe that is a reasonable inference from the testimony - but drawing inferences in favor of Walmart is forbidden. *See Tolan v. Cotton*, 572 U.S. 650, 660 (2014).**

18.     Braxton likewise had not visited the safety cubicle during the four hour period between when her wrist started hurting at 1:00 a.m. on April 13, and when she allegedly spoke to Wilbur at 5:00 a.m.  *(Id.* at 53:12-16).

**RESPONSE: UNCONTROVERTED.**

19.     Wilbur denies that Braxton reported the wrist pain to her at the end of the April 12-13 shift.  (Ex. C, Wilbur Dep. at 16:4-7; 18:15-17).

**RESPONSE: Wilbur's denial is CONTROVERTED. Whether Plaintiff reported her wrist pain to Wilbur on April 13, 2020 is a genuinely disputed material fact.**

   a.  **On April 13, 2020, Plaintiff told Ammie Wilbur her wrist was hurting. *Exhibit 2*, 51:12-23; 53:1-4.**

   b.  **The Court should not rely on self-serving testimony from an interested witnesses in ruling on summary judgment. *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 151 (2000). Wilbur has a self-serving motive to deny the fact of Braxton's initial report of injury to her.**

      i.  **According to Walmart, Plaintiff was fired for not reporting a workplace injury to management during the same shift in which it occurred. *Exhibit 4*, Deposition of Walmart (Usry – 04/30/2021), 37:6-9; 39:1-10; 39:15-18; *see also Exhibit 5*, WMV-763e, Depo.Ex.25.**

      ii.  **According to Walmart, Ammie Wilbur had a duty under Walmart policy to**

**report known workplace injuries, even if the injury happened to someone else, and if Wilbur did not report a known injury during the same shift learned of it, Wilbur would be subject to discipline. *Exhibit 4*, Deposition of Walmart (Usry – 04/30/2021), 40:7-16; 40:23 – 41:1; 41:7-10; 52:5-8; 52:16-24.**

20.     Braxton finished working and went to her boyfriend's home after her shift ended.

(Ex. A, Braxton Depo. at 56:12-20).

**RESPONSE: UNCONTROVERTED.**

21.     She reported for her next shift, which began on the evening of Monday, April 13

and ended on April 14. *(Id.* at 57:14-18).

**RESPONSE: UNCONTROVERTED.**

22.     Her wrist was still hurting at this point. *(Id.* at 58:21-24).

**RESPONSE: UNCONTROVERTED.**

23.     At the beginning of this shift, Braxton claims that she told a manager that her wrist

was hurting. *(Id.* at 61:17-20).

**RESPONSE: CONTROVERTED due to Walmart's mischaracterization of the testimony.**

  a. **At the beginning of her evening shift on April 13, 2020, Plaintiff told the Manager on duty (which was either Ammie Wilbur or another female employee) that her wrist was still hurting. *Exhibit 2*, 59:13-20; 61:5-24).**

  b. **Plaintiff's testimony is not a "claim" – it must be accepted as true for purposes of summary judgment. *Tolan v. Cotton*, 134 S.Ct. 1861, 1863 (U.S. 2014) ("The evidence of the nonmovant is to be believed…").**

24.     Braxton did not visit the safety cubicle during the April 13-14 shift. *(Id.* at 64:22-65:2).

**RESPONSE: UNCONTROVERTED.**

25.     Braxton completed this shift, and then went to her boyfriend's house. *(Id.* at 66:20-67:1).

**RESPONSE: UNCONTROVERTED.**

### C.   __Walmart Terminates Braxton's Employment__

26.    Braxton next reported to work for her April 14-15, 2020 shift. *(Id.* at 68:20- 22).

**RESPONSE: UNCONTROVERTED.**

27.    About two or two and a half hours into her shift, Braxton approached Wilbur to talk about her wrist pain.  *(Id.* at 72:11-73:7).

**RESPONSE: UNCONTROVERTED.**

28.    Braxton asked if she could get a brace or a wrap to help with the pain.  *(Id.* at 75:5-14).

**RESPONSE: UNCONTROVERTED.**

29.    Wilbur told Braxton to go to the safety cubicle. *(Id.* at 73:8-10).

**RESPONSE: UNCONTROVERTED.**

30.    Braxton went to the safety cubicle and spoke with the safety associate stationed there. *(Id.* at 77:1-4).

**RESPONSE: UNCONTROVERTED.**

31.    She asked the safety associate whether he had a wrap or brace for her wrist. *(Id.* at 77:21-24).

**RESPONSE: UNCONTROVERTED.**

32.    The safety associate told Braxton that he did not have a wrap or brace, and instead gave her ointment to put on her wrist. *(Id.* at 78:2-11).

**RESPONSE: UNCONTROVERTED.**

33.    Braxton returned to her station at 9:10 p.m. *(Id.* at 81:9-16).

**RESPONSE: UNCONTROVERTED.**

34.    At about 10:34 p.m., Braxton had another conversation with Wilbur, in which

Wilbur asked Braxton whether she thought her wrist pain was due to something that happened at work. Braxton said yes. *(Id.* at 83:24-84:13).

**RESPONSE: UNCONTROVERTED.**

35.    After this conversation, Wilbur reported what Braxton had told her to David Whitenack ("Whitenack"), an Operations Manager whose job duties involved supervising other managers and overseeing the Edgerton facility. (Ex. D, Deposition of David Whitenack at 8:22, 9:15-19, 79:2-7).

**RESPONSE: UNCONTROVERTED.**

36.    Then, Whitenack, whom Braxton did not know, came to her work station, and asked her how she had hurt her wrist. (Ex. A, Braxton Dep. at 86:1-16; 87:2-9). Braxton responded that she had been doing her job duties, and realized her wrist was hurting.  (*Id.* at 87:7-9).

**RESPONSE: UNCONTROVERTED.**

37.    Braxton logged off from her work station at 10:54 p.m., and Whitenack escorted Braxton to the safety cubicle.  *(Id.* at 88:8-10; 89:18-21).

**RESPONSE: UNCONTROVERTED.**

38.    At the safety cubicle, Whitenack asked Braxton to fill out a statement to record "everything [she] was feeling, that was going on with [her] wrist." *(Id.* at 90:19- 91:1).

**RESPONSE: CONTROVERTED in part.**

> a.   **In addition to handing her a blank form to fill out, Whitenack also asked Plaintiff to fill out an "incident report."** *Exhibit 2*, **90:21-23; 91:2-5.**

39.    Whitenack told Braxton to write down when she suffered her injury and when and to whom she reported it. (Ex. D, Whitenack Dep. at 79:24-80:3).

**RESPONSE: CONTROVERTED. There is no evidence that Whitenack gave these specific instructions to Plaintiff when he handed her the blank statement form.**

> a.   **Whitenack did <u>not</u> ask Plaintiff whether she had told anyone else about her workplace**

injury. *Exhibit 2*, 87:18-21.

b.  According to Plaintiff, when Whitenack asked Plaintiff to write on the blank Statement Form, he told her "to write down everything that [she] was feeling, that was going on with [her] wrist." *Exhibit 2*, 90:21 – 91:1; *see also* SOF ¶38.

c.  The first time Whitenack testified on this subject matter, he said, "I asked her to write down what date and time she recalled experiencing the pain." *Exhibit 6,* Whitenack Depo., 49:16-20. He did not say he asked Plaintiff to write down who she first reported it to or when she first reported it.

d.  The Statement Form Plaintiff filled out includes the information that she claims she was asked to include (everything she was feeling) and the information Whitenack initially said he asked Plaintiff to include (what date and time the pain started). *See Exhibit 14*, Statement Form 4-14-2020 (Depo.Ex.40). Notably, the Statement Form does not say anything about when Plaintiff first reported it, to whom she first reported it. *Id.*

Therefore, it is reasonable to infer that Plaintiff's testimony and Whitenack's initial testimony is accurate – Whitenack did <u>not</u> ask Plaintiff to record on the Statement Form when and to whom she previously reported the injury.

e.  Even on cross-examination, in response to a question from Walmart's attorney, Walmart's Operations Manager Whitenack did <u>not</u> testify that he gave Plaintiff these specific instructions. Instead, Whitenack said his general practice was to ask that question. *See Exhibit 6*, 75:4-5; 80:1-3.

Whitenack's testimony about his general practice is controverted by Plaintiff's testimony, Whitenack's testimony about his specific conversation with Plaintiff, and by the contents of the Statement Form filled out by Plaintiff.

40.     In her statement, Braxton wrote as follows:

On Monday morning [i.e., April 13] I noticed that my wrist began to ache. It progressed to throbbing pain and by the time I left at 5:00 am it was excruciating. I took a 500mg Tylenol & went to sleep. It is swollen & sometimes feels warm to the touch. There is a little bruising. It is hard for me to work fast when putting items in the mailers & it hurts to pick up semi heavy items with that wrist. I can only pick up the totes if they are partially full. It is my left wrist that is injured. I am trying not to use it. The pain progresses throughout the shift.

(Ex. G, Braxton Dep. Exhibit 28); (Ex. A, Braxton Dep. at 92:10-21) (authenticating this exhibit).

**RESPONSE: UNCONTROVERTED.**

41.     In her statement, Braxton did not mention reporting the wrist injury to Wilbur the same shift it occurred. (See, generally, id.).

**RESPONSE: UNCONTROVERTED.**

42.     Braxton handed the statement to Whitenack, who thanked her and told her he would be back soon. He then walked away from the safety cubicle. (Ex. A, Braxton Dep. at 103:9-12; 104:1-6).

**RESPONSE: UNCONTROVERTED.**

43.     Whitenack understood Braxton's statement to mean that she had failed to report a workplace injury during the same shift in which it occurred. (Ex. D, Whitenack Dep. at 14:12-14).

**RESPONSE: CONTROVERTED.** *See SOF ¶39(a-f).*

**a.  Whitenack did not ask Plaintiff whether she had previously reported her workplace injury. *Exhibit 2*, 87:18-21.**

**b.  Whitenack's alleged understanding is based on the Statement Form given to him by Plaintiff. *Exhibit 6*, 14:12-14. His alleged understanding has no factual basis and is therefore not credible.**

**c.  Plaintiff's Statement Form does not say anything about when Plaintiff first reported her injury, to whom she first reported the injury, or whether she previously reported her workplace injury. *Exhibit 6*, 49:12-15; *Exhibit 14*, Statement Form. It is reasonable to infer the Statement Form does not say these things because Whitenack did <u>not</u> ask Plaintiff to include them in her statement. *See SOF ¶39(a-f).***

**d.  The Statement Form did not ask Plaintiff to write down who she first reported the pain to, so she did not write down to whom she first reported. *Exhibit 6*, 50:10-17.**

**e.  Whitenack "asked [Plaintiff] to write down what date and time she recalled experiencing the pain." *Exhibit 6*, 49:19-20.**

**f.  When Whitenack gave Plaintiff the blank form, "he told [Plaintiff] to write down everything [she] was feeling, that was going on with [her] wrist." *Exhibit 2*, 90:19 – 91:1. Whitenack did not ask Plaintiff to write down who she first reported the injury to.**

**g.  Walmart has a separate form, called an "Incident Report," that according to Walmart company policy, is required to be given to an injured worker after Walmart learns of an injury. *See Exhibit 4*, Deposition of Walmart (Usry – 4/30/21), 89:22-90:8;**

*Exhibit 15*, Incident Report (Depo. Ex. 40).

h. According to Walmart, it <u>did not</u> ask Plaintiff to fill out an Incident Report even though doing that was mandatory under company policy. *Exhibit 4*, 90:12-24.

i. According to Plaintiff, Walmart <u>did</u> ask her to fill out an "incident report." *Exhibit 2*, 86:4-8; 90:19-23; 91:2-5.

j. The Incident Report form asks for specific information, including when and to whom the injury was first reported. *Exhibit 4*, Deposition of Walmart, 91:19-92:6; *Exhibit 15*.

44.     Whitenack shared Braxton's statement with Quincy Usry, the Environmental Health and Safety Operations Manager ("Usry") and Morgan Medaris, a Human Resources Coordinator ("Medaris"). *(Id.* at 15:10-18; Ex. B, Usry Dep. at 7:7-8).

**RESPONSE: UNCONTROVERTED.**

45.     Walmart has a company policy, Policy 670e, that requires associates to report "any known injury before the end of the shift" in which the injury was suffered. Failure to do so results in a First Written formal disciplinary action. (Ex. H, Braxton Dep. Exhibit 24).

**RESPONSE: CONTROVERTED. These assertions are not supported by the citation, and are controverted by other evidence.**

a. The document called 670e is not a "policy" but rather it is a "Safety and Compliance Rule Violation Form" that is a template that is supposed to be used to issue safety violations to employees. *Exhibit 4*, Walmart Deposition (Usry) 46:11-21, 50:5-8; *Exhibit 6,* Whitenack Deposition, 21:18-22:14; *Exhibit 7,* Form WMW-670e, Depo.Ex.11 (same as Dep.Ex.24).

b. The Form 670e does not state that failure to report any known injury before the end of the shift "results in a First Written formal disciplinary action." *See Exhibit 7*, Form WMW-670e.

c. The phrase "First Written" does not appear on Form 670e. *Exhibit 7*.

d. The phrase "formal disciplinary action" does not appear on Form 670e. *Exhibit 7*.

e. According to Chelsea Davidson, Walmart's Senior Manager of Human Resources for the Edgerton Fulfillment Center, who is the highest-ranking Human Resources employee at Walmart's facility in Edgerton, Kansas, that facility <u>does not even use</u>

Form 670e. *Exhibit 8*, 8:16 - 9:3; 43:3-23; 44:14-17; 44:21-23.

f. **According to Chelsea Davidson, Walmart's Edgerton Fulfillment Center has <u>never</u> used Form 670e. *Exhibit 8*, 45:6-9, 19-23.**

g. **Form 670e does not state an employee can be fired for failing to report a known injury by the end of the shift. *Exhibit 4*, 49:20-23; *Exhibit 7*.**

46.     Walmart also maintained a second policy, Policy 763e, which stated inpertinent part: "All known injuries, no matter how slight, will be reported to a member of management immediately. At a minimum, these must be reported to a member of management by the end of the shift." (Ex. I at 1, Braxton Dep. Exhibit 25).

**RESPONSE: UNCONTROVERTED that Walmart maintained a written policy called WMW-763e that contained that language.**

a. **Under Walmart's policies, an injury and soreness are not considered the same thing. *Exhibit 4*, Deposition of Walmart, 66:7-10.**

b. **Policy 763e does not define "injuries." *Exhibit 4*, Deposition of Walmart, 39:23-40:2; *Exhibit 5*, Policy 763e (Depo.Ex.25).**

c. **Regular soreness from doing your job does not count as an injury incident under Walmart company policy. *Exhibit 4*, 77:10-78:1.**

d. **Walmart recognizes that an injury might not be apparent when soreness first appears. *Exhibit 4*, 79:4-6.**

e. **Policy 763e does not require an employee to report soreness. *Exhibit 4*, 44:19-24.**

47.     These policies exist so that Walmart can investigate the cause of an associate's injury, and make sure that whatever caused the injury does not harm other associates. (Ex. D, Whitenack Dep. at 103:6-10).

**RESPONSE: CONTROVERTED. The testimony cited by Walmart for this proposition comes from a witness who admitted he lacked personal knowledge of this subject matter.**

a. **David Whitenack testified that he has no personal knowledge as to why Walmart created the rules at issue in this case. *Exhibit 6*, 102:8-21.**

b. **When asked whether he could explain why Walmart has these rules, Whitenack said, "I could only speculate as to why." *Exhibit 6*, 102:19-21.**

    **c.** **This assertion is also controverted by Whitenack's actions – he did not investigate the cause of Plaintiff's injury when he found out about it.** *Exhibit 6*, **103:11-13.**

48.    Braxton had an opportunity to review both of these policies at the outset of her employment, and on March 20, 2020, at 11:07:30 p.m., she electronically acknowledged  that she had read each policy, and agreed to abide by them. (Ex. Q, WM_Braxton_000176); (Ex. E, Medaris Dep. at 84:9-22) (authenticating Braxton's electronic acknowledgment).

**RESPONSE: CONTROVERTED.**

    **a.** **Form 670e is not a policy.** *See* **SOF ¶45(a-f).**

    **b.** **Plaintiff's employment did not start until March 23, 2020.** *Exhibit 9, Defendant's Answers to Plaintiff's First Set of Requests for Admissions*, **¶1.**

    **c.** **On March 20, 2020, Plaintiff acknowledged policies on her cell phone because she was instructed to review the policies before she showed up for her first day of work, but the documents did not populate or open on her phone so she was not able to review them.** *Exhibit 2*, **18:14-22; 19:13 – 20:10; 28:20-25.**

    **d.** **Walmart's Policy 763e (Deposition Exhibit 25) does not inform employees that they can be fired for not reporting a workplace injury by the end of the shift.** *Exhibit 4*, **41:16-19; 42:1-5;** *Exhibit 5* **(Policy 763e, Depo.Ex.25).**

    **e.** **Walmart's Policy 763e does not inform employees that they can be disciplined in any way for not reporting a workplace injury by the end of the shift.** *Exhibit 4*, **41:20-24.**

    **f.** **Walmart's Policy 763e does not inform employees that they can be fired for failing to report routine soreness during a shift in which the soreness first becomes apparent.** *Exhibit 4*, **46:2-6.**

    **g.** **Walmart's Form 670e does not inform employees that they can be fired for failing to report a known injury before the end of a shift.** *Exhibit 4*, **49:20-23;** *Exhibit 7* **(Form 670e, Depo.Ex.11).**

49.    Walmart also maintained a written Conduct Disciplinary Action Guidelines, which stated in relevant part that "Jet Seasonal [associates] should be terminated when their coaching has progressed to a formal written."  (Ex. R, WM_Braxton_000102); (Ex. E, Medaris Dep. at 78:25-79:18) (authenticating the Conduct Disciplinary Action Guidelines, and discussing how they

mandated Braxton's termination).

**RESPONSE: CONTROVERTED.**

    **a.** **The "JetFlex Disciplinary Guidelines" that were in place when Plaintiff was employed and applied to her employment with Walmart required that "A minimum of two Quick Coach conversations should occur before releasing a JetFlex associate for performance or conduct."** *Exhibit 6*, **Whitenack Deposition, 40:15-25; 41:20 – 42:7;** *Exhibit 10*, **JetFlex Disciplinary Guidelines, Depo. Ex. 37.**

    **b.** **Plaintiff never received a Quick Coach during her employment.** *Exhibit 6*, **42:8-12.**

    **c.** **During Plaintiff's employment, Walmart maintained a Policy regarding the company's response to workplace injuries that applied to all employees.** *Exhibit 4*, **Walmart Deposition (Usry), 68:7-69:4, 69:16-25;** *Exhibit 11, Dot Com Safety Policy* **(Depo.Ex.51).**

    **d.** **According to the Dot Com Policy that specifically applied to workplace injuries, whether to discipline employees who fail to immediately report a injury to management is a discretionary rule – issuing discipline is not mandatory.** *Exhibit 4, Walmart Deposition*, **112:9 – 114:18;** *Exhibit 11*.

    **e.** **If management exercises its discretion to issue discipline for an employee not timely reporting an injury incident, Walmart's mandatory Dot Com Safety Policy requires that the Form 670e be used to determine the appropriate level of discipline.** *Exhibit 4*, **115:13 – 117:5;** *Exhibit 11* **(Depo.Ex.51);** *Exhibit 7* **(Depo.Ex.11).**

    **f.** **A Form 670e was never completed for Plaintiff.** *Exhibit 4*, **117:6-8.**

    50.    Whitenack therefore texted Usry, who was not working at the time, and informed him that Braxton "said she hurt her wrist Sunday (doesn't know how) and didn't tell anyone." (Ex. J, Exhibit 7 to Whitenack Deposition).

**RESPONSE: UNCONTROVERTED that Whitenack sent that text message to Usry.**

    51.    Whitenack asked Usry "How long do they have to report? EOS [End of shift]?" *(Id.)*.

**RESPONSE: UNCONTROVERTED that Whitenack sent that in a text message.**

    52.    Usry texted back to ask for a copy of Braxton's statement, which Whitenack sent him and further sent a copy of the reporting language from 670e. *(Id.* at 2).

**RESPONSE: UNCONTROVERTED that Usry sent the texts appearing in Defendant's Exhibit J (Doc.95-11).**

> a. **CONTROVERTED that Usry "sent a copy of the reporting language from 670e" to Whitenack because no document has been produced showing that happened. Usry's text message says, "Awesome. Slacked you the line."** *See* **Defendant's Exhibit J (Doc.95-11), p.2. "Slack" is a messaging software used by Walmart for inter-office communications. But Walmart failed to produce any Slack messages in this case.**

53.      Whitenack asked, "Would she be termed with a written coaching?" *(Id.).*

**RESPONSE: CONTROVERTED. That text was sent by Usry.**

54.      Nowhere in these texts did Whitenack indicate a belief that Braxton had reported her wrist injury on the shift it happened.  *(See, generally, id.).*

**RESPONSE: UNCONTROVERTED but IMMATERIAL. It is unlawful for an employer in Kansas to fire an employee for suffering a workplace injury that might lead to a workers' compensation claim.** *See Pilcher v. Bd. of Cnty. Comm'rs of Wyandotte Cnty.***, 787 P.2d 1204, 1211 (Kan.App.1990).**

55.      About 15 minutes later, Whitenack returned to the safety cubicle, and took Braxton to the human resources office. (Ex. A, Braxton Dep. at 104:24-105:6).

**RESPONSE: UNCONTROVERTED.**

56.      In the human resources office, Braxton met with Whitenack and Medaris. (Id. at 105:7-9; Ex. E, Deposition of Morgan Medaris at 6:15-17).

**RESPONSE: UNCONTROVERTED.**

57.      Whitenack reminded Braxton about Walmart's policies, telling her that she should have reported her wrist injury shortly after it happened, and since she was a seasonal associate Walmart policy required that she be terminated for this infraction. (Ex.A, Braxton Dep. at 105:7-20).

**RESPONSE: UNCONTROVERTED that Walmart fired Plaintiff in close proximity to learning she was an injured worker who reported a workplace injury to Walmart.**

**The rest is CONTROVERTED.**

a. **CONTROVERTED that Whitenack "reminded" Plaintiff about anything – Plaintiff did not testify to that.** *See Exhibit 2*, **105:1-106:8.**

   i. **Whitenack told Plaintiff she should have reported her work injury "within 24 hours of having it."** *Exhibit 2*, **105:13-15.**

   ii. **The first time Walmart told Plaintiff she was required to report a workplace injury within 24 hours was when she was being fired.** *Exhibit 2*, **109:7-13.**

b. **Whitenack told Plaintiff they were firing her "to protect themselves."** *Exhibit 2*, **105:18-20.**

c. **Whitenack did not say Walmart's policy "required" Plaintiff to be fired.** *Exhibit 2*, **105:7-20.**

d. **Walmart's policy did not "require" Plaintiff to be fired.**

   i. **During Plaintiff's employment, Walmart maintained a Policy regarding the company's response to workplace injuries that applied to all employees.** *Exhibit 4*, **Walmart Deposition (Usry), 68:7-69:4, 69:16-25;** *Exhibit 11, Dot Com Safety Policy* **(Depo.Ex.51).**

   ii. **According to the Dot Com Policy that specifically applied to workplace injuries, whether to discipline employees who fails to immediately report an injury to management is** <u>discretionary</u> **– issuing discipline is** <u>not</u> **mandatory.** *Exhibit 4, Walmart Deposition*, **112:9 – 114:18;** *Exhibit 11*.

   iii. **If management exercises its discretion to issue discipline for an employee not timely reporting an injury incident, Walmart's mandatory Dot Com Safety Policy requires that the Form 670e be used to determine the appropriate level of discipline.** *Exhibit 4*, **115:13 – 117:5;** *Exhibit 11* **(Depo.Ex.51);** *Exhibit 7* **(Depo.Ex.11).**

   iv. **A Form 670e was never completed for Plaintiff.** *Exhibit 4*, **117:6-8. If a Form 670e would have been filled out as required by Walmart policy, Plaintiff would have received a "<u>Step 1</u>" Rule Violation and would have only been subject to termination if she repeated the same conduct within 180 calendar days.** *See Exhibit 7*, **Form 670e.**

58.      Braxton did not tell Whitenack or Medaris that she had reported her wrist injury to

Wilbur at the end of her April 12-13 shift.  *(Id.* at 108:22-109:1).

**RESPONSE: UNCONTROVERTED. Plaintiff was "completely confused" because she did not do anything wrong and once she realized she was being fired she became "real**

17
**App-II**

emotional." *Exhibit 2*, 105:21-25.

59.    Whitenack, Medaris and Usry made the decision to terminate Braxton, based on their belief that she had failed to comply with Policy 670e, and her status as a seasonal associate. (Ex. D, Whitenack Dep. at 20:3-6; 90:16-18; 97:13-14); (Ex. E, Medaris Dep. at 21:14-16; 23:5-9); (Ex. K, Declaration of Quincy Usry in Opposition to Pl's SJ at ¶¶ 6- 10).

**RESPONSE: CONTROVERTED.**

a.  **Operations Manager David Whitenack terminated Plaintiff because she was an injured worker who reported a workplace injury.**

   i.   **Whitenack admitted that if Plaintiff would have never told him that she was hurt at work, he would not have had a reason to fire her. *Exhibit 6*, Whitenack Depo. 74:21 – 75:1.**

   ii.  **Whitenack agreed that "if Ms. Braxton would have never reported her workplace injury to Walmart, there would have been no reason to fire her on April 14th, 2020." *Exhibit 6*, 91:7-12.**

b.  **Safety Manager Quincy Usry terminated Plaintiff because she was an injured worker who reported a workplace injury.**

   i.   **Usry admitted that Plaintiff would not have been fired on April 14, 2020 if she would not have reported her workplace injury. *Exhibit 12*, Usry Depo. 55:18-16:2.**

c.  **Human Resources Business Partner Morgan Medaris terminated Plaintiff because she was an injured worker who reported a workplace injury.**

   i.   **Medaris admitted that without knowledge of Plaintiff's injury report, Walmart would not have fired Plaintiff. *Exhibit 13*, Medaris Depo. 20:9-15.**

60.    At the time Walmart terminated Braxton's employment, Whitenack did not know that Braxton allegedly reported her wrist injury to Wilbur at the end of the April 12- 13 shift. (Ex. D, Whitenack Dep. at 77:17-20; 78:7-9).

**RESPONSE: CONTROVERTED and IMMATERIAL.**

a.  **IMMATERIAL because it is unlawful to fire an employee for suffering a workplace injury that might lead to a workers' compensation claim in the future. *See Pilcher v. Bd. of Cnty. Comm'rs of Wyandotte Cnty.*, 787 P.2d 1204, 1211 (Kan.App.1990).**

    **b.** **Whitenack knew Plaintiff was suffered a workplace injury approximately 30 minutes before he fired her.** *Exhibit 6*, **14:16-23; 15:25-16:4.**

    **c.** **Whitenack never asked Plaintiff whether she reported the workplace injury to anyone else.** *Exhibit 2*, **87:18-21; 111:18-23.**

    **d.** **Whitenack did ask Plaintiff to fill out an Incident Report.** *Exhibit 2*, **90:21-23; 91:2-5.**

    **e.** **The Incident Report asks when the injury when and to whom the injury was first reported.** *Exhibit 15*.

61.    At the time Walmart terminated Braxton's employment, Medaris did not know that Braxton allegedly reported her wrist injury to Wilbur at the end of the April 12-13 shift.(Ex. L, Declaration of Morgan Medaris in Opposition to Pl's SJ at ,¶¶ 5-6).

**RESPONSE: CONTROVERTED and IMMATERIAL.** *See* **SOF ¶60(a-e).**

62.    At the time Walmart terminated Braxton's employment, Usry did not know that Braxton allegedly reported her wrist injury to Wilbur at the end of the April 12-13 shift.(Ex. K, Declaration of Quincy Usry in Opposition to Pl's SJ at , ¶¶ 5-7).

**RESPONSE: CONTROVERTED and IMMATERIAL.** *See* **SOF ¶60(a-e).**

63.    Whitenack testified at deposition that Walmart made the decision to fire Braxton because she violated Policy 670e, and that he was not trying to prevent her from exercising her rights under the workers' compensation system.  (Ex. D, Whitenack Dep. at 20:3-6; 90:16-18).

**RESPONSE: Both assertions are CONTROVERTED.**

    **a.** **First, Walmart terminated Plaintiff because she was an injured worker who reported a workplace injury.**

        **i.** **Operations Manager David Whitenack admitted that if Plaintiff would have never told him she was hurt at work, he would not have had a reason to fire her.** *Exhibit 6*, **Whitenack Depo. 74:21 – 75:1.**

        **ii.** **Whitenack agreed that "if Ms. Braxton would have never reported her workplace injury to Walmart, there would have been no reason to fire her on April 14th, 2020."** *Exhibit 6*, **91:7-12.**

iii.   **Safety Manager Quincy Usry admitted that Plaintiff would not have been fired on April 14, 2020 if she would not have reported her workplace injury.** *Exhibit 12*, **Usry Depo. 55:18-16:2.**

iv.   **Human Resources Business Partner Morgan Medaris admitted that without knowledge of Plaintiff's injury report, Walmart would not have fired Plaintiff.** *Exhibit 13*, **Medaris Depo. 20:9-15.**

b.  **Second, Walmart <u>did</u> engage in behaviors to prevent Plaintiff from exercising her rights under the workers' compensation system.**

i.   **After learning of Plaintiff's workplace injury, Whitenack failed to inform Plaintiff about her right to seek medical treatment at Walmart's expense.** *Exhibit 6*, **57:16-20; 58:1-5.**

ii.   **Whitenack said he did not offer Plaintiff the right to seek medical treatment based on her Statement Form.** *Exhibit 6*, **58:21 – 59:2.**

iii.   **However, Plaintiff's Statement Form said she had excruciating pain, swelling, and bruising, and that she was only able to partially do her job.** *Exhibit 6*, **59:7-24.**

iv.   **Whitenack did not inform Plaintiff of her workers' compensation rights even though he knew she suffered a workplace injury.** *Exhibit 6*, **68:9-15.**

v.   **When Walmart learns that an employee has become an injured worker, managers such as Quincy Usry and David Whitenack are "supposed to follow" the rules in the "Associate Work-Related Injury Management Guideline."** *Exhibit 4*, **Deposition of Walmart, 81:18 - 82:5.**

vi.   **Under Walmart's Associate Work-Related Injury Management Guideline, once an employee reports a workplace injury, the employee is supposed to be given three options, one of which includes the right to "Seek medical attention from a Work Comp provider."** *Exhibit 4*, **83:2-20;** *Exhibit 6*, **61:14-17; 62:1-24;** *Exhibit 16*, **Associate Work-Related Injury Management Guidelines (Depo.Ex.41).**

vii.   **Plaintiff was not provided any of the three options listed in the mandatory Associate Work-Related Injury Management Guideline.** *Exhibit 4*, **83:21-23;** *Exhibit 6*, **63:7-10.**

viii.   **Walmart understood it had a duty to report Plaintiff's workplace injury to the State of Kansas.** *Exhibit 12*, **Depo. of Walmart (Usry – 1/6/21), 9:9-15; 11:1-10.**

ix.   **Walmart did not report Plaintiff's injury to the State despite knowing it had a duty to report it.** *Exhibit 12*, **39:5-11.**

x.   **Walmart never informed Plaintiff of her right to seek medical treatment between the time it learned she was injured and the time it fired her.** *Exhibit 4*, **92:16-20.**

xi.   **Walmart did not to follow the mandatory policies that applied to itself after learning that an employee suffered a workplace injury.** *Exhibit 4*, **109:13-110:2.**

xii.    **Walmart did not provide Plaintiff with documentation about her workers' compensation rights as required by the Kansas Department of Labor.** *See Exhibit 4***, 117:22-118:17;** *Exhibit 17***, Information for Injured Employees (Depo.Ex.44).**

64.    On April 14, 2020, shortly after her termination, Braxton exchanged text messages with Sue Sooialo, a Walmart associate who had trained her for the QC Singles position. (Ex. M, Exhibit 29 to Braxton Depo.).

**RESPONSE: UNCONTROVERTED.**

65.    In these texts, Braxton stated that she "just got fired for not reporting my wrist on the night it start[ed] hurting." *(Id.* at 1). She did not mention having reported the injury the shift it happened, or otherwise express a belief that Walmart had gotten the facts wrong. (See, *generally, id.).*

**RESPONSE: UNCONTROVERTED but IMMATERIAL.**

66.    Sooialo expressed her sympathy with Braxton, and stated she disagreed with the termination decision. *(Id.).*

**RESPONSE: UNCONTROVERTED but IMMATERIAL.**

67.    On April 15 at 12:15 a.m.-just a few hours after Braxton's termination- Medaris sent an email to Usry confirming that "[w]e have completed Janell's termination for late reporting." (Ex. N, Usry Dep. Exhibit 5 at 1). Medaris's email reflected her belief that the policy violation, and not the report of injury itself, was the reason for Braxton's termination. *(See id.).*

**RESPONSE: UNCONTROVERTED that the Email was sent.**

a.    **Walmart's contention about Medaris's "belief" is CONTROVERTED because it is an inference that Walmart is asking the Court to draw in its favor. Drawing inferences in Walmart's favor is forbidden because Walmart is the movant seeking summary judgment.** *See Tolan v. Cotton***, 572 U.S. 650, 660 (2014). Whether Medaris's email is a "reflection" of her belief requires an inference.**

    **b. Medaris admitted that without knowledge of Ms. Braxton's injury report, Walmart would not have fired her.** *Exhibit 13*, **Medaris Depo. 20:9-15.**

68.     Medaris also expressed concern that associates were not receiving training on incident reporting. (*Id.*).

**RESPONSE: UNCONTROVERTED.**

69.     In response to this concern, Usry modified associate training at the Edgerton facility, to make sure that newly hired associates receive training on Policy 670e. (Ex. F, Second Usry Depo. at 61:20-62:12).

**RESPONSE: UNCONTROVERTED that Usry made changes to the training program after Plaintiff was fired.**

    **a. Form 670e is not a policy.** *See* **SOF ¶45(a-f).**

    **b. According to Chelsea Davidson, Walmart's Senior Manager of Human Resources for the Edgerton Fulfillment Center, who is the highest-ranking Human Resources employee at Walmart's facility in Edgerton, Kansas, that facility <u>does not even use</u> Form 670e.** *Exhibit 8*, **8:16 - 9:3; 43:3-23; 44:14-17; 44:21-23.**

    **c. According to Chelsea Davidson, Walmart's Edgerton Fulfillment Center has <u>never</u> used Form 670e.** *Exhibit 8*, **45:6-9, 19-23.**

70.     He made sure that a copy of Policy 670e was posted at the training school associates attend during orientation. (*Id.* at 61:24-62:6).

**RESPONSE: UNCONTROVERTED.**

71.     Braxton did not seek medical treatment for her wrist pain, and the pain went away about a week after her April 14 termination. (Ex. A, Braxton Dep. at 117:2-16).

**RESPONSE: UNCONTROVERTED but IMMATERIAL.**

72.     Braxton also did not ask about medical treatment during her termination meeting. (*See, generally, id.*).

**RESPONSE: UNCONTROVERTED but IMMATERIAL.**

a. **IMMATERIAL because it is unlawful to fire an employee for suffering a workplace injury that might lead to a workers' compensation claim in the future.** *See Pilcher v. Bd. of Cnty. Comm'rs of Wyandotte Cnty.*, 787 P.2d 1204, 1211 (Kan.App.1990). All <u>three</u> individuals who fired Plaintiff knew she suffered a workplace injury and would not have fired her absent that knowledge. *See* SOF 63(a)(i-iv). Therefore, but for Plaintiff's workplace injury and her report of the same, Plaintiff would not have been fired.

b. **IMMATERIAL because Plaintiff requested medical treatment on April 14, 2020 before being fired.**

  i. **On April 14, 2020, Plaintiff asked her supervisor if Walmart could provide a "brace or wrap" for her wrist because it was bothering her.** *Exhibit 2*, Braxton Depo. 73:2-10; 75:2-9.

  ii. **Plaintiff also requested a brace from the safety cubicle.** *Exhibit 2*, 76:15-22.

  iii. **The safety cubicle did not have braces, but it provided Plaintiff an ointment to treat her pain.** *Exhibit 2*, 77:21 – 78:4.

c. **IMMATERIAL because Walmart refused to offer Plaintiff medical treatment for her workplace injury, thereby violating its own mandatory policy.**

  i. **Under Walmart's Associate Work-Related Injury Management Guideline, once an employee reports a workplace injury, the employee is supposed to be given three options, one of which includes the right to "Seek medical attention from a Work Comp provider."** *Exhibit 4*, 83:2-20; *Exhibit 6*, 61:14-17; 62:1-24; *Exhibit 16*, Associate Work-Related Injury Management Guidelines (Depo.Ex.41).

  ii. **Plaintiff was not provided any of the three options listed in the mandatory Associate Work-Related Injury Management Guideline.** *Exhibit 4*, 83:21-23; *Exhibit 6*, 63:7-10.

73.   Braxton acknowledged that at the termination meeting, no one mentioned workers' compensation. *(Id.* at 119:1-5).

**RESPONSE: UNCONTROVERTED. Walmart did not inform Plaintiff of her workers' compensation rights despite being required to under mandatory company policy and Kansas law. This material fact supports an inference that Walmart's actions were motivated by a desire to prevent Plaintiff from exercising her workers' compensation rights.**

74.   From 2018 to 2020, Walmart terminated 113 seasonal associates from the Edgerton facility because they received a first written discipline. (Ex. O, WM_Braxton_000181); (Ex. P, Declaration of Chelsea  Davidson) (authenticating Ex. O as a business record). Plaintiff was the only one who was discharged for failure to report her injury timely.

**RESPONSE: UNCONTROVERTED** that Walmart has terminated 113 seasonal associates, but this fact is **IMMATERIAL.**

**CONTROVERTED** that Plaintiff "was discharged for failure to report her injury timely." Walmart did not cite any evidentiary support for this assertion.

a.   Operations Manager David Whitenack admitted that if Plaintiff would have never told him she was hurt at work, he would not have had a reason to fire her. *Exhibit 6*, Whitenack Depo. 74:21 – 75:1.

b.   Whitenack agreed that "if Ms. Braxton would have never reported her workplace injury to Walmart, there would have been no reason to fire her on April 14th, 2020." *Exhibit 6*, 91:7-12.

c.   Safety Manager Quincy Usry admitted that Plaintiff would not have been fired on April 14, 2020 if she would not have reported her workplace injury. *Exhibit 12*, Usry Depo. 55:18-16:2.

d.   Human Resources Business Partner Morgan Medaris admitted that without knowledge of Plaintiff's injury report, Walmart would not have fired Plaintiff. *Exhibit 13*, Medaris Depo. 20:9-15.

## PLAINTIFF'S STATEMENT OF ADDITIONAL MATERIAL FACTS

75.      **Walmart's Policy Against Discrimination applies to Injured Workers –** Safety Manager Quincy Usry testified on behalf of Walmart regarding "The contents, implementations, and enforcement of Walmart's policies and practices regarding work injuries during Plaintiff's employment." *Exhibit 4*, Depo. of Walmart (Usry – 4/30/21), 9:13 - 10:4, 11:6-11; *Exhibit 20*,

76.      During Plaintiff's employment, Walmart maintained a Discrimination and Harassment Prevention Policy that was supposed to protect Plaintiff from being discriminated against. *Exhibit 4*, 18:7-17; 19:1-14; *Exhibit 19*, Discrimination and Harassment Prevention Policy (Depo.Ex.48).

77.      Walmart's policy recognized that, depending on the motivation, firing an employee could be an act of discrimination. *Exhibit 4*, 20:10-20.

78.      Walmart's policy prohibited an employee from being discriminated against based on a protected status. *Exhibit 4*, 21:16-22:4.

79.      Walmart's policy recognized that being an injured worker or being a person who reported a workplace injury was considered protected statuses upon which the employee may not be discriminated against. *Exhibit 4*, 22:5-24.

80.      **Plaintiff's Employment -** Walmart employed Plaintiff from March 23, 2020 until April 14, 2020. *Exhibit 9*, *Defendant's Answers to Plaintiff's Request for Admissions*, ¶1.

81.      Plaintiff's job required "continuous physical activity" and "[r]epetitive hand motions." *Exhibit 1*, Plaintiff's Job Description (Depo.Ex.21); *Exhibit 2*, 29:20-24.

82.      Plaintiff was a full-time employee. *Exhibit 1*.

83.      Plaintiff was on medical leave from March 29, 2020 until April 11, 2020 for a suspected coronavirus infection. At that time, testing was limited, so she did not get tested, but she was instructed to quarantine due to her symptoms. *Exhibit 2*, Plaintiff Depo. 37:1-38:2.

84.      Plaintiff returned to work symptom-free on April 12, 2020. *Exhibit 2*, 38:23-25.

85.      Plaintiff's first shift back from coronavirus-related medical leave was the night shift that went from April 12, 2020 until April 13, 2020. *Exhibit 2*, 39:9-12.

86.      **Wrist Starts to Hurt –** Around 1:00 AM on April 13, 2020 (first shift back from medical leave), she had pain in her left wrist that she had never felt before. *Exhibit 2*, 48:13 - 49:21.

87.      Plaintiff's wrist started hurting while she was working. *Exhibit 2*, 50:1-6.

88.      There was no specific incident or occurrence that caused Plaintiff's wrist pain. *Exhibit 2*, 50:7-10.

89.      **Plaintiff Reports Her Wrist Pain** – Plaintiff reported her wrist pain to a supervisor at least two times on April 13, 2020. *Exhibit 2*, 51:10-15.

90.      Between 1:00 AM and 5:00 AM on April 13, 2020, although Plaintiff's wrist was hurting, it was not to the point where she was incapacitated from working, so she worked through the pain. *Exhibit 2*, 53:17-24.

91.      Between 1:00 AM and 5:00 AM on April 13, 2020, Plaintiff's direct supervisor was Ammie Wilbur. *Exhibit 9*, *Defendant's Response to Plaintiff's First Request for Admissions*, ¶6. ("Amy" in Plaintiff's deposition – *see Exhibit 2*, 31:7-9).

92.      During the early morning hours of April 13, 2020 (the same shift the pain appeared) Plaintiff told a supervisor her wrist was "really hurting." *Exhibit 2*, 51:18-19; 21-23.

93.      During Plaintiff's next shift, in the evening of April 13, 2020, Plaintiff reported to a supervisor that her wrist was hurting. *Exhibit 2*, 51:24 - 52:4.

94.     The second time Plaintiff reported her wrist pain was at the beginning of her evening shift on the evening of April 13, 2020. *Exhibit 2*, 60:13-20; 61:5-24.

95.     Plaintiff worked that entire shift, which ended on the morning of April 14, 2020, even though the pain was getting worse. *Exhibit 2*, 62:10-15; 66:10-14.

96.     Plaintiff's next shift started in the evening of April 14, 2020, and her supervisor was Ammie Wilbur. *Exhibit 2*, 68:12-25.

97.     On April 14, 2020, Plaintiff reported her wrist pain for the third time in two days – this time she approached a supervisor and specifically requested a wrist brace or a wrap to help her get through the shift. *Exhibit 2*, 72:11-17; 73:2-10; 75:2-9.

98.     Plaintiff told her supervisor her wrist was still hurting since her initial complaint on the morning of April 13, 2020. *Exhibit 2*, 75:10-14.

99.     After the third time Plaintiff reported her wrist pain, her supervisor instructed her to go to the safety cubicle. *Exhibit 2*, 76:15-22.

100.    Plaintiff went to the safety cubicle and informed Safety Lead Mark Tuazon about the wrist pain she was experiencing while performing her duties for Walmart (her fourth time reporting the injury), and he provided a muscle ointment. *Exhibit 18*, Tuazon Depo., 18:2 - 19:11.

101.    **Safety Lead Mark Tuazon -** As a Safety Lead, Mark Tuazon was required to respond to employee reports of workplace injuries by providing support and medicine if needed. *Exhibit 18*, 4; 6:4-23.

102.    When Safety Lead Mark Tuazon receives a report of workplace injury, the first thing he is supposed to do is partner with management, which includes having the injured worker complete an "incident report." *Exhibit 18*, 9:14-22.

103.      Safety Lead Mark Tuazon is required to fill out an "incident report" after learning an employee has reported an injury. *Exhibit 18*, 11:1-5.

104.      Safety Lead Mark Tuazon did not fill out an "incident report" for Plaintiff. *Exhibit 18*, 11:6-9.

105.      Safety Lead Mark Tuazon did not fill out any paperwork to document that he had responded to an employee reporting an injury or to record Plaintiff requested medicine, and he did not ask Plaintiff to fill out any paperwork. *Exhibit 18*, 20:18 – 21:18.

106.      **Plaintiff Leaves the Safety Cubicle -** As Plaintiff returned to her workstation, she told her supervisor the safety cube did not have a brace but provided ointment. *Exhibit 2*, 83:6-13.

107.      After Plaintiff spoke with her supervisor three times on April 14, 2020 about her wrist pain, a male from "upper management" asked her to log off her workstation so she could fill out an "incident report." *Exhibit 2*, 86:1-8.

108.      **Status as Injured Worker & Walmart's Knowledge –** During April 2020, Walmart knew it was illegal to fire someone based on their status as an injured worker, i.e., an employee who suffered a workplace injury, because that would be a legally protected status. *Exhibit 4*, 22:8-14; 22-24.

109.      During April 2020, Walmart knew it was illegal to fire someone in response to them reporting a workplace injury, because reporting a workplace injury would be a legally protected status. *Exhibit 4*, 22:15-21.

110.      During Plaintiff's employment, she suffered a workplace injury, thereby becoming an injured worker. *Exhibit 4*, Deposition of Walmart (Usry – 04/30/21), 23:14-20.

111.      Walmart learned about Plaintiff's status as an injured worker. *Exhibit 4*, 23:21-23.

112.     The reason Walmart learned that Plaintiff was an injured worker was because Plaintiff told someone in her chain of command. *Exhibit 4*, 24:4-7.

113.     **Temporal Proximity –** At the latest, Walmart learned that plaintiff was an injured worker on April 14, 2020. *Exhibit 4*, 23:24 - 24:3.

114.     On April 14, 2020, Operations Manager David Whitenack asked Plaintiff to write a statement on a "Statement Form" and she complied with his request. *Exhibit 6*, 48:1-15.

115.     Operations Manager Whitenack asked Plaintiff to write down "what date and time she recalled experiencing the pain." *Exhibit 6*, 49:19-20.

116.     Operations Manager Whitenack asked Plaintiff to "to write down everything [she] was feeling, that was going on with [her] wrist." *Exhibit 2*, 90:19 – 91:1.

117.     Operations Manager Whitenack did not ask Plaintiff whether she had reported her wrist pain to anyone else. *Exhibit 2*, 87:18-21

118.     Approximately 30 minutes after Plaintiff filled out the Statement Form, Walmart fired her. *Exhibit 4,* 107:7-13; *Exhibit 6*, 49:2-5.

119.     According to Walmart, it fired Plaintiff the same calendar day on which it learned she was an injured worker. *Exhibit 4*, 26:9-12.

120.     **Admissions – By the Decision-Makers** – Safety Manager Quincy Usry, Operations Manager David Whitenack, and Human Resources Business Partner Morgan Medaris were all involved in the decision to fire Plaintiff. *Exhibit 4*, 111:25 - 112:5.

121.     Operations Manager David Whitenack admitted that if Plaintiff would have never told him she was hurt at work, he would not have had a reason to fire her. *Exhibit 6*, 74:21 – 75:1.

122.    Whitenack agreed that "if Ms. Braxton would have never reported her workplace injury to Walmart, there would have been no reason to fire her on April 14th, 2020." *Exhibit 6*, 91:7-12.

123.    Safety Manager Quincy Usry admitted that Plaintiff would not have been fired on April 14, 2020 if she would not have reported her workplace injury. *Exhibit 12*, 55:18-16:2.

124.    Human Resources Business Partner Morgan Medaris admitted that without knowledge of Plaintiff's injury report, Walmart would not have fired Plaintiff. *Exhibit 13*, 20:9-15

125.    **Walmart Violated Its Own Mandatory Policies –** Walmart has a policy called "Dot Com Safety" that applied to every employee at Walmart's facility in Edgerton, Kansas. *Exhibit 4*, 68:7 - 69:4; *Exhibit 11*, Dot Com Safety (Depo.Ex.51).

126.    The Dot Com Safety Manual contains the rules that Walmart is supposed to follow after learning that one of its employees has become an injured worker. *Exhibit 4*, 69:16 – 70:5.

127.    The Dot Com Safety Manual was supposed to be followed after Walmart learned Plaintiff was an injured worker. *Exhibit 4*, 111:14-23.

128.    The Dot Com Safety Manual is mandatory, not discretionary. *Exhibit 4*, 44:10-12.

129.    The Dot Com Safety Manual was available to Safety Lead Mark Tuazon, Operations Lead Ammie Wilbur, Safety Manager Quincy Usry, Operations Manager David Whitenack, and Human Resources Business Partner Morgan Medaris. *Exhibit 4*, 43:2-18.

130.    Safety Manager Quincy Usry received specific training on the Dot Com Safety Manual and trained other employees on the Manual. *Exhibit 4*, 93:9-21.

131.    The Dot Com Safety Manual was not available to Plaintiff. *Exhibit 4*, 42:14-16.

132.    During April 2020, Quincy Usry was aware of the mandatory rules set forth in the Dot Com Safety Manual. *Exhibit 4*, 93:19-21.

133.     The Dot Com Safety Manual defines "incidents" as "Any unexpected, unplanned or abnormal event or series of events that occurs and does result in an injury." *Exhibit 4*, 70:17 - 71:11; *Exhibit 11*.

134.     To qualify as an "incident" there has to be something "unexpected, unplanned or abnormal." *Exhibit 4*, 71:17-21.

135.     An employee engaged in their regular job is not unexpected, unplanned, or abnormal. *Exhibit 4*, 72:1-18.

136.     The Dot Com Safety Manual defines "injury" as "an abnormal condition or disorder." *Exhibit 4*, 73:3-9.

137.     An employee who is feeling sore from doing their job has not experienced an "injury incident" under Walmart's policies. *Exhibit 4*, 77:23 - 78:1.

138.     Walmart acknowledges that repetitive motion that initially causes soreness can eventually lead to an injury. *Exhibit 4*, 78:25 – 79:6.

139.     **Dot Com Procedures after Injury –** The Dot Com Safety Manual provides management with links to other documents and policies they are supposed to follow in response to learning an employee has been injured. *Exhibit 4*, 80:3-81:3; *Exhibit 11*.

140.     According to Walmart, Plaintiff reported an injury to David Whitenack, which required Walmart to follow the rules in the Dot Com Safety Manual. *Exhibit 4*, 85:7 - 86:2.

141.     The mandatory rules set forth in the Dot Com Safety Manual should have been followed in relation to Plaintiff. *Exhibit 4*, 104:10-14.

142.     The Dot Com Safety Manual requires a member of Human Resources or the Safety Manager to complete a "First Report of Injury Form" if required by the State. *Exhibit 4*, 86:14-17.

143.    Walmart never completed a "First Report of Injury Form" for Plaintiff. *Exhibit 4*, 86:18-20.

144.    Walmart never looked to see if the State of Kansas required a First Report of Injury Form. *Exhibit 4*, 86:21-25.

145.    The Dot Com Safety Manual provides a link for Walmart's employees to see whether the State they are in requires a First Report of Injury. *Exhibit 4*, 87:4-13.

146.    Quincy Usry claims he usually asks Walmart's Claims Management team to determine whether a First Report of Injury is required, but he chose not to do that for Plaintiff. *Exhibit 4*, 87:14-23.

147.    **Walmart was Required To Report Plaintiff's Injury –** The Dot Com Safety Manual provides management with "state specific required forms." *Exhibit 4*, 117:16-21; *Exhibit 11* (WM_Braxton_000195).

148.    The Kansas Department of Labor requires Walmart to provide an injured worker with information set forth in a document it makes available to employers like Walmart. *Exhibit 4*, 117:12-118:6; *Exhibit 17*, Information for Injured Employees (Depo.Ex.44).

149.    Walmart knew at least by April 14, 2020 that Plaintiff was an injured worker. *Exhibit 4*, 118:7-10.

150.    Walmart never provided Plaintiff with the document from the Kansas Department of Labor that it was supposed to provide or any other document with the same information. *Exhibit 4*, 118:11-17.

151.    Walmart understood it had 28 days to report Plaintiff's injury to the State of Kansas. *Exhibit 4*, 118:23 – 119:19.

152.    Walmart never reported Plaintiff's workplace injury to the State of Kansas. *Exhibit 4*, 119:20 - 120:3.

153.    **Filling out an Incident Report is Required -** The Dot Com Safety Manual requires management to ask an injured associate, such as Plaintiff, to complete, sign, and date a Medical Authorization and "Associate Incident Report." *Exhibit 4*, 88:12-21; *Exhibit 11*.

154.    The Dot Com Safety Manual rule about having an employee complete the Associate Incident Report is mandatory, not discretionary. *Exhibit 4*, 88:20 – 89:21.

155.     According to Walmart, it failed to have Plaintiff fill out an Associate Incident Report. *Exhibit 4*, 89:25 – 90:16.

156.    According to Walmart, Quincy Usry and Morgan Medaris violated the mandatory rule that required them to have Plaintiff fill out an Associate Incident Report. *Exhibit 4*, 90:12-24.

157.    Safety Manger Quincy Usry says he did not instruct David Whitenack to have Plaintiff fill out an Associate Incident Report even though that was his obligation under the mandatory Dot Com Safety Manual. *Exhibit 4*, 91:6-13.

158.    According to Plaintiff, Whitenack did ask her to fill out an "incident report." *Exhibit 2*, 90:21-23; 91:2-5. (Walmart did not produce any such document during discovery).

159.    The Associate Incident Report form asks the associate to state the date and time of the incident. *Exhibit 4*, 91:19-25; *Exhibit 15*.

160.    The Associate Incident Report form asks the associate to state the date and time she first reported the incident. *Exhibit 4*, 92:1-3; *Exhibit 15*.

161.    The Associate Incident Report form asks the associate to identify who the incident has been reported to. *Exhibit 4*, 92:4-6; *Exhibit 15*.

162.     The Associate Incident Report form asks the associate to state whether she wanted medical treatment. *Exhibit 4*, 92:12-15; *Exhibit 15*.

163.     **Using a Statement Form Violated Walmart Policy –** The Statement Form Quincy Usry and David Whitenack had Plaintiff fill out is not the form required by the Dot Com Safety Manual. *Exhibit 4*, 104:24 – 105:5.

164.     The Statement Form Plaintiff was asked to fill out was supposed to be filled out by witnesses who were asked to provide statements during an investigation. *Exhibit 4*, 105:6-21.

165.     **An Investigation was Required under Walmart Policy –** The Dot Com Safety Manual requires the manager of an injured associate to conduct an investigation and record the investigation in a document called WMV-738e. *Exhibit 4*, 93:22 – 94:14; *Exhibit 11*.

166.     Conducting an investigation after learning that an employee has become an injured worker is mandatory, not discretionary. *Exhibit 4*, 94:11-20.

167.     David Whitenack was required to conduct an investigation after learning of Plaintiff's workplace injury and to record his investigation in a WMV-783e. *Exhibit 4*, 95:2-17.

168.     David Whitenack did not conduct an investigation. *Exhibit 6*, 103:11-13.

169.     David Whitenack never completed a Safety Incident Investigation Form (738e) even though it was required by Walmart policy. *Exhibit 4*, 96:5-21.

170.     There are no exceptions to the mandatory Walmart policy requiring an investigation. *Exhibit 4*, 97:3-14.

171.     David Whitenack was supposed to submit the completed Safety Investigation form to Quincy Usry, but he never did. *Exhibit 4*, 98:1-24.

172.     The Dot Com Safety Manual required 8 steps be completed to document an investigation, but none of them were completed in response to Walmart learning Plaintiff was an injured worker. *Exhibit 4*, 99:9-17; *Exhibit 11*.

173.     **Daily Contact with Plaintiff was Required by Walmart Policy -** The Dot Com Safety Manual required David Whitenack to have daily contact with Plaintiff for at least seven days after learning that she was an injured worker. *Exhibit 4*, 99:25-100:15.

174.     David Whitenack did not speak to Plaintiff after he fired her. *Exhibit 6*, 16:25-17:1.

175.     **A "5 Why" Form Was Required by Walmart Policy –** Walmart maintains a document called the "5 Why" that is supposed to be used after an employee becomes an injured worker. *Exhibit 4*, 97:16-23.

176.     Walmart did not use the 5 Why in relation to Plaintiff. *Exhibit 4*, 97:24-25.

177.     **Internally Recording Plaintiff's Injury was Required by Walmart Policy –** The Dot Com Safety Manual contained a mandatory rule that required David Whitenack, Moran Medaris, or Quincy Usry to record Plaintiff's workplace injury in Walmart's internal Incident Reporting System within 24 hours. *Exhibit 4*, 100:24 – 101:25.

178.     Plaintiff's injury was not recorded in Walmart's Incident Reporting System. *Exhibit 4*, 102:1-2.

179.     **Walmart was Required to Provide Plaintiff with Three Options that She was Not Provided –** Walmart has an "Associate Work-Related Injury Management Guideline" that Quincy Usry and David Whitenack were supposed to follow after learning that an employee has become an injured worker. *Exhibit 4*, 81:12 - 82:5; *Exhibit 16* (Depo.Ex.41).

180.     When Walmart learns that an employee has become an injured worker, managers such as Quincy Usry and David Whitenack are "supposed to follow" the rules in the "Associate Work-Related Injury Management Guideline." *Exhibit 4*, Deposition of Walmart, 81:18 - 82:5.

181.     Under Walmart's Associate Work-Related Injury Management Guideline, once an employee reports a workplace injury, the employee is supposed to be given three options, one of which includes the right to "Seek medical attention from a Work Comp provider." *Exhibit 4*, 83:2-20; *Exhibit 6*, 61:14-17; 62:1-24; *Exhibit 16*, Associate Work-Related Injury Management Guidelines (Depo.Ex.41).

182.     Plaintiff was not provided any of the three options listed in the mandatory Associate Work-Related Injury Management Guideline. *Exhibit 4*, 83:21-23; *Exhibit 6*, 63:7-10.

183.     **Issuing Discipline is Not Required by Walmart Policy –** The Dot Com Safety Manual says "Associates involved in an incident will report it to their managers immediately. Failure to do so **may** result in disciplinary action." *Exhibit 4*, 112:9 – 113:5; *Exhibit 11*.

184.     Disciplining an employee for not reporting an incident is discretionary. *Exhibit 4*, 113:6 – 114:12.

185.     Usry had discretion regarding whether to discipline Plaintiff. *Exhibit 4*, 114:13-18.

186.     For issuing discipline, the Dot Com Safety Manual instructs management to "Refer to the WMW-670e eCommerce Safety and Compliance Rule Violation form." *Exhibit 11* (WM_Braxton_000197).

187.     **Firing Plaintiff Violated Walmart Policy –** If management exercises their discretion to issue discipline to an employee for not reporting an injury immediately, the Dot Com Safety Manual provides instructions. *Exhibit 4*, 114:19-23; *Exhibit 11* (WM_Braxton_000198).

188.     First, an investigation is supposed to be completed before deciding whether a safety or compliance violation occurred. *Exhibit 11* (WM_Braxton_000198).

189.     The Dot Com Safety Manual says, "If a safety or compliance violation occurred, the manager issues the appropriate per the WMW-670e eCommerce Safety and Compliance Rule Violation form." *Exhibit 4*, 115:13-18; *Exhibit 11* (WM_Braxton_000198).

190.     If management decides to issue discipline, the Dot Com Safety Manual requires them to use the Form 670e to issue the discipline. *Exhibit 4*, 115:19 – 116:23; *Exhibit 7*, Form 670e (Depo.Ex.11).

191.     According to the Form 670e, failure to report any known injury before the end of the shift is supposed to result in a Step 1 violation issued on the Form 670e. *Exhibit 4*, 116:24 – 117:5.

192.     Walmart failed to use the Form 670e for Plaintiff despite being required to by its own policies. *Exhibit 4*, 117:6-8. F

193.     **Firing Plaintiff was Not Required by the Policies Walmart Says it Relied On –** According to Safety Manager Quincy Usry, Plaintiff was fired because she violated two Walmart documents: Policy 763e and Form 670e. *Exhibit 4*, 26:22 - 27:6; 27:14-24; 28:7-19.

194.     Walmart's Policy 763e – "General Safe Work Practices" states, under a heading "Safety Related Incidents," says, "All known injuries, no matter how slight, will be reported to a member of management by the end of the shift." *Exhibit 4*, 39:1-10; *Exhibit 5*.

195.     Policy 763e does not define "Safety Related Incidents." *Exhibit 4*, 39:19-22.

196.     Policy 763e does not define "injuries." *Exhibit 4*, 39:24 - 40:2.

197.     Walmart's 763e does not say an employee can be fired for failing to report a workplace injury by the end of the shift. *Exhibit 4*, 41:16-19.

198.     Walmart's 763e does not say an employee can be disciplined for failing to report a workplace injury by the end of the shift. *Exhibit 4*, 41:20-24.

199.     The other document Walmart says Plaintiff violated was the Form 670e, which is a template that is supposed to be used to issue documentation for safety violations, but it is not a policy. *Exhibit 4*, 46:11-21; 50:5-8; *Exhibit 7*, Form 670e (Depo.Ex.11)

200.     On the Form 670e, there is one bullet point under the heading "Step 1" that says, "Failure to report any known injury before the end of the shift." *Exhibit 4*, 47:3-10; *Exhibit 7*.

201.     Form 670e does not define the work "injury." *Exhibit 4*, 49:11-13.

202.     According to the Form 670e, if an associate fails to report a known injury by the end of the shift in which it happened, the employee should receive a "Step 1" violation, which means that an employee may receive a Step 3 or be fired if the same violation happens within the next 180 days. *Exhibit 4*, 50:13-20; *Exhibit 7*.

203.     Walmart's corporate representative Quincy Usry testified that a Step 1 would be issued for "full time associates." *Exhibit 4*, 50:20.

204.     Plaintiff was an "associate" of Walmart. *Exhibit 4*, 19:11-14; 83:17-20.

205.     Quincy Usry knew Plaintiff was a full-time employee. *Exhibit 4*, 51:16-23.

206.     **Injury vs. Soreness -** Walmart acknowledges that under its policies, there is a difference between injury and soreness. *Exhibit 4*, 66:7-10.

207.     According to Walmart's Safety Lead Mark Tuazon, Walmart does not consider soreness the same as injury. *Exhibit 18*, 17:18.

208.     According to Walmart's Operation Manager David Whitenack, "soreness and injury … are two totally different things." *Exhibit 6*, 30:13-20.

209.     Policy 763e does not distinguish between an injury and soreness. *Exhibit 4*, 40:3-6.

210.    Walmart's 763e does not say employees must report soreness. *Exhibit 4*, 44:19-24.

211.    Walmart's 763e does not say an employee can be fired for failing to report soreness during the shift in which it occurs. *Exhibit 4*, 46:2-6.

212.    Form 670e does not distinguish between injury and soreness. *Exhibit 4*, 49:14-16.

213.    Form 670e does not reference failure to report soreness by the end of the shift. *Exhibit 4*, 49:17-19.

214.    Walmart's Policy 763e and Form 670e have a combined total of 308 bullet points, and only two of them relate to reporting workplace injuries during the same shift in which they occur. *Exhibit 4*, 53:18 - 55:1.

215.    None of the 308 bullet points informed an employee that they could lose their job for failing to report a workplace injury. *Exhibit 4*, 67:14-18.

216.    **Lack of Training -** Walmart's Policy 763e, was made available to Plaintiff before she became an employee of Walmart, but Plaintiff never received training about it. *Exhibit 4*, 30:14-21; 32:17-23.

217.    The Form 670e was made available to Plaintiff before she became an employee of Walmart, but Plaintiff never received training about the Form 670e. *Exhibit 4*, 47:17 - 48:4.

218.    Neither the 763e nor the 670e define what a known injury is. *Exhibit 4*, 55:18-23.

219.    Neither the 763e nor the 670e define what an incident is. *Exhibit 4*, 55:24-56:1.

220.    Neither document explains the difference between soreness and injury. *Exhibit 4*, 66:11-14; *Exhibit 5, Exhibit 7*.

221.    Walmart did not train Plaintiff regarding the difference between soreness and injury. *Exhibit 4*, 66:15-20.

222.     An employee who is feeling sore from doing their job has not experienced an "injury incident" under Walmart's policies. *Exhibit 4*, 77:23 - 78:1.

223.     Walmart acknowledges that repetitive motion that initially causes soreness can eventually lead to an injury. *Exhibit 4*, 78:25 – 79:6.

224.     **Safety School did not Cover Workplace Injuries –** At the beginning of Plaintiff's employment, she went through Walmart's Safety School training. *Exhibit 4*, 48:5-7.

225.     During Safety School, Walmart did not inform Plaintiff she was supposed to report a workplace injury during the same shift in which it happened. *Exhibit 4*, 49:6-10.

226.     **Plaintiff was the Only Employee Disciplined -** Plaintiff was the only employee who was disciplined after Walmart learned that she was an injured worker. *Exhibit 4*, 121:14-17.

227.     Quincy Usry and David Whitenack failed to comply with more than two mandatory rules set forth in the Dot Com Safety Manual. *Exhibit 4*, 103:6-15.

228.     All the rules that Quincy Usry and David Whitenack failed to follow were mandatory rules. *Exhibit 4*, 108:2-5.

229.     As of April 30, 2021, neither David Whitenack nor Quincy Usry had been disciplined for their violations of the Dot Com Safety Manual. *Exhibit 4*, 103:16-24; *Exhibit 8*, 67:14-18.

230.     David Whitenack did not receive discipline for failing to conduct the safety investigation he was required to perform. *Exhibit 4*, 99:3-8.

231.     Safety Lead Mark Tuazon was subject to discipline for not reporting Plaintiff's workplace injury to management. *Exhibit 6*, 94:2-8.

232.     Safety Lead Mark Tuazon was not disciplined for failing to follow the policies that applied to him in relation to learning Plaintiff was an injured worker. *Exhibit 8*, 67:14-18.

233.     **Walmart Refused to Inform Plaintiff of Her Workers' Compensation Rights** – Operations Manager David Whitenack did not provide Plaintiff any information about her right to seek medical treatment for her workplace injury. *Exhibit 6*, 97:19-24.

234.     Between the time Operations Manager David Whitenack received Plaintiff's Statement Form and when he fired her 30 minutes later, he did not witness anyone provide her information about her right to seek medical treatment. *Exhibit 6*, 99:15-21.

235.     After Walmart learned Plaintiff suffered a workplace injury, but before Walmart fired her, Walmart never provided Plaintiff information about her right to seek medical treatment. *Exhibit 4*, 92:16-20.

236.     **Walmart Did Not Investigate Its Purported Basis for Firing Plaintiff** – Walmart did not ask Plaintiff to write a statement as to when, how, or with whom she had reported her workplace injury to prior to April 14, 2020. *Exhibit 12*, Walmart Depo. (Usry - 1/6/21), 27:1-6.

237.     Walmart never asked Ammie Wilbur to write a statement about when Plaintiff first reported her wrist pain. *Exhibit 12*, 27:7-12.

238.     Walmart never conducted an investigation to find out when Plaintiff first reported her workplace injury. *Exhibit 12*, 41:1-5.

239.     Walmart could have conduced an investigation to find our when Plaintiff first reported her workplace injury. *Exhibit 12*, 41:6-7.

240.     Walmart chose not to conduct an investigation to find out when Plaintiff first reported her workplace injury. *Exhibit 12*, 41:14-17.

241.     Walmart acknowledges that whether Plaintiff reported her wrist pain on April 13, 2020 is genuinely disputed. *Exhibit 12*, 45:16- 46:13.

242.     Walmart denied Plaintiff had a workplace injury on April 13, 2020. *Ex. 9*, ¶5.

## ARGUMENT AND AUTHORITIES

Plaintiff alleges "Walmart violated the common law of Kansas prohibiting retaliatory discharge when it fired Plaintiff." *Pretrial Order* (Doc.93) at 11(4)(a). Specifically, "Walmart fired Plaintiff based on her status as an injured worker, i.e., because she suffered a workplace injury, because she reported a workplace injury, and/or because she requested medical treatment for a workplace injury." *Id.* There is sufficient evidence to show Walmart fired Plaintiff for these reasons. Based on Walmart's disregard for its own mandatory policies that are supposed to protect Plaintiff's rights, a jury could conclude Walmart fired Plaintiff to avoid workers' compensation liability, thereby violating the common law of Kansas.

Since 1981, Kansas has recognized the tort of retaliatory discharge where an employer fires an employee for exercising rights under the Kansas Workmen's Compensation Act. *See Murphy v. City of Topeka-Shawnee Cnty. Dept. of Labor Servs.*, 630 P.2d 186, 192-93 (Kan.App.1981). This claim is rooted in the "public policy" of Kansas. *Id.* at 192.

> The Workmen's Compensation Act provides efficient remedies and protection for employees, and is designed to promote the welfare of the people in this state. It is the exclusive remedy afforded the injured employee, regardless of the nature of the employer's negligence. **To allow an employer to coerce employees in the free exercise of their rights under the act would substantially subvert the purpose of the act.**

*Id.* (bold added). A company that fires an employee to subvert her workers' compensation rights has acted unlawfully. Accordingly, an employee cannot be fired for making a claim for workers' compensation or for suffering a workplace injury that might result in such a claim. *See Pilcher v. Bd. of Cnty. Comm'rs of Wyandotte Cnty.*, 787 P.2d 1204, 1211 (Kan.App.1990). Whether that happened to Plaintiff is the ultimate issue in this case and contested in summary judgment.

Generally, when analyzing a claim of retaliatory discharge at summary judgment, courts employ the classic burden-shifting analysis. *See Rebarchek v. Farmers Co-Op Elevator*, 35 P.3d

892, 898-99 (Kan.2001).[1] However, whether burden shifting applies depends on whether the plaintiff provides direct evidence or only circumstantial evidence. *EEOC v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1191 (10th Cir. 2000). A plaintiff can defeat summary judgment by either offering direct evidence of discrimination or by using circumstantial evidence to create an inference of discrimination under the *McDonnel Douglas* burden-shifting analysis. *Hare v. Denver Merchandise Mart, Inc.*, 255 Fed.Appx. 298, 301 (10th Cir. 2007). In this case, summary judgment should be denied because there is direct evidence that Plaintiff was fired in retaliation for suffering and reporting a workplace injury.[2]

## I.   Direct Evidence shows Walmart fired Plaintiff for being an Injured Worker

"When direct evidence is presented, *McDonnell Douglas's* burden-shifting scheme is inapplicable." *Fischer v. Forestwood Co., Inc.*, 525 F.3d 972, 983 (10th Cir. 2008); *accord Tomsic v. State Farm Auto Ins.*, 85 F.3d 1472, 1477 (10th Cir. 1996). The US Supreme Court agrees. *See Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985) ("the *McDonnell Douglas* test is inapplicable where the plaintiff presents direct evidence of discrimination).

Direct evidence does not mean an admission. Direct evidence is evidence showing a "nexus" between a protected class and an adverse employment action. *See Perry v. Woodward*, 199 F.3d 1126, 1134 (10th Cir. 1999). It must show a protected class was "actually relied on"

---

[1] According to the Kansas Supreme Court, "[the plaintiff] need not meet the clear and convincing standard at the summary judgment stage of the proceedings." *Rebarcheck v. Farmers Co-op Elevator*, 35 P.3d 892, 898 (Kan. 2001). Walmart's contrary assertion should be disregarded.

[2] The Court addressed Plaintiff's direct evidence argument in denying *Plaintiff's Motion for Partial Summary Judgment* and concluded the evidence did not establish liability in favor of Plaintiff. *See Memorandum and Order* (Doc.87) at 13. Plaintiff repeats the argument here because there is additional testimony from the two other decision-makers confirming a causal link between Plaintiff's act of reporting a workplace injury and getting fired. And here, the evidence is not viewed in Walmart's favor.

when making an employment decision without making an inference. *Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1217 (10th Cir. 2013). Comments by a decision maker can be direct evidence if they directly relate to the plaintiff, the protected class at issue, and show a nexus between the protected class and the adverse action at issue. *See id.* In *Tabor*, the decision maker expressed his opinion that women do not have adequate knowledge of tools, and then refused to hire a woman to be a tool salesperson. *Id.* at 1217. The decision maker did not admit his beliefs caused his decision. *See id.* Nevertheless, the Tenth Circuit recognized his comments were direct evidence of sex discrimination. In this case, all three decision makers provided testimony showing that Plaintiff would still be employed if she did not suffer and workplace injury and report it.

Three Walmart employees were involved in the decision to fire Plaintiff: Safety Manager Quincy Usry, Operations Manager David Whitenack, and Human Resources Business Partner Morgan Medaris. (SOF ¶120). All three individuals testified that Plaintiff would not have been fired if she did not report her workplace injury. (SOF ¶¶121-124). Whitenack agreed there would not have been a reason to fire Plaintiff if she did not report being hurt. (SOF ¶¶121-22). So did Usry and Medaris. (SOF ¶¶123-124). Walmart argues it was not Plaintiff's injury or report of injury that caused her termination alone, but it was also the timing of it. However, that clarification is immaterial under Kansas law.

A plaintiff alleging retaliatory discharge does "not need to show that retaliation was the employer's sole motive or reason for the termination." *Sanjuan v. IBP, Inc.*, 160 F.3d 1291, 1298 (10th Cir. 1998). "Employees can recover by proving that the discharge was 'based on,' 'because of,' 'motivated by,' or 'due to' the employer's intent to retaliate." *Id.* The testimony of Whitenack, Medaris, and Usry reveal that Plaintiff was fired for suffering and reporting a workplace injury. Their explanation is like the manager's explanation in *Tabor v. Hilti*. They have articulated a

different reason, but a direct link can be drawn between the statements, the adverse employment action, and the protected class. This direct evidence is sufficient to deny summary judgment without further analysis. Even if burden shifting applies, Walmart's Motion should be DENIED.

## II. Circumstantial Evidence shows Walmart fired Plaintiff for being an Injured Worker

In the absence of direct evidence, *McDonnell Douglas* burden-shifting applies. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993). Under this framework, a plaintiff must first establish a prima face case. *Id.* A prima facie case shifts the burden of production to the employer, who must articulate a legitimate (i.e., not illegal) motive for its actions. *Id.* Then the burden shifts back to the plaintiff to demonstrate the articulated reason is pretext. *See id.* at 515-16. If the plaintiff shows a jury *could* find the reason did not motivate the adverse action, then summary judgment should be denied. *Id.* at 510-11. Nothing more is needed. *Id.* The Tenth Circuit has "definitively rejected a 'pretext plus' standard." *Swackhammer v. Sprint/Utd Mgmt. Co.*, 493 F.3d 1160, 1167 (10th Cir. 2007). "[I]n order to survive summary judgment, a plaintiff generally need not provide affirmative evidence of discrimination beyond the prima facie case and evidence that the employer's proffered explanation is pretextual." *Id.*

### a. Prima Facie Case

When assessing the prima facie case, the moving party's evidence is disregarded. *See Ellison v. Sandra Nat'l Labs.*, 60 Fed.Appx. 203, 205 (10th Cir. 2003). The employer's evidence should only be considered in the second and third steps. *Kenworthy v. Conoco, Inc.*, 979 F.2d 1462, 1469-70 (10th Cir. 1992). "At the prima facie stage of the *McDonnell Douglas* analysis, a plaintiff is only required to raise an inference of discrimination, not dispel the non-discriminatory reasons subsequently proffered by the defendant." *EEOC v. Horizon/CMS Healthcare Corp.*, 220 F.3d

1184, 1193 (10th Cir. 2000). The threshold for making a prima facie case is very low. *See Orr v. City of Albuquerque*, 417 F.3d 1144, (10th Cir. 2005).

To demonstrate a prima facie case of retaliatory discharge, Plaintiff must show:

> (1) she sustained an injury that might result in workers' compensation;
>
> (2) Walmart knew of her workplace injury;
>
> (3) Walmart terminated Plaintiff's employment; and
>
> (4) there is a causal connection between the injury and the termination.

*Sanjuan v. IBP, Inc.*, 160 F.3d 1291, 1298 (10th Cir. 1998).

These elements are undisputed. On April 13, 2020, Plaintiff's wrist started to hurt while she was working. (SOF ¶86). The first four times Plaintiff reported her workplace injury may be disputed (SOF ¶¶89-100), but Walmart admits that on April 14, 2020, it learned Plaintiff suffered a workplace injury after Plaintiff reported it to an supervisor. (SOF ¶¶110-113). There is no dispute that Walmart fired Plaintiff. (SOF ¶119). The evidence establishing a causal connection for purposes of a prima facie case is also undisputed.

"For purposes of establishing a prima facie case of retaliation, a plaintiff can establish a causal connection by temporal proximity between the protected activity and adverse action." *Fye v. Oklahoma Corp. Comm'n*, 516 F.3d 1217, 1228 (10th Cir. 2008). In *Fye*, temporal proximity of "less than two weeks" was sufficient, even standing alone, to establish a causal connection for a prima facie case. *Id.* The same was true for temporal proximity of 24 days. *See Argo v. Blue Cross and Blue Shield of Kansas, Inc.*, 452 F.3d 1193, 1202 (10th Cir. 2006). Here, the timing is closer.

According to Walmart, it fired Plaintiff less than 30 minutes after she submitted a Statement Form about her workplace injury. (SOF ¶114-118). Walmart claims Plaintiff was fired the same day it learned of her workplace injury. (SOF ¶119). Of course, Plaintiff says she reported

her wrist pain the day before she was fired. (SOF ¶¶89-94). Either way, the temporal proximity alone establishes the causal connection for Plaintiff's prima facie case.

   b. **Walmart's Explanation is Not Legitimate**

Once the employee makes a prima facie case, the burden shifts to the employer to "articulate some legitimate, nondiscriminatory reason for [taking the action]." *McDonnell Douglas Corp. v. Green*, 411 US 792, 802-803 (1973). The proffered reason must be wholly separate from the protected class at issue. *See, e.g., Jaramillo v. Colorado Judicial Dept.*, 427 F.3d 1303, 1307 (10th Cir. 2005). For example, when a plaintiff alleges she is not chosen for a job based on her sex, the employer must provide a sex-neutral reason for its action. *See id*. Walmart has failed to meet this burden of production.

The Workmen's Compensation Act is a "state public policy conferring on all employees and employers certain nonnegotiable rights and imposing certain nonnegotiable duties and obligations…." *Coleman v. Safeway Stores, Inc.*, 752 P.2d 645, 650-51 (Kan.1988). This Act provides the "public policy" supporting a claim of retaliatory discharge. *See id*. Employers in Kansas cannot fire employees for a reason that is "violative of an established or statutorily declared public policy." *Id. at* 648. The public policy is "declared by the legislature or by the courts." *Hysten v. Burlington N. Santa Fe Ry.*, 108 P.3d 437, 440 (Kan.2004). Since 1981, the public policy of Kansas, as recognized by the courts, has been that an employee cannot be fired for exercising rights under the Workmen's Compensation Act. *Id*. The public policy of providing compensation to injured employees "would be undermined if the worker could be fired for the exercise of his or her statutory right." *Id*. at 441. Requiring employees to choose between reporting a workplace injury and being fired would "effectively release[] an employer from the obligation of the statute." *Id*.

"Under the Kansas Constitution, the primary lawmaking body is the legislature." *Coleman*, 752 P.2d at 648. Under Kansas law, an employee has 20 days to report an injury to their employer without sacrificing their workers' compensation rights. K.S.A. § 44-520(a)(1)(A). If Walmart maintains a policy of firing employees for reporting a workplace injury the day after it happens, Walmart is undermining the public policy established by the Kansas legislature.

Walmart previously argued that the Supreme Court of Kansas approved employers making company policies that require an injury to be reported in less time than the statute. *See Defendant's Sur-Reply Brief in Opposition to Summary Judgment* (Doc.64-1) at 4-5. That is inaccurate. In the case cited by Walmart, the Kansas Supreme Court was not deciding whether an employer may enforce a policy requiring employees to report injuries in less time than the applicable statute. *See Asp v. McPherson Cnty. Hwy. Dept.*, 388 P.2d 652, 655 (Kan.1964). In *Asp*, an injured worker provided late notice of his claim for compensation and commenced a claim for compensation after the statutory period. *Id*. at 652-53. The employee argued statute of limitations should be tolled because the employer engaged in constructive fraud. *Id.* at 655. He argued the company's policy requiring injuries to be reported in seven days was fraudulent. *See id.* The Court never approved the rule; instead, it held that there was no evidence the employee relied on the rule in deciding not to report the injury to his employer. *Id*. In addition, the employee's claim for compensation was denied for not proving written notice of the actual claim within 180 days or filing his claim within one year. *See id.* at 655-56. Accordingly, *Asp v. McPherson* does not support Walmart's argument that it may fire employees for reporting injuries within the 20-day limit set by the legislature.

The Kansas Statute recognizes that "repetitive trauma" can cause a workplace injury. *See* K.S.A. § 44-520(a)(1)(A). Walmart's policies recognize the same, *i.e.,* that repetitive motion may initially cause soreness that eventually develops into an injury. (SOF ¶138). Plaintiff's job with

Walmart required "continuous physical activity" and "repetitive hand motions." (SOF ¶81). An employee engaged in their regular job and feeling pain has not yet experienced an injury under Walmart policies. (SOF ¶¶133-137). Walmart's policies recognize there is a difference between an "injury" and "soreness." (SOF ¶¶206-208). Under Kansas law, an employee should have 20 days to report an injury to their employer even if it was caused by repetitive trauma. The resulting injury might not become readily apparent. Hence the 20-day reporting deadline.

Under the policy argument Walmart advances in this case, an employee can be fired for reporting an injury caused by repetitive trauma unless the employee reported the pain the first time the pain was felt. This argument not only undermines Walmart's policies, it undermines the public policy of Kansas as reflected in K.S.A. § 44-520(a). Walmart's purported reason for firing Plaintiff is not legitimate. It is directly tied to her status as an injured worker, which is protected from retaliation under Kansas law and under Walmart's own policies. (SOF ¶¶75-79).

Even if the Court decides Walmart's articulated reason for firing Plaintiff shifts the burden back to Plaintiff, summary judgment should still be denied because there is sufficient evidence that could cause a jury to find the real reason Plaintiff was fired was due to retaliation.

c. **Evidence of Pretext**

"A plaintiff may show pretext by demonstrating weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999). The issue is whether the evidence *could* allow the jury to disbelieve the employer. *Id.* at 1180. Summary judgment must be denied if a jury *could* find the employer's explanation is not the true motivation. *See Reeves*, 530 U.S. at 147.

"A plaintiff may not be forced to pursue any particular means of demonstrating that a defendant's stated reasons are pretextual." *Swackhammer*, 493 F.3d at 1168. Ultimately, "the combination of suspicious timing with other significant evidence of pretext can be sufficient to survive summary judgment." *Burton v. Freescale Semiconductor, Inc.*, 798 F.3d 222, 240 (5th Cir. 2015). When deciding whether a plaintiff has shown pretext, the Court must consider the "totality of th[e] evidence" and "draw[] all reasonable inferences in [the Plaintiff]'s favor." *Fassbender v. Correct Care Solutions, LLC*, 890 F.3d 875, 890 (10th Cir. 2018); *accord Sanders v. SW Bell Telephone, L.P.*, 544 F.3d 1101, 1111 (10th Cir. 2008).

## Testimony of the Decision-Makers

Even if the Court decides the testimony of Whitenack, Usry, and Medaris is not direct evidence of a retaliatory discharge, it must consider it in the pretext analysis. Comments suggesting an illegal motive can be evidence of pretext, even if the comments fall short of being direct evidence. *Santiago-Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 54 (1st Cir. 2000). Therefore, this Court should "begin where [it] left off with [Plaintiff]'s direct evidence argument." *Fassbender*, 890 F.3d at 884. In *Fassbender*, the Tenth Circuit held that a supervisor's comments about having too many pregnant workers was evidence of pretext despite not being direct evidence because it was not directly tied to the termination decision. *Id.* at 885-886.

The testimony of the decision makers in this case reveal that if Plaintiff would have never reported her workplace injury, she never would have been fired. That is the ultimate fact that all three decision makers agree on in this case. (SOF ¶¶120-124). The testimony of the decision makers in this case is directly related to the termination, which was not the case in *Fassbender*. Considered with the rest of Plaintiff's pretext evidence, a jury could find that Plaintiff was fired due to retaliation, and not for a legitimate reason.

**Walmart's Explanation is False**

A jury could find Walmart's purported reason for firing Plaintiff is pretext because it is false. A plaintiff can show pretext by showing that the employer's "explanation was false." *Reeves*, 530 U.S. at 144. Walmart's 30(b)(6) corporate representative admitted that whether Plaintiff reported her wrist pain the first day it started is genuinely disputed. (SOF ¶241). This is because, according to Plaintiff, she reported the pain to Walmart during the same shift it appeared.

At approximately 1:00 AM on April 13, 2020, while working, Plaintiff began to feel wrist pain she had never felt before. (SOF ¶¶86-87). She reported the wrist pain to her direct supervisor before she left work that day. (SOF ¶¶91-92). Plaintiff's testimony genuinely disputes Walmart's reason for firing her. A jury could believe Plaintiff reported her wrist pain during the same shift in which it started and conclude Ammie Wilber denies the same because she is worried about losing her own job. (SOF ¶19b.i-ii). A jury could likewise disregard Walmart's self-proclaimed good faith understanding that Plaintiff violated policy.

**The Basis for Walmart's Self-Described "Good Faith" Belief is False**

"A plaintiff may not be forced to pursue any particular means of demonstrating that a defendant's stated reasons are pretextual." *Swackhammer*, 493 F.3d at 1168. Inconsistent statements and contradictions are admissible to challenge witness credibility. *U.S. v. Carter*, 973 F.3d 1509, 1512 (10th Cir. 1992); F.R.E. 607; 613; 801(d)(1)(A). Showing pretext is essentially an attack on an employer's credibility when it comes to the reason it took adverse actions against the plaintiff. Summary judgment cannot be granted where the employer's witnesses have been contradicted or impeached. *See Reeves*, 530 U.S. at 151.

Walmart argues that even if Plaintiff reported her wrist pain the day it started, summary judgment should be granted because the decision makers believed in "good faith" that she did not.

Part of the basis for this argument is Walmart's assertion that when David Whitenack asked Plaintiff to compete the Statement Form, he specifically asked her to include "when and to whom she reported" the injury to. (SOF ¶39). That assertion is genuinely disputed. (SOF ¶39a-e). Notably, the information Walmart says he requested is not in the Statement Form. *See Exhibit 14*. Plaintiff testified Whitenack only asked her to use the Statement Form to write about how she was feeling. (SOF ¶39b). Likewise, Whitenack did not initially testify that he asked Plaintiff to write down who she first reported the injury to or when she reported it. (SOF ¶39c). Even when questioned by Walmart's attorney, Whitenack did not say he gave these instructions to Plaintiff, he said that was his normal practice. (SOF ¶39e). The evidence suggests Whitenack did not follow his normal practice with Plaintiff.

Plaintiff's testimony is that Whitenack never asked her whether she previously reported her wrist pain. (SOF ¶117). It is reasonable to infer that if Whitenack truly wanted that information, he would have asked for it after Plaintiff did not include it on the Statement Form. Instead of asking follow-up questions, he fired her. (SOF ¶118). Whitenack testified the Statement Form was allegedly the basis for firing Plaintiff, but it does not contain any statement regarding whether Plaintiff previously reported the pain. *Exhibit 14*. For these reasons, a jury could disregard Walmart's argument that Whitenack believed Plaintiff violated company policy.

## Walmart Made No Effort to Confirm Its Purported Reason for Firing Plaintiff

Walmart chose not to investigate when Plaintiff first reported her wrist pain even though it could have. (SOF ¶¶238-240). Contrary to Walmart's assertion in its Statement of Facts (SOF ¶39), Walmart's 30(b)(6) deposition witness admitted that Walmart never asked Plaintiff to provide a statement saying when, how, or to whom she had previously reported her wrist pain. (SOF ¶236). A reasonable jury could decide that if Walmart truly wanted to know when Plaintiff

first reported her workplace injury, it would have asked her or other employees, which it did not do. (SOF ¶237). Walmart's good faith argument is also undermined because Walmart wholly disregarded Plaintiff's workers' compensation rights after learning she was an injured worker.

**Walmart Disregarded its Own Mandatory Workplace Injury Policies**

Pretext can be found when an employer violates its own polices to take adverse action against the plaintiff. *See Plotke v. White*, 405 F.3d 1092, 1102 (10th Cir. 2005). "[I]nconsistencies and deviations from normal procedure … are sufficient to raise a genuine doubt about [the employer's] motivation. *Id.* at 1105. "[A]n employer's deviation from its own standard procedures may serve as evidence of pretext." *Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1299 (11th Cir. 2006); *accord Matson v. St. John Health System, Inc.*, 296 Fed.Appx 630, 635 (10th Cir. 2008) ("An employer's deviation from a binding company policy stated in an employee handbook can in certain circumstances be evidence of pretext.").

"The question is whether the jury could conclude that the procedural irregularities were somehow related to the decision-maker's discriminatory purpose." *Fassbender*, 890 F.3d at 889. Here, a jury could make such a conclusion because the mandatory policies Walmart disregarded directly apply to Plaintiff's workers' compensation rights. If the mandatory policies were followed, Plaintiff would have been offered medical treatment instead of being fired.

Walmart has a detailed policy manual that is mandatory and must be followed by human resources and management after they learn an employee is an injured worker. (SOF ¶¶125-126). Everyone involved in the situation with Plaintiff was aware of the Dot Com Safety Manual – except for Plaintiff. (SOF ¶¶129-132). Regardless, the policy is mandatory, not discretionary. (SOF ¶128). The Dot Com Safety Manual provides documents and instructions to management that must be used after learning an employee is injured. (SOF ¶139). Walmart admits that it should have

followed the mandatory Dot Com Safety Manual after it learned Plaintiff was an injured worker. (SOF ¶127; ¶¶140-141). The evidence shows it did not.

The Dot Com Safety Manual has several rules designed to make sure employees have access to their workers' compensation rights. It provides instructions about reporting an injury to the State (SOF ¶142), which was never done for Plaintiff (SOF ¶143) even though Walmart admits it was required based on information it had at its disposal. (SOF ¶147; ¶¶151-152). Quincy Usry says he never looked to see whether that needed to be done, even though that is his normal practice. (SOF ¶¶144-146). The Dot Com Manual also contains links to documents Walmart is supposed to provide to an injured worker to make sure she is informed of her rights, but Walmart failed to provide those documents to Plaintiff. (SOF ¶¶147-150).

The Dot Com Safety Manual also requires Walmart to provide an injured worker with a special form – the Associate Incident Report, which specifically requests information such as the cause of the injury, when it happened, and when and to whom it was first reported. (SOF ¶¶153-155; ¶¶159-161). Walmart claims it did not provide this form to Plaintiff (SOF ¶¶156-157). Interestingly, Plaintiff testified she was asked to fill out an Incident Report. (SOF ¶158). The Incident Report would have specifically asked Plaintiff if she wanted medical treatment. (SOF ¶162). According to Walmart, instead of using the required Associate Incident report, which asks for the pertinent information and informs the injured worker of their option to seek medical treatment, they used a Statement Form that was intended for witnesses and did not ask for any of the specific information Walmart claims it fired Plaintiff for failing to include in her statement. (SOF ¶¶163-164). Walmart's policy violations show Walmart was more concerned about firing Plaintiff than making sure she was healthy and afforded her workers' compensation rights.

Walmart failed to conduct an investigation into Plaintiff's injury report even though it was required. (SOF ¶¶165-172). Walmart's failure to investigate Plaintiff's injury undermines its argument that its reporting policy is designed to allow it to investigate injuries. Walmart not only failed to investigate Plaintiff's injury, it failed to properly document Plaintiff's injury report or to properly record her injury in its internal recording system. (SOF ¶¶175-178). Without creating the proper paper trail, perhaps Walmart could plausibly deny receiving notice of Plaintiff's injury if she did make a claim, which could cause a claim for compensation to be denied. *See Casco v. Armor Swift-Eckrich*, 154 P.3d 494, 519-20 (Kan. 2007) (discussing failure to notify could preclude compensation).

Walmart's actions suggest it did not want Plaintiff to exercise her workers' compensation rights beyond internally reporting her injury to Walmart. When Walmart learns that an employee has been injured, their mandatory policy informs management to provide the injured employee with three options – one of which includes seeking medical treatment, and none of which include being fired. (SOF ¶¶179-182). The Dot Com Safety Manual also required David Whitenack to have daily contact with Plaintiff for a week after finding out she was injured, but he never spoke to her again after he fired her. (SOF ¶¶173-174).

Walmart's Dot Com Safety Manual largely serves to ensure employee safety and compliance with workers' compensation laws and OSHA, and contains mandatory procedures that should have been followed. If Walmart were not motivated by a retaliatory motive designed to undermine the public policy of Kansas workers' compensation laws, it could have informed Plaintiff about her right to seek medical treatment, but it never did. (SOF ¶¶232-235). Walmart refused to offer Plaintiff medical treatment or inform her of her workers' compensation rights even though it knew she was in excruciating pain, had swelling, the pain was partially incapacitating

her job performance, she had taken medication for the pain, and the pain was getting worse. (SOF ¶63b.iii); *see also Exhibit 14*. Walmart not only engaged in a pattern of behavior that violated its own mandatory policies, but those policy violations also prevented Plaintiff from exercising her workers' compensation rights. (SOF ¶63b.i-xii).

Instead of following the Dot Com Safety Manual's mandatory rules, Walmart exercised its discretion to fire Plaintiff thirty minutes after she submitted her written Statement Form about her injury. (SOF ¶118). Although the Dot Com Safety Manual allowed for Plaintiff to be disciplined, firing Plaintiff violated the mandatory Dot Com Safety Manual.

### Walmart Violated its Safety Violation Disciplinary Policies

A jury could find Walmart's explanation is pretext for retaliation because even though Walmart violated all the mandatory policies that applied to it, it issued Plaintiff discipline under a discretionary rule, and then violated policy by firing Plaintiff instead of issuing her a Step 1.

The mandatory Dot Com Safety Manual gives management discretion in deciding whether to issue discipline for safety violations, such as an employee who fails to report a known injury by the end of the shift. (SOF ¶¶183-185). Notably, an investigation is supposed to be completed first (SOF ¶188). Walmart admits it did not investigate Plaintiff's injury or when she reported it. Regardless, if discipline is issued, the Dot Com Safety Manual instructs management to use a certain form to issue the discipline – the Form 670e. (SOF ¶¶186-189). Using the Form 670e is required. (SOF ¶190). If the Form 670e was used, Plaintiff would not have been fired.

Walmart's 30(b)(6) witness admitted that according to the Form 670e, failing to report a known injury before the end of the shift results in a Step 1 violation. (SOF ¶191; ¶200). If an employee receives a Step 1 and then repeats the same behavior within the next 180 days, the employee receives a Step 3 or may be fired. (SOF ¶202). Walmart testified that this applies to "full

time associates." (SOF ¶203). Notably, Plaintiff was a full-time associate. (SOF ¶82; ¶¶204-205). Walmart fired Plaintiff instead of using the Form 670e as required by the Dot Com Safety Manual. (SOF ¶192). Walmart claims it relied on JetFlex Disciplinary guidelines, but those policies conflict with the Dot Com Safety Manual that Walmart admits specifically applies to workplace injuries. Moreover, all the managers involved in firing Plaintiff knew about their obligations under the Dot Com Safety Manual and had access to it. (SOF ¶¶127-132). A jury could conclude they ignored it to prevent Plaintiff from exercising her workers' compensation rights.

### Walmart's Decision to Fire Plaintiff was Not Subjectively Reasonable

The jury could also find that Walmart's articulated basis for firing Plaintiff is illogical considering their policies and the circumstances surrounding Plaintiff's wrist pain and her job. A jury can disregard an employer's explanation for its own actions if the evidence undermines the subjective basis for the employer's actions. *See Fassbender*, 890 F.3d at 889. In other words, if there is not reasonable basis for the employer's stated reason for firing the plaintiff, the jury could find the employer is covering up an "ulterior motive." *Id.*

First, Walmart admits that it never provided Plaintiff any training about workplace injuries, when to report them, who to report them to, or the difference between injuries and routine soreness. (SOF ¶¶216-217; ¶¶224-225). The two documents that contain the rule Walmart says Plaintiff was fired for were provided to her before he employment began, but she received no training on them. Between the two documents, there are 308 bullet points, and only two of them relate to the rule Walmart claims Plaintiff violated. (SOF ¶214). Both documents suggest an employee must report a "known injury" during the shift in which the injury happens, but neither document explains what qualifies as an injury. (SOF ¶¶194-196; ¶¶199-201). Neither document explains the difference between soreness and injury. (SOF ¶¶218-219). Plaintiff was not provided any training on either

document or on what constitutes an injury versus what constitutes soreness. (SOF ¶¶216-217). This is material because Walmart's policies recognize the difference (SOF ¶206) and the Safety Employees recognize there is a difference. (SOF ¶¶207-208).

Unlike the policies accessible to Plaintiff, the Dot Com Safety Manual defines terms such as "injury" and "incident." (SOF ¶¶133-136). According to Walmart, an employee who is feeling sore from doing their normal job has not experienced an "injury incident." (SOF ¶137). Moreover, Walmart's policy contemplates that repetitive motion can cause pain, which may or may not result in an injury. (SOF ¶138). Given the nature of Plaintiff's job, the nature of her wrist pain, and Walmart's acknowledgment that repetitive motion can cause soreness, which is different than an "injury," a jury could find Walmart acted unreasonably. Plaintiff's job is physically demanding (SOF ¶81) and this was her first shift back from being quarantined for coronavirus symptoms. (SOF ¶¶83-85). No specific incident caused the pain. (SOF ¶88). It is reasonable to infer that she initially the pain she reported feeling did not qualify as an "injury incident" that even needed to be reported under Walmart's policy. Perhaps that is why Walmart actually denies Plaintiff suffered a workplace injury when she claims she started feeling pain on April 13, 2020. (SOF ¶242). Walmart's denial that Plaintiff suffered a workplace injury at 1:00 AM on April 13, 2020 brings us to Plaintiff's final pretext argument.

A jury could find it astonishing that Walmart claims it fired Plaintiff for reporting an April 13, 2020 workplace injury on April 14, 2020 while simultaneously denying Plaintiff suffered a workplace injury on April 13, 2020. (SOF ¶242). Given the totality of the circumstances, and drawing every reasonable inference in Plaintiff's favor, a jury could find that Walmart retaliated against Walmart by firing her. A jury will likely conclude Walmart was more concerned about firing Plaintiff than about actually finding out what happened, because it wanted to prevent her

from exercising her workers' compensation rights. If Walmart lacked an unlawful motive, it could have fired her and offered her medical treatment. But that is not what happened.

## CONCLUSION

Based on the foregoing, Plaintiff's claims of retaliatory discharge should proceed to a jury trial. Material facts set forth by Walmart are genuinely disputed. Moreover, Plaintiff has offered additional material facts which create questions of fact regarding Walmart's motive for firing Plaintiff. Accordingly, Defendant's *Motion for Summary Judgment* (Doc. 94) should be DENIED.

*Respectfully submitted by:*

**RALSTON KINNEY, LLC**

/s/ *Kenneth D. Kinney*
Kenneth D. Kinney, D.Kan. #78544
Thomas F. Ralston, D.Kan. #78212
4717 Grand Avenue, Suite 300
Kansas City, Missouri 64112
Tel: (816) 298-0086
Fax: (816) 298-9455
Email: ken@rklawllc.com
Email: tom@rklawllc.com
**ATTORNEYS FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

I hereby certify that on July 9, 2021, a PDF copy of the foregoing was filed through the Court's ECF system, which will serve Defendant by emailing notice and a copy to Defendant's attorneys of record.

/s/ *Kenneth D. Kinney*
**ATTORNEY FOR PLAINTIFF**

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

JANELL BRAXTON               )
            *Plaintiff*        )
      vs.                    )     Case No. 2:20-cv-02287-DDC-GEB
                          )
WALMART INC.               )
            *Defendant*     )

## PLAINTIFF'S RESPONSE TO
## <u>DEFENDANT'S MOTION FOR SUMMARY JUDGMENT</u>

### EXHIBIT 1

Plaintiff's Job Description

Deposition Exhibit 21

**EXHIBIT 1**



## www.jet.com
## Associate, Warehouse Fulfillment
30801 W. 191st St., Gardner, KS

**Duties:**

Jet.com's Fulfillment Center (FC) in Gardner, KS is a fast-paced environment fully focused on getting orders out the door in a timely and accurate manner. Our fulfillment team is brand new so be prepared for rapid growth! We want employees who care and take pride in their work, and given that we're a start-up you will need to be a jack of all trades - be prepared to wear many hats!

**Responsibilities**

- Receive and unload shipments, verify contents against purchase orders for accuracy, and report any issues or discrepancies
- Time management skills and the ability to organize and prioritize tasks
- Receive, count, and assign product into inventory
- Pick, pack and ship all orders daily
- Audit inventory through regular cycle counts, as required
- Meet established metrics for daily productivity

**Requirements**

- General understanding of common software and every day technology (like smartphones!)
- Problem solving and analytical skills – details are king!
- Established communication, interpersonal, and listening skills
- Ability to interact and participate in a fast-paced, high-energy, team-driven environment
- Time management skills and the ability to organize and manage multiple priorities
- May require the ability to work a schedule outside of normal business hours
- Requires a high-school level of writing and math skills
- Change will come fast and furious – you will have to be able to adapt and grow

**Physical Demands & Working Conditions**

- Typical FC environment with exposure to varying temperatures on a regular basis
- Concentrated mental and visual attention with a high degree of manual dexterity
- Requires continuous physical activity and the ability to lift and move up to 50lbs continuously
- Requires walking, standing, bending and continuous walking for long periods. Repetitive hand motions
- Ability to wear required personal protective equipment including safety glasses and safety shoes
- Works in accordance with general safety rules and practices



**WM_Braxton_000132**
**EXHIBIT 1**

**Salary:** Hourly position

**Part time or Full Time:** Full Time

WM_Braxton_000133
**EXHIBIT 1**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

JANELL BRAXTON                              )
           *Plaintiff*                     )
     vs.                                )     Case No. 2:20-cv-02287-DDC-GEB
                      )
WALMART INC.                               )
           *Defendant*                    )

**PLAINTIFF'S RESPONSE TO**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**EXHIBIT 2**

Plaintiff's Deposition

**EXHIBIT 2**

### In the Matter Of:

*JANELL BRAXTON vs*

*WAL-MART*

---

*JANELL BRAXTON*

*January 25, 2021*

---



**EXHIBIT 2**

Janell Braxton - January 25, 2021

**Page 1**

```
1        IN THE UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF KANSAS
2
    JANELL BRAXTON,              )
3                               )
        Plaintiff,              )
4                               )
        -vs-                    )  No. 2:20-CV-02287
5                               )
    WAL-MART, INC.,             )
6                               )
        Defendant.             )
7
8
9
10
11
12
13
14        DEPOSITION OF JANELL N. BRAXTON
15      TAKEN ON BEHALF OF THE DEFENDANT
16             JANUARY 25, 2021
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
1        IN THE UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF KANSAS
2
    JANELL BRAXTON,              )
3                               )
        Plaintiff,              )
4                               )
        -vs-                    )  No. 2:20-CV-02287
5                               )
    WAL-MART, INC.,             )
6                               )
        Defendant.             )
7
8
9
10
11
12        THE DEPOSITION of JANELL N. BRAXTON,
13  produced, sworn, and examined on January 25, 2021,
14  between the times of 10:00 in the forenoon and 3:42
15  in the afternoon of that day, at the offices of
16  Ralston Kenney, LLC, 4714 Grand Avenue, Suite 300,
17  Kansas City, Missouri, 64112, before Jill A. Bleskey,
18  Registered Professional Reporter, Certified Shorthand
19  Reporter (IL), and a Certified Court Reporter (MO) in
20  a certain cause now pending in the United States
21  District Court, for the District of Kansas, between
22  Janell Braxton, Plaintiff, vs. Wal-Mart, Inc.,
23  Defendant; on behalf of Defendant.
24
25
```

**Page 2**

```
1                I N D E X
2   EXAMINATION BY                        PAGE
3   Mr. Goldsmith                           5
    Mr. Ralston                           135
4   Mr. Goldsmith                         147
5              E X H I B I T S
6   EXHIBITS      DESCRIPTION              PAGE
7   Exhibit 20 - Onboarding Information      17
    Exhibit 21 - Jet dot com Job Description 28
8   Exhibit 22 - Global Ethics Policy        40
    Exhibit 23 - Discrimination and Harassment
9       Prevention Policy                    41
    Exhibit 24 - Safety and Compliance Rule
10      Violation Form                       43
    Exhibit 25 - General Safe Work Practices
11      Policy                               47
    Exhibit 26 - Complaint                   47
12  Exhibit 27 - Time Card Activity          79
    Exhibit 28 - Statement Form              92
13  Exhibit 29 - Text Exchange              115
    Exhibit 30 - May 15, 2020 E-mail from the
14      United States Postal Service        122
    Exhibit 31 - May 15, 2020 USPS Offer Letter 123
15  Exhibit 32 - Rural Carrier Associate Offer
        Letter                             124
16  Exhibit 33 - September 23, 2020 Best Buy
        Offer Letter                       127
17
    (Originals exhibits have been retained by the court
18  reporter and will be attached to copies of the
    transcript.)
19
20
21
22
23
24
25
```

**Page 4**

```
1              A P P E A R A N C E S
2   For the Plaintiff:
3       Mr. Thomas F. Ralston
        RALSTON KINNEY, LLC
4       4717 Grand Avenue, Suite 300
        Kansas City, Missouri 64112
5       (816)298-0086
        tom@rklawllc.com
6
    For the Defendant:
7
        Mr. Mark J. Goldsmith
8       BAIRD HOLM, LLP
        1700 Farnam Street, Suite 1500
9       Omaha, Nebraska 68102
        (402)344-0500
10      mgoldsmith@bairdholm.com
11
12
13
14  Court Reporter:
15  Jill A. Bleskey, RPR
        Illinois CSR #084-004430
16      Missouri CCR #1467
        Alaris Litigation Services
17      1608 Locust Street
        Kansas City, Missouri 64108
18      (816)221-1160
        1-800-280-3376
19
20
21
22
23
24
25
```

Janell Braxton - January 25, 2021

17

```
1    part of the onboarding.
2         BY: MR. GOLDSMITH
3         Q.   Was that tour given on your first day
4    of work or was it before you started work for
5    Wal-Mart?
6         A.   It was given on the first day of
7    work, first day I physically was clocking in to work.
8         (WHEREIN, Exhibit 20 was marked for
9    identification by the Court Reporter.)
10        BY: MR. GOLDSMITH
11        Q.   Ms. Braxton, you've been handed
12   what's been marked as Exhibit 20.  It's Bates stamped
13   WM Braxton 82 through 96.  Take a moment just to look
14   that over and let me know when you're done.
15        A.   Okay.
16        MR. RALSTON:  And Mark, I don't want to
17   step on your toes.  But the Bates numbers are these
18   little numbers right here on lower right-hand of the
19   document.  These Bates numbers are WM underscore
20   Braxton underscore and then there's a series of
21   numbers.  And so that's what Bates stamps are.
22        THE WITNESS:  Okay.
23        MR. RALSTON:  They're just numbers that we
24   put on documents to identify them.  Does that make
25   sense?
```

18

```
1         THE WITNESS:  Yes.  Okay.
2         BY: MR. GOLDSMITH
3         Q.   Now Ms. Braxton, I'll like to direct
4    your attention to the Bates numbers that your Counsel
5    explained, Numbers 86 and 87, I think it's the fifth
6    and sixth pages of Exhibit 20.
7         A.   Okay.
8         Q.   And actually, if you start on 87 and
9    work backwards.  And at the top of Page 87 you'll see
10   that there are a number of entries on the date of
11   March 20th, 2020 between 11:00 and, let's see, maybe
12   11:30 or so.  Do you see that?
13        A.   Yes.
14        Q.   Does that refresh your recollection
15   that your onboarding for your job at the Edgerton
16   facility occurred on March 20th?
17        A.   Well, I know -- I know that I was
18   told by the talent acquisition representative that
19   before I came into work for my first working day that
20   there were, like, some onboarding online things that
21   I was supposed to go in and like check off boxes
22   before I could start work.
23        Q.   So based on your testimony, am I
24   correct that your first visit to the Edgerton
25   facility occurred sometime before March 20th of 2020?
```

19

```
1         A.   My first visit?  I'm not sure what
2    you mean.
3         Q.   Do the entries that we see in
4    Exhibit 20 for March 20th, 2020, do these entries
5    occur in between your first visit to the Edgerton
6    facility and your first day of work?
7         MR. RALSTON:  Just for the record, it's
8    Exhibit 20, not Exhibit 4.
9         MR. GOLDSMITH:  If I said Exhibit 4, I
10   apologize.
11        THE WITNESS:  Yes.
12        BY: MR. GOLDSMITH
13        Q.   Okay.  When you filled out the
14   electronic documents on March 20th, 2020, how were
15   those provided to you?  Or how was access to those
16   documents provided to you?
17        A.   I think I remember accessing them on
18   my phone.  It was like a login portal that I was
19   instructed to go to and just complete all the checks
20   that were there for me to complete.
21        Q.   Do you remember who told you to
22   complete these electronic documents?
23        A.   Yes.  It was Lauren Graham.
24        Q.   And was that the talent acquisition
25   representative you mentioned earlier in your
```

20

```
1    testimony?
2         A.   Yes.
3         Q.   When you completed the electronic
4    documents on March 20th, 2020, did you read through
5    any of the materials that were electronically
6    provided to you?
7         A.   There weren't any -- I don't remember
8    anything like opening them up, it was more like just
9    a list of boxes with names of different documents and
10   you just needed to check them off.
11        Q.   Do you remember attempting to open
12   any documents?
13        A.   If -- like if I clicked on it then it
14   would open.  But I don't remember anything populating
15   or popping up when I clicked on them.
16        Q.   Am I correct that you remember
17   affirmatively clicking but nothing showing up?
18        A.   Yes.
19        Q.   Do you remember how many times you
20   did that?
21        A.   I don't remember how many checks
22   there were.  But there were a lot.
23        Q.   Did you attempt to open each document
24   before you checked it off electronically?
25        A.   Yes.
```

Janell Braxton - January 25, 2021

---

**25**

1    A.  No.  I thought it was just like a
2  process that you just go in and check.  Basically I
3  was just told to go in and check these boxes.  I
4  wasn't aware of what the boxes were, or what were in
5  the boxes -- what the documents were.
6        Q.  Can you tell me, to the best of your
7  recollection, exactly what Lauren Graham told you
8  regarding these documents that you checked on March
9  20, 2020?
10       A.  She just told me, you know, you have
11  to go online and check off the onboarding documents.
12  And just basically said you have to do it before you
13  can start your first day of work.
14       Q.  Did she describe what the onboarding
15  documents were or were going to be?
16       A.  No.
17       Q.  Did you ever ask her what they were
18  or what they were going to be?
19       A.  No.  Because it just seemed like a
20  routine process is the way that she kind of made
21  it...
22       Q.  Even if Lauren Graham, to your
23  recollection, did not identify the documents or what
24  they were going to be, did she explain why
25  acknowledgments of those documents were needed?

---

**26**

1    A.  She -- she explained to me that they
2  were needed in order to start your first day.
3        Q.  My understanding is your first day of
4  work at Wal-Mart was March 23rd, 2020.  Does that
5  sound right?
6        A.  Yes.
7        Q.  During your employment from
8  March 23rd, 2020 to April 14th, 2020, you held the
9  position of a QC singles associate, correct?
10       A.  Yes.
11       Q.  Is that also known as a packer?
12       A.  I think so but I'm not sure.  I was
13  packing items so that would make sense.
14       Q.  I'll simply refer to your position as
15  a QC singles just so there's no confusion, okay?
16       A.  Okay.
17       Q.  What were your job responsibilities
18  as a QC singles associate?
19       A.  My job responsibilities were to take
20  product that was already picked in a location and
21  take it back to my work station and package it and
22  put it on a conveyor belt.
23       Q.  And you were a seasonal QC singles
24  associate, correct?
25       A.  Yes.

---

**27**

1        Q.  Do you know if the job
2  responsibilities for a seasonal QC singles associate
3  was any different from the job responsibilities of a
4  permanent QC singles associate?
5        A.  No, I do not, no.
6        Q.  During your onboarding process, all
7  the way up through your first day of work, what was
8  your understanding of what the distinction was
9  between the permanent and a seasonal QC singles
10  associate?
11       A.  My understanding was that basically
12  they -- because of everything that was going on with
13  the Coronavirus at that time they needed to get
14  workers in.  And this is how -- usually like in and
15  around Christmastime this is how they would staff the
16  extra help that they needed.  And that if you -- it's
17  not stated that you would end up with a permanent
18  position but if you did well, you know, in the
19  position more than likely you would be able to stay
20  and become permanent.
21       Q.  Did you have an understanding of what
22  the probationary period for a seasonal association to
23  become a permanent associate was?
24       A.  No.
25       Q.  Was it your intention to become a

---

**28**

1  permanent QC singles associate?
2        A.  Yes.
3        (WHEREIN, Exhibit 21 was marked for
4  identification by the Court Reporter.)
5        BY:  MR. GOLDSMITH
6        Q.  Ms. Braxton, you've been handed
7  what's been marked as Exhibit 21, it's Bates stamped
8  WM Braxton 132 and 133.  Have you seen this document
9  before?
10       A.  I -- possibly when I was first
11  applying for the job.
12       Q.  And during that application process,
13  when would you have seen this document?
14       MR. RALSTON:  Objection, assumes facts,
15  misstates her testimony.
16       THE WITNESS:  I'm not sure exactly when I
17  would have seen it.  But there's a possibility that I
18  did see it.
19       BY:  MR. GOLDSMITH
20       Q.  Okay.  Is it possible that you saw
21  what we've marked as Exhibit 21 as part of the
22  electronic documents that you acknowledged on
23  March 20th, 2020?
24       A.  No.  Because nothing -- nothing
25  populated in those documents.

---

Janell Braxton - January 25, 2021

---

29

1    Q.   Is it possible that you saw what we
2  marked as Exhibit 21 during your first visit to the
3  Edgerton facility sometime before March 20th, 2020?
4    A.   That's possible.  I would think I
5  would have seen this when the talent acquisition
6  representative was recruiting people for the
7  position.
8    Q.   And by that do you mean during your
9  first visit to the property?
10    A.   Or -- or like through the online job
11  posting.
12    Q.   Either during your first visit or as
13  part of the online job posting, do you remember what
14  other documents, if any, you saw relative to your
15  potential employment with Wal-Mart?
16    A.   Only the form that asks us what
17  shifts we were interested in and it had like a number
18  of shifts and the time frames and the days of the
19  weeks, et cetera, I remember seeing that.
20    Q.   Regardless of whether you'd seen
21  Exhibit 21 before, does it accurately reflect your
22  understanding of the description of your job in March
23  and April 2020?
24    A.   Yes.
25    Q.   From March 23rd, 2020 to April 14th,

---

30

1  2020, did you understand that as a seasonal Wal-Mart
2  associate that you were subject to various Wal-Mart
3  policies?
4    A.   Yes.
5    Q.   Did you understand what those
6  policies were?
7    A.   I don't remember receiving, you know,
8  information on policies.
9    Q.   Whether you received information or
10  not, you understood that you were subject to Wal-Mart
11  policies, correct?
12    A.   Yes.
13    Q.   Did you have an understanding of what
14  those policies were, whether or not you actually saw
15  them?
16    A.   No.  I mean, I have understanding of,
17  you know, the policy like how to call in to work if
18  you're absent or how long your lunch should be and
19  things like that.
20    Q.   And how did you gain the
21  understanding relative at least to those policies?
22    A.   Through management.  Or also through
23  the -- the trainers that they have.
24    Q.   When you say through management, who
25  do you mean?

---

31

1    A.   Like my direct manager or the
2  trainers from the first day at work.  Like Sue, for
3  instance, she helped new employees get familiar with
4  the location and tell them, you know, where to put
5  your belongings when you come in and how to use the
6  clock in and out system.
7    Q.   Who was your direct manager that you
8  referenced?
9    A.   My lead was Amy.
10    Q.   Do you remember Amy's last name?
11    A.   No.
12    Q.   And when you said direct manager,
13  were you referencing Amy?
14    A.   Yes.
15    Q.   And you mentioned that you learned of
16  these policies through management.  Was there anybody
17  besides Amy that you would have been talking about
18  when you referenced management?
19    A.   No.
20    Q.   My understanding is that as a QC
21  singles associate you worked at an individual work
22  station next to a conveyor belt, is that generally
23  correct?
24    A.   Yes.
25    Q.   And generally speaking, your job was

---

32

1  to take items from a cart, scan them into a computer
2  system at your station, pack the items, and place
3  them on the conveyor belt, did I get that correct?
4    A.   Yes.
5    Q.   Did you have one set station within
6  the facility for the entire time that you were a
7  seasonal QC associate?
8    A.   No.
9    Q.   Were there simply QC single associate
10  stations and everybody just took whichever one was
11  most convenient to them that particular night?
12    A.   Well, actually the managers assigned
13  you to your station.
14    Q.   And did that happen before every
15  shift that you worked?
16    A.   Yes.  Sometimes they would change
17  them half -- midway through the shift.
18    Q.   And during your entire tenure as a QC
19  singles associate, you only worked the overnight
20  shift from about 6:30 p.m. to 5:00 a.m. the next
21  morning, correct?
22    A.   Yes.
23    Q.   And sometimes that's referenced as
24  the second shift; is that correct?
25    A.   Yes.

---

Janell Braxton - January 25, 2021

---

**37**

1      Q.   And you took a medical leave of
2  absence from your employment at Wal-Mart from
3  March 29th, 2020 to April 11, 2020, correct?
4      A.   Yes.
5      Q.   Prior to your leave of absence, did
6  you work every overnight shift between March 23rd,
7  2020 and March 28th, 2020?
8      A.   Yes.
9      Q.   And what was the basis for your
10  medical leave of absence between March 29th, 2020 and
11  April 11th, 2020?
12      A.   It was that I -- it was suspected
13  that I had Coronavirus.
14      Q.   What made you suspect that you had
15  Coronavirus?
16      A.   I was having shortness of breath, a
17  fever, and fatigue.
18      Q.   To your knowledge, did you have
19  Coronavirus?
20      A.   I do not know because during that
21  time when I called the Johnson County health line
22  they told me because I wasn't having severe symptoms
23  that at that time they weren't doing testing for
24  just -- you know.  So they told me that I should
25  quarantine like I do have it, it sounds like I

---

**38**

1  possibly do.  But they didn't give me a -- I couldn't
2  get a confirmation.
3      Q.   When you went out on leave on
4  March 29, 2020, did you expect to be out for a full
5  four weeks?
6      A.   No.
7      Q.   How long did you expect to be out
8  when you first went out on leave on March 29, 2020?
9      A.   Just two weeks.  I was only out for
10  two weeks.
11      Q.   Do you remember if you had a specific
12  expected return to work date when you first went out
13  on leave of absence on March 29th?
14      A.   No.  I just think that the quarantine
15  time or whatever the restrictions were was the two
16  weeks.
17      Q.   As you sit here today, do you think
18  you had Coronavirus back in March and April of 2020?
19      A.   I think so, yes.
20      Q.   You returned from your leave of
21  absence on April 12th, 2020, correct?
22      A.   If that was the two weeks, yes.
23      Q.   And when you returned to work on
24  April 12th, 2020, were you symptom free?
25      A.   Yes.

---

**39**

1      Q.   How long had you been symptom free?
2      A.   Symptom free for at least, I would
3  say, a week or so.
4      Q.   And when you returned from your leave
5  of absence, you then worked three consecutive shifts,
6  second shifts, until your termination on the night of
7  April 14th, 2020, correct?
8      A.   Yes.
9      Q.   So that first shift would have
10  started the evening of April 12th, 2020 and gone to
11  the morning of April 13th, 2020, correct?
12      A.   Yes.
13      Q.   And then the next shift would have
14  been evening of April 13th, 2020 to the morning of
15  April 14th, 2020, correct?
16      A.   Yes.
17      Q.   And then the final shift that you
18  worked would have been the evening of April 14th,
19  2020 until your termination shortly before midnight
20  during that shift, correct?
21      A.   Yes.
22      MR. RALSTON:  Hey Mark, is it okay if we
23  take a really short break?
24      MR. GOLDSMITH:  Absolutely.
25      MR. RALSTON:  Okay.

---

**40**

1      (At this point in the proceedings, a short
2  recess was taken.)
3      (WHEREIN, Exhibit 22 was marked for
4  identification by the Court Reporter.)
5      BY:  MR. GOLDSMITH
6      Q.   Ms. Braxton, I've handed you what
7  we've marked as Exhibit 22.  It's Bates stamped WM
8  Braxton 1 through 38.  Take a moment to look at that
9  and let me know when you're ready.
10      A.   Okay.  All right.
11      Q.   Ms. Braxton, have you ever seen
12  Wal-Mart Global Ethics Policy that we've marked as
13  Exhibit 22?
14      A.   I don't remember seeing this.
15      Q.   And if you turn back to Exhibit 20,
16  on Page WM Braxton 92.
17      A.   Okay.
18      Q.   On the bottom left-hand corner
19  there's a reference to the Global Ethics Policy, do
20  you see that?
21      A.   Yes.
22      Q.   Do you know if what we've marked as
23  Exhibit 22 is the Global Ethics Policy that you
24  acknowledged and agreed to comply with that we see on
25  Exhibit 20?

---

45

1    THE WITNESS:  I don't remember safety
2  related incidents.  But I definitely remember basic
3  things about the dress code or -- let's see.
4  Ergonomics, box knives, verbal information about
5  those items.
6    BY:  MR. GOLDSMITH
7    Q.   Do you just have a general
8  recollection of discussion of those topics or do you
9  have a more specific recollection?
10    A.   A general recollection.
11    Q.   Have you ever heard reference to a
12  policy labeled 6 -- strike that.  Have you ever heard
13  reference to a policy labeled 763E?
14    A.   No.
15    Q.   And again, if you turn to Exhibit 20.
16  Also on Page 93 there's a reference to WMW763E.  Do
17  you see that?
18    A.   Yes.
19    Q.   Do you know if what we see in
20  Exhibit 25 is the WMW673E that you acknowledged and
21  agreed to comply with as we see on Exhibit 20?
22    A.   I don't know because I haven't seen
23  it.
24    Q.   Now, following your medical leave of
25  absence your first shift back was the overnight shift

46

1  from April 12th at 6:30 p.m. to April 13th at
2  5:00 a.m., correct?
3    A.   Yes.
4    Q.   I will represent to you that that was
5  a Sunday night to Monday morning.  Does that sound
6  correct?
7    A.   Yes.
8    Q.   What time did you arrive for your
9  shift on April 12th?
10    A.   That would have been somewhere around
11  6:10, maybe 6:20.
12    Q.   Who was your lead for that April 12th
13  to 13th shift?
14    A.   Amy.
15    Q.   So Amy was your direct supervisor for
16  the April 12th through 13th shift, correct?
17    A.   Yes.
18    Q.   When you arrived around 6:10 to
19  6:20 p.m. on April 12th, what did you do for the next
20  10 to 20 minutes before your shift actually started?
21    A.   I probably had some food that I was
22  eating in my car before I went into the workplace.
23    Q.   Is there -- or strike that.  Was
24  there a general routine as to how a shift started?
25  Meaning, you know, did you have a group meeting or

47

1  did 6:30 hit and you just went to a station?
2    A.   Sometimes there were group meetings
3  and then sometimes we just went to the stations.
4    Q.   Do you remember which of those two
5  scenarios occurred on April 12th, 2020?
6    A.   No.
7    (WHEREIN, Exhibit 26 was marked for
8  identification by the Court Reporter.)
9    BY:  MR. GOLDSMITH
10    Q.   Ms. Braxton, I've handed you what we
11  have marked as Exhibit 26, which is a copy of your
12  complaint in this case.  Same deal, take a look at it
13  and let me know when you've had a chance to review
14  it.
15    A.   Okay.
16    MR. RALSTON:  Will you be using the
17  amended complaint?
18    MR. GOLDSMITH:  Why don't we go off for a
19  second.
20    (At this point in the proceedings, an off
21  the record discussion was held.)
22    THE WITNESS:  Okay.
23    BY:  MR. GOLDSMITH
24    Q.   Ms. Braxton, have you seen Exhibit 26
25  before?

48

1    A.   Yes.
2    Q.   Did you review Exhibit 26 before it
3  was filed in this case?
4    A.   Yes.
5    Q.   And if you turn to Page 3.
6  Throughout the complaint there's reference to a
7  manager, slash, lead.  An example of that would be in
8  Paragraph 20 on Page 3.  Do you see that?
9    A.   Yes.
10    Q.   By that do you mean your lead, Amy?
11    A.   Yes.
12    Q.   Now, if you look at Paragraph 19 on
13  Page 3 it says that you felt throbbing pain in your
14  wrist early morning hours of April 13th, 2020.  Do
15  you see that?
16    A.   Yes.
17    Q.   Is that an accurate statement?
18    A.   Yes.
19    Q.   Which wrist?
20    A.   My left wrist.
21    Q.   Can you give me a more specific
22  timeframe for early morning hours?
23    A.   Early morning, one a.m. or so.
24    Q.   So am I correct that you first began
25  to feel some sort of discomfort in your wrist on

Janell Braxton - January 25, 2021

49

1   April 13th, 2020?
2       A.   Yes.
3       Q.   At any time in the past, prior to
4   April 13th, had you ever felt a similar pain in your
5   wrist?
6       A.   No.
7       Q.   At any time in the past, prior to
8   April 13, 2020, had you ever felt any kind of pain in
9   your wrist?
10      A.   No.
11      Q.   Did you break your left wrist when
12  you were six years old on a jungle gym or anything
13  like that?
14      A.   No.
15      Q.   Had you ever injured your left wrist
16  at any time prior to April 13th, 2020?
17      A.   No.
18      Q.   So up to and through April 12th,
19  2020, as far as you knew your left wrist was and
20  always had been healthy?
21      A.   Yes.
22      Q.   As you sit here today, can you think
23  of any particular incident or occurrence that caused
24  the initial discomfort that you felt around one a.m.
25  April 13th, 2020?

50

1       A.   Well, I can just remember it started
2   to hurt while I was working.  But I can't remember,
3   like, something -- like a piece of equipment falling
4   on me or anything like that.  It wasn't like a -- it
5   wasn't like something just immediately caused it, it
6   just started giving me pain while I was working.
7       Q.   So am I correct that you can't think
8   of any particular incident or occurrence that caused
9   the initial discomfort on April 13th, 2020?
10      A.   Correct.
11      Q.   When you first started feeling
12  discomfort in the early morning hours of April 13th,
13  did that discomfort start as a throbbing or would
14  there be another description that would be more
15  accurate when it first started?
16      A.   No.  It was -- it was like a
17  throbbing pain that started.
18      Q.   When you first noticed the throbbing
19  in your wrist on April 13th, 2020, did it impede your
20  ability to do your job?
21      A.   Yes.
22      Q.   How?
23      A.   I was moving slower, I kept thinking
24  about it as I was working.  It was harder for me to
25  pick up items from the cart with one hand.

51

1       Q.   Am I correct that the throbbing in
2   your wrist got progressively worse as your shift went
3   on until your shift ended at five a.m. on April 13th,
4   2020?
5       A.   Yes.
6       Q.   My understanding is that two shifts
7   later, on the evening of April 14th, 2020, was the
8   first time that you informed management about the
9   pain in your wrist; is that correct?
10      A.   That's not correct because I informed
11  my lead Amy on April 13th.
12      Q.   How many times did you tell Amy that
13  you were feeling some kind of discomfort in your
14  wrist on April 13th, 2020?
15      A.   On April 13th.  At least two times.
16      Q.   When did those two times occur?
17      A.   The first time occurred towards the
18  end of my shift on the 13th in the morning --
19  early morning hours.  She came over to tell me how
20  well I was doing and I was pretty much doing better
21  than anyone on the team at that time.  And I stopped
22  her and I said, well, I don't know how that's
23  possible because my wrist's really hurting me.
24      And then the second time would have been
25  on April the 13th in the evening of my next shift, I

52

1   told her that my wrist, you know -- I told a lead,
2   and I'm pretty sure it was Amy but there was another
3   lead there at that time.  And -- but I did say, you
4   know, that my wrist was hurting me.
5       Q.   Now, the first time that you informed
6   Amy about something wrong with your wrist, you said
7   it was towards the end of your shift on April 13th in
8   the morning, correct?
9       A.   Yes.
10      Q.   Can you give me a timeframe as to
11  when that occurred?
12      A.   That would be like around five a.m.
13  or so.
14      Q.   Was it after your shift had finished
15  or were you about to be finished?
16      A.   About to be finished.
17      Q.   And when you first informed Amy about
18  your wrist on April 13th, 2020, can you tell me to
19  the best of your recollection exactly what you told
20  her?
21      A.   The first time that I informed Amy
22  that my wrist was hurting I said, my wrist -- I can't
23  believe I'm doing so well, my wrist is really hurting
24  me.  And she said, well, you're doing fine, you're
25  doing great.

Janell Braxton - January 25, 2021

|  | 53 |
|---|---|
| 1 | Q.   Did you elaborate at all on what you |
| 2 | meant by my wrist is really hurting me? |
| 3 | A.   No.  Just my wrist is really hurting |
| 4 | me.  So, you know, I can't believe I'm doing so well. |
| 5 | Q.   Did you ask at that time to go to the |
| 6 | safety cube? |
| 7 | A.   No.  It was at the end of the shift. |
| 8 | Q.   And if your shift ended around five |
| 9 | then your wrist had been bothering you for about four |
| 10 | hours, correct? |
| 11 | A.   Yes. |
| 12 | Q.   At any time during those four hours |
| 13 | between one a.m. and five a.m. on April 13th, 2020, |
| 14 | did you ask anybody to be able to go to the safety |
| 15 | cube? |
| 16 | A.   No. |
| 17 | Q.   Is there any reason that you didn't |
| 18 | ask anybody to go to the safety cube on April 13th, |
| 19 | between one and five a.m.? |
| 20 | A.   I'm thinking I was just trying to |
| 21 | work through, you know, I wasn't really sure what was |
| 22 | going on and I didn't -- it wasn't -- I wasn't to the |
| 23 | point to where I couldn't work.  So I just was |
| 24 | working through it. |
| 25 | Q.   Was there any reason why you simply |

|  | 54 |
|---|---|
| 1 | just didn't get up and go to the safety cube on |
| 2 | April 13th between one a.m. and five a.m.? |
| 3 | A.   I just figured I would work through |
| 4 | whatever was going on with my wrist at that time. |
| 5 | Not -- actually, I'm thinking because that -- the job |
| 6 | is very -- the stats depend on how long you're at |
| 7 | your station ad if you walk away from your station |
| 8 | you mess up your stats.  So I'm kind of a |
| 9 | perfectionist and I just didn't want to have to try |
| 10 | to make up my time and get back to the position I was |
| 11 | in if I left. |
| 12 | Q.   When you first told Amy about your |
| 13 | wrist, I think the words you said today was that you |
| 14 | told her your wrist was really hurting you.  Do you |
| 15 | remember if those were your exact words or did you |
| 16 | say something to that effect? |
| 17 | A.   I don't remember if those were my |
| 18 | exact words but I know I said something to that |
| 19 | effect. |
| 20 | Q.   What, if anything, did Amy say in |
| 21 | response to when you told her your wrist was |
| 22 | bothering you that first time on April 13th? |
| 23 | A.   She said something like, well, you're |
| 24 | doing good.  I think that's around what she said. |
| 25 | Q.   How much had the pain progressed |

|  | 55 |
|---|---|
| 1 | between one a.m. and five a.m.? |
| 2 | A.   Probably, if we were doing like a |
| 3 | scale, I'd say maybe from a three to five maybe. |
| 4 | MR. RALSTON:  Is that a scale of one two |
| 5 | ten? |
| 6 | THE WITNESS:  Yeah.  Sorry.  Scale of one |
| 7 | to ten. |
| 8 | BY:  MR. GOLDSMITH: |
| 9 | Q.   At any point prior to leaving the |
| 10 | Edgerton facility in the early morning hours of April |
| 11 | 13th, did you tell anybody else that your wrist had |
| 12 | been bothering you? |
| 13 | A.   The only other person would have been |
| 14 | my boyfriend. |
| 15 | Q.   Did you tell him during the shift or |
| 16 | at the completion of the shift? |
| 17 | A.   I think I told him during the shift. |
| 18 | We had a break, our last break maybe. |
| 19 | Q.   Can you give me a rough estimate of |
| 20 | what time that break would have been? |
| 21 | A.   Possibly around two a.m., two, 2:30. |
| 22 | Q.   To the best of your recollection, can |
| 23 | you tell me exactly what you told -- is it Mr. |
| 24 | McClinton? |
| 25 | A.   Yes.  I just told him my wrist was |

|  | 56 |
|---|---|
| 1 | hurting me a little bit. |
| 2 | Q.   Prior to leaving the Edgerton |
| 3 | facility on the morning of April 13th, 2020, did you |
| 4 | tell anybody else besides your lead Amy and Mr. |
| 5 | McClinton that your wrist had been bothering you? |
| 6 | A.   No. |
| 7 | Q.   And you worked your entire shift on |
| 8 | April 12th through the 13th of 2020, correct? |
| 9 | A.   Yes. |
| 10 | Q.   You didn't leave early? |
| 11 | A.   No. |
| 12 | Q.   After completing your April 12th |
| 13 | through the 13th shift you left the Edgerton |
| 14 | facility, correct? |
| 15 | A.   Yes. |
| 16 | Q.   Where'd you go? |
| 17 | A.   I went to where Ryan lives. |
| 18 | Q.   Did you go straight to your |
| 19 | boyfriend's home? |
| 20 | A.   I think so. |
| 21 | Q.   And then were off work from about |
| 22 | five a.m. until 6:30 p.m. on April 13th, correct? |
| 23 | A.   Yes. |
| 24 | Q.   What did you do -- strike that.  What |
| 25 | did you do during that time? |

Janell Braxton · January 25, 2021

57

1      A.   First thing I ate some food and took
2   some Ibuprofen for my wrist and then I went to sleep.
3   And I'm not for sure what I did after that but then
4   it was probably time for the next shift.
5      Q.   Do you recall if you left your
6   boyfriend's home for any reason other than to go back
7   to work for the shift that was starting at 6:30 p.m.
8   on April 13th?
9      A.   No.
10     Q.   During your time off between shifts
11  on April 13th, did you do any chores around the
12  house?
13     A.   No.
14     Q.   And then following your April 12th to
15  13th shift, the next shift you had was from
16  April 13th at 6:30 p.m. to April 14th at 5:00 a.m.,
17  correct?
18     A.   Yes.
19     Q.   And that would have been a Monday
20  night to Tuesday morning, right?
21     A.   Correct.
22     Q.   What time did you arrive for your
23  April 13th to 14th shift?
24     A.   It would have been anywhere between
25  6:10 and 6:20.

59

1   said that it -- the discomfort had progressed from I
2   think it was a three to a five between one a.m. and
3   five a.m. on the early morning hours of April 13th,
4   did I get that right?
5      A.   Yes.
6      Q.   Okay.  Using that same scale, when
7   you started your shift on the evening of April 13th,
8   where was your discomfort on the one to ten scale?
9      A.   When I first started that shift it
10  was probably just at like a two, maybe, a two or
11  three I'd say.
12     Q.   Was your wrist bothering you during
13  the entire time off in the middle of the day on
14  April 13th, 2020?
15     A.   I think so, yes.
16     Q.   During your time off between shifts
17  on April 13th, did you seek medical attention for
18  your wrist at any time?
19     A.   No.
20     Q.   Is there any reason why you did not?
21     A.   I still just was thinking it might go
22  away on its own possibly.  I wasn't really sure what
23  was causing it at the moment so I didn't really know
24  I needed to go to the doctor.
25     Q.   When you arrived for work on the

58

1      Q.   Was Amy your lead for the April 13th
2   to 14th shift as well?
3      A.   I think so.  But there was also
4   another woman similar to Amy but I think that was
5   Amy.
6      Q.   Is it your recollection that it was
7   either one or the other?
8      A.   Yes.
9      Q.   There was only one lead working on
10  April 13th or 14th as far as you know, correct?
11     A.   One was a lead and the other was -- I
12  feel like they were both leads but I'm not sure.
13     Q.   Is it possible that they were both
14  working for the April 13th to 14th shift or was it
15  one or the other?
16     A.   It's possible that they were both
17  working.
18     Q.   And you think it was Amy but it might
19  have been this other woman, correct?
20     A.   Yes.
21     Q.   When you arrived at the Edgerton
22  facility on the evening of April 13th, was your wrist
23  already bothering you?
24     A.   Yes.
25     Q.   And on a scale of one to ten, you

60

1   evening of April 13th, did you believe you could
2   perform your job even though your wrist was bothering
3   you?
4      A.   Yes.
5      Q.   And I believe you testified a little
6   while ago that at some point in the evening on
7   April 13th you told Amy that your wrist was bothering
8   you; is that accurate?
9      MR. RALSTON:  Object, to the extent it
10  misstates her prior testimony.
11     THE WITNESS:  Will you repeat that again?
12     BY:  MR. GOLDSMITH
13     Q.   Sure.  I think you said earlier that
14  you told Amy the first time at the end of your shift
15  around five a.m. on April 13th, correct?
16     A.   Yes.
17     Q.   And then you told Amy about your
18  wrist a second time on the evening of April 13th; is
19  that correct?
20     A.   Yes.  It was Amy or another one.
21     MR. RALSTON:  Would you mind terribly just
22  speaking up a little bit?
23     THE WITNESS:  No problem.
24     MR. RALSTON:  Can you read back that last
25  line of testimony?

EXHIBIT 2

61

1          (At this point in the proceedings, the
2    Court Reporter read aloud the aforesaid question and
3    answer.)
4          BY:  MR. GOLDSMITH
5          Q.  And when you say the other one, you
6    mean the other lead, the other woman lead that you
7    just don't remember her name right now?
8          A.  Yes.
9          MR. RALSTON:  That was good.  You
10   definitely changed the volume.
11         BY:  MR. GOLDSMITH
12         Q.  At what time did you tell Amy or this
13   other lead about your wrist on the evening of April
14   13th?
15         A.  It would have been close to the
16   beginning portion of my shift.
17         Q.  What exactly did you say to your lead
18   about your wrist on the evening of April 13th, 2020?
19         A.  I just said that my wrist is hurting
20   me.  I don't remember exactly what I said.
21         Q.  And I believe you said you told your
22   lead this close to the start of the shift on
23   April 13th, correct?
24         A.  Yes.
25         Q.  At any other point during this same

62

1    shift, from April 13th to the early morning hours of
2    April 14th, did you tell anybody else that your wrist
3    was bothering you?
4          A.  No.
5          Q.  And I believe you said the scale you
6    used, the one to ten pain scale, that at the start of
7    the shift in the evening it was about a two or a
8    three, correct?
9          A.  Yes.
10         Q.  Did that discomfort progress
11   throughout the shift or remain constant?
12         A.  It progressed throughout the shift.
13   But, like, for instance, if it was time to take my
14   lunch or a break it would kind of go back down, the
15   pain level.
16         Q.  Using your one to ten scale for
17   discomfort, can you give me an idea of what the
18   fluctuation was?
19         A.  I would say around my first break it
20   would be a three and then going back to work after my
21   first break maybe in between a three and a five, and
22   then from lunch back to work it would probably be at
23   like a three, and then from the rest of the shift
24   until the end of the shift, I would say maybe five,
25   six.

63

1          Q.  Did you have regular times when you
2    took your breaks when you worked the second shift?
3          A.  Yes.
4          Q.  What were the break times?
5          A.  I don't remember the break times.  I
6    just know -- let's see -- I don't even remember if it
7    was like a 30 or an hour lunch.  But -- I can't
8    remember.
9          Q.  Well, -- and let me ask it a little
10   differently to make sure we're on the same page.
11   About how far into your shift, how long into your
12   shift until your first break?  In other words, did
13   you get a break after you worked three hours, two
14   hours, do you remember it that way?
15         A.  I think it was about three hours or
16   so.
17         Q.  Do you remember what time you took
18   lunch?
19         A.  I don't.
20         Q.  Do you remember how long your lunch
21   break was?
22         A.  It was either 30 minutes or an hour.
23         Q.  Well, let's go about it this way.  So
24   on the April 12th to 13th shift.
25         A.  Uh-huh.

64

1          Q.  You said that you started feeling
2    discomfort around one a.m., correct?
3          A.  Yes.
4          Q.  Was that before or after lunch?
5          A.  That would have been -- I'm not sure.
6    It's probably right around that time.
7          Q.  Do you remember how many breaks you
8    got every shift?
9          A.  Two breaks and one lunch.
10         Q.  Okay.  So am I correct that you would
11   start a shift, at some point you would take a break,
12   and then your next break after that would be a lunch
13   break?
14         A.  Yes.
15         Q.  And then you'd have another break
16   after that and then it would be your end of shift?
17         A.  Yes.
18         Q.  Okay.  During this April 13th to 14th
19   shift, did you ever go to the safety cubicle?
20         A.  I went to the safety cubicle on the
21   first part of the April 14th shift.
22         Q.  Okay.  So just so we have a clear
23   record, I'll ask it again so we make sure we
24   understand each other.  At any time during your April
25   13th 6:30 p.m. to your April 14th 5:00 a.m. shift,

Janell Braxton - January 25, 2021

---

**Page 65**

1  did you go to the safety cubicle?
2      A.   No.
3      Q.   At any time during the April 13th to
4  14th shift, did you ask anybody to be able to go to
5  the safety cubicle?
6      A.   No.
7      Q.   At any time during the April 13th to
8  14th shift did the discomfort in your left wrist ever
9  go away completely?
10      A.   No.
11      Q.   Is there any reason why you did not
12  ask anybody to be able to go to the safety cube
13  during the April 13th to 14th shift?
14      A.   I just probably wasn't thinking that
15  it was -- it was causing problems but it wasn't
16  causing enough for me to say, hey, I really want to
17  go figure out what's going on.
18      Q.   Other than either Amy or the other
19  female lead towards the beginning of the shift on
20  April 13th, in the evening, did you tell anybody else
21  at Wal-Mart that your wrist was bothering you from --
22  during the April 13th to 14th shift?
23      A.   No.
24      Q.   During the -- strike that.  From one
25  a.m. to five a.m. on April 13th, was the discomfort

---

**Page 66**

1  in your wrist ever severe enough to bring you to
2  tears?
3      A.   No.
4      Q.   Okay.  And during the April 13th to
5  14th shift, was the discomfort in your wrist ever
6  severe enough to bring you to tears?
7      A.   April 13th to 14th shift?
8      Q.   Correct.
9      A.   No.
10      Q.   And you worked your entire shift on
11  April 13th to 14th, correct?
12      A.   Yes.
13      Q.   You didn't leave early, did you?
14      A.   No.
15      Q.   Once you had finished your shift in
16  the early morning hours on April 14th, but before you
17  left the facility, did you inform anybody about the
18  discomfort in your wrist?
19      Q.   And then after completing your
20      Q.   And then after completing your
21  April 13th to 14th shift, you left the Edgerton
22  facility, correct?
23      A.   Yes.
24      Q.   Where did you go?
25      A.   I'm thinking I went back to where

---

**Page 67**

1  Ryan lived.
2      Q.   Did you go straight to Mr.
3  McClinton's residence?
4      A.   I think so but I don't -- I don't
5  remember.
6      Q.   And then you were off work from about
7  5:00 a.m. to 6:30 p.m. on April 14th, correct?
8      A.   Yes.
9      Q.   What did you do during that time?
10      A.   I would have ate some food in the
11  morning and took some more medicine, went to sleep,
12  and then got ready for work again.
13      Q.   What medicine did you take on
14  April 14th, 2020?
15      A.   I think Ibuprofen.
16      Q.   And you took Ibuprofen on April 13th
17  in between your shifts, correct?
18      A.   Yes.
19      Q.   And on April 13th, did the Ibuprofen
20  help?
21      A.   Yes.
22      Q.   And on April 14th, did the Ibuprofen
23  help?
24      A.   I'm not sure.
25      Q.   Other than leaving to go back to work

---

**Page 68**

1  on the evening of the 14th, did you leave the house
2  in between your shifts?
3      A.   I don't think so.
4      Q.   Did you do any chores around the
5  house?
6      A.   No.
7      MR. GOLDSMITH:  We can go off the record
8  for a second.
9      (At this point in the proceedings, a short
10  recess was taken.)
11      BY:  MR. GOLDSMITH
12      Q.   Ms. Braxton, following your
13  April 13th to 14th shift, your next shift was from
14  April 14th at 6:30 a.m. to April 15th at 5:00 a.m.,
15  correct?
16      A.   Yes.
17      Q.   And that was a Tuesday night to
18  Wednesday morning, correct?
19      A.   Correct.
20      Q.   What time did you arrive for the
21  April 14th to 15th shift?
22      A.   Somewhere in between 6:10 and 6:20.
23      Q.   Was Amy your lead during the
24  April 14th to 15th shift?
25      A.   Yes.

---

Janell Braxton - January 25, 2021

---

69

1    Q.   In other words, Amy was your direct
2 supervisor for the April 14th to 15th shift, correct?
3    A.   Yes.
4    Q.   Was your wrist bothering you at the
5 start of your shift on April 14th?
6    A.   Yes.
7    Q.   And we'll use the pain scale that we
8 used before.  I think you said that by the end of the
9 prior shift, on the morning of April 14th, you were
10 at about a five or a six; is that correct?
11    A.   Yes.
12    Q.   Okay.  At the start of your
13 April 14th p.m. shift, where was your discomfort on
14 that scale?
15    A.   I would say it was somewhere between
16 maybe a two or three.
17    Q.   Had your wrist been bothering you
18 during the day on April 14th in between your two
19 shifts?
20    A.   Yes.
21    Q.   At any point during the day between
22 the two shifts on April 14th did the discomfort in
23 your wrist go away?
24    A.   No.
25    Q.   In between your two shifts on

---

70

1 April 14th, did you seek medical attention for your
2 wrist?
3    A.   No.
4    Q.   Is there any reason why you did not?
5    A.   I was still thinking it was something
6 that would just possibly go away.
7    Q.   At any point between 1:00 a.m. on
8 April 13th and 6:20 p.m. on April 14th, at any point
9 in that time did your wrist stop bothering you
10 completely?
11    A.   No.
12    Q.   Now, even if your discomfort didn't
13 go away completely between your shifts on April 14th,
14 did it get better between your shifts on April 14th?
15    A.   It fluctuated depending on if I was
16 using it.
17    Q.   Can you think of anything that you
18 did to use your wrist between your shifts on
19 April 14th?
20    A.   Possibly driving maybe.
21    Q.   When you left the facility on the
22 morning of April 14th and you went to Mr. McClinton's
23 residence, who drove you?
24    A.   I think he might have driven that
25 evening -- well, that early morning and then I would

---

71

1 have driven that next shift, the start of the next
2 shift.
3    Q.   Would it be accurate to say that Mr.
4 McClinton drove you home from the facility on the
5 morning of April 14th but you believe you drove
6 yourself to the facility on the evening of April
7 14th?
8    A.   Yes.
9    Q.   Did Mr. McClinton work the second
10 shift at the facility?
11    A.   Yes.
12    Q.   Did Mr. McClinton work the same
13 April 14th to April 15th shift that you were
14 scheduled for?
15    A.   Yes.
16    Q.   Is there any reason that you drove
17 separately to the facility on the evening of April
18 14th?
19    MR. RALSTON:  Objection, assumes facts.
20    THE WITNESS:  No.
21 BY:  MR. GOLDSMITH
22    Q.   And your attorney makes a good point.
23 Did you drive your -- strike that.  Did you drive Mr.
24 McClinton to the facility on the evening of April
25 14th?

---

72

1    A.   We drove one vehicle together, like
2 we carpooled.  So I was the one driving us to work
3 that evening.
4    Q.   When you arrived for work on the
5 evening of April 14th, did you believe that you could
6 perform your job even though your wrist was bothering
7 you?
8    A.   I believed I could but with -- it
9 would be -- I wouldn't be as fast or as good as I had
10 been previously.
11    Q.   Do you recall that about two or two
12 and a half hours into your April 14th to 15th shift
13 you had a discussion with Amy, your lead?
14    A.   Yes.
15    Q.   Did you approach Amy or did Amy
16 approach you?
17    A.   I approached Amy.
18    Q.   And where were you when you
19 approached Amy?
20    A.   I was walking down like the aisle
21 where all of our work stations were, right before you
22 get to where the work stations are, it was like an
23 open area right there.  And she had, like, a portable
24 work station cart that she would -- she would walk
25 around with -- it would roll, a rolling cart.  And I

---

Janell Braxton - January 25, 2021

73

1  approached her.
2      Q.  Was there a specific reason that you
3  approached her at that time?
4      A.  Yes.  It was because my wrist was
5  bothering me and I wanted to know if I could -- if
6  there was some type of brace or wrap or something
7  that I could use to help me get through my shift.
8      Q.  What did Amy say in response?
9      A.  She said she wasn't sure but to go
10  ahead and log off and go to the safety cubicle.
11      Q.  Would you estimate that this was
12  about nine p.m. on April 14th?
13      A.  I think so.
14      Q.  How would you describe the discomfort
15  in your wrist as of this time, nine p.m. April 14th?
16      A.  I would describe it at probably like
17  an eight or so.
18      Q.  And I'm sorry, did you say ache or
19  eight, like the number scale?
20      A.  Eight, like the number scale.
21      Q.  And that's the same scale we're
22  talking about where it's a scale of one to ten,
23  correct?
24      A.  Yes.
25      Q.  Was that time that you approached Amy

74

1  the worst your wrist had felt over the past two days?
2      A.  Yes.
3      Q.  Before speaking with Amy around nine
4  p.m., did you have any discussions with anybody else
5  at the facility regarding your wrist on the evening
6  of April 14th, 2020?
7      A.  No.
8      Q.  When you spoke with Amy around nine
9  p.m. on April 14th, were you on the verge of tears
10  due to the discomfort?
11      A.  No.
12      Q.  During this conversation around nine
13  p.m. on April 14th, who was the first person between
14  you and Amy to reference the safety cube, or you
15  going to the safety cube?
16      A.  I'm not sure I understand the
17  question.
18      Q.  Did you ask Amy if you could go to
19  the safety cube or did Amy suggest that you go to the
20  safety cube?
21      A.  Amy suggested.
22      Q.  When you spoke to Amy around nine
23  p.m. on April 14th, did you say anything or ask
24  anything of Amy other than the request for a brace or
25  a wrap for your wrist?

75

1      A.  No.
2      Q.  Did you tell Amy at that time that
3  your wrist was hurting?
4      A.  Yes.
5      Q.  What exactly did you tell Amy
6  regarding the discomfort in your wrist?
7      A.  I told Amy that my wrist was hurting
8  and I just wanted to know if there was anything that
9  I could get to help it, like a brace or a wrap.
10      Q.  During this April 14th, approximately
11  nine p.m. conversation with Amy, did you mention the
12  fact that your wrist was still hurting from your same
13  complaint in -- on the morning of April 13th?
14      A.  I think so.
15      Q.  Okay.  When you say you think so, do
16  you have a specific recollection one way or the
17  other?
18      A.  I feel like I told her that it was
19  still bothering me.
20      Q.  Okay.  And when you said you feel
21  like, I just need to know.  Do you have a specific
22  recollection that you told Amy that your wrist was
23  still bothering you from the comments you made on
24  April 13th?
25      A.  No, I can't say I do.

76

1      Q.  Do you have a specific recollection
2  of whether or not you told Amy on April 14th, in the
3  evening, around nine p.m., that your wrist was still
4  bothering you as it had during the evening of April
5  13th?
6      A.  No.
7      Q.  Did Amy tell you that she would call
8  the safety lead to make sure someone was present at
9  the cubicle?
10      A.  No.
11      Q.  Did -- strike that.  Did Amy tell you
12  that she would call anybody, or inform anybody, that
13  you were going to the safety cubicle?
14      A.  No.
15      Q.  When Amy suggested that you log off
16  your work station and go to the safety cubicle,
17  what'd you do?
18      A.  I logged off my work station and I
19  walked to the state -- safety cubicle and spoke with
20  the gentleman that was in the safety cubicle and told
21  him, you know, what was going on and asked if they
22  had a brace or anything that I could use.
23      Q.  How long was the walk from your
24  station to the safety cubicle?
25      A.  Probably one minute.

Janell Braxton - January 25, 2021

77

1    Q.   When you arrived at the safety
2  cubicle, was somebody present or did you have to
3  wait?
4       A.   Someone was present.
5       Q.   Do you know who that person was?
6       A.   I don't know his name.  He was -- he
7  had darker hair and he was probably either of Asian
8  or Hispanic descent possibly.
9       Q.   Even if you don't know his name, do
10 you know what his job was?
11      A.   No.
12      Q.   When you arrived at the safety
13 cubicle, was it your impression that this individual
14 was expecting you or did you have an impression at
15 all?
16      A.   I didn't have an impression at all.
17      Q.   And when you arrived at the safety
18 cubicle, did you speak to this individual first or
19 did he speak to you?
20      A.   I don't remember.
21      Q.   But among the first things that was
22 communicated was your request for a brace or a wrap;
23 is that correct?
24      A.   Yes.
25      Q.   What was this person's response to

78

1  that request?
2       A.   He said they don't have a brace or a
3  wrap but they could possibly give me some, like,
4  ointment to rub on it.
5       Q.   And what was your response to that
6  comment?
7       A.   I said, okay, I'll take that.
8       Q.   And when you say ointment, are we
9  talking about like muscle rub, Ben-Gay, or something
10 like that?
11      A.   Yes.
12      Q.   And when you said, okay, I'll take
13 that, did he provide that to you?
14      A.   Yes.
15      Q.   Did he give you, like, a whole tube
16 itself?
17      A.   No.  It was just like a little piece
18 of -- it was like a little paper packet, like a
19 sample pack of something, of the ointment.
20      Q.   When he provided that to you, did you
21 say anything else?
22      A.   Thank you.
23      Q.   Did he say anything else?
24      A.   Not that I can remember.
25      Q.   And at that point did you leave the

79

1  safety cube?
2       A.   Yes.
3       Q.   And you returned to your station?
4       A.   Yes.
5       Q.   And that's about a minute walk or so?
6       A.   Yes.
7       Q.   During your conversation with this
8  individual at the safety cube, did you describe the
9  discomfort that you were feeling at all?
10      A.   I think so.
11      Q.   Do you have a recollection one way or
12 another of whether or not you actually did?
13      A.   No.
14      Q.   Other than your request for a brace
15 or a wrap and this individual's provision of the
16 ointment to you, was there any other medical care
17 that was discussed during this interaction at the
18 safety cube?
19      A.   No.
20      (WHEREIN, Exhibit 27 was marked for
21 identification by the Court Reporter.)
22      BY:  MR. GOLDSMITH
23      Q.   Ms. Braxton, I've handed you what
24 we've marked as Exhibit 27.  It's Bates stamped WM
25 Braxton 106.  Take a look at Exhibit 27 and let me

80

1  know when you've had a chance to review it.
2       A.   Okay.  Okay.
3       Q.   Ms. Braxton, have you seen Exhibit 27
4  before?
5       A.   No.
6       Q.   Are you familiar with the time
7  station program from your time at Wal-Mart?
8       A.   I'm -- no, not that name.
9       Q.   Are you familiar with any program
10 that accounted for your time during your employment
11 with Wal-Mart?
12      A.   I'm familiar with our clock in and
13 out protocol.
14      Q.   Now, I will represent to you that my
15 understanding is this record is maintained by
16 Wal-Mart and reflects the times you logged in and out
17 of the system.  Is that what it appears to be to you?
18      A.   Yes.
19      Q.   And if you look at the fourth entry
20 down, it shows that you were logged in at your QC
21 singles station from 6:25 p.m. to 9:06 p.m.  Do you
22 see that?
23      A.   Yes.
24      Q.   And if you look at the third entry
25 down it shows that you were logged into the safety

81

1  department from 9:07 p.m. to 9:09 p.m.  Do you see
2  that?
3        A.  Yes.
4        Q.  And then if you look at the second
5  entry down it shows that you were logged back into
6  your QC singles station at 9:10 p.m.  Do you see
7  that?
8        A.  Yes.
9        Q.  Are these time entries that we see on
10  Exhibit 27 consistent with your recollection that you
11  logged into your work station at 6:25, that you
12  logged out of your work station at 9:06 and went to
13  the safety department, that you stayed at the safety
14  department from 9:07 to 9:09 and then returned back
15  to your QC singles station at 9:10?
16        A.  Yes.
17        Q.  Now, going back to your conversation
18  with Amy around nine o'clock on the evening of April
19  14th.  You asked her if you could get a brace or a
20  wrap, correct?
21        A.  Correct.
22        Q.  And she said she wasn't sure but that
23  you should go to the safety cube on -- to get
24  attention, correct?
25        A.  Yes.

82

1        Q.  And she told you to log off your
2  station and walk to the safety cube, right?
3        A.  Yes.
4        Q.  Was that the extent of your
5  communication with Amy regarding your wrist up to
6  that point on April 14th, 2020?
7        A.  As far as -- I'm not sure I
8  understand that question.
9        Q.  Right now I'm just talking about your
10  conversation that you had with Amy around nine
11  o'clock on the evening of April 14th.
12        A.  Okay.
13        Q.  And it generally had to do with your
14  wrist and you wanting a brace and she told you to go
15  to the safety cube, right?
16        A.  Yes.
17        Q.  Up to that point, was what you've
18  just now discussed and testified to the extent of
19  your communications with Amy regarding your wrist on
20  April 14th?
21        A.  Yes.
22        Q.  At the safety cube, did the
23  individual that was there ask you if you needed or
24  wanted anything other than ointment or muscle rub?
25        A.  No.

83

1        Q.  When you returned to your work
2  station -- strike that.  You got back to your work
3  station after the safety cube around 9:10 p.m.,
4  correct?
5        A.  Yes.
6        Q.  After you returned to your work
7  station around 9:10 p.m., did you at some point after
8  that have a second conversation with Amy?
9        A.  When I returned -- when I was on my
10  way back to my work station I stopped her and I said,
11  hey, they didn't have a brace but they gave me some
12  ointment.  And she was -- and I remember her saying,
13  okay.  And then I went back to my work station.
14        Q.  During this second conversation with
15  Amy on April 14th, 2020, did you say anything other
16  than they didn't have a brace and they gave me
17  ointment?
18        A.  No.
19        Q.  At some point after you returned to
20  your station around 9:10 p.m. on April 14th, 2020,
21  did you have a third conversation with Amy regarding
22  your wrist?
23        A.  Yes.
24        Q.  Using the 9:10 mark as the time that
25  you got back to your station following the safety

84

1  cube, can you tell me when that third conversation
2  with Amy occurred?
3        A.  It would have been somewhere between
4  9:30 and when I clocked out again, which is like 10
5  -- I guess that says 10:34.
6        Q.  What did you discuss with Amy during
7  this third conversation that you had with her on
8  April 14th, 2020?
9        A.  She asked me if I thought it was a
10  work -- my wrist was hurting because of something
11  with work.
12        Q.  What did you say in response?
13        A.  Yes.
14        Q.  Did you elaborate when you responded
15  to Amy?
16        A.  Not that I can remember.
17        Q.  What did Amy say next?
18        A.  I think she said okay.
19        Q.  During this third conversation with
20  Amy, did you discuss anything else related to your
21  wrist?
22        A.  No.
23        Q.  Was it just a quick one question
24  conversation that made up this third interaction that
25  you had with Amy on April 14th?

85

1    A.  Yes.
2        Q.  Up until this third conversation with
3  Amy on April 14th, 2020, did you have any discussions
4  with anybody else regarding your wrist other than the
5  individual at the safety cube?
6    A.  No.
7        Q.  During this third conversation with
8  Amy, did the two of you talk about how you hurt your
9  wrist?
10    A.  She asked me if I thought it was a
11  work -- something that happened at work and I said
12  yes.
13        Q.  And was that the extent of the
14  conversation that third time?
15    A.  Yes.
16        Q.  During this third conversation, was
17  there any discussion about when you hurt your wrist
18  or when you started feeling discomfort?
19    A.  No.
20        Q.  Did you ask anything of Amy during
21  this third conversation?
22    A.  No.
23        Q.  And did you tell her anything else
24  even if she didn't ask?
25    A.  No.

86

1        Q.  After this third conversation with
2  Amy on April 14th, 2020, what was the next thing that
3  happened relative to your wrist?
4    A.  The next thing was an upper
5  management type man came and got me and mentioned
6  that Amy had told him I was having issues with my
7  wrist.  And then he told me he wanted me to log off
8  so that I could do an incident report.
9        Q.  Do you know who this man was?
10    A.  No.
11        Q.  Do you know what his job title was?
12    A.  No.
13        Q.  During this conversation -- well,
14  strike that.  Where did this conversation with the
15  male manager take place?
16    A.  At my work station.
17        Q.  Was anybody else present during this
18  conversation?
19    A.  Not that I can remember.
20        Q.  Did this male manager ask how you
21  hurt your wrist?
22    A.  I think he asked me if it was
23  something that happened at work, and I said yes.
24        Q.  Did this male manager ask you when
25  you started feeling discomfort in your wrist?

87

1    A.  No.
2        Q.  Did this male manager ask you to
3  elaborate how or why you began to feel discomfort in
4  your wrist?
5    A.  Yes.  I think he wanted to know -- I
6  feel like he said can you explain to me what you were
7  doing when your wrist started to hurt.  And I just,
8  you know, said I was packaging the -- I was doing my
9  job duties and I realized it was hurting.
10        Q.  Did he ask you if there was a
11  specific incident that occurred that caused this?
12    A.  No.
13        Q.  What did you say?
14    A.  I said no.
15        Q.  Did this male manager ask you how
16  long you had been feeling discomfort in your wrist?
17    A.  No.
18        Q.  Did this male manager ask you if you
19  had told anybody else -- anybody else about the
20  discomfort you were feeling in your wrist?
21    A.  No.
22        Q.  Can you give me a rough estimate as
23  to how long this interaction with the male manager
24  took place at your work station?
25    A.  Maybe one minute.

88

1        MR. RALSTON:  I seriously feel like this
2  guy manages the mail at the facility.
3        BY:  MR. GOLDSMITH
4        Q.  After about a minute of talking with
5  this individual, did you then log off your work
6  station?
7    A.  Yes.
8        Q.  Did you walk with him to the safety
9  cube?
10    A.  Yes.
11        Q.  And I assume you arrived at the
12  safety cubicle with this person, correct?
13    A.  Yes.
14        Q.  From the time that your conversation
15  with this male manager started at your work station
16  to the time you got to the safety cube, was there
17  anybody else present or involved in the conversation
18  that you had?
19    A.  No.
20        Q.  Do you know if this male manager
21  spoke on the phone with anybody or texted anybody on
22  his phone between the time that your conversation
23  started and the time the two of you arrived at the
24  safety cube?
25    A.  No.

Janell Braxton - January 25, 2021

|  | 89 |
|---|---|
| 1 | Q.   Had you ever spoken to this male |
| 2 | manager before? |
| 3 | A.   No. |
| 4 | Q.   Before this male manager arrived at |
| 5 | your work station, did you know that Amy was going to |
| 6 | tell somebody that your wrist was bothering you? |
| 7 | A.   No. |
| 8 | Q.   Did this male manager, during your |
| 9 | conversation at the work station, ask you about the |
| 10 | level of discomfort you were feeling in your wrist? |
| 11 | A.   I don't remember. |
| 12 | Q.   Have you now told me everything that |
| 13 | either you said to this male manager or he said to |
| 14 | you from the time he arrived at your work station on |
| 15 | the evening of April 14th to the time that you got to |
| 16 | the safety cube? |
| 17 | A.   Yes. |
| 18 | Q.   And if you look at Exhibit 27, it |
| 19 | appears that you logged off your work station at |
| 20 | 10:54, do you see that? |
| 21 | A.   Yes. |
| 22 | Q.   Is that consistent with your |
| 23 | recollection of when you left your work station with |
| 24 | this male manager to go to the safety cube? |
| 25 | A.   Yes. |

|  | 90 |
|---|---|
| 1 | Q.   When you and this male manager |
| 2 | arrived at the safety cube, was anybody else present |
| 3 | at the safety cube? |
| 4 | A.   There was someone in the safety cube, |
| 5 | yes. |
| 6 | Q.   Was it the same person that had given |
| 7 | you ointment earlier? |
| 8 | A.   I think so. |
| 9 | Q.   And when you say you think so, do you |
| 10 | have a specific recollection either way? |
| 11 | A.   No. |
| 12 | Q.   Even though this other person was |
| 13 | present, did you have any interaction with this |
| 14 | individual that was already at the safety cube? |
| 15 | A.   I'm not sure. |
| 16 | Q.   And is the reason that you're not |
| 17 | sure you just don't remember? |
| 18 | A.   Yes. |
| 19 | Q.   What happened when you got to the |
| 20 | safety cube with the male manager? |
| 21 | A.   When I got to the safety cube, he |
| 22 | told me he was going to have me fill out the incident |
| 23 | report and he handed me the piece of paper that was |
| 24 | just like a blank paragraph form.  And he told me to |
| 25 | write down everything that I was feeling, that was |

|  | 91 |
|---|---|
| 1 | going on with my wrist. |
| 2 | Q.   Did he use the phrase incident report |
| 3 | or did he use another word or phrase to describe the |
| 4 | form? |
| 5 | A.   Incident report is what I remember. |
| 6 | Q.   Was the safety -- strike that.  Was |
| 7 | this male manager the one that handed you the blank |
| 8 | form for you to fill out? |
| 9 | A.   Yes. |
| 10 | Q.   Did the male manager get that form |
| 11 | from somewhere in the safety cube? |
| 12 | A.   Yes. |
| 13 | Q.   To the best of your recollection, can |
| 14 | you tell me exactly what he said when he instructed |
| 15 | you to complete the form? |
| 16 | A.   He said I want you to complete this |
| 17 | form and I want you to just write down everything |
| 18 | that's going on with your wrist, everything that's |
| 19 | wrong with it. |
| 20 | Q.   Did he tell you to include a timeline |
| 21 | of when you started experiencing discomfort in your |
| 22 | wrist? |
| 23 | A.   No. |
| 24 | Q.   Did you have any questions about the |
| 25 | form or how you were supposed to fill it out? |

|  | 92 |
|---|---|
| 1 | A.   No. |
| 2 | Q.   Did you fill out the form in your own |
| 3 | handwriting? |
| 4 | A.   Yes. |
| 5 | Q.   Are you right handed or left handed? |
| 6 | A.   Right handed. |
| 7 | (WHEREIN, Exhibit 28 was marked for |
| 8 | identification by the Court Reporter.) |
| 9 | BY:  MR. GOLDSMITH |
| 10 | Q.   Ms. Braxton, you've been handed |
| 11 | what's been marked Exhibit 28.  It's Bates stamped WM |
| 12 | Braxton 25.  Take a look at Exhibit 28 and let me |
| 13 | know when you've had a chance to review it. |
| 14 | A.   Okay.  Okay. |
| 15 | Q.   Ms. Braxton, do you recognize |
| 16 | Exhibit 28? |
| 17 | A.   Yes. |
| 18 | Q.   Is Exhibit 28 the statement form that |
| 19 | you filled out in your own handwriting and signed on |
| 20 | the night of April 14th, 2020? |
| 21 | A.   Yes. |
| 22 | Q.   Did you write Exhibit 28 on your own? |
| 23 | A.   Yes. |
| 24 | Q.   Did you receive any input on what to |
| 25 | write from anybody? |

Janell Braxton - January 25, 2021

---

101

1  semi heavy items with the left wrist?
2      A.  That started on the next shift, which
3  would have been on April the 13th.
4      Q.  The next sentence reads, I can only
5  pick up the totes that are partially full.  Do you
6  see that?
7      A.  Yes.
8      Q.  And when did you start only being
9  able to pick up partially full totes?
10     A.  On the evening shift of April 13th.
11     Q.  Next sentence reads, it's my left
12  wrist that's injured.  You see that?
13     A.  Yes.
14     Q.  At any time during your employment
15  with Wal-Mart in March and April 2020, did you ever
16  have a problem with your right wrist?
17     A.  No.
18     Q.  At any time during your employment
19  with Wal-Mart in March and April 2020, did you ever
20  experience any injury or discomfort to any part of
21  your body other than your left wrist?
22     A.  No.
23     Q.  The next sentence reads, I'm trying
24  not to use it.  Do you see that?
25     A.  Yes.

---

102

1      Q.  By this sentence did you mean that
2  you were trying to perform your job one handed, that
3  is only using your right hand?
4      A.  I meant I was just trying not to use
5  it as much since it was hurting.
6      Q.  The last sentence reads, the pain
7  progresses through the shift.  Do you see that?
8      A.  Yes.
9      Q.  And by that did you mean the pain in
10  your left wrist progressed during each of the last
11  three shifts?
12     A.  Yes.
13     Q.  And as we talked about, the pain
14  began on April 13th and progressed from an ache to a
15  throbbing to excruciating between one a.m. and five
16  a.m. on April 13th, correct?
17     A.  Yes.
18     Q.  During the April 13th to 14th shift,
19  did the pain similarly progress from ache to
20  throbbing to excruciating?
21     A.  Yes.
22     Q.  And during your April 14th to 15th
23  shift, did your pain similarly progress from ache to
24  throbbing to excruciating?
25     A.  On that shift I feel like it was more

---

103

1  of throbbing to excruciating.
2      Q.  When you completed and signed the
3  written statement we see in Exhibit 28, what did you
4  do with it?
5      A.  I handed it back to upper management.
6      Q.  Did you have any questions before you
7  handed it to him?
8      A.  No.
9      Q.  Do you know if he read it right then
10  and there?
11     A.  I feel like he took a quick look and
12  said thank you and that he would be back.
13     Q.  Up until this point in time when you
14  handed him the statement form, took a quick look at
15  it and said thank you, he told you he'd be back, up
16  until that point in time had you had any discussion
17  with this male manager about when you first began
18  experiencing discomfort in your wrist?
19     A.  No.
20     Q.  Up until this same point in time when
21  you handed your statement form to the male manager,
22  had you had any discussions with that male manager
23  regarding whether or not you had told anybody about
24  the discomfort you were feeling in your wrist?
25     A.  No.

---

104

1      Q.  When he told you thank you and told
2  you that he would be back, did that occur at the
3  safety cube?
4      A.  Yes.
5      Q.  And then he left the safety cube?
6      A.  Yes.
7      Q.  You stayed in the safety cube?
8      A.  Yes.
9      Q.  Do you know where this male manager
10  went when he left the safety cube?
11     A.  I thought he was going -- I think --
12  I thought he told me he was going to HR but I'm not
13  positive.
14     Q.  Did you watch him go to HR?
15     A.  No.
16     Q.  Aside from what he might have said,
17  do you know where he went when he left the safety
18  cube?
19     A.  No.
20     Q.  When he left the safety cube, do you
21  know if he spoke to anybody about your statement
22  form?
23     A.  No.
24     Q.  What happened next?
25     A.  He came back.  It took a while, like

---

Lexitas

EXHIBIT 2

105

1  -- it seemed like maybe 15 minutes, it was getting
2  close to lunch.  And he came back with -- he came
3  back, I don't know if he still had the form in his
4  hand.  But he came back and got me and said, hey,
5  we're going to go to HR real fast, something along
6  that line.
7        And then we went to -- he took me into HR
8  and then there was a lady in there, an HR
9  representative, her name was Morgan.  She was sitting
10 in the chair.  And he sat down in a seat next to her
11 and closed the door and he started to tell me that,
12 you know, we don't have to give you any warnings
13 because you're a temporary employee.  You're supposed
14 to report your work injury, I think he said within
15 24 hours of having it, but since you're a temporary
16 employee and we don't have to give you any warnings,
17 we can just fire you, we don't have to give you any
18 written warnings.  And that that's what they were
19 doing and that they wanted to protect themselves and
20 that they hoped that I could understand.
21       And when he told me that I was completely
22 confused and at first didn't believe that that's --
23 that it was true that he was saying that.  And then I
24 just got real emotional once I realized that it was
25 the truth.  They were just kind of both staring at me

106

1  like I was -- like it was just a normal routine.  So
2  I got emotional and he asked me if I had a ride,
3  which he knew -- he said, I know your boyfriend works
4  here, did you guys carpool.  And I said yes.  He said
5  he could take me home but he would receive a point if
6  he left.  And he asked me if I had my badge on me or
7  where it was.  And I think -- that's what I remember
8  at that time, just very confused and embarrassed.
9        Q.  So in the approximate 15 minutes that
10 this male manager was gone after you gave him the
11 statement form, did you have any conversations or
12 communications with anybody while you were at the
13 safety cube?
14       A.  No.
15       Q.  And then this male manager came back
16 after about 15 minutes, correct?
17       A.  Yes.
18       Q.  And he asked you to go with him to
19 human resources, correct?
20       A.  Yes.
21       Q.  And the two of you, meaning you and
22 the male manager, both went to the HR office,
23 correct?
24       A.  Yes.
25       Q.  Where was the HR office relative to

107

1  the safety cube?
2        A.  It was to the left, dawn a hallway.
3        Q.  And when you got to the HR office,
4  you and the male manager went inside, correct?
5        A.  Yes.
6        Q.  And there was a female HR
7  representative by the name of Morgan in the HR office
8  already?
9        A.  Yes.
10       Q.  Do you know Morgan's last name?
11       A.  I do not.
12       Q.  When you and the male manager entered
13 the room, did everybody sit down?
14       A.  Yes.
15       Q.  Who was the first to speak after you
16 were all three in the room?
17       A.  The male manager.
18       Q.  And one of the first things that he
19 said was that you were supposed to report your
20 injury, I think you said, during the first 24 hours
21 after it happened?
22       MR. RALSTON:  I object, to the extent it
23 misstates her prior testimony.
24       MR. GOLDSMITH:  Well, -- and let me just
25 ask it differently.

108

1  BY:  MR. GOLDSMITH
2        Q.  What did the male manager say to you
3  regarding the requirement to report an injury on the
4  job?
5        A.  He said that you're supposed to
6  report it within the first 24 hours and that because
7  of this they don't have to give me any warnings
8  because I am a temporary employee and that they are
9  going to terminate me at this time.  And that they're
10 just -- hope I can understand, they're just trying to
11 protect themselves.
12       Q.  When the male manager told you that
13 you were supposed to report an injury within
14 24 hours, what did you say in response to that
15 comment?
16       A.  I didn't say anything in response to
17 that comment because I was -- I got emotional at that
18 time.  And I was thinking in my head like I know I
19 reported -- I know I reported it because I spoke to
20 my lead on the night that it actually happened, the
21 morning.
22       Q.  Did you tell the male manager or
23 Morgan, the HR representative in the office, that you
24 had reported your injury on the morning of April
25 13th?

Janell Braxton - January 25, 2021

109

1      A.  No.
2          Q.  When the male manager told you that
3  you were supposed to report an injury within
4  24 hours, was that the first time that you had ever
5  been informed of any kind of a requirement like that?
6      A.  Yes.
7          Q.  When the male manager said that
8  because you're a seasonal associate you don't have to
9  get a written warning, did you understand that to
10 mean that your employment could be terminated without
11 first having any form of discipline enforced upon
12 you?
13     A.  Yes.
14         Q.  Before the male manager made that
15 comment, did you have an understanding that as a
16 seasonal associate your employment could be
17 terminated without first getting any written formal
18 discipline?
19     A.  No.
20         Q.  I think you said something to the
21 effect of the male manager said that they were just
22 trying to protect themselves.  Did I get that
23 correct?
24     A.  Yes.
25         Q.  What did you understand him to mean

110

1  by that?
2      A.  To me it just seemed like they
3  thought I was trying to do something wrong as far as
4  saying that my wrist was hurting and that that's why
5  they were going to let me go because of that, because
6  of me reporting a workplace injury.
7          Q.  Did you understand the male manager
8  to be saying that they were trying to protect
9  Wal-Mart due to what they thought was a late report
10 of an injury?
11     A.  No.
12         Q.  What did you understand?
13     A.  I understood that I was getting let
14 go because I'm reporting a workplace injury and it's
15 like they thought I was -- like I'm up like -- I
16 don't know.  I just felt like I was getting -- when
17 that happened I felt like I was being punished for
18 reporting a workplace injury.
19         Q.  During the meeting, did you
20 understand that Wal-Mart's reasoning that they were
21 telling you was the basis for your termination was
22 that you had failed to timely report a workplace
23 injury?
24     A.  They were telling me that I was being
25 let go for not reporting my injury within that

111

1  24-hour timeframe.
2          Q.  Did Morgan, the HR representative in
3  the room, say anything during this meeting?
4      A.  I think she just kind of shook her
5  head.  I don't remember her saying anything.
6          Q.  Can you give me an estimate as to how
7  long this meeting last -- lasted?
8      A.  I would say maybe five minutes or
9  less.
10         Q.  Did you say anything during the
11 meeting?
12     A.  I think I said I can't believe this
13 is happening.  And I was just really emotional.
14         Q.  Other than saying that you can't
15 believe this is happening, do you remember saying
16 anything else during this meeting?
17     A.  No.
18         Q.  Is there any reason why you did not
19 tell the male manager and the HR representative
20 Morgan that you had reported your injury on the early
21 morning hours of April 13th?
22     A.  They didn't ask me and it was just
23 like a super fast meeting.  They brought me in there,
24 told me, you know, hey, we're letting you go because
25 of this injury.  And it wasn't like I had time to --

112

1  they didn't really interact with me.  They just
2  basically told me -- it was like a cold situation.
3          Q.  Did they tell you that you were being
4  let go of your injury or because of the
5  failure to report the injury?
6      A.  Because of the -- not reporting it.
7          Q.  And I'm sorry, I can't remember if I
8  asked.  Did Morgan say anything during the meeting?
9      A.  I don't remember.  I just remember
10 her nodding her head.
11         Q.  When you left the safety cube to go
12 to HR with this male manager, did you know why you
13 were going to HR?
14     A.  No.
15         Q.  Even if you didn't know why, did you
16 have any idea what was going to happen when you got
17 to the HR office?
18     A.  I honestly thought that they were
19 just going to take some more documentations about my
20 wrist hurting.  But I didn't think that I was in
21 trouble for anything.
22     MR. RALSTON:  When you get to a good
23 breaking point, can we take a short break?
24     MR. GOLDSMITH:  Yeah.  We should be
25 approaching that.  Let me just finish up on this.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

JANELL BRAXTON                )
                                          )
                *Plaintiff*               )
                                          )       Case No. 2:20-cv-02287-DDC-GEB
vs.                                        )
                                          )
WALMART INC.                   )
                                          )
                *Defendant*              )

**PLAINTIFF'S RESPONSE TO**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**


**EXHIBIT 3**

Plaintiff's Time Punches

Deposition Exhibit 27

**EXHIBIT 3**

## Employee Activity

| Department | Date | In | Out | Deduction | Hours | Notes | Edit |
|---|---|---|---|---|---|---|---|
| HR/Talent | Tuesday, Apr 14 2020 | 10:55 PM | 11:32 PM | | 0.62 | | ✓ |
| QC/Shp- Singles | Tuesday, Apr 14 2020 | 9:10 PM | 10:54 PM | | 1.73 | | ✓ |
| Safety | Tuesday, Apr 14 2020 | 9:07 PM | 9:09 PM | | 0.03 | | ✓ |
| QC/Shp- Singles | Tuesday, Apr 14 2020 | 6:25 PM | 9:06 PM | | 2.68 | | ✓ |
| QC/Shp- Singles | Tuesday, Apr 14 2020 | 12:03 AM | 5:00 AM | | 4.95 | | ✓ |
| Lunch | Monday, Apr 13 2020 | 11:33 PM | 12:02 AM On 04/14/2020 | | 0.48 | | ✓ |
| QC/Shp- Singles | Monday, Apr 13 2020 | 6:35 PM | 11:33 PM | | 4.97 | | ✓ |
| LOA | Monday, Apr 13 2020 | 6:30 PM | 6:34 PM | | 0.07 | | ✓ |
| QC/Shp- Singles | Monday, Apr 13 2020 | 12:01 AM | 5:03 AM | | 5.03 | | ✓ |
| Lunch | Sunday, Apr 12 2020 | 11:32 PM | 12:01 AM On 04/13/2020 | | 0.48 | | ✓ |
| QC/Shp- Singles | Sunday, Apr 12 2020 | 6:26 PM | 11:32 PM | | 5.10 | | ✓ |
| LOA | Saturday, Apr 11 2020 | 6:30 PM | 5:00 AM On 04/12/2020 | 0.50 | 10.00 | | ✓ |
| LOA | Wednesday, Apr 08 2020 | 6:30 PM | 6:30 AM On 04/09/2020 | 0.50 | 11.50 | | ✓ |
| LOA | Tuesday, Apr 07 2020 | 6:30 PM | 5:00 AM On 04/08/2020 | 0.50 | 10.00 | ▬ | ✓ |
| LOA | Monday, Apr 06 2020 | 6:30 PM | 6:30 AM On 04/07/2020 | 0.50 | 11.50 | | ✓ |
| LOA | Sunday, Apr 05 2020 | 6:30 PM | 6:30 AM On 04/06/2020 | 0.50 | 11.50 | | ✓ |
| LOA | Saturday, Apr 04 2020 | 6:30 PM | 6:30 AM On 04/05/2020 | 0.50 | 11.50 | | ✓ |
| LOA | Tuesday, Mar 31 2020 | 6:30 PM | 5:00 AM On 04/01/2020 | 0.50 | 10.00 | ▬ | ✓ |
| LOA | Monday, Mar 30 2020 | 6:30 PM | 6:00 AM On 03/31/2020 | 0.50 | 11.00 | | ✓ |
| LOA | Sunday, Mar 29 2020 | 6:30 PM | 6:00 AM On 03/30/2020 | 0.50 | 11.00 | | ✓ |
| Point | Saturday, Mar 28 2020 | 6:30 PM | 6:00 AM On 03/29/2020 | | 11.50 | | ✓ |
| QC/Shp- Singles | Friday, Mar 27 2020 | 12:31 AM | 6:01 AM | | 5.50 | | ✓ |
| QC/Shp- Singles | Thursday, Mar 26 2020 | 6:24 PM | 12:01 AM On 03/27/2020 | | 5.62 | | ✓ |
| QC/Shp- Singles | Thursday, Mar 26 2020 | 12:31 AM | 6:01 AM | | 5.50 | | ✓ |
| Lunch | Thursday, Mar 26 2020 | 12:02 AM | 12:31 AM | | 0.48 | | ✓ |
| Picking | Thursday, Mar 26 2020 | 12:01 AM | 12:02 AM | | 0.02 | | ✓ |
| QC/Shp- Singles | Wednesday, Mar 25 2020 | 6:52 PM | 12:01 AM On 03/26/2020 | | 5.15 | | ✓ |
| HR/Talent | Wednesday, Mar 25 2020 | 6:38 PM | 6:51 PM | | 0.22 | | ✓ |
| Picking | Wednesday, Mar 25 2020 | 6:27 PM | 6:38 PM | | 0.18 | | ✓ |
| QC/Shp- Singles | Wednesday, Mar 25 2020 | 12:32 AM | 6:00 AM | | 5.47 | | ✓ |
| QC/Shp- Singles | Tuesday, Mar 24 2020 | 7:11 PM | 12:02 AM On 03/25/2020 | | 4.85 | | ✓ |
| Training | Tuesday, Mar 24 2020 | 6:26 PM | 7:10 PM | | 0.73 | | ✓ |
| Training | Tuesday, Mar 24 2020 | 12:31 AM | 6:01 AM | | 5.50 | | ✓ |
| Lunch | Tuesday, Mar 24 2020 | 12:00 AM | 12:30 AM | | 0.50 | | ✓ |
| Training | Monday, Mar 23 2020 | 8:00 PM | 11:59 PM | | 3.98 | | ✓ |



Δ π EXHIBIT 27
Deponent Braxton
Date 4/5/21 Rptr JB
WWW.DEPOBOOK.COM

WM_Braxton_000106
EXHIBIT 3

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

JANELL BRAXTON )
     *Plaintiff* )
vs. )     Case No. 2:20-cv-02287-DDC-GEB
        )
WALMART INC. )
     *Defendant* )

**PLAINTIFF'S RESPONSE TO**
**<u>DEFENDANT'S MOTION FOR SUMMARY JUDGMENT</u>**


**EXHIBIT 4**

**Walmart's Second 30(b)(6) Deposition**

Quincy Usry  (4-30-2021)

**EXHIBIT 4**

# Transcript of the Testimony of
# **Quincy Usry**

**Date:** April 30, 2021

**Braxton vs. Walmart**

CRAWFORD REPORTING
(816) 507-9630
CrawfordReporting@gmail.com

**EXHIBIT 4**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS


JANELL BRAXTON,            )
                          )
        Plaintiff,        )
                          )
vs.                       )    No. 2:20-cv-02287-DDC-GEB
                          )
WALMART INC.,             )
                          )
        Defendant.        )


VIDEOTAPED DEPOSITION OF
QUINCY USRY


a witness, being produced, sworn and examined on Friday,
April 30, 2021, pursuant to Notice to Retake Deposition
of Walmart, Inc. Safety Manager Quincy Usry, at the
offices of Ralston Kinney, LLC, Suite 300, 4717 Grand
Avenue in Kansas City, Missouri, before
        SHARON L. CRAWFORD, CCR, RPR,
a Certified Court Reporter in Missouri and Kansas.
Taken on behalf of the Plaintiff.

I N D E X

WITNESS:  QUINCY USRY                          PAGE
Examination by Mr. Kinney                        5


STIPULATIONS:

The witness is to read and sign.  If not signed by the
time of trial, the deposition may be used as if signed.

APPEARANCES

FOR THE PLAINTIFF:

    Mr. Kenneth D. Kinney
    Mr. Thomas F. Ralston
    RALSTON KINNEY, LLC
    4717 Grand Avenue, Suite 300
    Kansas City, Missouri  64112
    (816) 298-0086
    ken@rklawllc.com
    tom@rklawllc.com

FOR THE DEFENDANT:
    Mr. Christopher R. Hedican
    BAIRD HOLM LLP
    1700 Farnam Street, Suite 1500
    Omaha, Nebraska 68102-2068
    (402) 344-0500
    chedican@bairdholm.com

VIDEOTAPED BY:

    Mr. Bob Bennett with TBC Video Productions

4

E X H I B I T S

IDENTIFIED:                                          PAGE
39   5 Why Analysis                                   97
40   Associate Incident Report                        89
41   19-0902 Associate Work-Related Injury
     Management Guidelines                            81

42   Safety Incident Investigation Form               95

43   Employer's Report of Accident                    87

44   Information for Injured Employees               117

45   (Not identified)

46   (Not identified)

47   Notice to Retake Deposition of Walmart            9

48   Discrimination & Harassment Prevention
     Policy                                           18
49   Declaration of Quincy Usry                       26
50   Defendant's Answers to Plaintiff's Requests      57
51   Dot Com Safety Incident Investigation &
     Reporting                                        68

REFERENCED:                                          PAGE
 5   4/15/20 Email String                             60
 9   Jet Statement Form                              104
11   Safety & Compliance Rule Violation Form          46
11A  Safety & Compliance Rule Violation Form          54
25   General Safe Work Practices                      31
25A  General Safe Work Practices                      53

Case 2:20-cv-02287-DDC   Document 98-4   Filed 07/09/21   Page 4 of 30

Quincy Usry                    Braxton vs. Walmart                    4/30/2021

Appellate Case: 22-3003   Document: 010110660654   Date Filed: 03/21/2022   Page: 120

5

1      (Exhibits 39 through 49 were marked prior to
2  the deposition.)
3          THE VIDEOGRAPHER:  Today's date is
4  April the 30th, 2021.  The time now is approximately
5  10:40 a.m.  This is the videotaped deposition of
6  Quincy Usry in the case Janell Braxton vs. Walmart,
7  Incorporated.
8      Madam court reporter, would you please swear in the
9  witness.
10          QUINCY USRY,
11  a witness, having been produced, sworn and examined,
12  testified as follows on:
13  EXAMINATION BY MR. KINNEY:
14      Q.  Can you state your full legal name for the
15  record, please?
16      A.  Quincy Alexander Usry.
17      Q.  And Mr. Usry, my name is Ken Kinney, and I'm an
18  attorney that represents Janell Braxton in a lawsuit
19  she's filed against Walmart; do you understand that?
20      A.  Yes.
21      Q.  And Mr. Tom Ralston is also in the room today.
22  And he also represents Janell Braxton.  Do you understand
23  that?
24      A.  Yes.
25      Q.  And Mr. Hedican is an attorney that represents

7

1      A.  No.
2      Q.  Okay.  So, for instance, you should be answering
3  my question based on your own -- what you think is true.
4  So if you understand my question, you provide a true
5  answer because you're under oath to testify here today.
6  Does that make sense?
7      A.  Yes.
8      Q.  And if Mr. Hedican makes an objection for the
9  record, you still answer the question unless he tells you
10  not to answer.  Does that make sense?
11      A.  Yes.
12      Q.  And you shouldn't change what you're testifying
13  to under oath being influenced by an objection.  Does
14  that make sense?
15      A.  Yes.
16      Q.  Okay.  What's your date of birth?
17
18      Q.  Okay.  And that makes you how old today?
19      A.  27.
20      Q.  What's your current address?
21
22           .
23      Q.  Is that a single-family home?
24      A.  Yes.
25      Q.  Who do you live there were?

6

1  Walmart, and you arrived with him this morning, correct?
2      A.  No.
3      Q.  Well, you walked into our office with
4  Mr. Hedican this morning to -- you arrived at this office
5  with him, correct?
6      A.  Yes.
7      Q.  Okay.  Mr. Usry, do you understand you're here
8  to testify in the lawsuit that Ms. Braxton has filed
9  against Walmart?
10      A.  Yes.
11      Q.  And since you've already provided deposition
12  testimony in this case once before, I'm not going to
13  remind you of all the rules.  But I would ask you to do
14  me one favor and that is, if you don't understand one of
15  my questions, will you tell me before you answer?
16      A.  Yes.
17      Q.  Okay.  So if you answer my question, is it fair
18  for us to assume that you understood the question?
19      A.  Yes.
20      Q.  And also, Walmart's attorney might make
21  objections from time to time.  Those objections are
22  almost always for the judge to review later, and they're
23  not for you.  So it would be improper for you to tailor
24  your testimony to those objections.  Does that make
25  sense?

8

1      A.  Myself.
2      Q.  Do you own or rent?
3      A.  I'm paying a mortgage.
4      Q.  Okay.  So does that make you a homeowner?
5      A.  Yes.
6      Q.  How long have you owned that home?
7      A.  June of last year.
8      Q.  Okay.  Do you currently have any plans to leave
9  your employment with Walmart?
10      A.  No.
11      Q.  And you've work there since when?
12      A.  2016.
13      Q.  This case is set for trial next February of
14  2022.  So just in case for some reason you leave your
15  employment by then and we need to get ahold of you to get
16  you to come to trial, can you provide us with your cell
17  phone number?
18          MR. HEDICAN:  I'll provide that to you if
19  he leaves the company.
20      Q.  (BY MR. KINNEY)  What's your cell phone number?
21
22          MR. HEDICAN:  And I would place that under
23  the protective order for use in this case only.
24      Q.  (BY MR. KINNEY)  Is that cell phone number
25  something that you personally own?  Or is that a

Case 2:20-cv-02287-DDC   Document 98-4   Filed 07/09/21   Page 5 of 30

Quincy Usry                    Braxton vs. Walmart                    4/30/2021

Appellate Case: 22-3003   Document: 010110660654   Date Filed: 03/21/2022   Page: 121

9

1  Walmart-issued cell phone number?
2    **A.  I personally own my cell phone.**
3    Q.  Okay.  Do you share your cell phone number with
4  companies that you're customers of?
5    **A.  In reference to?**
6    Q.  If you order a pizza, you tell someone your
7  phone number?
8    **A.  Yes.**
9    Q.  Do you keep your cell phone confidential on a
10  day-to-day basis, your cell phone number?
11    **A.  I'm sparing on who I share my cell phone number**
12  **with, correct.**
13    Q.  Okay.  I want to hand you what's been marked as
14  Exhibit 47.  Exhibit 47 is, "Notice to Retake Deposition
15  of Walmart, Inc. Safety Manager Quincy Usry."  Do you see
16  that?
17    **A.  Yes.**
18    Q.  And if you look to the second page of
19  Exhibit 47, there's a topic for examination here today.
20  Do you see that?
21    **A.  Yes.**
22    Q.  And it says, "The contents, implementation and
23  enforcement of Walmart's policies and practices regarding
24  work injuries during Plaintiff's employment."  Did I read
25  that correctly?

10

1    **A.  Yes.**
2    Q.  And are you prepared to testify here today on
3  behalf of Walmart, Incorporated in regards to that topic?
4    **A.  Yes.**
5       MR. HEDICAN:  And Ken, just for the
6  record, this is a re-noticing of that original Exhibit 1,
7  on Topic 3.  And so he's here to talk about those
8  policies that you folks didn't have in the first
9  deposition.  Obviously, you've got some latitude to be
10  able to ask about that.  But I just want to be clear that
11  that's the limit of the 30(b)(6), correct?
12       MR. KINNEY:  The limit of the 30(b)(6) is
13  the topic written as No. 3, which I informed you is
14  different wording than the original Topic 3, which
15  specifically referenced the only policy we had at that
16  time.  So I'm intending to ask about Topic 3, which will
17  largely consist of the policies that Walmart didn't
18  produce to us until as recently as last week.  But it is
19  going to retread some same ground to put those things in
20  context, now that we have other documents to explain
21  them.
22       MR. HEDICAN:  Okay.  I think we're the
23  same.
24       MR. KINNEY:  And if I have a question
25  outside the scope of Topic 3, I'll just ask it to the

11

1  witness individually and we can note that.
2       MR. HEDICAN:  Okay.
3    Q.  (BY MR. KINNEY)  Mr. Usry, you're currently
4  employed by Walmart, correct?
5    **A.  Correct.**
6    Q.  What's your current job title?
7    **A.  Environmental Health and Safety Operations**
8  **Manager.**
9    Q.  Okay.  Do you often refer to that as safety
10  manager for short?
11    **A.  Yes.**
12    Q.  Okay.  How long have you been safety manager at
13  Walmart?
14    **A.  I have been a manager within safety since 2016.**
15    Q.  Okay.  And where do you physically work?
16    **A.  A facility in Edgerton, Kansas.**
17    Q.  The same facility where my client worked during
18  her employment with Walmart?
19    **A.  Correct.**
20    Q.  What are your normal business hours?
21    **A.  Roughly, 8:00 to 5:30, Monday to Friday.**
22    Q.  Was that the same in April of last year?
23    **A.  Correct.**
24    Q.  So if you're contacted outside of 8:00 to
25  5:30 -- that's 8:00 a.m. to 5:30 p.m., correct?

12

1    **A.  Correct.**
2    Q.  So typical business hours, roughly, correct?
3    **A.  Correct.**
4    Q.  If you're contacted by an employee of Walmart
5  asking you questions outside of those hours, it's not
6  part of your normal work day, correct?
7    **A.  Could you define a normal work day?**
8    Q.  What's your normal work day?
9    **A.  My normal work hours are 8:00 to 5:30 p.m.**
10    Q.  Okay.  So if you get contacted, for instance, at
11  11:30 p.m., that's outside your normal work day?
12    **A.  It is outside my normal work hours.**
13    Q.  Okay.  Do you get paid extra for the time that
14  you spend working outside your normal work hours?
15    **A.  I'm a salaried member of management, so no.**
16    Q.  Okay.  So if you get contacted at 11:30 at night
17  outside your normal work hours, are you expected to work
18  at that time?
19    **A.  I would choose to work at that time.**
20    Q.  Okay.  So you would volunteer to work for
21  Walmart at 11:30 p.m. when you get contacted by someone
22  who's currently working in the facility at that time,
23  correct?
24    **A.  I'm a salaried member of management, so I do not**
25  **consider it volunteering.**

13

1    Q.   Okay.  Well, you did use the word choose, did
2  you not?
3    A.   Yes.
4    Q.   Okay.  So, basically, you choose to work any
5  part of a 24-hour day if someone contacts you from the
6  Edgerton, Kansas facility?
7    A.   Yes.
8    Q.   Okay.  So it's not like the safety manager is on
9  shift for the people working there at that time?
10   A.   There is a safety manager on shift during that
11 time.
12   Q.   Okay.  So, the facility at Edgerton, Kansas, is
13 it open 24 hours a day?
14   A.   Yes.
15   Q.   And that was at the same in April of 2020?
16   A.   Yes.
17   Q.   So at any point in time during that 24-hour
18 period, there's someone with the same job title as you
19 who is working inside the facility?
20   A.   Not at any given time.  He also has business
21 hours.
22   Q.   Okay.  Oh, also has business hours you said?
23   A.   He also has hours that he's present on-site,
24 yes.
25   Q.   Okay.  In April 2020, how many other safety

14

1  managers were there?
2    A.   There were two.
3    Q.   And what was the other person's name?
4    A.   Which one?
5    Q.   Well, you were one of them, correct?
6    A.   Yes.
7    Q.   So what was the other person's name?
8    A.   I apologize.  There were three of us, total.
9    Q.   Okay.
10   A.   There were two others outside of myself.
11   Q.   Okay.  Who were those people?
12   A.   Tyler Roberts and Tabitha Smith.
13   Q.   Okay.  How many shifts did the Edgerton facility
14 have in April of 2020?
15   A.   Total shifts?
16   Q.   Yes.
17        MR. HEDICAN:  I object to foundation.  Go
18 ahead.
19   A.   I believe there were six.
20   Q.   (BY MR. KINNEY)  Okay.  They didn't have like,
21 first shift, second shift, and third shift?
22   A.   They're not classified that way.
23   Q.   Okay.  But it is open 24 hours a day, correct?
24   A.   Yes.
25   Q.   And between Ms. Smith, Mr. Robert and yourself,

15

1  would one of the safety managers be present at that
2  facility throughout the 24-hour period?
3    A.   Not during the entire 24 hours, no.
4    Q.   Okay.  Do you recall what Mr. Robert's hours
5  were in April of 2020?
6    A.   I believe they would have been 6:00 to
7  4:30 a.m., 6:00 p.m. to 4:30 a.m.
8    Q.   How about Tabitha Smith?
9    A.   She would have been 7:30 to 5:00.
10   Q.   7:30?
11   A.   A.m. to 5:00 p.m.
12   Q.   Okay.  So if Tyler Robert was working his
13 regular work hours, he would have been at the facility at
14 11:30 p.m.?
15   A.   Correct.
16   Q.   And there would be no need to contact you while
17 you were at home outside your normal work hours for
18 something that he could handle, correct?
19   A.   Correct.
20   Q.   Okay.  I want to focus in a little more on
21 the -- I want to focus in a little more on the --
22 Walmart's policies regarding workplace injuries and ask
23 you some very general questions first.
24        Walmart understands that its employees have
25 certain rights under the laws in Kansas regarding

16

1  workplace injuries, correct?
2    A.   Yes.
3    Q.   They have a right to report their workplace
4  injuries to Walmart, correct?
5    A.   Correct.
6    Q.   And they have a right to seek medical care for
7  workplace injuries at Walmart's expense, correct?
8    A.   Correct.
9    Q.   And Walmart also understands that it has certain
10 obligations under Kansas law in relation to an employee
11 who suffers a workplace injury, correct?
12   A.   Correct.
13   Q.   And if I use the phrase injured worker, can we
14 agree that that phrase means an employee who suffered a
15 workplace injury?
16   A.   Correct.
17   Q.   Okay.  And in April of 2020, Walmart knew that
18 it was illegal to fire someone because of their status as
19 an injured worker; is that true?
20   A.   Define status.
21   Q.   Well, I think we just defined injured worker,
22 didn't we?  And we agreed that injured worker means
23 someone who gets hurt at work?
24   A.   Correct.
25   Q.   So during April of 2020, did Walmart believe or

4 (Pages 13 to 16)

Case 2:20-cv-02287-DDC    Document 98-4    Filed 07/09/21    Page 7 of 30

Quincy Usry                Braxton vs. Walmart                4/30/2021
Appellate Case: 22-3003    Document: 010110660654    Date Filed: 03/21/2022    Page: 123

---

**17**

1  understand that it was illegal to fire an employee based
2  on their status as an injured worker?
3  **A.   I feel like that lacks context.**
4  Q.   Well, did Walmart believe it was illegal to fire
5  someone based on their status of being an
6  African-American?
7  MR. HEDICAN:  I object to foundation.
8  It's not part of the deposition.  But go ahead.
9  **A.   Can you repeat the question?**
10  Q.   (BY MR. KINNEY)  Yeah.  Did Walmart think, in
11  April of 2020 or at any point in time, that it was lawful
12  to fire someone based on their status of being an
13  African-American?
14  **A.   No.**
15  Q.   Do you need more context to testify that way?
16  **A.   I believe it lacks a lot of context, just to**
17  **state that someone could be fired for something of that.**
18  **I feel like there's -- there's a lot of context there**
19  **that's lacking.  But,**
20  Q.   Well, I'm not talking about Janell Braxton right
21  now.  Do you understand that?
22  **A.   Correct.**
23  Q.   I'm talking about Walmart and the way that it
24  treats its employees.  Do you understand that?
25  **A.   Correct.**

---

**18**

1  Q.   In April of 2020, did Walmart think it was
2  lawful to fire an employee based on their status as
3  injured worker?
4  **A.   Without context, the answer would be, no.**
5  Q.   Let's try to give it some context for you.  I'm
6  going to hand you what I've marked as Exhibit 48.
7  Exhibit 48 is a Discrimination and Harassment Prevention
8  Policy for Walmart.  Do you see that?
9  **A.   Yes, sir.**
10  Q.   Okay.  So I just want to point some things out
11  here before I get to the only question I have about this
12  policy.  This was -- this policy was updated April 3rd of
13  2020, correct?
14  **A.   Yes.**
15  Q.   And that means this policy was in place when
16  Ms. Braxton was fired, correct?
17  **A.   Yes.**
18  Q.   And the third paragraph, this says, "We are
19  committed."  Do you see that?
20  **A.   Yes.**
21  Q.   It says, "We are also committed to providing an
22  environment that is free of discrimination or harassment
23  based on an individual's status."  Did I read that
24  correctly?
25  **A.   Correct.**

---

**19**

1  Q.   And we jump down two paragraphs to the paragraph
2  that starts, "We will not tolerate any form of
3  discrimination or harassment in any aspect of our
4  business."  Do you see that?
5  **A.   Yes.**
6  Q.   The next sentence says, "This means we strictly
7  prohibit any discrimination or harassment as defined
8  within this policy by or directed at an associate."  Do
9  you see that?
10  **A.   Yes.**
11  Q.   And in April of 2020, Ms. Braxton would have
12  been an associate as that appears in this document,
13  Exhibit 48?
14  **A.   Yes.**
15  Q.   Now, we jumped down a little bit.  After those
16  bullet points it says, "This policy applies to all
17  associates who work for Walmart, Inc. or one of its
18  subsidiary companies in the United States, (Walmart)."
19  Do you see that?
20  **A.   Yes.**
21  Q.   So this exhibit would apply to every single
22  employee of Walmart in the United States of America,
23  correct?
24  **A.   Correct.**
25  MR. HEDICAN:  I object to foundation.  Go

---

**20**

1  ahead.
2  **A.   Correct.**
3  Q.   (BY MR. KINNEY)  And that means that this policy
4  would apply to every single employee that works for
5  Walmart in Kansas, correct?
6  MR. HEDICAN:  I object to foundation.  Go
7  ahead.
8  **A.   Yes, it would apply to people in**
9  **Edgerton, Kansas.**
10  Q.   (BY MR. KINNEY)  Okay.  And you see the big
11  heading that says Prohibited Conduct?
12  **A.   Yes.**
13  Q.   And then -- and it says, "For purposes of this
14  policy, discriminatory action includes, but is not
15  limited to firing."  Do you see that?
16  **A.   Yes.**
17  Q.   So according to Walmart's policy, firing an
18  employee could be considered discriminatory action
19  depending on the motive for the firing, correct?
20  **A.   Could be, yes.**
21  Q.   Okay.  And we can agree that Ms. Braxton was
22  fired from her employment at Walmart, correct?
23  **A.   She was terminated, yes.**
24  Q.   Okay.  So is terminated different than being
25  fired?

---

**App-II**
**123**

CRAWFORD REPORTING -- CrawfordReporting@gmail.com    **EXHIBIT 4**

Case 2:20-cv-02287-DDC   Document 98-4   Filed 07/09/21   Page 8 of 30

Quincy Usry                 Braxton vs. Walmart                 4/30/2021
Appellate Case: 22-3003   Document: 010110660654   Date Filed: 03/21/2022   Page: 124

---

**21**

1    A.  No.

2    Q.  So when we look at Exhibit 48 and it says,
3  "discriminatory action includes but is not limited to
4  firing," it doesn't use the word "terminate," they use
5  the word "firing;" is that correct?

6    A.  Correct.

7    Q.  But those two words, as you sit here today for
8  Walmart, would mean the same thing?

9    A.  Correct.

10    Q.  Okay.  Now, if we go back up to the definition
11  of individual's status, and here's where my question is
12  for you today as the spokesperson of Walmart related to
13  workplace injuries and their policies, do you see the
14  paragraph that starts, "Individual's status?"

15    A.  Yes.

16    Q.  Now it says, "Individual's status means an
17  individual's race, color, ancestry, ethnicity, religion,
18  sex, pregnancy, national origin, age, disability, marital
19  status, veteran status, military status or obligation to
20  perform military service, sexual orientation, gender
21  identity or expression, genetic information."

22      I want to pause right there.  So those would all
23  be considered, according to this policy, different parts
24  of an individual's status; is that correct?

25    A.  Correct.

---

**22**

1    Q.  And this policy is saying, we, Walmart does not
2  tolerate discrimination or harassment based on any of
3  those different statuses, correct?

4    A.  Correct.

5    Q.  Now, the last part of the sentence says, "or
6  other legally protected status."  Do you see that?

7    A.  Correct.

8    Q.  Now, Walmart agrees, that in April of 2020, it
9  knew it was illegal to fire someone based on their status
10  of an injured worker; isn't that correct?

11    A.  Correct.

12    Q.  Okay.  And an injured worker would be someone
13  who suffers a workplace injury, correct?

14    A.  Correct.

15    Q.  Okay.  And in April of 2020, Walmart knew it was
16  illegal to fire someone in response to them reporting a
17  workplace injury; is that correct?

18    A.  Correct.

19    Q.  Because reporting a workplace injury would be
20  considered a legally protected status, correct?

21    A.  Correct.

22    Q.  And becoming an injured worker would be
23  considered a legally protected status; is that correct?

24    A.  Correct.

25    Q.  Okay.  Now, just to give an overview, just to

---

**23**

1  get us on the same page, just to maybe refresh our
2  recollection about Ms. Braxton before we -- I'm going to
3  ask details about this stuff.  I just want to make sure
4  we're on the same page with the next few questions.  Does
5  that make sense?

6    A.  Yes, sir.

7    Q.  So Janell Braxton was formerly employed by
8  Walmart, Incorporated, correct?

9    A.  Correct.

10    Q.  And while she was employed with Janell Braxton,
11  she suffered a workplace injury, according to Walmart's
12  policies, correct?

13    A.  Can you repeat the question?

14    Q.  So during Ms. Braxton's employment, did she
15  suffer a workplace injury?

16    A.  Yes.

17    Q.  So during Ms. Braxton's employment, she became
18  what we can call a, quote, "injured worker," unquote,
19  correct?

20    A.  Correct.

21    Q.  Okay.  And Walmart learned about Ms. Braxton's
22  status as an injured worker, correct?

23    A.  Correct.

24    Q.  And while there might be disputes about when
25  Walmart learned that, can we agree that at least at the

---

**24**

1  latest, Walmart learned that Ms. Braxton was an injured
2  worker on April 14th of 2020, correct?

3    A.  Correct.

4    Q.  And the reason that Walmart learned that
5  Ms. Braxton was an injured worker was because she told
6  someone in her chain of command?

7    A.  Correct.

8    Q.  The reason that Ms. -- that Walmart knew that
9  Ms. Braxton became an injured worker was because she told
10  multiple employees that were in her chain of command,
11  correct?

12      MR. HEDICAN:  I object to foundation, and
13  this is beyond the 30(b)(6).  This isn't the topic that
14  was noticed, Ken.

15      MR. KINNEY:  Well, I'm just laying a
16  factual groundwork so that when we talk about the
17  policies, we have some frame of reference to --

18      MR. HEDICAN:  Yeah, and all those
19  questions were asked in the first incarnation of the
20  deposition.  I don't think we need to ask these questions
21  again.

22      MR. KINNEY:  Sir, if I play this video for
23  the jury, I want the jury to know what we're talking
24  about.  And we weren't able to ask the questions I
25  planned on asking because we didn't have the documents

Case 2:20-cv-02287-DDC   Document 98-4   Filed 07/09/21   Page 9 of 30

Quincy Usry                Braxton vs. Walmart              4/30/2021
Appellate Case: 22-3003   Document: 010110660654   Date Filed: 03/21/2022   Page: 125

25

1  until as early as last Monday.  11 days ago is when we
2  got the last production that was directly relevant to the
3  policies and procedures regarding workplace injuries.
4  And I need to ask about the contents of the policies,
5  implementation and enforcement.  So I just want to make
6  sure that the witness and I are on the same page with
7  some of these facts before we talk about how the policies
8  apply to facts.
9         MR. HEDICAN:  Would you read back the last
10 question, please?
11        (The question was read back by the reporter as
12 follows:  "QUESTION: "The reason that Walmart knew that
13 Ms. Braxton became an injured worker was because she told
14 multiple employees that were in her chain of command,
15 correct?")
16        MR. HEDICAN:  Okay.  I'm going to object
17 to the form of the question, it misstates testimony.  Go
18 ahead.
19   A.  To the best of my knowledge, yes.
20   Q.  (BY MR. KINNEY)  Okay.  So, to the best of your
21 knowledge, how did Walmart become aware of Ms. Braxton's
22 status as an injured worker?
23   A.  Based on her report.
24   Q.  To?
25   A.  To, I believe it was Ammie or David.

26

1    Q.  Okay.  Ammie or David?  Or Ammie and David?
2    A.  Ammie and David.
3    Q.  Okay.  And that's Ammie Wilbur, the operations
4  lead?
5    A.  Yes, I believe so.
6    Q.  And David Whitenack, the operations manager at
7  the time?
8    A.  Correct.
9    Q.  Okay.  And after Walmart learned of
10 Ms. Braxton's status as an injured worker, she was fired
11 that same calendar day, correct?
12   A.  Correct.
13   Q.  Okay.  And at the time that Ms. Braxton was
14 fired, Walmart knew that it was unlawful to fire someone
15 based on their status as an injured worker?
16   A.  Correct.
17   Q.  And at the time Ms. Braxton was fired, Walmart
18 knew it was unlawful to fire someone in response to them
19 reporting a workplace injury?
20   A.  Correct.
21   Q.  Okay.  I'm going to hand you what I've marked as
22 Exhibit 49.  Exhibit 49 is a declaration from you
23 personally that was provided to the federal court
24 presiding over this lawsuit; is that correct
25   A.  Correct.

27

1    Q.  And this declaration, you're familiar with it,
2  correct?
3    A.  Correct.
4    Q.  You actually signed this declaration on
5  February 19th of 2021, correct?
6    A.  Correct.
7    Q.  And you're -- when you're making this
8  declaration, you're doing it under what's called penalty
9  of perjury, correct?
10   A.  Correct.
11   Q.  And that's the same -- similar to the oath that
12 you are taking today to testify to, correct?
13   A.  Correct.
14   Q.  All right.  And is it fair to summarize this
15 declaration as facts that you are setting forth regarding
16 the policies relating to workplace injuries and the
17 reason that you supported Ms. Braxton's termination?
18   A.  Correct.
19   Q.  Okay.  Now, if we look at paragraph 3, there's a
20 reference to a Policy 67 -- or 763e, do you see that?
21   A.  Yes.
22   Q.  Now, Policy 763e is a policy that was in place
23 at Walmart during March and April of 2020, correct?
24   A.  Correct.
25   Q.  And that was a policy that would have been

28

1  accessible to Ms. Braxton as an employee, correct?
2    A.  Correct.
3    Q.  Regarding -- well, regarding a lot of topics
4  that we'll look at in a minute, but part of that was
5  reporting workplace injuries, correct?
6    A.  Correct.
7    Q.  And then, paragraph 4 talks about -- well, it
8  references Policy 670e, correct?
9    A.  Correct.
10   Q.  And 670e is actually a form that Walmart had
11 during March and April 2020 used to record safety
12 violations, correct?
13   A.  Correct.
14   Q.  Okay.  And both of those documents would have
15 been available to Ms. Braxton, correct?
16   A.  Correct.
17   Q.  And it was your opinion, in April of 2020, that
18 Ms. Braxton had violated those two documents, correct?
19   A.  Correct.
20   Q.  And if you review your declaration, isn't it
21 true that those are the only two policy documents
22 referred to in your declaration that would have been
23 available to Ms. Braxton at some point in time during her
24 employment with Walmart?
25        MR. HEDICAN:  I object to the foundation,

29

1  misstates testimony.  Go ahead.
2      **A.  Available is -- define available.  That's the**
3  **word that is confusing in that statement.**
4      Q.  (BY MR. KINNEY)  Mr. Usry, where did you go to
5  high school?
6      **A.  I went to high school at Pattonville High School**
7  **and also Trinity High School.**
8      Q.  Where?
9      **A.  Or Trinity Christian Academy in**
10  **Springfield, Missouri, and Pattonville High School was in**
11  **St. Louis.**
12      Q.  Okay.  And did you graduate high school?
13      **A.  I did.**
14      Q.  Did you go to college after high school?
15      **A.  I did.**
16      Q.  Where did you go to college?
17      **A.  University of Central Missouri.**
18      Q.  Okay.  Did you graduate?
19      **A.  Yes.**
20      Q.  Did you get a degree?
21      **A.  I did.**
22      Q.  What was your degree in?
23      **A.  Safety Management, BS.**
24      Q.  Bachelor's of Science in Safety Management?
25      **A.  Correct.**

30

1      Q.  Do you have any post-graduate degrees?
2      **A.  No, sir.**
3      Q.  Do you have any post-graduate classes?
4      **A.  No, sir.**
5      Q.  Okay.  Are you telling me right now that you
6  don't know what the word "available" means?
7      **A.  No, sir.**
8      Q.  Okay.  So you understand what it means to be
9  available?
10      **A.  Correct.**
11      Q.  Okay.  So, I mean, this is your declaration,
12  Exhibit 49, correct?
13      **A.  Correct.**
14      Q.  And you reference Policy 673e -- or 763e,
15  correct?
16      **A.  Correct.**
17      Q.  And Policy 670e, correct?
18      **A.  Correct.**
19      Q.  Those two documents were available to
20  Ms. Braxton during her employment, correct?
21      **A.  Correct.**
22      Q.  Now, are there any other documents referenced in
23  your declaration that would have been available to
24  Ms. Braxton during her employment?
25          MR. HEDICAN:  I object to foundation.  Go

31

1  ahead.
2      **A.  No, sir.**
3      Q.  (BY MR. KINNEY)  Okay.  So like the text
4  messages between you and David Whitenack, would
5  Ms. Braxton have had access to that?
6      **A.  No, sir.**
7      Q.  How about Walmart's Conduct Disciplinary Action
8  Guidelines?  Was that a document that Ms. Braxton had
9  access to as an associate?
10          MR. HEDICAN:  I object to foundation.  Go
11  ahead.
12      **A.  To the best of my knowledge, no.**
13      Q.  (BY MR. KINNEY)  Okay.  And as you sit here
14  today, are you aware of Ms. Braxton, during her
15  employment with Walmart, receiving specific training on
16  Walmart's Policy 673e?
17      **A.  Define specific training.**
18      Q.  Well, how would you, as a safety operations
19  manager, or safety manager at Walmart, define specific
20  training?
21      **A.  And also for clarity, are you talking about the**
22  **763?**
23      Q.  Here, I'm going to hand you what's been marked
24  as Exhibit 25.  Now, part of what you're here to testify
25  about -- first, Exhibit 763e, the General Safe Work

32

1  Practices, is related to workplace injuries, correct?
2      **A.  It's related to the general safe work practices**
3  **of associates, but does have a section related to**
4  **workplace injuries, yes.**
5      Q.  Okay.  So it's at least related to workplace
6  injuries, correct?
7      **A.  Correct.**
8      Q.  And this is a policy that you personally relied
9  on when deciding or supporting to fire Ms. Braxton,
10  correct?
11      **A.  Correct.**
12      Q.  And part of what you're here to testify about
13  today is the contents, implementation and enforcement of
14  Walmart's policies and practice regarding work injuries,
15  correct?
16      **A.  Correct.**
17      Q.  So I want to ask you about the part of
18  Exhibit 25 that relates to work injuries.  Did
19  Ms. Braxton ever receive training from another Walmart
20  employee regarding the part of 673e that relates to
21  workplace injuries?
22      **A.  To the best of my knowledge, from another**
23  **Walmart associate, no.**
24      Q.  So, on behalf of Walmart, can you guarantee us
25  under oath today, that Ms. Braxton received training on

Case 2:20-cv-02287-DDC  Document 98-4  Filed 07/09/21  Page 11 of 30

Quincy Usry                Braxton vs. Walmart                4/30/2021
Appellate Case: 22-3003  Document: 010110660654  Date Filed: 03/21/2022  Page: 127

---

37

1  the home office in Bentonville, Arkansas?
2  **A.  Yes, sir.**
3  Q.  And that's the home office for Walmart
4  generally, correct?
5  **A.  Correct.**
6  Q.  Okay.  All right.  So, coming back to
7  Exhibit 25, did Exhibit 25 apply to every employee
8  working at the Edgerton, Kansas facility?
9  **A.  Yes, sir.**
10  Q.  Okay.  And do you know the total number of
11  employees in the United States that Exhibit 25 applied to
12  during April of 2020?
13      MR. HEDICAN:  I object to foundation.  Go
14  ahead.
15  **A.  No, sir.**
16  Q.  (BY MR. KINNEY)  Do you know how many eCommerce
17  locations there were in April of 2020?
18      MR. HEDICAN:  I object to foundation.  Go
19  ahead.
20  **A.  Not off the top of my head, no.**
21  Q.  (BY MR. KINNEY)  Is Exhibit 25, was the parts of
22  this policy related to workplace injuries applicable to
23  everyone of Walmart's eCommerce employees in the United
24  States during April of 2020?
25      MR. HEDICAN:  I object to foundation.  Go

---

38

1  ahead.
2  **A.  I do not know that answer.**
3  Q.  (BY MR. KINNEY)  Okay.  So wouldn't you agree
4  that whether this policy applies to all of Walmart's
5  employees or just some, relates to Walmart's enforcement
6  and implementation of the policy itself?
7  **A.  Could you reask that?**
8  Q.  Yeah, I mean, to know how broad of a scope a
9  range of people are subject to the enforcement of policy
10  to 25, we'd have to know how many people it covers,
11  right?
12      MR. HEDICAN:  I object to foundation, it's
13  argumentative.  Go ahead.
14  **A.  I don't believe so.**
15  Q.  (BY MR. KINNEY)  Okay.  But at least we can
16  agree that every single one of Walmart's eCommerce
17  employees in the United States of America were subject to
18  Exhibit 25, at least during April of 2020?
19      MR. HEDICAN:  I object to foundation, it's
20  been asked and answered.  Go ahead.
21  **A.  I did not state that every eCommerce associate**
22  **would have been under this policy.**
23  Q.  (BY MR. KINNEY)  Which ones would not have been
24  under this policy?
25  **A.  I don't know.**

---

39

1  Q.  Okay.  Let's look at the second bold heading on
2  the first page of Exhibit 25.  There's a phrase called
3  Safety Related Incidents.  Do you see that?
4  **A.  Yes.**
5  Q.  And the first bullet point under that says, "All
6  known injuries, no matter how slight, will be reported to
7  a member of management immediately.  At a minimum, these
8  must be reported to a member of management by the end of
9  the shift."  Did I read that correctly?
10  **A.  Correct.**
11  Q.  And that's the line of Exhibit 25 that you put
12  in your declaration that was provided to the federal
13  court presiding over this case, correct?
14  **A.  Correct.**
15  Q.  And that's the specific line of Exhibit 25 that
16  you concluded Ms. Braxton had violated in April of 2020,
17  correct?
18  **A.  Correct.**
19  Q.  Now, that phrase, "safety related incidents," --
20  well, actually that word "incidents," does anywhere in
21  Policy 763e define what an incident is?
22  **A.  No, sir.**
23  Q.  Okay.  And then, the first bullet point under
24  the word "incidents" it says, "All known injuries."  Is
25  that word "injuries," is that word defined anywhere in

---

40

1  Exhibit 25?
2  **A.  No, sir.**
3  Q.  And does Exhibit 25, under Safety Related
4  Incidents, makes any distinction between an injury and
5  something like soreness?
6  **A.  No.**
7  Q.  Does this rule, under Safety Related Incidents,
8  apply to all the employees who are working at
9  Edgerton, Kansas in April of 2020?
10  **A.  Correct.**
11  Q.  And it would have applied to safety lead,
12  Ammie Wilbur, correct?
13  **A.  She was not a safety lead.**
14  Q.  Sorry, it would -- thank you.  It would -- it
15  would apply to operations lead, Ammie Wilbur, correct?
16  **A.  Correct.**
17  Q.  It would have applied to safety lead,
18  Mark Tuazon, correct?
19  **A.  Correct.**
20  Q.  And it would have applied to operations manager,
21  David Whitenack, correct?
22  **A.  Correct.**
23  Q.  And is the bullet point under Safety Related
24  Incidents require only the injured employee to report it
25  to management?  Or anyone who knows about an injury?

---

Quincy Usry                    Braxton vs. Walmart                    4/30/2021

Appellate Case: 22-3003    Document: 010110660654    Date Filed: 03/21/2022    Page: 128

41

1    A.  Anyone who knows about an injury.
2    Q.  So if a safety lead like Mark Tuazon became
3  aware of an injury, he would have a duty under Walmart's
4  policy to report that to a member of management
5  immediately, correct?
6    A.  Correct.
7    Q.  And if Ammie Wilbur learned about a known
8  injury, she would have a duty under this policy to report
9  it to a member of management immediately, correct?
10    A.  Correct.
11    Q.  And it's Walmart's contention in this case that
12  Ms. Braxton was fired because she knew about an injury
13  and didn't report it to a member of management
14  immediately; is that fair?
15    A.  Correct.
16    Q.  Okay.  Does anywhere in Exhibit 25 inform an
17  employee that they can be fired for not reporting a
18  workplace injury to management by the end of the shift?
19    A.  No.
20    Q.  Does anywhere in Exhibit 25 inform an employee
21  that they could be disciplined in any way for not
22  reporting an injury to a member of management by the end
23  of the shift?
24    A.  No, sir.  But there are safe work practices
25  within our facility.

42

1    Q.  Okay.  So does anywhere in Exhibit 25 tell an
2  employee that they can be fired for not reporting to a
3  member of management by the end of the shift if they know
4  about an injury?
5    A.  No, sir.
6    Q.  Okay.
7    A.  However, the first line does state, "Associates
8  must adhere to eCommerce Safety, Compliance, Trust and
9  Emergency Procedures, to include the Dot Com Safety
10  Policy" -- or "Safety Manual."
11    Q.  Okay.  So, the Dot Com Safety Manual, was that
12  available to Janell Braxton during her employment?
13    A.  Not specifically.
14    Q.  Well, did Walmart ever give Ms. Braxton a copy
15  of the DC-11 Dot Com Safety Manual?
16    A.  No, sir.
17    Q.  Was the DC-11 Dot Com Safety Manual one of those
18  documents that Janell Braxton acknowledged prior to her
19  employment?
20    A.  No, sir.
21    Q.  Did Janell Braxton receive any specific training
22  on the DC Dot Com Safety Manual?
23    A.  No, sir.
24    Q.  How about David Whitenack?
25    MR. HEDICAN:  I object to foundation.  Go

43

1  ahead.
2    Q.  (BY MR. KINNEY)  Would an operations manager
3  have access to the DC-11 Dot Com Safety Manual?
4    A.  Yes, sir.
5    Q.  And you would have access to the DC-11 Dot Com
6  Safety Manual, correct?
7    A.  Correct.
8    Q.  And how about a safety lead like Mark Tuazon?
9  Would he have access to the DC-11 Dot Com Safety Manual?
10    A.  Correct.
11    Q.  And how about Ammie Wilbur, an operations lead?
12  Would she have access to the DC-11 Dot Com Safety Manual?
13    A.  Correct.
14    Q.  How about Morgan Medaris?  Would she have access
15  to the DC Dot Com Safety Manual?
16    MR. HEDICAN:  I object to foundation.  Go
17  ahead.
18    A.  She would have access, yes.
19    Q.  (BY MR. KINNEY)  Okay.  And if we talk about
20  you, Janell Braxton, Mark Tuazon, Ammie Wilbur,
21  Morgan Medaris and David Whitenack, is that all the
22  people that had information regarding Janell Braxton's
23  workplace injury and then her termination?
24    MR. HEDICAN:  I object to foundation.  Go
25  ahead.

44

1    A.  To my knowledge, yes.
2    Q.  (BY MR. KINNEY)  And out of all those people,
3  Janell Braxton was the only person that did not have
4  access to the DC-11 Dot Com Safety Manual, correct?
5    A.  Correct.
6    Q.  But what you wanted to point out to me a moment
7  ago was that associates are required to follow that
8  manual, correct?
9    A.  Correct.
10    Q.  So it's mandatory, not discretionary, to follow
11  the DC-11 Dot Com Safety Manual, correct?
12    A.  Correct.
13    Q.  Okay.  I specifically ask you to remember that
14  testimony because we're going to talk about the DC Dot
15  Com safety Manual in a little bit.  But I want to go back
16  to what I want to ask you about, okay?  Does it make
17  sense?
18    A.  Yes.
19    Q.  Okay.  So does Exhibit 25, the one that was
20  available to Ms. Braxton, tell anywhere in there that an
21  employee is required to immediately report to a member of
22  management soreness, that might just be routine soreness
23  that she experienced during a work shift?
24    A.  No.
25    Q.  Does Exhibit 25 say anything in there that an

Case 2:20-cv-02287-DDC   Document 98-4   Filed 07/09/21   Page 13 of 30

Quincy Usry                    Braxton vs. Walmart                    4/30/2021

Appellate Case: 22-3003   Document: 010110660654   Date Filed: 03/21/2022   Page: 129

**45**

1  employee will be fired for failing to report routine
2  soreness as soon as it occurs during a work shift?
3      A.  Just as a side note, do you want to take care of
4  your finger?  I will gladly break for you to get --
5      Q.  No.
6      A.  -- a Band-Aid or something.
7      Q.  No, it's okay.
8          MR. HEDICAN:  He's a safety guy.
9          MR. KINNEY:  Yeah, it's all right.  I'll
10  be okay.  I'm declining medical treatment at this time,
11  first aid, but I appreciate that.
12          Did we get an answer to the last question?
13          THE REPORTER:  No.
14          (The question was read back by the
15  reporter as follows: "QUESTION: "Does Exhibit 25 say
16  anything in there that an employee will be fired for
17  failing to report a routine soreness as it occurs during
18  a work shift?"  And then he said, "Just as a note --")
19          MR. KINNEY:  Okay.
20      A.  So, no.
21      Q.  (BY MR. KINNEY)  So the answer to my original
22  question is no, correct?
23      A.  Which original question, the question that she
24  just read?
25      Q.  Yeah.

**46**

1      A.  Yes.
2      Q.  Okay.  So, just so we're clear, does Exhibit 25
3  tell an employee that they can be fired for failing to
4  report routine soreness during a shift in which this
5  soreness first becomes apparent to them?
6      A.  No, sir.
7      Q.  Okay.  Now, the other document that you relied
8  on, as stated in your declaration that was given to the
9  Federal Court, was a document called 670e, correct?
10      A.  Correct.
11      Q.  Okay.  I want to hand you a copy of what was
12  previously Exhibit 11.  Now, your declaration to the
13  Federal Court called this document a policy; is that
14  correct?
15      A.  Correct.
16      Q.  Now, does the word "policy" appear anywhere on
17  Exhibit 11?
18      A.  No, sir.
19      Q.  We see the title of this document is called
20  Safety and Compliance Rule Violation Form, correct?
21      A.  Correct.
22      Q.  And again, this is a policy that up at the top
23  right-hand corner is Walmart eCommerce, correct?
24      A.  Correct.
25      Q.  And Walmart eCommerce is more than just the

**47**

1  Edgerton, Kansas facility, correct?
2      A.  Correct.
3      Q.  Now, there's one bullet point in Exhibit 11.
4  Under Step 1 there's a bullet point that says Safety.  Do
5  you see that?
6      A.  Correct.
7      Q.  The next bullet point says, "Failure to report
8  any known injury before the end of the shift."  Did I
9  read that correctly?
10      A.  Correct.
11      Q.  Now again, we see the language, "Failure to
12  report any known injury before the end of the shift."
13  And that's the bullet point that you put in your
14  declaration to the Federal Court that you believe
15  Ms. Braxton violated, correct?
16      A.  Correct.
17      Q.  Now, this policy, or this form, document 670e,
18  the exhibit, this was something that was available to
19  Ms. Braxton prior to her starting employment at Walmart,
20  correct?
21      A.  Correct.
22      Q.  This is one of the policies that she
23  acknowledged three days before she became an employee of
24  Walmart, true?
25      A.  True.

**48**

1      Q.  And did Ms. Braxton ever get specific training
2  regarding the document we've marked as Exhibit 11?
3      A.  Specific training as defined earlier as verbally
4  from another associate, I do not believe so.
5      Q.  Okay.  Ms. Braxton went through a safety school
6  training at the beginning of her employment, correct?
7      A.  Correct.
8      Q.  And during the safety school training that
9  Ms. Braxton went through at the beginning of her
10  employment, did part of that training talk about when to
11  report a workplace injury?
12      A.  There's a piece within it that mentions that
13  incidents should be reported.  However it's not
14  specifically stated in relation to safety related
15  incidents.
16      Q.  Okay.  So generally, it says incidents should be
17  reported.  But that word "incidents" is broader than
18  workplace injuries, correct?
19      A.  Correct.
20      Q.  That word "incidents" could be sexual
21  harassment?
22          MR. HEDICAN:  I object to foundation.  Go
23  ahead.
24      A.  As defined by HR, yes.
25      Q.  (BY MR. KINNEY) Okay.  The word "incident,"

Case 2:20-cv-02287-DDC    Document 98-4    Filed 07/09/21    Page 14 of 30

Quincy Usry                    Braxton vs. Walmart                    4/30/2021
Appellate Case: 22-3003    Document: 010110660654    Date Filed: 03/21/2022    Page: 130

---

**49**

1  could it refer to two employees getting into a fist
2  fight?
3      A.  It could.  We would define that as workplace
4  violence.
5      Q.  Okay.  So, but what I'm -- okay.  Let's just
6  bring it back to what we're here to talk about.  Was Ms.
7  Braxton specifically told during that safety school
8  training that she was required to report a workplace
9  injury during the same shift in which it happened?
10     A.  I do not believe so.
11     Q.  Okay.  Now, this document we're looking at,
12  Exhibit 11, does it define what the word "injury" means?
13     A.  No, sir.
14     Q.  Does it differentiate between injury and
15  soreness?
16     A.  No, sir.
17     Q.  Does it say failure to report any known soreness
18  before the end of the shift?
19     A.  No, sir.
20     Q.  Does document 670e, Exhibit 11, inform the
21  person reading it that they can be fired for failing to
22  report a known injury before the end of the shift?
23     A.  No, sir.
24     Q.  And in fact, what it says under -- next to
25  Step 1 is, "Note:  Any repeat of the same violation

---

**50**

1  within 180 calendar days will result in a minimum of
2  Step 3, up to and including, termination."  Did I read
3  that correctly?
4      A.  Correct.
5      Q.  So this Exhibit 11 is really a template that can
6  be used, and you give it to an associate to inform them
7  that they have committed a safety violation, correct?
8      A.  Correct.
9      Q.  And according to the form itself, which by the
10  way, Ms. Braxton was provided by an acknowledgment prior
11  to becoming an employee, correct?
12     A.  Correct.
13     Q.  According to the information on the actual
14  document, anything listed under Step 1, after there was a
15  violation form entered, if they did it again within
16  180 days, then they would be given a minimum of Step 3,
17  up to a termination, correct?
18     MR. HEDICAN:  I object to form,
19  foundation.  Go ahead.
20     A.  For full-time associates, correct.
21     Q.  (BY MR. KINNEY)  Okay.  Does this form say
22  anything that's different for full-time associates versus
23  anyone else?
24     A.  Not on this form.
25     Q.  Okay.  Did Ms. Braxton work full-time hours

---

**51**

1  during her employment with Walmart?
2      MR. HEDICAN:  I object to foundation.  Go
3  ahead.
4      A.  I don't know what hours she worked.
5      Q.  (BY MR. KINNEY)  Okay.  So you never looked to
6  see whether she worked full-time hours or not?
7      A.  I believe she would have.  But associates could
8  have potentially been involved in VTO, or points,
9  et cetera.  So my definition of full-time hours would be
10  about 40 to 44.  So I don't know if she, according to my
11  definition, worked full-time hours.  However, I believe
12  she was employed to work full-time hours, correct.
13     Q.  Okay.  So Ms. Braxton, as far as you knew, was
14  employed to work full-time hours?
15     A.  Correct, on a seasonal basis.
16     Q.  Okay.  But she was employed during her
17  employment to work full-time hours.  Is that what you
18  just told me?
19     A.  To the best of my knowledge, yes.
20     Q.  Okay.  And that was your understanding in April
21  of 2020 when you were part of the decision to fire her,
22  correct?
23     A.  Correct.
24     Q.  Okay.  Now, back to Exhibit 11, which was a
25  document Walmart chose to give Ms. Braxton prior to her

---

**52**

1  employment.  Does it say anywhere on there there's a
2  difference between full-time or part-time or permanent
3  and seasonal employees?
4      A.  No, sir.
5      Q.  And this rule, under Step 1, "Failure to report
6  any known injury before the end of the shift," did that
7  rule apply to safety leads?
8      A.  Correct.
9      Q.  Did that rule apply to operations leads?
10     A.  Correct.
11     Q.  Did that rule apply to operations managers?
12     A.  Correct.
13     Q.  So that rule would have applied to Mark Tuazon
14  during April 2020, correct?
15     A.  Correct.
16     Q.  And that rule would have applied to Aimee Wilbur
17  during April 2020, correct?
18     A.  Correct.
19     Q.  And if they failed to report a known injury,
20  even if it wasn't their injury, but it was an injury they
21  knew about before the end of the shift, they could be
22  subject to discipline according to this form; is that
23  correct?
24     A.  Correct.
25     Q.  Now, we looked at two policies, or two

---

**53**

1  documents; the 763e, Exhibit 25, and the 670e,
2  Exhibit 11, and there's a total of two bullet points that
3  address what Walmart contends was the reason Ms. Braxton
4  was fired; is that correct?
5  **A. Correct.**
6  Q.  Okay.  Do you know how many bullet points there
7  are between those two documents that Ms. Braxton was
8  asked to review prior to her starting her employment at
9  Walmart?
10  **A. Without counting them, no.**
11  Q.  Okay.
12  (Exhibit 25A is marked for identification.)
13  Q.  (BY MR. KINNEY)  I want to hand you what I'm
14  marking as Exhibit 25A.  Exhibit 25A is the same as
15  Exhibit 25, except for we've numbered the bullet points.
16  Do you see that?
17  **A. Yes.**
18  Q.  Now, how many bullet points -- and you can feel
19  free to flip through and make sure that we numbered them
20  consecutively.  According to our handwritten count, how
21  many bullet points are there in the 763e General Safe
22  Work Practices?
23  **A. Including all the sub-bullet points, 258.**
24  Q.  Okay.  So, 258 bullet points on the 763e,
25  Exhibit 25, also marked as Exhibit 25A.  Out of those 258

**54**

1  bullet points, only one of them relates to reporting a
2  known injury to a member of management by the end of the
3  shift, correct?
4  **A. Correct.**
5  Q.  Okay.
6  (Exhibit 11A is marked for identification.)
7  Q.  (BY MR. KINNEY)  I'll hand you what I've marked
8  as Exhibit 11A, which is that same 670e Safety &
9  Compliance Rule Violation Form.  And do you see that we
10  have numbered the bullet points again?
11  **A. Correct.**
12  Q.  How many bullet points are on document 673e
13  (sic)?
14  **A. 670e?**
15  Q.  Yeah, the 670e, the Safety & Compliance Rule
16  Violation Form marked as Exhibit 11 and 11A.  How many
17  bullet points are on there?
18  **A. 50.**
19  Q.  Okay.  And how many of those bullet points
20  relate to reporting a workplace injury before the shift
21  ends?
22  **A. One.**
23  Q.  Okay.  So we have a total of two bullet points
24  between these two policies, or two documents.  Two bullet
25  points out of 308 bullet points, correct?

**55**

1  **A. Correct.**
2  Q.  Okay.  And those were -- these two documents
3  that we're looking at are not the only documents that
4  Ms. Braxton acknowledged prior to her employment with
5  Walmart, correct?
6  **A. Correct.**
7  Q.  So there would be even more information that she
8  acknowledged three days prior to becoming an employee
9  with Walmart, correct?
10  **A. Correct.**
11  Q.  And during safety school, she was never informed
12  that there was a specific rule that she was required to
13  report a known injury before the end of the shift; is
14  that correct?
15  MR. HEDICAN:  Objection, asked and
16  answered.  Go ahead.
17  **A. Correct.**
18  Q.  (BY MR. KINNEY)  And neither of the documents we
19  have looked at so far even define what a known injury is,
20  correct?
21  MR. HEDICAN:  Objection, asked and
22  answered.  Go ahead.
23  A.  Correct.
24  Q.  (BY MR. KINNEY)  And neither of the documents
25  we've looked at so far defined what an incident is?

**56**

1  **A. Correct.**
2  Q.  Okay.  Now, as of April 2020, does Walmart think
3  its training regarding when to report workplace injuries
4  was adequate?
5  MR. HEDICAN:  I'm going to object to
6  foundation.  Go ahead.
7  **A. Could you repeat the question?**
8  THE REPORTER:  Do you want me to read it?
9  MR. KINNEY:  Sure.
10  (The question was read back by the
11  reporter as follows: "QUESTION: Now, as of April 2020,
12  does Walmart think its training regarding when to report
13  workplace injuries was adequate?")
14  MR. HEDICAN:  Objection, beyond the
15  30(b)(6).  Go ahead.
16  **A. For clarity, are you asking from April to now?**
17  **Or in my mind, in April?**
18  Q.  (BY MR. KINNEY) So, how about this.  During
19  Plaintiff's employment, was Walmart adequately training
20  its employees on when to report a workplace injury at its
21  facility in Edgerton, Kansas?
22  MR. HEDICAN:  I object.  Beyond the
23  30(b)(6), and to the extent it calls for a legal
24  conclusion.  Go ahead.
25  **A. I believe so.**

65

```
 1  We're going off the record.  The time now is
 2  approximately 11:50 a.m.
 3        (Recess taken.)
 4        THE VIDEOGRAPHER:  And we are back on the
 5  record.  The time now is approximately 12:01 p.m.  Would
 6  you, please, proceed.
 7     Q.  (BY MR. KINNEY)  Mr. Usry, are you ready to
 8  proceed?
 9     A.  Yes, sir.
10     Q.  Prior to the break, we were talking about some
11  policies that relate to associates and the rules related
12  to what an associate is supposed to do after they suffer
13  a workplace injury, correct?
14     A.  Correct.
15     Q.  Now, according to Walmart, and the policies that
16  it has on that topic, is there a difference between
17  suffering a workplace injury and just experiencing
18  soreness from the work you're performing for the job?
19     A.  Could you repeat the first part of that
20  question?
21     Q.  Yeah.  According to Walmart's policies and
22  practices regarding work injuries, is there a difference
23  between an injury and soreness?
24     A.  Specifically stated in policy, no.
25     Q.  Okay.  So if an employee is just experiencing
```

66

```
 1  soreness from repetitive motion at work, are they
 2  supposed to report that immediately?
 3     A.  We like to hear of all types of discomfort to
 4  where we can address them with first aid.  So, would we
 5  like to know about that, yes.  But we would not -- that's
 6  not necessarily an injury at that point.
 7     Q.  Okay.  So there -- there could be a difference,
 8  under Walmart's policies, like, safe -- like, soreness
 9  versus an injury, correct?
10     A.  Correct.
11     Q.  And did any of the policies that we looked at up
12  to this point in the deposition, the ones that were
13  available to Ms. Braxton, discuss that difference?
14     A.  No, sir.
15     Q.  And did any of the training that Ms. Braxton
16  went through with her employment at Walmart discuss the
17  difference between what might be soreness and what might
18  be an injury?
19     A.  Training as discussed earlier as from the voice
20  of another associate.  No, sir.
21     Q.  Okay.  Does Walmart consider having someone
22  acknowledge forms prior to starting employment training?
23     A.  Yes.
24     Q.  Okay.  So Ms. Braxton was required to undergo
25  training on her own prior to becoming employed by Walmart
```

67

```
 1  that she wasn't paid for?
 2     A.  That's an option we make available to them.
 3     Q.  Okay.  So it's an option to train yourself?
 4     A.  It's an option to go through that training
 5  before starting your employment.
 6     Q.  Okay.  And if you go through the training
 7  yourself, there's no one with you to explain what the
 8  policies mean, correct?
 9     A.  Correct.
10     Q.  And like we looked at, two policies that had a
11  combined 308 bullet points and only two of them talked
12  about injuries, correct?
13     A.  Correct.
14     Q.  And neither of those, there wasn't a single
15  bullet point out of those 308 that said that failing to
16  report a workplace injury could result in you losing your
17  job?
18     A.  Correct.
19     Q.  Okay.  Now, I want to, kind of, shift gears and
20  talk about the policies that apply more to Walmart than
21  to associates like Janell Braxton and management
22  employees.  Do you understand that there's different
23  policies that apply to management employees and safety
24  employees that aren't necessarily accessible to an
25  entry level employee like Ms. Braxton?
```

68

```
 1     A.  Correct.
 2     Q.  Okay.  And one of those policies is the Dot Com
 3  Safety Policy that you pointed out to me earlier,
 4  correct?
 5     A.  Correct.
 6        (Exhibit 51 is marked for identification.)
 7     Q.  (BY MR. KINNEY)  I'm going to hand you what I'm
 8  marking as Exhibit 51.
 9     A.  Thanks.
10     Q.  Exhibit 51 is that Dot Com Safety Policy that
11  you referred to earlier, correct?
12     A.  Yes, sir.
13     Q.  And this DC, Dot Com Safety Policy, I think it
14  was your testimony, that all the employees at
15  Edgerton, Kansas are required to abide by this Dot Com
16  Safety Policy?
17     A.  Correct.
18     Q.  And that would include you, correct?
19     A.  Correct.
20     Q.  That would include David Whitenack, correct?
21     A.  Correct.
22     Q.  That would include Morgan Medaris, correct?
23     A.  All employees, correct.
24     Q.  That would include David Whitenack and
25  Ammie Wilbur and Mark Tuazon, correct?
```

Case 2:20-cv-02287-DDC   Document 98-4   Filed 07/09/21   Page 17 of 30

Quincy Usry      Braxton vs. Walmart      4/30/2021

Appellate Case: 22-3003   Document: 010110660654   Date Filed: 03/21/2022   Page: 133

---

**69**

1    **A. Correct.**

2    Q. That would apply to the other two employees that

3 do your job that you referred to earlier, correct?

4    **A. Correct.**

5    Q. So what we're looking at now is a document, the

6 Dot Com Safety Policy marked as Exhibit 51, that was not

7 ever provided to Ms. Braxton during her employment,

8 correct?

9        MR. HEDICAN: I object to foundation. Go

10 ahead.

11    **A. To the best of my knowledge, no.**

12    Q. (BY MR. KINNEY) Okay. But this document would

13 have been accessible to safety employees and management

14 employees and Human Resources, correct?

15    **A. Correct.**

16    Q. Now, is this Dot Com Safety Policy, is it fair

17 to summarize this policy as this is the rules that apply

18 to Walmart after they become aware that one of their

19 employees has become an injured worker?

20    **A. Correct.**

21    Q. Okay. That injured worker we talked about

22 earlier is someone who has suffered a workplace injury

23 during the course of their employment with Walmart,

24 correct?

25    **A. Correct.**

---

**70**

1    Q. And if Walmart learns about an employee becoming

2 an injured worker, Exhibit 51 is like the overarching

3 policy that tells Walmart's employees how to respond to

4 that information, correct?

5    **A. Correct.**

6    Q. Okay. This sets forth the rules that employees

7 like David Whitenack and yourself are supposed to follow

8 after becoming aware that an employee has suffered a

9 workplace injury, correct?

10    **A. Correct.**

11    Q. Okay. So let's look at some of the information

12 that's in this policy that's not in the documents that we

13 looked at earlier. I want to go first to the section

14 under Procedures on the first page that says Definitions.

15 Do you see that?

16    **A. Yes, sir.**

17    Q. Now, the Definitions, there's certain words

18 that, in this policy, have special meanings and they're

19 defined by Walmart policy, correct?

20    **A. Correct.**

21    Q. Now, the first word I want to ask you about is

22 that word "incident" under the Definitions. Do you see

23 the word "incident?"

24    **A. Yes, sir.**

25    Q. Now, we saw that same word "incidents" in the

---

**71**

1 policies we looked at earlier that were part of

2 Ms. Braxton's pre-employment acknowledgments, correct?

3    **A. Correct.**

4    Q. We saw that word "incidents" in the 763e, which

5 was Exhibit 25 for example, correct?

6    **A. Correct.**

7    Q. Now, back to Exhibit 51. Exhibit 51 defines

8 incident to include, quote, "Any unexpected, unplanned or

9 abnormal event or series of events that occurs and does

10 result in an injury." Did I read that correctly?

11    **A. Correct.**

12    Q. So it's not just an event that causes an injury,

13 but according to this definition, the event or series of

14 events has to be unexpected, unplanned or abnormal; is

15 that correct?

16    A. Correct.

17    Q. Okay. So in order to qualify as an incident

18 under Walmart's policies on -- that we're looking at, the

19 event or series of events has to be unexpected, unplanned

20 or abnormal, correct?

21    **A. Correct.**

22    Q. And an employee who is just doing their job,

23 their normal job, repetitive motion in their normal job,

24 that wouldn't be unexpected, correct?

25    **A. Could you restate the question?**

---

**72**

1    Q. So an employee like Janell Braxton, when she

2 worked at Edgerton -- the Edgerton facility, her job

3 involved doing a similar task over and over again,

4 correct?

5    **A. Correct.**

6    Q. And if she was doing that similar task over and

7 over again how she was supposed to, well, that's not

8 unexpected, is it?

9    **A. Correct.**

10    Q. And that's not unplanned, correct?

11    **A. Correct.**

12    Q. And it's not abnormal, correct?

13    **A. Correct.**

14    Q. And as we see here, the definition of incident,

15 like you've already testified to, to be an incident under

16 this policy, the event or series of events has to be

17 unexpected, unplanned or abnormal, correct?

18    **A. Correct.**

19    Q. Okay. Now, let's look to the -- oh, by the way,

20 that definition of incident was not provided to

21 Ms. Braxton during training, correct?

22    A. Correct.

23    Q. And that definition of incident was not set

24 forth inside the documents that Walmart made available to

25 Ms. Braxton through her pre-employment acknowledgements,

---

---

73

1  correct?
2      A.  Correct.
3      Q.  Okay.  Let's look at the next page.  There's a
4  bullet point that says Injury/Illness.  Do you see that?
5      A.  Yes.
6      Q.  And it says, "An injury or illness is an
7  abnormal condition or disorder."  Did I read that
8  correctly?
9      A.  Correct.
10     Q.  So again, we see -- abnormal would be something
11  that's not typical, correct?
12         MR. HEDICAN:  I object to foundation.  Go
13  ahead.
14     A.  It could mean abnormal, correct.
15     Q.  (BY MR. KINNEY)  Okay.  So abnormal, an abnormal
16  condition or disorder means a condition or disorder
17  that's not normally present, correct?
18     A.  Correct.
19     Q.  Now, if someone has a heavy labor job -- what's
20  like the most physically demanding job at the
21  Edgerton, Kansas facility?
22         MR. HEDICAN:  I object to foundation.  Go
23  ahead.
24     A.  Depending on the task, probably related to
25  maintenance in some way, shape or form.

---

74

1      Q.  (BY MR. KINNEY)  Okay.  So, you're a safety --
2  you're the top safety employee at Edgerton, Kansas,
3  right?
4      A.  Yes.
5      Q.  And you know, you relate to OSHA -- I mean, OSHA
6  reports, you're familiar with, right, generally?
7      A.  Generally, yes.
8      Q.  OSHA ratings, correct?
9      A.  Ratings, such as?
10     Q.  Well, such as some jobs are rated as being more
11  dangerous than others.
12     A.  So OSHA incident reports -- or OSHA incident
13  rate.
14     Q.  Right.  You're familiar with those?
15     A.  Yes.
16     Q.  Which job, under your supervision, has the
17  highest OSHA incident rate inside the Edgerton, Kansas
18  facility?
19     A.  We don't classify them by job code.
20     Q.  Okay.  But you're saying that maintenance would
21  be like the most physically demanding job, correct?
22     A.  Yes, you need the most training to be in
23  maintenance.
24     Q.  Someone that does a very physically demanding
25  job, it's probably normal for them to feel a little sore

---

75

1  or have some muscle fatigue?
2          MR. HEDICAN:  I object to foundation.  Go
3  ahead.
4      A.  Potentially.  However, in the general safe work
5  practices, the --
6      Q.  (BY MR. KINNEY)  You're going back to
7  Exhibit 25?
8      A.  Yes, sir.
9      Q.  Okay.
10     A.  The portion on Ergonomics and Body Mechanics,
11  under -- up on 25A, bullet point 85, "Associates will
12  practice safe lifting techniques."  So 86 to 95 on
13  Exhibit 25A, the way that is designed with that
14  professional ergonomist is if -- or ergonomic individual
15  that supported that would -- you would not -- or you
16  would not be expected to receive or experience fatigue if
17  all of these things were done to perfection.
18     Q.  So there's a professional ergonomist who helped
19  Walmart come up with that list in Exhibit 25?
20     A.  Yes, sir.
21     Q.  Okay.  Is that person employed by Walmart?
22     A.  I --
23         MR. HEDICAN:  I object to foundation.  Go
24  ahead.
25     A.  I do not believe so.

---

76

1      Q.  (BY MR. KINNEY)  So are you saying that when
2  you're lifting, like if you use safe lifting techniques,
3  you can just lift forever without ever
4  experiencing fatigue?
5      A.  No, sir.
6      Q.  Okay.  I didn't think so.  But that's what your
7  testimony sounded like.  Do you know that?
8          MR. HEDICAN:  Objection, argumentative,
9  misstates his testimony.  Go ahead.
10     A.  I take that at your word.
11     Q.  (BY MR. KINNEY)  Okay.  So let's get back to the
12  exhibit that I was trying to ask you about, Exhibit 51.
13     A.  Okay.
14     Q.  It defines injury or illness as an injury or
15  illness as an abnormal condition or disorder.  What I'm
16  simply trying to get to is that, some jobs it's normal to
17  feel a little sore when you're done working.
18         MR. HEDICAN:  I object to foundation.  Go
19  ahead.
20     A.  Sure.
21     Q.  (BY MR. KINNEY)  Right?  You use a computer at
22  work often?
23     A.  I do.
24     Q.  Do you ever stare at a computer so long at work
25  that your eyes kind of get fatigued?

---

**App-II**
**134**

**EXHIBIT 4**

77

1    A.  Sometimes, yes.  I use glasses to help prevent
2  that, the blue light glasses.
3    Q.  Okay.  But have you ever looked at a computer so
4  long that your eyes felt fatigued?
5    A.  Yes, sir.
6    Q.  And that would be normal for someone in a job
7  like yours that involves a computer for a long time,
8  correct?
9    A.  Sure.
10    Q.  So in order to be an injury or illness, under
11  this policy marked as Exhibit 51, it has to be abnormal,
12  correct?
13    A.  Correct.
14    Q.  Okay.  So when we see together, if we put those
15  two definitions together, incident, which is an
16  unexpected, unplanned or abnormal event or series of
17  events that result in an injury, if we put those
18  together, an incident that causes an injury would be an
19  unexpected, unplanned, abnormal event or series of events
20  that occurs and does result in an abnormal condition or
21  disorder, correct?
22    A.  Correct.
23    Q.  In other words, it's not an injury incident if
24  it's just, you're doing your job and you're just, kind
25  of, getting sore, correct?

78

1    A.  Correct.
2    Q.  Now, some of these injuries and illnesses that
3  are listed in Exhibit 51 talks about chronic illnesses,
4  such as, but not limited to, a skin disease, a
5  respiratory order -- disorder or poisoning.  Do you see
6  that?
7    A.  Yes, sir.
8    Q.  And if you develop a respiratory disorder from
9  your workplace, it would be difficult to pinpoint exactly
10  when that happened, correct?
11    MR. HEDICAN:  I object to foundation.  Go
12  ahead.  Calls for speculation.
13    A.  In our environment, yes.
14    Q.  (BY MR. KINNEY)  Okay.  Does Walmart appreciate
15  the fact that when employees are engaged in repetitive
16  motion over a long period of time, something that might
17  appear like normal wear and tear, or normal soreness,
18  might turn into something more serious, like an injury?
19    A.  I got hung up on the word, "Does Walmart
20  appreciate."
21    Q.  Do they know?  Does Walmart -- does Walmart's
22  policies contemplate that?
23    A.  Contemplate that?  Could you repeat the rest of
24  the question?
25    Q.  Yeah.  Does Walmart think that normal,

79

1  repetitive motion, even if it's producing soreness
2  initially, can eventually lead to an injury?
3    A.  Correct.
4    Q.  Okay.  And that injury might not be apparent
5  right when the normal soreness is apparent?
6    A.  Correct.
7    Q.  Okay.  These definitions that we've been looking
8  at are not present in the documents that were made
9  available to Janell Braxton, correct?
10    A.  Correct.
11    Q.  But these definitions are applicable to
12  Exhibit 51 which you, as safety manager, were required to
13  follow, correct?
14    A.  Correct.
15    Q.  And David Whitenack was required to follow this
16  Dot Com Safety Policy marked as Exhibit 51, correct?
17    A.  Correct.
18    Q.  And Morgan Medaris was required to follow this
19  policy, Exhibit 51, correct?
20    MR. HEDICAN:  I object to foundation.  Go
21  ahead.
22    A.  Correct.
23    Q.  (BY MR. KINNEY)  And this discussion we're
24  having about incident and injury and what's normal and
25  abnormal, it warrants some discussion and analysis,

80

1  depending on several factors, correct?
2    A.  Correct.
3    Q.  Okay.  So I want to talk about what this policy
4  says that Walmart is supposed to do after it receives
5  notice of an injury, or receives notice that an employee
6  has become an injured worker.  Can I ask you about that?
7    A.  Yes.
8    Q.  On the very first page of Exhibit 51 -- and
9  there's -- it says Links; do you see that?
10    A.  Correct.
11    Q.  So all of these words that show up in either
12  blue, or some other color, you can actually, when you
13  look at it from your computer, you can click on it and
14  another policy will open up, or another document will
15  open up, correct?
16    A.  In theory, yes.
17    Q.  Oh, what do you mean in theory?
18    A.  Well, due to a systems transition from what they
19  call The Wire, to One Dot Walmart, some of the links
20  don't always pop up, or populate, when you click them.
21  But that is the -- that is what should happen when I
22  click that link.
23    Q.  Okay.
24    A.  They're still repairing some.
25    Q.  It's designed that when you click on one of

20  (Pages 77 to 80)

Case 2:20-cv-02287-DDC   Document 98-4   Filed 07/09/21   Page 20 of 30

Quincy Usry                 Braxton vs. Walmart                4/30/2021

Appellate Case: 22-3003   Document: 010110660654   Date Filed: 03/21/2022   Page: 136

81

1 these links, that you should be able to find the other
2 document?
3    A.  Correct.
4    Q.  And even if it doesn't work how it's supposed
5 to, that other document, you could still access it
6 somehow?
7    A.  Correct.
8    Q.  Okay.  So sometimes when you click on the links
9 in Exhibit 51, the document you're trying to access fails
10 to populate; is that what you are saying?
11   A.  Correct.
12   Q.  Okay.  Now, I want to ask you about -- under
13 Procedures, there's a document referenced, "19-0902
14 Associate Work Related Injury Management Guidelines."
15 Did I read that correctly?
16   A.  Yes, sir.
17   Q.  Okay.  I'm going to hand you what was previously
18 marked as Exhibit 41.  Exhibit 41 is that Associate
19 Work-Related Injury Management Guideline that's
20 referenced in Exhibit 51, correct
21   A.  Correct.
22   Q.  Now, Exhibit 41 is a document that sets forth
23 guidelines for management employees of Walmart,
24 correctly -- correct?
25   A.  Correct.

82

1    Q.  So Exhibit 41 contains some additional rules
2 that employees like you and David Whitenack are supposed
3 to follow once you learn an employee has become an
4 injured worker, correct?
5    A.  Correct.
6    Q.  Now -- and it says the purpose of this policy
7 is, "To provide clarity to manager -- to managers on how
8 to support their associates when work related injuries
9 are reported."  Did I read that correctly?
10   A.  Yes, sir.
11   Q.  Now, "support their associates" means to help
12 them; is that fair?
13   A.  Yes.
14   Q.  Okay.  So the purpose of this stated policy is,
15 it appears on paper, that the intent is to help employees
16 who have reported workplace injuries, right?
17   A.  Correct.
18   Q.  And that's because they might need medical
19 treatment or care, and Walmart acknowledges that if an
20 employee gets hurt at work, Walmart's responsible for
21 providing medical treatment for that workplace injury,
22 correct?
23   A.  Correct.
24   Q.  Now, under the heading called, Procedures,
25 there's a spot called Three Options.  Do you see that?

83

1    A.  Yes, sir.
2    Q.  And it says, "Once an associate reports an
3 injury to their manager, they have three options.
4 1. Return to normal duties immediately/same day with no
5 restrictions.  2. Seek medical attention from a Work Comp
6 provider.  3. Elect to leave work immediately without
7 returning to normal duty and refuse to seek medical
8 attention from a Work Comp provider."  Did I read that
9 correctly?
10   A.  Yes, sir.
11   Q.  In April of 2020, Ms. Braxton was an associate,
12 correct?
13   A.  Correct.
14   Q.  In April of 2020, David Whitenack was a manager,
15 correct?
16   A.  Correct.
17   Q.  And at least on April 14th, 2020, Ms. Braxton,
18 the associate, reported an injury to her manager,
19 David Whitenack, correct?
20   A.  Correct.
21   Q.  Was Ms. Braxton provided any of the three
22 options listed in Exhibit 41?
23   A.  I do not believe so.
24   Q.  Is being fired one of the options listed under
25 the three options on Exhibit 41?

84

1       MR. HEDICAN:  I object to form of the
2 question.  Go ahead.
3    A.  No, sir.
4    Q.  (BY MR. KINNEY)  Okay.  If you look to the
5 second page of Exhibit 41, do you see Resources,
6 Procedures, and there's some more documents listed under
7 Procedures?
8    A.  Yes, sir.
9    Q.  And those would be, basically, like
10 cross-references from this policy to other policies,
11 correct?
12   A.  To my knowledge, yes.
13   Q.  And to your knowledge the procedures, like for
14 example, 19-0901 would be a resource that you could
15 access when trying to figure out how to follow the
16 management guidelines we're looking at in Exhibit 41?
17      MR. HEDICAN:  I object to foundation.  Go
18 ahead.
19   A.  Could be a resource, yes.
20   Q.  (BY MR. KINNEY)  Okay.  And could you access
21 19-0901 if you wanted to from your work computer?
22   A.  If I wanted to, yes.
23   Q.  How long do you think it would take you to
24 access that policy or procedure?
25   A.  Not very long.

Case 2:20-cv-02287-DDC   Document 98-4   Filed 07/09/21   Page 21 of 30

Quincy Usry                    Braxton vs. Walmart                    4/30/2021

Appellate Case: 22-3003    Document: 010110660654    Date Filed: 03/21/2022    Page: 137

---

85

1    Q.  Okay.  Same for the other procedures listed
2    under that heading?
3        A.  Correct.
4        Q.  Okay.  Not very long meaning a matter of
5    moments?
6        A.  If my VPN is working for me, yes.
7        Q.  Okay.  Okay.  So, let's go back to Exhibit 51,
8    the big policy that sets forth the rules that the
9    management and safety and employees are supposed to
10   follow when they find out one of their employees has
11   become an injured worker.  I'd like you to go to Page 3.
12   It says, Page 3 of 11.  It's also says 197 at the bottom.
13   Do you see that?
14       A.  Yes, sir.
15       Q.  Now, under the heading "Responding to an
16   Incident," do you see that subparagraph 5, "If an injury
17   has occurred"?
18       A.  Yes, sir.
19       Q.  Do you see that?  Now, it was Walmart's opinion
20   that Ms. Braxton did report an injury to David Whitenack,
21   correct?
22       A.  Correct.
23       Q.  Okay.  So if an injury has occurred, such as the
24   one Ms. Braxton reported to David Whitenack, there are
25   steps listed in Exhibit 51 that we're looking at that

---

86

1    management employees are supposed to follow, correct?
2        A.  Correct.
3        Q.  Now, the first one, 5A, says, "A member of Human
4    Resources, CSAP Management," that would be you, correct?
5        A.  Correct.
6        Q.  "Or the Medcor Professional, if applicable."
7    Was there a Medcor Professional at Edgerton, Kansas in
8    April of 2020?
9        A.  No, sir.  That was not applicable.
10       Q.  Okay.  So, Medcor Professional, any time it
11   references that, we can just ignore that as it relates to
12   Edgerton?
13       A.  As it relates to Edgerton, correct.
14       Q.  Okay.  5A, a member of Human Resources or
15   CSAP Management completes the First Report of Injury Form
16   if required by the State.  Do you see that?
17       A.  Yes, sir.
18       Q.  Now, was the First Report of Injury Form ever
19   filed out for Ms. Braxton?
20       A.  No, sir.
21       Q.  Okay.  Did you check to see if the State of
22   Kansas required First Report of Injury Form?
23       A.  No, sir.
24       Q.  Okay.  Didn't even look to see?
25       A.  No, sir.

---

87

1        Q.  Okay.  Now, Exhibit 51 says that you're supposed
2    to do that if they're required by the state, correct?
3        A.  Correct.
4        Q.  And if we go back to Exhibit -- the first page
5    of Exhibit 51 where it says, Items Needed, "Associate
6    Incident Report or the First Report of Injury if required
7    by the State.  Refer to the CMI-Claims Management, Inc.
8    site to determine if, and which, First Report of Injury
9    is necessary for your state."  Do you see that?
10       A.  Yes, sir.
11       Q.  And that CMI-Claims Management, Inc. is one of
12   those links that you can click on, correct?
13       A.  Correct.
14       Q.  And did you click on that link to see if you
15   were -- if Walmart was required to submit a report of
16   injury to the State of Kansas?
17       A.  I have not.
18       Q.  Okay.  Have you done that for other employees?
19       A.  No.  I typically talk to the Claims Management
20   team myself versus going to the website.
21       Q.  Okay.  Did you talk to the Claims Management
22   employees yourself with regard to Ms. Braxton?
23       A.  No, sir.
24       Q.  Okay.  I want to hand you what's been marked as
25   Exhibit 43.  But you didn't even call to see if you were

---

88

1    required to do a Report of Accident for the State of
2    Kansas, correct
3        A.  Correct.
4        Q.  Exhibit 43 is Kansas Department of Human
5    Resources, Division of Workers' Compensation, Employer's
6    Report of Accident, correct?
7        A.  Correct.
8        Q.  So Walmart never provided one of these forms to
9    the State of Kansas with regard to Ms. Braxton's
10   workplace injury; is that true?
11       A.  Correct.
12       Q.  Okay.  Let's go back to Exhibit 51.  Back on
13   Page 3 under the paragraph 5 that says, "If an injury has
14   occurred."  Letter b; "A member of Human Resources, CSAP
15   Management, or the Medcor Professional, if applicable,
16   will have the associate complete, sign, and date the
17   Release of Medical Information Authorization and the
18   Associate Incident Report."  Did I read that correctly?
19       A.  Yes.
20       Q.  And that rule says "will."  Do you see that?
21       A.  Yes, sir.
22       Q.  Does this policy give employees like you and
23   Morgan Medaris discretion on whether to follow the rule,
24   or is it mandatory?
25       A.  There's no discretion.

Case 2:20-cv-02287-DDC   Document 98-4   Filed 07/09/21   Page 22 of 30

Quincy Usry                    Braxton vs. Walmart                    4/30/2021

Appellate Case: 22-3003   Document: 010110660654   Date Filed: 03/21/2022   Page: 138

89

1    Q.  No discretion means it's mandatory, correct?
2    A.  Correct.
3    Q.  The policy says you will have the associate,
4  that would be Janell Braxton in this case, correct?
5    A.  Correct.
6    Q.  This policy says that Walmart will have the
7  associate complete, sign, and date the Associate Incident
8  Report, correct?
9    A.  Correct.
10   Q.  And that phrase, Associate Incident Report, is
11  in bold, correct?
12   A.  Correct.
13   Q.  And that's a particular form, correct?
14   A.  Correct.
15   Q.  If we look at the first page of Exhibit 51,
16  Associate Incident Report is one of the forms, in blue,
17  with a link that you can click on and get, correct?
18   A.  Correct.
19   Q.  And that rule is mandatory, meaning it's
20  required?
21   A.  Correct.
22   Q.  Okay.  I want to hand you what's been marked as
23  Exhibit 40.
24   A.  Thank you.
25   Q.  Exhibit 40 is the Associate Incident Report form

90

1  referenced in Exhibit 51; is that correct?
2    A.  Correct.
3    Q.  Now, this is the form that, according to company
4  policy, you personally, or Morgan Medaris, was
5  responsible for having Ms. Braxton fill out after
6  learning that she became an injured worker, correct.
7            MR. HEDICAN:  I object to form.  Go ahead.
8    A.  Correct.
9    Q.  (BY MR. KINNEY)  Okay.  Was there anything
10  misleading or inaccurate about my last question?
11   A.  No, sir.
12   Q.  Okay.  Now, was an Associate Incident Report
13  form ever provided to Ms. Braxton at all?
14   A.  No, sir.
15   Q.  You said, no, sir?
16   A.  Correct.
17   Q.  Okay.  So neither you nor Morgan Medaris
18  actually followed the rule and the mandatory rule that
19  we've talked about in Exhibit 51?
20   A.  Correct.
21   Q.  Okay.  And that rule required one of you to make
22  sure Ms. Braxton filled out this Associate Incident
23  Report form, correct?
24   A.  Correct.
25   Q.  And this all happened outside your normal work

91

1  hours, correct?
2    A.  Correct.
3    Q.  But you were communicating with David Whitenack
4  at the time, correct?
5    A.  Correct.
6    Q.  You could have asked David Whitenack to provide
7  this Associate Incident Report form, correct?
8    A.  I could have.
9    Q.  Did you instruct him to do that?
10   A.  No, sir.
11   Q.  Okay.  Even though that was your obligation
12  under the rule we looked at in Exhibit 51?
13   A.  Correct.
14   Q.  Okay.  Now, if Ms. Braxton would have actually
15  been provided the form that Walmart policy was required
16  to be given to her, there's a lot of detailed information
17  she would have been asked to provide, correct?
18   A.  Correct.
19   Q.  For example, on Exhibit 40 -- and by the way,
20  this form would have been filled out by Ms. Braxton
21  herself, correct?
22   A.  Correct.
23   Q.  Now, she would have been asked to provide the
24  date and time of the incident, correct?
25   A.  Correct.

92

1    Q.  And the date and time she first reported the
2  incident, correct?
3    A.  Correct.
4    Q.  She would have been asked to specifically
5  identify who she reported it to, correct?
6    A.  Correct.
7    Q.  We see underneath the boxes, she would have been
8  asked to describe what was she doing before the incident
9  happened, and then describe what happened and how the
10  injury actually occurred.  Do you see that?
11   A.  Correct.
12   Q.  If we go down a little bit, there's a question
13  that says, "Are you requesting medical treatment at this
14  time?"  And she could have selected, yes or no, correct?
15   A.  Correct.
16   Q.  Was Ms. Braxton -- after Walmart learned that
17  she was an injured worker, did Walmart, before they fired
18  her, ever provide information to Ms. Braxton about her
19  right to seek medical treatment?
20   A.  To the best of my knowledge, no.
21   Q.  Okay.  On the bottom of Exhibit 40, if this
22  document would have been given to Ms. Braxton as required
23  by Walmart policy, there is a sentence there that says,
24  "I understand that my employer will not be responsible
25  for any expenses related to the incident or any resulting

**93**

1  injury, unless the expenses are pre-approved and obtained
2  from an approved provider." Did I read that correctly?
3     A. Yes, sir.
4     Q. So if Ms. Braxton would have been provided the
5  form that Walmart policy required to be given to her, she
6  would have known and been informed that she could have
7  sought medical treatment if it was approved by Walmart?
8     A. Correct.
9     Q. Okay. In April of 2020 this Exhibit 51, the
10  Dot Com Safety Policy, was available to you, correct?
11    A. Correct.
12    Q. It was accessible to you, correct?
13    A. Correct.
14    Q. Had you received specific training on this
15  policy?
16    A. Yes, sir.
17    Q. Had you trained other employees on this policy?
18    A. Yes, sir.
19    Q. So you were aware of the mandatory rules that
20  are set forth in this policy, correct?
21    A. Correct.
22    Q. Okay. Let's look at Page 4 of 11 on Exhibit 51.
23  There's a heading called Incident Investigation. Now,
24  the second paragraph says -- are you there?
25    A. Yes, sir.

**94**

1     Q. "A thorough investigation of the incident will
2  be completed as soon as possible." Did I read that
3  correctly?
4     A. Yes, sir.
5     Q. "The associate's manager is responsible for
6  completing investigation and document -- documenting the
7  results of the investigation on the WMW-738e, eCommerce
8  Safety Incident Investigation form." Did I read that
9  correctly?
10    A. Yes, sir.
11    Q. So after Walmart learns that an employee has
12  become an injured worker, Exhibit 51 requires an
13  investigation, correct?
14    A. Correct.
15    Q. We use -- we see that phrase the investigation
16  will be completed, and that means it's mandatory,
17  correct?
18    A. Correct.
19    Q. That means it's not discretionary, correct?
20    A. Correct.
21    Q. That means that you just have to do it. It's a
22  rule, correct?
23    A. Correct.
24    Q. And the associate's manager in this case would
25  be David Whitenack, correct?

**95**

1     A. Correct.
2     Q. And so, under this Exhibit 51, David Whitenack
3  was required by Walmart policy to conduct an
4  investigation into Ms. Braxton's workplace injury,
5  correct?
6     A. Correct.
7     Q. And he wasn't just required to investigate it
8  however he felt like he should. This policy actually
9  references another one of those documents written in bold
10  that he is required to fill out, correct?
11    A. Correct.
12    Q. And that document is the WMW-738e, correct?
13    A. Correct.
14    Q. And that's one of the policies listed on the
15  front page of Exhibit 51 that you can just click on and
16  you can get it, correct?
17    A. Correct.
18    Q. Okay. And at the time that David Whitenack
19  informed you that Ms. Braxton had suffered a workplace
20  injury, you were aware of the investigation requirement,
21  correct?
22    A. Correct.
23    Q. You'd received training about the investigation
24  requirement, correct?
25    A. Correct.

**96**

1     Q. You provided training to other employees about
2  the investigation requirement, correct?
3     A. Correct.
4     Q. I want to hand you what has been previously
5  marked as Exhibit 42. Exhibit 42, it is the form 738e,
6  Safety Incident Investigation Form; is that correct?
7     A. Correct.
8     Q. And this is the document that, by mandatory
9  Walmart policy, David Whitenack should have completed
10  after learning that Ms. Braxton was an injured worker,
11  correct?
12    A. Correct.
13    Q. Was a Safety Incident Investigation Form ever
14  completed in relation to Ms. Braxton?
15    A. No, sir.
16    Q. You said, no, sir?
17    A. Correct.
18    Q. David Whitenack never completed a Safety
19  Incident Investigation Form for Ms. Braxton's injury; is
20  that correct?
21    A. Correct.
22    Q. Okay. Even though Walmart policy required him
23  to do a thorough investigation of the incident as soon as
24  possible, correct?
25       MR. HEDICAN: Objection, argumentative.

Quincy Usry                 Braxton vs. Walmart                    4/30/2021

97

1  Go ahead.
2     A.  Correct.
3     Q.  (BY MR. KINNEY)  And Walmart policy did not give
4  David Whitenack discretion on whether to do a safety
5  incident investigation, correct?
6     A.  Correct.
7     Q.  And Walmart policy did not give you discretion
8  to tell David Whitenack, you don't have to do an
9  investigation here, correct?
10    A.  This policy did not, correct.
11    Q.  Okay.  There's no exception to, if you fire
12  someone after they report a workplace injury, then you
13  don't have to investigate?  Is that a rule at Walmart?
14    A.  No, sir.
15    Q.  Okay.  I'm going to hand you what's been
16  previously marked as Exhibit 39.  Exhibit 39 is a
17  document called 5 Why, correct
18    A.  Correct.
19    Q.  And the 5 Why is part of investigating an
20  incident that led to an injury, correct?
21    A.  Correct.
22    Q.  And the 5 Why is supposed to be used, correct?
23    A.  Correct.
24    Q.  Was it used in relation to Ms. Braxton?
25    A.  No, sir.

98

1     Q.  Okay.  Let's look at page 5 of 11 on Exhibit 51.
2  There is a heading called Incident Investigation
3  Paperwork Flow.  Do you see that?
4     A.  Yes, sir.
5     Q.  And this first step says, "After completing the
6  initial investigation, the manager submits the completed
7  WMW-738e, eCommerce Safety Incident Investigation form
8  and applicable documentation, i.e. witness statements, to
9  CSAP."  Did I read that correctly?
10    A.  Yes, sir.
11    Q.  Is that rule mandatory?
12    A.  In this process, yes.
13    Q.  And did David Whitenack complete that mandatory
14  part of this process?
15    A.  No, sir.
16    Q.  Okay.  And actually, when it says CSAP, what
17  does that stand for?
18    A.  Compliance Safety and Asset Protection.
19    Q.  And that -- you're a CSAP employee, correct?
20    A.  At that time that was my title, yes.
21    Q.  So at that time, you were the person that was
22  supposed to receive David Whitenack's completed Safety
23  Investigation form?
24    A.  Correct.
25    Q.  Right.  And you never got one of those from him,

99

1  correct?
2     A.  Correct.
3     Q.  Did you ever issue David Whitenack discipline
4  for not providing that form to you?
5     A.  No, sir.
6     Q.  Did you ever attempt to issue David Whitenack
7  discipline for not providing that documentation to you?
8     A.  No, sir.
9     Q.  Now, there is actually eight steps underneath
10  Incident Investigation Paperwork Flow.  So if the first
11  step was never complied with, doesn't that mean that all
12  eight steps -- none of those eight steps happened in
13  response to Ms. Braxton's notifying David Whitenack that
14  she had a workplace injury?
15    A.  Yes.
16    Q.  None of those happened, correct?
17    A.  Correct.
18    Q.  Now, the very bottom of that page, there's a
19  heading called Actively Caring Injury Contacts.  Do you
20  see that?
21    A.  Yes, sir.
22    Q.  Can you read the first two sentences of that to
23  yourself and let me know when you're done?
24    A.  (Witness complied.)  Yes.
25    Q.  Is it safe to summarize that, or is it fair to

100

1  summarize that, as according to Walmart's official
2  policy, Walmart wants a manager like David Whitenack to
3  reach out to an injured employee after becoming aware
4  just to check in on him?
5     A.  Correct.
6     Q.  Yeah.  And the last sentence on that page
7  starts, "At a minimum, daily contacts will occur for
8  seven work days following injury."  Did I read that
9  correctly?
10    A.  Correct.
11    Q.  Did David Whitenack follow that part of this
12  policy?
13        MR. HEDICAN:  I object to foundation.  Go
14  ahead.
15    A.  No, sir.
16    Q.  (BY MR. KINNEY)  And if he would have followed
17  that part of the policy and checked in on Ms. Braxton to
18  see how she was doing, he should have documented those on
19  the WMW-738e, correct?
20    A.  If he would, correct.
21    Q.  If he had actually contacted her, he would have
22  to record it on the document that he never created?
23    A.  Correct.
24    Q.  Okay.  Are there any other mandatory rules that
25  Exhibit 51 has that apply to either you or

**App-II**
**140**

CRAWFORD REPORTING -- CrawfordReporting@gmail.com        **EXHIBIT 4**

101

1  David Whitenack that were not followed in relation to
2  Ms. Braxton?
3      A.  Nothing was keyed in IRS.
4          THE REPORTER:  Can you repeat that?
5      A.  Nothing was keyed into I-R-S, Incident Reporting
6  System.
7      Q.  (BY MR. KINNEY)  Okay.  So you're referring to
8  the bottom of Page 3 of Exhibit 51 under, "If an injury
9  has occurred," subparagraph c?  Is that where you're
10 looking?  Record the incident in the Incident Reporting
11 System, IRS?
12     A.  Yes.
13     Q.  So that was a rule that applied to the situation
14 with Ms. Braxton, correct?
15     A.  Correct.
16     Q.  And that should have been done if Walmart policy
17 was followed by, here it's Human Resources, CSAP
18 Management and/or a designated member of management,
19 correct?
20     A.  Correct.
21     Q.  So if that rule was followed with relation to
22 Ms. Braxton, there would have been the incident recorded
23 in the Incident Reporting System within 24 hours of
24 notification of injury, correct?
25     A.  Correct.

102

1      Q.  And so that step was never done either?
2      A.  As stated, correct.
3      Q.  Okay.  Any other mandatory rules that either you
4  or Morgan Medaris or David Whitenack should have done in
5  response to learning that Ms. Braxton was an injured
6  worker there in Exhibit 51 that you did not do?
7          MR. HEDICAN:  I object to foundation.  Go
8  ahead.
9      A.  In relation to Incident Reporting System, there
10 is additional -- there is an additional -- what's it
11 called, program that we would input incidents into on
12 Page 4, known as LSI.  I believe stands for Logistic
13 Service Intelligence, AP Logging System; Event Reporting
14 (LSI) within 24 hours of incident.
15     Q.  (BY MR. KINNEY)  Okay.  So when we were looking
16 at the policies earlier that related to Ms. Braxton, we
17 looked at two bullet points out of 308 bullet points that
18 Walmart contends that she did not follow, correct?
19     A.  Correct.
20     Q.  And the substance of each of those bullet points
21 was pretty much the same, correct?
22     A.  Correct.
23     Q.  And Ms. Braxton had never received any specific
24 training from another person at Walmart regarding those
25 two bullet points, correct?

103

1      A.  Correct.
2      Q.  And according to Walmart, she was fired for not
3  following what was set forth in those two bullet points,
4  correct?
5      A.  Correct.
6      Q.  And Exhibit 51, we've looked at several
7  mandatory rules that apply to you personally, correct?
8      A.  Correct.
9      Q.  We've looked at many mandatory rules that apply
10 to David Whitenack, correct?
11     A.  Correct.
12     Q.  And we've definitely identified more than two
13 mandatory rules that were not followed by either you or
14 David Whitenack, correct?
15     A.  Correct.
16     Q.  Was David Whitenack disciplined for not
17 following any of the rules set forth in Exhibit 51?
18         MR. HEDICAN:  I object to foundation.  Go
19 ahead.
20     A.  No, sir.
21     Q.  (BY MR. KINNEY)  Have you been disciplined for
22 any of the rule violations of -- violations of the rules
23 set forth in Exhibit 51?
24     A.  No, sir.
25     Q.  Okay.  And you've since been promoted since last

104

1  April, correct?
2      A.  No, sir.
3      Q.  You haven't been promoted since April 2020?
4      A.  No, sir.
5      Q.  Okay.  And these rules in Exhibit 51 that we've
6  been talking about, if the policy was actually followed,
7  those steps would have been taken in response to Ms.
8  Braxton informing Walmart of her workplace injury?
9      A.  Can you repeat the question?
10     Q.  Yeah.  These mandatory rules that we talked
11 about in Exhibit 51 so far, if the policy was followed as
12 written, those steps would have been taken in relation to
13 Ms. Braxton?
14     A.  Correct.
15     Q.  Okay.  So let's talk about what Walmart did do
16 after David Whitenack learned that Ms. Braxton suffered a
17 workplace injury.  I'm going to hand you what's been
18 marked as Exhibit 9.
19         MR. HEDICAN:  This was covered in the
20 first incarnation.  I don't see any relation to the
21 policy here.  I don't -- I don't know what the basis
22 would be to ask questions about this again.
23         MR. KINNEY:  Well, I can show you.
24     Q.  (BY MR. KINNEY)  Mr. Usry, Exhibit 9 is the
25 document that you asked David Whitenack to have

---

**105**

1   Ms. Braxton fill out, correct?
2       A.   Correct.
3       Q.   And is Exhibit 9 an Associate Incident Report as
4   listed on Exhibit 51?
5       A.   No, sir.
6       Q.   Is Exhibit 9 a witness statement?
7       A.   Correct.
8       Q.   Okay.  So if we look back at Exhibit 51, a
9   witness statement is actually supposed to be used during
10  an investigation, correct?
11      A.   Exhibit what?
12      Q.   Okay.  51, the Dot Com policy.
13      A.   Yes.
14      Q.   On the very first page, there's a hyperlink to
15  it's called Witness Statement.  Do you see that?
16      A.   Yes, sir.
17      Q.   So Exhibit 9 is a witness statement, correct?
18      A.   Correct.
19      Q.   It's meant to be used during an investigation,
20  correct?
21      A.   Correct.
22      Q.   And Walmart didn't do an investigation in
23  response to Ms. Braxton reporting her workplace injury,
24  did they?
25      A.   We did not do the 738 Safety Incident

---

**106**

1   Investigation Form, correct.
2       Q.   Okay.  And were any witnesses other than Ms. --
3   well, I'll scratch that.
4            The form we're looking at, Exhibit 9, is that a
5   form that the Dot Com Safety Policy required Ms. Braxton
6   to fill out?
7       A.   No, sir.
8       Q.   There was different forms that, according to
9   Walmart official policy, Ms. Braxton was supposed to fill
10  out, correct?
11      A.   Correct.
12      Q.   Those forms that she was supposed to fill out
13  were never given to her?
14      A.   Correct.
15      Q.   And the forms that Ms. Braxton was supposed to
16  fill out asked for really detailed information.  We
17  looked at that earlier, correct?
18      A.   Correct.
19      Q.   And it also provided information about her right
20  to seek medical treatment, correct?
21      A.   Correct.
22      Q.   And none of that information that was supposed
23  to be given to Ms. Braxton is set forth on Exhibit 9,
24  correct?
25      A.   Correct.

---

**107**

1       Q.   And after you got Exhibit 9, did you ever speak
2   to Ms. Braxton?
3       A.   No, sir.
4       Q.   And Exhibit 9, according to you, formed the
5   basis for her termination, correct?
6       A.   Correct.
7       Q.   After Walmart learned that Ms. Braxton was a
8   injured worker, they asked her to fill out this statement
9   form marked as Exhibit 9, correct?
10      A.   Correct.
11      Q.   And then, within approximately 30 minutes she
12  was fired, correct?
13      A.   Correct.
14      Q.   Okay.  Now, unlike all the rules that we looked
15  at up until now that, you remember we talked about the
16  difference between mandatory rules and discretionary
17  rules?
18      A.   We did not discuss the difference.  You asked if
19  something was mandatory and I said, yes.
20      Q.   Okay.  So we've -- I've asked you questions
21  about whether certain rules were mandatory or
22  discretionary, correct?
23      A.   Correct.
24      Q.   Now, we looked at words like "will," and that
25  meant that it's mandatory, correct?

---

**108**

1       A.   Correct.
2       Q.   Now, all the rules that we've talked about that
3   either you or David Whitenack failed to follow were all
4   mandatory rules, correct?
5       A.   Correct.
6       Q.   Now, was there any mandatory rule that required
7   Ms. Braxton to be fired on April 14th, 2020?
8       A.   Could you rephrase the question?
9       Q.   Was there any mandatory rule that required
10  Ms. Braxton to get fired on April 14th, 2020?
11           MR. HEDICAN:  I object to foundation.  Go
12  ahead.
13      A.   It's a lot of context there.  But she reported
14  an incident late, and that late reporting aligned to a
15  Step 1 on the 670, and that Step 1 was written coaching.
16  And for temporary associates, it would be a written
17  coaching, and that written coaching would result in
18  termination.
19      Q.   (BY MR. KINNEY) Okay.  So was that process you
20  just talked about, was that mandatory or discretionary?
21           MR. HEDICAN:  I object to foundation.  Go
22  ahead.
23      A.   Which part of that?
24      Q.   (BY MR. KINNEY) Firing Ms. Braxton on
25  April 14th, 2020?

---

27 (Pages 105 to 108)

Case 2:20-cv-02287-DDC   Document 98-4   Filed 07/09/21   Page 27 of 30

Quincy Usry                    Braxton vs. Walmart                    4/30/2021

Appellate Case: 22-3003   Document: 010110660654   Date Filed: 03/21/2022   Page: 143

---

**109**

1      MR. HEDICAN:  It's been asked and
2  answered.  Go ahead.
3      A.  We -- we used discretion within understanding,
4  and we used mandatory and enforcement.
5      Q.  (BY MR. KINNEY)  So --
6      A.  Discretion being, wanting to understand what she
7  would say on this statement form.  And the mandatory
8  being, once we learned of what was stated, we have to be
9  consistent in applying the policy.
10     Q.  Okay.  So we have to be consistent in following
11 the policy is your testimony?  That's what you just said?
12     A.  Yes.
13     Q.  Did you follow the policy that required an
14 investigation?
15     A.  No, sir.
16     Q.  Did you follow the policy that required giving
17 Ms. Braxton the Associate Incident Reporting form that
18 would have told her about her right to get medical
19 treatment?
20     A.  No, sir.
21     Q.  Did you follow the mandatory procedure of
22 inputting her injury into an electronic system that
23 Walmart uses to record information like that?
24     A.  No, sir.
25     Q.  Did you report Ms. Braxton's workplace injury to

**110**

1  the State of Kansas?
2      A.  No, sir.
3      Q.  Okay.  So my question's a little different.  And
4  I'm talking about what you did.  I want to -- here, I'll
5  make my question clearer.  How's does that sound?  Sound
6  better?
7      A.  Good.
8      Q.  Was there a mandatory rule that required
9  Ms. Braxton to be fired on April 14th, 2020?
10     MR. HEDICAN:  Objection, asked and
11 answered.
12     Q.  (BY MR. KINNEY)  Mr. Usry, do you think this is
13 funny?
14     A.  I'm trying to understand in my head.  And it's
15 not laughter of the situation.  It's me getting confused.
16 It's an outward expression of an internal tick.  In that,
17 yes.
18     Q.  So you think that, yes, there was a mandatory
19 rule requiring Ms. Braxton to be fired --
20     A.  Yes.
21     Q.  -- on April 14th, 2020?
22     A.  To the best of my knowledge, yes.
23     Q.  Okay.  And did you make that rule?
24     A.  No, sir.
25     Q.  Who -- it's a rule from Walmart; is that your

**111**

1  understanding?
2      A.  Yes.
3      MR. HEDICAN:  I object to foundation.  Go
4  ahead.  And to form.
5      Q.  (BY MR. KINNEY)  So unlike the other mandatory
6  rules that you knew about and chose not to follow, you
7  chose to follow what you think is a mandatory rule
8  requiring Ms. Braxton to be fired?
9      A.  Yes.
10     MR. HEDICAN:  Objection, argumentative.
11     Q.  (BY MR. KINNEY)  Okay.  Is that -- is that fair?
12     A.  Yes.
13     MR. HEDICAN:  It's argumentative.
14     Q.  (BY MR. KINNEY)  Let's look back to Exhibit 51.
15 Exhibit 51 you've already told me is, this is the main
16 policy that relates to what Walmart's supposed to do
17 after learning than an employee is an injured worker,
18 correct?
19     A.  Yes.
20     Q.  And Exhibit 51 applied to the situation after
21 Ms. Braxton reported her workplace injury to Walmart,
22 correct?
23     A.  Correct.
24     Q.  Okay.  And we've looked already at several
25 mandatory rules inside of Exhibit 51 that apply to you

**112**

1  and David Whitenack and Morgan Medaris, correct?
2      A.  Correct.
3      Q.  And the three of you were involved in firing
4  Ms. Braxton, correct?
5      A.  Correct.
6      Q.  And we've already seen some mandatory rules that
7  the three of you failed to follow, correct?
8      A.  Correct.
9      Q.  Okay.  So let's look at Exhibit 51 on Page 3 of
10 11.
11     A.  Okay.
12     Q.  There is a heading called Notification of Injury
13 Incident.  Do you see that?
14     A.  Yes, sir.
15     Q.  And again, that phrase, injury incident, is that
16 thing we talked about earlier that has to be abnormal or
17 unexpected or unplanned and create abnormal condition?
18 Do you remember that?
19     A.  Yes, sir.
20     Q.  So it has to be an abnormal, unexpected, or
21 unplanned event or series of events that creates an
22 abnormal condition in order to be an injury incident,
23 correct?
24     A.  Correct.
25     Q.  Now, underneath this Notification of Injury

28 (Pages 109 to 112)

Case 2:20-cv-02287-DDC   Document 98-4   Filed 07/09/21   Page 28 of 30

Quincy Usry                    Braxton vs. Walmart                    4/30/2021
Appellate Case: 22-3003   Document: 010110660654   Date Filed: 03/21/2022   Page: 144

**113**

1 Incident it says, "Associates involved in an incident
2 will report it to their manager immediately.  Failure to
3 do so may result in disciplinary action."  Did I read
4 that correctly?
5    A.  Correct.
6    Q.  Now, that word "may" is not mandatory, correct?
7    A.  Correct.
8    Q.  That word "may" doesn't create one of those
9 mandatory rules, like the other ones we looked at, that
10 applied to you and David Whitenack and Morgan Medaris,
11 correct?
12    A.  "May" means need to determine if it will result
13 in disciplinary action.  So required every time, no.  But
14 it may apply or it could apply.
15    Q.  Oh.  "An associate involved in an incident who
16 doesn't report it to their manager immediately may get
17 disciplinary action," correct?
18    A.  Correct.
19    Q.  Not every time, right?  It doesn't say failure
20 to do so will result in disciplinary action, correct?
21    A.  Correct.
22    Q.  It doesn't say failure to do so shall result in
23 disciplinary action, correct?
24    A.  Correct.
25    Q.  It says may result in disciplinary action,

**114**

1 right?
2    A.  Yes.
3    Q.  Okay.  And I think your testimony was that that
4 word "may" means that there has to be a determination
5 made, correct?
6    A.  Correct.
7    Q.  Which means that you have to apply your
8 discretion, correct?
9    A.  Correct.
10    Q.  Which means that you have to know the facts in
11 order to know how to apply your discretion, correct?
12    A.  Correct.
13    Q.  Okay.  So with regard to Ms. Braxton's
14 situation, you had some discretion as we look at in this
15 policy, correct?
16        MR. HEDICAN:  I object to foundation.  Go
17 ahead.
18    A.  Correct.
19    Q.  (BY MR. KINNEY)  Okay.  Now, if you decide to go
20 forward with disciplinary action, there's some other
21 places that you could look to see to get guidance on
22 that, correct?
23    A.  Correct.
24    Q.  Okay.  Let's look at Page 4 of Exhibit 51.
25 Underneath Incident Investigation, we're back to that

**115**

1 same paragraph that said, "A thorough investigation."  Do
2 you see that?
3    A.  Yes.
4    Q.  Okay.  There's a sentence that says, "Also, the
5 manager will converse with the associate and obtain all
6 necessary information to complete the investigation
7 forms."  Did I read that correctly?
8    A.  Correct.
9    Q.  So David Whitenack should have interacted with
10 Ms. Braxton to complete the investigation form that he
11 never created, correct?
12    A.  Correct.
13    Q.  Now, the next sentence, "If a safety or
14 compliance violation occurred, the manager issues the
15 appropriate per the WMW-670e, eCommerce Safety and
16 Compliance Rule Violation Form."  Did I read that
17 correctly?
18    A.  Yes, sir.
19    Q.  Okay.  So if there's been a safety or compliance
20 violation, and you or the manager or HR exercise your
21 discretion to issue discipline, this part of Exhibit 51
22 says you're supposed to do it per the WMW-670e, eCommerce
23 Safety and Compliance Rule Violation Form; is that
24 accurate?
25    A.  Yes, sir.

**116**

1    Q.  Okay.  Do you have Exhibit 11 handy?
2    A.  Yes, sir.
3    Q.  Exhibit 11 is that Safety and Compliance Rule
4 Violation Form that's referred to in Exhibit 51, correct?
5    A.  Correct.
6    Q.  And once -- once management decides to issue
7 discipline for a safety or compliance violation, Exhibit
8 51 again says, this is the form, Exhibit 11 is the form
9 you're supposed to use, correct?
10    A.  Correct.
11    Q.  And Exhibit 670e, it says, "Issue the
12 appropriate per the 670e," correct?
13    A.  It --
14    Q.  In Exhibit 51 --
15        MR. HEDICAN:  What page are you on?
16    Q.  (BY MR. KINNEY)  Page 4 of 11, the same sentence
17 we're talking about.  "If a safety or compliance
18 violation occurred, the manager issues the appropriate
19 per the WMW-670e, eCommerce Safety and Compliance Rule
20 Violation Form," correct?
21    A.  Correct.
22    Q.  And that's Exhibit 11, correct?
23    A.  Correct.
24    Q.  And per Exhibit 11, failure to report any known
25 injury before the end of the shift results in a Step 1

Case 2:20-cv-02287-DDC    Document 98-4    Filed 07/09/21    Page 29 of 30

Quincy Usry          Braxton vs. Walmart                    4/30/2021

Appellate Case: 22-3003   Document: 010110660654   Date Filed: 03/21/2022   Page: 145

---

**117**

1  violation, correct?
2      A.  Correct.
3      Q.  That's the rule according to Exhibit 11,
4  correct?
5      A.  Correct.
6      Q.  Was a 670e form ever completed for
7  Janell Braxton?
8      A.  No, sir.
9      Q.  Okay.  Now, Ms. Braxton, as of April 14th, 2020,
10  Walmart knew that she was an injured worker, correct?
11      A.  Correct.
12      Q.  I'm going to hand you what's been marked as
13  Exhibit 44.  Exhibit 44 is a document from the Kansas
14  Department of Labor, correct?
15      A.  Correct.
16      Q.  This would be one of those state specific forms
17  that we looked at in Exhibit 51, correct?
18      A.  (No response.)
19      Q.  On the very first page of Exhibit 51, do you see
20  where it says, "State Specific Required Forms?"
21      A.  Correct.
22      Q.  So Exhibit 44 would be one of those state
23  specific required forms, correct?
24      A.  Correct.
25      Q.  And it says right on the top, this is from the

---

**118**

1  Kansas Department of Labor, correct?
2      A.  Correct.
3      Q.  And do you see where it says, "Employers are
4  required to provide this information to each injured
5  worker."  Do you see that?
6      A.  Yes, sir.
7      Q.  And on April 14th, 2020, at no later than
8  April 14th of 2020, Walmart knew Ms. Braxton was an
9  injured worker, correct?
10      A.  Correct.
11      Q.  Was this document ever provided to Ms. Braxton?
12      A.  No, sir.
13      Q.  Between the time that Ms. Braxton told Walmart
14  she was an injured worker, and the time Walmart fired
15  her, did Walmart provide her with a document similar to
16  Exhibit 44?
17      A.  To my knowledge, no.
18      Q.  Okay.  And Exhibit 44 actually sets forth some
19  rules for the employee, correct, "What To Do if an Injury
20  Occurs on the Job?"  Like, Step 1, "Notify Your Employer
21  Immediately."  Do you see that?
22      A.  Yes, sir.
23      Q.  If you look at Page 2 of Exhibit 44 it says
24  "Responsibilities Of The Employer."  I believe you've
25  already testified in this case that you understood that

---

**119**

1  an employer like Walmart has 28 days to report a
2  workplace injury to the State of Kansas.  Do you recall
3  that?
4      A.  Yes, sir.
5      Q.  Can you read to yourself, and let me know when
6  you're done, under Responsibilities Of The Employer, read
7  the paragraph that starts "Per K.S.A. 44-557."  I want
8  you to read that whole paragraph to yourself and tell me
9  when you're done.
10      A.  (Witness complied.)  Okay.
11      Q.  Okay.  So you've read that part of Exhibit 44?
12      A.  Yes, sir.
13      Q.  Okay.  So does Walmart understand that if an
14  employee reports a workplace injury that partially
15  incapacitates their ability to do their job, they're
16  supposed to report that injury to the State of Kansas?
17          MR. HEDICAN:  Objection, calls for a legal
18  conclusion, foundation.  Go ahead.
19      A.  Yes.
20      Q.  (BY MR. KINNEY)  The information that you had
21  from Janell Braxton on April 14th, 2020 was that she had
22  had pain in her wrist for more than one shift that was
23  partially making her unable to do parts of her job,
24  correct?
25      A.  Correct.

---

**120**

1      Q.  And did you ever take that information and make
2  sure it got reported to the State of Kansas?
3      A.  No, sir.
4      Q.  Did you ever relay that information to the
5  Claims Management Department of Walmart?
6      A.  No, sir.
7      Q.  But you understood that you were supposed to do
8  that?
9          MR. HEDICAN:  Objection, foundation,
10  it calls for a legal conclusion.
11      A.  Yes.
12      Q.  (BY MR. KINNEY)  Okay.  It was your
13  understanding in April of 2020 that Ms. Braxton's
14  workplace injury should have been reported to the State
15  of Kansas?
16          MR. HEDICAN:  Objection, calls for a legal
17  conclusion, foundation.  Go ahead.
18      A.  I would have reported it to IRS, and IRS
19  notifies CMI, and CMI would handle that claim, or
20  anything that is involved with the State of Kansas.  I
21  personally would not inform the State of Kansas.
22      Q.  (BY MR. KINNEY)  So you personally were aware
23  that you were required to report it to IRS?
24      A.  Yes, sir.
25      Q.  Did you do that?

---

30 (Pages 117 to 120)

Case 2:20-cv-02287-DDC   Document 98-4   Filed 07/09/21   Page 30 of 30

Quincy Usry                    Braxton vs. Walmart                    4/30/2021

Appellate Case: 22-3003   Document: 010110660654   Date Filed: 03/21/2022   Page: 146

**121**

1    **A.  No, sir.**
2         MR. KINNEY:  Let's take a break.
3         THE VIDEOGRAPHER:  Stand by, please.
4    We're going off the record.  The time now is
5    approximately 1:09.
6         (Recess taken.)
7         THE VIDEOGRAPHER:  We are back on the
8    record.  The time now is approximately 1:12 p.m.  Would
9    you, please, proceed.
10    Q.  (BY MR. KINNEY)  Mr. Usury, have you ever
11   personally been disciplined in relation to your response
12   to learning that Ms. Braxton was an injured worker?
13    **A.  No, sir.**
14    Q.  Are you aware of any employee, other than
15   Ms. Braxton, being disciplined after Walmart learned that
16   Ms. Braxton was an injured worker?
17    **A.  I am not aware, no.**
18    Q.  Okay.
19        MR. KINNEY:  I have no further questions
20   for you.
21        MR. HEDICAN:  We'll reserve our questions.
22   He can read and sign.  You can send that to me.  You're
23   done.
24        THE VIDEOGRAPHER:  Stand by, please.
25   We're going off the record.  The time now is 1:13 p.m.

**122**

1              # # # # #
2
3    _____  I hereby certify that I have read my deposition
4           and that NO CHANGES are being made.
5    _____  I hereby certify that the attached changes have
6           been made to my deposition.
7
8
9         _____
               QUINCY USRY
10
11
12
13        Subscribed and sworn to before me this _____
14   day of _____, 2021.
15
16        _____
               NOTARY PUBLIC
17
18
19   My commission expires:
20   _____
21
22
23   Braxton vs. Walmart
24   Taken by Ken Kinney on April 30, 2021
25

**123**

1         ERRATA SHEET FOR THE TRANSCRIPT OF
                      QUINCY USRY
2
3    Page/Line    Correction and Reason for Change
4    _____    _____    _____
5    _____    _____    _____
6    _____    _____    _____
7    _____    _____    _____
8    _____    _____    _____
9    _____    _____    _____
10   _____    _____    _____
11   _____    _____    _____
12   _____    _____    _____
13
14        _____
               SIGNATURE OF WITNESS
15
16        Subscribed and sworn to before me this _____ day
17   of _____, 2021.
18        _____
               NOTARY PUBLIC
19
20   My commission expires:
21   _____
22
23   RETURN TO:    CRAWFORD REPORTING
                29009 East 117th Street,
                Lee's Summit, MO.  64086
24              crawfordreporting@gmail.com
25

**124**

CRAWFORD REPORTING
29009 East 117th Street
Lee's Summit, MO  64086
crawfordreporting@gmail.com

May 12, 2021

Mr. Quincy Usry
c/o Mr. Christopher Hedican
BAIRD HOLM LLP
1700 Farnam Street, Suite 1500
Omaha, Nebraska 68102-2068
chedican@bairdholm.com

Re:  Braxton vs. Walmart
Dear Mr. Usry:
     Enclosed is the deposition you gave in the
above-named matter for your examination and signing.  You
will also find a signature page and an errata sheet for
your convenience in making any changes or corrections.
     Pursuant to the law, any change in form or substance
of an answer shall be accompanied with a statement of the
reason given by you for making such a change.
     Please mail or email me your signature page and
errata sheet if there are any changes to the address
above.

Sincerely,

CRAWFORD REPORTING

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

JANELL BRAXTON )
                                    *Plaintiff*              )
vs.                                 )        Case No. 2:20-cv-02287-DDC-GEB
                                    )
WALMART INC.                        )
                                    *Defendant*             )

### PLAINTIFF'S RESPONSE TO
### DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### EXHIBIT 5

Policy 763e

Deposition Exhibit 25

**EXHIBIT 5**

WMW-763e  Rev. 10/19
**General Safe Work Practices**
eCommerce



Associates must adhere to eCommerce Safety, Compliance, Trust, and Emergency Procedures, to include the DC-11 Dot Com Safety Manual, eEP Dot Com Emergency Procedures, and DC-28 Environmental Regulatory Compliance Manual. This includes being attentive and responsive to the safety and health of fellow associates. Associates are empowered to share and contribute suggestions and ideas for improving the safety in the fulfillment center (FC). Participation in safety and health programs is a condition of employment. The list below of Safe Work Practices is not all inclusive but serves as a general guideline for ensuring the safety and health of our associates.

**Dress Code:**
- Closed toe and heel shoes that do not expose the top of the foot will be worn.  Platform, wedges, "Shape-Up", and Minimalist / Five toe shoes and/or shoes with a heel in excess of 1 ½ inch high or less than 1 inch wide are prohibited.
- Nails (Natural or Artificial) will not exceed 1/2 inch beyond the finger-tip.
- To eliminate potential hazards when working in areas where conveyors are present:
  - Hair past your shoulders must be put up in bun style, in a hair net, and/or a cap.
  - Baggy and loose clothing, jewelry and accessories are not permitted and/or veils and scarves that hang more the 3 inches beyond the neckline must be tucked in and/or removed.  Hooded clothing (i.e. "hoodies") and/or other clothing items that may create a choking hazard are prohibited. (Note: Hoodies may be worn in work areas where conveyors are not present, however strings must be tucked in they must remain off the head and cannot restrict peripheral vision.)
  - Beards exceeding 3 inches from the face will be tied up or netted.
- The following items are not permitted to be worn inside the FC:
  - Sunglasses, Mirrored, or Tinted lenses
    - Exception: Authorized associates wearing approved and tinted PPE for welding operations or associates with proper medical accommodation contact Human Resources).
  - Lanyards worn will be equipped with "break away" device.

**Safety Related Incidents:**
- All known injuries, no matter how slight, will be reported to a member of management immediately.  At a minimum, these must be reported to a member of management by the end of the shift.
- All Powered Industrial Trucks (PIT) and/or Property Damage incidents will be reported to a member of management immediately.
- Associates will discretely report to Human Resources any:
  - Personal medications or conditions that may affect their ability to safely perform their job.
  - Non-work related or pre-existing conditions that may affect their ability to safely perform their job.
- When needed, associates will cooperate in incident investigations.

**General Safety:**
- Associates will actively and cooperatively participate in facility safety and health initiatives.
- Associates will correct unsafe conditions when they are identified.  If the associate is unable to immediately correct the condition, he/she will report it immediately to their manager.
- "Clean as you go"- All areas will be kept clean so that the area does not create a safety hazard.  Associates will immediately clean any discovery of trash, debris, or a spill (i.e. cardboard, wood, oil, damaged product, etc.).
- Horseplay of any kind is strictly forbidden.

Page **1** of **11**

Δ π EXHIBIT 25
Deponent Braxton
Date 1/25/21 Rptr JB
WWW.DEPOBOOK.COM

CONFIDENTIAL;
SUBJECT TO PROTECTIVE ORDER

WM_Braxton_000144
**EXHIBIT 5**

WMW-763e Rev. 10/19
**General Safe Work Practices**
eCommerce



- Personal firearms and illegal weapons are not permitted on company property. Refer to the Violence-Free Workplace Policy for more information on state exceptions that permit firearms in a locked vehicle on company property.
- Associates are not permitted on company property while under the influence or in possession of intoxicants or non-prescribed drugs (narcotics). Refer to the Alcohol and Drug Free Workplace Policy for further information.
- Associates must have a valid license and/or certification to operate a powered industrial truck or specially designated equipment. Associates must be licensed and certified through the approved training processes.
- All exterior doors, to include dock doors, will be kept shut when not in use. If left opened, an approved screen that meets food safety criteria is put in place.
- Only authorized associates are permitted to perform Lockout Tagout activities. All safety procedures will be followed when clearing jams on conveyors, operating equipment, etc.
- Only authorized and licensed associates may access the yard.
  - Exception: In the event of an emergency, associates may have to access the yard to reach the appropriate safety/ evacuation zone. During this time, normal operations of the yard will stop, allowing individuals to seek safety.
- Associates will wear approved material handling gloves when handling product, freight, boxes, or pallets, using or handling equipment, tools, and metal seals and/or opening and closing trailers doors.

**Pedestrians:**

- Associates will only walk in approved and designated walk areas.
- Associates will not enter unauthorized areas (i.e. signed, active construction, PIT only).
- Associates will only cross PIT traffic lanes at approved and designated locations.
- Pedestrians must maintain a safe distance around operating powered industrial trucks (minimum 8 feet) and/or powered industrial trucks when the load is moved up or down or there is an overhead load (minimum 20 feet). This also applies to stock pickers.
- Associates will not stand or walk under the forks of a loaded or unloaded forklift.
- Associates will use hand-rails when climbing stairs, crossovers, etc. A minimum of three points of contact will be maintained.
- Associates will only use approved doors for entry and exit. Emergency Fire Doors, Dock doors, Fire Wall Doors that are not designated for general entry and exit will not be used.
- Never walk into an aisle from a blocked or blind location without stopping and looking for other traffic.
- Associates will not jump from elevated working/ walking surface. The designated steps or rungs will be used.
- Pedestrian doors that open to an active PIT aisle will be guarded (i.e. bollards, guardrails, chains and/or railing) to protect pedestrians. Pedestrians must walk within this guarded area.
- Hi Visibility Safety Vests:
  - Will be worn by selected associates and contractors in the Walmart Fulfillment Center (Refer to Standard Safety Equipment Procedure).
  - Vests will be worn over the last layer of clothing and donned before entering the floor of operation or beginning work activity (whichever comes first).

**Parking Lot:**

- Associates must obey all posted traffic rules and signs when driving personal vehicles on the parking lot. Parking lots will not be posted with speed limits that exceed 10 mph.
- Associates will not run on Walmart owned, leased or occupied property.
- Vehicles must be properly parked within a single parking space. Associates will only park in a single space.
- Associates will not park in a specially selected and signed location (i.e. Visitor, Disabled Zone, or Associate of the Month) unless authorized.

Page **2** of **11**

CONFIDENTIAL;
SUBJECT TO PROTECTIVE ORDER

WM_Braxton_000145
**EXHIBIT 5**

WMW-763e Rev. 10/19
## General Safe Work Practices
eCommerce



- During inclement weather, associates will follow designated walking paths to and from the facility. These paths will be properly treated for associate safety.

**Pallet Handling and Product Storage:**
- Before using, associates will verify pallets are in good condition. Damaged pallets will be removed from service immediately.
- Associates will only physically handle one pallet at a time.
- When transporting, empty pallets will not be stacked more than 12 high. The stack height will not exceed the height of the mast for stand-up counterbalanced trucks (i.e. Crown RR/RM, Crown RC) and/or the backrest of a front-rider or center-rider (i.e. Crown PC4500).
- Associates are not permitted to climb on, up, under, or through pallet racking.
- Associates will not stand, walk, or step on pallets in elevated or non-pickable locations unless fall protection is properly donned. (Note: Associates that are fully outside the confines of elevated equipment must have approval form the FC Director and it must be planned event.).
- When picking from pickable floor pallet locations only, Associates will be allowed to place one foot on the top slat of the front of the pallet (middle support beam) to gain access to pickable locations. If the middle support location is inaccessible a standard reach tool shall be utilized to gain access to pickable locations.
- Associates should use leverage when possible to physically maneuver pallets. However, when not possible, the chart below will be followed when physically lifting to stack and/or de-stack pallets:

| "White Wood" | $1^{st} - 5^{th}$ pallet in stack | One handler may physically handle |
| | $6^{th} - 10^{th}$ pallet in stack | Team lift is required for physical lift |
| | 11th pallet in stack and above | Powered Industrial Truck (PIT) required to mechanically handle |
| Plastic, Blue CHEP, & Red PECO | $1^{st} -4^{th}$ pallet in stack | Team lift is required for physical lift. |
| | 5th pallet in stack and above | Powered Industrial Truck (PIT) required to mechanically handle |

- Pallets will only be stored in a flat position. A pallet will not be stored on its side, edge, end and/or in a leaning position.
- Pallets will only be stored in approved locations. A single pallet, not located in a pallet return, pick location and/or a designated area, will have product, an empty tote, or a safety cone placed on top to visually identify the potential trip hazard.
- Pallets will only be stored in approved storage locations.
- Pallet storage locations may not extend into pedestrian walkways.
- Pallets must be stably stacked. Only pallets of like size and material will be stacked together. Pallet sizes should not be mixed. In the rare event pallet sizes must be mixed, the recommended max stack height will be reduced by half.
- In elevated pallet storage locations, empty pallet stacks or product on pallets shall not exceed the height of the outward-facing guardrail.
- Pallets will not be stacked within 20 feet of workstations or walkways. Safety nets to prevent items from falling onto pedestrians will be used for pallet racking storage within 20 feet of workstations or walkways.
- Pallets of product stored in pallet racking above floor level and not in active pick locations will be secured with at least two layers of shrink wrap, banding, and/or filament tape to prevent items from falling off the pallet.
- When storing pallets (to include empty pallets and pallets of product) in racking, the pallet and product shall not exceed a maximum of 3 inches overhanding the front of the rack.

**Carts & Cages:**

CONFIDENTIAL;
SUBJECT TO PROTECTIVE ORDER

WM_Braxton_000146
**EXHIBIT 5**

WMW-763e Rev. 10/19
**General Safe Work Practices**
eCommerce



- Carts/ cages will be parked and stored in designated areas.
- Carts/ cages must be inspected before each use. Damaged carts and cages will be immediately removed from service if defects are found.
- Associates will push carts and cages (not pull) with both hands keeping elbows in. Carts/ cages will be pushed using handles.
- Associates will maintain physical control of the cart/ cage until it comes to a complete stop.
- Associates will only push one cart/ cage at a time.
- Associates will not ride on carts/ cages.
- Product stacked on carts/ cages will not be stacked above eye-level and/or obstruct the associate's view while pushing.
- Associates will stop at the end of every aisle, intersection, and/or designated stop area. When at these locations in the module, associates will shout "in" or "out" and/or use an approved safety device (i.e. bell, etc.) to announce presence.

**Transporting Loads and Materials:**
- Pallet jacks will be inspected before each use. Damaged jacks will be immediately removed from service if defects are found.
- Pallet jack operators will pull pallet jacks when transporting loads.
- When not in use, pallet jacks will be parked and stored in designated areas. The pallet jack forks will be fully lowered and stored under a pallet with the handle in the locked position.
- Associates will not stand on and/or attempt to ride pallet jacks.
- All loads will be straight, stable, and secure before transporting.
- When transporting loads, the height will not exceed the mast of the equipment.
- When transporting loads on mastless equipment (i.e. Center Rider/ Front Rider) the following practices will be followed:
    - When Single pallet loads extend past the backrest of the equipment the top of the load will be secured with shrink wrap to prevent the load from shifting during transport.
    - Stacked pallet loads may be transported as long as the top load's pallet does not exceed the backrest of the equipment. The top load will be secured with shrink wrap to prevent the load from shifting during transport.
    - When backing a load that exceeds 6 feet a spotter will be used.
- Associates will not physically reach to greater than 6 feet to stack a load. If a load greater than 6 feet is necessary (i.e. upstacking loads on the dock to maximum trailer cube) it must be stacked mechanically.
- When stacking loads, ensure they are straight and stable.
- Never block or place objects in front of fire extinguishers, hoses, fire risers, emergency exits, eye wash stations, automated external defibrillators (AED), electrical cabinets and/or other emergency equipment. Notify a manager **immediately** if any emergency equipment becomes damaged.

**Ergonomics / Body Mechanics:**
- Associates will participate in the facility's designated warm-up program.
- Associates will practice safe lifting techniques:
    - *Face Work* – Square up to what is being lifted to eliminate twist and stress. Also, square up to the delivery point prior to setting the product down.
    - *Lead with the Feet* – After case is lifted, move feet to eliminate twisting at the waist. Square up to the delivery prior to delivering product to end point. Always move your feet to stay in front of the work being done.
    - *Shoulders Square* – Eliminate side to side twist of shoulders. Use handholds in product or reach under the product to securely and evenly lift load. Tip large cases on a 45-degree angle and lift with shoulders even. Move case instead of shoulders.

Page 4 of **11**

CONFIDENTIAL;
SUBJECT TO PROTECTIVE ORDER

WM_Braxton_000147
**EXHIBIT 5**

WMW-763e Rev. 10/19
**General Safe Work Practices**
eCommerce



- ○ *Keep It Close* – Slide case as close as possible prior to lifting. When placing product on a conveyor or pallet don't over-extend. Place case on edge of pallet and slide into position.
- ○ *Don't Fly Like a Bird* – Keep elbows down and in a position of strength instead of up and out. Watch for the elbows being extended up and out.
- ○ *90 Degree Bend* – Bend at the knees vs. bending at the waist. Use the legs and keep the back as straight as possible when lifting.
- ○ *Don't Hold* – Know where you are going to place the product prior to lifting. Plan where the product is going prior to picking it up.
- ○ *Use Momentum Lift* – The weight of the product helps deliver it to the end point. With elbows slightly bent, pick up the case. Take a short step and use the momentum of the step to start the product moving. Guide to the delivery point and release as it touches down. This must be a smooth, controlled motion from pick-up to delivery point. Do not attempt to throw freight.
- ○ *Leverage Transfer* – Use a planned lift when moving large, bulky items. Slide the case part of the way off the pallet and stand it on end. Walk it to the take-away pallet and lower to the ground. Make certain the take away pallet is correctly positioned so it is not too close or too far away.
- ○ *Wrist Straight* – When picking up small items with one hand, use caution to keep the wrist in a neutral position. The wrist is designed to flex up and down, like shaking hands. The thumb should be pointed up as much as possible to eliminate stress on the wrist.
- When using hand-held equipment (i.e. scanners, tools, etc.) wrists should be kept in a neutral position.
- Ergonomic mats will be use in locations where associates are expected to stand for periods of 15 minutes or longer. Associates will stand on approved ergonomic mats when working in applicable areas.

**Box Knives**:
- When using box cutters, associates will:
  - ○ Only use an approved box knife(s).
  - ○ Retract the razor blade into the box knife handle when not using the knife (retractable blades).
  - ○ Replace the razor blade when it becomes dull or broken.
  - ○ Hold the item securely when cutting so it cannot shift or move.
  - ○ Concentrate on the item to be cut and watch the blade at all times.
  - ○ Apply a consistent, firm (but not excessive) pressure while performing the cut.
  - ○ Always cut away from the body and be mindful of the opposite hand placement and ensure it is out of the cut path.

**Conveyors and Material Handling Equipment (MHE):**
- Associates will not step, sit, stand or climb on non-approved walking surfaces (i.e. conveyors, pallets, merchandise, carts, racks). Additionally, associates are not permitted to walk, ride, stand, or climb on, under or over any machine or equipment.
  - ○ Exception: With proper preparation and planning, "Authorized associates" may have a need to step, sit, stand or climb on these areas. In these instances, the appropriate and applicable procedures will be followed (i.e. Lockout Tagout, Personal Protective Equipment- Fall Protection).
- Associates will not work at conveyor transition zones.
  - ○ Exception: With proper preparation and planning, "Authorized associates" may have a need to step, sit, stand or climb on these areas. In these instances, the appropriate and applicable procedures will be followed (i.e. Lockout Tagout, Personal Protective Equipment- Fall Protection).

Page **5** of **11**

CONFIDENTIAL;
SUBJECT TO PROTECTIVE ORDER

WM_Braxton_000148
**EXHIBIT 5**

WMW-763e Rev. 10/19
**General Safe Work Practices**
eCommerce



- Associates will not walk or work under platforms, structures or elevated equipment that is less than 6 feet 8 inches.
    - ○ Exception: With proper preparation and planning, "Authorized associates" may have a need work in these areas. In these instances, the appropriate and applicable procedures will be followed (i.e. Lockout Tagout, Personal Protective Equipment- Fall Protection).
- Associates will not crawl under, between, or over and/or lean over conveyors.
- Conveyors and MHE, such as belts, pullies, and rollers under 7 feet, will be properly guarded.
- Emergency stop buttons and cabling at work station areas will not be obstructed and remain accessible at all times.

**Ladders (Portable & Fixed):**
- Associates will select the correct ladder for the job. When selecting a step ladder, only use a ladder OSHA rated as a "Type I – Industrial Step Ladder".
- All fixed ladders built in-house must conform to OSHA standard 29 CFR 1910.27.
- When climbing, descending, or working from a ladder, associates will not overload themselves or the ladder. If needed, associates will ask a partner to hand them the load once in the proper position.
- Only wood or fiberglass ladders will be used when working on electrical equipment or lighting.
- Associates will face the ladder when ascending or descending a ladder.
- Ladders will be ascended/ descended one step at a time using at least one hand to grasp the ladder when moving up or down the ladder (maintaining 3 points of contact).
- Ladders will be maintained to be free of oil, grease, and other slipping hazards. Make sure footwear is free of oil, grease, or another slipping hazard.
- Never climb or jump off the ladder onto a rack, piece of equipment, etc. Always work from the ladder.
- When portable ladders are used for access to an upper landing surface, the side rails will extend at least three feet above the upper landing surface. When such an extension is not possible, the ladder must be secured. A grasping device, such as a grab rail, must be provided to assist the associate in mounting and dismounting the ladder. A ladder extension must not deflect under a load that would cause the ladder to slip off its support.
- When moving or using a portable ladder, watch for overhead objects, lights, sprinkler heads, and electrical wires. Two or more associates may be required to move a large ladder.
- When using a Portable Ladder:
    - ○ Make sure a step ladder is fully spread (extended) and locked.
    - ○ Standing on the first step, rock the ladder back and forth to ensure that it is in a stable position.
    - ○ Do not push a ladder through a swinging door to open it. Open the door, brace it and post an associate to prevent a collision.
    - ○ Never overreach. Reposition the ladder closer to the work area.
    - ○ Never climb past the second step (rung) from the top unless it is a platform ladder.
    - ○ If the ladder is positioned by a door or walkway, block the door or walkway to prevent collisions.
    - ○ Use the non-self-supporting ladders at an angle where the horizontal distance from the top support to the foot of the ladder is approximately one-quarter of the working length of the ladder.
    - ○ Ladders will not be used on slippery surfaces unless secured or provided with slip resistant feet to prevent accidental movement. Slip resistant feet will not be used as a substitute for the care in placing, lashing or holding a ladder upon slippery surfaces.
    - ○ Areas around the top and bottom of the ladder will be kept clear.
- The top of a non-self-supporting ladder will be placed with two rails supported equally, unless the ladder is equipped with a single support attachment.

Page **6** of **11**

CONFIDENTIAL;
SUBJECT TO PROTECTIVE ORDER

**WM_Braxton_000149**
**EXHIBIT 5**

WMW-763e Rev. 10/19
**General Safe Work Practices**
eCommerce



- Do not use cross-bracing on the rear section of step ladders for climbing unless the ladder is designed and provided with a step for climbing on both front and rear sections.
- Ladders will not be used by more than one associate at a time.
- Ladders will not be placed on boxes, barrels, or other unstable bases to obtain additional height.
- Ladders will not be tied or fastened together to provide longer sections.
- Ladders will be inspected by a qualified associate for visible defects. A qualified associate is someone who has reviewed these safe work practices.
- Associates will inspect the ladder for defects before use. Defective ladders will be tagged with "Danger – Do Not Use" and withdrawn from service.
- Ladders will be maintained in good condition. The joint between the steps and side rails must be tight, all hardware and fittings securely attached, and the movable parts must operate freely without binding or undue play.
- A ladder will be inspected ladder after any incident that could affect its safe use. If a ladder tips over, immediately inspect the ladder for side rail dents, bends, and excessively dented rungs. Check all rung-to-side-rail connections, hardware connections, and rivets for shears.
- The steps to inspect a ladder are as follows:
  - Look at the feet (the portion that touches the ground) for cracks.
  - Look for missing or faulty rubber safety treads (if equipped).
  - Look for uneven edges, bent or broken rails, and missing braces.
  - Look at steps (rungs) for cracks or broken sections.
  - If it is a step-ladder, spread and check the spreader bars. Determine if they are straight or if the ladder wobbles.
  - Check for stability by opening the ladder and stand on the first step. Shake the ladder and determine if you would feel comfortable working on the ladder. If the ladder moves around too much, tag it out, and follow the procedures below.
  - For wooden ladders, all wood parts shall be free from sharp edges and splinters; sound and free from accepted visual inspection from shake, wane, compression failures, decay, or other irregularities.

**Step Stands/ Stools:**
- Only industrial rated step stands/ stools with manufacturer's stated load capacity will be used. The manufacturer's stated load capacity of the stand must not be exceeded.
- Inspect step stand/ stool to ensure it is in good repair before use. If there are cracks or damage, do not use the stand.
- Ensure proper placement of the step stand/ stool to prevent overreach while working.
- When the step stand is not in use, store it where it will not interfere with egress, the loading/unloading of trailers, extendable conveyor operation, and powered industrial truck operation.

**eCommerce FC Orderfilling Module:**
- All replenishment gates kept in the replenish position unless being utilized.
- Associates will not step into an unguarded transfer gate location.
- Associates will not stand in front of slot locations being replenished.
- Associates will not lean on the guard rails on the exterior of the module.
- The quantity of empty pallets in a module pallet return will not exceed 6.
- Be sure pallet load is stable before breaking tape or cutting shrink wrap.

**eCommerce FC Pallet Module:**
- Associates will not step into elevated pallet locations in the first level of the module. Pallet pull hooks will be used as needed to pull pallets forward.
- Associates are strictly prohibited from placing any body part(s) beyond the first pallet position when on the second floor (or higher) of the module. A visible line will be present to depict this

CONFIDENTIAL;
SUBJECT TO PROTECTIVE ORDER

WM_Braxton_000150
**EXHIBIT 5**

WMW-763e Rev. 10/19
**General Safe Work Practices**
eCommerce



zone. Fall protection must be worn and/or proper guarding (Top rail, mid rail, and toe board) must be present to physically access this location.
- Associates will not stand in front of slot locations being replenished.
- Associates will not lean on the guard rails on the exterior of the module.
- The quantity of empty pallets in a pallet module pallet return will not exceed 3.
- Be sure pallet load is stable before breaking tape or cutting shrink wrap.

**Baler Safety:**
- Associates will not overfill the baler.
- Keep the baler door gates closed while cycling the machine.
- It is never acceptable to enter the baler or place a part of your body into the baler.
- The area around the baler will be clear of obstructions, to include the emergency disconnect switch.
- Balers have a red emergency stop button which immediately stops the equipment. Locate this button so it can be used in case of an emergency.
- Personal protective equipment (PPE) to include safety glasses and gloves, will be worn when opening the chamber door of the baler and/or ejecting and preparing the final bale.
- If cardboard gets caught in parts of the baler or in the openings for the tie wire, dislodge it with a broom handle or bar, but do not do this while the baler is cycling.
- If unable to dislodge material that is stuck inside the baler or otherwise cannot operate the baler, immediately contact the Maintenance Department for repair.
- Visually verify that the area is clear, and no associates have entered the baler door area before cycling the machine.

**Compactor Safety:**
- Associates will not use the compactor for containers of chemicals or liquids, either full or partially empty. Compacting these items can contribute to potential fires.
- Compactors will not be used to compress cardboard. Cardboard should be placed into the baler.
- Associates will not overload the compactor chute. To reduce the potential for jams, break down large items before placing them in the compactor chute.
- The compactor chute door must be closed during operation.
- A safety interlock is located on the compactor door. The interlock ensures the compactor does not operate when the door is in the open position. If it is not operating properly, immediately stop the cycle and contact the Maintenance Department.
- Associates will not overload the compactor. If it is full or it malfunctions, immediately contact the Maintenance Department.
- Keep the area around the compactor clear to include the emergency disconnect switch.
- Never place any part of your body in the compactor or climb into the trash compactor chute
- Compactors have a red emergency stop button, which immediately stops the equipment. Locate this button so it can be used in case of an emergency.
- In the event of a compactor chute jam, attempt to dislodge the jammed item with a broom handle or bar after the compactor has finished the cycle in progress.

**Tier Racking Safety:**
- All tier racks must be visually inspected prior to being used. Never use bent or damaged components (uprights or base unit).
- Loaded tier racks are to be transported one high with a powered industrial truck or equipment with forks. Clamps cannot be used to transport tier racks.
- No shrink wrap is to be used outside of the uprights.
- Loads shall not exceed the tier rack load capacity rating and/or the recommended stack height of the manufacturer.

CONFIDENTIAL;
SUBJECT TO PROTECTIVE ORDER

**WM_Braxton_000151**
**EXHIBIT 5**

WMW-763e Rev. 10/19
**General Safe Work Practices**
eCommerce



- When hauling empty stacked (non-spiral) tier rack, the stack should not exceed 8 (height that would fit in a trailer) and be shorter than their mast.
- If any component is found to be damaged notify your Manager immediately.
- Orderfilling should occur from the top to the bottom of the slot. Never pick from a bottom slot with loaded tier rack above.
- Loaded tier racks will be unstacked one rack at a time when stacked without a powered industrial truck.
- Overhang should be avoided whenever possible. Freight will be stacked parallel to the tier rack support cross bars allowing overhang on the sides not to the front and back.

**Reliability Maintenance Engineering (RME):**
- Non-portable equipment will be secured to a floor and/or workstation when the ability to secure the equipment is present.
- RME associates will only use approved equipment and tools and will store them safely in approved locations. Equipment & tools will only be used for their intended purposes. Only tools provided by the company are permitted for use. Personal tools strictly prohibited.
- All equipment and tools will be inspected before use. Damaged tools will be tagged and immediately removed from service.
- Safety glasses, gloves or other Personal Protective Equipment (PPE) will be worn as required with tools and equipment.
- Drill Press Operation:
    o Guarding will be present over the motor, belts, and pulleys.
    o An adjustable guard will be installed to cover the unused portion of the bit and chuck above the material being worked. Before starting the drill press, the guard will be functional and in place.
    o Only authorized associates will operate the drill press.
    o Before drilling, materials will be secured to the drill press bed with clamps so that the material will not spin and/or strike the operator. The operator will not attempt to adjust the drill press, work platform or stock while the drill bit is still rotating.
    o The drill press will only be used for its intended purposes.
    o The drill press will be shut off when not in use or when left unattended for any period of time.
    o Remove the chuck immediately after removing a drill bit.
    o Lockout Tagout procedures will be followed if drill press is hardwired or un-plug if drill press is cord/plug type prior to servicing or adjusting the drive belts. Refer to Lockout Tagout procedures for specific information.
    o The drill press will be secured to the floor if it is a pedestal type or to the bench if it is a bench top model prior to operation.
    o Drill bits will be sharp and designed for the product being drilled (i.e. wood, metal, ceramic, masonry, etc).
- Battery Room:
    o Care will be taken in the Battery Room to prevent explosions or spills of acids.
    o Batteries will not be overfilled. Battery acid should be treated as hazardous and disposed of accordingly. Emergency showers should be accessible and properly marked in the Maintenance area. Access to emergency showers will be kept clear at all times.
    o The Battery Change Personnel will wear required PPE (i.e. face shields, goggles, apron, gloves, etc.) while changing or servicing batteries.
- Flammable/Hazardous Chemicals:
    o Care will be taken in handling and storage of any flammable or hazardous chemicals.
    o Chemicals will not be mixed unless they are intended to be mixed. If mixed, the manufacturer's mixing directions will be followed.
    o Material Safety Data Sheets must be made available for review in the facility's MSDSOnline eBinder.

CONFIDENTIAL;
SUBJECT TO PROTECTIVE ORDER

**App-II**
**156**

**WM_Braxton_000152**
**EXHIBIT 5**

WMW-763e Rev. 10/19
**General Safe Work Practices**
eCommerce



- o Any flammable or hazardous chemical not being used will be stored in the flammable cabinet.
- Welding, Cutting, and/or Brazing:
  - o Welding, cutting and brazing will be performed according to the DC-11 Dot Com Safety Manual, 0601 Hot Works procedure.
  - o Welding, cutting, and brazing will occur in the shop area when possible. If welding is to be performed elsewhere, the Hot Works Procedure must be followed, to include:
    - Obtaining a Hot Works Permit from Safety, Compliance, & Trust (SCT).
    - A trained fire watch associate must be present at all times during the process with a fully charged fire extinguisher.
    - Flash reduction screens will be used to protect associates working in the area. Caution associates to avoid welder flash and sparks.
  - o Personal Protective Equipment, according to the DC-11 Dot Com Safety Manual, 0601 Hot Works procedure will be worn.
- Housekeeping in the Maintenance area is important. The area will be kept clean and 5S standards (where applicable) followed to prevent slips, trips and falls.
- Storage areas will be kept organized and clean. Flammable liquids will be stored in a U.L. approved cabinet and grounded (as applicable).
- Electrical Safety:
  - o Grounding prongs must never be removed from electrical devices.
  - o Do not perform equipment modification that could adversely affect grounding.
  - o Use portable fiberglass ladders when working on electrical circuits.
  - o Do not wear conductive jewelry, materials, or clothing when working on energized circuits.
  - o Treat non-locked/non-tagged electrical equipment as conductive or energized parts.
  - o De-energize equipment except when testing or troubleshooting is being performed.
  - o Conduct tests or visual inspections before energizing electrical equipment.
  - o Warn associates to stand clear before energizing electrical equipment.
  - o Update electrical prints after completing any modifications.
  - o Before using a voltage detector:
    - Review process for selecting appropriate voltage detector.
    - Review how to use a device to verify an absence of voltage and interpreting indications from the device.
    - Examine how to understand all limitations of each voltage detector that may be used.
- NFPA 70e – Arc Flash:
  - o RME associates will follow the 2301 Arc Flash/ Electrical Safety Program procedure as outlined in the DC-11 Dot Com Safety Manual.
  - o RME associates will follow guidelines for Limited Approach Boundary and Restricted Approach Boundary.
  - o Only trained and qualified RME associates work on energized electrical equipment.
  - o Before performing work, RME associates will:
    - Examine skills and techniques for distinguishing exposed energized electrical conductors and circuit parts from other parts of electrical equipment.
    - Review how the degree and extent of a hazard is determined as well as PPE and job planning necessary to perform tasks.
  - o Understand proper use of special precautionary techniques, including Arc Flash Personal Protective Equipment (PPE), insulated materials, and tools.
  - o Housekeeping duties will not be conducted near live electrical parts, unless safeguards are provided.
  - o Never reach blindly into areas that may contain live electrical components.
  - o Qualified RME associates will not enter spaces containing exposed energized parts unless illumination is provided.

Page **10** of **11**

CONFIDENTIAL;
SUBJECT TO PROTECTIVE ORDER

**WM_Braxton_000153**
**EXHIBIT 5**

WMW-763e Rev. 10/19
**General Safe Work Practices**
eCommerce



- Lockout Tagout:
  - RME associates will follow the 2201 Lockout Tagout Program procedure as outlined in the DC-11 Dot Com Safety Manual.
  - Only trained and authorized RME associates will perform Lockout Tagout activities.
  - RME associates will de-energize electrical components and verify that it is de-energized before working on or near them.
  - RME associates will properly Lock/Tag electrical circuits or equipment that have been de-energized. When LOTO placard is provided, the RME associate will follow it.
  - Any stored energy will be relieved before work begins.
  - Interlocks will not be used as a substitute for Lockout Tagout procedures.

CONFIDENTIAL;
SUBJECT TO PROTECTIVE ORDER

**App-II**
**158**

WM_Braxton_000154
**EXHIBIT 5**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

JANELL BRAXTON )
         *Plaintiff* )
vs. )     Case No. 2:20-cv-02287-DDC-GEB
  )
WALMART INC. )
         *Defendant* )

## PLAINTIFF'S RESPONSE TO
## <u>DEFENDANT'S MOTION FOR SUMMARY JUDGMENT</u>

### EXHIBIT 6

David Whitenack Deposition (4-01-2021)

**EXHIBIT 6**

# Transcript of the Testimony of
# **David Whitenack**

**Date:** April 1, 2021

## **Braxton vs. Walmart**

CRAWFORD REPORTING
(816) 507-9630
CrawfordReporting@gmail.com

**EXHIBIT 6**

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF KANSAS

JANELL BRAXTON,              )
                Plaintiff, )  Case No. 2:20-cv-02287-DDC-GEB
vs.                         )
WALMART INC.,               )
                Defendant. )

VIDEOTAPED ZOOM DEPOSITION OF

DAVID WHITENACK,

being produced via Zoom, sworn and examined on Thursday,

April 1, 2021, pursuant to notice to take the deposition

of David Whitenack, before Deborah K. McLaughlin, MO-CCR,

IL-CSR, KS-CCR.  Taken on behalf of Plaintiff.

---

I N D E X

WITNESS:  DAVID WHITENACK                          PAGE

Examination by Mr. Kinney                             5

Examination by Mr. Hedican                           75

Examination by Mr. Kinney                            91

Examination by Mr. Hedican                          105

Examination by Mr. Kinney                           107

Examination by Mr. Hedican                          108

STIPULATIONS:

The witness is to read and sign.  If not signed by the

time of trial, the deposition may be used as if signed.

---

APPEARANCES

FOR PLAINTIFF:
    Mr. Kenneth Kinney
    RALSTON KINNEY, LLC
    4717 Grand Avenue, Suite 300
    Kansas City, Missouri  64112
    816.298.0086
    ken@rklawllc.com

FOR DEFENDANT:
    Mr. Christopher R. Hedican
    BAIRD HOLM, LLP
    1700 Farnam Street, Suite 1500
    Omaha, Nebraska  68102
    402.636.8311
    chedican@bairdholm.com

Also present:  Videographer

---

4

E X H I B I T S

IDENTIFIED                                         PAGE

7         Text String                               44

9         Jet Statement Form                        47

11        Safety & Compliance Rule Violation Form   21

12        Conduct Disciplinary Action Guidelines    35

37        JetFlex Disciplinary Action Guidelines    40

39        5 Why Form                                61

40        Associate Incident Report                 51

41        Associate Work-Related Injury Management   61

42        Safety Incident Investigation Form        63

43        Employer's Report of Accident             65

44        Information For Injured Employees         67

45        Declaration of David Whitenack            17

(The original exhibits were retained by Mr. Kinney.)

**13**

1      Was Ms. Braxton employed by Walmart as an
2  associate?
3      **A  Yes.**
4      Q   Did Ms. Braxton perform labor services for
5  Walmart?
6      **A  Yes.**
7      Q   Did Ms. Braxton report to Walmart that she was
8  experiencing pain in her left wrist from the labor that
9  she performed for Walmart?
10     **A  I don't recall the exact way that she worded it.**
11 **She did report that she was experiencing an injury and**
12 **that she was not sure how it occurred.**
13     Q   All right.
14     Did Ms. Braxton tell you that she had suffered a
15 workplace injury?
16     **A  She stated that she had -- she was experiencing**
17 **pain, and I believe her -- her wrists and her shoulder.**
18 **She wasn't sure how the injury occurred.**
19     Q   Did you have an understanding one way or the
20 other whether she thought that her pain was from the work
21 she performed at Walmart?
22     **A  No, I did not.**
23     Q   Okay.
24     So have you ever fired someone for reporting
25 pain that happened outside the workplace?

**14**

1      **A  No.**
2      Q   And it's -- it's -- I believe it's Walmart's
3  position, and part of your decision was that the reason
4  Ms. Braxton was fired was for the timing of which she
5  reported a workplace injury.  Was that your conclusion
6  before firing Ms. Braxton?
7      **A  Yes.**
8      Q   So, at the time that you decided to fire
9  Ms. Braxton, was it your impression that she was reporting
10 that she suffered a injury from the work she was providing
11 for Walmart?
12     **A  Based on her statement, which I don't have the**
13 **statement in front of me, I was under the impression that**
14 **she was reporting an injury late for a workplace injury.**
15     Q   All right.
16     So you would agree that Ms. Braxton at least
17 reported to Walmart that she had suffered a workplace
18 injury?
19     **A  Correct.**
20     Q   Okay.
21     And you spoke with Ms. Braxton one-on-one about
22 that workplace injury, correct?
23     **A  Correct.**
24     Q   You asked Ms. Braxton to fill out a statement
25 form about that workplace injury, correct?

**15**

1      **A  Yes.**
2      Q   And she cooperated with your request, didn't
3  she?
4      **A  She did.**
5      Q   She wrote a statement and handed it to you?
6      **A  Correct.**
7      Q   And you took that statement and reviewed it,
8  correct?
9      **A  Yes.**
10     Q   You shared that statement with a couple over
11 management employees at Walmart, correct?
12     **A  With the safety operations manager and HR.**
13     Q   Okay.
14     So the safety operations manager would be Quincy
15 Usry?
16     **A  Correct.**
17     Q   And HR would be Morgan Medaris, correct?
18     **A  That's correct.**
19     Q   The next time you talked to Ms. Braxton was when
20 you terminated her employment, correct?
21     **A  I don't recall if there was any other**
22 **conversation in between then, but it was pretty -- the**
23 **time -- the timeline was pretty close.**
24     Q   Okay.
25     Would you agree that approximately

**16**

1  thirty minutes after Ms. Braxton filled out a statement
2  form for you about her workplace injury, you told her she
3  was being fired?
4      **A  Yes.**
5      Q   Okay.
6      When you told Ms. Braxton that she was fired,
7  did she start crying?
8      **A  Yes.**
9      Q   And did you ask her if she needed a ride home?
10     **A  Yes, we typically ask everybody who is being**
11 **released that evening if -- if they have transportation**
12 **from -- home from the facility.**
13     Q   Is that a typical question you ask because some
14 of Walmart's associates don't drive themselves to work?
15     **A  Yes, there's quite a few associates that would**
16 **carpool with one another, so it was typically the first**
17 **question that we would ask, and oftentimes it would be**
18 **brought up by the associate.**
19     Q   Okay.
20     So at least when you fired Ms. Braxton, she
21 started crying and became emotional, correct?
22     **A  Correct.**
23     Q   And after she left, did you ever see her again?
24     **A  No.**
25     Q   Have you ever talked to her again since the time

17

1   that you fired her?
2       A   No.
3       Q   Okay.
4           I want to ask you some questions about your
5   decision to fire Ms. Braxton.
6           You recall in February of this year signing a
7   declaration that was going to be provided to the federal
8   court in this lawsuit?
9       A   Yes.
10      Q   Okay.
11          I'm going to share my screen with you, and if
12  you would, let me know when you can see that.
13      A   I can see it.
14      Q   Okay.
15          So I'm showing you a document that's been marked
16  as Exhibit 45.  Do you see that?
17      A   Yes.
18      Q   And Exhibit 45 is a declaration that you
19  provided under penalty and perjury for purposes of this
20  lawsuit, correct?
21      A   Correct.
22      Q   And when you signed this declaration, did you
23  know that it was going to be provided to the -- the
24  federal judge in this case for their review?
25      A   Yes.

18

1       Q   All right.
2           And this declaration is about -- part of what
3   this declaration talks about is you finding out that
4   Ms. Braxton had suffered a workplace injury, correct?
5       A   Can you repeat the question, please.
6       Q   Part of what this declaration talks about is you
7   learning that Ms. Braxton suffered a workplace injury?
8       A   Correct.
9       Q   And part of what this declaration's about is
10  your involvement in the decision to fire Ms. Braxton,
11  correct?
12      A   Would you be able to scroll down, please.
13      Q   Yeah.  Sure.
14          So I'm going to scroll down to -- can you see
15  Paragraphs Six, Seven, Eight and Nine on the screen in
16  front of you?
17      A   Yes.
18      Q   Can you read those to yourself, please, and let
19  me know when you're done.  You can read them silently and
20  let me know when you're done reading them.
21      A   Okay.
22      Q   All right.
23          So if you read through Paragraph Seven -- or Six
24  through Nine, is that what you just did?
25      A   Yes.

19

1       Q   Okay.
2           Now, those paragraphs are about your decision,
3   your involvement in the decision to fire Ms. Braxton from
4   her employment at Walmart, correct?
5       A   Correct.
6       Q   Now, if you look at Paragraph Seven, part of
7   what you declared under penalty of perjury is that,
8   according to you, Ms. Braxton's failure to report her
9   injury during the April 12th through 13th, 2020 overnight
10  shift violated Policy 670e, did I read that correctly?
11      A   Yes.
12      Q   And if we look at Paragraph Eight, you wrote, I
13  supported the decision that Braxton's policy [sic] of 670e
14  warranted a first written disciplinary action.
15          Did I read that correctly?
16      A   Correct.
17      Q   And, finally, in Paragraph Nine it says, "I
18  supported the decision to terminate Braxton's employment
19  pursuant to Policy 670e and Walmart's Conduct Disciplinary
20  Action Guidelines".
21          Did I read that correctly?
22      A   Correct.
23      Q   So in your declaration you were providing the
24  fact that you relied on two different Walmart documents to
25  support the decision to fire Ms. Braxton, is that correct?

20

1       A   Can you specify the two documents that you're
2   referring to?
3       Q   Right.  You said that you supported the decision
4   to terminate Braxton's employment pursuant to Policy 670e.
5   That's a document that Walmart has, correct?
6       A   Correct.
7       Q   And the second, you said you supported the
8   decision to terminate Ms. Braxton's employment pursuant to
9   Walmart's Conduct Disciplinary Action Guidelines, correct?
10      A   Yes.
11      Q   Now, that's another document that Walmart has
12  and uses in its operation of the Edgerton facility,
13  correct?
14      A   Yes.
15      Q   And those are the only two documents that -- or
16  policies, if you will, that you say in your declaration
17  you relied on in coming to the decision to fire
18  Ms. Braxton, is that accurate?
19      A   From a policy standpoint, yes.
20      Q   Okay.
21          In Paragraph Eight, you wrote that -- whoops --
22  you wrote that you supported the decision that Braxton's
23  violation of Policy 670e warranted a first written
24  disciplinary action.
25          Did I read that correctly?

**App-II
163**

CRAWFORD REPORTING -- CrawfordReporting@gmail.com     **EXHIBIT 6**

David Whitenack          Braxton vs. Walmart                    4/1/2021

21

```
 1    A   Yes.
 2    Q   Did you ever create a first written disciplinary
 3  action for Ms. Braxton?
 4    A   No.
 5    Q   Okay.
 6        I want to take a look at -- so where we're going
 7  from here, I want to show you the 670e, and ask you some
 8  questions about it.  And then I'm going to have some
 9  questions about Walmart's Conduct Disciplinary Guidelines,
10  does that make sense?
11    A   Yes.
12    Q   And, again, those are the only two documents
13  from a policy perspective that you relied on in supporting
14  the decision to terminate Ms. Braxton's employment.  Is
15  that -- that accurate?
16    A   Yes.
17    Q   Okay.
18        I want to show you, I want to share Exhibit 11.
19        Can you see that on your screen?
20    A   I can.
21    Q   Okay.
22        And Exhibit 11 is the Form 670e.
23        Do you see that at the top of the screen?
24    A   I do.
25    Q   Now, the title of this document is "Safety &
```

22

```
 1  Compliance Rule Violation Form", do you see that?
 2    A   I do.
 3    Q   Does this document identify itself as a policy
 4  or a form?
 5    A   Based on what I'm seeing here, it identifies
 6  itself as Document 670e, Safety and Compliance Rule
 7  Violation Form.
 8    Q   And does it identify itself as a policy or a
 9  form?
10    A   It appears to identify itself as a form.
11    Q   And on this form, at the top of the form that's
12  marked as Exhibit 11, there's actually some different
13  spaces to fill in some blanks, correct?
14    A   Correct.
15    Q   And this entire form has to do with safety and
16  compliance rules, correct?
17    A   Yes.
18    Q   All of the incidents and bullet points that we
19  see on here are related to safety in the workplace,
20  correct?
21    A   Correct.
22    Q   And you said part of your job as operations
23  manager is that you're responsible for safety of the
24  employees under your supervision?
25    A   Correct.
```

23

```
 1    Q   And this is the same 670e form that you referred
 2  to in your declaration that was provided for the federal
 3  judge to review in this case, correct?
 4    A   Correct.
 5    Q   Is this the same 670e that you relied on in your
 6  decision to support the termination of Ms. Braxton?
 7    A   Yes.
 8    Q   All right.
 9        Now, this form, does it apply to every single
10  employee at Walmart?
11    A   It does.
12        MR. HEDICAN:  Foundation.
13        Go ahead.
14    Q   (By Mr. Kinney) Based on your --
15        MR. KINNEY:  Oh, sorry, Chris, go ahead.
16        MR. HEDICAN:  Oh, I just was telling him to go
17  ahead.
18        My objection is foundation.
19        Go ahead and answer, Dave.
20        MR. KINNEY:  Okay.
21    Q   (By Mr. Kinney) Based on your understanding as
22  operations manager, who was responsible for supervising
23  approximately 200 hourly associates, is it your
24  understanding that this policy applies to every employee
25  that worked at the Edgerton, Kansas facility?
```

24

```
 1        MR. HEDICAN:  Object to foundation.
 2    A   The level -- the level of disciplinary action
 3  isn't the same.  All of the policies in itself, though,
 4  are the same.
 5    Q   (By Mr. Kinney) So every -- all the information
 6  set forth in this form would apply to all the individuals
 7  employed by Walmart to work at the Edgerton, Kansas
 8  facility?
 9    A   Can you repeat the question, please.
10    Q   Yeah.  All the rules that are set forth in
11  Policy 670e applies to every employee of Walmart at the
12  Edgerton, Kansas facility, correct?
13    A   Yes.
14    Q   This form 670e applied to you as operations
15  manager?
16    A   Correct.
17    Q   Did this 670e apply to Morgan Medaris as HR
18  business partner?
19    A   Yes.
20    Q   Did this Form 670e apply to Ammie Wilber as QC
21  operations lead?
22    A   Yes.
23    Q   Did this 670e apply to Mark Tuazon, safety lead?
24    A   Yes.
25    Q   Is -- are you aware of any employees that work
```

**App-II
164**

David Whitenack          Braxton vs. Walmart                4/1/2021

29

1    **A   Possibly.**
2    Q   When I use the phrase "latent injury", what does
3  that phrase mean to you?
4    **A   That it could be sore from various activities**
5  **inside or outside of work.**
6    Q   Well, Mr. Whitenack, do you engage in any
7  exercise or sports or any activities like that?
8    **A   Yes.**
9    Q   What do you do for exercise?
10    **A   My wife and I play tennis.**
11    Q   Okay.
12      So if you're playing tennis for six hours one
13  day, and then the next day you realize that your shoulder
14  and elbow are kind of sore from the day before, even if
15  they weren't sore while you were playing tennis because
16  you were having fun and the adrenaline was going on and
17  you were just playing tennis, is that something that
18  you've ever experienced?
19    **A   No, it's not.  Not while playing tennis.**
20    Q   So you've never engaged in a physical activity
21  that resulted in soreness the day after?
22    **A   Yes, I have.**
23    Q   Okay.
24      And you understand that, like a repetitive
25  motion, such as working on the production floor at the

30

1  Edgerton, Kansas facility is a type of repetitive motion
2  that could, possibly, result in soreness the next day or
3  later?
4    **A   There's a difference between soreness and an**
5  **injury, in my opinion.**
6    Q   Okay.
7      Is the difference between soreness and an injury
8  set forth on the Form 670e?
9    **A   It states failure to report any known injury**
10  **before the end of shift, so this -- this policy is**
11  **specific to an injury.**
12    Q   Okay.
13      So just soreness that someone experienced during
14  an injury, they might not necessarily need to report that
15  soreness?
16      MR. HEDICAN:  Object to form.
17      Go ahead.
18    **A   I think it would be encouraged to report**
19  **soreness, however, soreness and an injury, to me, are two**
20  **totally different things.**
21    Q   (By Mr. Kinney) Does the Form 670e say that
22  failure to report soreness during the shift in which the
23  soreness first occurred could result in disciplinary
24  action?
25    **A   It does not.**

31

1    Q   Okay.
2      Now, soreness, generally, can come and then go
3  without ever needing medical attention, correct?
4    **A   Yes.  In this particular case, though,**
5  **Ms. Braxton was reporting excruciating pain, which did not**
6  **seem to align with soreness.**
7    Q   All right.
8      So, it's your understanding that Ms. Braxton's
9  complaint was that she was experiencing excruciating pain?
10    **A   Based on her statement, yes.**
11    Q   And that's what she told you on April 14th of
12  2020?
13    **A   I don't recall the exact date.  That's what she**
14  **put into her written statement, though, was that it was**
15  **excruciating pain.**
16    Q   Okay.
17      Now, when she filled out the statement to you,
18  it's your understanding that whatever day that was, and
19  we'll look at that statement form in a minute, but she had
20  reported excruciating pain at the time she filled out the
21  statement form, correct?
22    **A   She was referring to one to two shifts prior, as**
23  **far as I remember.**
24    Q   All right.
25    **A   But I would need to see the statement form.**

32

1    Q   Okay.
2      So you're saying if an employee is experiencing
3  excruciating pain, they should report that pain?
4    **A   Correct.**
5    Q   If someone's experiencing a lesser pain that's
6  not preventing them from doing their full job, is failing
7  to report that lesser pain a terminable offense at
8  Walmart?
9    **A   Can you clarify pain between soreness, please.**
10    Q   So let's talk about soreness.
11      So an employee is experiencing soreness.  It's
12  not interfering with their ability to do their job.  If
13  they fail to report that soreness, does that subject them
14  to disciplinary action during the time you were operations
15  manager?
16    **A   No.**
17    Q   Okay.
18      So if someone's soreness is not preventing them
19  from doing their job at the time, there's not a need to
20  report that during that time?
21    **A   Can you repeat that, please.**
22    Q   If someone's soreness is not preventing them
23  from doing their job at Walmart, while you were operations
24  manager, then there's not a need to report that soreness
25  at that time?

8 (Pages 29 to 32)

CRAWFORD REPORTING -- CrawfordReporting@gmail.com    **EXHIBIT 6**

Case 2:20-cv-02287-DDC   Document 98-6   Filed 07/09/21   Page 8 of 20

David Whitenack          Braxton vs. Walmart                    4/1/2021
Appellate Case: 22-3003   Document: 010110660654   Date Filed: 03/21/2022   Page: 166

37

1       Did you ever provide this document to
2   Ms. Braxton?
3       A   **Not that I recall.**
4       Q   And this document sets forth four different
5   levels of discipline, correct?
6       A   **Correct.**
7       Q   It has a Quick Coach, a first written, second
8   written and third written, in parentheses, final, correct?
9       A   **Correct.**
10      Q   Is this what would be referred to as a
11  progressive disciplinary policy?
12      A   **Yes.**
13      Q   Now, was the progressive disciplinary policy,
14  while you were operations manager at Walmart, mandatory or
15  did it give managers like you discretion?
16      A   **For the most part, as I recall, it was mandatory**
17  **with the exception of safety incidents or severe conduct.**
18      **It -- it could potentially skip levels of**
19  **progression.**
20      Q   So there were instances where you as an
21  operations manager had discretion when it came to the
22  progressive disciplinary policy?
23      MR. HEDICAN:  Objection.
24      Hold on.
25      Misstates testimony.

38

1       Go ahead.
2       A   **Not personally.  I would have to partner with HR**
3   **on -- on further steps to make sure that whatever action**
4   **is consistent with both the policy and previous**
5   **disciplinary action.**
6       Q   Okay.
7       Now, we see a phrase, "the first level of
8   discipline on this Conduct Disciplinary Action Guideline
9   is Quick Coach", you see that?
10      A   **Yes.**
11      Q   And Quick Coach is a phrase that we did not see
12  in the Form 670e, is that correct?
13      A   **I'm sorry, could you repeat that.**
14      Q   The phrase "Quick Coach", that phrase was not on
15  the Form 670e anywhere, was it?
16      A   **Not that I recall.**
17      Q   Okay.
18      And then there's a section under Quick Coach
19  that says, "JetFlex and Jet Seasonal should be terminated
20  when their coaching has progressed to a formal written",
21  did I read that correctly?
22      A   **Yes.**
23      Q   Phrase "formal written" did not appear on the
24  Form 670e, did it?
25      A   **No, I believe Step 1 was used in place of formal**

39

1   written.
2       Q   But the phrase "formal written" was not written
3   anywhere on the Form 670e, is that correct?
4       A   **Not that I recall, no.**
5       Q   And then we see the phrase "First written" on
6   the Conduct Disciplinary Action Guidelines, and, again,
7   that phrase "first written" does not appear on the Form
8   670e anywhere, correct?
9       A   **Correct, I believe it was referred to as a Step**
10  **1.**
11      Q   Okay.
12      Well, the phrase "first written warning",
13  remember I asked you that and you looked through the
14  document and you couldn't see it written on Form 670e
15  anywhere, correct?
16      A   **Correct.**
17      Q   All right.
18      Now, so far when we looked at Exhibit 11 and 12,
19  those are the two documents from a policy perspective that
20  you relied on in supporting the decision to terminate
21  Ms. Braxton's employment, is that correct?
22      A   **Correct.**
23      Q   Those are the only two documents you put in your
24  declaration for the federal judge to look at that you
25  identify as sources of the reason, from a policy

40

1   perspective, that you supported to fire Ms. Braxton, is
2   that accurate?
3       A   **Yes.**
4       Q   Okay.
5       I want to look at a different one of the
6   Walmart's policies.
7       And before we do that, you would agree that
8   Ms. Braxton was what was referred to as a JetFlex
9   associate, correct?
10      A   **Yes.**
11      Q   Even though she was called JetFlex associate,
12  she was still an employee of Walmart, true?
13      A   **Correct.**
14      Q   All right.
15      I want to show you what's been marked as
16  Exhibit 37.
17      See at the bottom here it says Exhibit 37?
18      A   **Yes.**
19      Q   All right.
20      And then we see, this is called "JetFlex
21  Disciplinary Action Guidelines", do you see that?
22      A   **Yes.**
23      Q   Now, this policy would have applied to
24  Ms. Braxton while she was employed with Walmart, correct?
25      A   **Correct.**

David Whitenack          Braxton vs. Walmart              4/1/2021

41

1    Q   Now, during the title process -- and, first of
2  all, you did not consider this policy when you supported
3  the decision to fire Ms. Braxton, is that accurate?
4    **A   I believe I relied on Morgan Medaris' knowledge**
5  **and expertise when it came to this policy.**
6    Q   Okay.
7       Well, I want to go back real quick and show you
8  Exhibit 45, which is your declaration that you signed and
9  you knew was being provided to the federal judge in this
10 case.
11      You said that you supported the decision to
12 terminate Ms. Braxton's employment pursuant to Policy 670e
13 and Walmart's Conduct Disciplinary Action Guidelines,
14 correct?
15   **A   Correct.**
16   Q   You didn't write anything about the JetFlex
17 Associate Disciplinary Guidelines, did you?
18   **A   I did not.**
19   Q   Okay.
20      So let's look back at the JetFlex Disciplinary
21 Guidelines, Exhibit 37.
22      There's a sentence that I've highlighted that
23 says, "A minimum of two Quick Coach conversations should
24 occur before releasing a JetFlex associate for performance
25 or conduct", did I read that correctly?

42

1    **A   You did.**
2    Q   Now, this Exhibit 37 was available to you as
3  operations manager in April of 2020, is that fair?
4    **A   Yes.**
5    Q   You could have accessed this policy if you
6  wanted to, correct?
7    **A   Correct.**
8    Q   When Ms. Braxton was fired, had she ever
9  received a Quick Coach conversation?
10      MR. HEDICAN:  Object to foundation.
11      Go ahead.
12   **A   Not to my knowledge.**
13   Q   (By Mr. Kinney) Did you ever look to see if
14 Ms. Braxton had ever received a Quick Coach before you
15 decided to fire her?
16   **A   I don't recall, it was too long ago.**
17   Q   Okay.  Well, at the time did you go and look to
18 see if Ms. Braxton had any Quick Coaches in her file?
19   **A   I don't recall, that was too long ago.**
20   Q   Okay.
21      I know we've only been going about 45 minutes,
22 but I want to take a quick break.
23   **A   Okay.**
24      MR. HEDICAN:  No problem.  How long you want to
25 take ten -- like ten minutes, five minutes?

43

1       MR. KINNEY:  Yeah, that's fine, ten.
2       MR. HEDICAN:  Okay.
3       MR. KINNEY:  All right.  Cool.
4       VIDEOGRAPHER:  Going off the record.  Time now
5  is 2:47 p.m.
6       (A break was taken at 2:47 p.m.  The following
7  proceedings resumed back on the record beginning at
8  2:58 p.m.:)
9       VIDEOGRAPHER:  We are back on the record.  The
10 time now is 2:58 p.m.
11      Please continue.
12   Q   Mr. Whitenack, I want to ask you some questions
13 about the response and the actions that you took,
14 specifically after you found out from Ms. Braxton that she
15 had suffered a workplace injury, so can we focus on that
16 for a minute?
17   **A   Yes.**
18   Q   Now, when Ms. Braxton told you that she had
19 suffered a workplace injury, was that the first time any
20 employee had ever said that to you?
21   **A   I don't believe so, no.**
22   Q   All right.
23      Now, so were you generally familiar with what
24 your obligations were after you found out that an employee
25 under your supervision suffered a workplace injury?

44

1    **A   Generally, yes.**
2    Q   All right.
3       Had you received training about what you're
4  supposed to do when an employee suffers a workplace
5  injury?
6    **A   There was generalized training, yes.**
7    Q   Okay.
8       And a generalized training related to what your
9  obligation was if an employee suffered or reported a
10 workplace injury?
11   **A   Correct.**
12   Q   Okay.
13      Do you recall, after you found out Ms. Braxton
14 had suffered a workplace injury, you sent some text
15 messages to Quincy Usry?
16   **A   Yes.**
17   Q   Have you reviewed those text messages in
18 preparation for today's deposition?
19   **A   I have.**
20   Q   Okay.
21      I want to show you Exhibit 7.  Let me know when
22 you can see Exhibit 7, please.
23   **A   Yes, I can see it.**
24   Q   Now, Exhibit 7 are some screenshots of text
25 messages between you and Quincy Usry, correct?

CRAWFORD REPORTING -- CrawfordReporting@gmail.com   **EXHIBIT 6**

David Whitenack            Braxton vs. Walmart                    4/1/2021

---

**45**

1    A   Correct.
2    Q   And Quincy Usry is the person that you
3  described, I think, as the subject matter expert on
4  Walmart's rules and policies related to workplace
5  injuries, is that accurate?
6    A   I would say so, yes.
7    Q   Okay.
8       I'm going to zoom in to -- there's a text from
9  you after you talked about talking to Janell Braxton and
10 about her hurting her wrist, there's a text that you
11 write, IR and 5 Why, question mark.  Did I read that
12 correctly?
13   A   Correct.
14   Q   Now, what does IR stand for?
15   A   Incident report.
16   Q   Is incident report a document, like a form
17 template that Walmart has that can be used after an
18 employee suffers a workplace injury?
19   A   Yes.
20   Q   Okay.
21      And the 5 Why, is that also a form that Walmart
22 has that can be used after an employee suffers a workplace
23 injury?
24   A   It's an investigation tool, yes.
25   Q   Okay.

---

**46**

1       So the investigation tool, 5 Why, is actually a
2  document, correct?
3    A   Correct.
4    Q   And it's a document that's meant to aid a
5  supervisor or a manager investigating what led to a
6  workplace injury, correct?
7    A   Yes.
8    Q   Now, on April 14th of 2020, the incident report
9  form and the 5 Why form were both available to you as
10 operations manager, correct?
11   A   Yes.
12   Q   Okay.
13      And based on your experience as operations
14 manager, are the incident report form and 5 Why forms part
15 of the paperwork that is generated in response to a
16 workplace injury or a safety incident?
17   A   It can be.
18   Q   Okay.
19      Did you create either one of those documents in
20 response to Ms. Braxton's workplace injury?
21   A   I did not.
22   Q   Okay.
23      Let's look at what -- you did ask Ms. Braxton to
24 write a statement, correct?
25   A   Yes.

---

**47**

1    Q   Okay.
2       I want to show you what's been marked as Exhibit
3  9.  Let me know if you can see that in front of you?
4    A   Yes, I can.
5    Q   Okay.
6       I'm going to zoom in a little bit, but I want to
7  make sure you can see the whole thing.
8       You see that on your laptop screen in front of
9  you?
10   A   I can.
11   Q   Can you read that to yourself silently, and then
12 tell me when you're done.
13   A   Okay.
14   Q   All right.
15      So this document is -- the very top of it
16 identifies itself as "Jet Statement Form", correct?
17   A   Correct.
18   Q   Now, this document is not an incident report, is
19 it?
20   A   No, this document is used to gain a statement if
21 there's no -- if the employee doesn't know exactly how
22 they injured themselves.
23      The IR and 5 Why are used to assist in that
24 process.
25   Q   Okay.

---

**48**

1       So is this document we're looking at, Exhibit 9,
2  an incident report?
3    A   No.
4    Q   Okay.
5       It's called a statement form, correct?
6    A   Correct.
7    Q   And Ms. Braxton provided a statement form to you
8  on April 14th of 2020, correct?
9    A   Correct.
10   Q   And you asked Ms. Braxton to fill out this
11 statement form, true?
12   A   Yes.
13   Q   And she complied with your request, and she
14 wrote this statement out, correct?
15   A   Yes.
16   Q   And the bottom of this document, there's a
17 phrase, I'll highlight, it says, "Jet.com strictly
18 prohibit retaliation for reporting a concern or
19 cooperating in an investigation".  Did I read that
20 correctly?
21   A   Yes, you did.
22   Q   And approximately 30 minutes after you gave
23 Ms. Braxton this form and asked her to fill it out, she
24 was fired, is that true?
25   A   Yes, we terminated her for late reporting

---

Case 2:20-cv-02287-DDC    Document 98-6    Filed 07/09/21    Page 11 of 20

David Whitenack          Braxton vs. Walmart                    4/1/2021

Appellate Case: 22-3003   Document: 010110660654   Date Filed: 03/21/2022   Page: 169

49

1  **approximately 30 minutes later.**
2  **Q   Approximately 30 minutes after Ms. Braxton**
3  **filled out this statement form, she was terminated,**
4  **correct?**
5  **A   Correct.**
6  Q   Between the time that you found out about
7  Ms. Braxton's workplace injury and the time that you fired
8  her, you provide her any documents other than what's been
9  marked as Exhibit 9?
10  **A   No, I didn't feel that it was necessary.**
11  Q   Okay.
12  **On this statement form, did Ms. Braxton write**
13  **down when she first reported her wrist pain to anyone at**
14  **Walmart?**
15  **A   It does not mention any specific individual.**
16  **Q   Does the statement form specifically ask**
17  **Ms. Braxton to write down when she first reported her**
18  **wrist pain?**
19  **A   I asked her to write down what date and time she**
20  **recalled experiencing the pain.**
21  Q   Yeah.
22  MR. KINNEY:  I'm going to object to the answer
23  as nonresponsive, and move to strike it.
24  Q   (By Mr. Kinney) So I'm going to ask my question
25  again.

50

1  And I'd like you to listen to the question and
2  answer the question that I'm asking, is that okay?
3  **A   Yes.**
4  Q   Does the statement form marked as Exhibit 9
5  specifically ask Ms. Braxton to write down when she first
6  reported her wrist pain?
7  MR. HEDICAN:  Objection.  Asked and answered.
8  Go ahead.
9  **A   No.**
10  Q   (By Mr. Kinney) **On this statement form, did**
11  **Ms. Braxton write down who she first reported the wrist**
12  **pain to?**
13  **A   No.**
14  **Q   Does this statement form specifically ask**
15  **Ms. Braxton to write down who she first reported her pain**
16  **to?**
17  **A   It does not.**
18  Q   On the statement form did Ms. Braxton indicate
19  whether she wanted medical attention?
20  **A   It does not appear to, no.**
21  Q   Does this statement form specifically ask for
22  Ms. Braxton to indicate whether she wanted medical
23  attention?
24  **A   Not that I can see, no.**
25  Q   Does the statement form marked as Exhibit 9

51

1  provide any information to Ms. Braxton about her rights
2  under the workers' compensation laws of Kansas?
3  **A   Not to my knowledge, no.**
4  Q   Does the statement form inform Ms. Braxton that
5  Walmart would pay for medical attention if it was approved
6  and obtained from an approved provider?
7  **A   It does not appear to, no.**
8  Q   Okay.
9  I want to show you a different document.  I'm
10  showing you Exhibit 40.
11  You see Exhibit 40 in front of you?
12  **A   Yes.**
13  Q   And Exhibit 40 is an associate incident report.
14  You see that?
15  **A   Yes.**
16  Q   And this is the type of incident report that you
17  referred to when you texted Quincy Usry IR for incident
18  report, Exhibit 40 is the type of incident report that you
19  were referencing in your text message, correct?
20  **A   I don't know if this is the specific document**
21  **that was used, but this does resemble an incident report,**
22  **yes.**
23  Q   Okay.
24  And this incident report, this form that we're
25  looking at, Exhibit 40, would have been available to you

52

1  as operations manager, correct?
2  **A   I don't remember if it was this specific form,**
3  **but I would have had access to an incident report, yes.**
4  Q   Okay.
5  Well, I'm going to show you at the bottom where
6  it says "WM Braxton underscore Braxton underscore 000180",
7  do you see that?
8  **A   Yes.**
9  Q   What that number means is that Walmart has
10  produced this document to the Plaintiff in this lawsuit.
11  You understand that?
12  **A   Okay.**
13  Q   Okay.
14  So, see at the top -- are you familiar with the
15  form we're looking at here, Associate Incident Report?
16  **A   Not -- not that I recall, no.**
17  Q   Okay.
18  Well, let's look at what's laid forth on -- do
19  you see this section that says "instructions to manager"?
20  **A   Yes.**
21  Q   And the instruction says, "Have associate
22  complete and sign this form immediately after the injury
23  is reported to you".
24  Did I read that correctly?
25  **A   Yes.**

David Whitenack          Braxton vs. Walmart                4/1/2021

57

1  computer related to Ms. Braxton's workplace injury?
2     A  No.
3     Q  Okay.
4        So, you, in your interaction with Ms. Braxton,
5  never provided Ms. Braxton a form like Exhibit 40 that
6  specifically asked for when Ms. Braxton first reported her
7  injury; who she first reported it to, and it gave her the
8  option to select whether she wanted medical treatment?
9        MR. HEDICAN:  Objection.  Asked and answered.
10  Form.
11        Go ahead.
12     A  Correct.
13     Q  (By Mr. Kinney) And you could have provided a
14  form to Ms. Braxton that asked for those things, true?
15     A  Correct.
16     Q  And you could have provided Ms. Braxton
17  information about her rights to seek medical attention at
18  Walmart's expense because it was a workplace injury,
19  correct?
20     A  Correct.
21     Q  But you didn't provide Ms. Braxton any
22  information about her rights to seek medical attention
23  related to her workplace injury, did you?
24     A  Based on the statement, we didn't deem that it
25  was necessary.

58

1     Q  Well, did you provide Ms. Braxton information
2  about her right to seek medical attention?
3        MR. HEDICAN:  Objection.  Asked and answered.
4        Go ahead.
5     A  Not that I recall.
6     Q  (By Mr. Kinney) Were you under -- did you
7  know that Ms. Braxton went to the safety cube and
8  asked for a wrist brace?
9     A  Not to my knowledge, no.
10     Q  Did you know that Ms. Braxton went to -- when
11  she went to the safety cube, they had given her some
12  ointment for her wrist?
13     A  I found that out after the fact.
14     Q  Okay.
15     A  Yes.
16     Q  But you think that there was no need to offer
17  Ms. Braxton medical attention or inform her of her right
18  to seek medical attention, and that was based on her
19  statement?
20     A  Can you repeat that, please.
21     Q  I think you testified a moment ago that based on
22  Ms. Braxton's statement, your conclusion was that she
23  didn't need to know about her right to seek medical
24  attention under workers' compensation?
25        MR. HEDICAN:  Objection.  Asked and answered.

59

1     Q  (By Mr. Kinney) Is that your testimony?
2     A  Correct.
3        MR. HEDICAN:  Asked and answered.
4        Go ahead.
5     A  Correct.
6     Q  (By Mr. Kinney) Okay.
7        Well, let's go back to Exhibit 9 real quick.
8        Didn't Ms. Braxton say that the pain was
9  excruciating?
10     A  Yes.
11     Q  Didn't Ms. Braxton say that it was swollen and
12  sometimes feels warm to the touch?
13     A  Yes.
14     Q  Didn't Ms. Braxton say that there was bruising?
15     A  Yes.
16     Q  And didn't Ms. Braxton say, I can only pick up
17  the totes if they are partially full?
18     A  Yes.
19     Q  And didn't she say that it's her left wrist
20  that's injured, and I am trying not to use it?
21     A  Yes.
22     Q  And she said the pain progresses throughout the
23  shift?
24     A  Yes.
25     Q  And that's the statement that you relied on in

60

1  coming to the conclusion that Walmart didn't need to
2  provide Ms. Braxton information about her right to seek
3  medical attention from a workers' compensation provider?
4     A  No, sir, it was based on the reporting date.
5     Q  So it's your understanding that she was not
6  allowed to seek workers' compensation treatment because
7  she reported this to you on April 14th of 2020?
8     A  It was our understanding that based on the
9  safety general guidelines, having -- having reported the
10  injury on the 14th that happened at 1 a.m. on the 13th,
11  that it would be a late reporting in violation of the
12  policy, which would result in termination.
13     Q  All right.  So that's not my question,
14  Mr. Whitenack.
15        My question was, I believe you testified
16  based on her statement, you decided that Walmart did not
17  need to provide Ms. Braxton information about her right to
18  seek workers' compensation for her injury.  Isn't that
19  what you said?
20     A  Correct, based on the entire statement that she
21  gave.
22     Q  And the entire statement that she gave is marked
23  as Exhibit 9 in front of you on your screen, correct?
24     A  Correct.
25     Q  I want to show you what's been marked as

61

1  Exhibit 39.
2       Exhibit 39 is the 5 Why form, correct?
3  **A   Correct.**
4  Q   And this is a form that's routinely used by
5  management to conduct an investigation after a workplace
6  injury, correct?
7  **A   Correct.**
8  Q   Did you fill out a Form 5 Why in response to
9  Ms. Braxton's workplace injury?
10  **A   Not that I recall, no.**
11  Q   Okay.
12       I want to show you what's been marked as Exhibit
13  41.
14       Exhibit 41 is a document that's called
15  "Associate Work-Related Injury Management Guidelines".
16       Do you see that?
17  **A   Yes.**
18  Q   And it says revised November 2017, do you see
19  that?
20  **A   Yes.**
21  Q   And it says the purpose is to provide clarity to
22  managers on how to support their associates when
23  work-related injuries are reported.  Did I read that
24  correctly?
25  **A   Correct.**

62

1  Q   You see this section in front of you that's
2  called three options.  You see that?
3  **A   Yes.**
4  Q   It says, "Once an associate reports an injury to
5  their manager, they have three options".  You see that?
6  **A   Yes.**
7  Q   On April 14th, 2020, Ms. Braxton was an
8  associate of Walmart, is that true?
9  **A   I believe so, yes.**
10  Q   And you were a manager, correct?
11  **A   Correct.**
12  Q   And the three options we see here, can you read
13  those to yourself real quick and tell me when you're done
14  reading those three options.
15  **A   Okay.**
16  Q   Now, the three options are, first, they can just
17  go back to work without restrictions, correct?
18  **A   Correct.**
19  Q   The second option is that they can seek medical
20  attention, correct?
21  **A   Correct.**
22  Q   And the third option is that they can elect to
23  leave work early, correct?
24  **A   Correct.**
25  Q   Is being fired listed as one of the options that

63

1  should be offered to an associate after reporting a
2  workplace injury?
3       MR. HEDICAN:  Objection.  Argumentative.
4       Go ahead.
5  **A   It doesn't appear to be an option listed, no.**
6  Q   (By Mr. Kinney) All right.
7       Now, were any of the three options listed on
8  this policy offered to Ms. Braxton after she reported her
9  workplace injury to you?
10  **A   No.**
11  Q   I want to show you what's been marked as
12  Exhibit 42.
13       Exhibit 42 is Form 738e, do you see that?
14  **A   Yes.**
15  Q   And this is entitled "Safety Incident
16  Investigation Form", do you see that?
17  **A   Yes.**
18  Q   This is a document that can be used after to
19  investigate what led to a workplace injury for an employee
20  of Walmart, correct?
21  **A   It appears to be, yes.**
22  Q   And was this a document that was accessible to
23  you as operations Walmart at the Edgerton facility?
24  **A   I would assume so, but I don't recall seeing
25  this document.**

64

1  Q   Did you use the Safety Incident Investigation
2  form in response to Ms. Braxton's workplace injury?
3  **A   We used some sort of safety incident reporting,
4  yes.**
5  Q   Did you conduct a safety incident investigation
6  after Ms. Braxton's injury?
7  **A   No, we didn't believe it was necessary.**
8  Q   All right.
9       Are you saying that you created some type of
10  document to record the incident after Ms. Braxton's
11  injury?
12  **A   The statement form was used as the document.**
13  Q   Okay.
14       But that was a document created by Ms. Braxton,
15  correct?
16  **A   Correct.**
17  Q   Did you create any documents in response to
18  Ms. Braxton's reporting the workplace injury?
19  **A   No.**
20  Q   All right.
21       And Exhibit 9 was the only document that you
22  gave to Ms. Braxton after you found out she suffered a
23  workplace injury, correct?
24  **A   Can you repeat that question, please.**
25  Q   Exhibit 9, and I'll show it to you real quick.

65

1 Exhibit 9, the statement form, you see that in front of
2 you?
3     A   Yes.
4     Q   That was the only document that you provided to
5 Ms. Braxton after you found out she suffered a workplace
6 injury, but before she was fired, correct?
7     A   I believe so. I don't recall -- I don't recall
8 all the events of the exact date.
9     Q   Okay.
10        Can you identify for us today, under oath, any
11 document that you gave Ms. Braxton after finding out about
12 her workplace injury other than Exhibit 9?
13    A   No, sir.
14    Q   I want to show you what's been marked as Exhibit
15 43. You see it on the screen in front of you?
16    A   Yes.
17    Q   Exhibit 43 is a document from the Division of
18 Workers' Compensation, Kansas Department of Human
19 Resources, do you see that?
20    A   Yes.
21    Q   And do you see the statement -- I'll zoom in a
22 little bit. Do you see a statement I just highlighted
23 that says, "There is a $250 penalty for repeated failure
24 to file accident reports within 28 days of the employer's
25 receipt of knowledge of the accident", do you see that?

66

1     A   Yes.
2     Q   Did you ever complete an employer's report of
3 accident and provide it to the Division of Workers'
4 Compensation for the State of Kansas after Ms. Braxton
5 told you she -- she suffered a workplace injury?
6     A   I personally did not. That wouldn't have been
7 under the -- the scope of my job description.
8     Q   Okay. Whose job description would that have
9 been?
10        MR. HEDICAN: Objection. Foundation.
11        Go ahead.
12    A   I couldn't tell you. I would assume that it
13 would be either human resources or safety.
14    Q   (By Mr. Kinney) So when you say human resources,
15 that would be Morgan Medaris, correct?
16    A   She was --
17        MR. HEDICAN: Object to foundation.
18        MR. KINNEY: Excuse me?
19        MR. HEDICAN: Object to that on foundation
20 grounds.
21        You can go ahead and answer if you can.
22    Q   (By Mr. Kinney) Well, Mr. Whitenack, I'll just
23 ask you a different question.
24        Who was the human resources employee that you
25 dealt with regarding the termination of Ms. Braxton's

67

1 employment?
2     A   Morgan Medaris.
3     Q   And who was the safety employee that you dealt
4 with regarding the decision to terminate Ms. Braxton's
5 employment?
6     A   Quincy Usry.
7     Q   Okay.
8         As far as you know, was an employer's report of
9 accident provided by Walmart to the State of Kansas after
10 Walmart found out that Ms. Braxton suffered a workplace
11 injury?
12        MR. HEDICAN: Objection. Asked and answered.
13        Go ahead.
14    A   Not to my knowledge.
15    Q   (By Mr. Kinney) Okay.
16        I want to show you what's been marked as
17 Exhibit 44. Exhibit 44 is a document from the Kansas
18 Department of Labor. Do you see that in the top left-hand
19 corner?
20    A   Yes.
21    Q   And it's titled "Information For Injured
22 Employees", do you see that?
23    A   Yes.
24    Q   And it says, "This notice applies to accidents
25 on or after April 25th, 2013", do you see that?

68

1     A   Yes.
2     Q   And Ms. Braxton's workplace injury occurred
3 after April 25th, 2013, correct?
4     A   Yes.
5     Q   This document says, "Employers are required to
6 provide this information to each injured worker", do you
7 see that?
8     A   Yes.
9     Q   Now on April 14th, 2020, you found out that
10 Ms. Braxton had suffered a workplace injury, correct?
11    A   Correct.
12    Q   And you didn't provide Ms. Braxton any
13 information about her rights under the workers'
14 compensation law of Kansas, isn't that true?
15    A   I did not.
16    Q   Did anyone in your presence on April 14th, 2020
17 provide Ms. Braxton information about her rights to seek
18 workers' compensation in response to a workplace injury?
19    A   I don't recall.
20    Q   Okay.
21        Now, this document that the Kansas Department of
22 Labor wants employers like Walmart to give to their
23 employees who suffer workplace injuries says, "What to do
24 if an injury occurs on the job", do you see that?
25        MR. HEDICAN: Object to the --

73

1  from doing her job, isn't that correct?
2       MR. HEDICAN:  Objection.  Calls for speculation,
3  a legal conclusion.
4       Go ahead.
5   **A   Can you repeat the question, please.**
6   Q   (By Mr. Kinney) Yeah.  On April 14th, 2020, did
7  Ms. Braxton tell you that she was partially unable to do
8  her job?
9       MR. HEDICAN:  Objection.  Calls for legal
10 conclusion.
11      Go ahead.
12  **A   Yes.**
13  Q   (By Mr. Kinney) Okay.  And we can look at it
14 real quick.
15      In Exhibit 9 Ms. Braxton wrote, "I can only pick
16 up the totes if they are partially full", correct?
17  **A   Correct.**
18  Q   "I would normally be able to pick up the totes
19 if they are all the way full", correct?
20  **A   I don't know what her exact capacity would have
21 been, but based on this statement, yes.**
22  Q   She's specifically telling you that because of
23 this injury, she can only pick up the totes if they're
24 partially full, correct?
25  **A   Correct.**

74

1   Q   And she also says, "I'm trying not to use it" in
2  reference to her left wrist, correct?
3   **A   Correct.**
4   Q   So whatever the injury was was bad enough that
5  Ms. Braxton was telling you and telling Walmart that it
6  was interfering with her ability to do her job, and she
7  was trying not to use her left wrist, correct?
8   **A   Correct.**
9   Q   Okay.
10      Mr. Whitenack, are you aware of any reason that
11 Ms. Braxton would have been fired on April 14th, 2020 if
12 she would have never ever told Walmart that she hurt her
13 wrist at work?
14      MR. HEDICAN:  Objection.  Calls for speculation.
15      Go ahead.
16  **A   Without her informing us that there would have
17 been an injury, there would have been no way to know that
18 one occurred, so we wouldn't have been able to terminate
19 her, no.**
20  Q   Okay.
21  So if she would have never told you that she had
22 been hurt at work, would you personally have had a reason
23 to fire Ms. Braxton on April 14th, 2020?
24      MR. HEDICAN:  Objection.  Asked and answered.
25      Go ahead.

75

1   **A   Correct.**
2       MR. KINNEY:  All right.
3       I have no more questions for you, Mr. Whitenack.
4           EXAMINATION
5  BY MR. HEDICAN:
6   Q   Mr. Whitenack, I have some questions for you.
7       Are you one of the people who made the decision
8  to terminate Ms. Braxton's employment?
9   **A   Yes.**
10  Q   Did you terminate Ms. Braxton's employment
11 because she reported an injury?
12  **A   No.**
13  Q   Did you terminate her employment to retaliate
14 against her for having a work injury?
15  **A   No.**
16      MR. KINNEY:  Objection.  Leading.
17  Q   (By Mr. Hedican) Did you answer the question,
18 sir?  Do you need me to repeat it?
19  **A   No.**
20  Q   Why did you terminate her employment?
21  **A   We terminated her employment for failure to
22 report an injury by the end of shift.**
23  Q   How did you feel about terminating her
24 employment?
25  **A   Felt horrible terminating her employment, same**

76

1  **as anybody who I've had to terminate in the past.**
2  **Never -- never feels good to -- to tell someone that**
3  **they're losing their job.**
4   Q   Sir, I want to ask you a little bit about your
5  involvement in the report of the injury in this particular
6  case.
7       As the operations manager, who directly reports
8  to you on your shift?
9   **A   Typically, it would be two to five area**
10 **managers.**
11  Q   And those area managers who were working that
12 night that you recall on April 14th?
13  **A   Brady Kells (phonetic) would have been the only**
14 **one that I recall.**
15  Q   Okay.
16      How about Ammie Wilbur, what's her position?
17  **A   She was in operations lead, so she would have,**
18 **typically, reported to one of my area managers, who was on**
19 **maternity leave, so during that time she was reporting**
20 **directly to me.**
21  Q   Okay.
22  Q   Had you worked with Ms. Wilber in the past?
23  **A   Yes.**
24  Q   What were lead people to do if an associate told
25 them that they had been injured on their shift?

**App-II**
**173**

Case 2:20-cv-02287-DDC   Document 98-6   Filed 07/09/21   Page 16 of 20

David Whitenack          Braxton vs. Walmart                    4/1/2021

Appellate Case: 22-3003   Document: 010110660654   Date Filed: 03/21/2022   Page: 174

**77**

1    A    Any lead or manager or member of leadership
2  would be required to escalate that up to myself
3  immediately after learning that somebody reported an
4  injury.
5    Q    Okay.
6        And if someone reported an injury to one of the
7  operations leads or area managers, in your experience, if
8  you were working, would they tell you?
9    A    Yes.  I absolutely think that they would tell
10  us, because they would be held accountable to the
11  reporting structure, same as a level one associate who was
12  responsible for reporting their own injury.
13    Q    Okay.
14        Did you ever know Ms. Wilber to not inform
15  management of a work injury when she learned about it?
16    A    No, never.
17    Q    Did Ms. Wilber ever inform you that Ms. Braxton
18  told her that she had reported her injury to her?
19    A    She -- she never told me that she had reported
20  it other than the shift on the 14th.
21    Q    Okay.
22        And so let's talk a little bit more about that.
23        During the entire time that you interacted with
24  Ms. Braxton, did she ever tell you that she had reported
25  her injury previously to Ms. Wilber?

**78**

1    A    No.
2    Q    When you met with her, with Ms. Medaris, and
3  informed her that her employment was going to be
4  terminated, did she ever tell you that she had reported
5  her injury to Ms. Wilber?
6    A    Not that I recall, no.
7    Q    Did Ms. Braxton, at any time, tell you she
8  reported her injury to Ms. Wilber or anyone else?
9    A    Not that I recall, no.
10    Q    And during the time that you met with her when
11  you told her that she was going to be terminated because
12  she had not timely reported her injury, did she, in
13  response, say, but I did report it on my -- my shift when
14  I got hurt?
15    A    Not to my knowledge, no.
16    Q    Did she ever say words to that effect?
17    A    Not to my knowledge, no.
18    Q    And in your experience dealing with Ms. Wilber
19  had Ms. Braxton, in fact, told her on her April 12th to
20  13th shift, the day that she alleges she hurt herself, in
21  your experience, would Ms. Wilber have told you?
22        MR. KINNEY:  Objection.  Leading.  Calls for
23  speculation.
24    Q    (By Mr. Hedican) You can go ahead.
25    A    Ms. Wilber would have escalated the concern,

**79**

1  yes.
2    Q    And who was the first person you learned from
3  that Ms. Braxton was indicating that she had gotten hurt
4  at work?
5    A    I learned that information from Ammie Wilber.
6    Q    And that was on the evening of April 14th?
7    A    Correct.
8    Q    Now, let's talk about Exhibit 9.
9        You recall Exhibit 9?  Well, I apologize, you
10  probably don't remember it as Exhibit 9.
11        Give me a minute here, cause I need to get mine.
12    A    Would that be the statement form?
13    Q    Yeah.  It's the statement form.
14    A    Yes.
15    Q    Do you recall the statement form now --
16    A    Yes.
17    Q    -- at the top of this statement form, do you
18  recall that what's written there was 1 a.m., April 13th,
19  do you recall that?
20    A    Correct.
21    Q    And when you gave Ms. Braxton that form,
22  Exhibit 9, to fill out, did you talk with her at all about
23  information that she should include in that form?
24    A    Yes, I always instructed everybody who was
25  filling out a safety form to include when the injury

**80**

1  occurred.  And then I would ask them if they reported it
2  to anyone, to ensure that we were able to -- to follow-up
3  with any leaders who -- who were involved in that.
4    Q    Okay.
5        And when you spoke with her, did Ms. Braxton
6  tell you that she told anyone about her injury on the
7  shift that had occurred?
8    A    No, she did not.
9    Q    And as far as your asking her to put a timeline
10  down there, why did you ask her to put the timeline down?
11    A    I asked her to put the timeline on there to note
12  when the injury occurred for both, investigation purposes
13  and to make sure that we were able to follow-up with any
14  leadership who was on site that day that could have --
15  could have been reported to.
16    Q    Now, Ms. -- Ms. Braxton, in her deposition, said
17  that when she met with you that you had said to her that
18  you did not have to give her any additional -- or a
19  warning for termination as a seasonal employee.
20        Do you recall having any such discussion with
21  her?
22        MR. KINNEY:  Object to form.
23    A    Could you repeat?
24    Q    (By Mr. Hedican) Let me just ask that -- let me
25  just ask that again.

David Whitenack            Braxton vs. Walmart                4/1/2021

**89**

1    A   I have a bachelor's of science degree in
2  business administration from The Citadel, the military
3  college in South Carolina.
4    Q   Okay.
5        And when you mention that's a military school,
6  is that like West Point or Annapolis, something like that?
7    A   Yeah, it's very similar.  It's not
8  federally-funded.  And instead it's a state-funded school.
9  But the -- the coursework and regiment is essentially the
10 same.
11   Q   Sir, doesn't that military school, like other
12 military schools, apply an honor code of some type?
13   A   Yes, it applies a very strict honor code.
14   Q   What is an honor code -- or what was the honor
15 code at The Citadel?
16   A   The honor code at The Citadel was a cadet does
17 not lie, cheat, steal nor tolerate those who do.
18   Q   Where is -- it sounds like honesty is a pillar
19 of that?
20   A   Yes, absolutely.
21   Q   Did you have any role at The Citadel in
22 enforcing the honor code?
23   A   I did.  I was -- I was an honor representative
24 for my company my senior year in the Corps of Cadets, who
25 would sit on the council for cadets who had broken or

**90**

1  violated that honor code.
2    Q   Sir, do you continue to live by that code?
3    A   Yes, I do.
4    Q   You were asked some questions about
5  Ms. Braxton's condition and information that was provided
6  or not provided.
7        Were there postings of any kind at -- at Walmart
8  identifying the various rights of employees or associates?
9    A   I believe so, yes.
10   Q   Okay.
11       And, sir, when you met with Ms. Braxton, and you
12 and Ms. Medaris made the decision to terminate her
13 employment, did you terminate her employment so that she
14 could not get medical care?
15   A   No, we did not.
16   Q   And were you trying to prevent her from
17 exercising her workers' compensation rights?
18   A   Absolutely not.
19   Q   And, sir, have you told the jury and told
20 Mr. Kenny and all of us here the truth here today?
21   A   Yes, I have.
22   Q   And if Ms. Braxton had been subject to
23 retaliation for seeking workers' compensation benefits or
24 reporting an injury, would you tell this jury that that's
25 what happened?

**91**

1    A   I would.
2    Q   And did that happen?
3    A   No, it did not.
4    Q   No further questions, sir.
5            EXAMINATION
6  BY MR. KINNEY:
7    Q   Mr. Whitenack, I believe the very last question
8  I asked you, and your answer was, if Ms. Braxton would
9  have never reported her workplace injury to Walmart, there
10 would have been no reason to fire her on April 14th, 2020.
11       Was that your testimony?
12   A   Yes.
13   Q   Okay.
14       You mentioned when Mr. Hedican was asking you
15 questions that Ms. Braxton never told you that she
16 reported her injury to Mrs. Wilber, was that your
17 testimony?
18   A   That she never reported it on the 12th, I
19 believe is what he was asking.
20   Q   Okay.
21       Ms. -- Ms. Braxton never claimed to have been
22 injured on April 12th, did she?
23   A   Sorry, I misspoke.  I meant the 13th at 1 a.m.,
24 the shift of the 12th.
25   Q   Right.

**92**

1        So I think when Ms. -- when Walmart's lawyer
2  asked you a question, if Ms. Braxton ever told you that
3  she reported her injury to Mrs. Wilber, your answer was,
4  no, Ms. Braxton never told you that --
5    Q   MR. HEDICAN:  Objection.
6    Q   (By Mr. Kinney) -- is that correct?
7        MR. HEDICAN:  Objection.  Misstates testimony.
8        Go ahead.
9    A   Can you repeat that question, please.
10   Q   (By Mr. Kinney) Yeah.  When Walmart's lawyer
11 asking you questions, he asked you a question that did
12 Ms. Braxton ever tell you that she reported her workplace
13 injury to Mrs. Wilber, and your answer was no.
14       Do you remember that testimony?
15       MR. HEDICAN:  Same objection.
16   A   Correct, I remember the question.  I believe he
17 was referring to that shift.
18   Q   (By Mr. Kinney) Okay.
19       Well, your answer was, no, Ms. Braxton never
20 told you that she reported her workplace injury to
21 Ms. Wilber, is that your testimony?
22       MR. HEDICAN:  Objection.  Asked and answered.
23       Go ahead.
24   A   My testimony would be that she did not report it
25 to her on the shift of the 12th, but, to my knowledge, she

23 (Pages 89 to 92)

CRAWFORD REPORTING -- CrawfordReporting@gmail.com            **EXHIBIT 6**

93

1  did report it to her on the 14th, yes.
2      Q   (By Mr. Kinney) Did -- did Mrs. Braxton tell you
3  that she reported her workplace injury to Mrs. Wilber?
4      A   No, she did not.  I learned that information
5  from Ms. Wilber directly.
6      Q   Okay.
7          So Mrs. Wilber is the one that told you about
8  Mrs. Braxton's workplace injury, correct?
9      A   Correct.
10     Q   And Mrs. Wilber was subject to the rule about
11 reporting workplace injuries when you first become aware
12 of them, correct?
13     A   Correct.
14     Q   And I think it was your testimony that if
15 Ms. Wilber found out one of the employees under her
16 supervision suffered a workplace injury and failed to
17 report that to Walmart, Ms. Wilber could be subject to
18 disciplinary action for that, correct?
19     A   To the best of my knowledge, yes.
20     Q   Okay.
21         So if Ms. Wilber was to admit to you on
22 April 14th that she learned about Ms. Braxton's wrist pain
23 the day before, and Ms. Wilber failed to report that,
24 under your understanding, would Ms. Wilber have been
25 subjecting herself to discipline?

94

1      A   Potentially, yes.
2      Q   And same question for Mark Tuazon.  If he learns
3  that Ms. Braxton had suffered pain from work, was he under
4  an obligation to report that to management?
5      A   Yes, he would be.
6      Q   And by failing to report that to management,
7  would Mr. Tuazon have been subject to discipline?
8      A   Potentially, yes.
9      Q   Did you ever discipline Mark Tuazon for failing
10 to report Ms. Braxton's workplace injury to management?
11         MR. HEDICAN:  Object to the form of the question
12 and the foundation.
13         Go ahead.
14     A   Can you repeat the question.  I don't quite
15 understand the question.
16     Q   (By Mr. Kinney) Did you ever issue Mark Tuazon
17 discipline because of the situation with Janell Braxton?
18     A   No, Mark didn't report to me, so there would be
19 no way for me to discipline Mark directly.
20     Q   Did you recommend to anyone that Mark Tuazon be
21 disciplined?
22     A   No.
23     Q   Do you -- are you aware of any discipline being
24 issued to Mark Tuazon because of the situation with
25 Ms. Braxton?

95

1      A   No, I'm not.
2      Q   Okay.
3          I want to show you, again -- we're going to --
4  we looked at this several times, but I want to show you
5  again Exhibit 9, the statement form.  Do you see that?
6      A   Yes.
7      Q   And I believe when Walmart's attorney asked you
8  about the statement form, you testified that this is the
9  form that you, quote, always, unquote, use in response to
10 a workplace injury.  Was that your testimony?
11     A   Not that I recall.  I believe I was referring
12 to -- I always ensure that any time we're filling out a
13 form regarding a safety incident that they include the
14 date of the -- that the incident occurred.
15     Q   Okay.
16         And, in fact, when you first texted Quincy Usry
17 about Ms. Braxton's workplace injury, the two documents
18 you mentioned are IR and 5 Why, correct?
19     A   Correct.
20     Q   And those were the two documents that you asked
21 Quincy Usry if you needed to complete for Ms. Braxton,
22 correct?
23     A   Correct.
24     Q   And those two forms were never completed,
25 correct?

96

1      A   That is correct.
2      Q   And isn't the truth that the reason you didn't
3  fill out those two forms was cause Quincy Usry said I want
4  to see a statement form first?
5      A   Yes, the reason he said that is because --
6      Q   Well, Mr. Whitenack, I'm going to cut you off.
7  I'm sorry.  Because I don't want you to speculate about
8  what someone else did; why they did it.
9          Does that make sense?
10         MR. HEDICAN:  That's a speech --
11     Q   (By Mr. Kinney) Well --
12         MR. HEDICAN:  -- not a question.
13     Q   (By Mr. Kinney) -- Mr. Whitenack, you're under
14 oath.  We're not going to have a chance to redo this,
15 cause this trial's going to be in Kansas.  And you're
16 under oath to testify truth and honestly based on your
17 personal knowledge.  You understand that?
18     A   Yes.
19     Q   Now, I don't want you to speculate about why
20 Quincy Usry did something, okay?
21     A   Yeah.
22     Q   I want to ask you about your personal actions.
23 Does that make sense?
24     A   It does.
25     Q   Now, isn't the reason that you didn't fill out

**App-II**
**176**

97

1 the IR and the 5 Why is because Quincy Usry told you that
2 he wanted to see the statement form first?
3      **A   Yes.**
4      Q   And after you provided the statement form to
5 Quincy Usry, the next step was to fire Ms. Braxton,
6 correct?
7      **A   That came after collaboration between Quincy,**
8 **Morgan and myself, yes.**
9      Q   Right.
10        And was that a decision that you independently
11 came up with, or were you following instructions from
12 Quincy Usry related to that situation?
13     **A   It was a decision that was jointly made between**
14 **Quincy, Morgan and myself.**
15     Q   No one ever asked Ms. Braxton to fill out the
16 incident report, true?
17     **A   Not to my knowledge, no.**
18     Q   No one ever provided Ms. Braxton about
19 information to inform her of her rights to seek medical
20 treatment for her workplace injury, true?
21     **A   I couldn't answer that question.**
22     Q   Okay.  You didn't?
23     **A   I did not, no.**
24     Q   Did you witness anyone else provide that
25

98

1 information to Ms. Braxton?
2      **A   No, I wouldn't have typically been involved,**
3 **though, in that process if they did.**
4      Q   Okay.  Well, when you found out Ms. Braxton
5 suffered a workplace injury, didn't you go over to her
6 workstation and ask her to come with you?
7      **A   Yes.**
8      Q   And you asked her to fill out the statement
9 form, correct?
10     **A   Correct.**
11     Q   And then you went and talked to Morgan Medaris
12 and Quincy Usry, correct?
13     **A   Yes.**
14     Q   When that conversation was done, you went back
15 and got Ms. Braxton, correct?
16     **A   Correct.**
17     Q   And you brought her into an office with you and
18 Morgan Medaris, correct?
19     **A   Yes.**
20     Q   And you fired Ms. Braxton, correct?
21     **A   Correct.**
22     Q   And then Ms. Braxton left the brick building,
23 correct?
24     **A   Correct.**
25     Q   At any point in time between pulling Ms. Braxton

99

1 away from her workstation and the time that she got fired
2 and left the building, did you witness anyone from Walmart
3 provide Ms. Braxton information about her right to seek
4 workers' compensation treatment?
5      MR. HEDICAN:  Objection.  Asked and answered.
6      Go ahead.
7      **A   No, I believe the company would typically send**
8 **out materials post-termination as well, so that's why I'm**
9 **not sure if it would have been included in that.**
10     Q   (By Mr. Kinney) Okay.  So my question isn't
11 about what the company would typically do.
12        My question is about what you witnessed with
13 your own eyes.  Do -- do you understand that?
14     **A   Yes, I understand.**
15     Q   So between the time that you pulled Ms. Braxton
16 off of her workstation and the time that you told
17 Ms. Braxton she was fired, did you witness anyone provide
18 Ms. Braxton information about her rights to seek medical
19 treatment at Walmart's expense?
20     MR. HEDICAN:  Objection.  Asked and answered.
21     **A   No, I did not personally see anybody.**
22     Q   (By Mr. Kinney) Okay.
23     MR. KINNEY:  Mr. Hedican, I want to take a quick
24 break.  Five minutes.
25     MR. HEDICAN:  That's fine.

100

1      VIDEOGRAPHER:  Going off record.  Time now is
2 4:02 p.m.
3        (A break was taken at 4:02 p.m.  The following
4 proceedings resumed back on the record beginning at
5 4:08 p.m.:)
6      VIDEOGRAPHER:  We are back on record.  The time
7 now is 4:08 p.m.
8      Q   (By Mr. Kinney) Mr. Whitenack, I believe
9 when Walmart's lawyer was asking you questions, you
10 testified that you didn't want to retaliate against
11 Ms. Braxton for reporting workplace injury, is that
12 true?
13     **A   I believe I said that I felt bad for terminating**
14 **Ms. Braxton.**
15     Q   Okay.
16        Well, do you remember being specifically asked
17 if you were firing her in retaliation for reporting
18 workplace injury?
19     **A   Yes.**
20     Q   And what was your answer?
21     **A   That Ms. Braxton was terminated for failure to**
22 **report injury by end of shift.**
23     Q   Right.
24        So your testimony when Walmart's lawyer was
25 asking you questions was that, no, you -- you -- you

101

1  weren't trying to retaliate against Ms. Braxton when you
2  fired her.
3          Do you remember that?
4      A   Correct.
5      Q   But isn't it true that earlier you testified
6  that there are rules put in place by Walmart, and you do
7  not have discretion to part ways with those rules when it
8  comes to discipline?
9      A   Can you rephrase that question, please, I don't
10  quite understand.
11      Q   Earlier when I asked you about the progressive
12  disciplinary policies, you said that you didn't have
13  discretion to deviate from it.  Do you remember that
14  testimony?
15      A   Correct.  Yes.
16          MR. HEDICAN:  Objection.  Misstates testimony.
17          Go ahead.
18      Q   (By Mr. Kinney) Did I misstate your testimony,
19  Mr. Whitenack, or is that accurate?
20      A   I generally recall that, yes.
21      Q   And generally recall what?
22      A   Saying that I didn't have the ability to deviate
23  myself personally without the support of other support
24  teams on the progressive progress warnings.
25      Q   Okay.

102

1          So you didn't have permission to deviate from
2  the policies that Walmart set in place, correct?
3          MR. HEDICAN:  Object to the form.
4          Go ahead.
5      A   Correct, I could not independently make that
6  decision.
7      Q   (By Mr. Kinney) Okay.
8          Now, did you create the rule that required
9  Ms. Braxton to be fired in this case?
10      A   I did not, no.
11      Q   Do you know personally who created the rule that
12  Walmart had in place that you say required Ms. Braxton to
13  be fired in this case?
14      A   I do not, no.
15      Q   Were you part of creating that rule?
16      A   I was not.
17      Q   That's Walmart's rule, correct?
18      A   Correct.
19      Q   And you can't tell us exactly why Walmart has
20  that rule, can you?
21      A   I could only speculate as to why.
22      Q   Well, I don't want you to speculate, and the
23  judge doesn't want you to speculate, and no one wants you
24  to speculate.  We want you to know -- we want to know
25  about what your personal knowledge is.

103

1          So, without speculating, can you tell us why
2  Walmart had the rule that you say in this case required
3  Ms. Braxton to be fired?
4          MR. HEDICAN:  Objection.  Asked and answered.
5          Go ahead.
6      A   Based on my training that I have had, the
7  reasoning behind it would be failure to report the injury
8  by the end of shift would not give the company enough time
9  to investigate and be able to mitigate that risk for other
10  employees.
11      Q   (By Mr. Kinney) So, did you investigate the
12  injury that Ms. Braxton suffered?
13      A   Not in this case, no.
14      Q   Did you take any action in response to
15  Ms. Braxton's injury to prevent other employees from
16  suffering the same injury?
17      A   Ms. Braxton didn't know exactly how she was
18  injured, so it would have been impossible to prevent other
19  employees from repeating that same injury --
20      Q   So --
21      A   -- that's why there was no investigation.
22      Q   Okay.  I'm going to object to your question
23  [sic] and move to strike it as non-responsive.
24          MR. HEDICAN:  Objection.
25          Go ahead.

104

1      Q   (By Mr. Kinney) My question is this.
2          Did you personally engage in any behavior to
3  eliminate any risk for other employees based on the injury
4  that Ms. Braxton said she suffered?
5          MR. HEDICAN:  Objection.  Asked and answered.
6          Go ahead.
7      A   There would have been no way to, no.
8      Q   (By Mr. Kinney) Okay.
9          Were you part of creating a rule that required
10  Ms. Braxton to be fired in this case?
11      A   No.
12      Q   Okay.
13          Did you have any authority to change that rule?
14      A   I did not, no.
15      Q   Okay.
16          And when you fired Ms. Braxton you said that you
17  felt bad about it?
18      A   Correct.
19      Q   And that she be -- she started crying?
20      A   Yes.
21      Q   All right.
22          I have no further questions.
23
24
25          EXAMINATION

26 (Pages 101 to 104)

CRAWFORD REPORTING -- CrawfordReporting@gmail.com   **EXHIBIT 6**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

JANELL BRAXTON                           )
                    *Plaintiff*          )
          vs.                            )          Case No. 2:20-cv-02287-DDC-GEB
                                         )
WALMART INC.                             )
                    *Defendant*          )

**PLAINTIFF'S RESPONSE TO**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**EXHIBIT 7**

Policy 670e

Deposition Exhibit 11

**EXHIBIT 7**

WMW-670e 11/2019
## Safety & Compliance Rule Violation Form
eCommerce

**Walmart** ⁘
eCommerce

Associate Name: _____ Associate #: _____ DOH: _____ Reference #: _____

Date of Violation: _____ Time: _____ Manager Name: _____

---

**Documented Coaching** (Note: Any repeat of the same violation within 180 calendar days will result in a Step.)

- Safety
  - o   Not actively participating in a start-up exercise program.
  - o   Failure to follow General Safe Work Practices not otherwise covered specifically within this guideline.
  - o   Failure to follow Powered Industrial Truck Safe Work Practices not otherwise covered specifically within this guideline.
- Compliance
  - o   Failure to follow stacking directional arrows on regulated items.
  - o   Failure to close hazardous waste drum properly.
  - o   Failure to follow spill cleanup procedures.

**Step 1** (Note: Any repeat of the same violation within 180 calendar days will result in a minimum of a Step 3, up to and including, termination.)

- **Safety**
  - o   Failure to report any known injury before the end of the shift.
  - o   Failure to report a non-reckless and/or careless powered industrial truck accident at the time it occurs.
  - o   Failure to properly complete a WMW-118 or WMW-119.
  - o   Careless personal behavior regardless whether this resulted in an incident.
  - o   Entering or exiting through an unauthorized door or entry/exit way.
  - o   Jumping from an elevated working/walking surface.
  - o   Failure to use appropriate jack stabilizer.
  - o   Blocking a Fire Exit or Path of Egress.
  - o   Powered Industrial Truck Operator and Battery Changer failure to verify Battery Plate replacement after Battery Exchange.
  - o   Failure to wear required personal protective equipment (PPE) not otherwise covered specifically within this guideline.
- Compliance
  - o   Covering hazardous material carton coverings.
  - o   Improper processing of compromised regulatory cartons.
  - o   Failure to secure all shipments.
  - o   Shipping fully regulated cartons that are damaged, opened, or considered unsecure.
  - o   Failure to apply the proper hazardous material shipment label (e.g. lithium ion, lithium metal).
  - o   Improper classification or disposal of product.
  - o   Failure to provide proper outbound paperwork for regulated shipments.

## Step 3

- Safety
  - o   Stepping on the pallet position/location within the module without safety gate in place.
  - o   Reckless personal behavior regardless whether this resulted in an incident.
  - o   Using tobacco in unauthorized area.
  - o   Authorized Associate – Yard Safety Access/Trailer Procedure Control Rule Violation.
- Compliance
  - o   Unauthorized signature on Haz-Waste Manifest or Bill of Lading.
  - o   Disposal of unauthorized liquids or chemicals down drains.

## Termination

- Safety
  - o   Willful disregard for Safety and Compliance.
  - o   Lockout Tagout/Access Procedure Violation.
  - o   Hot Works Violation.
  - o   Arc Flash (NFPA 70E) Violation.
  - o   Failure to wear and/or Properly Utilize Fall Protection.
  - o   Horseplay
  - o   Unauthorized Associate – Yard Safety Access/Trailer Procedure Control Rule Violation.
  - o   Modifications and additions to equipment which affect capacity and safe operation.
  - o   Stepping over/under an unguarded conveyor where proper handrails are not in place.
  - o   Operating equipment without the proper license, certification, and/or training.
  - o   Bypassing or unauthorized removal of a safeguarding safety device.
- Compliance
  - o   Improper disposal of hazardous waste (EC-03).
  - o   Willful violation of DC-28 Environmental Regulatory Compliance Manual, Supply Chain Hazardous Waste Management procedures.



Page **1** of **1**

**EXHIBIT 7**

WM Braxton 000097

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

JANELL BRAXTON )
        *Plaintiff* )
    vs. )    Case No. 2:20-cv-02287-DDC-GEB
         )
WALMART INC. )
        *Defendant* )

## PLAINTIFF'S RESPONSE TO
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### EXHIBIT 8

Chelsea Davidson Deposition (4-30-2021)

EXHIBIT 8

# Transcript of the Testimony of
# **Chelsea Davidson**

**Date:** April 30, 2021

**Braxton vs. Walmart**

CRAWFORD REPORTING
(816) 507-9630
CrawfordReporting@gmail.com

**EXHIBIT 8**

Case 2:20-cv-02287-DDC   Document 98-8   Filed 07/09/21   Page 3 of 8

Chelsea Davidson                  Braxton vs. Walmart                  4/30/2021

Appellate Case: 22-3003   Document: 010110660654   Date Filed: 03/21/2022   Page: 183

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

JANELL BRAXTON,          )
                         )
          Plaintiff,     )
                         )
vs.                      )   No. 2:20-cv-02287-DDC-GEB
                         )
WALMART INC.,            )
                         )
          Defendant.     )


VIDEOTAPED DEPOSITION OF
CHELSEA DAVIDSON


a witness, being produced, sworn and examined on Friday,
April 30, 2021, pursuant to Amended Notice of Videotaped
Deposition, at the offices of Ralston Kinney, LLC, Suite
300, 4717 Grand Avenue in Kansas City, Missouri, before
          SHARON L. CRAWFORD, CCR, RPR,
a Certified Court Reporter in Missouri and Kansas.
Taken on behalf of the Plaintiff.

I N D E X

WITNESS:  CHELSEA DAVIDSON                          PAGE
Examination by Mr. Kinney                             5


STIPULATIONS:

The witness is to read and sign.  If not signed by the
time of trial, the deposition may be used as if signed.

---

APPEARANCES

FOR THE PLAINTIFF:

    Mr. Kenneth D. Kinney
    Mr. Thomas F. Ralston
    RALSTON KINNEY, LLC
    4717 Grand Avenue, Suite 300
    Kansas City, Missouri  64112
    (816) 298-0086
    ken@rklawllc.com
    tom@rklawllc.com

FOR THE DEFENDANT:
    Mr. Christopher R. Hedican
    BAIRD HOLM LLP
    1700 Farnam Street, Suite 1500
    Omaha, Nebraska 68102-2068
    (402) 344-0500
    chedican@bairdholm.com

VIDEOTAPED BY:

    Mr. Bob Bennett with TBC Video Productions

4

E X H I B I T S

| IDENTIFIED: | | PAGE |
|---|---|---|
| 52 | Amended Notice of Videotaped Deposition | 6 |
| 53 | Defendant's Answers to Plaintiff's Second Set of Interrogatories | 21 |
| 54 | Workday Record | 25 |
| 55 | Powered Industrial Truck Safe Work Practices | 39 |
| 56 | Walmart Company Facts | 59 |

| REFERENCED: | | PAGE |
|---|---|---|
| 11 | Safety & Compliance Rule Violation Form | 42 |
| 48 | Discrimination & Harassment Prevention Policy | 27 |

5

1        THE VIDEOGRAPHER:  Today's date is April
2  the 30th, 2021.  The time now is approximately 2:10 p.m.
3  This is the videotaped deposition of Chelsea Davidson in
4  the case Janell Braxton vs. Walmart, Incorporated.
5        Madam Court Reporter, would you please swear our
6  witness.
7        CHELSEA DAVIDSON,
8  a witness, having been produced, sworn and examined,
9  testified as follows on:
10 EXAMINATION BY MR. KINNEY:
11     Q.  Can you state your full legal name for the
12 record, please?
13     **A.  Chelsea Ann Davidson.**
14     Q.  And Ms. Davidson, my name is Ken Kinney.  We
15 were introduced just a moment ago.  Do you understand
16 that I'm an attorney that represents Janell Braxton in a
17 lawsuit that she has filed against Walmart, Incorporated?
18     **A.  Yes, I do.**
19     Q.  And do you understand right next to me is
20 Tom Ralston, and he's also an attorney that represents
21 Janell Braxton in this lawsuit?
22     **A.  Yes, I do.**
23     Q.  Have you ever had a deposition before?
24     **A.  No.**
25     Q.  Okay.  So we are taking your testimony today,

6

1  and there's a video camera, and there's also a transcript
2  being created so that we can use your testimony in that
3  lawsuit, or perhaps show it to a jury or judge.  Does
4  that make sense?
5      **A.  Understood.**
6      Q.  If I ask you a question and you don't understand
7  it, can you tell me before you answer it?
8      **A.  Yes.**
9      Q.  Okay.  So if you answer one of my questions, is
10 it fair for us to assume that you understood the
11 question?
12     **A.  Yes.**
13     Q.  All right.  And you're doing good so far.  If
14 you say "uh-huh" or "huh-uh," or shake or nod your head
15 without giving a verbal response, I might prompt you just
16 to answer with words.
17     **A.  Okay.  Noted.**
18     Q.  Because words show up better on a transcript
19 than movements or grunts or groans.
20     **A.  Okay.**
21       **(Exhibit 52 is marked for identification.)**
22     Q.  (BY MR. KINNEY)  And I want to hand you --
23 whoops, what's been marked as Exhibit 52.  Sorry to throw
24 that at you.  Exhibit 52 is an amended notice to take
25 your videotaped deposition for this case, correct?

7

1      **A.  It appears to be, yes.**
2      Q.  Okay.
3      **A.  Uh-huh.**
4      Q.  What is your current home address?
5      **A.  It is 37595 Hedge Lane, Paola, Kansas, 66071.**
6      Q.  How far is Paola, Kansas from here?
7      **A.  It is about an hour and 20 minutes south of**
8  **here.**
9      Q.  Okay.  Do you know how many miles it is from
10 here, roughly?
11     **A.  No.**
12     Q.  Okay.  Do you commute from there to work at
13 Edgerton, Kansas?
14     **A.  I do, yes.**
15     Q.  Okay.  Where did you go to high school?
16     **A.  I went to Blue Valley High School.**
17     Q.  Okay.  And that's in Johnson County, Kansas?
18     **A.  It's in Johnson County, Kansas.**
19     Q.  Okay.  And did you go to college after high
20 school?
21     **A.  I did.**
22     Q.  Where did you go to college?
23     **A.  I went to the University of Kansas.**
24     Q.  And did you get a degree?
25     **A.  I did not.**

8

1      Q.  Okay.  How much course work did you take at the
2  University of Kansas?
3      **A.  I was there for four years.**
4      Q.  Okay.
5      **A.  And I have since received a degree from**
6  **Belleview University.**
7      Q.  Okay.  What's your degree in?
8      **A.  Business.**
9      Q.  A bachelor's?
10     **A.  Correct, yes.**
11     Q.  When did you earn your Bachelor's degree from
12 Belleview in business?
13     **A.  2020.**
14     Q.  Okay.  Congratulations.
15     **A.  Thank you.**
16     Q.  How long have you been employed by Walmart?
17     **A.  I have been employed with Walmart since October**
18 **of 2016.**
19     Q.  Okay.  What's your current job title with
20 Walmart?
21     **A.  I am the senior manager of Human Resources for**
22 **the Edgerton Fulfillment Center.**
23     Q.  Senior manager of Human Resources for the
24 Edgerton Fulfillment Center?
25     **A.  Correct.**

9

1    Q.  Okay.  Does that mean that you are the highest
2  ranking Human Resources employee in Edgerton, Kansas?
3    A.  In Edgerton, Kansas at that facility, yes.
4    Q.  Okay.  How long have you held that role at the
5  facility in Edgerton, Kansas?
6    A.  I have been in that role since the beginning of
7  2016 -- or 2018.  I'm sorry.
8    Q.  In that role, what's the job title of the person
9  you considered to be your direct supervisor?
10    A.  In my current role?
11    Q.  Uh-huh.
12    A.  Leslie Lark, she's the director of Human
13  Resources.
14    Q.  Where does she physically report to work?
15    A.  She works remotely from home.
16    Q.  Is that because of Coronavirus?  Or is that
17  before Covid?
18         MR. HEDICAN:  I object to foundation.  Go
19  ahead.
20    Q.  (BY MR. KINNEY)  If you know.
21    A.  I'm not aware.
22    Q.  Okay.  And she's a director of Human Resources?
23    A.  Correct.
24    Q.  At any point in time during your -- has your
25  entire employment with Walmart been at the Edgerton

10

1  facility?
2    A.  It has, yes.
3    Q.  What was your first role there?
4    A.  I was an HR business partner, HRBP.
5    Q.  So, first an HR business partner?
6    A.  Uh-huh.
7    Q.  Is that a yes?
8    A.  Correct, yes.
9    Q.  And then you became HRVP, as vice president?  Or
10  was --
11    A.  No, I'm sorry.  I was a Human Resources business
12  partner.
13    Q.  Oh, BP.
14    A.  BP.
15    Q.  BP for business partner.
16    A.  Correct, Yes.
17    Q.  Okay.  Gotcha.  Thank you.
18    A.  Uh-huh.
19    Q.  How long were you a HR business partner?
20    A.  From October 2016 until approximately February
21  of 2018.
22    Q.  And then, what did -- how did your job change in
23  February of 2018?
24    A.  I became the senior manager of Human Resources.
25  So I was in charge of the Human Resources Department

11

1  within that facility.
2    Q.  Okay.  When you were an HR business partner --
3    A.  Uh-huh.
4    Q.  -- did you report to the senior manager of
5  Human Resources?
6    A.  I did, yes.
7    Q.  Okay.  And you said that Leslie Lark's job title
8  was a Director of Human Resources?
9    A.  Correct.
10    Q.  At any point in time since you've been employed
11  by Walmart, was there a director of Human Resources
12  employed at the Edgerton facility specifically?
13    A.  Yes and no.  There was the senior manager of
14  Human Resources that I replaced.  Her name was
15  Lori Chestine, was promoted to a director of Human
16  Resources and she was, for a brief moment in time,
17  located in that facility in 2018.
18    Q.  When she was briefly located inside the facility
19  at Edgerton, Kansas, was that the only facility under her
20  umbrella of Human Resources?
21    A.  No.
22    Q.  Do you know what other facilities were under her
23  umbrella?
24    A.  She had a division within the supply chain for
25  eCommerce Fulfillment Centers.  But off the top of my

12

1  head, I do not know which facilities.
2    Q.  Do you know how many facilities?
3    A.  No, I do not.
4    Q.  Okay.  So at least the highest ranking Human
5  Resources employee for the Fulfillment Center in
6  Edgerton, Kansas, that job title is senior manager of
7  Human Resources?
8    A.  Correct.
9    Q.  So, your boss, the Director of HR, Leslie Lark,
10  she's over Edgerton, but she would at least be over some
11  number of other facilities also?
12    A.  Correct.
13    Q.  So, in other words, the facility at
14  Edgerton, Kansas ultimately is subject to the authority
15  of Walmart employees outside of the Edgerton facility?
16    A.  Can you --
17         MR. HEDICAN:  I object to foundation.  Go
18  ahead.
19    A.  Can you repeat the question, please?
20    Q.  (BY MR. KINNEY)  Yeah, let me make it a little
21  more clear.  So it's part of your job as HR is helping to
22  enforce policies inside the workplace?
23    A.  Correct.
24    Q.  Payroll policies?
25    A.  Correct.

41

1    A.  That is, yes.
2    Q.  What's the third logo?
3    A.  I do not know.
4    Q.  How about the fourth logo?
5    A.  I'm guessing it's Shoes, but I do not know.
6    Q.  Just the company called Shoes?
7    A.  Dot com.
8    Q.  Okay.  How about the next one?
9    A.  I do not know.
10   Q.  And the final one?
11   A.  I'm not sure.
12   Q.  Okay.  So Exhibit 55 is a document that
13   Ms. Braxton reviewed at the same time that she reviewed
14   the other policies listed at Exhibit 54, correct?
15   A.  Yes.
16   Q.  And it has all to do with powered industrial
17   trucks at work, correct?
18   A.  I would need to review the policy to be able to
19   answer that in its entirety.
20   Q.  But is that the title of the policy?
21   A.  That is the title of the policy, yes.
22   Q.  And an industrial truck would be like a forklift
23   at work?
24   A.  It is powered industrial equipment, yes.
25   Q.  Powered industrial truck, correct?

42

1    A.  That is the terminology that they often use for
2    all powered equipment.
3    Q.  Okay.  And this was one of the policies
4    Ms. Braxton apparently reviewed and was supposed to be
5    familiar with, correct?
6    A.  Correct.
7    Q.  And does Exhibit 55, is that one of the
8    documents you relied on in signing this interrogatory
9    answer under oath that had to do with workplace injuries?
10   A.  No.
11   Q.  Okay.  I want to hand you what was previously
12   marked as Exhibit 11.  I think at the beginning of this
13   line of questioning, when I asked you which documents you
14   relied on to form your answer in the interrogatory, you
15   said the Harassment and Discrimination Policy and the
16   670e itself, correct?
17   A.  I believe so.
18   Q.  Okay.  And we've already looked at the
19   harassment policy, correct?
20   A.  Correct.
21   Q.  Harassment policy doesn't even mention workplace
22   injuries in there?
23   A.  Correct.
24   Q.  And the discrimination policy doesn't say
25   anything about failing to report a workplace injury,

43

1    correct?
2    A.  Correct.
3    Q.  I want to hand you what's been marked as
4    Exhibit 11.  So Exhibit 11 is the Form 670e, correct?
5    A.  Correct.
6    Q.  And the Form 670e, there is one bullet point on
7    that form that references, "Failure to report any known
8    injury before the end of the shift," correct?
9    A.  Yes.
10   Q.  According to this form, you see how there's a
11   list -- there's headings that says Documented Coaching,
12   Step 1, Step 2, Step -- or Step 1, then Step 3 and then
13   Termination.  Do you see that?
14   A.  I do.
15   Q.  And there is actually no Step 2 on this form,
16   correct?
17   A.  Correct.
18   Q.  So this is a Safety and Compliance Rule
19   Violation Form, correct?
20   A.  Correct.
21   Q.  It's a form that's used to give to an associate
22   after they've committed a safety violation, true?
23   A.  Not in our facility, no.
24   Q.  What do you base that on?
25   A.  We do not utilize this form for documented

44

1    coachings.
2    Q.  Well, isn't this the form that Ms. Braxton had
3    to acknowledge prior to working at a -- at Walmart?
4    A.  She did, yes.  We do not use this for coaching.
5    Q.  You don't use this for a Step 1?
6    A.  No, we do not.
7    Q.  You don't use it for Step 3?
8    A.  No.
9    Q.  So even though this form is supposed to be used,
10   Walmart just -- in Edgerton, they just decided not to
11   follow policy?
12       MR. HEDICAN:  I object to form and
13   foundation, it's argumentative.  Go ahead.
14   A.  Okay.  This is not a form that we use at our --
15   in our building --
16   Q.  (BY MR. KINNEY)  Is it a form --
17   A.  -- for coaching.
18   Q.  Is it a form that is supposed to be used for
19   safety and compliance?
20   A.  I am not a safety or compliance expert.
21   Q.  Okay.  So when you say it's a not a form we use,
22   are you talking about HR, or the whole entire facility?
23   A.  I'm talking about our facility in particular.
24   Q.  Okay.  So even the safety employees don't use
25   form 670e?

Case 2:20-cv-02287-DDC    Document 98-8    Filed 07/09/21    Page 7 of 8

Chelsea Davidson                     Braxton vs. Walmart                        4/30/2021

Appellate Case: 22-3003    Document: 010110660654    Date Filed: 03/21/2022    Page: 187

45

1      A.   I do not know if they do use it.  We do not use
2  it in HR for coaching.
3      Q.   Okay.  So is HR the only department that issues
4  coaching to employees?
5      A.   Yes.
6      Q.   If there's a policy from Walmart that mandates
7  the use of the form 670e, do you know any reason why
8  employees at Edgerton failed to follow that mandate?
9      A.   No.
10     Q.   Okay.  According to the 670e -- so this document
11  was provided to Ms. Braxton prior to her employment,
12  correct?
13     A.   Yes.
14     Q.   And you're saying, this should have formed the
15  basis for her being informed that she could be fired for
16  failure to report any known injury before the end of the
17  shift?
18     A.   Correct.
19     Q.   And your testimony here and under oath, we don't
20  even use that form in Edgerton?
21     A.   Correct.
22     Q.   How long has that been the case?
23     A.   Always.
24     Q.   Never used this form in Edgerton, ever?
25     A.   Only for acknowledgment in training of employees

46

1  on their responsibilities.
2      Q.   Okay.  So does anywhere on Exhibit 11 say that
3  an employee can be fired for failing to report a known
4  injury before the end of the shift?
5      A.   No.
6      Q.   Okay.  So the two documents that you say that
7  you relied on in forming the basis for the answer to the
8  interrogatory that you signed under oath, we've already
9  looked at those policies right now, correct?
10     A.   Correct.
11     Q.   And neither one of those policies specifically
12  informs Plaintiff that she could be fired for failing to
13  report any known injury before the end of the shift,
14  correct?
15     A.   It did not explicitly state that, correct.
16     Q.   Okay.  And what it explicitly says on the form
17  670e is that, first of all, that failure to report any
18  known injury before the end of the shift is underneath
19  Step 1, correct?
20     A.   That is correct.
21     Q.   And the note next to Step 1 says, "Any repeat of
22  the same violation within 180 calendar days will result
23  in a minimum of Step 3, up to and including,
24  termination," correct?
25     A.   Correct.

47

1      Q.   So the information on the form is actually that,
2  if an employee fails to report a known injury before the
3  end of the shift, and then they do it again, then they'll
4  either get a Step 3 or up to and including termination?
5      A.   That is correct for regular full-time
6  associates, but that is not the case for seasonal
7  associates.
8      Q.   Well, did Ms. Braxton -- when she was hired by
9  Walmart, did Ms. Braxton receive the 670e, or some other
10  form that applied to her?
11     A.   She -- she received the 670e.
12     Q.   Okay.  Did she receive any information on
13  March 20th, 2020 that said, eh, the 670e doesn't actually
14  apply to you?
15     A.   No.
16     Q.   Okay.  So on March 20th of 2020, did Walmart
17  specifically inform Plaintiff that she could be fired for
18  failing to report a known injury before the end of the
19  shift?
20     A.   Yes.
21     Q.   Where?
22     A.   In the 670e and harassment policy.
23     Q.   Where on 670e does it say you can be fired for
24  failing to report a known injury before the end of the
25  shift?

48

1      A.   It does not state that.
2      Q.   Where in the harassment policy does it say an
3  employee can be fired for failing to report a known
4  injury before the end of the shift?
5      A.   It does not say that.
6      Q.   Okay.  And yet, that's still your answer in the
7  interrogatory under oath that was provided in a case
8  filed in Federal Court in the District of Kansas?
9      A.   Yes.
10     Q.   Okay.  Is it your testimony that the only two
11  documents that you relied on in answering interrogatory
12  No. 22 was the Harassment and Discrimination Policy we've
13  already looked at and the Form 670e that we've also
14  looked at?
15     A.   No.
16     Q.   Okay.  So what other documents did you consider
17  in forming your answer to interrogatory No. 22?
18     A.   There are coaching guidelines that outline a
19  process that we use within HR within our facility --
20     Q.   Uh-huh.
21     A.   -- that outlines seasonal associates and any
22  level of coaching --
23     Q.   On exhibit --
24     A.   -- would lead to termination.
25     Q.   Were those -- were those coaching guidelines

65

1    **A.  Essentially.**
2    Q.  Okay.
3         MR. KINNEY:  Let's take a break.
4         THE VIDEOGRAPHER:  Stand by, please.
5    We're going off the record.  The time now is
6    approximately 3:13 p.m.
7         (Recess taken.)
8         THE VIDEOGRAPHER:  We are back on the
9    record.  The time now is approximately 3:23 p.m.  Would
10   you, please, proceed.
11   Q.  (BY MR. KINNEY)  Ms. Davidson, are you aware of
12   any discipline that was given to any employee other than
13   Ms. Braxton in relation to Walmart finding out that
14   Ms. Braxton was an injured worker?
15   **A.  No.**
16   Q.  Are you aware of Ammie Wilbur receiving any
17   discipline in relation to the situation with
18   Janell Braxton?
19   **A.  I am not aware of it, no.**
20   Q.  And if she was subject to discipline, you would
21   be -- you'd have access to that information, correct?
22   **A.  What is Ammie Wilbur's title?**
23   Q.  Operations Lead.
24   **A.  Operations lead?  Is she part of the safety org?**
25   Q.  It's my understanding that she was Ms. Braxton's

66

1    direct supervisor, and she's part of operations, yes.
2    **A.  Okay.  Yes, I would -- it would come through my**
3    **HR organization, yeah.**
4    Q.  Okay.  So HR have authority to issue discipline
5    for people involved in operations?
6    **A.  Operations will discipline their own associates**
7    **within them, but they oftentimes consult with us to**
8    **ensure we're being fair and consistent.**
9    Q.  Okay.  Is HR consulted when it comes to
10   discipline issued toward safety employees?
11   **A.  We are not, typically.  They report outside of**
12   **the building through a different structure.**
13   Q.  Okay.  So whether Mark Tuazon, a safety lead --
14   **A.  Uh-huh.**
15   Q.   -- received any discipline in relation to
16   Ms. Braxton becoming an injured worker, that would be a
17   better question for Quincy Usry than you?
18   **A.  It would.**
19   Q.  Okay.  How about for -- but for an operations
20   lead --
21   **A.  Uh-huh.**
22   Q.   -- like Ammie Wilbur, typically you would be
23   aware of that?
24   **A.  Yes.**
25   Q.  And are you aware of Ms. Wilbur receiving any

67

1    discipline in relation to Ms. Braxton's status as an
2    injured worker?
3    **A.  I have not looked it up, but I'm not aware of**
4    **any.**
5    Q.  How about David Whitenack during his employment?
6    **A.  I do not believe he had any coachings during his**
7    **employment.**
8    Q.  Okay.  Or any other discipline?
9    **A.  For David Whitenack?**
10   Q.  Right --
11   **A.  Not --**
12   Q.   -- in relation to Janell Braxton?
13   **A.  No, not that I'm aware.**
14   Q.  So can you identify any other employee, other
15   than Janell Braxton, who was disciplined in any way in
16   relation to Ms. Braxton becoming an injured worker, other
17   than Ms. Braxton?
18   **A.  Not that I'm aware of, no.**
19        MR. KINNEY:  I have no more questions for
20   you.
21        MR. HEDICAN:  We'll have you read and sign
22   the deposition.
23        THE WITNESS:  Okay.
24        MR. HEDICAN:  But you're done.
25        THE VIDEOGRAPHER:  Stand by, please.

68

1    We're going off the record.  The time now is
2    approximately 3:25 p.m.
3         (Off the record at 3:25 p.m.)
4              # # # # #
5
6    ____  I hereby certify that I have read my deposition
7          and that NO CHANGES are being made.
8          I hereby certify that the attached changes have
9          been made to my deposition.
10
11   _____
12   CHELSEA DAVIDSON
13
14
15        Subscribed and sworn to before me this _____
16   day of _____, 2021.
17
18   _____
19   NOTARY PUBLIC
20
21   My commission expires:
22   _____
23
24   Braxton vs. Walmart
25   Taken by Ken Kinney on April 30, 2021

**App-II**
**188**
CRAWFORD REPORTING -- CrawfordReporting@gmail.com      **EXHIBIT 8**

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

JANELL BRAXTON )
     *Plaintiff* )
  vs. )   Case No. 2:20-cv-02287-DDC-GEB
         )
WALMART INC. )
     *Defendant* )

## PLAINTIFF'S RESPONSE TO
## <u>DEFENDANT'S MOTION FOR SUMMARY JUDGMENT</u>

### EXHIBIT 9

Walmart Request for Admission Answers

**EXHIBIT 9**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

_____

JANELL BRAXTON,

                Plaintiff,

v.

WALMART INC.,

                Defendant.

_____

Case No. 2:20-cv-02287

**DEFENDANT'S ANSWERS TO**
**PLAINTIFF'S FIRST SET OF**
**REQUESTS FOR ADMISSIONS**

## **REQUESTS**

1.     Walmart employed Janell Braxton from March 23, 2020 until April 14, 2020.

      **ADMITTED:** _____X_____        **DENIED:** _____

2.     Prior to April 14, 2020, Walmart never issued Janell Braxton any discipline, reprimands, or disciplinary coaching pursuant to company policy.

      **ADMITTED:** _____X_____        **DENIED:** _____

3.     Walmart employed Janell Braxton as a "QC Singles Seasonal Associate" throughout her employment.

      **ADMITTED:** _____X_____        **DENIED:** _____

4.     At approximately 1:00 AM on April 13, 2020, Janell Braxton began experiencing pain in her left wrist.

      **ADMITTED:** _____        **DENIED:** _____X_____

5.     At approximately 1:00 AM on April 13, 2020, Janell Braxton sustained an injury to her left wrist.

      **ADMITTED:** _____        **DENIED:** _____X_____

1

**EXHIBIT 9**

6.   Between 1:00 AM and 5:00 AM on April 13, 2020, Janell Braxton's direct supervisor was Ammie Wilbur.

ADMITTED: _____X_____          DENIED: _____

7.   On April 14, 2020, Walmart instructed Janell Braxton to fill out a "Statement Form" regarding her work injury.

ADMITTED: _____X_____          DENIED: _____

8.   The "Statement Form" Walmart asked Janell Braxton to fill out and sign said "Jet.com strictly prohibits retaliation for reporting a concern or cooperating in an investigation."

ADMITTED: _____X_____          DENIED: _____

9.   On April 14, 2020, Janell Braxton filled out the "Statement Form" which included a description of the pain in her wrists and provided the Statement Form to Walmart.

ADMITTED: _____X_____          DENIED: _____

10.   Janell Braxton filled out the "Statement Form" between 10:55 PM and 11:32 PM on April 14, 2020.

ADMITTED: _____X_____          DENIED: _____

11.   Walmart fired Janell Braxton between 10:55 PM and 11:32 PM on April 14, 2020.

ADMITTED: _____X_____          DENIED: _____

12.   "Thus, if Plaintiff had not reported her workplace injury, then the circumstances and basis for her termination would not have existed, and Walmart would not have terminated her employment 'as it did.'"[1]

---

[1] *Quoting <u>Defendant's Brief in Opposition to Motion for Partial Summary Judgment</u>* (Doc.55), at 4 to 5.

2

App-II

191

**EXHIBIT 9**

ADMITTED: _____          DENIED: _____X_____

13.     Under Kansas law, an employer must report an employee's workplace injury

to the state of Kansas within 28 days of learning about it.

**Walmart objects to this Request on grounds that it calls for a purely legal conclusion.  *See Utley v. Wray*, 2007 WL 2703094, \*3 (D. Kan. Sept. 14, 2007) ("Although Rule 36 allows for requests applying law to fact, one party cannot demand that the other party admit the truth of a legal conclusion."); *Vasquez v. Am. Cas. Co. of Reading, PA*, 2016 WL 7199100, \*1 (D.N.M. Mar. 11, 2016).  Walmart additionally objects insofar as this Request does not seek information relevant to Plaintiff's claim, or information likely to lead to the discovery of relevant information, because Walmart's compliance with Kansas' workers' compensation reporting requirements has no bearing on Plaintiff's assertion of workers' compensation retaliation.  For the same reason, the Request is not proportional to the needs of the case.**

**Walmart additionally objects insofar as Plaintiff has not laid a foundation establishing that her particular injury is subject to Kansas' purported reporting requirement.  Finally, the Request is vague and ambiguous, insofar as its use of the term "workplace injury" is undefined and unclear.  Walmart additionally notes that Kansas law requires employers to report workplace "accidents," not "injuries."  Kan. Rev. Stat. § 33-557. Similarly, Kansas law limits the reporting requirement to accidents that "are sufficient wholly or partially to incapacitate the person injured from labor or service for more than the remainder of the day, shift or turn on which such injuries were sustained."  *Id.*  Subject to and without waiving the foregoing, denied.**

ADMITTED: _____          DENIED: _____

14.     Walmart never reported Janell Braxton's work injury to the state of Kansas.

**Walmart objects to this Request on grounds that it Request does not seek information relevant to Plaintiff's claim, or information likely to lead to the discovery of relevant information, because Walmart's compliance with Kansas' workers' compensation reporting requirements has no bearing on Plaintiff's assertion of workers' compensation retaliation.  For the same reason, the Request is not proportional to the needs of the case.**

**Walmart additionally objects insofar as Plaintiff has not laid a foundation establishing that her particular injury is subject to Kansas' purported reporting requirement.  Finally, the Request is vague and ambiguous, insofar as its use of the term "workplace injury" is undefined and unclear.  Walmart additionally notes that Kansas law requires employers to report workplace "accidents," not "injuries."  Kan. Rev. Stat. § 33-557. Similarly, Kansas law limits the reporting requirement to accidents that "are**

**EXHIBIT 9**

**sufficient wholly or partially to incapacitate the person injured from labor or service for more than the remainder of the day, shift or turn on which such injuries were sustained."** *Id.* **Subject to and without waiving the foregoing, Walmart admits that it did not file a report with the State of Kansas concerning the injury Plaintiff suffered in connection with this lawsuit, but denies that it was obligated to do so.**

ADMITTED: _____          DENIED: _____

Dated this 29th day of April 2021.

WALMART INC. Defendant,

By:   /s/ Christopher R. Hedican_____
        Christopher R. Hedican (KS #14542)
of     BAIRD HOLM LLP
        1700 Farnam St, Ste 1500
        Omaha, NE  68102-2068
        Phone: 402-344-0500
        Facsimile:  402-344-0588
        chedican@bairdholm.com

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the above and foregoing document was sent via email this 29th day of April 2021 to the following:

Thomas Ralston
Kenneth Kinney

/s/ Christopher R. Hedican_____

EXHIBIT 9

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

JANELL BRAXTON )
            *Plaintiff* )
    vs. )        Case No. 2:20-cv-02287-DDC-GEB
            )
WALMART INC. )
            *Defendant* )

**PLAINTIFF'S RESPONSE TO**
**<u>DEFENDANT'S MOTION FOR SUMMARY JUDGMENT</u>**

**EXHIBIT 10**

Jetflex Discipline Guide

Deposition Exhibit 37

**EXHIBIT 10**



# JetFlex Disciplinary Action Guidelines

The following guidelines exist to help managers coach up or coach out underperforming associates.

## *When to partner and with whom to partner...*

- **HR Takes the Lead:** Ethics concerns (including sexual harassment, discrimination, threats, etc.)
- **Partner with HR:** Final warnings, terminations, safety incidents (also partner with CSAP)
- **Loop in HR:** Culture/attitude corrective conversations, all Lead corrective actions, corrective action conversations gone wrong, safety incidents (in house)
- **You've Got This:** Performance conversations First Written and employee disputes
- **3PL/Onsite Manager:** All contingent workforce concerns

### *Process*

- A minimum of two Quick Coach conversations should occur before releasing a JetFlex associate for performance or conduct
- If the associate's conduct is severe enough for a written coaching, the JetFlex associate should be released immediately



**EXHIBIT**

**37**

**WM_Braxton_000134**

**EXHIBIT 10**

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

JANELL BRAXTON )
*Plaintiff* )
vs. ) Case No. 2:20-cv-02287-DDC-GEB
)
WALMART INC. )
*Defendant* )

**PLAINTIFF'S RESPONSE TO
<u>DEFENDANT'S MOTION FOR SUMMARY JUDGMENT</u>**

**EXHIBIT 11**

Dot Com Safety Manual

Deposition Exhibit 51

11-0901



# Dot Com Safety
## Incident Investigation & Reporting (WC/OSHA)

## Purpose

To provide guidance to the eCommerce Fulfillment Center for establishing an investigative system to identify root causes to incidents to prevent reoccurrence and reporting incidents to meet Workers Compensation (WC) and Occupational Safety & Health Administration (OSHA) Recordkeeping Guidelines.

## Resources

| Links | Resources |
|---|---|
| **Procedures** | |
| eEP21 | Fatalities and Serious Injury |
| | Alcohol and Drug Free Workplace Policy |
| 19-0902 | Associate Work Related Injury Management Guidelines |
| **Forms** | |
| | Physician Work Status Report |
| | Associate Incident Report |
| | Witness Statement |
| | Release of Medical Information Authorization |
| | Temporary Alternative Duty Assignment |
| WMW-670e | eCommerce Safety and Compliance Rule Violation form |
| WMW-738e | eCommerce Safety Incident Investigation form |
| | OSHA Form 300 Log of Work-Related Injuries and Illnesses |
| | OSHA Form 300A Summary of Work-Related Injuries and Illnesses |
| | OSHA Form 301 Injuries and Illnesses Incident Report |
| | OSHA 300 Form Recordkeeping Guidebook |
| | OSHA Inspection Report |
| | Regulatory & Compliance Visits – Logistics |
| | Work > Operations > Compliance > OSHA |
| | OSHA Notification Checklist |
| **Items Needed** | |
| | OSHA Poster (Job Safety and Health Protection) |
| | OSHA State Specific Injury Reporting Requirements |
| | State Specific Required Forms |
| | Incident Reporting System |
| | Associate Incident Report or the First Report of Injury if required by state. Refer to the CMI – Claims Management Inc. site to determine if, and which, First Report of Injury is necessary for your state. |
| | Monthly Injury Claim Reconiliation Log |

**PLAINTIFF'S EXHIBIT**

**5l**

## Procedures

**Definitions:**
- **Near Miss**- Any unexpected, unplanned, or anomalous event or series of events that occurs and does not result in an injury or property damage but creates a situation in which the risk of injury is significantly elevated.
- **Incident**- Any unexpected, unplanned, or abnormal event or series of events that occurs and does result in an injury, Powered Industrial Truck (PIT) event and/or property damage but creates a situation in which the risk of injury is significantly elevated.

CONFIDENTIAL;
SUBJECT TO PROTECTIVE ORDER

**App-II**
**197**

**EXHIBIT 11**
**WM_Braxton_000195**

- **Injury/Illness-** An injury or illness is an abnormal condition or disorder. Injuries include cases such as, but not limited to, a cut, fracture, sprain, or amputation. Illnesses include both acute and chronic illnesses, such as, but not limited to, a skin disease, respiratory disorder, or poisoning. [29 CFR 1904.46]
- **Non-Medical Injury-** Non-medical injuries refer to minor injuries that do not require treatment by a licensed health care professional.
- **OSHA Recordable Injury-** An injury or illness that results in death, days away from work, restricted work or transfer to another job, medical treatment beyond first aid, or loss of consciousness. [29 CFR 1904.7]
- **Medically Treated Injury-** Medically treated injuries refer to injuries that require treatment by a licensed medical practitioner to treat and mitigate a disease or disorder. Medical treatment does not include visits to a licensed health care professional solely for observation, counseling, diagnostic procedures or first aid.
- **Lost Time Injury-** Lost time injuries refer to injuries that cause the associate to be off work beyond the day of the accident.
- **Root Cause-** The underlying reason(s) why unsafe conditions exist or if a procedure or safety rule was not followed in a workplace. Root causes generally reflect management, design, planning, organizational or operational failings (e.g., a damaged guard had not been repaired; failure to use the guard was routinely overlooked by supervisors to ensure the speed of production).
- **First Aid-** The following treatments are considered "first aid" and are therefore not considered OSHA Recordable. Notations in parenthesis provide more information about what is considered medical treatment and must be recorded on the 300 log:
    - Using a nonprescription medication at nonprescription strength (for medications available in both prescription and non-prescription form, a recommendation by a physician or other licensed health care professional to use a non-prescription medication at prescription strength is considered medical treatment for record keeping purposes).
    - Administering tetanus immunizations (other immunizations, such as Hepatitis B vaccine or rabies vaccine, are considered medical treatment).
    - Cleaning, flushing or soaking wounds on the surface of the skin.
    - Using wound coverings such as bandages, Band-Aids, gauze pads, etc.; or using butterfly bandages or Steri-Strips (other wound closing devices such as sutures, glues, staples, etc. are considered medical treatment).
    - Using hot or cold therapy.
    - Using any non-rigid means of support, such as elastic bandages, wraps, non-rigid back belts, etc. (devices with rigid stays or other systems designed to immobilize parts of the body are considered medical treatment for record keeping purposes).
    - Using temporary immobilization devices while transporting an accident victim (e.g., splints, slings, neck collars, back boards, etc.).
    - Drilling of a fingernail or toenail to relieve pressure, or draining fluid from a blister.
    - Using eye patches.
    - Removing foreign bodies from the eye using only irrigation or a cotton swab.
    - Removing splinters or foreign material from areas other than the eye by irrigation, tweezers, cotton swabs or other simple means.
    - Using finger guards.
    - Using massages (physical therapy or chiropractic treatment are considered medical treatment for recordkeeping purposes).
    - Drinking fluids for relief of heat stress.
    - Use of a liquid bandage.
- **Medcor Professional/ On-site Clinic-** In selected Walmart eCommerce facilities, Medcor is our contracted on-site health care partners responsible for:
    - Providing immediate first aid care for associate injuries and illnesses.
    - Managing WC and OSHA Recordkeeping programs under the supervision of Human Resources and Compliance, Safety, & Asset Protection (CSAP) Management.
    - Assisting facility management in identifying unsafe behaviors, injury incident trends, and potential hazards in the workplace.
    - Training and Certification of the Serious Injury Response Team (SIRT).

CONFIDENTIAL;
SUBJECT TO PROTECTIVE ORDER

**App-II
198**

**EXHIBIT 11**
WM_Braxton_000196

o   Providing Hepatitis B Vaccinations for associates in High Risk Roles.

**Notification of Injury Incident**

Associates involved in an incident will report it to their manager immediately.  Failure to do so may result in disciplinary action (Refer to the WMW-670e eCommerce Safety and Compliance Rule Violation form). If needed, call a member of the Serious Injury Response Team (SIRT) OR the Medcor On-site Professional (if applicable) to provide first aid care to the associate. In the event the injury is serious in nature, contact Emergency Medical services immediately.

**Responding to an Incident**

1) The manager will immediately evaluate the scene of the incident by first checking on associates involved for potential injury(s) and then scanning the immediate area for hazards that need addressed.  If an injury has occurred as the result of an incident and it appears serious in nature the manager, CSAP, SIRT Member and/or the Medcor Professional (if applicable), will contact Emergency Medical Services. SIRT and/or the Medcor Professional (if applicable) renders first aid as necessary until local Emergency Responders arrive. In the event an incident does not require an ambulance but does require medical treatment, the associate's manager and the Medcor Professional (if applicable) and/or a selected member of management transports the associate to the appropriate medical facility for treatment. Refer to the section titled, "Non-Emergent Transportation of an Injured Associate to Health Care Provider." If the injury does not require medical treatment, proceed to Step 2.  If the incident does not involve an injury, please proceed to Step 3.

   **Note:** For post-accident drug testing follow the "Post-Accident Screening – Field Supply Chain Only" section located in the Alcohol & Drug Free Workplace Policy. Some states/cities do not allow post-accident drug testing or have specific conditions that must be met. Refer to the Corporate Policy Alcohol and Drug Free Workplace Policy or call Corporate Drug Screening at 479-273-4355 for additional information.

2) If First Aid Treatment is required, the associate's manager will contact a member of SIRT or escort the associate to the on-site Medcor Clinic (if applicable).

   **Note:** If the clinic is located on a workplace campus environment (i.e. Sortable and Non- Sortable Facilities in close proximity) a member of management will transport the injured associate to the on-campus clinic. During the triage of an associate's injury, by a Medcor Professional, management and other individuals will exit the clinic.

3) The associate's manager will complete a thorough investigation of the incident and document utilizing the **WMW-738 eCommerce Safety Incident Investigation** form. Please Refer to the "Incident Investigation" section below.

   a. At the facility director's discretion, operator licenses of those involved in PIT incidents may be suspended until the outcome of the investigation.

4) The associate's manager will have the associate involved in the incident and/or any associates that witnessed the incident complete a **Witness Statement.**

5) If an injury has occurred:

   a. A member of Human Resources, CSAP Management, or the Medcor Professional (if applicable) completes the **First Report of Injury Form** if required by the state. These forms vary according to each state's requirements. Contact your claims representative for assistance.

   b. A member of Human Resources, CSAP Management, or the Medcor Professional (if applicable) will have the associate complete, sign, and date the **Release of Medical Information Authorization** and the **Associate Incident Report**. Note: A member of management or the Medcor Professional (if applicable) must sign the bottom portion of this form.

   c. A member of Human Resources, CSAP Management, and/or a designated member of management will record the incident in the **Incident Reporting System (IRS)** within 24 hours of notification of injury. To ensure timely entry in

CONFIDENTIAL;
SUBJECT TO PROTECTIVE ORDER

**EXHIBIT 11**
WM_Braxton_000197

the Incident Reporting System, all Human Resources associates, CSAP Management, and other designated managers must have access to enter claims information into IRS. Late reporting in some states can result in fines.

   d. Note: If an associate reports a non-medical injury, then later requests medical treatment or informs management that he/she has already sought medical treatment, the facility will then notify the Claims Administrator of the change in the status of the claim.

6) If an injured associate seeks medical attention (i.e. at the facilities designated medical provider):

   a. A member of Human Resources, CSAP, or the Medcor professional (if applicable), completes the **Physician Work Status Report (PWSR)**. A member of Management or the Medcor Professional will provide and then receive the **PWSR** from the Medical Provider.

   b. Upon return, Human Resources and the Medcor Professional (if applicable) reviews the information on the **PWSR** to ensure compliance with any work restrictions or time off as stated by the Health Care Provider.

   c. If the Health Care Provider recommends that the associate be transferred to another job and/or restricts the associates duties due to the injury (placed on TAD), the injury should be recorded on the OSHA 300 Log. Whenever additional information regarding work restrictions or days away from work is received from a medical provider, the facility has seven days upon receipt to update the OSHA 300 Log. A member of Human Resources, or CSAP Management will ensure the OSHA 300 Log is updated with the appropriate information.

   d. The associate's manager and the Medcor Professional (if applicable) will follow-up with the injured associate on a regular basis to check on their progress and monitor compliance with any restricted duty (TAD).

   e. Note: Refer to the section below titled "Administrative – WC Files" guideline regarding the recordkeeping of the above-mentioned forms and paperwork.

7) CSAP will record the incident in the **LSI: AP Logging System; Event Reporting (LSI)** within 24 hours of incident (or incident status change).

**Incident Investigation**

The purpose of the investigation is to provide an effective means of determining the root cause(s) of an incident and allowing corrective action to be taken to prevent similar occurrences in the future. It is a systematic method for determining what happened, how it happened, why it happened, and most importantly, what must be done to prevent similar injuries/incidents from occurring in the future. Only by answering these questions can safety be enhanced, and injuries/incidents reduced within the facility.

A thorough investigation of the incident will be completed as soon as possible. The associate's manager is responsible for completing investigation and documenting the results of the investigation on the **WMW-738e eCommerce Safety Incident Investigation** form. The manager may consider using additional resources, maintenance, engineering, project management, CSAP, the Medcor Professional, etc., to assist in conducting a thorough investigation.  Also, the manager will converse with the associate and obtain all necessary information to compete the investigation forms. If a safety or compliance violation occurred, the manager issues the appropriate per the WMW-670e eCommerce Safety and Compliance Rule Violation form. The manager provides the completed investigation to CSAP.  A member of CSAP Management will review the investigation with the facility's senior leadership staff.

An investigation will be considered thorough based on the following items being included, or at the very least, pursued (Note: This list is not all inclusive, but should be used as a guide to determine the investigative path.):

- Video/Photo Reenactment – This should include the associate involved in the incident as soon as possible by the investigating manager and the involved parties.
- Closed Circuit Television (CCTV) Review- Contact CSAP Management to see if video of the incident is available.

CONFIDENTIAL;
SUBJECT TO PROTECTIVE ORDER

App-II
200

**EXHIBIT 11**
WM_Braxton_000198

- Witness Statement(s) – Upon retrieval of statement the investigating manager should ask follow-up questions, address any concerns, and consult with the associate for any other relevant information.
- WMS/THOR/ANT/MANHATTAN Research – These tools should be consulted to determine relevant location, SKU's involved, DIMS, Weight, etc.
- 5-Why Analysis – Ask Why until you have determined a systematic root cause that can be used to Remove, Guard, or Educate the team on the hazard identified.
- Translation Services – Google Translate, Luna, etc.
- Company Procedure Review
- Maintenance Record/Log – Equipment Preventative Maintenance History
- Learning Documents/Acknowledgement
- Measurements – Distance, time, size, etc.
- Determining Corrective Actions- Corrective actions must address root cause to be effective. Think Remove- Guard- Educate. Can the hazard be removed completely? If not, can the hazard be guarded? If not, can the hazard be avoided through training? Once corrective actions have determined, completion dates must be provided.

**Incident Investigation Paperwork Flow**
1) After completing the initial investigation, the manager submits the completed **WMW-738e eCommerce Safety Incident Investigation** form and applicable documentation (i.e. Witness Statements) to CSAP.
2) Unsafe behaviors/conditions must be corrected as soon as possible.
   a. Refer to WMW-670e eCommerce Safety and Compliance Rule Violations form for guidance.
3) CSAP will ensure the investigation is appropriately logged in LSI: AP Logging System.
4) CSAP Management ensures the **WMW-738 eCommerce Safety Incident Investigation** form is reviewed timely with the facility's senior staff.
5) The facility's senior staff will review the investigation as soon as possible. The manager responsible for conducting the investigation should be present (if possible) to provide necessary information. The Senior Staff will determine:
   a. If the appropriate root cause analysis has been performed.
   b. If corrective actions are appropriate to prevent a similar occurrence.
   c. If the associate committed an unsafe act according to the **WMW-670e eCommerce Safety and Compliance Rule Violation** form.
   d. Appropriate accountability is selected for the associate in conjunction with the 20-0121 Performance Tracking – Hourly Field Supply Chain procedure.
   e. The appropriate refresher training will be administered for Powered Industrial Truck (PIT) related incidents. The complexity of the refresher training, as determined by the senior staff, is dictated by the severity or frequency of the accident. Refer to 11-1302 Power Equipment/Yard Tractor Safety procedure for additional information.
6) After the review of the investigation by the senior staff, the manager will inform the associate of the **WMW-738 eCommerce Safety Incident Investigation** form investigation results, obtain the signature of acknowledgement from the associate. sign the form to acknowledge the results, administer any accountability, and coordinate the completion of any refresher training (if applicable).
7) The manager will return the signed **WMW-738 eCommerce Safety Incident Investigation** form and refresher training (if applicable) to CSAP for recordkeeping.
8) CSAP Management will ensure all forms, investigative follow-up, corrective actions, accountability (if applicable), and training is completed.
   a. **Note:** CSAP Management will be responsible for verifying the quality and timeliness of the Incident Investigation process.

**Actively Caring Injury Contacts**
The associate's manager (or a designated member of management) perform daily follow-up conversations with injured associates on each scheduled work day following the incident. This is an opportunity to "actively care" for the associate to see if additional aid is necessary. At a minimum, daily

CONFIDENTIAL;
SUBJECT TO PROTECTIVE ORDER

**App-II
201**

**EXHIBIT 11**

WM_Braxton_000199

contacts will occur for 7 work days following injury.  These contacts are documented on the **WMW-738e eCommerce Safety Incident Investigation** form.

**Administrative- WC Files**
Human Resources OR the Medcor Professional (if applicable) under the supervision of Human Resources will manage all paperwork associated with Workers Compensation claims.

- Copies of all forms are sent to the appropriate Claims Handling Office (refer to the CMI site located online to determine the appropriate office).
- Place forms and information pertaining to a particular Workers Compensation claim in a reversible File Folder and follow the instructions on the folder.
- Set up a filing system to maintain the reversible file folders. Do not file Workers Compensation files in the associate's Personnel folder.
- Ensuring claims are properly submitted on the Incident Reporting System (WIRE).
- Provide status updates to the appropriate Claims Handling Office as specific changes take place (e.g. injured associate's placement in another position, associate's non-compliance with Health Care Provider appointments, etc.).
- Order all forms necessary to handle associate claims (refer to the CMI site located online for information concerning all necessary forms).
- The following items may be printed from the CMI Site:
  - Workers Compensation Request for Medical Care
  - Associate Incident Report
  - Physician's Work Status Report
  - Release of Medical Information Authorization
  - Temporary Alternative Duty Assignment
  - Witness Statement
  - OSHA Form 300
  - OSHA Form 300A
  - OSHA Form 301
  - Contact your CMI case claims representative for the Preferred Provider Posters.

**First Aid**
If necessary, a SIRT member or the Medcor On-site Professional (if applicable) will provide basic first aid. Refer to the definition of "First Aid" above.

First aid treatment is considered one-time treatment of minor injuries that do not involve loss of consciousness, restriction of work or motion, or transfer to another job.
- **Note:** Do not record first aid treatment on the OSHA 300 Log.

The First Aid Supplies, AEDs, and the First Aid Room is maintained by the Medcor On-site Professionals (if applicable) under the supervision of CSAP Management.  If the facility does not have contracted services with Medcor, this is managed by CSAP Management.

**Temporary Alternative Duty (TAD) Program**
The goal of the TAD Program is to transition associates from a verified/confirmed work-related injury to a return-to-work release.

***CMI – TAD Guidelines (also applies to other Workers Compensation administrators)***
All work injuries, including Medical-Only, OSHA Recordable, TAD & Lost Time injuries,  are managed by CMI.

CMI will:
- Require a written medical treatment plan from the Health Care Provider.
- Follow-up with the Health Care Provider every two weeks or after each appointment.
- Evaluate claims at 30/60/90 days.
- Provide a monthly status report on all claims.
- Name one contact person to resolve issues.

CONFIDENTIAL;
SUBJECT TO PROTECTIVE ORDER

**App-II
202**

**EXHIBIT 11**

WM_Braxton_000200

*eCommerce Fulfillment Centers – TAD Guidelines*
All associates with verified/confirmed injuries who have been released to modified duty are placed on TAD for up to 90 calendar days per claim. Ninety calendar days may not necessarily be consecutive days.

- Note: Vacation, sick time, personal time, and VTO days are included in the 90 calendar-day window. Time on an approved LOA for a non-work related reason is also included in the 90 calendar-day window. Time on an approved LOA for a work-related injury is not to be counted against the 90 calendar days allowed for TAD.
- Example 1: Shelia is injured and is placed on TAD May 1st of this year. Shelia's TAD expires on July 30th. At that time, if she is unable to return to regular work, the Regional Human Resource Manager should be notified.
- Example 2: Josh is injured and is placed on TAD May 1st of this year. He is scheduled for surgery on May 5th and is not able to return to work, according to his doctor's orders, until May 12th. The 90- calendar day window starts May 1st, but stops during the week John is off for surgery. It resumes counting once John returns on the 12th with his TAD assignment.

After 90 calendar days on the TAD Program, the facility has the option to discontinue TAD and place the associate on a Leave of Absence (LOA) until they have a return to work release. It is important to review each situation that reaches the 90-day point to maintain consistency in the application of this program.

CMI must be contacted before a TAD associate is placed on an LOA (at any point in time within the 90 calendar days) to determine if a release date has been set. If the associate has already been on TAD for 90 calendar days, but their release date is anticipated to be within the next 30 days, the TAD Program can be extended up to an additional 30 calendar days, for a maximum of 120 calendar day's total. Any extension beyond 90 days requires Divisional Human Resource Director approval.

If at any time a facility places a TAD associate on an LOA due to the work-related injury, the associate's injury becomes a lost-time accident for OSHA reporting purposes.

Hours worked by an associate on the TAD Program should basically reflect those worked by the department to which they are assigned.

The Human Resources Manager is responsible for managing the execution of the TAD Program, including contacts with the associate, follow-up with CMI on case management, and utilization of the TAD Tracking System on Global Reporting Tool (GRT).

**Lost Time Injuries**
When the facility receives notice that an associate is going be placed off work by a Health Care Provider, they notify the appropriate Claims Handling Office.

In the event the associate is taken off of work due to the injury, Human Resources and/or management will designate the absence as a FMLA-LOA, notify the associate of the FMLA designation, and contact the associate on a regular basis until the associate returns to work.

**Non-Emergent Transportation of an Injured Associate to a Health Care Provider**
The injured associate must be escorted to the initial visit to the Health Care Provider by the associate's manager and/or a designated member of management and the Medcor Professional (if applicable). The associate will be escorted to the physician in the facility's company vehicle. If the vehicle is unavailable, the manager may elect to escort the associate (and Medcor Professional) in his/her personal vehicle. However, this is at the discretion of the manager. Otherwise, if the company vehicle is not available, the LYFT ride share service can be utilized. The Administrative Assistant will ensure the facility has an account with this approved vendor.

- **Note:** Medcor Professionals are unable to operate company owned vehicles. Additionally, they are prohibited from escorting an associate in their own personal vehicle. Therefore, the following methods are acceptable forms of transportation for the Medcor professional and injured associate.

CONFIDENTIAL;
SUBJECT TO PROTECTIVE ORDER

**App-II
203**

**EXHIBIT 11**

WM_Braxton_000201

- An associate or manager authorized to operate the company vehicle may transport the Medcor professional and injured associate in the approved company vehicle.
- An associate or manager authorized to operate the company vehicle may transport the injured associate in the approved company vehicle and the Medcor professional may report to the health care provider by using his/her own personal vehicle.

**Pay for First Visit to Health Care Provider**
The following applies to the first visit to the Health Care Provider only, whether medical attention is sought on the date of the injury or at a later date.
- An associate who is injured within the first half of their shift will receive pay for half of their scheduled hours.
- An associate who is injured in the second half of their shift will receive pay for all of their scheduled hours.
- An associate is not paid for time off for follow-up Health Care Provider visits.

**Subsequent Visits to the Health Care Provider**
The associate schedules any necessary return visits to receive further medical treatment and notifies the facility of any such appointments and the status of their injury following each appointment. It is the associate's responsibility to provide proof of continued disability from their Health Care Provider. The injured associate is responsible for transportation to all follow-up medical visits.

**Denied Claims**
If the injury is deemed not work-related by the Health Care Provider, contact the claims representative to discuss the WC claim immediately.  Contact a member and the Home Office Environmental Health & Safety (EHS) team immediately for guidance on OSHA Recordkeeping (300 Log). All communication to the claims representative and Home Office EHS team member regarding the denied claim will be kept in the WC file.

**Incident Reporting System- WC**
Submit claims in the Incident Reporting System. Follow the guidelines below when entering an incident into the system:
- All associate injuries regardless of medical attention are to be keyed into the Incident Reporting System (IRS) within 24 hours of notification of the injury.
- If entering a claim with medical treatment:
    o Reporting must occur within 24 hours of the request for medical treatment by a Health Care Provider. If an associate requests medical treatment on Saturday and it is not keyed until Monday, it is considered a late report and can result in fines in some states. Make sure that someone is trained to handle this task on the weekend schedule.
    o The "date management was informed that medical treatment was requested or sought for the work injury" field (under the header Medical Contact Information section) is how a late claim is identified. It is important to complete this field by entering the date the associate notified management that he/she requests treatment or has already sought treatment for a work related injury.  This may not necessarily be the date the injury occurred or the date they sought medical treatment, if the associate sought medical treatment on their own.
    o The Initial Treatment field must be completed before you can submit the form. Enter the most current information available at the time the associate reports the treatment. If, at a later date, it is found this information was entered incorrectly, contact your claims representative for assistance.
- Review all information on the incident report before submitting the form. Once submitted this form cannot be updated or revised. If you submit the form with incorrect information, contact your claims representative for assistance.

Contact your claims representative or your Divisional Human Resource Manager for additional assistance.

CONFIDENTIAL;
SUBJECT TO PROTECTIVE ORDER

**EXHIBIT 11**
WM_Braxton_000202

**Fraudulent Claims**

If the facility has evidence of a fraudulent Workers Compensation claim, the following steps should be followed:

- Communication should be made through the Claims Handling Office Manager. This allows a timely review of all evidence such as witness statements, medical documents, etc.
- If a facility suspects a critical event should be video recorded through a third party investigator, they should request this through the Claims Handling Office Manager.
- At no time should on-site personnel video any outside events regarding a Workers Compensation case without Home Office Legal, Divisional Vice President, and Divisional Compliance, Safety, Asset Protection Sr. Manager (CSAP) approval.

**Monthly Claims Conference Calls**

Each facility should hold a monthly conference call with their Claims Office to include, at a minimum the Medcor Professional (if applicable) and a member HR & CSAP Management. The facility General Manager/ Director of Operations should participate in the call and/or designate a team member to take notes of the discussion for him/her.

- During the call all claims should be discussed to a degree that all participants fully understand current charges.
- The following questions should be used to guide the facility through the conference calls.
  - When the injured associate's was last medical visit and were restrictions given?
  - If the associate has not returned to work, when do you anticipate they will return?
  - If the associate returns to work, how long do you anticipate they will remain on Temporary Alternative Duty (TAD)?
  - When do you believe the associate will get a full duty release?
  - When is the associate's next medical visit?
  - When do you anticipate the claim being closed?

Remember that Workers Compensation laws can be complicated and the Claims Adjustors have experience and background in this arena. All conference call questions should be directed in a manner that is mutually beneficial to all concerned parties. Though we may not always agree with the direction the claim may be taking, often the direction is required by state laws or regulations.

**Monthly Injury Claim Reconciliation Log**

Each month, CSAP Management will conduct a reconciliation of injury incidents using the **Monthly Injury Claim Reconciliation Log.** This includes reconciliation includes:

- Verifying injury incidents are properly logged and aligned in **IRS**, the **OSHA 300 log**, and **LSI; AP Logging System.**
- Recording relevant notes from the Monthly Claims Conference Call.

The CSAP and Human Resources Operations Managers and the Sr. Director of Operations will sign and the log to verify completion and review. CSAP Management is responsible for the recordkeeping of this document (Retention: 5 Years).

**OSHA Recordkeeping**

It is important to note that OSHA recordkeeping requirements are different than Workers Compensation requirements. If you have questions regarding OSHA Recordkeeping Requirements, contact the Divisional CSAP Leader.

The Medcor Professional (if applicable) OR selected Human Resources personnel will maintain all OSHA Records under the supervision of the HR & CSAP Manager. This includes ensuring the log and summary form is posted each year as required by the U.S. Department of Labor. CSAP Management will verify OSHA 300 log incidents are current, accurate and recorded as required per the OSHA standard.

All the records of occupational injuries and illnesses must be kept for a minimum of five years and be readily available when requested for examination by a representative of the Department of Labor.

CONFIDENTIAL;
SUBJECT TO PROTECTIVE ORDER

**EXHIBIT 11**
WM_Braxton_000203

*Posting Requirements*
- At the end of the year, all cases on the OSHA 300 Log must be updated and Form 300A must be printed and posted. The General Manager/ Director of Operations must sign Form 300A and then OSHA Form 300A must be posted from February 1st through April 30th for the previous calendar year. Post only form 300A, the summary for the 300 Log. Do not post names of associates.  The 300A summary must be conspicuously posted in a secure location where all associates would be able to view it. (E.g., near the time clock).
- The OSHA poster must be conspicuously posted in a secure location where all associates would be able to view it. (E.g., near the time clock).

*Completing the OSHA 300 Log*
The OSHA 300 Log should contain the following information:

| Column | Description |
|---|---|
| Column A | The file number. It can be any sequential number (e.g., 00-01, 00-02, etc.) |
| Column B | The Associate's name. |
| Column C | The injured associate's job title. |
| Column D | The date of injury or onset of illness. |
| Column E | The area in which the event occurred. |
| Column F | Description of injury or illness. This should tell the part of the body and the type of injury or illness. (I.e., sprain lower back, laceration of right forefinger, carpal tunnel in left wrist, etc.). If a diagnosis is given by a doctor, it should be entered in this column. |
| Columns G through J are used to classify the case. Using these categories, check only the most serious result of the case. | |
| Column G | Use this column if an incident results in a death. |
| Column H | Use this column if an incident results in "Days away from work". |
| Column I | Use this column if an associate remained at work but had a job restriction, including in-house light duty, or job transfer. |
| Column J | Use this column for other recordable cases such as receiving medical treatment beyond first aid but not covered under columns G through I. |
| Column K | Use this column for tracking restricted days or days involving job transfer |
| Column L | Use this column for tracking days away from work. **Note:** Ensure that any days away from work or restricted days are placed on the Log as soon as possible. |
| Column M | Use columns 1-5 for tracking the type of injury or illness. <br> • If the loss is an injury, a check should be made in the appropriate column, (M) (1). <br> • If the loss is an illness (carpal tunnel, tendonitis, skin disease, etc.) Make a note in one of the columns (M 2 through 5). <br> **Note:** When entering a recordable hearing loss case on the OSHA 300 Log, check the 300 Log column for hearing loss.  (M-5) |
| For further assistance, contact a member of the Home Office EHS Compliance team. | |

*Bureau of Labor Statics or Data Collection Requests*
Upon receiving a Bureau of Labor Statistics or an OSHA Occupational Injury and Illness Data Collection Form, complete the form and scan/send it to the Home Office EHS Compliance team for review before sending it to the U.S. Department of Labor.

**OSHA Federal Serious Injury/Fatality Reporting Requirement**
Before contacting an OSHA Office, you must speak to a the Divisonal CSAP Leader.

    Walmart, Inc. Confidential
Incident Investigation & Reporting (WC/OSHA) 11-0901

CONFIDENTIAL;
SUBJECT TO PROTECTIVE ORDER
**EXHIBIT 11**
WM_Braxton_000204

OSHA must be contacted within 8 hours after the death of any associate from a work-related incident. OSHA must be contacted for all work related inpatient hospitalizations, all amputations, and all losses of an eye within 24 hours. Only fatalities occurring within 30 days of the work-related incident must be reported to OSHA. Further, for an in-patient hospitalization, amputation or loss of an eye, these incidents must be reported to OSHA only if they occur within 24 hours of the work-related incident. OSHA State Plan programs can be more stringent. Refer to the OSHA State Specific Injury Reporting Requirements for state specific reporting requirements.

You must orally report the fatality, hospitalization, amputation or loss of eye by telephone, in person or via the online form at osha.gov to the Area Office of the Occupational Safety and Health Administration (OSHA), U.S. Department of Labor, which is nearest to the site of the incident. You may also use the OSHA toll-free central telephone number, 1-800-321-6742.  The Divisional CSAP Leader and the Home Office EHS Compliance will assist the facility in preparation for the call to the OSHA office. Utilize the OSHA Notification Checklist to gather necessary information.  Refer to eEP 21 Fatalities and Serious Injury procedure.

CONFIDENTIAL;
SUBJECT TO PROTECTIVE ORDER

**App-II
207**

**EXHIBIT 11**
WM_Braxton_000205

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

JANELL BRAXTON )
       *Plaintiff* )
vs. )    Case No. 2:20-cv-02287-DDC-GEB
  )
WALMART INC. )
       *Defendant* )

**PLAINTIFF'S RESPONSE TO**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**EXHIBIT 12**

**Walmart's First 30(b)(6) Deposition**

Quincy Usry  (1-6-2021)

**EXHIBIT 12**

# Transcript of the Testimony of
# **Quincy Usry**

**Date:** January 6, 2021

**Braxton vs. Walmart**

CRAWFORD REPORTING
(816) 507-9630
CrawfordReporting@gmail.com

**EXHIBIT 12**

Case 2:20-cv-02287-DDC   Document 98-12   Filed 07/09/21   Page 3 of 10

Quincy Usry                     Braxton vs. Walmart                1/6/2021
Appellate Case: 22-3003   Document: 010110660654   Date Filed: 03/21/2022   Page: 210

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

JANELL BRAXTON,            )
                          )
        Plaintiff,        )
                          )
vs.                       )      No. 2:20-cv-02287-DDC-GEB
                          )
WALMART INC.,             )
                          )
        Defendant.        )

VIDEOTAPED DEPOSITION OF
QUINCY USRY,
(30(b)(6) Deposition)

a witness, being produced, sworn and examined on
Wednesday, January 6, 2021, pursuant to Second Amended
Notice of Videotaped Deposition of Walmart, Inc. Safety
Manager Quincy Usry, at the offices of Ralston Kinney,
LLC, Suite 300, 4717 Grand Avenue in Kansas City,
Missouri, before
        SHARON L. CRAWFORD, CCR, RPR,
a Certified Court Reporter in Missouri and Kansas.
Taken on behalf of the Plaintiff.

I N D E X

WITNESS:  QUINCY USRY                          PAGE
Examination by Mr. Ralston                       5

STIPULATIONS:
The witness is to read and sign.  If not signed by the
time of trial, the deposition may be used as if signed.

APPEARANCES

FOR THE PLAINTIFF:

    Mr. Thomas F. Ralston
    RALSTON KINNEY, LLC
    4717 Grand Avenue, Suite 250
    Kansas City, Missouri  64112
    (816) 298-0086
    tom@rklawllc.com

FOR THE DEFENDANT:
    Mr. Mark J. Goldsmith
    BAIRD HOLM LLP
    1700 Farnam Street, Suite 1500
    Omaha, Nebraska 68102-2068
    (402) 344-0500
    mgoldsmith@bairdholm.com

VIDEOTAPED BY:

    Mr. David Lombardo with TBC Video Productions

4

E X H I B I T S

MARKED & IDENTIFIED:                           PAGE
 1   Second Amended Notice of Deposition        12
 2   First Amended Complaint                    18
 3   Answer & Affirmative Defenses              19
 4   Defendant's Answers to Plaintiff's First
     Set of Interrogatories                     84

 5   4/15/20 Email String (WM-Braxton_122)      91

 6   4/15/20 Email String (WM-Braxton_130)     139

 7   Text Messages (WM_Braxton_103-104)        118

 8   4/15/20 Email String (Wm_Braxton_119-120)  58

 9   Jet Statement Form (WM_Braxton_105)        21

10   Global Statement of Ethics (WM_Braxton_1-38)  51

11   Safety & Compliance Rule Violation Form
     (WM_Braxton_97)                            73
12   Conduct Disciplinary Action Guidelines
     (WM_Braxton_102)                           80

13   Employee Activity (WM_Braxton_106)         87

14   Paycheck Stubs (Braxton 01-03)            88

15   Defendant's Supplemental Answers to
     Plaintiff's First Set of Interrogatories  136
16   Employer's Report of Accident
     (WM_Braxton_131)                          164

17   (Not identified)

18   Defendant's Responses to Plaintiff's
     First Rule 34 Requests                    113
19   March & April 2020 Calendar              144
(Original exhibits are attached to original transcript.)

Quincy Usry                    Braxton vs. Walmart                    1/6/2021

9

1  Q.  Okay.  Does that include government regulations?

2  A.  Yes, sir.

3  Q.  Okay.  So compliance with the law; would that be

4  fair?

5       MR. GOLDSMITH:  Vague and ambiguous.  To

6  the extent you understand the question, you can answer

7  it.

8  A.  Define "the law."

9  Q.  (BY MR. RALSTON)  Does any part of your job have

10 to do with making sure that Walmart or associates comply

11 with laws of any kind?

12 A.  Yes.

13 Q.  Okay.  And do you deal with workers'

14 compensation claims at all?

15 A.  Yes.

16 Q.  Okay.  And are you familiar with the Kansas laws

17 on workers' compensation?

18      MR. GOLDSMITH:  Vague and ambiguous.

19 A.  What specifically within the law?

20 Q.  (BY MR. RALSTON)  Are you familiar with any of

21 the laws having to do with workers' compensation under

22 Kansas law?

23 A.  Yes.

24 Q.  And which ones are you familiar with?

25 A.  List all of them that I am familiar with?

10

1  Q.  Yes.  If you could just generally tell me what

2  laws regarding workers' compensation under Kansas state

3  law you're familiar with, I would appreciate it.

4  A.  Under Kansas state law, the few that I'm

5  familiar with is the immediate notification of incident.

6  However, they do have 30 days to submit a work comp

7  claim.  And if that claim is not submitted within 30

8  days, then the company or employer is only responsible

9  for $500 of that total claim.

10 Q.  Okay.  One of the laws you are aware of with

11 respect to workers' compensation laws in Kansas is the

12 employer's duty to report a work injury that's -- that

13 they have knowledge of?

14      MR. GOLDSMITH:  Asked and answered.  Vague

15 and ambiguous.  But, again, to the extent you understand

16 it you can answer.

17 A.  Yes.

18 Q.  (BY MR. RALSTON)  Okay.  So were you familiar

19 with that law when -- during Janell Braxton's employment?

20 A.  Yes.

21 Q.  Were you aware in April of 2020 that an employer

22 who receives a report of an injury has 28 days to report

23 that on a form that's provided by the State to the State

24 of Kansas?

25 A.  Could you repeat the question?

11

1  Q.  Yeah.  Were you aware that Kansas, in April of

2  2020, had a law regarding an employer's duty to report

3  work injuries?

4  A.  Yes.

5  Q.  Were you aware in April of 2020 that under the

6  duty to report law for employers, when an employer

7  receives a work injury report from one of its employees,

8  it has 28 days to report that to the state?  Are you

9  aware of that?

10 A.  Yes.

11 Q.  Okay.  Now, other than the duty to report law in

12 Kansas, are you aware of any other laws having to do with

13 workers' compensation claims under Kansas law?

14 A.  Not that I could quote.

15 Q.  Okay.  So, Mr. Usry -- is that how you pronounce

16 it?

17 A.  Yes, sir.

18 Q.  You have been designated as the official

19 spokesperson to give testimony on behalf of Walmart; is

20 that correct?

21 A.  Yes, sir.

22 Q.  You have been designated as Walmart's official

23 spokesperson to give testimony on certain topics; is that

24 correct?

25 A.  Yes, sir.

12

1  Q.  I will show you what I will mark as Exhibit 1.

2       (Exhibit 1 is marked for identification.)

3  Q.  (BY MR. RALSTON)  Exhibit 1 is the Second

4  Amended Notice of Videotaped Deposition of Walmart, Inc.

5  Safety Manager Quincy Usry.  Do you see that?

6  A.  Yes.

7  Q.  And Exhibit 1 also has topics for which you have

8  been designated by Walmart to give testimony on the

9  second and third pages.  Do you see that?

10 A.  Yes.

11 Q.  You have been designated by Walmart to give

12 testimony on all the topics that are listed in Exhibit 1.

13 Is that fair?

14      MR. GOLDSMITH:  I will object to the

15 extent that this witness knows.  Obviously it is

16 Walmart's duty to designate and we discussed that,

17 Counsel.  As we discussed, he is here to talk about the

18 safety issues in 2 and 3, as well as the other things we

19 discussed in -- via e-mail.

20      So if it is easier, I can identify specifically

21 which among the topics he is here to talk about.  But I

22 don't know that this witness personally knows the topics.

23 Q.  (BY MR. RALSTON)  So you understand that I am

24 not asking for your personal knowledge today.  Do you

25 understand that?

CRAWFORD REPORTING -- CrawfordReporting@gmail.com

**EXHIBIT 12**

25

1    Q.  Is the written statement that you are talking
2    about what I marked as Exhibit 9 that was produced to us
3    by Walmart?
4    A.  Yes.
5    Q.  Exhibit 9 is a Statement Form, correct?
6    A.  Yes.
7    Q.  In this Statement Form, Mrs. Braxton makes
8    absolutely no comment about when she had previously
9    reported her workplace injury, correct?
10        MR GOLDSMITH:  Form, I object as to form.
11    A.  Correct.
12    Q.  (BY MR. RALSTON)  When Walmart gave Mrs. Braxton
13    Exhibit 9, it instructed her to fill out a statement
14    regarding her injury, correct?
15    A.  Correct.
16    Q.  It did not ask her to submit a statement
17    regarding when she had previously reported her workplace
18    injury, correct?
19        MR. GOLDSMITH:  Foundation, form.
20    A.  Can you repeat the question?
21    Q.  (BY MR. RALSTON)  Sure.  On April 14th, 2020, in
22    this Statement Form, Walmart instructed Mrs. Braxton to
23    fill this out concerning the nature of her injury, not
24    when she had reported it prior to filling out this form,
25    correct?

26

1        MR. GOLDSMITH:  Foundation, form.
2    A.  Correct.
3    Q.  (BY MR. RALSTON)  So Walmart never asked
4    Mrs. Braxton to submit some sort of written document or
5    statement regarding her previous reports or whether she
6    had previously reported her workplace injury?
7        MR. GOLDSMITH:  Form, foundation.
8    A.  Can you rephrase the question?
9    Q.  (BY MR. RALSTON)  Yes.  Did Walmart ever ask
10    Mrs. Braxton to submit some sort of written statement on
11    when and how she had reported her work -- and if she had
12    reported her workplace injury prior to April 14th, 2020?
13        MR. GOLDSMITH:  Form, foundation.
14    A.  No.
15    Q.  (BY MR. RALSTON)  Okay.  It could have, correct?
16    A.  It could have what?
17    Q.  It could have -- Walmart could have asked
18    Mrs. Braxton to provide a written statement listing out
19    all the times that she reported her workplace injury,
20    true?
21    A.  It could have.
22    Q.  It chose not to?
23        MR. GOLDSMITH:  Lacks foundation.
24    A.  Due to what was provided on the 14th is when we
25    asked for the Statement Form.

27

1    Q.  (BY MR. RALSTON)  Walmart chose not to ask
2    Mrs. Braxton for a written statement from her concerning
3    when, how, or with who she had previously reported her
4    workplace injury prior to April 14th of 2020, correct?
5        MR. GOLDSMITH:  Lacks foundation.
6    A.  Correct.
7    Q.  (BY MR. RALSTON)  Walmart didn't ask Ammie
8    Wilbur, your lead over Mrs. Braxton, to provide a written
9    statement regarding whether or not Mrs. Braxton had
10    reported her workplace injury to her prior to April 14th
11    of 2020, correct?
12    A.  Correct.
13    Q.  What we know is April 14th, 2020, Mrs. Braxton
14    was given Exhibit 9, this Statement Form, correct?
15    A.  Correct.
16    Q.  She was asked to fill it out, correct?
17    A.  Correct.
18    Q.  She was asked to fill it out with respect to the
19    nature of her injury, correct?
20    A.  Correct.
21    Q.  This Statement Form actually says that Jet.com
22    or Walmart strictly prohibits retaliation for reporting a
23    concern, correct?
24    A.  Correct.
25    Q.  Immediately after Mrs. Braxton filling out this

28

1    Statement Form which concerns her workplace injury and
2    also states that she will not be retaliated against for
3    reporting a concern, she was terminated from her
4    employment with Walmart, correct?
5    A.  Correct.
6    Q.  Walmart chose not to ask Mrs. Braxton for any
7    kind of written statement from her, signed by her, dated
8    by her, that had to do with when and how she had made
9    reports of a workplace injury, correct?
10        MR. GOLDSMITH:  Lacks foundation.
11    A.  There is no written documentation, correct.
12    Q.  (BY MR. RALSTON)  That is not my question.  My
13    question is, Walmart did not ask Mrs. Braxton to provide
14    a written statement concerning whether or not she had
15    reported her workplace injury prior to April 14th of
16    2020?
17        MR. GOLDSMITH:  Lacks foundation.
18    A.  Correct.
19    Q.  (BY MR. RALSTON)  Walmart chose not to ask
20    Mrs. Braxton or instruct her to provide a written
21    statement listing out the times prior to April 14th that
22    she had reported her workplace injury, correct?
23        MR. GOLDSMITH:  Lacks foundation.
24    A.  Correct.
25    Q.  (BY MR. RALSTON)  It chose not to ask -- Walmart

Case 2:20-cv-02287-DDC   Document 98-12   Filed 07/09/21   Page 6 of 10

Quincy Usry                 Braxton vs. Walmart                1/6/2021
Appellate Case: 22-3003   Document: 010110660654   Date Filed: 03/21/2022   Page: 213

37

1  Ms. Braxton, correct?
2     A. Yes.
3     Q. And without that knowledge, Walmart would not
4  have terminated Mrs. Braxton the way it did, fair?
5     A. Fair.
6        MR. GOLDSMITH: I know it's still kind of
7  early. Whenever we get a chance for a bathroom break,
8  I'd appreciate it.
9        MR. RALSTON: I am just going to finish
10 this topic real quick.
11    Q. (BY MR. RALSTON) After Mrs. Braxton's
12 termination, did Walmart ever have any more contact with
13 Ms. Braxton?
14    A. I am not aware of that.
15    Q. After Ms. Braxton's termination on April 14th of
16 2020, did Walmart ever reach out and attempt to contact
17 Mrs. Braxton?
18    A. I am not aware of that.
19       MR. RALSTON: Okay. We can take a break.
20       THE VIDEOGRAPHER: Stand by, please.
21 Going off the record. It is 10:39 a.m.
22       (Recess taken)
23       THE VIDEOGRAPHER: Resuming record at
24 10:48 a.m.
25    Q. (BY MR. RALSTON) I just want to make sure that

38

1  I understand Walmart's position in this case. You've --
2  Ms. Braxton was employed by Walmart, correct?
3     A. Correct.
4     Q. During her employment, specifically at the end
5  of her employment, she reported a workplace injury to
6  Walmart; is that correct?
7     A. Correct.
8     Q. Walmart had knowledge of her report of a
9  workplace injury, correct?
10    A. Correct.
11    Q. Walmart then involuntarily terminated
12 Mrs. Braxton employment the day that she submitted a
13 written report of her injury, correct?
14    A. Correct.
15    Q. There is a causal connection between
16 Mrs. Braxton's report of a workplace injury and her
17 termination?
18       MR. GOLDSMITH: Vague and ambiguous.
19    A. Generally speaking, yes.
20    Q. (BY MR. RALSTON) After Mrs. Braxton was
21 terminated on April 14th of 2020, Walmart had no more
22 contact with Mrs. Braxton?
23    A. Not that I'm aware of.
24    Q. After Mrs. Braxton was involuntarily terminated
25 on April 14th of 2020, Walmart -- after Mrs. Braxton was

39

1  involuntarily terminated on April 14th of 2020, Walmart
2  made no further attempts to contact Mrs. Braxton; is that
3  correct?
4     A. To what I am aware, yes.
5     Q. The day of Mrs. Braxton's report of a workplace
6  injury, Walmart was aware that they had a duty to report
7  that injury to the State?
8     A. Correct.
9     Q. Walmart did not submit any kind of report to the
10 State with respect to Mrs. Braxton?
11    A. Correct.
12    Q. The date that Mrs. Braxton was terminated by
13 Walmart, Walmart was aware that it was a violation of the
14 law to terminate or discharge Mrs. Braxton because of her
15 report of an injury?
16       MR. GOLDSMITH: Lacks foundation, form.
17    A. Can you repeat the question?
18    Q. (BY MR. RALSTON) Does Walmart make it a
19 practice of firing its employees who report work
20 injuries?
21    A. No.
22    Q. Isn't part of that reason because Walmart knows
23 that would violate the law?
24    A. Correct.
25    Q. On the date Mrs. Braxton was terminated, April

40

1  14th of 2020, Walmart was aware that it would be a
2  violation of the law to terminate Mrs. Braxton for
3  reporting a workplace injury.
4     A. Correct.
5     Q. Walmart's official position in this lawsuit is
6  that it terminated Mrs. Braxton because, according to
7  Walmart, she did not report her workplace injury in the
8  shift that she first became aware of it?
9     A. According to what she provided, yes.
10    Q. "According to what she provided." Are you
11 talking about a written statement?
12    A. I am talking about a verbal conversation with
13 David Whitenack, the operations manager on shift.
14    Q. Again, just to make sure I understand where we
15 are at, so far in your testimony, Walmart -- did it
16 conduct an investigation that actually led to
17 Mrs. Braxton's termination?
18       MR. GOLDSMITH: Vague and ambiguous.
19    A. Could you repeat?
20    Q. (BY MR. RALSTON) Did Walmart ever investigate
21 exactly when Mrs. Braxton first reported her workplace
22 injury?
23       MR. GOLDSMITH: Lacks foundation.
24    A. It was included in text messages from David
25 Whitenack.

41

1    Q.  (BY MR. RALSTON)  My question is, did Walmart
2  ever conduct an investigation regarding when Mrs. Braxton
3  first reported her workplace injury?
4           MR. GOLDSMITH:  Vague and ambiguous.
5     A.  No.
6    Q.  (BY MR. RALSTON)  Walmart could have.
7     A.  Could have.
8    Q.  Walmart could have conducted an investigation to
9  figure out if Mrs. Braxton had or had not reported her
10 workplace injury the first moment that she became aware
11 of it.
12          MR. GOLDSMITH:  Lacks foundation.
13    A.  Correct.
14   Q.  (BY MR. RALSTON)  It chose not to conduct such
15 an investigation, correct?
16          MR. GOLDSMITH:  Lacks foundation.
17    A.  Correct.
18   Q.  (BY MR. RALSTON)  The genuine fact or issue in
19 dispute between the parties in this case is when
20 Mrs. Braxton reported her workplace injury, fair?
21    A.  Yes.
22          MR. GOLDSMITH:  Calls for a legal
23 conclusion.
24   Q.  (BY MR. RALSTON)  The genuine fact.  I'm sorry,
25 the central fact that's in dispute between Mrs. Braxton

42

1  and Walmart is when Mrs. Braxton reported her workplace
2  injury during her employment with Walmart, fair?
3           MR. GOLDSMITH:  Lacks foundation.
4     A.  Fair.
5    Q.  (BY MR. RALSTON)  Walmart's contention is that
6  Mrs. Braxton didn't report it in the shift she first
7  became aware of it, correct?
8     A.  Correct.
9    Q.  Mrs. Braxton's contention, as you understand it
10 as the representative for Walmart to testify about
11 Mrs. Braxton's lawsuit, her complaint, is that she says
12 she reported it in the very first shift that she became
13 aware of it, fair?
14          MR. GOLDSMITH:  Lacks foundation, and also
15 beyond the scope of the notice.
16   Q.  (BY MR. RALSTON)  You're here to testify about
17 Walmart's answer to certain paragraphs, correct?
18    A.  Correct.
19   Q.  Would you turn to Exhibit 1, which is the
20 deposition notice.  Exhibit 1 is the Second Amended
21 Notice of the Videotaped Deposition of Walmart, Inc.,
22 Safety Manager Quincy Usry, correct?
23    A.  Correct.
24   Q.  That's you, correct?
25    A.  Correct.

43

1    Q.  You have been designated to give testimony on
2  topics 10 and 11, which is on the third page of Exhibit
3  1, correct?
4     A.  Correct.
5    Q.  You have been designated to give testimony on
6  certain admissions or denials made by Walmart to the
7  allegations in Mrs. Braxton's lawsuit, correct?
8     A.  Correct.
9    Q.  Would you turn back to Exhibit 2, which is
10 Mrs. Braxton First Amended Complaint.  Let me know when
11 you're there.
12    A.  Yes.
13   Q.  Do you see paragraph two is one of the
14 paragraphs you have been designated to give testimony on,
15 correct?
16    A.  Correct.
17   Q.  And it says, "In violation of Kansas law,
18 Defendants terminated Plaintiff's employment because
19 Plaintiff invoked her rights under the workers'
20 compensation laws."
21       Correct?
22          MR. GOLDSMITH:  I'm sorry.  Did you ask if
23 that is what it says?  I didn't hear you.  Could you
24 repeat the question, please?
25    A.  Do you want me to read it?

44

1    Q.  (BY MR. RALSTON)  Paragraph 2 of Mrs. Braxton's
2  First Amended Complaint says, "In violation of Kansas
3  law, Defendants terminated Plaintiff's employment because
4  Plaintiff invoked her rights under the workers'
5  compensation laws of Kansas."
6        Did I read that correctly?
7     A.  Yes, sir.
8    Q.  And if you turn to Exhibit 3, which is Walmart's
9  response to that paragraph, do you see that Walmart
10 denied that?
11    A.  Correct.
12   Q.  As the environmental health and safety
13 operations manager for Walmart since 2018, you would
14 agree that by making an injury report Mrs. Braxton had
15 invoked her rights under the workers' compensation laws
16 of Kansas?
17    A.  Yes.
18   Q.  Okay.  If you turn to the third page of
19 Mrs. Braxton's First Amended Complaint and look at
20 paragraph 20.  Paragraph 20 of Plaintiff's lawsuit
21 states, "In the early morning of April 13th, 2020,
22 Plaintiff told her manager/lead that her wrist was
23 hurting while working."
24       Did I read that correctly?
25    A.  Correct.

Case 2:20-cv-02287-DDC   Document 98-12   Filed 07/09/21   Page 8 of 10

Quincy Usry                    Braxton vs. Walmart                    1/6/2021

Appellate Case: 22-3003    Document: 010110660654    Date Filed: 03/21/2022    Page: 215

45

1    Q.  And this is the paragraph or a fact that Walmart
2  denies, correct?
3    A.  Correct.
4    Q.  And Walmart's contention is that had
5  Mrs. Braxton actually reported her injury on April 13th
6  of 2020, it would not have fired her; is that correct?
7    A.  If she would have reported it by end of shift,
8  correct.
9    Q.  And so the disagreement about -- between
10  Mrs. Braxton and Walmart about when she reported her
11  workplace injury is material, meaning that according to
12  Walmart it makes a difference in the outcome of their
13  decisions with respect to her employment.  Does that make
14  sense?
15    A.  No, I'm sorry.  Could you repeat it?
16    Q.  That's okay.  Mrs. Braxton and Walmart dispute
17  when she first reported her workplace injury.
18    A.  Correct.
19    Q.  Walmart's contention or position in this lawsuit
20  is that it would not have fired her had she reported her
21  workplace injury in the shift she first noticed it,
22  correct?
23    A.  Correct.
24    Q.  Mrs. Braxton denies that she did not report her
25  workplace injury in the shift she first noticed it,

46

1  correct?
2    A.  Correct.
3    Q.  This is a material issue.  Would you agree?
4    MR. GOLDSMITH:  Vague and ambiguous.
5    A.  Define "material issue."
6    Q.  (BY MR. RALSTON)  Significant.  Walmart is
7  saying it would have changed the course of her employment
8  with Walmart, so it is significant.
9    A.  Correct.
10    Q.  Correct.  And this is an issue or a fact that's
11  in genuine dispute between Walmart and Ms. Braxton,
12  correct?
13    A.  Correct.
14    Q.  I mean, the major issue that's in dispute
15  between Walmart and Ms. Braxton in this case is when she
16  reported her workplace injury, correct?
17    MR. GOLDSMITH:  Vague and ambiguous.
18    A.  Define "report."
19    Q.  Forget it.  I will just move on.
20    Walmart provides training to its employees.  Is
21  that fair to say?
22    A.  Yes.
23    Q.  Part of the way that Walmart provides training
24  to its employees is through written policies --
25    A.  Correct.

47

1    Q.  -- is that correct?
2    Walmart also has a safety school that it
3  conducts for the employees at the Edgerton facility,
4  correct?
5    A.  Correct.
6    Q.  One of the ways that Walmart provides training
7  to its employees is through policies that are required
8  that the employees review and acknowledge, correct?
9    A.  Correct.
10    Q.  Walmart pays its employees for its training,
11  correct?
12    A.  Correct.
13    Q.  One of the things Walmart trains its employees
14  on is a manual called the "Global Statement of Ethics,"
15  correct?
16    A.  Correct.
17    Q.  And when the employees of Walmart go through the
18  training on Walmart's Global Statement of Ethics, they
19  are paid for that time.  Would that be fair?
20    MR. GOLDSMITH:  Beyond the scope of this
21  witness' designation.
22    MR. RALSTON:  It is not.  The
23  implementation of the rules is specifically a topic.
24  Topic 3 is, "Walmart's implementation and enforcement of
25  its policies regarding reporting work injuries during

48

1  plaintiff's employment."
2    Topic 2 is Walmart's implementation and
3  enforcement.
4    Q.  (BY MR. RALSTON)  All I am asking you, sir, is
5  Walmart doesn't conduct training on its policies without
6  paying its employees --
7    MR. GOLDSMITH:  Beyond the scope of this
8  witness' designation.
9    Q.  (BY MR. RALSTON)  Does it?
10    A.  It is more an HR question, but I believe that is
11  correct.
12    Q.  You are here to testify on the implementation of
13  certain policies, correct?
14    A.  Correct.
15    Q.  You got prepared before today to give testimony
16  on the implementation of Walmart's workplace injury
17  reporting policy, otherwise known as WMW-670e, correct?
18    A.  Correct.
19    Q.  You also got prepared and have been designated
20  by Walmart to give testimony on the implementation of
21  Walmart's Health & Safety in the Workplace Policy,
22  correct?
23    A.  Correct.
24    Q.  And I am asking you, is a way that that is
25  implemented through training?

Case 2:20-cv-02287-DDC   Document 98-12   Filed 07/09/21   Page 9 of 10

Quincy Usry                    Braxton vs. Walmart                    1/6/2021

Appellate Case: 22-3003     Document: 010110660654     Date Filed: 03/21/2022     Page: 216

53

1    A.  I'm there.

2    Q.  This is the training that Walmart provides its
3  employees at the beginning of their employment regarding
4  health and safety, correct?

5        MR. GOLDSMITH:  I would like the witness
6  to read through it first and then you can answer the
7  questions.

8    A.  Okay.

9    Q.  (BY MR. RALSTON)  Have you not read this policy
10  before today?

11    A.  I have.

12    Q.  You are the person in charge of enforcing this
13  policy, correct?

14    A.  Correct.

15    Q.  This is a policy that's given to employees, this
16  health and safety policy that's contained in your Global
17  Statement of Ethics is a policy given to your employees
18  during training, correct?

19    A.  Correct.

20    Q.  It is required training before they start
21  employment, correct?

22    A.  Correct.

23    Q.  It is required training for which the employees
24  clock in and are paid?

25    A.  To the extent that I know, yes.

54

1    Q.  It says here, "Walmart is committed to
2  protecting the health and safety of our associates,
3  members, customers, and communities because we care for
4  one another's well-being.  Conducting our business in
5  compliance with all health and safety laws is crucial to
6  protecting each other from harm."

7        Did I read that correctly?

8    A.  Yes, sir.

9    Q.  Does Walmart actually enforce this policy?

10    A.  Yes, sir.

11    Q.  It says at the very bottom in the footnote,
12  "Walmart strictly forbids retaliation against any
13  associate who reports a concern."

14        Did I read that correctly?

15    A.  Yes, sir.

16    Q.  And that is the same statement that Walmart or
17  Jet.com strictly forbids retaliation against an associate
18  who reports a concern that we saw printed at the bottom
19  of the Statement Form that Mrs. Braxton was given on
20  April 14th, 2020, correct?

21    A.  Correct.

22    Q.  And on April 14th of 2020, Mrs. Braxton on that
23  Statement Form reported a concern, correct?

24    A.  Correct.

25    Q.  And then she was fired, correct?

55

1    A.  Correct.

2        MR. GOLDSMITH:  Lacks foundation.

3    Q.  (BY MR. RALSTON)  And there is a connection
4  between her report of a workplace injury and her
5  termination that same day?

6        MR. GOLDSMITH:  Vague and ambiguous.

7    A.  Simplistically, yes.

8    Q.  (BY MR. RALSTON)  Meaning but for her report of
9  an injury, she would not have been fired when and how she
10  was fired, correct?

11        MR. GOLDSMITH:  Lacks foundation, vague
12  and ambiguous.

13    A.  But for her timely report, yes.

14    Q.  (BY MR. RALSTON)  "But for" means had she have
15  not.  I'm sure you know that.  If you don't understand
16  one of my questions, let me know before you answer, okay?

17    A.  Yes.

18    Q.  Earlier I asked you if Mrs. Braxton hadn't
19  reported her workplace injury, she wouldn't have been
20  fired by Walmart as she was, meaning the same day and
21  same time.  And you agreed with that statement.  Do you
22  remember that testimony?

23    A.  Yes.

24    Q.  So but for Mrs. Braxton's report of a workplace
25  injury to Walmart, Walmart would not have terminated her

56

1  as it did, correct?

2    A.  Correct.

3    Q.  And as the person in charge of compliance of
4  this health and safety policy, it is your understanding
5  that these employees have to be trained on the health and
6  safety policy contained in this Global Statement of
7  Ethics at the beginning of their employment.

8    A.  Correct.

9    Q.  That training is mandatory.

10    A.  Correct.

11    Q.  Walmart pays its employees for its mandatory
12  training.

13    A.  Correct.

14    Q.  Earlier you testified that it's Walmart's
15  position in this lawsuit that she was fired for
16  violating -- I think you said an acknowledgement.  Did I
17  understand your testimony correctly?

18        MR. GOLDSMITH:  Form.

19        MR. RALSTON:  Make proper objections.  I
20  didn't hear what you said, but it is sounded like you
21  were just talking, Mr. Goldsmith.

22        MR. GOLDSMITH:  I said, "Form."

23        MR. RALSTON:  I'm sorry.

24        MR. GOLDSMTIH:  That's okay.

25    Q.  (BY MR. RALSTON)  Earlier you testified that it

Case 2:20-cv-02287-DDC Document 98-12 Filed 07/09/21 Page 10 of 10

Quincy Usry      Braxton vs. Walmart      1/6/2021

Appellate Case: 22-3003    Document: 010110660654    Date Filed: 03/21/2022    Page: 217

117

1  Q.  One of those policies would be WMW-770e,
2  correct?
3  **A.  The 763e.**
4  Q.  The 763e?
5  A.  Yes.
6  Q.  Not the 770e?
7  **A.  763e was the general safe work practices and**
8  **770e is the PIT Safe Work Practices.**
9  Q.  Which one of those two would have been -- would
10 have had to do with reporting a workplace injury, 763 or
11 770?
12 **A.  I believe from prior discussion, the 763e.**
13 Q.  Okay.  So 763e would have been -- should have
14 been one of the policies that Defendant Walmart provided
15 Mrs. Braxton regarding when she is supposed to report a
16 workplace injury, correct?  763e, correct?
17 **A.  Yeah.**
18 Q.  Okay.  You understand, I don't have those
19 policies.  They regard one of the topics you were
20 designated to give testimony on, though, correct?
21 **A.  Correct.**
22 Q.  We're going to have to take your deposition
23 again as Walmart on those specific policies that were not
24 produced.  Do you understand that?
25 **A.  Yes, sir.**

118

1  Q.  Earlier in your testimony you were referencing
2  text messages between you and David Whitenack.  Do you
3  remember that?
4  **A.  Yes.**
5  Q.  In one of those text messages, Mr. Whitenack
6  asked you how long do employees have to report a
7  workplace injury.  Do you remember that?
8        MR. GOLDSMITH:  Lacks foundation.
9  **A.  I would like to see the text messages.**
10 Q.  (BY MR. RALSTON)  Okay.  I am sure you would,
11 but I need you to answer the question.  Didn't
12 Mr. Whitenack send you a text message saying, "How long
13 do employees have to report a workplace injury"?
14       MR. GOLDSMITH:  Lacks foundation.
15 **A.  I am not sure.  I don't have it memorized.**
16 Q.  (BY MR. RALSTON)  But again, that would not be
17 something you would forget.  Your operations manager
18 asking you how long employees have to report a workplace
19 injury.
20 **A.  Not typically.**
21 Q.  I will show you what I've marked as Exhibit 7.
22       (Exhibit 7 is marked for identification.)
23 Q.  (BY MR. RALSTON)  Exhibit 7 are a series of text
24 messages that were produced to us by Walmart.  Do you
25 understand that?

119

1  **A.  Yes.**
2  Q.  Walmart has labeled them -- Walmart or its
3  attorneys have labeled these with little numbers in the
4  lower right-hand corner.  Do you see that?
5  **A.  Yes.**
6  Q.  Walmart or its attorneys have labeled it
7  WM_Braxton_103 to 104, correct?
8  **A.  Correct.**
9  Q.  These were screen shots of text messages on your
10 phone, correct?
11 **A.  Correct.**
12 Q.  These are text messages that you received on
13 April 14th from Walmart's operations manager, David
14 Whitenack, correct?
15 **A.  Correct.**
16 Q.  And on April 14th of 2020, David Whitenack
17 texted you at 10:36 p.m. asking if you are awake,
18 correct?
19 **A.  Correct.**
20 Q.  He then goes on to tell you in these text
21 messages that he had talked to Janell.  Do you see that?
22 **A.  Yes.**
23 Q.  And did you understand that he was referring to
24 Janell Braxton?
25 **A.  No.**

120

1  Q.  Did you understand that he was referring to a
2  Walmart employee?
3  **A.  Yes.**
4  Q.  Did you never meet Mrs. Braxton?
5  **A.  No.**
6  Q.  Did you make the decision to terminate her
7  employment?
8  **A.  No.**
9  Q.  Do you know who did?
10 **A.  One individual person?**
11 Q.  Do you know who made the decision to terminate
12 Mrs. Braxton's employment?
13 **A.  It was a partnership with HR.  So HR and Morgan**
14 **Medaris.**
15 Q.  Identify the people that you understand made the
16 decision to terminate Mrs. Braxton's employment?
17 **A.  Morgan Medaris, the HR on site, David Whitenack,**
18 **and then my recommendation of the 673e line, they would**
19 **report by end of shift.**
20 Q.  So you were involved in the decision to
21 terminate Mrs. Braxton's employment?
22       MR. GOLDSMITH:  Vague and ambiguous, lacks
23 foundation.
24 Q.  (BY MR. RALSTON)  Were you involved in the
25 decision to terminate Ms. Braxton's employment?

30 (Pages 117 to 120)

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

JANELL BRAXTON                              )
                             *Plaintiff*          )
          vs.                                          )          Case No. 2:20-cv-02287-DDC-GEB
                                                          )
WALMART INC.                                )
                             *Defendant*       )

**PLAINTIFF'S RESPONSE TO**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**EXHIBIT 13**

Morgan Medaris Deposition (3-4-2021)

**EXHIBIT 13**

# Transcript of the Testimony of
# **Morgan Medaris**

**Date:** March 4, 2021

## Braxton vs. Walmart

CRAWFORD REPORTING
(816) 507-9630
CrawfordReporting@gmail.com

**EXHIBIT 13**

```
                UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF KANSAS


JANELL BRAXTON,            )
                Plaintiff, )  Case No. 2:20-cv-02287-DDC-GEB
vs.                        )
WALMART INC.,              )
                Defendant. )


                 ZOOM DEPOSITION OF
                  MORGAN MEDARIS,

being produced via Zoom, sworn and examined on Thursday,
March 4, 2021, pursuant to notice to take the deposition
of Morgan Medaris, before Deborah K. McLaughlin, MO-CCR,
IL-CSR, KS-CCR.  Taken on behalf of Plaintiff.
```

```
                    I N D E X

WITNESS:  MORGAN MEDARIS                           PAGE
Examination by Mr. Ralston                           5
Examination by Mr. Hedican                          78
Examination by Mr. Ralston                          81


STIPULATIONS:

The witness is to read and sign.  If not signed by the
time of trial, the deposition may be used as if signed.
```

## APPEARANCES

```
FOR PLAINTIFF:
    Mr. Thomas F. Ralston
    RALSTON KINNEY, LLC
    4717 Grand Avenue, Suite 300
    Kansas City, Missouri  64112
    816.298.0086
    tom@rklawllc.com

FOR DEFENDANT:
    Mr. Christopher R. Hedican
    BAIRD HOLM, LLP
    1700 Farnam Street, Suite 1500
    Omaha, Nebraska  68102
    402.636.8311
    chedican@bairdholm.com
```

4

```
                 E X H I B I T S

IDENTIFIED                                         PAGE
5      4/15/20 Email                                89
11     (Not identified)                             80
12     Conduct Disciplinary Action Guidelines       79
24     Safety & Compliance Rule Violation Form      38
34     Time Records                                 15
37     JetFlex Disciplinary Action Guidelines       27
38     Mark Tuazon Transcript                       63




(The original exhibits were retained by Mr. Ralston.)
```

Case 2:20-cv-02287-DDC   Document 98-13   Filed 07/09/21   Page 4 of 4

Morgan Medaris                    Braxton vs. Walmart                        3/4/2021

Appellate Case: 22-3003     Document: 010110660654     Date Filed: 03/21/2022     Page: 221

---

17

1    **A   Correct.**

2    Q    April 14th, 2020 Ms. Braxton filled out a form

3    regarding her work injury, correct?

4    **A   Correct.**

5    Q    Did you say yes?

6    **A   I'm -- yes, correct.**

7    Q    And on April 14th of 2020, after Braxton gave

8    her -- Walmart her statement form regarding her work

9    injury, Walmart terminated her employment, correct?

10   **A   She was terminated based on her statement that**

11   **she reported late.**

12   Q    On April 14th, 2020 after Ms. Braxton gave

13   Walmart her statement form regarding her work injury,

14   Walmart fired her, correct?

15   **A   Correct.**

16   MR. HEDICAN:  Objection.  Asked and answered.

17   Go ahead.

18   **A   Correct.**

19   Q    (By Mr. Ralston) Walmart actually gained

20   knowledge of Ms. Braxton's work injury from Ms. Braxton,

21   correct?

22   **A   That's correct.**

23   Q    And without the knowledge that Walmart gained

24   about Ms. Braxton's work injury, which you gained from

25   Ms. Braxton, it would not have fired her, correct?

---

18

1    MR. HEDICAN:  Objection.  Calls for speculation.

2    Go ahead.

3    **A   (Indiscernible.)**

4    THE COURT REPORTER:  Can you please repeat that.

5    I can't hear you.

6    Make sure your volume is turned up.  I wonder if

7    your volume's not turned up.  Sorry.

8    THE WITNESS:  So I have my -- so I have it

9    turned up all the way.

10   MR. RALSTON:  That sounds good.

11   THE COURT REPORTER:  Okay --

12   MR. HEDICAN:  Yeah, you sound louder now.

13   THE WITNESS:  It's louder now?

14   THE COURT REPORTER:  If you just repeat your

15   last answer, please.

16   THE WITNESS:  All right.  Yeah.

17   MR. RALSTON:  I'll just -- I'll re-ask it.

18   THE COURT REPORTER:  Thank you.

19   MR. RALSTON:  I'll just go back just a little

20   bit, okay?

21   Q    (By Mr. Ralston) You doing okay, Ms. Medaris?

22   **A   Yeah, I'm okay.  Thank you.**

23   Q    Yeah, you're welcome.

24   Did you do anything to get prepared for your

25   deposition other than read the interrogatories that you

---

19

1    signed?

2    **A   I have read her incident report, the emails sent**

3    **out, not only from myself, but from Quincy Usry and David**

4    **Whitenack, who were also involved in the situation.  I**

5    **read that as well to be prepared.**

6    Q    If you don't understand one of my questions

7    today, let me know before you answer, okay.  I'd be happy

8    to rephrase them for you, all right?

9    **A   Okay.**

10   Q    Now, if anybody's told you to testify in a way

11   that's inconsistent with the truth as you know it, forget

12   that and just tell the truth, okay?

13   **A   Yes, sir.**

14   Q    You understand that your testimony is subject to

15   the penalty of perjury?

16   **A   Yes, sir, I do.**

17   Q    Okay.

18   **A   Yes, sir, I do.**

19   Q    And just because we're on Zoom, you're still

20   giving testimony under oath, just as you would in front of

21   a judge, do you understand that?

22   **A   Yes, sir.**

23   Q    Walmart gained knowledge of Braxton's work

24   injury from Braxton, correct?

25   **A   That's correct.**

---

20

1    Q    Walmart gained knowledge of Braxton's work

2    injury on the same day it fired her, correct?

3    **A   That's correct.**

4    Q    Within a half an hour of Ms. Braxton filling out

5    an injury report form Walmart terminated her, correct?

6    MR. HEDICAN:  Object to foundation.

7    Go ahead.

8    **A   Correct.**

9    Q    (By Mr. Ralston) Without the knowledge of

10   Ms. Braxton's injury report, Walmart wouldn't have fired

11   her, correct?

12   MR. HEDICAN:  It calls for speculation.

13   Go ahead.

14   **A   In relation to the reason that she was**

15   **terminated, no, we would not.**

16   Q    (By Mr. Ralston) I'm sorry, could you repeat

17   that -- or could I have the court reporter read back that

18   answer, please.

19   Sorry.

20   THE COURT REPORTER:  That's okay.

21   (The court reporter read back the last answer.)

22   Q    (By By Mr. Ralston) So you agree that if

23   Mrs. Braxton wouldn't have reported her workplace

24   injury, Walmart wouldn't have fired her?

25   MR. HEDICAN:  Objection.  Asked and answered.

---

5 (Pages 17 to 20)

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

JANELL BRAXTON )
          *Plaintiff* )
    vs. )    Case No. 2:20-cv-02287-DDC-GEB
     )
WALMART INC. )
          *Defendant* )

**PLAINTIFF'S RESPONSE TO**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**EXHIBIT 14**

Statement Form

Deposition Exhibit 9

**EXHIBIT 14**

# Jet

## Statement Form

Case Number

1:00am 4/13/20 On Monday morning I noticed that my wrist began to ache. It progressed to throbbing pain and by the time I left at 5:00am it was excruciating. I took a 500mg tylenol & went to sleep. It is swollen + sometimes feels warm to the touch. There is a little bruising. It is hard for me to work fast when putting items in the mailers & it hurts to pick up semi heavy items with that wrist. I can only pick up the totes if they are partially full. It is my left wrist that is injured. I am trying not to use it. The pain progresses throughout the shift

Jet.com will make every reasonable effort to maintain the confidentiality of all parties involved in any investigation. Jet.com will disclose information only to those who have a need to know to further the investigation or make an employment decision. Jet.com strictly prohibits retaliation for reporting a concern or cooperating in an investigation. You can and should immediately report any perceived retaliation to a salaried member of management.

I acknowledge the signature below is my own and that the information I have submitted in this report is true, correct and complete to the best of my knowledge.

**Signature** _Janell Braxton_

**Date** 4-14-2020

**Location (City, State)**

EXHIBIT
9
1-6-21
PENGAD 800-631-6989

Jet Business Confide

EXHIBIT 14

WM_Braxton_000105

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

JANELL BRAXTON )
           *Plaintiff* )
vs. )    Case No. 2:20-cv-02287-DDC-GEB
            )
WALMART INC. )
           *Defendant* )

**PLAINTIFF'S RESPONSE TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**EXHIBIT 15**

Incident Report

Deposition Exhibit 40

**EXHIBIT 15**



**PLAINTIFF'S EXHIBIT 40**

## ASSOCIATE **INCIDENT REPORT**



**INSTRUCTIONS TO ASSOCIATE:** Fill out this form completely, sign the form where indicated and return the original signed form to your Manager immediately.

**INSTRUCTIONS TO MANAGER:** Have Associate complete and sign this form immediately after the injury is reported to you. If no medical treatment is requested by the Associate, file the report in the appropriate location unless your facility is located in Alaska, Maine or Texas. In Alaska, Maine, and Texas, **all incidents** must be reported via the Incident Reporting System (IRS) within 24 hours of notice. Once you enter the incident via IRS, fax or email this completed form to your Claims Administrator.

| ASSOCIATE INFORMATION: | INCIDENT INFORMATION: |
|---|---|
| Associate Name:_____<br>(first, middle, last)<br>Home Address:_____<br>(street address)<br>City, State, Zip:_____<br><br>Home Phone #:_____ Cell #:_____<br>(area code + phone)  (area code + phone)<br>Birth Date:___/___/___  ☐ Male ☐ Female<br><br>Email Address:_____<br><br>Hire Date:___/___/___  Marital status:_____<br><br>Department/Location:_____<br><br>Job Title:_____ | Incident Location:_____<br><br>Work Phone #:_____<br><br>Manager's Name:_____<br><br>Manager's Phone #:_____<br><br>Date/Time of Incident: ___/___/___  (☐am☐pm)<br><br>Date/Time Reported: ___/___/___  (☐am☐pm)<br><br>Reported To:_____<br><br>Witnesses (Name/phone number for each witness):<br>_____ |

**What were you doing just before the incident happened?** Describe the activity, as well as the tools, equipment, or materials that you were using. Be specific. (*Example:* "I was climbing a ladder"):_____

**Describe what happened.** Describe how the injury actually occurred (*Example:* "I slipped off the ladder and hit the ground."):_____

**Describe the part(s) of your body (including left or right side) affected and type of injury (bruise, cut, etc.).** Be more specific than just saying "hurt" or "sore". (*Example:* "Nature of Injury: twisted and bruised ankle; Part of Body Injured: left ankle"):

| Nature of Injury: | Part of Body Injured: |
|---|---|
| | |

**Have you ever been treated for a similar injury?** ◯ Yes  ◯ No   If yes, please describe any previous treatment that you received and the Name(s) and Telephone Number(s) of the Health Care Provider(s) that provided you with previous treatment:_____

**Are you requesting medical treatment at this time?** ◯ Yes  ◯ No
**For Texas Only:** You will not be eligible for benefits if medical treatment is not sought within 14 days from the date of injury.

I certify that the above information is true and correct to the best of my knowledge. I understand that my employer will not be responsible for any expenses related to the incident or any resulting injury, unless the expenses are pre-approved and obtained from an Approved Provider.

**ASSOCIATE SIGNATURE:**_____  **DATE:**_____

*MANAGER - AFTER ENTERING THE CLAIM VIA IRS, FAX THE COMPLETED FORM TO YOUR CLAIMS ADMINISTRATOR.*

**CONFIDENTIAL;**
**SUBJECT TO PROTECTIVE ORDER**

**EXHIBIT 15**
**WM_Braxton_000180**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

JANELL BRAXTON )
*Plaintiff* )
vs. )        Case No. 2:20-cv-02287-DDC-GEB
)
WALMART INC. )
*Defendant* )

**PLAINTIFF'S RESPONSE TO**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**EXHIBIT 16**

Associate Work-Related Injury Management Guidelines

Deposition Exhibit 41

**EXHIBIT 16**

## 19-0902 Associate Work-Related Injury Management Guidelines



**PLAINTIFF'S EXHIBIT 41**

Rev. November 2017

Walmart Inc. - Sensitive

### Purpose

To provide clarity to managers on how to support their associates when work related injuries are reported.

# Procedures

Always ensure that the best interest of the associate is kept in mind through every step of this process. If there is any indication that the associate is injured from work related activities, the associate should seek medical treatment from a Work Comp provider.

### Major Injuries

The management staff or AP contacts the local Emergency Responders or Emergency Medical Technicians (EMT) if necessary. In the event an accide does not require an ambulance, use the following guidance below.

### Three Options

Once an associate reports an injury to their Manager, they have three options:

**1.** Return to normal duties immediately/same day with no restrictions.

**2.** Seek medical attention from a Work Comp provider.

**3.** Elect to leave work immediately without returning to normal duty and refuse to seek medical attention from a Work Comp provider.

### Additional Requirements if the Associate Chooses Option 3

Since the associate is choosing not to return to work due to an injury, the associate should be encouraged to immediately, or on the same day, seek medical attention from a Work Comp provider.

Regarding associate accountability, follow the normal process found in the 20-0121 Performance Tracking Policy.

The associate may return to work (no medical release required) on their next scheduled day at normal duty or seek medical attention from a Work Comp provider. If after declining medical attention and returning to work at normal duty, the associate appears to be physically unable to perform th essential functions of their job, consult with Human Resources and Legal. Management may then un-schedule the associate and require a confidentia fitness for work examination by a health care provider (at company expense), except where prohibited by law per the Safety and Health in the Workplace Policy.

If the confidential fitness for work examination determines that a work related injury has occurred and that additional treatment and follow up are needed, Human Resources should notify CMI and pursue the claims process. For additional support, contact Legal and your Divisional Compliance an Safety Sr. Manager.

### OSHA 300 Log Recording

If the associate misses their next scheduled work day, the injury must be recorded on the OSHA 300 Log and counted as an OSHA lost time injury. Contact your Divisional Compliance and Safety Sr. Manager for guidance on OSHA 300 Log recording.

https://one.walmart.com/content/uswire/en_us/supply-chain/sc-1bw-ho...es/19-0902-associate-work-related-injury-management-guidelines.html     Page 1 of 2

**CONFIDENTIAL;**
**SUBJECT TO PROTECTIVE ORDER**

**EXHIBIT 16**
**WM_Braxton_000189**

#### When More than Three Days are Missed

If the associate misses more than three consecutive scheduled work days, the associate is eligible to apply for a Leave of Absence (LOA); Sedgwick should be contacted. Sedgwick may require a confidential fitness for work examination by a health care provider before allowing the associate to return to work.

## Resources

#### Procedures

19-0901 Workers Compensation Reports and Medical Treatment – Field Logistics

19-1501 Incident Investigation

19-2001 Occupational Safety and Health Act (OSHA)

20-0121 Performance Tracking Policy

EP-21 Fatalities and Serious Injury

Alcohol and Drug Free Workplace Policy

Leave of Absence Policy

Safety and Health in the Workplace Policy

**Items Needed**

Associate Work-Related Injury Flowchart

CONFIDENTIAL;
SUBJECT TO PROTECTIVE ORDER

**App-II
228**

**EXHIBIT 16**
WM_Braxton_000190

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

JANELL BRAXTON )
*Plaintiff* )
vs. )        Case No. 2:20-cv-02287-DDC-GEB
)
WALMART INC. )
*Defendant* )

**PLAINTIFF'S RESPONSE TO**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**EXHIBIT 17**

Info for Injured Employees

Deposition Exhibit 44

**EXHIBIT 17**

**KANSAS DEPARTMENT OF LABOR**
www.dol.ks.gov

# INFORMATION FOR INJURED EMPLOYEES

K-WC 27-A (Rev. 11-16)

**PLAINTIFF'S EXHIBIT**
**44**

age 1 of 2

### * THIS NOTICE APPLIES TO ACCIDENTS ON OR AFTER APRIL 25, 2013 *

### Employers are required to provide this information to each injured worker

## WHAT TO DO IF AN INJURY OCCURS ON THE JOB

If you have any questions about workers compensation benefits, contact the Division of Workers Compensation at the phone number at the bottom of the page. **Assistance in Spanish is available.**

**(1)** **NOTIFY YOUR EMPLOYER IMMEDIATELY**: Per K.S.A. 44-520, a claim may be denied if an employee fails to notify their employer within the earliest of the following dates: (A) 20 calendar days from the date of accident or the date of injury by repetitive trauma; (B) if the employee is working for the employer against whom benefits are being sought and such employee seeks medical treatment for any injury by accident or repetitive trauma, 20 calendar days from the date such medical treatment is sought; or (C) if the employee no longer works for the employer against whom benefits are being sought, 10 calendar days after the employee's last day of actual work for the employer.

Notice may be given orally or in writing. Where notice is provided orally, if the employer has designated an individual or department to whom notice must be given and such designation has been communicated in writing to the employee, notice to any other individual or department shall be insufficient under this section. If the employer has not designated an individual or department to whom notice must be given, notice must be provided to a supervisor or manager.

Where notice is provided in writing, notice must be sent to a supervisor or manager at the employee's principal location of employment.

The notice, whether provided orally or in writing, shall include the time, date, place, person injured and particulars of such injury. It must be apparent from the content of the notice that the employee is claiming benefits under the workers compensation act or has suffered a work-related injury.

**(2)** **FOLLOW YOUR EMPLOYER'S INSTRUCTIONS** for getting medical aid and follow the doctor's instructions.

**(3)** **MEDICAL BENEFITS:** An injured worker is entitled to all medical services reasonably necessary to cure and relieve the worker from the effects of the injury. The employer has the right to select the doctor who will treat the injury. A worker may seek the services of an unauthorized doctor up to a limit of $500.00. A worker may apply to the Workers Compensation Director to change the authorized treating doctor. Reimbursement for travel to obtain medical treatment is payable at a rate set by law for trips that are five miles or more (round trip).

**(4)** **WEEKLY BENEFITS: Benefits are paid by the employer's insurance carrier or self insurance program.** Injured workers are not entitled to compensation for the first week they are off work unless they lose three consecutive weeks. The first compensation payment is normally due at the end of the 14th day of lost time. An injured employee is entitled to a weekly amount of 66 ⅔ percent of his/her average weekly wage up to a maximum of 75 percent of the state's average weekly wage. These benefits are subject to legislative changes. If the injury results in permanent disability, the Kansas Workers Compensation law provides for additional benefits.

DIVISION OF WORKERS COMPENSATION – OMBUDSMAN / CLAIMS ADVISORY UNIT
401 SW Topeka Blvd., Ste. 2, Topeka, KS 66603-3105 • Phone (785) 296-4000, (800) 332-0353 • Fax (785) 296-0025

**App-II**
**230**

**EXHIBIT 17**

Kansas Department of Labor
**Information for Injured Employees**
K-WC 27-A (Rev. 11-16)

# RESPONSIBILITIES OF THE EMPLOYER

1. Unless self-insured, the employer must advise its insurance carrier or group-funded pool of employee's injury.

   Per K.S.A. 44-557, it is the duty of every employer to make or cause to be made a report to the director of any accident, or claimed or alleged accident, to any employee which occurs in the course of the employee's employment and of which the employer or the employer's supervisor has knowledge, which report shall be made upon a form to be prepared by the director, within 28 days, after the receipt of such knowledge, if the personal injuries which are sustained by such accidents, are sufficient wholly or partially to incapacitate the person injured from labor or service for more than the remainder of the day, shift or turn on which such injuries were sustained.

   As outlined in K.A.R. 51-9-17, all insurance carriers, group pools and self-insurers are required to use Electronic Data Interchange (EDI) to file First Reports of Injury (FROI) and Subsequent Reports of Injury (SROI) using the Release 3 Standards. For details contact the Technology and Statistics section of the Division of Workers Compensation at (785) 296-4000 or (800) 332-0353. You may access our website at http://www.dol.ks.gov/WorkComp/edinews.aspx.

2. Employers must provide for the payment of workers compensation claims without any charge to employees.

3. Employers must post the Workers Compensation Notice prepared by the Director.

4. Employers must pay compensation benefits, regardless of insurance coverage.

5. Upon receiving notice of an injury, the employer must provide the employee written information to assist the injured worker in understanding his/her rights and responsibilities in obtaining compensation.

## Pursuant to K.S.A. 44-5, 102(a)
## EMPLOYERS MUST COMPLETE THE FOLLOWING INFORMATION FOR INJURED WORKERS

**YOUR CLAIM WILL BE HANDLED BY:**

Company _____

Address _____

_____

Contact Person _____

Phone (_____) _____

Email_____

DIVISION OF WORKERS COMPENSATION – OMBUDSMAN / CLAIMS ADVISORY UNIT
401 SW Topeka Blvd., Ste. 2, Topeka, KS 66603-3105 • Phone (785) 296-4000, (800) 332-0353 • Fax (785) 296-0025

**EXHIBIT 17**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

JANELL BRAXTON )
*Plaintiff* )
vs. )            Case No. 2:20-cv-02287-DDC-GEB
)
WALMART INC. )
*Defendant* )

**PLAINTIFF'S RESPONSE TO**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**EXHIBIT 18**

Mark Tuazon Deposition (1-25-2021)

**EXHIBIT 18**

# Transcript of the Testimony of
# **Mark Tuazon**

**Date:** January 25, 2021

## **Braxton vs. Walmart**

CRAWFORD REPORTING
(816) 507-9630
CrawfordReporting@gmail.com

**EXHIBIT 18**

Case 2:20-cv-02287-DDC   Document 98-18   Filed 07/09/21   Page 3 of 7

Mark Tuazon                    Braxton vs. Walmart                    1/25/2021

Appellate Case: 22-3003    Document: 010110660654    Date Filed: 03/21/2022    Page: 234

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS


JANELL BRAXTON,               )
                             )
          Plaintiff,          )
                             )
vs.                          )    No. 2:20-cv-02287-DDC-GEB
                             )
WALMART INC.,                 )
                             )
          Defendant.          )



DEPOSITION OF
MARK TUAZON


a witness, being produced, sworn and examined on Monday,
January 25, 2021, pursuant to Amended Notice to Take the
Deposition of Mark Tuazon, at the offices of Ralston
Kinney, LLC, Suite 300, 4717 Grand Avenue in Kansas City,
Missouri, before
          SHARON L. CRAWFORD, CCR, RPR,
a Certified Court Reporter in Missouri and Kansas.
Taken on behalf of the Plaintiff.

I N D E X

WITNESS:  MARK TUAZON                           PAGE
Examination by Mr. Ralston                        5


STIPULATIONS:

The witness is to read and sign.  If not signed by the
time of trial, the deposition may be used as if signed.


E X H I B I T S

IDENTIFIED:                                      PAGE
17   Photo ID of Janell Braxton                   10

REFERENCED:
 9   4/13/2020 Statement Form (WM_Braxton 105)    16


(Exhibits 9 and 17 are attached to the original
transcript.)

APPEARANCES

 FOR THE PLAINTIFF:

     Mr. Thomas F. Ralston
     RALSTON KINNEY, LLC
     4717 Grand Avenue, Suite 250
     Kansas City, Missouri  64112
     (816) 298-0086
     tom@rklawllc.com

 FOR THE DEFENDANT:
     Mr. Mark J. Goldsmith
     BAIRD HOLM LLP
     1700 Farnam Street, Suite 1500
     Omaha, Nebraska 68102-2068
     (402) 344-0500
     mgoldsmith@bairdholm.com

4

               (On the record at 8:57 a.m.)
                    MARK TUAZON,
a witness, having been produced, sworn and examined on,
testified as follows on:
EXAMINATION BY MR. RALSTON:
     Q.  Sir, my name is Tom Ralston.  I represent Janell
Braxton in a case she has against Walmart.  Do you
understand who I am?
     A.  Yes.
     Q.  Would you state your full name, spelling each
name as you go?
     A.  Mark M-a-r-k, Anthony, A-n-t-h-o-n-y, Tucson,
T-u-c-s-o-n.
     Q.  And your residential address?
     A.  ████████████████
     ██  ████████████████████
     ██  ████████████████.
     Q.  Are you employed, sir?
     A.  Yes.
     Q.  Where are you employed?
     A.  With Walmart.
     Q.  You are currently an employee of Walmart?
     A.  Yes.
     Q.  Do you have a second job outside of your
employment with Walmart?

Case 2:20-cv-02287-DDC   Document 98-18   Filed 07/09/21   Page 4 of 7

Mark Tuazon                 Braxton vs. Walmart                 1/25/2021

Appellate Case: 22-3003   Document: 010110660654   Date Filed: 03/21/2022   Page: 235

5

1  A.  No.
2  Q.  Is Walmart your sole source of income?
3  A.  Yes.
4  Q.  Do you get benefits through Walmart?
5  A.  Yes.
6  Q.  What kind of benefits do you get?
7  A.  **Medical benefits and 401(k).**
8  Q.  So do you have your investment plan set up
9  through your employment with Walmart?
10  A.  **Yes.**
11  Q.  If you suffer some sort of injury, your benefits
12  through Walmart would pay at least a portion of your
13  medical expenses?
14  A.  **As I understand, yes.  Yes.**
15  Q.  Does your medical benefits through Walmart cover
16  any other family members of yours?
17  A.  **My fiancee is in it as well.**
18  Q.  So as a part of the benefits you receive through
19  your employment at Walmart, it also covers medical
20  expenses that might be incurred by your fiancee?
21  A.  **Yes.**
22  Q.  When did you start your employment with Walmart?
23  A.  **I started back in February of 2018.**
24  Q.  Approximately three years ago; is that correct?
25  A.  **Yes.**

6

1  Q.  Have you held the same position with Walmart
2  throughout your employment there?
3  A.  **No.**
4  Q.  What is your current position with Walmart?
5  A.  **My current position is environmental health and**
6  **safety lead.**
7  Q.  For short do you refer to that as a safety lead?
8  A.  **Yes.**
9  Q.  And what are your duties -- actually first, how
10  long have you held the position of safety lead?
11  A.  **It will be a year in March.**
12  Q.  What are your duties as a safety lead?
13  A.  **Our duties is to be support for anybody who --**
14  **any associate that has incurred an injury or also provide**
15  **any kind of medicine for any soreness or pains as well as**
16  **do compliance and -- performing our compliance audits and**
17  **performing our daily audits.**
18  Q.  So a part of your current duties as a safety
19  lead for Walmart to respond to employee reports of
20  workplace injury?
21  A.  **Uh-huh.**
22  Q.  Is that a yes?
23  A.  **Yes.**
24  Q.  A second part of your duties as safety lead for
25  Walmart is to ensure compliance?

7

1  A.  **Yes.**
2  Q.  How do you as a safety lead for Walmart ensure
3  compliance?
4  A.  **If we see any unsafe behaviors, there is also**
5  **other portions of the compliance as well as like Haz-Mat**
6  **communications, or delegating Haz-Mat waste as well as**
7  **partnering with janitorial services for cleanup and**
8  **helping with -- sorry, helping with --**
9  Q.  Environmental hazards?
10  A.  **Yes.**
11  Q.  Is training employees on Walmart's injury
12  reporting policies a part of your duties?
13  A.  **I'm sorry?**
14  Q.  Is training employees on Walmart's policies with
15  respect to when employees are supposed to report a
16  workplace injury part of your duties?
17  A.  **No.**
18  Q.  Do you do any training?
19  A.  **No.**
20  Q.  Have you ever trained any employees at Walmart?
21  A.  **No.**
22  Q.  Has training ever been a part of your job duties
23  at Walmart?
24  A.  **No.**
25  Q.  Do you have written policies that you follow as

8

1  the safety lead for Walmart with respect to responding to
2  an Employee Injury Report?
3  A.  **Yes.**
4  Q.  When was the last time that you referred to
5  those policies of Walmart's concerning how you as
6  Walmart's safety lead is supposed to respond to Employee
7  Injury Reports?
8      MR. GOLDSMITH:  Form.
9  Q.  (BY MR. RALSTON)  Is it within the last month?
10  A.  **Yes.**
11  Q.  Okay.  So those are readily accessible to you?
12  A.  **Yes.**
13  Q.  So Walmart's policies on how you as a safety
14  lead are supposed to respond to an Employee Injury Report
15  are readily accessible to you at work?
16  A.  **Yes.**
17  Q.  That's something you can go to your computer and
18  you can print those policies off, correct?
19  A.  **Yes.**
20  Q.  What are the steps that you are supposed to take
21  as a safety lead in responding to an Employee Injury
22  Report?
23  A.  **First step as a safety lead is partnering with**
24  **management, first of all, so we can do a report.  Our**
25  **responsibility is to start partnering with management so**

Case 2:20-cv-02287-DDC   Document 98-18   Filed 07/09/21   Page 5 of 7

Mark Tuazon                 Braxton vs. Walmart                    1/25/2021

Appellate Case: 22-3003     Document: 010110660654      Date Filed: 03/21/2022      Page: 236

9

1  we can do a report.  That includes getting an associate's
2  statement and then doing a possible reenactment of how
3  the injury occurred.
4      Q.  So the first step that you as a safety lead for
5  Walmart -- Has this been true that these are the steps
6  that you're supposed to take in responding to an Employee
7  Injury Report as a safety lead for Walmart since the
8  beginning of 2020?
9      A.  I'm sorry?
10     Q.  Has your duties with respect to responding to an
11 Employee Injury Report changed in any way over the last
12 year?
13     A.  No.
14     Q.  Okay.  So the first step in responding to an
15 Employee Injury Report for you as a safety lead for
16 Walmart is to, No. 1, partner with management; is that
17 correct?
18     A.  Yes.
19     Q.  What does that mean?
20     A.  So it means that they have, management and me
21 will talk to the associate so we can fill out our report,
22 incident report.
23     Q.  Do you know who Janell Braxton is; do you know
24 who my client is?
25     A.  No, I can't remember.

10

1      Q.  I'll show you what I marked as Exhibit 17.
2          (Exhibit 17 is marked for identification.)
3      Q.  (BY MR. RALSTON)  Exhibit 17 is a photo ID of
4  Janell Braxton that was produced to us by Walmart as a
5  part of this lawsuit.  Do you have Exhibit 17 in front of
6  you?
7      A.  Yes.
8      Q.  Do you recognize the picture of Janell Braxton
9  in Exhibit 17?
10     A.  Yes.
11     Q.  Do you remember speaking with Janell Braxton on
12 April 14th, 2020?
13     A.  (No response)
14     Q.  How about this, do you remember speaking with
15 Janell Braxton ever?
16     A.  Yes.
17     Q.  Do you remember speaking to my client Janell
18 Braxton as a part of your employment at Walmart?
19     A.  Yes.
20     Q.  Do you remember speaking to Janell Braxton on
21 the day of her termination as an employee from Walmart?
22     A.  No.
23     Q.  Okay.  Did you ever fill out an incident report
24 with respect to the woman who is pictured in Exhibit 17?
25     A.  No.

11

1      Q.  So one of the steps you are required to take as
2  a part of your duties as a safety lead for Walmart in
3  responding to an Employee Injury Report is to fill out an
4  incident report, correct?
5      A.  Yes.
6      Q.  But you did not do that with respect to
7  Mrs. Braxton?
8          MR. GOLDSMITH:  Foundation.
9      A.  I did not.
10     Q.  (BY MR. RALSTON)  Why do you emphasize that you
11 did not?  Are you thinking that somebody else did?
12     A.  A manager would have had to, yes.
13     Q.  You said a manager would have had to?
14     A.  A manager would have to if they are reporting an
15 injury, yes.
16     Q.  So just to make sure I understand, part of your
17 duties as the safety lead for Walmart is to first partner
18 with management, correct?
19     A.  Yes.
20     Q.  And one of the reasons you partner with
21 management is so that you can create an incident report,
22 correct?
23     A.  I don't create it, I take a statement.
24     Q.  Are you aware of anybody creating an incident
25 report with respect to Janell Braxton, my client?

12

1      A.  No.
2      Q.  Have you ever seen an incident report created by
3  a manager at Walmart with respect to Janell Braxton?
4      A.  No.
5      Q.  Did anybody at Walmart explain to you why
6  Walmart didn't follow its policy with respect to creating
7  an incident report when it came to Ms. Braxton?
8          MR. GOLDSMITH:  Lacks foundation.
9      A.  No.
10     Q.  (BY MR. RALSTON)  Did you ever ask any of the
11 other managers at Walmart why an incident report wasn't
12 created with respect to Janell Braxton?
13         MR. GOLDSMITH:  Lacks foundation.
14     A.  No.
15     Q.  (BY MR. RALSTON)  Sir, you work at the Edgerton,
16 Kansas facility, correct?
17     A.  Yes.
18     Q.  Describe the layout of the Edgerton, Kansas
19 facility that you work at?
20     A.  What do you mean?
21     Q.  Do you not understand what I mean by layout?
22     A.  Not really.
23     Q.  If I were somebody that met you last night and
24 we were watching the Chiefs game together, and I said
25 describe the layout of the place where you work, how

3 (Pages 9 to 12)

Case 2:20-cv-02287-DDC   Document 98-18   Filed 07/09/21   Page 6 of 7

Mark Tuazon                 Braxton vs. Walmart                    1/25/2021
Appellate Case: 22-3003   Document: 010110660654   Date Filed: 03/21/2022   Page: 237

17

```
 1   time?
 2       A.  Yes.
 3       Q.  Okay.  Did Ms. Braxton report to you anything by
 4   way of soreness or injury?
 5       A.  No.
 6       Q.  Are you aware that Ms. Braxton reported a
 7   workplace injury?
 8           MR. GOLDSMITH:  Lacks foundation.
 9       A.  It depends on what you mean by injury.
10       Q.  (BY MR. RALSTON)  Do you not know what I mean by
11   the term injury?
12       A.  I do, yes.
13       Q.  Okay.  So let's just again assume that you're
14   not in the deposition and I'm just a friend of yours
15   talking to you.  Did Ms. Braxton ever report to you an
16   injury like that she was sore or hurting in some way?
17           MR. GOLDSMITH:  Form.
18       A.  Soreness we don't consider injury per se because
19   soreness can be anything from doing something at home or
20   anything like that as far as injury.
21       Q.  (BY MR. RALSTON)  I appreciate that.  I'm sorry
22   to interrupt you.  It's just that you're not answering my
23   question.
24           Did Mrs. Braxton ever report to you that she was
25   hurting?
```

18

```
 1       A.  Yes.
 2       Q.  Okay.  When was the first time that you learned
 3   that Mrs. Braxton was raising concerns about hurting
 4   while she was doing her duties for Walmart?
 5       A.  I don't remember the exact day, but I did get a
 6   call on the radio by another lead that somebody was going
 7   to be at the safety cube.
 8       Q.  When you say safety cube, you mean the safety
 9   cubicle?
10       A.  Yes.
11       Q.  It's just four false walls that are set up in
12   the middle of the facility, correct?
13       A.  Yes.
14       Q.  They are approximately four to five -- the walls
15   are four to five feet tall; is that correct?
16       A.  Yes.
17       Q.  And so you got a call from Aimee Wilbur?
18       A.  Yes.
19       Q.  And Aimee Wilbur told you that an employee, one
20   of the employees underneath her supervision was going to
21   come to you in the safety cubicle?
22       A.  Yes.
23       Q.  Did you then visit with Ms. Braxton?
24       A.  Yes.
25       Q.  She came to your cubicle?
```

19

```
 1       A.  Yes.
 2       Q.  Tell me everything that you remember about
 3   speaking with Ms. Braxton in your cubicle?
 4       A.  I asked her what was going on and she told me
 5   that she had a soreness in her wrist.  And so I asked her
 6   if she would like any pain medicine or ice, and she did
 7   say she would like some pain medicine and muscle rub.
 8       Q.  And muscle rub?
 9       A.  Yes.
10       Q.  Ointment?
11       A.  Yes.
12       Q.  Is there anything else that you can remember
13   about Mrs. Braxton coming to you and reporting that her
14   wrist was hurting in your safety cubicle?
15       A.  No.
16       Q.  So this is going to be my only opportunity to
17   talk to you before trial.  Do you understand that?
18       A.  Uh-huh, yes.
19       Q.  Do you understand that?
20       A.  Yes.
21       Q.  I need to know is there anything else at all
22   that you remember about Mrs. Braxton coming to you in
23   your safety cubicle and telling you that her wrist was
24   hurting?
25       A.  No.
```

20

```
 1       Q.   Was there anybody present besides you and
 2   Mrs. Braxton when she first reported to you that her
 3   wrist was hurting?
 4       A.  No.
 5       Q.  Was that the last time that you spoke to
 6   Mrs. Braxton when she came to you in your cubicle?
 7       A.  Yes.
 8       Q.  Okay.  And did you ever speak to anybody else at
 9   Walmart about Mrs. Braxton?
10       A.  No.
11       Q.  So after Mrs. Braxton left your safety cubicle,
12   you never spoke to another employee at Walmart about
13   Mrs. Braxton?
14       A.  Yes, I did, sorry.
15       Q.  You did, okay.  Now, you actually gave
16   Mrs. Braxton ointment, correct?
17       A.  Yes.
18       Q.  When you were giving Mrs. Braxton ointment, you
19   didn't ask her to fill out any paperwork, correct?
20       A.  No.
21       Q.  And you didn't fill out any paperwork?
22       A.  No.
23       Q.  You didn't fill out any paperwork about
24   Mrs. Braxton coming to you and telling you that her wrist
25   was hurting and that she wanted either medicine or
```

Case 2:20-cv-02287-DDC   Document 98-18   Filed 07/09/21   Page 7 of 7

Mark Tuazon                    Braxton vs. Walmart                    1/25/2021
Appellate Case: 22-3003      Document: 010110660654      Date Filed: 03/21/2022      Page: 238

21

1  ointment for it; is that correct?
2      A.  Correct.
3      Q.  You didn't fill out any paperwork showing that
4  you actually had responded to that Employee Injury
5  Report, correct?
6          MR. GOLDSMITH:  Lacks foundation, form.
7      A.  No.
8      Q.  (BY MR. RALSTON)  That's not correct?
9      A.  Yes, that's correct.
10     Q.  We'll do it again just to make sure I'm clear.
11  When Mrs. Braxton came to you in your cubicle and she
12  told you that her wrist was hurting and you gave her some
13  ointment, you didn't fill out any paperwork with respect
14  to that Employee Injury Report, true?
15         MR. GOLDSMITH:  Lacks foundation, form.
16     A.  Yes.
17     Q.  (BY MR. RALSTON)  Are you saying that's true?
18     A.  Yes.
19     Q.  Okay.  And then after Mrs. Braxton received
20  ointment from you, you say you spoke to another employee
21  at Walmart about Mrs. Braxton; is that correct?
22     A.  Yes.
23     Q.  Okay.  So approximately how long would you say
24  your visit with Ms. Braxton in your safety cubicle was?
25     A.  Three minutes.

22

1      Q.  Okay.  And did you ask Mrs. Braxton when she
2  first noticed that her wrist was hurting?
3      A.  No.
4      Q.  Did you ask Mrs. Braxton if she thought that her
5  sore wrist was caused by the work that she was doing for
6  Walmart?
7      A.  No.
8      Q.  Okay.  Do you remember anything that
9  Mrs. Braxton said to you in that three minutes in your
10  safety cubicle other than her wrist was sore?
11     A.  No.
12     Q.  Who did you speak to after you gave Mrs. Braxton
13  the ointment?
14     A.  Aimee Wilbur --
15     Q.  Okay.
16     A.  -- the lead.
17     Q.  Did you do that in person?
18     A.  Yes.
19     Q.  So you went out to Mrs. Braxton's work station?
20     A.  No.
21     Q.  Okay.  Where did you meet Mrs. Wilbur?
22     A.  In the QC command center.
23     Q.  So after you gave Mrs. Braxton ointment, you
24  went to Mrs. Braxton's supervisor, Ammie Wilbur; is that
25  correct?

23

1          MR. GOLDSMITH:  Form.
2      Q.  (BY MR. RALSTON)  After you gave Mrs. Braxton
3  ointment for her wrist, you then met with her supervisor,
4  Ammie Wilbur, correct?
5      A.  I didn't intentionally go meet her.  I was
6  walking back to where I was at.
7      Q.  And what did you say to Ms. Wilbur?
8      A.  She asked if somebody was at the cube.
9      Q.  And what did you tell her?
10     A.  I said yes.
11     Q.  Okay.  And did either one of you discuss
12  Mrs. Braxton's wrist at that time?
13     A.  No.
14     Q.  Was that the last employee at Walmart that you
15  spoke to about Mrs. Braxton's hurting wrist?
16     A.  Yes.
17     Q.  You never -- after speaking to Mrs. Wilbur and
18  after giving Mrs. Braxton ointment, you never spoke to
19  another employee at Walmart again about Mrs. Braxton?
20     A.  Correct.
21         MR. RALSTON:  Okay.  I don't have any
22  other questions for you.  Thanks for your time.
23         MR. GOLDSMITH:  None for me.
24         THE REPORTER:  Would you like him to read
25  and sign?

24

1          MR. GOLDSMITH:  Yes.
2          THE REPORTER:  And the same order as
3  before, Etran and PDF?
4          MR. GOLDSMITH:  Yes.
5          (Off the record at 9:21 a.m.)
6              # # # #
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

JANELL BRAXTON                      )
                                    )
             *Plaintiff*        )
                                    )
    vs.                           )        Case No. 2:20-cv-02287-DDC-GEB
                                    )
WALMART INC.                        )
                                    )
             *Defendant*       )

**PLAINTIFF'S RESPONSE TO
<u>DEFENDANT'S MOTION FOR SUMMARY JUDGMENT</u>**

**EXHIBIT 19**

Discrimination & Harassment Prevention Policy

Deposition Exhibit 48

**EXHIBIT 19**

6/1/2020                                              Discrimination & Harassment Prevention Policy - English



Column Component
Edit Text

Updated: April 3, 2020

We believe in fostering a workplace culture and customer experience where everyone is and feels included. We respect the dignity of every individual and value their unique skills. Having a workforce of associates from diverse backgrounds makes us a better company. Respectful and professional conduct furthers our mission, promotes productivity, minimizes disputes and enhances our reputation in the communities where we work.

## State Specific

California

New York

All associates, customers, members, or other individuals with whom we have contact in the course of our business should be treated fairly and respectfully without regard to their personal appearance, beliefs, culture, affiliations, or any other characteristics, as long as their conduct does not interfere with the legitimate interests of Walmart or other individuals.

We are also committed to providing an environment that is free of discrimination or harassment based on an individual's status.

Individual's status means an individual's race, color, ancestry, ethnicity, religion, sex, pregnancy, national origin, age, disability, marital status, veteran status, military status or obligation to perform military service, sexual orientation, gender identity or expression, genetic information or any other legally protected status. Individual's status also includes an individual's marriage to or association with someone with any status listed above.

We will not tolerate any form of discrimination or harassment in any aspect of our business. This means that we strictly prohibit any discrimination or harassment, as described within this policy, by or directed at:

- an associate
- job applicant
- customer
- member
- supplier
- or person working on behalf of Walmart.

This policy applies to all associates who work for Walmart Inc., or one of its subsidiary companies, in the United States (Walmart).

Managers and supervisors should use the Discrimination and Harassment Prevention Management Guidelines.

## Prohibited conduct

### Discrimination

We prohibit any discriminatory action based on an individual's status in all aspects of our business.

For purposes of this policy, Discriminatory action includes, but is not limited to

- firing,
- refusing to hire,
- denying training,

PLAINTIFF'S
EXHIBIT
48

https://wm-east-author.walmart.com/tmp/version/onlistory/ef893bcba51993f5d0016eeda7a5c4c84e96af82ad68a903f9549ba6d5af5624/143c98be-ddea-4968-bfd3-71af80710c0e/uswr/en_us/work1/policies/people-policies/discrimination-haras....    1/4

WM_Braxton_000064

EXHIBIT 19

6/1/2020

Discrimination & Harassment Prevention Policy - English

• failing to promote or

Azure Prod Author East

• discriminating in pay or other terms, conditions or privileges of employment based on an individual's status.

It also includes encouraging or assisting anyone to take discriminatory actions.
We prohibit associates from designing, implementing or executing a business process in any manner that discriminates against, singles out or subjects to heightened scrutiny a person based on an individual's status.

For the purposes of this policy, a business process includes, but is not limited to

• sales and purchase of goods and services

• customer service;

• verification or acceptance of any form of payment, including checks, money orders and credit cards; acceptance of shopping cards, gift cards, gift certificates and coupons;

• refunds, returns and/or exchanges of merchandise;

• surveillance, investigation or detention of suspected shoplifters, and

• use of Electronic Article Surveillance.

### Harassment

We prohibit any form of harassment based on an individual's protected status in all aspects of our business. This includes, but is not limited to:

• Pressure for sexual activity, including offering employment benefits in exchange for sexual favors or denying employment benefits in response to a refusal to provide sexual favors

• Repeated unwanted sexual flirtations, advances, or propositions;

• Using slurs or negative stereotyping;

• Verbal kidding, teasing, joking or making offensive comments about an individual's status, appearance, or sexual activity;

• Leering or making offensive gestures;

• Circulating or displaying offensive pictures, cartoons, posters, letters, notes, e-mails, social media, text messages, invitations, or other materials;

• Using company e-mail or Internet resources to receive, view, or send offensive jokes, pictures, posters, or other similar materials;

• Intimidating acts, such as bullying or threatening based on an individual's status;

• Offensive physical contact such as patting, grabbing, pinching, or intentionally brushing against another's body;

• Physical touching or assault, as well as impeding or blocking movements;

• Any other conduct that shows hostility toward, disrespect for or degradation of an individual based on the individual's status.

Harassing conduct, such as that listed above, is prohibited regardless of whether it is welcome or unwelcome and regardless of whether the individuals involved are of the same or are of a different sex, sexual orientation, race, or other status.

### Retaliation

We prohibit taking negative action against any individual for reporting conduct that violates this policy, cooperating in an investigation, opposing discrimination or harassment, or filing or assisting another individual in filing a complaint of discrimination or harassment with a government agency or court.

# Reporting procedures

We are committed to preventing discrimination and harassment in all aspects of our business and will take all reasonable measures to prevent it. However, if we are not aware that discrimination or harassment is taking place, we cannot address the situation.

If you experience, observe or become aware of any conduct that may violate this policy, you should immediately

WM_Braxton_000065

**App-II**
**241**

**EXHIBIT 19**

report the violation to any salaried member of management or confidentially and/or anonymously to the Global Ethics Office, email: ethics@walmart.com or phone: 1-800-WMETHIC (1-800-963-8442). If you believe a salaried member of management may be violating this policy, you do not have to report the violation to that person. You may report the possible violation to another salaried member of management or call/email the Global Ethics Office.

### Managers

If you observe, receive a report or otherwise become aware of a possible violation of this policy, you must immediately report such conduct to the appropriate level of management for investigation. A salaried member of management who fails to report a violation of this policy may be subject to disciplinary action, up to and including termination.

Appropriate level of management includes, but is not limited to, facility management, Human Resources or Global Ethics.

We will take appropriate steps to ensure there is no retaliation of any kind for using the reporting procedures described in this policy. Retaliation of any kind for using the reporting procedures is strictly forbidden and violates this policy.

# Investigation and appropriate action

We take all reported violations of this policy seriously, and we will promptly and thoroughly investigate all allegations in accordance with the procedures set forth in the management guidelines.

In order to conduct a prompt and thorough investigation, we ask that you cooperate and tell the truth to the individual who investigates your report. If you do not cooperate or you fail to tell the truth, we will be unable to conduct a proper investigation or take prompt remedial action. Any associate who refuses to cooperate in an investigation or fails to tell the truth during an investigation may be subject to disciplinary action up to and including termination.

We will take appropriate action to eliminate conduct that violates this policy and are committed to ensuring that there is no recurrence of such conduct. We may put reasonable interim measures in place during an investigation of a reported policy violation including, but not limited to, suspension or transfer of the associate who reportedly violated this policy. Suspensions are unpaid; however you may use PTO in accordance with the applicable PTO Policy for scheduled hours during your suspension. If you are suspended and the allegations against you are not substantiated, you will be returned to work and paid for all scheduled hours missed while suspended and applicable PTO used during that time will be reinstated.

We will take further appropriate action once the reported violation has been thoroughly investigated. If an investigation reveals that an associate has violated this policy (or any other policy), that associate will be subject to disciplinary action up to and including termination and any other appropriate corrective action.

# Confidentiality

Walmart will make every reasonable effort to maintain the confidentiality of all parties involved in any investigation. We will disclose information to only those having a need to know in order to facilitate the investigation or resolution.

# For More Information

If you have questions or need further guidance, please contact

- your HR representative
- Ethics Office using one of these methods:
    - www.walmartethics.com and select "Report a Concern"
    - Access True North on the WIRE and select "Report a Concern"
    - Email: ethics@walmart.com
    - 1-800-WMETHIC (1-800-963-8442)

WM_Braxton_000066

EXHIBIT 19

6/1/2020

Discrimination & Harassment Prevention Policy - English

Azure Prod Author East

This information does not create an express or implied contract of employment or any other contractual commitment. Walmart may modify this information at its sole discretion without notice, at any time, consistent with applicable law. Employment with Walmart is on an at-will basis, which means that either Walmart or the associate is free to terminate the employment relationship at any time for any or no reason, consistent with applicable law.

Edit Text

Last Modified: April 3, 2020

WM_Braxton_000067

**App-II**
**243**

**EXHIBIT 19**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| JANELL BRAXTON | ) | |
| *Plaintiff* | ) | |
| vs. | ) | Case No. 2:20-cv-02287-DDC-GEB |
| | ) | |
| WALMART INC. | ) | |
| *Defendant* | ) | |

**<u>INDEX OF EXHIBITS</u>**

Exhibit 1:    Plaintiff's Job Description – Deposition Exhibit 21

Exhibit 2:    Plaintiff's Deposition

Exhibit 3:    Plaintiff's Time Punches – Deposition Exhibit 27

Exhibit 4:    Walmart's Second 30(b)(6) Deposition (Quincy Usry 4-30-2021)

Exhibit 5:    Policy 763e – Deposition Exhibit 25

Exhibit 6:    David Whitenack Deposition (4-1-2021)

Exhibit 7:    Form 670e – Deposition Exhibit 11

Exhibit 8:    Chelsea Davidson Deposition (4-30-2021)

Exhibit 9:    Walmart's Response to Plaintiff's First Requests for Admission

Exhibit 10:   Jetflex Discipline Guide – Deposition Exhibit 37

Exhibit 11:   Walmart Dot Com Safety Manual – Deposition Exhibit 51

Exhibit 12:   Walmart's First 30(b)(6) Deposition (Quincy Usry 1-6-2021)

Exhibit 13:   Morgan Medaris Deposition (3-4-2021)

Exhibit 14:   Statement Form – Deposition Exhibit 9

Exhibit 15:   Associate Incident Report – Deposition Exhibit 40

Exhibit 16:   Associate Work-Related Injury Management Guidelines – Deposition Exhibit 41

Exhibit 17:   Kansas Department of Labor Info for Injured Employees – Deposition Exhibit 44

Exhibit 18:   Mark Tuazon Deposition (1-25-2021)

Exhibit 19:   Discrimination & Harassment Prevention Policy – Deposition Exhibit 48

*Respectfully Submitted by,*
**RALSTON KINNEY, LLC**

/s/ *Kenneth D. Kinney*
Kenneth D. Kinney - D.Kan. #78544
4717 Grand Avenue, Suite 300
Kansas City, Missouri 64112
TEL: (816) 298-0086
FAX: (816) 298-9455
Email: ken@rklawllc.com

**ATTORNEY FOR PLAINTIFF**

## **CERTIFICATE OF SERVICE**

I hereby certify that on July 9, 2021, I filed the foregoing was filed through the Court's ECF/CM system, which will serve all parties with the same by emailing notice and a copy to each attorney of record.

/s/ *Kenneth D. Kinney*
**ATTORNEY FOR PLAINTIFF**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

JANELL BRAXTON,

          Plaintiff,

v.

WALMART, INC.,

          Defendant.

Case No. 2:20-cv-02287

**DEFENDANT'S REPLY BRIEF IN
SUPPORT OF MOTION FOR
SUMMARY JUDGMENT**

## I.    <u>INTRODUCTION</u>

Plaintiff Janell Braxton's ("Braxton" or "Plaintiff") response brief simply challenges the Court's previous ruling rejecting Braxton's motion for summary judgment.  In denying Braxton's motion for summary judgment, this Court held that a rule that requires an employee to timely report her injury is not unlawful or direct evidence of workers' compensation retaliation.(Dkt. 87 at 13).  In addition, the Court held that discharge for violating such a rule is a legitimate nondiscriminatory reason for termination.  (*Id.* at 17)

Notably, Plaintiff's response brief fails to refute these facts:

- Plaintiff was a seasonal associate.

- Walmart's rules required termination of seasonal associates for any first written warning.

- In the two years before Plaintiff's discharge, Defendant Walmart, Inc. ("Walmart") terminated all 113 seasonal associates at its Kansas facility who had a first written warning, including Plaintiff.

- Walmart's work rules required all associates to report any work injury by the end of the shift.

- The decision makers were not seasonal associates and were members of management.

- Each decision maker believed in good faith that Plaintiff had not reported her work injury timely, in violation of the work rules, and terminated her employment given she attained a first written warning and was a seasonal associate.

- All contemporaneous written communication demonstrates Walmart discharged Plaintiff for failing to timely report her injury.

- Plaintiff never told any of the decision makers that she had allegedly reported her injury on the day it occurred.

Plaintiff's response brief also failed to discuss, refute, or even comment on the following text messages exchanged between two of the decision-makers, David Whitenack ("Whitenack") and Quincy Usry ("Usry") on the night of her termination:

> **Whitenack:**  Just talked to janell.  She said she hurt her wrist Sunday (doesn't know how) and didn't tell anyone
>
> **Usry:**  Hurt how?  Can she write a statement.  She only get [sic] coached if she describes pain
>
> **Whitenack:**  Yes I'll have her write a statement . . . How long do they have to report?  EOS?
>
> ***
>
> **Whitenack:**  Yea, that would be a coaching.  Is HR on site? Would she be termed with a written coaching?

(Dkt. 95-11 at 1).   In this exchange, Whitenack and Usry unambiguously demonstrated their understanding that Braxton failed to report her injury during the shift it happened, and that this failure violated Walmart's policy in a way that required a written coaching.  Similarly, Morgan Medaris's ("Medaris") email to Usry, sent a few hours after Braxton's termination, stated that "[w]e have completed Janell's termination *for late reporting.*"  (Dkt. 95-15 at 1) (emphasis added).

None of the arguments in Braxton's response brief call into question this contemporaneous evidence that Walmart's decision-makers terminated Braxton because she violated the company's injury reporting policy.   Braxton's arguments—which

significantly distort the factual record—do not demonstrate by clear and convincing evidence that Walmart terminated Braxton to avoid workers' compensation liability.

## II.   **RESPONSE TO BRAXTON'S FACTUAL OBJECTIONS**

Plaintiff does not dispute the following material facts set forth by Walmart in Paragraphs 1-6; 8-15; 18; 20-22; 24-37; 40-42; 44, 46, 50-51; 54-56; 58; 64-66; 68; and 70-73.   Pursuant to Fed. R. Civ. P. 56 and Local Rule 56.1, Walmart sets forth the following responses to Braxton's objections to Walmart's statement of undisputed facts.

In several of her responses, Plaintiff's "disputes" with Walmart's Statement of Undisputed Facts do not actually address the asserted fact, nor do they cite evidence that creates a dispute of fact.   For example:

- **Paragraph 7**: Though Plaintiff claims this fact is controverted in part, it is unclear what aspect of the paragraph Plaintiff is disputing.   Regardless, she cites no testimony or any other evidence in her opposition that disputes Plaintiff's status as a seasonal employee who had no guarantee of employment and the Court should consider that fact undisputed.

- **Paragraph 19:** Paragraph 19 does not assert that Plaintiff did not report her wrist pain to Ammie Wilbur ("Wilbur") on her first shift on April 13, 2020; rather, it asserts that *Wilbur denies* any such report occurred.   Wilbur's *denial* is not disputed by any record evidence.

- **Paragraph 43:**   Plaintiff cites no evidence that would contradict Whitenack's cited deposition testimony about *his understanding* of the facts.

- **Paragraph 45:**   Plaintiff fails to cite to any controverting evidence in disputing this Paragraph.   Plaintiff challenges this Paragraph mainly on the grounds the 670(e) is a "form" and not labeled as a "policy" on the document itself, but she does not cite evidence contradicting that Walmart maintains and enforces 670(e) in the manner described in this paragraph.   First, though 670(e) does not contain that phrase "First Written" a Step 1 is a "written" coaching.   (*See* Responses to Paragraphs 183, 190-192 below).   Second, Plaintiff's witnesses each testified that upon violation of 670e, Walmart terminated the seasonal associate's employment. (*Id.*)

- **Paragraph 48:**   Though Plaintiff asserts this fact is "controverted" Plaintiff's response does not dispute that Plaintiff electronically acknowledged that she read the policies set forth in the cited evidence at Dkt. 95-18, which include Policy 670(e)

and 673(e).  In fact, she testified, "Plaintiff acknowledged policies on her cell phone."

- **Paragraph 49**: Plaintiff's citations to other policies does not controvert that Walmart maintained written Conduct Disciplinary Action Guidelines, which stated in relevant part "Jet Seasonal [associates] should be terminated when their coaching has progressed to a formal written."  Throughout her argumentative responses, Plaintiff ignores but does not identify any evidence refuting this fact.

- **Paragraphs 59, 63, and 74**: Plaintiff's attempt to controvert the basis of Walmart's termination of her employment by arguing that Whitenack,  Usry , and  Medaris testified that Walmart would not have terminated her had it not been for her report of injury *does not create a dispute of fact*.  Though knowledge of her injury report was a necessary condition for her termination, *the record is clear that it was not the basis of the termination*.  Indeed, Usry, Whitenack, and Medaris all testified or provided declarations that Plaintiff's failure to report the injury *timely* was the cause for her termination and Plaintiff has not controverted this testimony.  Moreover, this Court – like many other courts - has already ruled that the failure to report an injury timely is a legitimate non-retaliatory reason for termination and this is the law of the case.  (*See Infra* Response to Plaintiff's Additional Fact Paragraph 79).  Implicit in the Court's ruling is the predicate that the employer received an untimely report prior to discharge.

- **Paragraph 60-63**: Plaintiff cites no evidence showing that Whitenack, Medaris, or Usry knew about Plaintiff's alleged report of injury on her first shift.  The record citations in these Paragraphs show they did not.

In other places, Plaintiff wrongly contends that no evidence supports Walmart's proposed fact, for example:

- **Paragraph 39:** Plaintiff's response erroneously claims that there is no evidence that Whitenack gave Plaintiff specific instructions to write down when she suffered her injury or to whom she reported it.  Walmart's cited testimony provides such evidence.  When Whitenack was asked: "did you talk with [Plaintiff] at all about information that she should include in that form" he responded "*Yes*, I always instructed everybody to include when the injury occurred.  And then I would ask them if they reported it to anyone..."  (Dkt. 95-1 at 10-11, Whitenack Dep. at 79:24-80:3) (emphasis added).

Moreover, in response to Paragraphs 13, 14, 46, 54, 58, 67, 69, and 73 Plaintiff responds to each fact as "Uncontroverted" but then adds additional facts or arguments in response.  Such additional response and argument is irrelevant and, the Court should consider these facts undisputed.

### III.  **RESPONSE TO BRAXTON'S STATEMENT OF ADDITIONAL MATERIAL FACTS**

Pursuant to Fed. R. Civ. P. 56 and Local Rule 56.1, Walmart sets forth the following responses to Plaintiff's statement of additional material facts.[1]

**Paragraphs 75-78:** Undisputed.

**Paragraphs 79: Disputed** to the extent Plaintiff asserts a legal conclusion from the stated testimony that Defendant could not terminate Braxton for filing her report late. Defendant objects to this question and answer to the extent offered as a legal conclusion, *see United States v. Wilson*, No. 89-1275-SAC, 1992 WL 331243, at *4 (D. Kan. Oct. 22, 1992) (holding that the Defendants' legal conclusions cannot create a genuine issue of fact that precludes a court from granting summary judgment) , and this conflicts with the Courts Ruling on Plaintiff's Motion for Summary Judgment that termination for a late report is a legitimate non-retaliatory reason for discharge which is also the law of the case (Dkt. 87 at 17); *see also Black & Veatch Corp. v. Aspen Ins. (Uk) Ltd.*, 378 F. Supp. 3d 975, 982 (D. Kan. 2019) ("[t]he law of the case doctrine recognizes that, '[w]hen a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.'") (quoting *Mason v. Texaco, Inc.* 948, F.2d 1546, 1553 (10th Cir. 1991).

**Paragraphs 80-81:** Undisputed.

---

[1] Several of Plaintiff's Additional Material Facts contain a bolded argumentative title.  (*See, e.g.*, Paragraph 125) ("**Walmart's Violated Its Own Mandatory Policies**"). Given that these are argumentative titles and are not supported by record citations, Walmart objects to the titles and does not address them; as such, argument is inappropriate and insufficient to create a material issue of fact.  Walmart respectfully requests that the Court not considered these argumentative titles for that purpose.

**Paragraph 82**: Undisputed that she was a full-time associate but disputed that she was a regular associate.  Plaintiff's status as a full-time associate did not alter her admitted status as a *seasonal* associate.  (Dkt. 98-2 at 5, Braxton Dep. at 26:23-25).

**Paragraphs 83-87:** Undisputed.

**Paragraph 88**:  **Disputed**.  The cited testimony only establishes that Plaintiff cannot think of a specific incident or occurrence that caused her wrist pain.  (Dkt. 98-2 at 49, Plaintiff Dep. at 50:4-10).

**Paragraphs 96:** Undisputed.

**Paragraphs 89-95, 97-100:    Disputed.**    Walmart disputes Plaintiff's characterizations of each time she allegedly *mentioned* her wrist pain as separate "reports" (*see* Paragraphs 89, 93, 97, 100) or a "complaint" (*see* Paragraph 98) because it fails to acknowledge the context of these alleged statements.  First, Aimee Wilbur ("Wilbur") denies that Plaintiff mentioned to her any wrist pain on her first shift on April 13, 2020 or that she was injured (Dkt.  95-4 at 2-3, Wilbur Dep. at 16:4-7; 18:15-17).  Second, on Plaintiff's second shift (April 13-14), Plaintiff claims she said she was having wrist pain to Wilbur but she did not visit the safety cubicle during that visit nor assert that she was injured.  (Dkt. 98-2 at 12-13, Plaintiff Dep. at 61:17-20; 64:22-65:2).  Then two and a half hours into her shift on April 14-15, Plaintiff approached Wilbur about her wrist pain and specifically asked Wilbur for a brace or wrap for her wrist pain, after which she was told to go the safety cubicle where she informed Safety Lead Mark Tuazon ("Tuazon") about her wrist pain but she did not assert that she was injured.  (Dkt. 98-2 at 14-15, Plaintiff Dep. at 72:11-73:7; 75:5-14; 73:8-10; Dkt. 98-18 at 6, Tuazon Dep. at 18:2-19:11).  Plaintiff's characterization of this series of events as four separate injury reports is

disingenuous, particularly given that her last two statements were clearly part of a continuing interchange to address her pain.

**Paragraph 101-106:** Undisputed subject to the correction that the testimony cited in support of Paragraph 102 does not state that the "first thing" Tuazon is required to do in response to a report of workplace injury is to partner with management and have the injured worker complete an incident report.

**Paragraph 107**: **Disputed**. See response to Paragraphs 89-95, 97-100 above.

**Paragraphs 108-109**: **Disputed.** These paragraphs primarily assert legal conclusions, which do not constitute "facts" under Fed. R. Civ. P. 56, and thus, the legal conclusions contained in these paragraphs should be disregarded by the Court. *See United States v. Wilson*, No. 89-1275-SAC, 1992 WL 331243, at *4 (D. Kan. Oct. 22, 1992) (holding that the Defendants' legal conclusions cannot create a genuine issue of fact that precludes a court from granting summary judgment).

**Paragraphs 110-116:** Undisputed.

**Paragraphs 117**: **Disputed**. Whitenack told Plaintiff to write down when she suffered her injury and when and to whom she reported it. (Dkt. 98-6 at 16, Whitenack Dep. at 79:24-80:3).

**Paragraph 118-119:** Undisputed.

**Paragraphs 120-124:** Walmart does not dispute that Plaintiff reporting her injury untimely was a condition precedent for her termination because without such information, Walmart would not have known her report was untimely. Thus, Walmart does not dispute these paragraphs but **disputes** any implication that Plaintiff was terminated for any reason other than her failure to abide by Policy 670(e) requiring that she report her injury at the end of a shift and her status as a seasonal associate. Usry, Whitenack, and

Medaris all testified that Plaintiff's failure to report the injury *timely* was the cause for her termination. (*See* Dkt. 55, Opposition to Plaintiff's Motion for Partial Summary Judgment at 8-10; Dkt. 98-6, Whitenack Dep. at 15, 75:10-22; Dkt. 98-13, Medaris Dep. at 17:7-11).

**Paragraphs 125-130:** Undisputed.

**Paragraph 131**: The cited testimony states that the Dot Com Safety Manual was not given to Plaintiff, not that it was unavailable to her.

**Paragraphs 132-135:** Undisputed.

**Paragraphs 137:** Undisputed with the correction that Usry testified that soreness from repetitive work is "not necessarily" an injury. (*See* Dkt. 98-4 at 16, Usry Dep. at 65:25-6).

**Paragraphs 138-145:** Undisputed

**Paragraphs 146. Disputed** as Usry testified to the fact, which is not contradicted and is not "claimed."

**Paragraphs 147-152:** Undisputed

**Paragraphs 153-158: Disputed in part.** The "Associate Incident Report" referenced in these paragraphs refers to a *particular form* (Dkt. 98-4 at 89:10-14). Though Whitenack did not use that specific form, he did have Plaintiff fill out a statement about her injury, including "everything [she] was feeling, that was going on with [her] wrist" as well as when she suffered her injury and to whom she reported it. (Dkt. 98-6 at 20 at Whitenack Dep. at 90:19-91:1; 79:24-80:3). Walmart did produce a copy of this statement. (Dkt. 98-14).

**Paragraph 159-167:** Undisputed.

**Paragraph 168: Disputed in part.**  Though Whitenack did not initiate a formal investigation, Whitenack took steps to investigate Plaintiff's injury.   After Wilbur told Whitenack that Plaintiff reported an injury on April 14, 2020, Whitenack met with Plaintiff and had her fill out a statement about her injury, asking her to provide specific details (*see* Response to Paragraphs 153-158 above).   In Plaintiff's written statement, she provided details about when she noticed the pain, the progression of the pain, and the impacts it was having on her ability to lift items.  (*See id*).   Because Plaintiff did not know exactly how she was injured, Whitenack determined there was no need to investigate beyond her self-report because "it would have been impossible to prevent other employees from repeating that same injury."  (Dkt. 98-6 at 20 at Whitenack Dep. at 103:11-21)

**Paragraph 169-181:** Undisputed.

**Paragraph 181: Disputed in part.**   The Associate Work-Related Injury Management Guidelines simply states that an employee has three options when they report an injury to their manager, not that they are supposed to be "given" or explicitly informed of those options.

**Paragraph 182: Disputed in part.**  The cited testimony only supports that Plaintiff was not explicitly offered these options.

**Paragraph 183: Disputed in part.**  The cited Dot Com Safety Policy states as quoted in Paragraph 183 but the Conduct Disciplinary Action Guidelines state that for "Jetflex and Jet Seasonal should be terminated when their coaching has progressed to a formal written."  (Dkt. 95-19; *see also* Response to Paragraphs 122- 124 above).  A Step 1 is a "written coaching.  And for seasonal associates, it would be a written coaching, and that written coaching would result in termination."  (Dkt. 98-4 at 26, Usry Dep. at 108:13-18).

Paragraph 184-185:   Disputed.  Usry did not testify that he had discretion in all aspects of issuing discipline.  Usry testified that when it comes to discipline and policy violations Walmart uses "discretion with[] understanding" of what factually occurred, but once he was aware of what occurred, "we have to be consistent in applying the policy." (Dkt. 98-4 at 27, Usry Dep. at 109:3-9).

Paragraph 186: The referenced document speaks for itself.  (*See* Dkt. 98-11, Dot Com Safety Manual).

Paragraph 187:  Disputed.  Walmart disputes Paragraph 187's use of the phrase "if management exercises their discretion to issue discipline" for the reasons provided in Response to Paragraphs 184-185 above.  Moreover, the Dot Com policy is not the only source of disciplinary guidance for Walmart management.   Relevant to this case, Walmart's Conduct Disciplinary Action Guidelines also apply.   (*See* Response to Paragraph 183 above and 191 below).

Paragraph 188-189: The referenced document speaks for itself.  (*See* Dkt. 98-11, Dot Com Safety Manual).

Paragraph 190-192:  Disputed in part.  Walmart does not dispute that Policy 670e prescribes "Step 1" issued on a Form 670e discipline for failing to report an injury within the shift it happens, but it otherwise **disputes** these paragraphs.   Walmart's Conduct Disciplinary Action Guidelines provide that "Jetflex and Jet Seasonals should be terminated when their coaching has progressed to a formal written."  (Dkt. 95-19).  A Step 1 is a "written coaching.  And for seasonal associates, it would be a written coaching, and that written coaching would result in termination."  (Dkt. 98-4 at 26, Usry Dep. at 108:13-18).  In accordance with these policies, Plaintiff, *a seasonal associate*, was terminated for

failing to report an injury within the shift it happened.  (*See* SOF 59; *see* Dkt. 98-6 at 15, Whitenack Dep. at 75:21-22).

**Paragraph 193: Disputed in part** to the extent that Paragraph 193 implies that these policies served as the only policy basis for Plaintiff's termination.   Plaintiff's termination was based on her violations of Policies 763(e) and 670(e) in conjunction with Walmart's Conduct Disciplinary Action Guidelines.  (Dkt. 95-19; Dkt. 98-4 at 26, Usry Dep. at 108:13-18).

**Paragraphs 194- 198:** The referenced document speaks for itself.  (*See* Dkt. 98-5, Policy 763e). **Disputed as to Paragraph 197** as the Conduct Disciplinary Action Guideline provided for termination of seasonal associate upon first written warning.  (*See* Responses to Paragraphs 122-124,183, 191)

**Paragraph 199:** *See* Response to SOF 193.

**Paragraphs 200-201:** The referenced documents speak for themselves.  (*See* Dkt. 98-5, Policy 763e; Dkt. 98-7, Policy 670e).

**Paragraphs 202-205: Disputed.**   Walmart admits that Plaintiff was a full time seasonal associate of Walmart, but she was not a regular associate.  Rather, she was a seasonal associate subject to Walmart's Conduct Disciplinary Action Guidelines that provide that "Jetflex and Jet Seasonals should be terminated when their coaching has progressed to a formal written."  (Dkt. 95-19; *see also* Dkt. 98-4 at 26, Usry Dep. at 108:13-18).

**Paragraphs 209-215:** The referenced documents speak for themselves.  (*See* Dkt. 98-5, Policy 763e; Dkt. 98-7, Policy 670e).

**Paragraph 206: Disputed**.  In the cited testimony, Usury only agreed to the statement "there *could* be a difference, under Walmart's policies, like…soreness versus an injury."  (emphasis added).

**Paragraph 207: Disputed.**  In the cited testimony, Tuazon's complete testimony was that "[s]oreness we don't consider injury per se."

**Paragraph 208: Disputed**.  In the cited testimony, Whitehead's complete testimony was that "I think it would be encouraged to report soreness, however, soreness and an injury, to me, are two totally different things."

**Paragraphs 209-215:** The referenced documents speak for themselves.  (*See* Dkt. 98-5, Policy 763e; Dkt. 98-7, Policy 670e).

**Paragraphs 216-217:** Undisputed.

**Paragraphs 218-220:** The cited documents speak for themselves.  (*See* Dkt. 98-5, Policy 763e; Dkt. 98-7, Policy 670e).

**Paragraphs 221:** Undisputed.

**Paragraphs 222-223:** *See* Response to Paragraphs 137-138.

**Paragraphs 224-225:**  Undisputed.

**Paragraph 226: Disputed.**  Plaintiff was the only seasonal associate who was disciplined *in connection with* the untimely report of her injury.  (*See* Walmart's Response to Plaintiffs' Second Set of Interrogatories No. 19, attached as Ex. A) Walmart had issued a first written warning to eight regular associates who failed to timely report their injury from January 2019 through March 2021.  (*Id.*)

**Paragraphs 227-229:** Undisputed.

**Paragraph 230**: **Disputed in part.**  Walmart does not dispute that Whitenack was not disciplined in connection with investigating Plaintiff's injury report, however, Walmart

disputes that Whitenack failed to investigate Plaintiff's injury. (*See* Response to Paragraphs 168, 238-240).

**Paragraph 231**: The cited testimony does not support this paragraph.

**Paragraph 232**: The cited testimony does not support this paragraph.

**Paragraph 238-240: Disputed** to the extent it implies that Walmart did not try to discern when Plaintiff first reported her injury before her termination. Wilbur, Plaintiff's immediate supervisor, told Whitehouse that Plaintiff reported the wrist injury to her on April 14—the shift after the injury actually occurred. (Dkt. 98-6, Whitenack Dep. at 77:17-20). Whitenack followed up by having Plaintiff complete a statement form and asked to include if she reported it to anyone. (Dkt. 98-6, Whitenack Dep. at 79:21-80:3). In her written statement, Plaintiff did not give any indication that she reported her wrist injury the same shift it happened. (Dkt 95-8 at 1). Even at her termination meeting when she was reminded of the injury reporting policy, Plaintiff did not tell Whitenack or Medaris that she allegedly reported her injury during her first shift. (SOF 57-58).

**Paragraph 241**: *See* Response to Paragraphs 89-100, which already addresses the question of the timing of Plaintiff's mentions of wrist pain. Regardless, this fact is immaterial because at the time of her termination, Whitenack, Medaris, and Usry did not know that Plaintiff allegedly made a report to Wilbur at the end of the April 12-13 shift. (*See* Dkt. 95-13, Medaris Decl.¶¶ 5-6; Dkt. 95-12, Usry Decl. ¶¶ 5-7; Dkt. 98-6 at 6; 17, Whitenack Dep. at 20:3-6; 90:16-18).

**Paragraph 242**: Walmart **disputes** Plaintiff's characterization of its denial. In response to Requests for Admissions, Walmart specifically denied the allegation that "At approximately 1:00 AM on April 13, 2020, Janell Braxton sustained an injury to her left wrist." (Dkt. 98-9¶ 5). Walmart did not dispute she injured her wrist on the 13th, and

failed to report it timely but the precise time on that date could be earlier than 1:00 AM. Nor did Plaintiff dispute Paragraph 14, in which Walmart asserted, "[A]t about 1:00 a.m. on the morning of April 13, 2020, Braxton felt throbbing pain in her left wrist." (*See* Paragraph 14). Thus, this fact is undisputed for summary judgment purposes. Plaintiff's attempt to use Walmart's denial as independent affirmative evidence is in appropriate; Fed. R. Civ. P. 36; *See Harris v. Oil Reclaiming Co., Ltd.*, 190 F.R.D. 674, 678 (D. Kan. Dec. 20, 1999) (stating that "[w]here a request [for admission] contains interdependent, compound issues, a party may deny the entire statement if it is premised upon a fact which is denied") *see also Diederich v. Department of the Army*, 132 F.R.D. 614, 621 (S.D.N.Y.1990); *Audiotext Communications Network, Inc. v. U.S. Telecom, Inc.*, No. 94–2395–GTV, 1995 WL 625744 (D. Kan. Oct. 5, 1995).

## IV.    __ARGUMENT__

Braxton's workers' compensation retaliation claim fails as a matter of law. She lacks direct evidence of retaliation. She also has insufficient evidence, let alone clear and convincing evidence, that Walmart's legitimate reason for firing her was really a pretext for workers' compensation retaliation. Braxton's claim that Walmart failed to comply with certain of its policies does not show that Walmart lied about the reason it fired her to conceal workers compensation retaliation. Indeed, each of its contemporaneous written communications consistently stated the reason she lost her job: untimely reporting of her injury in violation of the work rule resulting in termination for a seasonal associate. Likewise, the comparator evidence shows that Walmart treated Braxton exactly the same way as more than a hundred other seasonal associates who received written discipline.

### A.  The Clear and Convincing Standard Applies to Braxton's Claim

Braxton claims that the clear and convincing evidence standard does not apply to her claim at the summary judgment stage, but she is wrong.  (*See* Dkt. 98 at 43 n. 1).  In *Foster v. Alliedsignal, Inc.*, 293 F.3d 1187 (10th Cir. 2002), the Tenth Circuit explained that a court "ruling on a motion for summary judgment . . . must view the evidence through the prism of the substantive evidentiary burden."  *Id.* at 1195 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986)).  Thus, "a plaintiff in federal court who opposes a summary judgment in a retaliatory discharge case based on Kansas law must set forth evidence of a clear and convincing nature . . ."  *Id.*  Although the Kansas Supreme Court held in *Rebarchek v. Farmers Co-op. Elevator*, 272 Kan. 546 (2001) that Kansas courts should not apply the clear and convincing evidence standard on summary judgment, that holding is inapplicable because the Federal Rules of Civil Procedure govern summary judgment in federal court.  Thus, *Alliedsignal* squarely addressed *Rebarchek*'s holding on this score and rejected its application in federal court.  *Id*; *see also Pfannensteil v. Mars Wrigley Confectionary US, LLC*, No. 19-02096-JAR, 2021 WL 308604, at *17 n. 122 (D. Kan. Jan. 29, 2021); *Roth v. Francesca's Collection, Inc.*, 295 F. Supp. 3d 1177, 1184 (D. Kan. 2018) ("The clear and convincing evidence standard applies once the burden shifts back to plaintiff to demonstrate that the employer's proffered reasons for termination are pretextual").  Moreover, Braxton's argument for the lower standard itself concedes that she cannot meet this heightened standard on summary judgment and she has not argued to the contrary in her briefing.

### B.  Braxton Lacks Direct Evidence of Retaliation

The Court properly rejected Braxton's argument in her motion for summary judgment that she has direct evidence of retaliation by pointing to a few snippets of Usry's

deposition testimony tortured out of context.  (Dkt. 87 at 13) ("Plaintiff urges the court to focus on three lines of testimony, ignoring the overall context of that testimony."). Nevertheless, in opposing summary judgment, Braxton retreads the same argument this Court rejected previously.  She now also points to deposition testimony from Whitenack and Medaris as purported direct evidence.  But she once again ignores testimony from each of them that she was fired *not* for the report of injury itself, but instead for reporting her injury late.

For example, Whitenack testified at deposition as follows:

Q:     Did you terminate Ms. Braxton's employment because she reported an injury?

**A:     No.**

Q:     Did you terminate her employment to retaliate against her for having a work injury?

**A:     No.**

\*\*\*

Q:     Why did you terminate her employment?

**A:     We terminated her employment for failure to report an injury by the end of shift.**

(Dkt. 98-6, Whitenack Dep. at 75:10-22).

Similarly, Medaris testified:

Q:     And on April 14th of 2020, after Braxton gave her – Walmart her statement form regarding her work injury, Walmart terminated her employment, correct?

> A:    **She was terminated based on her statement that**
>
> **she reported late.**

(Dkt. 98-13, Medaris Dep. at 17:7-11).

> ***
>
> Q:    Right.  It was based on the information that Walmart
>
> provided Ms. Braxton concerning her suffering a workplace
>
> injury that prompted Walmart to fire her, true?
>
> A:    **No.  She was actually terminated for violating our**
>
> **policy regarding late reporting, not regarding the injury**
>
> **itself.**

(Dkt. 95-6, Medaris Dep. at 21:7-16) (objection omitted).

Braxton ignores this testimony, and instead focuses on Whitenack and Medaris's statements that, if Braxton had never reported her injury, Walmart would not have known the injury happened and therefore would not have discovered Braxton's policy violation. (Dkt. 98 at 29-30) (Braxton's SOF 120-24).  Taken in full context, Whitenack and Medaris's deposition testimony is fully consistent with Usry's testimony: Walmart fired Braxton because she violated company policy, not because of the injury itself; and Walmart would not have known of Braxton's policy violation but for her untimely report of injury.

As such, Braxton lacks direct evidence of workers' compensation retaliation. "Direct evidence is evidence, which if believed, proves the existence of a fact in issue without inference or presumption."  (Dkt. 87 at 12) (quoting *Riggs v. AirTran Airways, Inc.*, 497 F.3d 1108, 1117 (10th Cir. 2007)).  "Direct evidence demonstrates on its face that the employment decision was reached for discriminatory reasons."  *Danville v. Regional Lab*

*Corp.*, 292 F.3d 1246, 1249 (10th Cir. 2002).  Tenth Circuit "precedent makes clear that evidence is not 'direct' if an inference of discrimination is required."  *Riggs*, 497 F.3d at 1118; *see also Hall v. U.S. Dep't of Labor, Admin. Review Bd.*, 476 F.3d 847, 855 (10th Cir. 2007) ("A statement that can plausibly be interpreted two different ways—one discriminatory and the other benign—does not directly reflect illegal animus, and, thus, does not constitute direct evidence.").  Direct evidence is particularly uncommon in retaliation cases, which require the plaintiff to show retaliatory intent.  *Smith v. Maschner*, 899 F.2d 940, 949 (10th Cir. 1990) ("Precisely because the ultimate fact of retaliation turns on defendants' state of mind, it is particularly difficult to establish by direct evidence.").

Here, taken in full context, Whitenack and Medaris's deposition testimony expressly state the non-retaliatory reason for discharge:  both clearly testified that Walmart did not terminate Braxton due to her workplace injury, but rather because of her late report.  *Hall*, 476 F.3d at 855.  As such, just like Usry, the portions of their deposition testimony that Braxton takes out of context in her opposition brief cannot serve as direct evidence of retaliation.[2]

More importantly, the Court has already rejected this argument, which is now the law of the case.  *Black & Veatch Corp. v. Aspen Ins. (Uk) Ltd.*, 378 F. Supp. 3d 975, 982 (D. Kan. 2019) (quoting *Mason v. Texaco, Inc.* 948, F.2d 1546, 1553 (10th Cir. 1991).  Contrary to Plaintiff's assertion in her motion for summary judgment that Walmart's timely reporting rule was unlawful, the Court held that Kansas workers compensation laws did

---

[2] It is irrelevant that Walmart now moves for summary judgment.  On summary judgment, the court must "view the facts and draw *reasonable* inferences in the light most favorable to the party opposing the summary judgment motion."  *Scott v. Harris*, 550 U.S. 372, 378 (2007) (emphasis added).  This standard is not a license to cherry-pick evidence by "ignoring the overall context of [deposition] testimony," as Braxton has repeatedly done in her briefing to this Court.  (Dkt. 87 at 13).

not forbid Walmart's rule and such was a "legitimate nonretaliatory reason for terminating plaintiff's employment." (Dkt. 87 at 17). Nevertheless, Plaintiff retreads this argument. At base, Plaintiff argues that an employer has retaliated against an employee by holding him or her accountable for violating a timely reporting rule because it has necessarily acted on knowledge of that employee's injury – or as Plaintiff has coined the term "status as an injured worker." Such a timely reporting rule by necessity requires knowledge that the employee failed to timely report an injury whether the employee or someone else informs the employer. But this argument contradicts this Court's prior ruling and the numerous other Courts, including the Tenth Circuit in *Alires v. Amoco Prod. Co*, 774 F.2d 409 (10th Cir. 1985) that have held that such rules are legitimate reasons to terminate injured workers.[3] Consequently, for both of the above reasons, Plaintiff's direct evidence argument fails.

### C. Walmart Had a Legitimate, Non-Retaliatory Reason to Terminate Braxton

Because Braxton lacks direct evidence of retaliation, she must satisfy the burden-shifting framework of *McDonnell Douglas Corp v. Green*, 411 U.S. 792 (1973). *See Sanjuan v. IBP, Inc.*, 160 F.3d 1291, 1298 (10th Cir. 1998). For purposes of this motion only, Walmart assumes that Braxton has established a prima facie case of retaliation. The burden therefore "shifts to [Walmart] to articulate, [a] non-retaliatory reason for the discharge." *Id.* Walmart meets this burden, because it fired Braxton due to her violation of company policy requiring her to report workplace injuries the same shift they happen. In denying Braxton's summary judgment motion, the Court found as a matter of law that this policy violation is a legitimate, non-retaliatory reason for her discharge. (Dkt. 87 at

---

[3] Plaintiff did not discuss any of these cases cited in Defendant's Summary Judgment Brief (Dkt. 95 at19-20) that have agreed that such reporting rules are legitimate nonretaliatory reasons for discharge.

17) ("The court thus finds that defendant has come forward with a legitimate, nonretaliatory reason for terminating plaintiff's employment."); (*see also id.* at 16) ("When an employee violates an employer's policies . . . it will often be the case that the employer can assert a legitimate, non-retaliatory reason for taking an adverse employment action against the employee.") (quoting *Vaughn v. Epworth Villa*, 537 F.3d 1147, 1152 n. 3 (10th Cir. 2008)).

Braxton offers no reason why the Court should revisit this holding.  The Court has already rejected her argument that Walmart's same-shift reporting requirement violates Kansas law.  (Dkt. 87 at 17) (Kansas statute "does not forbid employers from adopting . . . workplace policies requiring their employees to report workplace injuries on a prompter basis.").  Braxton relies heavily on *Coleman v. Safeway Stores, Inc.*, 242 Kan. 804 (1988) in arguing for a different conclusion.  But nothing in *Coleman* prohibits an employer from requiring prompt reporting of workplace injuries.  Moreover, the Kansas Supreme Court abrogated *Coleman* in *Gonzalez-Centeno v. North Cent. Kansas Regional Juv. Det. Facility*, 278 Kan. 427 (2004).

Accordingly, Walmart has met its burden of furnishing a legitimate, non-retaliatory reason for Braxton's termination.[4]

## D.   Braxton Has No Clear and Convincing Evidence of Pretext

Although Braxton advances several arguments in favor of pretext, as discussed below, none are availing, particularly given the clear and convincing evidence standard.

---

[4] As Braxton admits, in *Asp v. McPherson Cnty. Highway Dep't*, 192 Kan. 444 (1964), the Kansas Supreme Court declined to criticize an employer's policy requiring workplace injuries to be reported within seven days of their occurrence.  (Dkt. 98 at 48).

### 1.   <u>The Decision Makers' Testimony Does Not Show Pretext</u>

Braxton first argues that the snippets of Usry, Whitenack, and Medaris's deposition testimony that she has taken out of context supplies evidence of pretext.  She is wrong.  As recognized in the Court's order denying Braxton summary judgment, and as argued *supra* at § IV.B, the decision makers' deposition testimony demonstrates that they terminated Braxton because of her policy violation, and not because of the injury itself.  *Cf. Annett v. Univ. of Kan.*, 216 F. Supp. 2d 1249, 1262 (D. Kan. 2002) (piece of evidence "taken out of context" insufficient to show pretext).[5]

Significantly, Plaintiff has not impeached or contradicted any of the decision makers' testimony about the reason for the termination decision.  Rather, she has merely urged that the testimony signifies an unlawful motive on a material fact that the Court has rejected.  In *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000) the Supreme Court stated that on summary judgment a court should accept the evidence of the moving party that is "uncontradicted and unimpeached, at least to the extent that the evidence comes from disinterested witnesses."  *Id.* at 151.  As the testimony of Usry, Medaris, and Whitenack is uncontradicted on the reasons for discharge, the Court should accept such evidence as true for purposes of summary judgment.  *E.E.O.C. v. Picture People, Inc.*, 684 F.3d 981, 989 (10th Cir. 2012)(Court ruled that current employees are

---

[5] By contrast, in *Fassbender v. Correct Care Solutions, LLC*, 890 F.3d 875 (10th Cir. 2017), the plaintiff's supervisor made numerous disparaging remarks towards pregnant women prior to the plaintiff's termination.  *Id.* at 884-85 (Finding pretext where the supervisor "made the following remarks: (1) 'What, you're pregnant too?'; (2) 'I don't know how I'm going to be able to handle all of these people being pregnant at once,'; and (3) 'I have too many pregnant workers, I don't know what I am going to do with all of them.'") (internal citations omitted).  Similarly, in *Santiago-Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 50-55 (1st Cir. 2000), the Court found that plaintiff could establish pre-text where plaintiff's supervisors: (1) asked her "whether it was possible for her to handle simultaneously her job, child care, and marital responsibilities"; (2) "questioned how her husband was managing, considering she was not home to cook for him"; and (3) told her they "preferred unmarried, childless women because they would give 150% to the job," among other comments about her status as a mother. None of Braxton's pretext-related evidence is remotely as compelling that contained in these cases.

not interested parties and that there is still a duty to review and consider uncontroverted evidence favoring the moving party).  *Picture People* also involved former employees that the court treated as disinterested witnesses.  *See also Aztec Corp. v. Tublar, Steel, Inc.* 758 S.W.2d 793, 800 (Tex. App. 1988)(former employee who was now a competitor was a disinterested witness for purposes of summary judgment).  Whitenack is a disinterested witness, as he was a former Walmart associate when deposed and is employed with a key Walmart competitor, Amazon.  Given that the reason for Plaintiff's discharge is lawful, unimpeached, and not contradicted by Plaintiff, the Court should grant Defendant's Motion for Summary Judgment for this reason alone.

### 2. Braxton Has No Evidence That Walmart's "Explanation is False"

Braxton next argues that the Court should find pretext because "Walmart's explanation is false."  (Dkt. 98 at 51) (formatting omitted).  This is circular reasoning.  *See Wolfe v. Buss ( Am.) Inc.*, 77 F.3d 914, 919 (7th Cir. 1996) ("Pretext means more than a mistake on the part of the employer; pretext means a lie, specifically a phony reason for some action").  Moreover, the evidence Braxton cites in support of this argument does not clearly and convincingly generate a material issue of fact that Walmart lied about its reason for terminating her employment.

Braxton's assertion that she reported her injury timely does not establish pretext. She offers absolutely no evidence that the decision-makers were aware of this alleged fact.  Whitenack's deposition testimony contains no inconsistencies indicating such an awareness.  Instead, Whitenack testified that Wilbur, Braxton's immediate supervisor, told him that Braxton reported the wrist injury to her on April 14—the shift after the injury actually occurred.  (Dkt. 98-6, Whitenack Dep. at 77:17-20) ("Q:  Did Ms. Wilber ever inform you that Ms. Braxton told her that she had reported her injury to her?  **A:  She –**

**she never told me that she had reported it other than the shift on the 14th.**")  Nothing in Whitenack's deposition indicates that he ever thought Braxton timely reported her injury.  Moreover, his testimony is consistent with his contemporaneous text message to Usry: "Just talked to janell. [sic] She said she hurt her wrist Sunday …and did not tell anyone." (Dkt. 95-11 at 1).

### 3.   The Decision Makers Adequately Investigated Braxton's Injury, and Reasonably Concluded Her Report Was Untimely

Braxton argues that during the termination meeting, Whitenack told her that she should have reported her work injury within 24 hours of having suffered it.  (Dkt. 98 at 17). It is undisputed that Braxton failed to protest at this point; she did not insist that she had, in fact, made a timely report.  (*Id.* at 17-18).  Thus, based on Wilbur's report, Braxton's written statement, and Braxton's own failure at the termination meeting to tell Whitenack and Medaris that she made a timely report of injury, the decision-makers had more than sufficient reason to believe that Braxton did not report her injury the same shift it happened.  Moreover, all of their words and actions were consistent with their belief that she had violated that rule. Braxton's allegation that Walmart should have investigated more thoroughly – particularly following her admission - does not demonstrate that Walmart lied about the reason it terminated her employment.

### 4.   Walmart's Alleged Deviation from Its Internal Policies Does Not Demonstrate Pretext

Braxton's next argument is that Walmart disregarded its workplace injury policies, and that this allegedly shows Walmart acted dishonestly to conceal workers' compensation retaliation.  Braxton contends that Walmart did not report Braxton's injury to the State of Kansas.  She also argues that Walmart did not give Braxton certain documents required to be given to injured workers, or an "Associate Incident Report"

form, a document that would have prompted her to record details about her injury. Additionally, she states that Whitenack failed to submit an eCommerce Safety Incident Investigation form to the company's internal system.  (Dkt. 98 at 53-55).

Braxton also contends that Walmart violated its disciplinary policies by not investigating her injury and by firing her.  (*Id.* at 56-57).  She misconstrues these policies—as noted *supra* § IV.D.3, the decision-makers adequately investigated Braxton's injury.  Braxton also conflates policies applicable to regular associates (as opposed to seasonal associates like her), who are often afforded multiple opportunities to improve their conduct prior to termination, (*id.* at 37, SOF 191), with the policy applicable to seasonal associates like Braxton, which requires termination upon receipt of first written discipline.  (Dkt. 95-19) (Walmart's Conduct Disciplinary Action Guidelines, which state "Jetflex and Jet Seasonals should be terminated when their coaching has progressed to a formal written").  Policy 670e prescribes "Step 1" discipline for failing to report an injury within the shift it happens.  (Dkt. 95-9).  As Usry explained at his deposition, "Step 1 was written coaching.  And for seasonal associates, it would be a written coaching, and that written coaching would result in termination."  (Dkt. 98-4 at 26, Usry Dep. at 108:13-18). Medaris and Whitenack reiterated this.  (*See* Dkt. 95-13, Medaris Decl. ¶¶ 6-8(Dkt. 98-6 at 6, Whitenack Dep. at 38:25-39:1; 39:9-10; Dkt. 95-5 at 7, Whitenack Dep. at 20:3-10)

Braxton's argument that Policy 670e is not a policy, even though it clearly sets forth guidelines on what associates are supposed to do to comply with safety rules, is disingenuous.  (Dkt. 95-9).  Plaintiff identifies no evidence to substantiate that Walmart DID NOT apply 670e as a policy in exactly the manner that every witness testified. Likewise, Braxton's claim that her wrist pain is somehow not a workplace injury, does not establish pretext.  The decision makers had her own statement that her wrist "began to

ache" while she was at her job and that by the time her shift ended, she was in "excruciating" pain.  (Dkt. 95-8 at 1).[6]

Braxton relies on *Plotke v. White*, 405 F.3d 1092 (10th Cir. 2005), to argue that Walmart's failure to follow its internal procedures supplies evidence of pretext.  But *Plotke* concerned a gender discrimination claim that is factually not at all comparable.  Plotke was fired after allegedly taking leave without obtaining advance approval.  *Id.* at 1096-97. A memorandum discussing the termination also described the plaintiff's alleged "failure to follow guidance issued by superiors; failure to follow established chain-of-command; breakdown in the ethos and substance of customer service; and fostering a climate of dissension and distrust within the Army Knowledge Network Directorate."  *Id.* at 1097. Yet, "there was no documentation to support the termination."  *Id.*  The plaintiff also reported that her colleagues' treatment of her "worsen[ed]" after she refused to go out on a date with one of them, and that one of her colleagues "fondled his genitals" at a meeting with her.  *Id.* at 1098.

The chief of staff of plaintiff's military base investigated these allegations against the plaintiff's colleagues and reported that they "were confirmed."  *Id.*  The chief of staff then tried to persuade the plaintiff's superiors "to reverse the termination decision," but they refused "due to concerns that reinstatement would have an adverse impact on [the plaintiff's] then pending EEO discrimination and retaliation charges."  *Id.*  Moreover, there was evidence that the Army had conjured "post-hoc reasons for [the plaintiff's] termination," in addition to "[c]onflicting evidence regarding the point in time at which" the Army made the termination decision.  *Id.* at 1103.  There was also "evidence of fabrication

---

[6] Not to mention that a core component of Braxton's workers' compensation retaliation claim is that she did, in fact, suffer a workplace injury.

of a June 22 memoranda" that was used to support *Plotke's* termination.  *Id.* at 1104.

Throughout her employment, the plaintiff's colleagues directed numerous sexist remarks

at her, "referring to [the plaintiff] as 'Jane' instead of 'Dr.'; calling her a 'femi-Nazi' and

'wire-head,'; advising her that she 'should be quiet and not make [her]self noticed,';

remarking that her presence would prevent the all-male group from 'sitting around

drinking beer, smoking cigars, and farting' on a professional staff ride,'" among several

other derogatory remarks.  *Id.* at 1106 (internal citations omitted).

In addition to all of this, the Army terminated Plotke "without well-documented

counseling files," something that is "procedurally irregular for the Army." *Id.* at 1105.  The

Tenth Circuit therefore held that "[t]hese inconsistencies and deviations from normal Army

procedure, *especially when viewed in the aggregate with the other evidence* proffered by

[the plaintiff], were sufficient to raise a genuine doubt about [d]efendant's motivation."  *Id.*

(emphasis added).

Here, by contrast, Braxton has no evidence that Walmart did not apply its policies

concerning termination of seasonal associates exactly as it has for other seasonal

associates, whereas in *Plotke*, there was substantial evidence of violation of the actual

termination policies applicable to Plotke.[7]  Moreover, unlike in *Plotke*, Walmart's policies

clearly allowed it to fire seasonal associates like Braxton for failing to report a workplace

injury before the end of the shift in which it occurs.  (Dkt. 95-9 at 1).  All that Braxton

---

[7] Plaintiff's reliance on *Hurlbert v. St. Mary's Health Care Sys., Inc.,* 439 F.3d 1286, 1299 (11th Cir. 2006)
is unavailing for the same reason.  In *Hurlbert,* the Court found that one of *several* factors suggesting
pretext was that the Vice President of Human Resources did not follow his routine practice of preparing
separation notices—which explained the basis for the termination— shortly after any termination. In fact,
he did not prepare plaintiff's notice until after he received a letter from plaintiff's attorney demanding an
explanation for his client's termination. *Id.*  In contrast, and as argued above, Braxton has no evidence that
Walmart did not apply its policies concerning termination of seasonal associates exactly as it has for other
seasonal associates.  Moreover, unlike *Hurlbert,* Walmart was forthright with Braxton as to the reason for
her termination (her untimely report of injury), it communicated that reason to her at the time of her
termination, and the decision makers' contemporaneous texts and emails reflect the same.

argues is that Walmart did not follow certain policies regarding investigation and reporting of her injury where she acknowledged she did not know how it occurred.  It did not fail to follow its discharge policy based on the undisputed fact that it understood she had not timely reported her injury in violation of its rules.  As the case law cited in Walmart's initial brief demonstrates, "[t]he mere fact that an employer failed to follow its own internal procedures," without more, does not show pretext.  *Berry v. T-Mobile USA, Inc.*, 490 F.3d 1211, 1222 (10th Cir. 2007); ((*see* Dkt. 95 at 16-19) (discussing cases to this effect)); *see also Degraw v. Exide Techs.*, 744 F. Supp. 2d 1199, 1210 (D. Kan. 2010) (No pretext, even though "Plaintiff contends that Nurse Ramsey's refusal to file an injury report on August 7, 2006 shows that the decision to terminate his employment was motivated to retaliate against him because he may have sustained a workplace injury.").  The cases cited in Walmart's initial brief, where no pretext was found despite an employer's failure to follow internal policies, are far more similar to the facts of the instant case than is *Plotke*. (Dkt. 95 at 16-19).

Braxton's evidence of pretext must also be viewed in light of the undisputed evidence of the decision makers' contemporaneous texts and emails with each other, which clearly evince their understanding that Braxton was being fired due to her untimely report of injury.  Unlike *Plotke*, the Court must apply the clear and convincing evidence standard to Braxton's claim.  No reasonable jury could find that it is "highly probable" that Walmart terminated Braxton to interfere with her filing a workers' compensation claim.  *In re B.D.-Y.*, 286 Kan. 686, 696 (2008) (defining clear and convincing evidence).

### 5. The Subjective Reasonableness of Braxton's Termination Cannot Show Pretext

Finally, Braxton's claim that Walmart's termination decision was "not subjectively reasonable" fails.  (Dkt. 98 at 57).  First, this Court as well as numerous others has

rejected this argument holding that as a matter of law an employer may discharge an employee for failing to timely report an injury in violation of a work rule.  (Dkt. 87 at 17). Second, Braxton overlooks the maxim that "[t]he courts may not act as a super personnel department that  second  guesses  employers'  business  judgments." *Jaramillo v. Colo. Jud. Dep't*, 427 F.3d 1303, 1308 (10th Cir. 2005); *accord Romkes v. Univ. of Kan.*, 49 Kan. App. 871, 889 (2014) ("The court is not a super personnel department").  Instead, "[a]ll that a court does is to exercise a very limited review of the employment practices of an employer to see if the practices are shown to be lawful." *Romkes*, 49 Kan. App. at 889 (quoting *Verniero v. Air Force Acad. Sch. Dist. No. 20*, 705 F.2d 388, 390 (10th Cir. 1983)).  Here, Walmart has advanced an honest explanation for its termination decision:  Walmart's decision makers genuinely believed that Braxton failed to report her injury the same shift it happened.  There is no contrary evidence.

Walmart also notes that the comparator evidence conclusively refutes Braxton's claim of pretext.  It is undisputed that between 2018 and 2020, Walmart terminated 113 seasonal associates from its Edgerton facility because they received a first written discipline.  (Dkt. 98 at 23-24, Walmart's SOF 74, which Braxton does not challenge).  In other words, Walmart treated Braxton the same way it treated more than a hundred other seasonal associates.

Moreover, contrary to Braxton's implication, Safety Lead Mark Tuazon and Whitenack are not similarly situated to Braxton.  Whitenack and Tuazon were regular associates and not seasonal associates, and both had different supervisors than did Braxton.  Plaintiff has not established otherwise.  (Second Declaration of Chelsea Davidson ("Davidson Decl.") ¶¶3-5, attached as Exhibit A; *see also* Dkt. 95-5 at 3-4, Whitenack Dep. at 8:21-9:25; Dkt. 98-18 at 3-4, Tuazon Dep. at 4-7:10)  *See Aramburu*

*v. Boeing Co.*, 112 F.3d 1398, 1404 (10th Cir. 1997) ("Similarly situated employees are those who deal with the same supervisor and are subject to the same standards governing performance evaluation and discipline."); *Herrera v. United Airlines, Inc.*, 754 Fed. Appx. 684, 692 (10th Cir. 2018) (unpublished) (rejecting comparator evidence where claimed comparator not similarly situated to the plaintiff).  Moreover, there is no evidence that they violated the rule that Braxton did in failing to report the injury late.  Moreover, violation of 670e would result in only a first written warning and only seasonal associates (not regular associates) would face discharge at that stage. (*See* SOF 49, 57, 59)

Because Braxton cannot show pretext by clear and convincing evidence, entry of summary judgment is appropriate.

## V.      <u>CONCLUSION</u>

Walmart respectfully requests that the Court grant its motion for summary judgment and dismiss this matter with prejudice.

Dated this 30th day of July 2021.

WALMART, INC. Defendant,

By:   /s/ Christopher R. Hedican

Christopher R. Hedican (KS #14542)

of      BAIRD HOLM LLP
1700 Farnam St, Ste 1500
Omaha, NE  68102-2068
Phone: 402-344-0500
Facsimile:  402-344-0588
chedican@bairdholm.com

## CERTIFICATE OF SERVICE

I hereby certify that on July 30, 2021, the undersigned served the foregoing via the CM/ECF Electronic Filing System, which sent notification of the same to:

| | |
|---|---|
| Thomas F. Ralston (KS# 78212) | tom@rklawllc.com |
| Kenneth D. Kinney (KS# 78544) | ken@rklawllc.com |

/s/ Christopher R. Hedican

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

JANELL BRAXTON,

      Plaintiff,

v.

WALMART, INC.,

      Defendant.

Case No. 2:20-cv-02287

**SECOND DECLARATION OF
CHELSEA DAVIDSON IN SUPPORT
OF DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT**

I, Chelsea Davidson, hereby declare and state as follows:

1.     My name is Chelsea Davidson. I am over the age of 18 and have personal knowledge of the facts contained in this declaration.

2.     Since 2018, I have held the position of Senior Manager of Human Resources for Walmart's Edgerton, Kansas fulfillment center. I am the senior most human resource professional at the Walmart ecommerce fulfillment center in Edgerton, Kansas (the "Edgerton Facility").

3.     At all relevant times to this case, including without limitation April of 2020, Walmart employed David Whitenack, Morgan Medaris, Quincy Usry, and Mark Tuazon as regular associates and not seasonal associates. More specifically, Mr. Whitenack was last employed by Defendant as Operations Manager, Ms. Medaris is currently employed by Defendant as HR Business Partner, Mr. Usry is currently employed by Defendant as Environmental Health and Safety Operations Manager, and Mr. Tuazon is currently employed by Defendant as an Environmental Health and Safety Lead.

**EXHIBIT
A**

4.    Ms. Braxton was employed as a QC Singles Associate and was a seasonal worker.  Mr. Whitenack, Ms. Medaris, Mr. Usry, and Mr. Tuazon were not employed in such a position and did not have the same job duties as Ms. Braxton.

5.    Mr. Whitenack, Ms. Medaris, Mr. Usry and Mr. Tuazon each had different supervisors than did Janelle Braxton in 2020.  Specifically, in 2020, Mr. Whitenack reported to Tyler Edwards, Ms. Medaris reported to me, Mr. Usry reported to Rob Andretta, and Mr. Tuazon reported to Tyler Roberts.  Ms. Braxton, however, reported to Brady Kells.

*I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.*

Executed this 28 day of ⟨July⟩                     2021.

CHELSEA DAVIDSON

DOCS/2668593.2

2

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

JANELL BRAXTON,

     Plaintiff,

v.

WALMART INC.,

     Defendant.

Case No. 2:20-cv-02287

**DEFENDANT'S ANSWERS TO**
**PLAINTIFF'S SECOND SET OF**
**INTERROGATORIES**

TO: Plaintiff Janell Braxton, in the care her attorneys, Thomas Ralston and Kenneth Kinney.

  18. How many of Defendant's employees have been subject to Policy 670e since November 2019?

  **ANSWER:** Defendant objects to Interrogatory No. 18 as overly broad and not proportional to the needs of the case as it applies to facilities at which the Plaintiff and decision makers did not work. Subject to and without waiving these objections, during the requested time period, Walmart employed 1570 e-commerce associates at the Edgerton, Kansas facility since November 2019, each of whom were subject to Policy 670e.

  19. How many employees has Defendant disciplined for "Failure to report any known injury before the end of the shift" as stated in Policy 670e?

  **ANSWER:** Defendant objects to Interrogatory No. 19 as overly broad and not proportional to the needs of the case as it places no limitation on time period or relevant work location. Subject to and without waiving these objections, from January 1, 2019 through the present, Defendant assessed nine associates, including Plaintiff with a Frist

EXHIBIT
**A2**

Written Warning for "Failure to report any known injury before the end of the shift" as stated in Policy 670e at the Edgerton, Kansas facility where Plaintiff worked.

20.     How many employees has Defendant fired for "Failure to report any known injury before the end of the shift" as stated in Policy 670e?

**ANSWER:** Defendant objects to Interrogatory No. 20 as overly broad and not proportional to the needs of the case as it places no limitation on time period or relevant work location.   Subject to and without waiving these objections, to the best of its knowledge Defendant has discharged one seasonal associate at the Edgerton, Kansas Facility from January 1, 2019 through the present who attained a First Written Warning for failure to timely report any known injury before the end of the shift as stated in Policy 670e.  That first written warning resulted in termination of her employment for receipt of any first written warning as a seasonal associate.

21.     How many individuals has Defendant required to review Policy 670e before starting employment or without paying them for the time spent reviewing it?

**ANSWER:**  None.

22.     On what date did Defendant first inform Plaintiff that she could be fired for "Failure to report any known injury before the end of the shift" as stated in Policy 670e?

**ANSWER:** March, 20, 2020

 Dated this 29th day of March 2021.

WALMART INC. Defendant,


By:  /s/ Christopher R. Hedican
      Christopher R. Hedican (KS #14542)
      Mark Goldsmith (KS #28446)
of   BAIRD HOLM LLP
      1700 Farnam St, Ste 1500
      Omaha, NE  68102-2068
      Phone: 402-344-0500
      Facsimile:  402-344-0588
      mgoldsmith@bairdholm.com


## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the above and foregoing document was sent via email this 29th day of March 2021 to the following:


Thomas Ralston
Kenneth Kinney


/s/ Christopher R. Hedican

DOCS/2604807.2

## VERIFICATION

STATE OF KANSAS          )
                         )  SS
COUNTY OF JOHNSON        )

Chelsea Davidson, being first duly sworn according to law, and upon oath, declares:

1.    That Affiant is Chelsea Davidson, Sr. Manager Human Resources for Walmart, upon which the Plaintiff's Second Set of Interrogatories were served and upon whose behalf Affiant makes this declaration.

2.    That Affiant is authorized on behalf of Defendant to make this declaration and that Affiant has read the foregoing Discovery propounded to Defendant in the action originally entitled *Janell Braxton v. Walmart Inc.*

3.    That the Discovery seeks information from Defendant and that no one individual associate of this entity has personal knowledge of the information so as to permit that one individual to respond fully and completely to all subjects addressed within this Discovery.

4.    That while Affiant does not have personal knowledge of all of the facts cited therein, the information was collected and the responses were made only after a reasonable search for information relating to the subject Discovery.

5.    Therefore, on information and belief, Affiant believes the attached Responses to the subject Interrogatories to be complete and accurate to the best of Affiant's knowledge, based upon the information available at this time.

FURTHER AFFIANT SAYETH NAUGHT.

IN WITNESS HEREOF, Defendant has caused the attached Responses to be executed on its behalf this 29 day of March 2021 by:

_____
on behalf of Defendant

Subscribed to and sworn before me this 29 day of March 2021.

MEGAN SHIELDS
Notary Public, State of Kansas
My Appointment Expires
03/14/2022

_____
Notary Public

DOCS/2613038.1

## **<u>PROOF OF SERVICE</u>**

I certify that on March 21, 2022, a copy of the foregoing (Appendix Volume II) was filed electronically with the Clerk of Court using the CM/ECF system, which will automatically send email notification of same to the following attorneys of record.

/s/ *Kenneth D. Kinney*
Kenneth D. Kinney – D.Kan. #78544
Ralston Kinney, LLC
4717 Grand Avenue, Suite 300
Kansas City, Missouri 64112
(816) 298-0086; Fax: (816) 298-9455
Email: ken@rklawllc.com
*Attorney for Appellant Janell Braxton*