APPEAL NO. 22-3003

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

---

**JANELL BRAXTON**

APPELLANT

v.

**WALMART, INC.**

APPELLEE

---

Appeal from the United States District Court
For the District of Kansas
District Case No. 20-2287-DDC-GEB
Daniel D. Crabtree, United States District Judge

---

**APPELLANT'S BRIEF**

---

Kenneth D. Kinney – D.Kan. #78544
RALSTON KINNEY, LLC
4717 Grand Avenue, Suite 300
Kansas City, MO 64112
816-298-0086
**Attorney for Appellant**

---

**ORAL ARGUMENT REQUESTED**

## **<u>TABLE OF CONTENTS</u>**

TABLE OF CONTENTS.................................................................2

TABLE OF AUTHORITIES ..........................................................5

GLOSSARY....................................................................................8

STATEMENT OF RELATED CASES ...........................................8

JURISDICTIONAL STATEMENT ...............................................9

STATEMENT OF THE ISSUES....................................................10

STATEMENT OF THE CASE .......................................................11

    a.  Braxton's Cause of Action  ...........................................12

    b.  Walmart's Motion for Summary Judgment ..................12

    c.  Braxton's Motion for Partial Summary Judgment  .......13

    d.  Braxton's Hiring, Training & Workplace Injury ..........14

    e.  The Policies Walmart is Supposed to Follow after an Injury.......................15

        Dot Com Safety Manual  ..........................................15

        Associate Incident Report.........................................17

        A Prompt, Thorough Investigation ..........................18

    f.  Braxton's Injury Report ................................................19

    g.  The Safety Cubicle  ......................................................20

    h.  "Upper Management" Gets Involved ............................21

    i.  Braxton's Termination ..................................................21

j.   Walmart Admits It Violated its Safety Manual & Other Policies ................22

k.   Other Disciplinary Documents ........................................................................23

l.   Walmart Denies Braxton Suffered an Injury.................................................24

m. Walmart Only Punished Braxton ....................................................................24

SUMMARY OF THE ARGUMENT ........................................................................25

STANDARD OF REVIEW ........................................................................................26

ARGUMENT & AUTHORITIES ..............................................................................27

I.   Retaliatory Discharge under Kansas Law  ....................................................28

II.  Direct Evidence Precluded Summary Judgment  .........................................29

III. Burden-Shifting  ................................................................................................32

a.   Step 1: Braxton's Prima Facie Case .........................................................33

b.   Step 2: Walmart's Explanation...................................................................34

c.   Step 3: Evidence of Pretext ........................................................................38

The Burden of Proof is Not a Reason to Grant Summary Judgment.......39

Walmart's "Belief" that Braxton Violated Policy was Not Dispositive ..40

Braxton's Evidence was Sufficient to Demonstrate Pretext ...................43

Walmart's "Belief" was Not Honestly Held ............................................45

Walmart's "Belief" was an Excuse to Fire an Injured Worker  ..............47

Pretext Summary ......................................................................................52

CONCLUSION ...........................................................................................................53

STATEMENT REQUESTING ORAL ARGUMENT ............................................54

CERTIFICATE OF COMPLIANCE WITH RULE 32(a) ......................................55

NOTICE OF FILING AND PROOF OF SERVICE ................................................56

ADDENDUM ......................................................................................................57

    K.S.A. § 44-520 ................................................................................................58

    Judgment in a Civil Case (Doc.105) (12/08/2021)
        Entering judgment for Walmart ..................................................................60

    Memorandum and Order (Doc. 104) (12/08/2021)
        Granting Walmart's Motion for Summary Judgment ..................................61

    Memorandum and Order (Doc.87) (05/18/2021)
        Denying Braxton's Motion for Partial Summary Judgment .....................105

# TABLE OF AUTHORITIES

Anderson v. Liberty Lobby, Inc.
    477 U.S. 242 (1986)..................................................................26, 39

Asp v. McPherson County Highway Department,
    388 P.2d 652 (Kan.1964).........................................................36, 37

Bausman v. Interstate Brands Corp.
    252 F.3d 1111 (10th Cir. 2001).....................................................41

Bostock v. Clayton County, Georgia
    140 S.Ct. 1731 (2020)..................................................................31

Campbell v. Husky Hogs, LLC,
    255 P.3d 1 (Kan. 2011)................................................................27

Coleman v. Safeway Stores, Inc.
    752 P.2d 645 (Kan.1988)...............................................34, 35, 37

Doebele v. Sprint/United Management Company
    342 F.3d 1117 (10th Cir. 2003)........................................28, 38, 49

Fassbender v. Correct Care Solutions, LLC
    890 F.3d 875, 882 (10th Cir. 2018) ............. 26, 29, 38, 41, 44, 47, 48, 49, 53

Foster v. AlliedSignal, Inc.
    293 F.3d 1187 (10th Cir. 2002).........13, 25, 28, 31-34, 38, 39, 41, 42, 44, 50

Fye v. Oklahoma Corp. Comm'n
    516 F.3d 1217 (10th Cir. 2008).....................................................33

Gonzalez-Centeno v. N Central Kansas Reg'l Juvenile Detention Facility
    101 P.3d 1170 (Kan. 2004).................................................27, 34, 36, 40, 41

Ibrahim v. Alliance for Sustainable Energy, LLC
    994 F.3d 1193 (10th Cir. 2021).....................................................46

Loudermilk v. Best pallet Co., LLC
    636 F.3d 312 (7th Cir. 2011).........................................................43

McDonnell Douglas Corp. v. Green
    411 U.S. 792 (1972)....................................................................14, 28, 38

Medtronic, Inc. v. Mirowski Family Ventures, LLC
    571 U.S. 191 (2014) ................................................................40

Murphy v. City of Topeka
    630 P.2d 186 (Kan.App. 1981)............................................27, 28, 35

Ortega v. IBP, Inc.
    874 P.2d 1188 (Kan.1994)..............................................................40

Pfeifer v. FedEx Corp.
    304 P.3d 1226 (Kan.2013)........................................................35, 37

Pilcher v. Board of County Commissioner of Wyandotte County
    787 P.2d 1204 (Kan.App. 1990).......................................................28

Platt v. Kansas State University
    379 P.3d 362 (Kan.2016)..................................................................9

Plotke v. White
    405 F.3d 1092 (10th Cir. 2005)......................................................47

Rebarchek v. Farmers Co-op. Elevator
    35 P.3d 892 (Kan. 2001)...............................................................28

Reeves v. Sanderson Pluming Prods., Inc.
    530 U.S. 133 (2000)...............................................................26, 40

Sanjuan v. IBP, Inc.
    78 F.Supp.2d 1195 (D.Kan.1999)......................................................9

Smothers v. Solvay Chemical, Inc.
    740 F.3d 530 (10th Cir. 2014)...................................................45, 46

Tabor v. Hilti, Inc.
    703 F.3d 1206 (10th Cir. 2013).............................................29, 30, 32

Tolan v. Cotton
        572 U.S. 650 (2014)...........................................................................26, 30, 31

US v. Anderson
        85 F.Supp.2d 1047 (D.Kan. 1999).........................................................39, 40

US v. McClatchey
        217 F.3d 833 (10th Cir. 2000) .....................................................................40

Young v. Dillon Companies, Inc.
        468 F.3d 1243 (10th Cir. 2006) ...................................................................13

## **Statutes**

K.S.A. § 44-520  ......................................................................................34, 35, 37

28 U.S.C. § 1291 .............................................................................................9

28 U.S.C. § 1332.............................................................................................9

## **Federal Rules**

Fed.R.Civ.P. 56 ............................................................................................26

# GLOSSARY

The following abbreviations appear Appellant's Brief or Appendix:

App-I ..........................................................................Appendix, Volume I

App-II..........................................................................Appendix, Volume II

App-III.........................................................................Appendix, Volume III

Form 670e .............................. Walmart Safety & Compliance Rule Violation Form
WMW-670e (App-II:179)

IR or Incident Report .........................................Walmart Associate Incident Report
(App-II:225)

Policy 763e....................................................Walmart General Safe Work Practices
WMW-763e (App-II:147)

Safety Manual ..................................Walmart eCommerce Dot Com Safety Manual
(App-II:196-207)

# STATEMENT OF RELATED CASES

There are no prior or related appeals.

## **JURISDICTIONAL STATEMENT**

The District Court had jurisdiction under 28 U.S.C. § 1332(a)(1) because there is complete diversity and the matter in controversy exceeds $75,000. Braxton is domiciled in Missouri. Walmart is a Delaware corporation with its principal place of business in Arkansas. Braxton alleged the tort of retaliatory discharge under Kansas law, which allows damages for lost wages, emotional distress, pain and suffering, and punitive damages. Platt v. Kansas State Univ., 379 P.3d 362, 365 (Kan.2016). A wrongful discharge causes "serious financial and emotional harm." Sanjuan v. IBP, Inc., 78 F.Supp.2d 1195, 1196 (D.Kan.1999).

This Circuit has jurisdiction under 28 U.S.C. § 1291 because the District Court granted summary judgment on Braxton's only claim. (App-III:3-46). A final judgment was entered in Walmart's favor on December 8, 2021. (App-III:47). The Notice of Appeal was filed 30 days later, on January 7, 2022. (App-III:48).

## STATEMENT OF THE ISSUES

1.     Is an employer entitled to summary judgment on a retaliation claim even if each decisionmaker admits the plaintiff would not have been discharged if she had not engaged in protected activity?

2.     Under Kansas law, the tort of retaliatory discharge is a "public policy" exception to at-will employment, making it illegal to discharge an employee for suffering a workplace injury or exercising rights as an injured worker. Kansas law allows a claim for workers' compensation to be brought if the worker notified her employer of the injury within 20 days. Is it lawful for an employer to shorten that deadline, and fire an employee for reporting an injury one day after it occurs?

3.     Is it reasonable to infer that a company policy of firing employees for reporting workplace injuries one day after they occur is a pretext, or an excuse, to fire injured workers to avoid workers' compensation liability?

4.     It is reasonable to infer a retaliatory motive when a company disregards its mandatory Safety Manual that applies to workplace injuries by not reporting, recording, or investigating an injury, by not offering an injured worker medical treatment, and instead deciding to fire the employee for allegedly violating a rule that was intentionally omitted from training in order to save time, while a non-injured worker who violated the same rule was not disciplined at all?

5.     If the evidence presents a "***close call***," can reasonable minds disagree?

## STATEMENT OF THE CASE

Walmart owns a warehouse/distribution center in Edgerton, Kansas, which fills online orders. (App-I:174, ¶¶1-5). Braxton worked there from March 23, 2020 until she was fired on April 14, 2020. (App-I:156-57, ¶¶2.a.1-10). On April 14, 2020, Braxton gave Walmart a "Statement Form" describing a workplace injury she sustained on April 13, 2020, and was fired immediately. (App-I:157, ¶¶9-10).

### a.  Braxton's Cause of Action

Braxton filed this case on June 10, 2020 and amended her complaint on September 29, 2020. (App-I:5-6, 13).[1] She alleged one cause of action—the tort of retaliatory discharge under Kansas law. In the Pretrial Order, she alleged:

> Walmart violated the common law of Kansas prohibiting retaliatory discharge when it fired Plaintiff. Walmart fired Plaintiff based on her status as an injured worker, i.e., because she suffered a workplace injury, because she reported a workplace injury, and/or because she requested medical treatment for a workplace injury.

(Doc.93, App-I:165-66, ¶4a).

In Walmart's first deposition,[2] it agreed "it fired Mrs. Braxton *because she reported her workplace injury* on April 14th" (App-I:83-84) and admitted it would not have fired her "but for" her injury report. (App-II:216) (App-I:57-58).

---

[1] Braxton initially sued Jet.Com. (Doc.1). By stipulation, Jet.Com was substituted with Walmart, Inc. (Doc.19).

[2] Quincy Usry gave two 30(b)(6) depositions as Walmart. (App-I:57; App-II:49, 117, 208).

**b. Walmart's Motion for Summary Judgment**

On June 9, 2021, Walmart moved for summary judgment. (App-I:171). It argued "the undisputed facts show that Walmart terminated Braxton's employment because it believed in good faith that she violated Walmart policy by failing to report a workplace injury during the same shift in which it occurred." (Id). Walmart argued Braxton had "no evidence … that Walmart actually fired her because she suffered an on-the-job injury." (App-I:183).

Braxton made three primary arguments in response. First, the decisionmakers' testimony was "direct evidence" linking Braxton's injury to her discharge. (App-II:59-60, 73, 216). Direct evidence precludes summary judgment without burden-shifting. If burden-shifting applied, Walmart failed to articulate a nonretaliatory reason for discharging Braxton because its policy conflicts with Kansas law. (App-II:77-79). Finally, she argued Walmart's explanation was a pretext for a retaliatory discharge designed to avoid workers' compensation liability. (App-II:79-89). Walmart's "**Safety Manual**" (App-II:196) required it to offer Braxton medical treatment, investigate her injury, inform her of her rights, and report her injury to the State. Instead of doing those things, Walmart fired her.

On December 8, 2021, the Court granted Walmart's motion. The Memorandum and Order making that decision (Doc.104, App-III:3) is the ruling presented for review.

When the Court granted Walmart's motion, it wrote,

> Admittedly, the situation here presents **another** relatively **close call**—especially because Walmart made such a mess of things. But ultimately, the court is guided by two legal principles: (1) plaintiff hasn't shown *clear and convincing evidence* of pretext, as she must at this stage, *see Foster*, 293 F.3d at 1195, and (2) the court isn't a 'super personnel department' second guessing employers' honestly held (even if erroneous) business judgments, *Young*, 468 F.3d at 1250.

(App-III:44) (bold added). The other "***close call***" was the denial of <u>Plaintiff's Motion for Partial Summary Judgment</u>. (Doc.47). That <u>Order</u> (Doc.87, App-I:136) is not presented for review, but it is relevant because the Court relied on it when granting Walmart's motion. (App-III:3, 14-15, 23-24).

### c. Braxton's Motion for Partial Summary Judgment

Braxton's motion rested on Walmart's 30(b)(6) deposition admissions. Its representative agreed there was a "causal connection" between Braxton reporting her injury and being fired. (App-I:31, ¶10); (App-I:52). He admitted Braxton would not have been fired "but for" reporting her workplace injury to Walmart. (App-I:31, ¶11); (App-I:53-54). Braxton's arguments about direct evidence and Walmart's injury reporting policy (which resurfaced when opposing Walmart's motion) first appeared in her Reply. (App-I:108-16).

Braxton's motion required the Court to view the evidence and inferences in Walmart's favor. From that perspective, the Court rejected Braxton's arguments about direct evidence and Walmart's lack of a nonretaliatory explanation. (App-

I:143-52). The Court's burden-shifting analysis reached the pretext stage, and Braxton did not argue pretext, so the Court denied her motion. (App-I:153).[3]

When the Court denied Braxton's motion, it wrote, "While plaintiff's retaliation claim may survive for trial, she has not demonstrated that she deserves summary judgment under the *McDonnell Douglas* framework." (App-I:153). So, after these two "**close calls**," the Court entered judgment for Walmart.

### d. Braxton's Hiring, Training, & Workplace Injury

On March 20, 2020 (three days before Braxton's employment began) Walmart instructed Braxton to review documents online and acknowledge her receipt before her first day. (App-II:44, ¶48.c). A Walmart "talent acquisition representative" gave Braxton these instructions. (App-II:96). Two of those documents reference the rule Walmart says it fired Braxton for violating. One is Walmart's "Safety and Compliance Rule Violation Form," or **Form 670e**. (App-II:42-44, App-II:180). The other is Walmart's "General Safe Work Practices" or **Policy 763e**. (App-II:43, App-II:147-58). Braxton tried to review them on her phone, she but could not. (App-II:96-97). They were not covered at orientation.

Once at work, Braxton attended "Safety School" orientation. (App-II:70, ¶224). Training on workplace injuries was not included. (Id. ¶225). In fact, the

---

[3] If burden-shifting reaches pretext, summary judgment for plaintiff is impossible. Pretext "will *permit* the trier of fact to infer … discrimination," but cannot compel judgment for plaintiff. St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 510 (1993).

"Training Specialist" who trained Braxton did not know Walmart's policy on reporting workplace injuries, she did not cover it in training, and she had never been trained on it herself. (App-II:16). **Form 670e** and **Policy 763e** were omitted from Safety School to "save time" because Walmart wanted to shorten the time it took to get new employees working. (Id).[4] Walmart never trained Braxton about reporting workplace injuries. (App-II:70).

Braxton's job was "Associate, Warehouse Fulfillment." (App-II:91). It was a full-time position that required "continuous physical activity" and "repetitive hand motions." (App-II:91-92). She pulled merchandise, packaged it, and placed packages on a conveyor belt. (App-II:33, ¶5). She worked nights. (App-II:34, ¶8).

A week into her employment, Braxton took medical leave for COVID-19 symptoms. (App-II:56, ¶83). She was on leave from March 29, 2020 until April 11, 2020, and returned April 12. (App-II:56, ¶86). She was injured on April 13, 2020, during her first shift back. (App-II:223).

### e. The Policies Walmart was Supposed to Follow after an Injury

**Dot Com Safety Manual** (App-II:196-207): During Braxton's employment, Walmart's **Safety Manual** contained mandatory policies and procedures that apply when an employee is injured. (App-II:60, ¶¶125-28); (App-II:128). Managers have

---

[4] Braxton was hired when the COVID-19 pandemic was causing online sales to surge. (App-II:33-34, ¶7a).

access to it, and are trained on it, but it is unavailable to employees like Braxton. (Id. ¶¶129-32). It is an electronic document with hyperlinks to forms and policies that must be used when an employee is injured. (App-II:61, ¶139). It applies when there is an "incident" that causes an "injury." These terms are defined.

The Safety Manual defines "incident" as "Any unexpected, unplanned or abnormal event or series of events that occurs and <u>does</u> result in an injury." (App-II:61, ¶¶133-34). An "injury" includes "an abnormal condition or disorder." (Id. ¶136). Walmart's policy distinguishes "injury" from "soreness." (App-II:68, ¶206). If an employee experiences soreness from the regular performance of her job, there has not been an "injury incident" under the Safety Manual. (App-II:61, ¶¶135, 137). But repetitive motions that initially cause soreness can lead to an "injury." (Id. ¶¶138-39). Walmart never explained this to Braxton. (App-II:69, ¶¶216-21).

Two Walmart policies require "incidents" and "injuries" to be reported. **Policy 763e** (App-II:147-58) says:

> All known **injuries**, no matter how slight, will be reported to a member of management immediately. At a minimum, these must be reported to a member of management by the end of the shift.

(App-II:148). Policy 763e does not define "injuries" or say employees may be disciplined for not reporting them. (App-II:67, ¶¶194-98). The **Safety Manual** says employees must report an "**incident**" to a manager. (App-II:199). "Failure to do so *may* result in disciplinary action." (Id.) (emphasis added).

16

The Safety Manual provides three qualifications for issuing discipline. First, issuing discipline for safety violations is discretionary, not mandatory. (App-II:66, ¶¶183-85); (App-II:144). Second, the Safety Manual requires an investigation. (App-II:67, ¶188). Third, if management exercises its discretion to issue discipline for a safety violation, the Safety Manual requires the discipline be issued "per the **WMW-670e** eCommerce Safety and Compliance Rule Violation Form." (App-II:200). Using the **Form 670e** is required. (App-II:67, ¶190); (App-II:144). The Form 670e makes "Failure to report any known injury before the end of the shift" a "Step 1" violation, which is not a terminable offense. (App-II:180).

**Associate Incident Report** (App-II:225): When an employee is injured, the Safety Manual requires Walmart to provide the injured worker with an "Associate Incident Report." (App-II:63, ¶153). This is mandatory, not discretionary. (Id. ¶154). The Incident Report asks for information such as how the injury occurred, when it was first reported, and to whom. (App-II:225). The Incident Report asks injured workers to state whether they want medical treatment. (App-II:64, ¶162). Walmart also has other policies to help ensure injured workers are afforded their rights, including medical treatment.

A Medical Authorization form must be given to the injured worker with the Incident Report. (App-II:63, ¶153). Walmart is also required to give injured workers a form issued by the State of Kansas describing their rights. (App-II:62,

¶¶147-49) (App-II:230). Walmart has a policy called the "Associate Work-Related Injury Management Guidelines" (App-II:226-27) which instructs managers to offer injured workers "medical attention from a Work Comp provider." (App-II:65-66, ¶¶179-81). The Safety Manual requires a manager to contact an injured worker for seven days after the injury, "to see if additional aid is necessary." (App-II:201-02).

The Safety Manual requires every injury to be recorded in Walmart's "Incident Reporting System" within 24 hours. (App-II:65, ¶177). The Safety Manual requires management to file a report with State if required and provides a link to "state specific" documents. (App-II:61-62, ¶¶142-45). Walmart agrees a report to the State was required for Braxton's injury. (App-II:62, ¶151)

**A Prompt, Thorough Investigation**. (App-II:199-201). The Safety Manual requires a manager to promptly investigate workplace injuries. (App-II:64, ¶165). This is mandatory, there is no exception. (Id. ¶166, ¶170). The Safety Manual has a link to a form "WMW-738e," which must be used to conduct a "thorough investigation." (Id. ¶¶165-67); (App-II:197-99). The minimum requirements include collecting "witness statements," completing a "5-Why Analysis" and "determining corrective action" to address the injury's "root cause." (App-II:200-01). The **5-Why** is a separate form. (App-II:65, ¶175). Walmart has a "Statement Form" to use with witnesses giving statements in an investigation. (App-II:64,

¶163). Operations Manager **David Whitenack** was supposed to investigate Braxton's injury. ([App-II:64-65](App-II:64-65), ¶¶167-72).

### f. Braxton's Injury Report

Around 1:00 am on April 13, 2020, Braxton felt pain in her left wrist. ([App-II:56](App-II:56), ¶86). No specific incident caused it. (Id. ¶¶86-88). Braxton kept working, but before her shift ended, she told **Ammie Wilbur** her wrist was "really hurting." (Id. ¶¶90-92). Wilbur was "Braxton's manager." ([App-II:35](App-II:35), ¶16). Wilbur had a duty under Walmart policy to report Braxton's injury to management, and was subject to discipline if she failed to. ([App-II:128](App-II:128), Depo.41:7-10). Braxton finished her shift the morning of April 13, and returned to work that evening. ([App-II:37](App-II:37), ¶¶20-21).

Upon returning, Braxton told her supervisor her wrist still hurt. ([App-II:56-57](App-II:56-57), ¶¶93-94). Her pain progressed throughout the shift, but she kept working. ([App-II:57](App-II:57), ¶95). She returned to work on April 14. (Id. ¶96). Braxton told Wilbur she was "still hurting" and asked for a wrist brace. (Id. ¶¶97-98) ([App-II:107](App-II:107)). This time, Wilbur sent Braxton to the "safety cubicle." ([App-II:57](App-II:57), ¶99).

### g. The Safety Cubicle

The Safety Cubicle is in the middle of the warehouse. It provides first aid, medical treatment, and other assistance for injuries. ([App-II:34](App-II:34), ¶¶9-11; [App-II:57](App-II:57), ¶101). **Mark Tuazon** was stationed there as "Safety Lead." (Id). Braxton told Tuazon about her wrist pain. (Id). Walmart policy required Tuazon to make an

"incident report" if he learned of a workplace injury, but he did not comply with that policy. (Id. ¶¶103-05). He gave Braxton an ointment for the pain. (Id. ¶107).

### h. "Upper Management" Gets Involved

Braxton returned to her workstation and updated Wilbur. Sometime later, a member of "upper management" asked Braxton to come with him to complete an "**incident report**." (App-II:58, ¶¶106-07). It was Operations Manager Whitenack, whose job included overseeing the entire facility. (App-II:39, ¶35). Despite what he said, he gave Braxton a "**Statement Form**" instead of an "**Incident Report**." (App-II:59, ¶114).[5] Whitenack was following instructions from **Quincy Usry**.

Usry was the "Environmental Health and Safety Operations Manager" during Braxton's employment. (App-II:42, ¶42). Usry was familiar with the Safety Manual because he had access to it, had received training on it, and his job included training other employees on it. (App-II:60, ¶130-32) (App-II:139).

On April 14, Whitenack texted Usry about Braxton's injury. (App-I:296). Whitenack said Braxton "hurt her wrist Sunday (doesn't know how) and didn't tell anyone." (App-I:296). ***But Whitenack never asked Braxton when she was injured or if she had told anyone***. (App-II:110-11). Usry asked Whitenack to get a statement from Braxton and said she would be punished *"if she described pain*."

---

[5] *Compare* "Statement Form," *with* "Incident Report" (App-II:223-25).

(App-I:296). In response, Whitenack asked, "**IR and 5 why**?" (Id). Usry did not answer, but again asked for a "statement." (App-I:296).

Whitenack gave Braxton a **Statement Form** and told her to write "what date and time she recalled experiencing the pain" and "everything [she] was feeling, that was going on with [her] wrist." (App-II:59, ¶¶115-17). He *did **not*** tell her to write whether she previously reported the injury. (App-II:59, ¶117). Braxton wrote:

> 1:00 am 4/13/2020. On Monday morning I noticed that my wrist began to ache. It progressed to throbbing pain and by the time I left at 5:00 am it was excruciating. I took a 500 mg tylenol & went to sleep. It is swollen & sometimes feels warm to the touch. There is a little bruising. It is hard for me to work fast when putting items in the mailers & it hurts to pick up semi heavy items with that wrist. I can only pick up the totes if they are partially full. It is my left wrist that is injured. I am trying not to use it. The pain progresses throughout the shift.

(App-II:223). Whitenack texted the Statement to Usry, who responded, "Yea, that would be a coaching. Is HR on site? Would she be termed with a written coaching?" (App-I:297). Walmart fired Braxton less than 30 minutes later. (App-I:157, ¶¶9-10).

### i. Braxton's Termination

Whitenack told Braxton she was fired. He said employees are supposed to report workplace injuries within 24 hours, which is something she had never been told. (App-II:46-47, ¶57.a.i-ii). Whitenack said they were firing Braxton to "protect themselves." (App-II:47, ¶57.b). Braxton was "completely confused" and became

"real emotional." (App-II:47-48, ¶58).

Walmart admits it never investigated whether Braxton reported her injury during the shift in which it occurred. (App-II:71, ¶¶236-42) (App-II:214). Walmart simply chose not to investigate that issue, even though it says whether she timely reported the injury determined whether she was fired. (App-II:214-15).

### j. Walmart Admits It Violated its Safety Manual & Other Policies

Walmart admits the Safety Manual should have been followed for Braxton's injury (App-II:60, ¶¶125-32); (App-II:132-33; Dep.68-70); (App-II:143, Dep.111-12). It was available to each management employee who knew about Braxton's injury. (App-II:128; Dep.43-44). Walmart admits it violated its Safety Manual, and other policies in the following ways:

- Walmart never offered Braxton medical treatment. (App-II:71, ¶¶233-35).

- Walmart never provided Braxton the required Kansas state form describing the rights of injured workers. (App-II:62, ¶¶147-50; App-II:230).

- Walmart violated the Safety Manual by not providing Braxton an "Associate Incident Report." (App-II:63, ¶¶155-57).

- The "Statement Form" Whitenack gave Braxton did not comply with the Safety Manual. (App-II:64, ¶163).

- Whitenack violated the Safety Manual by not investigating Braxton's injury or submitting any findings to Walmart. (App-II:64-65, ¶¶167-72).

- Walmart violated the Safety Manual by not completing a "5 Why" analysis form for Braxton's injury. (App-II:65, ¶¶175-76).

- Walmart violated the Safety Manual by not recording Braxton's injury in its internal "Incident Reporting System." (App-II:65, ¶¶177-78).

- Walmart never submitted an Injury Report to the State of Kansas even though it was required. (App-II:61-63, ¶¶143-52).

- Walmart violated the Safety Manual by not using the Form 670e for Braxton.  (App-II:67, ¶192).

### k.  Other Disciplinary Documents

Although the Safety Manual is mandatory for workplace injuries and requires the Form 670e to be used for safety violations, the record contains two other documents related to discipline, which Walmart claims it relied on. One is called "Conduct Disciplinary Guidelines." (App-II:28). That document mentions four types of discipline: Quick Coach, First Written, Second Written, and Third Written (Final). (Id). None of those are listed on the Form 670e. (App-II:180). These Guidelines say, "Jetflex and Jet Seasonal should be terminated when their coaching has progressed to a formal written." (App-II:28). A "formal written" is not an option on the Form 670e. (App-II:180). The Guidelines do not say anything about safety violations. (App-II:28).

23

The other document is called "JetFlex Disciplinary Action Guidelines." (App-II:195). They mention "sexual harassment, discrimination, threats, etc." (Id). These types of misconduct are not listed on the Form 670e. (App-II:180). These Guidelines say an employee should receive two "Quick Coach" conversations or one "written coaching" before being fired. (App-II:195). Neither of those types of discipline are listed on the Form 670e. (App-II:180). When Walmart determines discipline is warranted for a Safety Violation, it is supposed to use the Form 670e. (App-II:144-145, Dep.115:13 - 117:8). The JetFlex Disciplinary Action Guidelines also do not say anything about safety violations. (App-II:195).

### l.   Walmart Denies Braxton Suffered an Injury

"Walmart's position in this lawsuit is that it fired Mrs. Braxton because she reported her workplace injury on April 14th of 2020." (App-I:83-84). Yet Walmart denies that Braxton suffered a workplace injury on April 13, 2020. (App-II:190, ¶¶4-5).

### m. Walmart Only Punished Braxton

Braxton is the only employee who was punished after Walmart learned of her injury. (App-II:70, ¶¶226-32). Usry and Whitenack were not disciplined for violating their duties under the Safety Manual. (App-II:141). Safety Lead Tuazon was not disciplined for failing to record Braxton's injury. (App-II:188). No other employee was disciplined in relation to Braxton's injury. (App-II:145-46).

## SUMMARY OF THE ARGUMENT

The Court erred because it was guided by principles inconsistent with the "axiom" governing summary judgment. Invoking the "honest belief" doctrine caused it to view the evidence from Walmart's perspective, in Walmart's favor, and against Braxton. Accepting Walmart's "honest" belief in the face of conflicting evidence required a credibility decision, which is forbidden. The Court invoked the burden of proof as a reason to grant summary judgment, contrary to Foster, which it cites as its basis for doing so. If it had focused on the proper principles, it would have denied summary judgment in this "***close call***."

Braxton proffered "direct evidence" that her workplace injury was *a factor* in her discharge. The Court agreed all three decisionmakers admitted as much, but it viewed the evidence in Walmart's favor. It required proof that Braxton's injury was the sole cause of her discharge, which conflicts with Kansas law.

Walmart was also not entitled to summary judgment under burden-shifting. Firing an employee for reporting an injury one day after it happens is not "nonretaliatory" because it conflicts with Kansas public policy. Even if Walmart's policy is valid, when the evidence is viewed in Braxton's favor, it is "rational" to infer pretext. Walmart disregarded every policy designed to protect Braxton as an injured worker, and instead exercised its discretion to fire her. According to Whitenack, Walmart fired Braxton to "protect" itself. That is evidence of pretext.

## STANDARD OF REVIEW

Summary judgment is reviewed *de novo*. <u>Fassbender v. Correct Care Solutions, LLC</u>, 890 F.3d 875, 882 (10th Cir. 2018). Summary judgment is only proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). If the movant makes this showing, the nonmovant can avoid summary judgment by showing "a rational jury could find in favor of the nonmoving party on the evidence presented." <u>Fassbender</u>, 890 F.3d at 882. If "reasonable minds could differ," summary judgment must be denied. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 250-51 (1986).

Throughout the analysis, the court must view the evidence in favor of the nonmovant. <u>Tolan v. Cotton</u>, 572 U.S. 650, 651 (2014). Reversal is required if the district court "failed to adhere to the axiom that in ruling on a motion for summary judgment, the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." <u>Id</u>. The court cannot rely on evidence that requires a credibility assessment. A court reviewing summary judgment "may not make credibility determinations or weigh the evidence." <u>Reeves v. Sanderson Plumbing Products, Inc.</u>, 530 U.S. 133, 150 (2000). The court "must disregard all evidence favorable to the moving party that the jury is not required to believe." <u>Id</u>. That did not happen here.

## ARGUMENT & AUTHORITIES

### I.     Retaliatory Discharge under Kansas Law

Braxton's sole cause of action was retaliatory discharge under Kansas law. (App-I:165). Kansas adopted this tort in 1981. Murphy v. City of Topeka, 630 P.2d 186, 192-93 (Kan.App. 1981). The Murphy court held it is unlawful to discharge an employee for exercising rights under the Workers' Compensation Act, specifically by filing a claim for workers' compensation. Id. This claim is a "public policy" exception to the employment at-will doctrine. Id. Since Murphy, Kansas has expanded this tort to other kinds of protected activity. Campbell v. Husky Hogs, LLC, 255 P.3d 1, 4-5 (Kan. 2011) (citing four protected acts, recognizing fifth). This expansion also continues in the work comp. sector of the claim.

Kansas has consistently expanded the tort of retaliatory discharge for injured workers. Gonzalez-Centeno v. North Central Kansas Reg'l Juvenile Detention Facility, 101 P.3d 1170, 1173 (Kan. 2004). It has been expanded to prohibit retaliatory demotions. Id. It has been expanded to protect employees who merely suffer an injury that *might* lead to a workers compensation claim. Id. It has been expanded to protect the spouses of injured workers. Id. And in Gonzalez-Centeno, the Court expanded it to protect injured workers from being discharged by one employer in retaliation for exercising rights against another employer. Id. at 433-34 (plaintiff with two jobs was injured at one, fired by the other).

27

This continuous expansion serves to protect the public policy established by Kansas law. That has been the purpose of this cause of action since its inception.

> The Workmen's Compensation Act … is designed to promote the welfare of the people in this state. It is the exclusive remedy afforded the injured employee, regardless of the nature of the employer's negligence. ***To allow an employer to coerce employees in the free exercise of their rights under the act would substantially subvert the purpose of the act.***

Murphy, 630 P.2d at 192 (emphasis added). Though often couched in terms of exercising "rights," it is also illegal to discharge an employee for suffering an injury that could *possibly* lead to a claim for workers' compensation. Pilcher v. Bd. of Cnty. Comm'rs of Wyandotte Cnty., 787 P.2d 1204, 1211 (Kan.App. 1990). The protected activity does not have to be the "sole motive or reason." Foster v. AlliedSignal, Inc., 293 F.3d 1187, 1196 (10th Cir. 2002). Under Kansas law a discharge is retaliatory if it is "motivated by" the protected act. Id.

Kansas applies McDonnell Douglas[6] burden-shifting to retaliatory discharge claims. Rebarchek v. Farmers Co-op. Elevator, 35 P.3d 892, 898 (Kan. 2001). When reviewing summary judgment, reversal is required unless the employer's motion was based on "abundant and uncontroverted independent evidence that no [retaliation] occurred." *See* Doebele v. Sprint/United Mgmt. Co., 342 F.3d 1117, 1137 (10th Cir. 2003).

---

[6] McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).

## II.    **Direct Evidence Precluded Summary Judgment** (App-II:73-75)

Where burden-shifting generally applies, direct evidence precludes summary judgment without it. Tabor v. Hilti, 703 F.3d 1206, 1216 (10th Cir. 2013). The District Court erred by deciding the decisionmakers' testimony is not direct evidence. Part of its error was relying on its Order denying Braxton's motion for summary judgment, which viewed all the evidence in Walmart's favor. When reviewing Walmart's motion, however, it was no longer appropriate to view the evidence that way. When the inferences favoring Walmart are ignored, the decisionmakers' testimony directly links Braxton's injury to her discharge.

A decisionmaker's statements are direct evidence when they "directly link" a protected class to an adverse action. Tabor, 703 F.3d at 1216-17. The issue is whether the evidence "demonstrates on its face that" the employment decision was based on an illegal motive. *See* Fassbender, 890 F.3d at 884. Such is the case here.

The decision to fire Braxton was made by Usry, Whitenack, and Medaris. (App-II:59, ¶120). The Court agreed all three admitted they would not have fired Braxton if she did not report her workplace injury. (App-III:18). ("Plaintiff's right.") Whitenack agreed he would not have had a reason to fire Braxton if she did not report her injury. (App-III:19). Medaris agreed Walmart would not have fired Braxton without knowledge of her injury. (Id). And Usry, testifying as Walmart, agreed Braxton would not have been fired "but for [her] report of a workplace

injury to Walmart." (Id). This testimony is direct evidence because it "directly links" Braxton's injury to her discharge. <u>Tabor</u>, 703 F.3d at 1217.

The Court conceded that when the cited testimony stands alone, which it called being "stripped of context," it "looks like direct evidence of retaliatory intent." (App-III:21). That's because it is – no inference is required. "On its face," the testimony links the protected class to the adverse action. True, other parts of the decisionmakers' testimony allow one to see the evidence differently. But viewing the evidence in Walmart's favor is inappropriate.

The Court considered Braxton's argument a "do-over" of the one it rejected when ruling on Braxton's motion. (App-III:18). In one sense, it was the same. But there were two material differences. First, Braxton proffered the testimony of the two other decisionmakers. More importantly, Walmart was now the movant, so it was not entitled to a single inference, and the evidence could not be weighed in its favor. <u>Tolan</u>, 572 U.S. at 651. Failing to recognize this paradigm shift caused the Court to rely too much on its prior ruling.

The Court was persuaded by the decisionmakers' testimony saying their decision was based on Braxton not "*timely*" reporting her injury. (App-III:19). But that testimony doesn't erase their admissions that Braxton would have remained employed if she never reported her injury. The Court essentially weighed the evidence and viewed it in Walmart's favor. That runs afoul of the "axiom" of

summary judgment and requires reversal. <u>Tolan</u>, 572 U.S. at 651. The Court's analysis also disregarded the substantive law of Kansas.

Braxton was not required to prove her workplace injury was Walmart's "sole motive or reason" for her termination. <u>Foster</u>, 293 F.3d at 1196. She was only required to show "her discharge was 'based on,' 'because of,' 'motivated by,' or 'due to' the employer's intent to retaliate." <u>Id</u>. By disregarding the face-value of the decisionmakers' testimony in exchange for their alternative explanation, the Court essentially invoked a sole causation standard. When an employer admits the plaintiff would not have been fired "but for" her protected activity, that is sufficient to trigger the law.

Testimony admitting Braxton would not have been fired without her protected activity establishes "but for" causation. *See* <u>Bostock v. Clayton County, Ga.</u>, 140 S.Ct. 1731, 1739 (2020). In <u>Bostock</u>, the Supreme Court held that when a protected class is "one but-for cause of [a challenged employment] decision, that is enough to trigger the law." <u>Id</u>. An employer cannot avoid liability for sex discrimination by saying it acted on an employee's sexual orientation and not their sex; the former can't exist without the latter. <u>Id</u>. at 1740-41. Walmart's explanation for firing Braxton cannot be extrapolated from her protected activities (being injured and reporting it) unless the decisionmakers' testimony is ignored or viewed in Walmart's favor. Either option violates the standard of review. When the

testimony's face value is accepted, without drawing contrary inferences, the nexus between Braxton's protected activity and discharge is present.

In Tabor, this Circuit held that comments showing an interviewer's bias against females selling tools was direct evidence of a sex-based refusal to hire. 703 F.3d at 1217. The decisionmaker did not admit his bias influenced his decision, and the employer argued the plaintiff was not hired because of her low ratings. Id. at 1213-15. The comments were still direct evidence because they were made about the plaintiff's sex, during her interview, and about the job in question. So, they "directly linked" her sex to the decision. Id. at 1217. Here, the link is closer. Walmart's motion should have been denied based on Braxton's direct evidence.

### III.   __Burden-Shifting__ (App-II:75-89)

Braxton's claim should have also survived burden-shifting. There are three steps to the process. First, the plaintiff makes a prima facie case. Foster, 293 F.3d at 1193. A prima facie case shifts the burden to the defendant, who must produce a "legitimate, nonretaliatory justification" for firing the plaintiff. Id. at 1194. If the employer does so, the employee may avoid summary judgment by showing the employer's justification is a "cover-up or pretext for retaliatory discharge." Id. Throughout the analysis, the evidence is viewed in Braxton's favor. Id. at 1195.

### a. Step 1: Braxton's Prima Facie Case (App-II:75-77)

Braxton's prima facie case was uncontested. (App-III:21-22). Braxton's prima facie case required evidence showing:

> (1) she sustained an injury that might result in workers' compensation;
>
> (2) Walmart knew of her workplace injury;
>
> (3) Walmart terminated Braxton's employment; and
>
> (4) "a causal connection existed between the protected activity or injury and the termination."

Foster, 293 F.3d at 1193. Braxton's prima facie case is simple and straightforward.

It was undisputed that Braxton suffered a workplace injury, Walmart knew about it, and Walmart fired her. For the fourth element, a causal connection can be inferred from the temporal proximity between the protected activity and discharge. Id.; *see also* Fye v. Okla. Corp. Comm'n, 516 F.3d 1217, 1228 (10th Cir. 2008) (2 weeks sufficient). The temporal proximity was disputed, but not material.

Braxton's evidence shows the temporal proximity between Walmart's knowledge of her injury and her discharge was one day (reported injury April 13; fired April 14). Walmart says both occurred on April 14. Notably, the District Court accepted Walmart's evidence instead of Braxton's. (App-III:22). Either way, the temporal proximity was sufficient to establish a prima facie case.

### b.  Step 2: Walmart's Explanation (App-II:77-79)

At the second stage, Walmart must produce a nonretaliatory explanation for firing Braxton. Foster, 293 F.3d at 1194. Walmart says it fired Braxton for reporting her injury one day after it happened, pursuant to its policy. Walmart's policy conflicts with the public policy established by K.S.A. § 44-520, which allows a workers' compensation claim to be made if the employee notifies the employer of an injury within 20 days. The public policy established by this statute is that employees have the "right" to report workplace injuries for 20 days. The Court rejected this argument without the analysis required by Kansas precedent.

The Kansas Supreme Court's opinion in Coleman v. Safeway Stores, Inc., 752 P.2d 645 (Kan.1988) provides the proper framework to assess Braxton's public policy argument.[7] Under Kansas law, "public policy" is "a principle of law which holds that no citizen can lawfully do that which injures the public good." Id. at 647. When analyzing public policy, the Kansas Supreme Court is mindful that "the primary lawmaking body is the legislature." Id. When considering the impact

---

[7] The Court disregarded Coleman because part of it was disapproved by Gonzalez-Centeno. (App-III:25, n.8). But it only disapproved Coleman's discussion of the employer's enforcement of its attendance policy against an employee who misses work for an injury. See Gonzalez-Centeno, 101 P.3d at 1175 (injured worker fired for attendance creates issue of fact for jury). Braxton did not cite that part of Coleman. She cited its discussion of whether enforcing a contract to preclude claims of retaliatory discharge violates the public policy of Kansas. See Coleman, 752 P.2d at 646-652. Coleman's holding that such a contract violates public policy is still good law and its analysis remains instructive.

of an employer's policy or contract on claims of retaliatory discharge, the Court focuses on the public policy giving rise to the cause of action. *See* Pfeifer v. FedEx Corp., 304 P.3d 1226, 1231-34 (Kan.2013). That being the prohibition of preventing injured workers from exercising their rights. Murphy, 630 P.2d at 192. Coleman describes three situations that may arise when assessing public policy:

> (1) The legislature has clearly declared the public policy of the state; (2) the legislature, though not directly declaring public policy, has enacted statutory provisions from which public policy may reasonably be implied; or (3) the legislature has neither made a clear statement of public policy nor can it be reasonably implied.

Id. at 648. The second is present here.

Under Kansas law, a claim for workers' compensation cannot be pursued unless the employee notifies his employer of an "accident or injury by repetitive trauma" within 20 days. K.S.A. § 44-520(a)(1)(A). It is reasonable to conclude this statute implies a "right" to report injuries within its deadline. Otherwise, the deadline would be shorter. Walmart's policy punishes employees for exercising this right unless the right is exercised on Walmart's schedule. But Walmart's schedule undermines the public policy established by the statute.

Heavy labor causes muscles to get sore, joints to ache, and bodies to fatigue. If an employee feels pain but does not immediately report it, and subsequently realizes the pain has progressed to an injury, he should not have to choose between seeking treatment and being fired. If he is within the statutory deadline, it is his

"right" to receive medical treatment. But to secure that right, he must notify his employer of the injury. Does he not have the "right" to report the injury to his employer if he is within the 20-day statutory deadline? If he does, then it is illegal to fire him for exercising that "right" because "exercising rights under the Kansas Workers Compensation Act" is protected. Gonzalez-Centeno, 101 P.3d at 1172.

Instead of focusing on Kansas law, the Court relied on cases in other jurisdictions that do not "directly address" the issue even though they involve employers with a policy like Walmart's. (App-III:25). Two of the employees admitted they submitted a false injury report.[8] The other two failed to make prima facie cases.[9] None discuss the validity of the policy directly or indirectly.

The District Court also read too far into the Kansas Supreme Court's refusal to address the issue in Asp v. McPherson County, 388 P.2d 652 (Kan.1964). (App-III:25). Asp filed a worker's compensation claim late and argued his failure to timely file should be forgiven because his employer engaged in constructive fraud by having a policy shortening the deadline to report an injury. The Court did not address his argument; it said that even if the policy was fraudulent, there was no evidence he relied on it. Asp, 388 P.2d at 655. Fraud requires proof of reliance, but

---

[8] Charney v. Utd. Airlines, Inc., 2020 WL 6450445 *3 (D.Col. 11/02/20); Yowell v. Admin. Review Bd., 993 F.3d 418, 420 (5th Cir. 2021).

[9] Ramirez v. Goodyear Tire & Rubber Co., 2014 WL 3744166, *9 (W.D. Okla. 07/30/14); Alires v. Amoco Production Co, 774 F.2d 409 (10th Cir. 1985).

that holding has no application here. The District Court viewed the lack of "criticism" as the Kansas Court's tacit approval of such a rule. (App-III:25).

A proper public policy analysis is displayed in Coleman, which the District Court erroneously ignored. (Id., fn.8). The Coleman Court held that enforcing a collective bargaining agreement to bar litigation of a retaliatory discharge claim violates public policy. 752 P.2d at 647-52. That holding remains good law in Kansas. The proper analysis should have considered the purpose of the 20-day reporting deadline and the public policy establishing the tort of retaliatory discharge. In Coleman, that public policy invalidated a contract requiring retaliatory discharge claims to be exhausted through a grievance procedure. Id. In 2013, that public policy invalidated a contract shortening the statute of limitations to bring a retaliatory discharge claim. Pfeifer, 304 P.3d at 1228-29. Both times, the Kansas Supreme Court emphasized the public policy underpinning the claim. The District Court did not. (App-III:23-26).

The Kansas Supreme Court will not "inject" an employer's "own public policy views" into the Workers' Compensation Act or into the tort of retaliatory discharge. Id. at 1234-35. So, it would most likely hold K.S.A. § 44-520 establishes a public policy giving workers the "right" to report injuries for 20 days. If that is true, Walmart's position that it fired Braxton for reporting an injury one day after it happened is not "nonretaliatory." That may not mean Braxton is

entitled to summary judgment, but it does mean she is entitled to a jury trial.

### c.  Step 3: Evidence of Pretext (App-II:79-89)

Even if Walmart's "stated reason" for firing Braxton can be considered "nonretaliatory," Braxton can still show it is "a pretext for the sort of [retaliation] prohibited by [Kansas law]." McDonnell Douglas, 411 U.S. at 805. The issue is whether the explanation was a "mere cover-up or pretext for retaliatory discharge." Foster, 293 F.3d at 1194. Summary judgment cannot be affirmed unless Braxton "failed to produce any evidence from which a reasonable inference could be drawn that [Walmart's] proffered reasons for firing her were pretextual." Id. at 1195. Could a jury view Walmart's explanation as "an excuse" to eliminate an injured worker from its workforce? If so, that makes it pretextual. *See* Fassbender, 890 F.3d at 890.

If a "rational jury" *could* find pretext, summary judgment must be reversed. Id. at 882. The "totality of the circumstances" is the relevant scope of inquiry. Id. at 884. Any doubt as to pretext must be resolved in Braxton's favor. Doebele, 342 F.3d at 1139. And "the fact of pretext alone" is sufficient. Id. at 1135-36. These "legal principles" should have guided the District Court's analysis.

Instead, the Court was guided by the "clear and convincing evidence" standard, and by Walmart's "honest" belief that Braxton violated policy. (App-III:44) (Id). These principles caused a departure from the proper standard, resulted

in summary judgment despite the evidence making it a "close call, and conflict with the substantive law of Kansas.

## **The Burden of Proof is Not a Reason to Grant Summary Judgment**

Citing <u>Foster</u>, the Court invoked the clear and convincing evidence standard to justify granting summary judgment. According to <u>Foster</u>:

> a plaintiff in federal court who opposes summary judgment in a retaliatory discharge case based on Kansas law must set forth evidence of a clear and convincing nature that, if believed by the ultimate factfinder, would establish that plaintiff was *more likely than not*[10] the victim of illegal retaliation by her employer.

<u>Foster</u>, 293 F.3d at 1195. The District Court focused on the "clear and convincing" language instead of the analysis and result in <u>Foster</u>.

"A federal court's responsibility to apply the clear-and-convincing standard of proof at the summary judgment state is not a license to engage in a mini-trial." <u>Id</u>. Courts still must act with "caution," erring towards denial. <u>Id</u>., *quoting* <u>Anderson</u>, 477 U.S. at 255. Courts still may not perform "jury functions" like weighing evidence, assessing credibility, or drawing inferences for the movant. <u>Id</u>. These principles – not a burden of proof – must guide the analysis.

Even in criminal cases, "close calls" go to the jury. In <u>US v. Anderson</u>, the court granted a motion for acquittal in an "exceedingly close call[]." 85 F.Supp.2d

---

[10] *More likely than not* is a preponderance of evidence standard. <u>Four Corners Helicopters, Inc. v. Turbomeca, S.A.</u>, 979 F.2d 1434, 1438-39 (10th Cir. 1992).

1047, 1051 (D.Kan. 1999). The court explained, "although the evidence appears close upon first glance, it is upon closer review insufficient…." <u>Id.</u> at 1061. This Circuit agreed the evidence made it "relatively close," but nevertheless reversed the acquittal. <u>U.S. v. McClatchey</u>, 217 F.3d 833 (10th Cir. 2000). "Close calls" go to the jury, even when the burden is beyond a reasonable doubt.

The Court should have used the preponderance of evidence standard. "The burden of proof is a substantive aspect of a claim." <u>Medtronic, Inc. v. Mirowski Family Ventures, LLC</u>, 571 U.S. 191, 199 (2014). Under Kansas law, the burden of proof is preponderance of the evidence. <u>Ortega v. IBP, Inc.</u>, 874 P.2d 1188, 1198 (Kan.1994); <u>Gonzalez-Centeno</u>, 101 P.3d at 1171. When the Kansas Supreme Court decided <u>Gonzalez</u> in 2004, it made no mention of the "clear and convincing" language that appears in <u>Ortega</u>. Even if the burden is clear and convincing, Braxton's evidence *could* allow a rational jury to decide it is "highly probable" her injury was *one of the factors that motivated* her discharge.

### **<u>Walmart's Belief that Braxton Violated Policy was Not Dispositive</u>**

The Court's other guiding "principle" was the decisionmakers "honest" belief that Braxton violated a policy. (App-III:25-45). The "honest" belief doctrine runs afoul of the axiom that all evidence must be viewed in the nonmovant's favor without regard to credibility. <u>Reeves</u>, 530 U.S. at 150. Even if Walmart's belief was honestly held (which is disputed) it was not entitled to summary judgment.

Proving an employee violated company policy does not automatically result in summary judgment. This Court has reversed summary judgments based on such evidence. Fassbender, 890 F.3d 875 (reversal when plaintiff violated fraternization policy); Foster, 293 F.3d 1187 (reversal when plaintiff violated attendance policy). Whether the employee violated policy is not the ultimate issue. Rather, the issue is whether that policy violation was used as an "excuse" for an ulterior motive. Undue focus on the "belief" doctrine prevented the Court from viewing Braxton's pretext evidence in her favor. The Court's hyperfocus on Walmart's "belief" also conflicted with Kansas law in two ways – both of which were discussed in Foster.

First, the Court refused to consider what the decision makers "*should* have known." (App-III:30). In Foster, the plaintiff was fired for violating the company's attendance policy. She alleged retaliatory discharge because her absences were for a workplace injury. The employer argued the decisionmakers did not know her absences and injury were related, and summary judgment was granted. Foster, 293 F.3d at 1191-92. This Court reversed, recognizing the issue was whether they "knew or should have known" the absences were related to the injury. Id. at 1193. The "knew or should have known" standard is a matter of Kansas law. Bausman v. Interstate Brands Corp., 252 F.3d 1111, 1115 (10th Cir. 2001), *cited with approval* in Gonzalez-Centeno, 101 P.3d at 1177-78 (Kan.2004). For claims of retaliatory discharge, evidence showing what the decisionmakers *should have known* is

41

evidence of pretext. <u>Foster</u>, 293 F.3d at 1195-96. The District Court should have considered what Walmart *should have known*.

If Ammie Wilbur would have fulfilled her duty, she would have reported Braxton's injury as soon as Braxton reported it to her. If Whitenack and Usry would have used the Incident Report (<u>App-II:225</u>) as required by the Safety Manual (<u>App-II:199</u>), Braxton would have been asked when she first reported her injury and to whom. If Whitenack would have conducted the investigation he was supposed to conduct, then the relevant witnesses, including Braxton, would have been interviewed thoroughly using the Investigation Form required by the Safety Manual. (<u>App-II:200</u>). Walmart never did any of that, and Whitenack never even asked Braxton if she had told anyone about her wrist. (<u>App-II:110</u>).

Second, the Court required Braxton to disprove "Walmart's good faith belief that it fired her for violating a workplace rule." (<u>App-III:38</u>, *citing* <u>Foster</u>). In <u>Foster</u>, the district court required the employee to prove "she was not in violation of defendant's attendance policies." <u>Id</u>. at 1191. This Circuit reversed because a plaintiff alleging retaliatory discharge is not required to prove "sole" causation. <u>Id</u>. at 1196. Braxton was not required to prove Walmart's "proffered, nonretaliatory motive for terminating her employment was a factual impossibility." <u>Id</u>. But that is what the District Court required. It should have been evaluating whether the evidence *could* allow a juror to find Walmart's explanation was pretextual.

The Court's focus on Walmart's "belief" prevented it from recognizing that a rational juror *could* decide Walmart's policy is itself a pretext for retaliation. The Seventh Circuit has held that "a policy that may have been designed to curtail" protected activity can be evidence of pretext. <u>Loudermilk v. Best Pallet Co., LLC</u>, 636 F.3d 312, 315 (7th Cir. 2011). Loudermilk was fired for taking pictures in the workplace, but there was evidence he took them for the EEOC. <u>Id</u>. Summary judgment was reversed because the "fired for photography" defense came "close to *conceding* retaliation." <u>Id</u>. Taking the pictures was directly related to the plaintiff's protected activity. Similarly, Braxton's injury report was protected by Kansas law.

Perhaps an anti-photography policy is legitimate. Perhaps an injury reporting policy is legitimate. But if evidence shows a policy *could* have been invoked to fire an employee for protected activity, summary judgment should be denied. Braxton's pretext evidence, including Walmart's complete disregard for its Safety Manual, makes it *rational* to infer Walmart fired Braxton to avoid workers' compensation liability. That should have been the Court's focus.

### **Braxton's Evidence was Sufficient to Demonstrate Pretext**

Even under a clear and convincing standard, Braxton's evidence was sufficient to raise "suspicion" that her status as an injured worker was a factor that "motivated" her discharge. Braxton made several arguments, all of which were rejected by the Court.

43

Braxton's first argument was that the decisionmakers' testimony is evidence of pretext. (App-II:80). The Court agreed that "all three [decisionmakers] testified that they wouldn't have fired her if she did not report her workplace injury." (App-III:18-19). As Braxton was only required to prove her injury was one of the reasons that "motivated" her discharge, Foster, 293 F.3d at 1196, the testimony quoted by the Court should have been sufficient.

The issue is not whether the testimony reveals "disdain" for injured workers, it is whether the testimony allows an inference of a causal link between a protected class and the discharge. Fassbender, 890 F.3d at 885. Braxton contends no inference is required; however, inferring a causal link between her injury and discharge is rational *because the decision-makers acknowledge it*. The Court required the testimony to show Walmart's explanation was "false or otherwise unworthy of belief." (App-III:30). Those are ways to show pretext, but they are not required. The issue is whether the explanation is an excuse for something else. The plaintiff does not have to prove it is false. Foster, 293 F.3d at 1196.

Braxton's evidence was sufficient to show Walmart's "honest" belief that she violated policy was pretextual. The Court recognized that whether Braxton reported her injury the first shift in which it occurred is genuinely disputed. (App-III:30). As previously discussed, the relevant inquiry is what Walmart knew or should have known, Foster, 293 F.3d at 1193, and the evidence shows Walmart

should have known Braxton reported her injury the day it happened. Beyond that, there is evidence that the decisionmakers' belief was not honestly held, and even if it was, it was used as an excuse to fire her for being injured and reporting it.

### Walmart's "Belief" was Not Honestly Held

The Court concluded a "reasonable juror would have no reason to doubt the good faith of the decisionmakers' belief." (App-III:33-34). The cornerstone for that conclusion was Whitenack's text message to Usry saying Braxton "hurt her wrist Sunday … and didn't tell anyone." (App-III:31-32). But Braxton denied saying any of that to him. Walmart's lawyer asked Braxton to describe her entire conversation with Whitenack from the time she first met him until she wrote the Statement Form, and in response to direct questions, she testified Whitenack *never* asked her when she was first injured her wrist or whether she told anyone else about it. (App-II:110-111, Depo. 86:1 - 92:23). The truthfulness of Whitenack's text message and whether he asked Braxton whether she already reported her pain was genuinely disputed. (App-II:39-40, ¶39a-e). It was resolved in Walmart's favor. (App-III:33).

Braxton also argued Walmart's lack of an investigation undermined its "good faith" belief that she violated company policy. (App-III:34). When an employer does not conduct a "fair investigation of the violation" the employee was allegedly fired for, that may show pretext. Smothers v. Solvay Chem., Inc., 740 F.3d 530, 542 (10th Cir. 2014) (pretext where employer formed conclusions

"based on one-sided information"); *accord* Ibrahim v. Alliance for Sustainable Energy, LLC, 994 F.3d 1193, 1199-1120 (10th Cir. 2021) (pretext based on "shortcomings in the employer's investigation").

Usry, as corporate representative of Walmart, admitted Walmart *never* investigated whether Braxton reported her workplace injury during the shift in which it occurred. (App-II:71, ¶¶236-41). The Court acknowledged "Walmart didn't investigate her injury," (App-III:34), but failed to acknowledge Walmart also admitted it *never* investigated when she first reported her injury. (App-II:71, ¶¶238-40) (App-II:214). It simply chose not to. (Id). Notably, the employee who was *required* to conduct the investigation was Whitenack, (App-II:64, ¶¶165-71), the same employee who claimed Braxton "didn't tell anyone" about her injury (App-I:296), even though he never asked her. (App-II:110-11).

The Court suggested "maybe" Walmart should have "investigated more" or "specifically asked plaintiff whether she had reported her injury in a timely manner." (App-III:45). That is correct – not just because that is what the Safety Manual required, but because that is what any reasonable person would do if that was genuinely their concern. And the problem is not that Walmart should have investigated "more" – it never investigated *at all*. In Smothers and Ibrahim, the failure to conduct a "fair" investigation was evidence of pretext. Walmart did even less. A jury *could* find that suspicious.

### Walmart's "Belief" was an Excuse to Fire an Injured Worker

Walmart's ulterior motive for firing Braxton is revealed through its disregard of her rights as an injured worker. When Braxton was injured, Walmart ignored its Safety Manual, thereby depriving Braxton of her rights as an injured worker. The District Court failed to appreciate the connection between these policy deviations and how they conflict with Braxton's claim of retaliatory discharge.

An employer's "deviations from normal procedure" can be evidence of pretext. Plotke v. White, 405 F.3d 1092, 1102 (10th Cir. 2005). Deviations are evidence of pretext if the "procedural irregularities were somehow related to the decision-maker's discriminatory purpose." Fassbender, 890 F.3d at 889. The relevant "discriminatory purpose" is interfering with injured workers' rights. It is rational to infer that Walmart's policy violations were designed to do just that.

Walmart's mandatory Safety Manual must be obeyed when an employee is injured. Management is *required* to give the injured worker an Associate Incident Report, a Medical Authorization, offer medical treatment, and provide a Kansas form with information about injured workers' rights. It is *required* to conduct a thorough investigation to determine how the injury occurred and whether discipline is warranted. It is *required* to record the injury and, in this case, was *required* to provide notice to the State of Kansas. When Walmart found out Braxton was injured, *it disregarded all of that*. The Court acknowledged this, but

believed Walmart's failures could not cast suspicion as to its motive.

If Walmart gave Braxton the "Incident Report" instead of a "Statement Form," it would have been clear whether she previously reported her injury. Whitenack knew which forms were required. (App-I:296) "**IR and 5 why?**"). So did Usry – he's in charge of Safety and conducts training on the Safety Manual. Instead of following the rules, Usry's response to learning Braxton was hurt was to say she would be punished "*if she describes pain*." (App-I:296).

The Safety Manual, however, says an injured worker describing pain is supposed to be offered first aid and medical treatment. (App-II:199-200). Braxton's "Statement Form" describes throbbing, swelling, warmth, bruising, and diminished function, and Usry responds with instructions to punish her. (App-I:297). There is no concern for Braxton's health or her rights as an injured worker. Walmart admits it violated its Safety Manual by not offering Braxton medical treatment, informing her of her rights, providing her the required State form, or reporting her injury to the State. These policy violations directly relate to the interference of Braxton's rights as an injured worker.

When viewed in Braxton's favor, these policy violations cast "sufficient suspicion," Fassbender, 890 F.3d at 884, that Braxton's injury, and Walmart's desire to avoid liability for it, were factors motivating her discharge. So, a rational jury could believe whether she violated a policy was not truly why she was fired.

Usry's text that Braxton should be punished *if she describes pain* suggests Walmart's decision was being made before it understood the situation. In Doebele, the employer violated its own policies in a way which allowed an inference that the employer acted to "justify a decision already made." 342 F.3d at 1138. The deviations from routine procedure allowed for an inference that the plaintiff's supervisors "acted with an ulterior motive." Id. at 1138. There, the ulterior motive was getting rid of an employee who took extensive medical leave. Id. at 1137-38. Here, the ulterior motive is avoiding liability for workers' compensation. This is revealed in Usry's texts and his post-discharge emails.

Hours after Braxton's termination, Human Resources and Usry debated whether Safety School should include training on workplace injuries. (App-II:16). HR was concerned that neither the new hires, nor the trainers knew Walmart's injury reporting policy. Usry explained those topics were omitted to "save time" and get new employees working faster. The Court acknowledged this evidence, but summarily decided no jury could see it as evidence of a retaliatory motive. (App-III:44). It viewed the evidence in isolation instead of considering it as part of a larger "narrative." Fassbender, 890 F.3d at 888.

The larger "narrative" suggests Braxton was fired to avoid liability. Ursy was responsible for knowing and training on the Safety Manual, he testified that every rule in the Safety Manual (except for issuing discipline) is mandatory, he

49

recommended punishing Braxton *if she described pain*, he refused to offer Braxton medical treatment *when she did describe pain*, he testified that Braxton would not have been fired "but for" reporting her injury, and he opposed training new employees about workplace injuries or reporting them. Whitenack never asked Braxton if she had reported her injury and told Braxton he was firing her because "**to protect**" Walmart. (App-II:113). Braxton's pretext evidence is much stronger than the evidence prompting reversal in <u>Foster</u>. 293 F.3d at 1195-96.

And yet there is more. Walmart also disregard the Safety Manual's policies on discipline. The Court believed Walmart was "convinced that certain policies governing seasonal associates required [Braxton]'s immediate termination." (<u>App-III:3</u>). The problem is, Walmart *testified* differently. During Usry's second deposition as the 30(b)(6) representative for Walmart, Usry admitted that although every other policy in the Safety Manual is mandatory, the decision to issue discipline is discretionary. (<u>App-II:143-44</u>). But *if* Walmart exercises its *discretion* to issue discipline for a safety violation, *then it must* use the Form 670e. (<u>App-II:144</u>, referring to "Exhibit 11") (<u>App-II:179-80</u>). The Form 670e says failing to report a "known injury" by the end of the shift is not a terminable offense. (<u>App-II:180</u>). That was Walmart's testimony, but the Court drew another conclusion. It believed other "Guidelines" required Braxton to be fired, even though they conflict with the mandatory Safety Manual and have nothing to do with safety.

Walmart produced two documents that provide "guidelines" for discipline. ([App-II:28](#)); ([App-II:194-95](#)). In discussing the "Conduct Disciplinary Guidelines" (Doc.95-19, [App-II:28](#)) the Court said it "directs that managers 'should … terminate[]' Jet seasonal associates like plaintiff when they violate **serious safety rules**." ([App-III:38](#), *quoting* Doc.95-19) (bold added). But those guidelines do not say anything about safety at all – the word "safety" is not even mentioned. ([App-II:28](#)). The types of discipline they reference have nothing to do with safety and are not listed as options on the Form 670e ([App-II:180](#)). The same is true for the "JetFlex Disciplinary Action Guidelines" ([App-II:195](#)) – those mention types of discipline and misconduct that are nowhere on the Form 670e. ([App-II:180](#)).

According to both "guidelines" that mention Jetflex, the touchstone for termination is when a "coaching" progresses to written discipline. ([App-II:28](#)) ("terminated when their coaching has progressed to a formal written"); ([App-II:195](#)) ("…severe enough for a written coaching…"). The Court trusted the decisionmakers that "formal written" and "written coaching" refer to a "Step 1 violation" on the Form 670e ([App-III:5](#), n.2) even though the Form 670e does not call it a "formal written" or a "written coaching." ([App-II:180](#)). The Court's conclusion conflicts with the Safety Manual, Walmart's testimony, and the testimony of Chelsea Davidson, the highest-ranking HR employee in Edgerton. ([App-II:184-85](#)).

Davidson testified that HR is the only department that issues "coaching," and they do not use the Form 670e for "coaching." (App-II:186-87). If Usry and Whitenack would have followed the Safety Manual like they knew they were supposed to, then (assuming there would have been any reason to discipline Braxton) the form 670e would have been used and Braxton would not have been fired. This is not a "super personnel" argument – this is about credibility.

When discussing the "Conduct Disciplinary Action Guidelines," the District Court concluded "nothing in the summary judgment record suggested that the decisionmakers believed some other policy applied and it would have or even could have prevented them from firing plaintiff." (App-III:42). That is mistaken. Usry and Whitenack knew the Safety Manual applied, knew it should have been followed, and knew it was mandatory. The Safety Manual makes issuing discipline discretionary, but proscribes the level of discipline according to the Form 670e. Whitenack and Usry knowingly disregarded the Safety Manual. Walmart convinced the Court that its sole attention was Braxton's policy violation. But not a single other employee who violated company policy (Usry, Whitenack, Wilbur, Tuazon) received any discipline at all. A jury *could* be suspicious.

**Pretext Summary**

Instead of reviewing each pretext argument in isolation (App-III:35-41), The District Court should have considered how each argument fit in with the "totality

52

of the circumstances." <u>Fassbender</u>, 890 F.3d at 884. By viewing each argument alone, it failed to recognize the larger, and quite plausible "narrative," <u>id</u>. at 888, that Walmart fired Braxton to eliminate an injured worker from its payroll to avoid paying for medical bills and lost time.

The Court realized "Walmart made such a mess of things," (App-III:44), but it failed to see how a jury *could* see that "mess" *could* as evidence of an ulterior motive. It resolved the "mess" in Walmart's favor. It recognized the evidence presented a "*close call*," but resolved that in Walmart's favor too. It should have resolved every "doubt" in Braxton's favor and recognized that "reasonable minds" could disagree. Braxton presented sufficient evidence upon which a jury *could* determine that her status as an injured worker was one of the factors that motivated her discharge. With such a "mess," summary judgment should have been denied on this "close call."

## <u>CONCLUSION</u>

Braxton requests this Court issue an opinion reversing the District Court's <u>Memorandum and Order</u> (Doc.104) that granted Walmart's motion for summary judgment, vacating the <u>Judgment</u> (Doc.105) in Walmart's favor, and remanding this case for further proceedings and a jury trial.

## STATEMENT REQUESTING ORAL ARGUMENT

Oral argument is necessary because this case presents a matter of first impression. Kansas has not decided whether a company that fires employees for reporting an injury one day after it occurs has committed the tort of retaliatory discharge even if its company policy requires an earlier report. This case could affect all employees in Kansas who get injured. This appeal could affect what factors injured workers and their workers' compensation attorneys must consider before reporting an injury to the employer.

Oral argument is also necessary because arguments that are persuasive in writing often become less so when tested by robust discussion and debate. The opposite is also true. Braxton should have a chance to have her arguments *heard*, especially because Walmart made "such a mess of things." Braxton deserves a chance to orally argue why the evidence discounted by the District Court *could* allow a jury to infer Walmart's conduct was designed to dissuade employees from exercising their workers' compensation rights.

s/ *Kenneth D. Kinney*
Kenneth D. Kinney – D.Kan. #78544
RALSTON KINNEY, LLC
4717 Grand Avenue, Suite 300
Kansas City, Missouri 64112
(816) 298-0086; Fax: (816) 298-9455
Email: ken@rklawllc.com
*Attorney for Appellant Janell Braxton*

## <u>CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT</u>

Certificate of Compliance With Type-Volume Limit,
Typeface Requirements and Type Style Requirements

1.    This document complies with Fed.R.App.P. 32(a)(5) and Rule 32(a)(7)(B) because, excluding the parts of the document exempted by Fed.R.App.P. 32(f):

   [X]    this document contains **10,532** words


2.    This document complies with the typeface requirements of Fed.R.App.P. 32(a)(5) and the type style requirements of Fed.R.App.P. 32(a)(6) because:

   [X]    this document has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 (Version 2202) in 14 font size in Times New Roman.

Date: March 23, 2022


s/ *Kenneth D. Kinney*
Kenneth D. Kinney – D.Kan. #78544
RALSTON KINNEY, LLC
4717 Grand Avenue, Suite 300
Kansas City, Missouri 64112
(816) 298-0086; Fax: (816) 298-9455
Email: ken@rklawllc.com

## <u>CERTIFICATE OF SERVICE</u>

I certify that on March 23, 2022, I electronically filed the foregoing using the Court's CM/ECF system which will automatically send email notification of same to the following attorneys of record:

Christopher R. Hedican
Michael J. Roccaforte
BAIRD HOLM LLP
1700 Farnam St., Ste. 1500
Omaha, NE  68102-2068
Phone: 402-344-0500
Facsimile: 402-344-0588
chedican@bairdholm.com
mroccaforte@bairdholm.com

Amelia A. Fogleman
GableGotwals
110 N. Elgin Ave., Ste. 200
Tulsa, OK 74120
Phone: 918-595-4800
Facsimile: 918-595-4990
afogleman@gablelaw.com

Gerard M. DEmilio
GableGotwals
BOK Park Plaza
499 W. Sheridan Ave., Ste 2200
Oklahoma City, OK 73102
Phone: 405-235-5500
Facsimile: 405-235-2875
gdemilio@gablelaw.com

I have signed the original brief and will maintain it for a period of time not less than the maximum allowable time to complete the appellate process.

Seven (7) hard copies of this filing will be securely bound and will be forwarded in a method to ensure they arrive at the clerk's office within five business days of the court issuing notice that the electronic brief is compliant and has been accepted for filing, pursuant to 10th Cir. R. 31.5.

s/ *Kenneth D. Kinney*
Kenneth D. Kinney – D.Kan. #78544
RALSTON KINNEY, LLC
4717 Grand Avenue, Suite 300
Kansas City, Missouri 64112
(816) 298-0086; Fax: (816) 298-9455
Email: ken@rklawllc.com

# ADDENDUM

## TABLE OF CONTENTS

K.S.A. § 44-520 ......................................................................................58

Judgment in a Civil Case (Doc.105) (12/08/2021)
    Entering judgment for Walmart............................................................60

Memorandum and Order (Doc. 104) (12/08/2021)
    Granting Walmart's Motion for Summary Judgment ........................61

Memorandum and Order (Doc.87) (05/18/2021)
    Denying Braxton's Motion for Partial Summary Judgment ............105

West's Kansas Statutes Annotated
    Chapter 44. Labor and Industries
        Article 5. Workers Compensation (Refs & Annos)

K.S.A. 44-520

44-520. Notice of injury

Currentness

(a)(1) Proceedings for compensation under the workers compensation act shall not be maintainable unless notice of injury by accident or repetitive trauma is given to the employer by the earliest of the following dates:

(A) 20 calendar days from the date of accident or the date of injury by repetitive trauma;

(B) if the employee is working for the employer against whom benefits are being sought and such employee seeks medical treatment for any injury by accident or repetitive trauma, 20 calendar days from the date such medical treatment is sought; or

(C) if the employee no longer works for the employer against whom benefits are being sought, 10 calendar days after the employee's last day of actual work for the employer.

Notice may be given orally or in writing.

(2) Where notice is provided orally, if the employer has designated an individual or department to whom notice must be given and such designation has been communicated in writing to the employee, notice to any other individual or department shall be insufficient under this section. If the employer has not designated an individual or department to whom notice must be given, notice must be provided to a supervisor or manager.

(3) Where notice is provided in writing, notice must be sent to a supervisor or manager at the employee's principal location of employment. The burden shall be on the employee to prove that such notice was actually received by the employer.

(4) The notice, whether provided orally or in writing, shall include the time, date, place, person injured and particulars of such injury. It must be apparent from the content of the notice that the employee is claiming benefits under the workers compensation act or has suffered a work-related injury.

(b) The notice required by subsection (a) shall be waived if the employee proves that: (1) The employer or the employer's duly authorized agent had actual knowledge of the injury; (2) the employer or the employer's duly authorized agent was unavailable to receive such notice within the applicable period as provided in paragraph (1) of subsection (a); or (3) the employee was physically unable to give such notice.

(c) For the purposes of calculating the notice period proscribed in subsection (a), weekends shall be included.

**Credits**

Laws 1927, ch. 232, § 19; Laws 1974, ch. 203, § 25; Laws 1993, ch. 286, § 42; Laws 2011, ch. 55, § 16, eff. May 15, 2011; Laws 2013, ch. 104, § 11, eff. April 25, 2013.

Notes of Decisions (76)

K. S. A. 44-520, KS ST 44-520

Statutes are current through laws enacted during the 2022 Regular Session of the Kansas Legislature effective on March 10, 2022. Some statute sections may be more current, see credits for details.

**End of Document**                                           © 2022 Thomson Reuters. No claim to original U.S. Government Works.

# United States District Court

#### ------------------------- DISTRICT OF KANSAS---------------------------

JANELL BRAXTON,

        **Plaintiff,**

v.                            **Case No. 20-2287-DDC-GEB**

WALMART INC.,

        **Defendant.**

## JUDGMENT IN A CIVIL CASE

☐     Jury Verdict.   This action came before the Court for a jury trial.  The issues have been tried and the jury has rendered its verdict.

☒     Decision by the Court.  This action came before the Court.  The issues have been considered and a decision has been rendered.

**Plaintiff recovers nothing, the action is dismissed on the merits, and the defendant shall recover costs from plaintiff consistent with the Memorandum and Order (Doc. 104) filed on December 8, 2021.**

      12/08/2021                         SKYLER B. O'HARA
        Date                                CLERK OF THE DISTRICT COURT

                                      by:   s/ Megan Garrett
                                          Deputy Clerk

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| **JANELL BRAXTON,** | |
| **Plaintiff,** | |
| **v.** | **Case No. 20-2287-DDC-GEB** |
| **WALMART INC.,** | |
| **Defendant.** | |

## MEMORANDUM AND ORDER

Plaintiff Janell Braxton used to work for defendant Walmart, Inc. at its eCommerce facility in Edgerton, Kansas.  Plaintiff's employment began as a seasonal associate in March 2020.  But on one of her first days on the job, she sustained an injury to her wrist.  Walmart policy required associates to report a workplace injury to a supervisor during the same shift when the injury occurred.  And while it's disputed whether plaintiff did so, Walmart—or, more appropriately, three decisionmakers at the Edgerton facility—believed she didn't.  So, Walmart fired plaintiff, convinced that certain policies governing seasonal associates required her immediate termination.

Plaintiff brings this lawsuit against Walmart, claiming that Walmart fired her in retaliation for reporting a workplace injury, violating a well-established common law exception to at-will employment in Kansas.  Plaintiff previously moved for summary judgment, and the court denied that motion.  Now, taking a turn of its own, defendant Walmart has filed a Motion for Summary Judgment (Doc. 94), and a supporting brief (Doc. 95).  Plaintiff has responded (Doc. 98) and Walmart has filed a Reply in turn (Doc. 101).  So, Walmart's motion is now fully

briefed and ready for the court to decide.  The court grants Walmart's Motion for Summary

Judgment, for reasons explained below.

## I.    Background

### A.    Summary Judgment Facts

The following facts either have been stipulated by the parties in the Pretrial Order (Doc.

93), are uncontroverted, or, where controverted, are stated in the light most favorable to the

plaintiff, the party opposing summary judgment.  *Scott v. Harris*, 550 U.S. 372, 378 (2007).

#### 1.    Plaintiff's Employment

Walmart hired plaintiff in March 2020 as a seasonal associate, on a temporary basis.

Doc. 95-2 at 3, 5–6 (Pl.'s Dep. 11:16–18, 26:23–27:20).  Plaintiff worked overnight shifts at an

eCommerce warehouse in Edgerton, Kansas, a facility associated with Jet.com, a distinct

company owned by Walmart.  *Id.* at 3, 8 (Pl.'s Dep. 11:16–12:8, 32:18–22); Doc. 95-3 at 4 (Usry

30(b)(6) Dep. 126:5–7).  Although plaintiff was a Jet.com seasonal associate (sometimes also

called a Jet seasonal associate in the summary judgment record),[1] plaintiff was still a Walmart

employee.  *See id.* (Usry 30(b)(6) Dep. 126:5–7).  So, Walmart's general policies applied to her,

but so did specific policies that applied to Jet seasonal associates.  *See* Doc. 98-6 at 8 (Whitenack

Dep. 40:15–25).

#### 2.    Relevant Walmart Policies

Walmart maintains two policies that are relevant to this case.  The first—"Policy 763e"

or the "General Safe Work Practices"—reads:  "All known injuries, no matter how slight, will be

---

[1]    The summary judgment record also contains references to JetFlex seasonal associates.  *See, e.g.*, Doc. 95-19 at 1.  Although the difference between a Jet or JetFlex seasonal associate isn't clear, the record doesn't indicate that there is any meaningful difference between the two titles.  And Walmart has acknowledged that policies applying to JetFlex seasonal associates applied to plaintiff during her employment.  *See* Doc. 98-6 at 8 (Whitenack Dep. 40:15–25); *see also infra* n.3.

reported to a member of management immediately.  At a minimum, these must be reported to a member of management by the end of the shift."  Doc. 95-10 at 1.  Any associate who violates this policy receives a written discipline.  *See* Doc. 95-9 (Walmart Safety & Compliance Rule Violation Form 670e, noting that "Failure to report any known injury before the end of shift" is a "Step 1" violation).  The second policy, called the "Conduct Disciplinary Action Guidelines," provides that "Jetflex and Jet Seasonal [associates] should be terminated when their coaching has progressed to a formal written[.]"[2]  Doc. 95-19 at 1; Doc. 95-6 at 6 (Medaris Dep. 79:1–14) (authenticating Conduct Disciplinary Action Guidelines).[3]

Walmart also has a general and comprehensive "Dot Com Safety" policy for incident investigation and reporting.  *See generally* Doc. 98-11.  Like policy 763e, the Dot Com Safety policy required associates involved in an incident to report the incident to their manager immediately.  *Id.* at 4.  The Dot Com Safety policy defines an "incident" as any "unexpected, unplanned, or abnormal event or series of events that occurs and does result in an injury."  *Id.* at 2 (emphasis omitted).  Failure to report an incident to management "may result in disciplinary action[.]"  *Id.* at 4.  In that situation, the Dot Com Safety policy directs managers to the "WMW-670e eCommerce Safety and Compliance Rule Violation form[.]"  *Id.* at 4, 5; *see also* Doc. 95-9 at 1 (Form 670e).  Form 670e is a template form that managers use to tell associates when they

---

[2]      Mr. Whitenack, Ms. Medaris, and Mr. Usry all testified or declared that the phrase "formal written" or "written coaching" refers to a "Step 1 violation."  Doc. 98-6 at 8 (Whitenack Dep. 38:18–39:10); Doc. 95-5 at 7 (Whitenack Dep. 20:21–24); Doc. 98-4 at 26 (Usry 30(b)(6) Dep. 108:13–18); Doc. 95-13 at 2 (Medaris Decl. ¶¶ 6–8).

[3]      Walmart also maintained "JetFlex Disciplinary Action Guidelines" that applied to plaintiff during her employment.  Doc. 98-10 at 2; Doc. 98-6 at 8 (Whitenack Dep. 40:15–25).  The JetFlex Disciplinary Guidelines provide that a "minimum of two Quick Coach conversations should occur before releasing a JetFlex associate for performance or conduct[.]"  Doc. 98-10 at 2.  But, like the Conduct Disciplinary Action Guidelines, the JetFlex Disciplinary Guidelines also provide that if "the associate's conduct is severe enough for a written coaching, the JetFlex associate should be released immediately[.]"  *Id.*  The two guidelines are thus consistent with each other.

3

have committed a safety violation.[4]  Doc. 98-4 at 14 (Usry 30(b)(6) Dep. 50:5–8).  Form 670e

lists "Failure to report any known injury before the end of the shift" as a "Step 1" violation.

Doc. 95-9 at 1.  Form 670e also specifies that any "repeat of the same violation within 180

calendar days" potentially could result in termination.  *Id.*

The Dot Com Safety policy also requires that, if an injury has occurred, management

should perform a variety of tasks—those tasks are discussed in more detail below.  Walmart

required all employees (associates and management) at the Edgerton facility to follow the Dot

Com Safety policy.  Doc. 98-4 at 16 (Usry 30(b)(6) Dep. 68:10–17).

Finally, during plaintiff's employment, Walmart maintained a "Discrimination &

Harassment Prevention Policy."  Doc. 98-19; Doc. 98-4 at 7 (Usry 30(b)(6) Dep. 18:5–17).  The

policy prohibits discrimination directed at associates, and explicitly prohibits firing an associate

based on a legally protected status.  Doc. 98-19 at 2; Doc. 98-4 at 7–8 (Usry 30(b)(6) Dep. 18:5–

22:7).  As Walmart understood, its policy recognized that reporting a workplace injury qualifies

as a legally protected status.  Doc. 98-4 at 8 (Usry 30(b)(6) Dep. 22:12–24).

So, to review, Walmart Policy 763e required all employees to report a known injury to a

manager or supervisor immediately or, at least, by the end of the shift when the injury had

occurred.  Failure to do so triggered a "Step 1" written violation, as specified in the Dot Com

Safety policy and Form 670e.  But the Conduct Disciplinary Action Guidelines provided that

---

[4]      Plaintiff argues that the Edgerton facility "does not even use Form 670e."  Doc. 98 at 24.  For
support, she cites testimony from Chelsea Davidson, Senior Manager of Human Resources for
defendant's Edgerton facility.  But plaintiff's argument misrepresents Ms. Davidson's testimony.  Ms.
Davidson testified that Human Resources does not use Form 670e for "coaching" but did not know if
safety employees used the form.  Doc. 98-8 at 6–7 (Davidson Dep. 43:3–45:2).  Plaintiff acknowledges,
and the summary judgment record confirms, that the Dot Com Safety policy applied to all associates at
the Edgerton facility, and the Dot Com Safety policy mandated the use of Form 670e.  Doc. 98-11 at 5.

managers "should terminate" any JetFlex or Jet Seasonal associates who received a "Step 1" written violation.

### 3.    Plaintiff's Injury and Termination

Plaintiff worked three consecutive, overnight shifts from April 12, 2020, through April 15, 2020.  Doc. 95-2 at 11 (Pl.'s Dep. 39:4–12).  During her April 12–13 shift, at about 1:00 AM, plaintiff began to feel a "throbbing pain" in her left wrist.  *Id.* at 13 (Pl.'s Dep. 48:12–23).  The pain worsened over the course of plaintiff's shift.  *Id.* at 14 (Pl.'s Dep. 51:1–5).  At the end of her shift, around 5:00 AM on April 13, plaintiff's direct supervisor, Ammie Wilbur, came over to plaintiff's workstation and told plaintiff she was "doing better than anyone on the team at that time."  *Id.* (Pl.'s Dep. 51:16–21).  Plaintiff responded that she didn't "know how that's possible because [her] wrist [was] really hurting" her.  *Id.* (Pl.'s Dep. 51:22–23).  Plaintiff didn't elaborate.  *Id.* at 15 (Pl.'s Dep. 53:1–4).  The Edgerton facility maintained a "safety cubicle" staffed by safety personnel to assist associates.  *Id.* at 9 (Pl.'s Dep. 34:1–25).  Walmart instructed associates to go to the safety cubicle whenever they needed medical attention.  *Id.* at 10 (Pl.'s Dep. 36:18–25).  But plaintiff finished work without visiting the safety cubicle.  *Id.* at 15 (Pl.'s Dep. 53:12–24).  And Ms. Wilbur doesn't remember plaintiff reporting any wrist pain to her at the end of the April 12–13 shift.  Doc. 95-4 at 2, 3 (Wilbur Dep. 16:4–7, 18:15–17).

When plaintiff arrived for her next shift on April 13, her wrist still was bothering her. Doc. 95-2 at 17, 18 (Pl.'s Dep. 57:14–18, 58:21–24).  At the beginning of her April 13–14 shift, plaintiff told a manager that her wrist hurt.  *Id.* at 19 (Pl.'s Dep. 61:12–20).  And her wrist continued to hurt during her shift.  *Id.* at 21 (Pl.'s Dep. 65:7–10).  Plaintiff didn't visit the safety cubicle during this shift.  *Id.* at 20 (Pl.'s Dep. 64:22–65:2).

On April 14, plaintiff reported for her April 14–15 shift. *Id.* at 24 (Pl.'s Dep. 68:12–22).

Two or two and a half hours into her shift, plaintiff approached Ms. Wilbur about her wrist pain.

*Id.* at 25 (Pl.'s Dep. 72:4–17).  Plaintiff's wrist still was bothering her, and she requested a brace

or wrap.  *Id.* at 26, 27 (Pl.'s Dep. 73:2–7, 75:15–19).  Ms. Wilbur told plaintiff to go to the safety

cubicle, where Safety Lead Mark Tuazon provided plaintiff with an ointment.  *Id.* at 26, 28–29

(Pl.'s Dep. 73:8–10, 77:25–78:11); Doc. 98-18 at 4, 6 (Tuazon Dep. 6:4–8, 18:17–19:11).

Walmart's Dot Com Safety policy required Mr. Tuazon to create an incident report when an

associate reported an injury, but Mr. Tuazon didn't file any kind of report about plaintiff's injury.

Doc. 98-18 at 5, 6–7 (Tuazon Dep. 9:14–22, 11:1–9, 20:18–21:18).  Plaintiff then returned to

work.  Doc. 95-2 at 31 (Pl.'s Dep. 83:1–5).

About an hour and a half later, Ms. Wilbur approached plaintiff and asked if she had

sustained her wrist injury at work.  *Id.* at 31–32 (Pl.'s Dep. 83:24–84:13).  Plaintiff said she had.

*Id.*  Ms. Wilbur then reported this to David Whitenack,[5] the Operations Manager.  Doc. 95-5 at 3,

10 (Whitenack Dep. 8:19–22, 79:2–7).  Mr. Whitenack came to plaintiff's workstation and asked

her if her wrist injury had occurred at work, and plaintiff said yes.  Doc. 95-2 at 33 (Pl.'s Dep.

86:20–23).  Mr. Whitenack told her to log off so she could file an incident report.  *Id.* at 33 (Pl.'s

Dep. 86:1–8).

Walmart's Dot Com policy requires that, when an injury occurs, human resources or

management "will have the associate complete, sign, and date . . . the Associate Incident

Report."  Doc. 98-4 at 21–22 (Usry 30(b)(6) Dep. 88:12–89:14); *see also* Doc. 98-11 at 4 (Dot

Com Safety Policy).  This mandatory Associate Incident Report includes places for the associate

to describe the incident, provide the date and time when the associate reported the incident, and

---

[5]     At her deposition, plaintiff didn't know Mr. Whitenack's name and referred to him throughout
her testimony as "male manager."

name the manager to whom the associate reported the incident. Doc. 98-15 at 2 (Associate

Incident Report Form). But when plaintiff and Mr. Whitenack went to the safety cubicle, Mr.

Whitenack didn't give plaintiff the Associate Incident Report. *See* Doc. 98-4 at 22 (Usry

30(b)(6) Dep. 90:12–91:13); Doc. 95-2 at 37 (Pl.'s Dep. 90:19–24). Instead, he provided a blank

"Statement Form." Doc. 95-2 at 37 (Pl.'s Dep. 90:19–24). Mr. Whitenack told plaintiff to

complete the form and "write down everything that [she] was feeling, that was going on with

[her] wrist." Doc. 95-2 at 37–38 (Pl.'s Dep. 90:24–91:1).

> On the "Statement Form," dated April 14, 2020, plaintiff wrote:
>
> On Monday morning [April 13,] I noticed that my wrist began to ache. It progressed to throbbing pain and by the time I left at 5:00 am it was excruciating. I took a 500mg tylenol & went to sleep. It is swollen & sometimes feels warm to the touch. There is a little bruising. It is hard for me to work fast when putting items in the mailers & it hurts to pick up semi heavy items with that wrist. I can only pick up the totes if they are partially full. It is my left wrist that is injured. I am trying not to use it. The pain progresses throughout the shift.

Doc. 98-14 at 2 (Statement Form); Doc. 95-2 at 39 (Pl.'s Dep. 92:10–23) (authenticating the

Statement Form). In her statement, plaintiff doesn't mention reporting her wrist injury to Ms.

Wilbur at the end of her April 13 shift. *See generally* Doc. 98-14 at 2 (Statement Form). The

parties dispute whether plaintiff and Mr. Whitenack talked about plaintiff previously reporting

her injury. Plaintiff claims Mr. Whitenack didn't ask her whether she had previously reported

her injury. Doc. 98-2 at 18 (Pl.'s Dep. 87:18–21). Mr. Whitenack claims he always instructed

associates filling out a safety form to include when the injury occurred and if they reported the

injury to anyone. Doc. 95-5 at 10–11 (Whitenack Dep. 79:24–80:3). But it's undisputed that

plaintiff, in her statement form, didn't mention reporting her wrist injury to Ms. Wilbur at the

end of her April 13 shift.

Sometime after talking with plaintiff, Mr. Whitenack texted Quincy Usry, an

Environmental Health and Safety Operations Manager. Doc. 98-6 at 9 (Whitenack Dep. 44:13–

16); Doc. 95-11 (text message exchange). He told Mr. Usry that plaintiff "said she hurt her wrist

Sunday (doesn't know how) and didn't tell anyone[.]" Doc. 95-11 at 1. Mr. Usry responded:

"Hurt how? Can she write a statement. She only get coached if she describes pain." *Id.* Mr.

Whitenack responded that he'd have plaintiff write a statement. *Id.* at 1. Then, Mr. Whitenack

asked, "How long do they have to report? EOS [End of shift]?" *Id.* at 1. Mr. Usry said that he

"want[ed] to see the statement first," but he didn't otherwise respond directly to Mr. Whitenack's

question. *See id.* at 1–2. Mr. Whitenack then sent a picture of plaintiff's statement to Mr. Usry.

*Id.* at 2. Mr. Usry responded: "Yea, that would be a coaching. Is HR on site? Would she be

termed with a written coaching?" *Id.* at 2. Mr. Whitenack replied, "Let me ask[.]" *Id.* The

record of the text conversation stops there. But Mr. Whitenack testified that he provided

plaintiff's written statement to Morgan Medaris, a Human Resources Coordinator at the

Edgerton facility. Doc. 95-5 at 6 (Whitenack Dep. 15:5–18). And Ms. Medaris testified that she

read the statement. Doc. 95-6 at 3 (Medaris Dep. 19:2); *see also* Doc. 95-13 at 1–2 (Medaris

Decl. ¶ 5) ("Whitenack . . . informed me that [plaintiff] had injured her wrist during her April

12–13, 2020 overnight shift . . . [but] first reported her injury to Walmart during her April 14–15,

2020 overnight shift.").

Mr. Whitenack then took plaintiff to the human resources office. Doc. 95-2 at 41–42

(Pl.'s Dep. 104:24–105:8). There, plaintiff met with Mr. Whitenack and Ms. Medaris. *Id.* at 42

(Pl.'s Dep. 105:7–9). Mr. Whitenack told plaintiff that she was "supposed to report [her] work

injury . . . within 24 hours[.]" *Id.* (Pl.'s Dep. 105:13–15). It's undisputed that, at this point,

plaintiff didn't tell Mr. Whitenack or Ms. Medaris that she had reported her injury to Ms. Wilbur

at the end of her April 12–13 shift.  *Id.* at 42–43 (Pl.'s Dep. 108:12–109:1).  Mr. Whitenack

continued, explaining that plaintiff was a temporary employee and, as a result, neither he nor Ms.

Medaris was required to give plaintiff any warnings, and they could fire plaintiff without written

warnings.  *Id.* at 42 (Pl.'s Dep. 105:15–18).  According to plaintiff, Mr. Whitenack told her "they

wanted to protect themselves and that they hoped that [plaintiff] could understand."  *Id.* (Pl.'s

Dep. 105:18–20).  Walmart then terminated plaintiff's employment on April 14, 2020, before

11:32 PM, a few hours after she had reported her injury to Ms. Wilbur during that shift.  Doc. 93

at 3 (Pretrial Order ¶ 10).

Shortly after plaintiff was terminated, she texted a fellow associate, "I just got fired for

not reporting my wrist on the night it started hurting."  Doc. 95-14 at 1.  And around the same

time, Ms. Medaris e-mailed Mr. Usry:  "We have completed [plaintiff's] termination for late

reporting."  Doc. 95-15.  In her email, Ms. Medaris expressed concern that Walmart's "safety

school" training overlooked "the compliance portion of safety" because new associates weren't

told when to report an injury.  *Id.*  In response to Ms. Medaris's concern, Walmart posted the

670e form in "safety school[.]"  Doc. 95-7 at 3–4 (Usry 30(b)(6) Dep. 61:20–62:6).

Mr. Whitenack and Ms. Medaris jointly agreed to terminate plaintiff's employment, with

advice from Mr. Usry.  Doc. 95-6 at 5 (Medaris Dep. 23:5–9); Doc. 98-6 at 19 (Whitenack Dep.

97:4–8); Doc. 98-12 at 10 (Usry 30(b)(6) Dep. 120:15–19).  Mr. Whitenack testified that, at the

time he fired plaintiff, he didn't know that plaintiff had reported her injury to Ms. Wilbur at the

end of her April 12–13 shift.  Doc. 95-5 at 8 (Whitenack Dep. 77:13–20).  He testified that, at the

time he decided to fire plaintiff, he "was under the impression that she was reporting an injury

late[.]"  *Id.* at 5 (Whitenack Dep. 14:13–14).  Mr. Whitenack also testified that, if plaintiff had

not reported her injury, he wouldn't have terminated her—but he specified that he terminated

plaintiff "for failure to report an injury by the end of shift."  Doc. 98-6 at 15 (Whitenack Dep. 74:10–75:22).  Mr. Whitenack testified that he relied on two documents when deciding to fire plaintiff:  (1) Form 670e, which, as described above, specified that failing to report an injury by the end of the shift in which it occurred was a "Step 1" violation, Doc. 95-9; and (2) the Conduct Disciplinary Action Guidelines, which provided that "Jetflex and Jet Seasonal [associates] should be terminated when their coaching has progressed to a formal written[,]"  Doc. 95-19; Doc. 95-5 at 7 (Whitenack Dep. 20:3–19).

Ms. Medaris similarly testified that she terminated plaintiff's employment "based on her statement that she reported late."  Doc. 98-13 at 4 (Medaris Dep. 17:7–11).  She considered plaintiff's failure to report an injury in a timely fashion to require a "first written" discipline.  Doc. 95-6 at 6 (Medaris Dep. 79:15–18).  And, under the Conduct Disciplinary Action Guidelines, this "first written" discipline required her to terminate plaintiff's employment.  *Id.* (Medaris Dep. 79:1–14); *see also* Doc. 95-13 at 2 (Medaris Decl. ¶ 8) ("Based upon my conclusion that [plaintiff's] violation of Policy 670e warranted a First Written disciplinary action, and because [she] was a Jet Seasonal associate, I concluded that [her] employment was to be terminated pursuant to Policy 670e and Walmart's Conduct Disciplinary Action Guidelines.").  But, like Mr. Whitenack, Ms. Medaris conceded that without knowledge of plaintiff's injury, she wouldn't have fired her.  Doc. 98-13 at 4 (Medaris Dep. 20:9–15).

Mr. Usry, as Walmart's Rule 30(b)(6) corporate representative, likewise testified that Walmart terminated plaintiff's employment for failing to report her injury in a timely manner.  *See* Doc. 98-12 at 10 (Usry 30(b)(6) Dep. 120:15–19); *see also id.* at 8 (Usry 30(b)(6) Dep. 45:19–23).  But Mr. Usry—again as Walmart's corporate representative—also acknowledged

that if plaintiff hadn't reported her injury, Walmart wouldn't have fired her.  *Id.* at 9 (Usry 30(b)(6) Dep. 55:18–56:2).

### 4.    Walmart's Failure to Follow the Dot Com Safety Policy

Under Walmart's Dot Com Safety policy, Walmart should've taken several actions after learning of plaintiff's workplace injury.  Specifically, under the policy, Walmart should have:

- provided plaintiff with an "Associate Incident Report," with specific questions about when plaintiff reported her injury and to whom;

- completed a "First Report of Injury Form" if required by the State of Kansas;

- recorded the incident in Walmart's "Incident Reporting System" within 24 hours of the incident;

- completed a "Safety Incident Investigation" form and followed an 8-step review and investigation process;

- Followed up with plaintiff for seven days after her injury.

Doc. 98-11 at 4–7.  It's undisputed that Walmart didn't do any of those things.  *See* Doc. 98-4 at 21, 22, 23, 24–25, 29 (Usry 30(b)(6) Dep. 86:14–87:23, 90:12–24, 94:11–20, 97:15–25, 99:9–17, 99:18–100:15, 100:24–102:2, 117:6–8); Doc. 98-6 at 4–5, 20 (Whitenack Dep. 16:25–17:2, 103:11–13).

The State of Kansas requires employers to provide injured workers with "Information for Injured Employees," a document explaining what to do if an injury occurs on the job.  Doc. 98-17 at 2.  Walmart didn't give plaintiff this document, though it knew she was an injured worker.  Doc. 98-4 at 29 (Usry 30(b)(6) Dep. 117:19–118:17).  The State of Kansas also requires Walmart to report plaintiff's injury within 28 days.  *Id.* (Usry 30(b)(6) Dep. 118:23–119:19).  Walmart didn't do that either.  *Id.* (Usry 30(b)(6) Dep. 119:20–120:3).

11

### B.    Procedural History

Plaintiff brings this lawsuit against Walmart for retaliatory discharge under Kansas common law.  At base, she argues that Walmart fired her for reporting a workplace injury, violating Kansas public policy.  Earlier in this litigation, plaintiff filed a Motion for Partial Summary Judgment (Doc. 47).  The court denied that motion in a Memorandum and Order dated May 18, 2021.  *See generally* Doc. 87.  Because the court's Order deciding that earlier motion is relevant to the motion currently before the court, the court will briefly summarize it.

In the May 18 Order, the court first rejected plaintiff's argument that she had direct evidence of retaliation.  *See* Doc. 87 at 9–13.  Plaintiff pointed to the following few lines of deposition testimony from Mr. Usry:

> Q.  So but for Ms. Braxton's report of a workplace injury to Walmart,
>      Walmart would not have terminated her as it did, correct?
>
> A.  Correct.

*Id.* at 9 (quoting Doc. 48-2 at 13–14 (Usry 30(b)(6) Dep. 55:24–56:2)).

But, after reviewing the testimony as a whole, the court concluded that Mr. Usry repeatedly testified that Walmart "terminated plaintiff because she failed to report her workplace injury in a timely fashion," violating Walmart policy.  *Id.* at 13.  The court found that Mr. Usry repeatedly emphasized the untimeliness of plaintiff's report as the reason for her termination, and that his failure to emphasize timeliness "just once" in his deposition testimony wasn't sufficient to establish direct evidence of retaliation.  *Id.*

Next, the court applied the familiar *McDonnell-Douglas* burden-shifting framework to determine whether plaintiff had adduced circumstantial evidence of retaliation.  The court first assumed that plaintiff had established her prima facie case.  *Id.* at 15–16.  The court then accepted Walmart's offer of a legitimate, nonretaliatory reason for terminating plaintiff:  she

violated Walmart's policy requiring employees to report workplace injuries during the shift in which they occur. *Id.* at 16. In doing so, the court rejected plaintiff's argument that Walmart's policy violated the public policy of Kansas that makes it "illegal to fire an employee for sustaining a workplace injury." *Id.* at 17. As support for her argument, plaintiff relied on Kan. Stat. Ann. § 44-520(a)(1)(A). It provides employees in Kansas 20 days from the date of injury to report a claim for workers' compensation. Kan. Stat. Ann. § 44-520(a)(1)(A). Plaintiff argued that Walmart's immediate reporting rule undermined this public policy. Doc. 87 at 17. But the court rejected this argument, concluding that plaintiff "misconstrue[d]" the statute. *Id.* The court reasoned that the statute did "not forbid employers from adopting . . . workplace policies requiring their employees to report workplace injuries on a prompter basis" *i.e.*, sooner than 20 days from the date of injury. *Id.* Thus, the court found that Walmart had come forward "with a legitimate, nonretaliatory reason for terminating plaintiff's employment." *Id.* And finally, because plaintiff didn't make any argument that Walmart's non-retaliatory reason was pretextual, the court denied plaintiff's Motion for Partial Summary Judgment. *Id.* at 18.

## II.   Legal Standard

Summary judgment is appropriate if the moving party demonstrates "no genuine dispute" exists about "any material fact" and that it is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). When the court applies this standard, it views the evidence and draws reasonable inferences in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). But the court "need not make unreasonable inferences or adopt one party's version of the facts if the record doesn't support it." *Harte v. Bd. of Comm'rs of Cnty. of Johnson, Kan.*, 864 F.3d 1154, 1173 (10th Cir. 2017). An issue of "material fact is 'genuine' . . . if the evidence is such that a

reasonable jury could return a verdict for the nonmoving party" on the issue. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And, an issue of fact is "material" if it has the ability to "affect the outcome of the suit under the governing law[.]" *Id.*

The party moving for summary judgment bears the initial burden of showing "the basis for its motion[.]" *Celotex Corp.*, 477 U.S. at 323; *Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010) (explaining that the moving party bears "'both the initial burden of production on a motion for summary judgment and the burden of establishing that summary judgment is appropriate as a matter of law'" (quoting *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002))). A summary judgment movant can satisfy this burden by demonstrating "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp.*, 477 U.S. at 325; *see also Kannady*, 590 F.3d at 1169 (explaining that, to meet its summary judgment burden, the moving party "need not negate the non-movant's claim, but need only point to an absence of evidence to support the non-movant's claim" (quotation cleaned up)).

If the moving party satisfies its initial burden, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250 (quotation cleaned up); *see also Kannady*, 590 F.3d at 1169 ("If the movant carries [the] initial burden, the nonmovant may not rest on its pleadings, but must bring forward specific facts showing a genuine issue for trial [on] those dispositive matters for which it carries the burden of proof." (quotation cleaned up)). To satisfy this requirement, the nonmoving party must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex Corp.*, 477 U.S. at 324 (quotation cleaned up). When deciding whether the parties have shouldered their summary judgment burdens, "the judge's function is not . . . to

weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

Summary judgment is not a "disfavored procedural shortcut[.]" *Celotex Corp.*, 477 U.S. at 327.  Instead, summary judgment is an important procedure "designed 'to secure the just, speedy, and inexpensive determination of every action.'" *Id.* (quoting Fed. R. Civ. P. 1 (further citation omitted)).

## III.   Analysis

Plaintiff claims that Walmart retaliated against her for reporting a workplace injury, violating Kansas law.[6]  "Kansas follows the common-law employment-at-will doctrine, which allows employers to terminate employees for good cause, for no cause, or even for the wrong cause." *Goodman v. Wesley Med. Ctr., LLC*, 78 P.3d 817, 821 (Kan. 2003).  So, to prevail on a retaliatory discharge claim, "an employee must demonstrate that he or she falls within one of the exceptions to the employment-at-will doctrine." *Id.*  One such exception applies "where an employer discharges an employee in retaliation" for exercising his or her rights under the Kansas Workers' Compensation Act.  *Sanjuan v. IBP, Inc.*, 160 F.3d 1291, 1298 (10th Cir. 1998).

Plaintiff's claim for retaliatory discharge under Kansas law follows the familiar analytical framework applied to a Title VII claim.  *Foster v. Alliedsignal, Inc.*, 293 F.3d 1187, 1193 (10th

---

[6]      Plaintiff is a resident and citizen of Missouri.  Doc. 20 at 1 (First Am. Compl. ¶ 4).  Walmart is incorporated in Delaware and its principal place of business is in Arkansas.  *Id.* at 2 (First Am. Compl. ¶¶ 8–9).  So, there is complete diversity between the parties.  And the court previously concluded that plaintiff sufficiently established that the amount in controversy in this case exceeds $75,000.  Doc. 86.  The court thus has diversity jurisdiction under 28 U.S.C. § 1332.

In a diversity case, the court applies the law of the forum state.  Here, that's Kansas.  And for tort claims like plaintiff's retaliatory discharge claim, Kansas applies the law of the state where the tort occurred.  *Brown v. Kleen Kut Mfg. Co.*, 714 P.2d 942, 944 (Kan. 1986); *see also Atchison Casting Corp. v. Dofasco, Inc.*, 889 F. Supp. 1445, 1456 (D. Kan. 1995).  Walmart fired plaintiff in Kansas.  So, Kansas law applies.

Cir. 2002) ("Kansas courts have adopted the *McDonnell Douglas* burden-shifting framework for analyzing retaliatory discharge cases." (footnote omitted)).  That is, plaintiff can either (1) adduce direct evidence of retaliation, or (2) establish circumstantial evidence of retaliation, through the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *Lounds v. Lincare, Inc.*, 812 F.3d 1208, 1233 (10th Cir. 2015).  Although "evidence of retaliatory intent is frequently circumstantial in nature," *Hysten v. Burlington Northern Santa Fe Railway Co.*, 530 F.3d 1260, 1268 (10th Cir. 2008), plaintiff argues that she has adduced both direct and circumstantial evidence of retaliatory intent.  The court considers both arguments below, in turn.

## A.    Direct Evidence

Plaintiff first argues that she has direct evidence of Walmart's retaliatory intent.  This argument essentially is a do-over of an argument the court already rejected when ruling plaintiff's Motion for Partial Summary Judgment.

"'Direct evidence is evidence, which if believed, proves the existence of a fact in issue without inference or presumption.'"  *Riggs v. AirTran Airways, Inc.*, 497 F.3d 1108, 1117 (10th Cir. 2007) (quoting *Hall v. U.S. Dep't of Labor*, 476 F.3d 847, 855 (10th Cir. 2007)).  Necessarily then, "evidence is not 'direct' if an inference of discrimination is required."  *Id.* at 1118; *see also Hall*, 476 F.3d at 855 ("A statement that can plausibly be interpreted two different ways—one discriminatory and the other benign—does not directly reflect illegal animus, and, thus, does not constitute direct evidence." (quotation cleaned up)).

Plaintiff highlights three snippets of testimony from the depositions of the three decisionmakers who fired her—Mr. Whitenack, Ms. Medaris, and Mr. Usry.  She claims all three testified that they wouldn't have fired her "if she did not report her workplace injury."  Doc. 98 at 46.  Plaintiff's right.  All three testified to that fact in their depositions:

16

Q.  So if [plaintiff] would have never told you that she had been hurt at work, would you personally have had a reason to fire [her] on April 14th, 2020?

…

MR. WHITENACK:  Correct.

Doc. 98-6 at 15 (Whitenack Dep. 74:21–75:1).

Q.  Without the knowledge of [plaintiff's] injury report, Walmart wouldn't have fired her, correct?

…

MS. MEDARIS:  In relation to the reason that she was terminated, no, we would not.

Doc. 98-13 at 4 (Medaris Dep. 20:9–15).

Q. So but for [plaintiff's] report of a workplace injury to Walmart, Walmart would not have terminated her as it did, correct?

MR. USRY:  Correct.

Doc. 98-12 at 9 (Usry 30(b)(6) Dep. 55:24–56:2).

But plaintiff's argument inaccurately excerpts these three statements in a fashion that robs them of their context.  All three decisionmakers clarified and emphasized throughout their depositions that the reason they decided to fire plaintiff was that she didn't *timely* report her injury.  Just a few lines after plaintiff's cited testimony from Mr. Whitenack, he testified that he "terminated [plaintiff's] employment for failure to report an injury by the end of shift."  Doc. 98-6 at 15 (Whitenack Dep. 75:21–22).  Likewise, a few lines before plaintiff's cited testimony from Ms. Medaris, Ms. Medaris testified that she terminated plaintiff "based on her statement that she reported late."  Doc. 98-13 at 4 (Medaris Dep. 17:7–11); *see also* Doc. 95-6 at 4 (Medaris Dep. 21:14–16) ("[Plaintiff] was actually terminated for violating our policy regarding late reporting, not regarding the injury itself.").  And yet again, in earlier parts of Mr. Usry's Rule 30(b)(6) testimony, he reiterated that Walmart fired plaintiff because of her untimely report.  Doc. 98-12

17

at 8 (Usry 30(b)(6) Dep. 45:4–8) ("Q.  And Walmart's contention is that had [plaintiff] actually reported her injury on April 13th of 2020, it would not have fired her; is that correct?  A.  If she would have reported it by end of shift, correct."); *id.* (Usry 30(b)(6) Dep. 45:19–23) ("Q. Walmart's contention or position in this lawsuit is that it would not have fired her had she reported her workplace injury in the shift she first noticed it, correct?  A.  Correct.").

The court's previous Order already has concluded that plaintiff's argument took Mr. Usry's deposition testimony out of context.  Her arguments now about Mr. Whitenack's and Ms. Medaris's testimony are cut from the same cloth.  Thus, the court again rejects plaintiff's direct evidence argument.

To be sure, the court recognizes the conceptual difficulty with this case.  If plaintiff hadn't reported her injury at all, she wouldn't have failed to report her injury in a timely fashion. The decisionmakers recognized this in their testimony.  *See* Doc. 98-6 at 15 (Whitenack Dep. 74:16–19) ("Without [plaintiff] informing us that there would have been an injury, there would have been no way to know that one occurred, so we wouldn't have been able to terminate her[.]"); Doc. 95-6 at 4 (Medaris Dep. 21:23–24) ("Had [plaintiff] not reported [her injury], we would have never known an injury would have occurred."); Doc. 98-12 at 9 (Usry 30(b)(6) Dep. 55:3–7) ("Q.  And there is a connection between [plaintiff's] report of a workplace injury and her termination that same day? . . . A.  Simplistically, yes.").  And Walmart acknowledges as much in its briefing.  *See* Doc. 101 at 19 ("At base, Plaintiff argues that an employer has retaliated against an employee by holding him or her accountable for violating a timely reporting rule because it has necessarily acted on knowledge of that employee's injury[.]").

But plaintiff can't properly adduce direct evidence by exploiting the conceptual similarity linking reporting and timely reporting, and then cherry-picking favorable words in the testimony

while ignoring unfavorable words.  After all, a witness's statement, when read in context, "that can plausibly be interpreted two different ways—one discriminatory and the other benign—does not directly reflect illegal animus, and, thus, does not constitute direct evidence." *Hall*, 476 F.3d at 855.  *Hall*'s principle applies directly to this case.  When stripped of context, the decisionmakers' testimony looks like direct evidence of retaliatory intent.  But, when read in context, the statements don't reflect retaliatory animus.  Thus, plaintiff's cited testimony doesn't amount to direct evidence of retaliation.

### B.      Circumstantial Evidence

Having concluded that plaintiff hasn't adduced direct evidence of retaliatory intent, the court now turns to plaintiff's offer of circumstantial evidence under *McDonnell Douglas*.  As discussed before, "Kansas applies the familiar *McDonnell Douglas* burden-shifting framework for analyzing retaliatory discharge claims." *Hysten v. Burlington N. Santa Fe Ry. Co.*, 530 F.3d 1260, 1268 (10th Cir. 2008) (citations omitted).  First, the plaintiff must establish a prima facie case.  *Sanjuan v. IBP, Inc.*, 275 F.3d 1290, 1294 (10th Cir. 2002).  If plaintiff does so, the burden then shifts to the defendant to articulate a non-retaliatory reason for terminating plaintiff.  *Id.* Then, plaintiff shoulders the ultimate burden to show that defendant's non-retaliatory reason was pretextual. *Id.*  The court applies all three steps below.

### 1.      Prima Facie Case

In retaliation cases, the framework begins with the prima facie case.  A "plaintiff makes a prima facie claim by showing (1) that [s]he filed a claim for workers compensation benefits or sustained an injury for which [s]he might assert a future claim for such benefits; (2) that the employer had knowledge of the compensation claim or the fact that [s]he sustained a work-related injury for which the plaintiff might file a future claim for benefits; (3) that the employer

terminated the plaintiff's employment; and (4) that a causal connection existed between the protected activity or injury and the termination." *Sanjuan*, 275 F.3d at 1294.

Walmart assumes for summary judgment purposes that plaintiff has established a prima facie case. Doc. 95 at 12. Because plaintiff's prima facie case is not at issue, the court likewise accepts Walmart's assumption about this burden. And, plaintiff has established her prima facie case. *First*, she sustained an injury to her wrist that could support a future workers' compensation claim. *Second*, Walmart had knowledge of that injury. *Third*, Walmart terminated plaintiff's employment. And *fourth*, there was a causal connection between Walmart's undisputed knowledge of plaintiff's injury and its decision to fire her—both occurred on the same shift on April 14. *See Fye v. Okla. Corp. Comm'n*, 516 F.3d 1217, 1228 (10th Cir. 2008) (holding that temporal proximity of "less than two weeks" was "alone sufficient to establish a causal connection between [plaintiff's] protected activity and termination"). The court thus concludes that plaintiff has established her prima facie case of retaliatory discharge.

### 2. Non-Retaliatory Reason

So, the burden shifts to Walmart to show a non-retaliatory reason for firing plaintiff. *Sanjuan*, 275 F.3d at 1294. At this second step of the *McDonnell-Douglas* framework, the defendant doesn't "'need to litigate the merits of the reasoning, nor does it need to prove that the reason relied upon was bona fide, nor does it need to prove that the reasoning was applied in a nondiscriminatory fashion.'" *Frappied v. Affinity Gaming Black Hawk, LLC*, 966 F.3d 1038, 1058 (10th Cir. 2020) (quoting *EEOC v. Flasher Co.*, 986 F.2d 1312, 1316 (10th Cir. 1992)). "This stage of the analysis only requires the defendant to articulate a reason for the discipline that is not, on its face, prohibited and that is reasonably specific and clear." *Id.* (quotation cleaned up).

The court's earlier Order already concluded that Walmart articulated such a non-retaliatory reason. *See* Doc. 87 at 17. Walmart fired plaintiff based on its belief that she violated Walmart policy 763e by failing to report her injury in the same shift in which it occurred. Doc. 95 at 13; *see also* Doc. 95-10 at 1 (Policy 763e). Because Walmart Form 670e designated this violation as a "Step 1" violation, and the Conduct Disciplinary Action Guidelines provided that seasonal associates like plaintiff "should be terminated when their coaching has progressed to a formal written" violation, the decisionmakers here believed they had to terminate plaintiff's employment. *See* Doc. 95-9 at 1 (Form 670e); Doc. 95-19 at 1 (Conduct Disciplinary Action Guidelines); Doc. 95-2 at 42 (Pl.'s Dep. 105:10–13); Doc. 95-5 at 7 (Whitenack Dep. 20:3–19); Doc. 95-6 at 6 (Medaris Dep. 79:1–18). As the court previously concluded, when "'an employee violates an employer's policies . . . it will often be the case that the employer can assert a legitimate, non-retaliatory reason for taking an adverse employment action against the employee.'" Doc. 87 at 16 (quoting *Vaughn v. Epworth Villa*, 537 F.3d 1147, 1152 n.3 (10th Cir. 2008)); *see also Frappied*, 966 F.3d at 1058 (concluding that "violations of company policy" were "legitimate, nondiscriminatory reasons for [employer's] termination of each plaintiff").

Resisting this conclusion, plaintiff resurrects an argument the court already has rejected. Plaintiff argues that Walmart's policy requiring an employee to report an injury in the same shift when it occurred undermines Kansas public policy, as reflected in Kan. Stat. Ann. § 44-520(a)(1)(A). Doc. 98 at 50–51. That statute allows an employee to file a workers' compensation claim so long as the employee provided notice of her injury to her employer within 20 days of injury. Kan. Stat. Ann. § 44-520(a)(1)(A). Plaintiff reasons that this 20-day reporting period allows an employee to file a claim for an injury that doesn't become

immediately apparent, such as an injury caused by "repetitive trauma."  Doc. 98 at 50–51.  But, plaintiff argues, Walmart's policy allows it to fire an employee "for reporting an injury caused by repetitive trauma unless the employee reported the pain the first time the pain was felt."  *Id.* at 51.[7]  Plaintiff thus concludes that Walmart's rules undermine the public policy of Kansas.  *Id.* But this argument fails for two reasons.

*First*, the court already concluded that plaintiff's argument "misconstrues this statute." Doc. 87 at 17.  "Section 44-520 requires employees, if they wish to preserve their right to recover under Kansas's workers compensation laws, to report their injuries within 20 days after they occur."  *Id.*  "It does not forbid employers from adopting . . . workplace policies requiring their employees to report workplace injuries on a prompter basis."  *Id.  Second*, other district courts in our Circuit have concluded that timely reporting rules like Walmart's are legitimate, nonretaliatory reasons for terminating employee/plaintiffs who violated such rules.  *See, e.g.*, *Charney v. United Airlines, Inc.*, No. 19-CV-01700-NYW, 2020 WL 6450445, at *14 (D. Colo. Nov. 2, 2020) (finding that defendant offered non-retaliatory reason for terminating plaintiff where plaintiff violated company policy requiring employees to "immediately report any workplace injury to the employee's supervisors at the time of occurrence" (quotation cleaned up)); *Ramirez v. Goodyear Tire & Rubber Co.*, No. CV-13-85-R, 2014 WL 3744166, at *2 (W.D. Okla. July 30, 2014) (granting summary judgment to employer where plaintiff reported

---

[7]     Plaintiff claims that she is such an employee.  Throughout her briefing, plaintiff tries to argue that her wrist injury wasn't really an injury at all, but rather a "soreness" that later developed into an injury. *See, e.g.*, Doc. 98 at 60.  But plaintiff, in her written statement to Walmart, conceded that she had "injured" her wrist at work, and that during the shift when she sustained her injury, her wrist went from an "ache" to "throbbing pain" to "excruciating" pain by the time she left work.  *See* Doc. 98-14 at 2.  No reasonable juror could find or infer that plaintiff hadn't sustained an "injury" at work.  So, the court rejects plaintiff's argument that she didn't technically "injure" her wrist and so Walmart shouldn't have fired her for failing to report it immediately.

workplace injury five days after it occurred, violating employer's policy requiring employees to report workplace injuries "immediately after discovered").

Also, while neither the Kansas Supreme Court nor the Tenth Circuit has addressed plaintiff's argument directly, both courts have noted—without criticism—timely reporting rules like Walmart's.  In *Asp v. McPherson County Highway Department*, 388 P.2d 652, 655 (Kan. 1964), the employer had adopted a rule requiring employees to report an injury "immediately after the accident" (or seven days after it, at the latest), or else "relinquish all rights to claim for damages."  The Kansas Supreme Court made no comment about the legality of this policy even though Kansas law, at that time, gave injured workers 10 days to provide notice of an injury to their employer.  *See id.* at 656 (citing Kan. Stat. Ann. § 44-520 (1949)).  And in *Alires v. Amoco Production Co.*, 774 F.2d 409, 410 (10th Cir. 1985), the Tenth Circuit affirmed dismissal of a plaintiff's discrimination claim where an employer had disciplined the plaintiff for failing to "promptly report all injuries, regardless of their apparent severity."  Again, the court is mindful that neither one of these cases directly addressed an argument like plaintiff's.  Indeed, it's likely the plaintiffs in those cases didn't raise such an argument.  But in the absence of any authority to support plaintiff's argument, those cases are all the court has.[8]

---

[8]      Plaintiff cites *Coleman v. Safeway Stores, Inc.*, 752 P.2d 645 (Kan. 1988), to argue that Walmart's injury reporting rule undermines Kansas public policy.  In *Coleman*, the Kansas Supreme Court concluded that allowing "an employer to discharge an employee for being absent or failing to call in an anticipated absence as the result of a work-related injury would allow an employer to indirectly fire an employee for filing a workers' compensation claim, a practice contrary to the public policy of this state[.]"  *Id.* at 652.  But as Walmart highlights, the Kansas Supreme Court later expressly disapproved of this impermissibly broad liability language.  *See Gonzalez-Centeno v. N. Cent. Kan. Reg'l Juv. Det. Facility*, 101 P.3d 1170, 1175 (Kan. 2004) ("The first question we consider is whether the broad liability language from *Coleman* reflects current law, and the answer is no.  With a variety of facts presented and a burden-shifting analysis adopted in subsequent cases, the statement from *Coleman* has been treated not as a rule of law but rather as depending on the peculiar circumstances of each case.").  Thus, *Coleman* is not an ace in the hole for plaintiff.  And, as *Gonzalez* highlighted, under the burden-shifting framework adopted post-*Coleman* for retaliatory discharge cases, it's inappropriate to evaluate the merits of an employer's policy at the second step of the framework, which requires only a facially legitimate and non-retaliatory reason for discharge.  *See Gonzalez*, 101 P.3d at 1177 (noting that, at step two of the burden-

Walmart cites an out-of-circuit case—*Yowell v. Administrative Review Board, United States Department of Labor*, 993 F.3d 418 (5th Cir. 2021)—with nearly identical facts.  But that case dealt with causation standards under the Federal Railroad Safety Act.  In that different statutory setting, the court is reluctant to adopt the Fifth Circuit's reasoning and apply it to this case.  But for what it's worth, *Yowell* recognized the conceptual difficulty with timely reporting rules like Walmart's, where "an employee's protected act itself reveals, or at least leads to the discovery of, conduct for which discipline is otherwise appropriate."  993 F.3d at 422.  Ultimately, the Fifth Circuit held that without evidence "that company representatives attempted to prevent [plaintiff's] report [of his workplace injury] or discouraged him from reporting," an employer didn't violate the Federal Railroad Safety Act by firing an employee for failing to report a work injury promptly.  *Id.* at 427; *see also id.* at 427–28 ("There is unchallenged evidence in the record that it was not the fact of reporting an injury but the failure to report promptly an earlier injury that caused Yowell to be discharged.").

Walmart's burden at this second step of the *McDonnell-Douglas* framework is light.  "This stage of the analysis only requires the defendant to articulate a reason for the discipline that is not, on its face, prohibited and that is reasonably specific and clear."  *Frappied*, 966 F.3d at 1058.  Walmart has done that.  And plaintiff hasn't convinced the court that Walmart's timely reporting rule, on its face, undermines Kansas public policy.  All the authority the court has suggests the opposite.  The court thus concludes that Walmart has offered a legitimate, non-retaliatory reason for terminating plaintiff's employment.  So, the court proceeds to pretext.

---

shifting framework, *Coleman* "does not preclude an employer from invoking the attendance record of an employee who claims a work-related injury as a facially legitimate reason for an employee's termination").

### 3.    Pretext

Because Walmart has articulated a legitimate, nonretaliatory reason for plaintiff's

termination, the *McDonnell Douglas* test shifts the burden back to plaintiff.  At this step, plaintiff

must show—by clear and convincing evidence—that a reasonable juror could find it "highly

probable" that the stated reason is pretextual.  *See Foster v. Alliedsignal, Inc.*, 293 F.3d 1187,

1195 (10th Cir. 2002) (establishing that a Kansas retaliatory discharge plaintiff suing in federal

court must show "clear and convincing" evidence of retaliation at the summary judgment stage);

*In re B.D.-Y.*, 187 P.3d 594, 601 (Kan. 2008) (defining "clear and convincing evidence" as

evidence establishing "that the truth of the facts asserted is 'highly probable'").[9]  To make the

---

[9]       The parties dispute whether the clear and convincing evidence standard applies in this federal
diversity suit.  Under Kansas law, a plaintiff in a retaliatory discharge case "need not meet the clear and
convincing standard at the summary judgment stage of the proceedings."  *Rebarchek v. Farmers Co-op.
Elevator*, 35 P.3d 892, 898 (Kan. 2001).  Instead, a plaintiff "can successfully oppose a motion for
summary judgment by a preponderance of the evidence."  *Bracken v. Dixon Indus., Inc.*, 38 P.3d 679, 683
(Kan. 2002).

        But "a federal court sitting in diversity will be guided by federal-law standards governing
summary judgment procedure."  *Foster*, 293 F.3d at 1194–95.  And binding Tenth Circuit precedent holds
"that a plaintiff in federal court who opposes a summary judgment in a retaliatory discharge case based on
Kansas law must set forth evidence of a clear and convincing nature that, if believed by the ultimate
factfinder, would establish that plaintiff was more likely than not the victim of illegal retaliation by her
employer."  *Id.* at 1195.

        To be sure, the Tenth Circuit has expressed some doubt about this precedent's vitality after the
Supreme Court's decision in *Shady Grove Orthopedic Associates, P.A. v. Allstate Insurance Co.*, 559
U.S. 393 (2010).  *See Macon v. United Parcel Serv., Inc.*, 743 F.3d 708, 713 n.2 (10th Cir. 2014) ("'A
federal rule, therefore, cannot govern a particular case in which the rule would displace a state law that is
procedural in the ordinary use of the term but is so intertwined with a state right or remedy that it
functions to define the scope of the state-created right.'" (quoting *Shady Grove*, 559 U.S. at 423 (Stevens,
J., concurring); then citing *James River Ins. Co. v. Rapid Funding, LLC*, 658 F.3d 1207, 1217 (10th Cir.
2011) (noting Justice Stevens's concurrence provides the controlling analysis in *Shady Grove*))).  But the
Tenth Circuit hasn't overruled *Foster*, so it's still binding precedent.  *See id.* (noting that, under the
binding precedent of *Foster*, "the district judge erred in applying the more lenient 'preponderance of the
evidence' standard").  Indeed, the Tenth Circuit recently applied the "clear and convincing evidence"
standard to a Kansas retaliatory discharge case decided at the summary judgment stage, albeit in an
unpublished case.  *See Benjamin v. Bd. of Trs. of Barton Cnty. Cmty. Coll.*, 810 F. App'x 691, 694 (10th
Cir. 2020); *see also id.* at 697 (Tymkovich, C.J., dissenting) (emphasizing the clear and convincing
evidence standard).  So, bound by Tenth Circuit precedent, the court applies the clear and convincing
evidence standard to plaintiff's claim at this summary judgment stage.

requisite showing, plaintiff must provide clear and convincing evidence that "the employer's explanation was so weak, implausible, inconsistent or incoherent" such that a reasonable juror could find it highly probable that the employer's explanation "was not an honestly held belief but rather was subterfuge for [retaliation]." *Young v. Dillon Cos., Inc.*, 468 F.3d 1243, 1250 (10th Cir. 2006).

To analyze whether a reasonable juror could find pretext under this standard, the court doesn't ask "whether the employer's reasons [for terminating plaintiff] were wise, fair or correct[.]" *Riggs v. AirTran Airways, Inc.*, 497 F.3d 1108, 1118 (10th Cir. 2007). Instead, the court asks "whether the employer honestly believed its reasons and acted in good faith upon them," *id.* at 1119, "even if they later prove to be untrue," *Young*, 468 F.3d at 1250. The court thus considers "the facts as they appeared to the person making the decision," and doesn't "second-guess the employer's decision even if it seems in hindsight that the action taken constituted poor business judgment." *Riggs*, 497 F.3d at 1119. "The reason for this rule is plain: [the court's] role is to prevent intentional discriminatory hiring practices, not to act as a 'super personnel department,' second guessing employers' honestly held (even if erroneous) business judgments." *Young*, 468 F.3d at 1250; *see also Rivera v. City & Cnty. of Denver*, 365 F.3d 912, 925 (10th Cir. 2004) ("'An articulated motivating reason is not converted into pretext merely because, with the benefit of hindsight, it turned out to be poor business judgment.'" (quoting *McKnight v. Kimberly Clark Corp.*, 149 F.3d 1125, 1129 (10th Cir. 1998))).

Plaintiff offers seven reasons why Walmart's stated reason for firing her was pretextual. *See* Doc. 98 at 50–59. Recognizing some overlap between those arguments, Walmart offers five responses to plaintiff's seven arguments. *See* Doc. 101 at 21–29. The court doesn't ignore any

of the parties' arguments but concludes that plaintiff's contentions of pretext boil down to three arguments.  None are availing.

### a.  The Decisionmakers' Testimony

Plaintiff's pretext argument begins where her direct evidence argument left off:  the testimony of the three decisionmakers that they wouldn't have fired plaintiff if she hadn't reported her injury.  Although the court concluded that this testimony didn't provide direct evidence of retaliation, that doesn't mean that the testimony can't establish pretext.  *See Fassbender v. Correct Care Sols., LLC*, 890 F.3d 875, 884–85 (10th Cir. 2018) (determining that supervisor's comments suggesting bias against pregnant employees served as evidence of pretext, even though they didn't qualify as direct evidence of retaliation).

But the court concludes that plaintiff's cited testimony from Mr. Whitenack, Ms. Medaris, and Mr. Usry can't establish pretext sufficient to survive summary judgment.  As discussed before, the three decisionmakers' testimony, taken as a whole, shows that all three believed plaintiff hadn't reported her injury in a timely fashion—and that's why she was fired. It's true:  they wouldn't have known that plaintiff didn't timely report if she hadn't reported her injury at all.  But merely acknowledging that fact doesn't weaken or contradict Walmart's cited reason for firing plaintiff.  Nor does it render Walmart's non-retaliatory reason incoherent, or undermine the consistency of Walmart's explanation.  On the contrary, throughout the summary judgment record, all three decisionmakers consistently testified that they fired plaintiff because she didn't timely report her injury—and not because she reported the injury in the first place.

Also, when considering the decisionmakers' testimony as a whole, plaintiff's cherry-picked comments pale in comparison to the comments establishing pretext in the Tenth Circuit case cited by plaintiff.  *Cf. Fassbender*, 890 F.3d at 884–85 (concluding a reasonable juror could

find pretext where supervisor "made the following remarks:  (1) 'What, you're pregnant too?';

(2) 'I don't know how I'm going to be able to handle all of these people being pregnant at once,';

and (3) 'I have too many pregnant workers, I don't know what I am going to do with all of

them'" (quotation cleaned up)).

In the end, a reasonable juror couldn't find that the few testimonial statements—all

comments taken out of context—could establish that Walmart's non-retaliatory reason for firing

plaintiff was false or otherwise unworthy of belief.

### b.  Walmart's Good Faith Belief That Plaintiff Violated the Timely Reporting Rule

Plaintiff next argues that Walmart's reason for firing her was false.  She contends that a

reasonable juror could conclude that she in fact timely reported her injury during the shift when

it occurred (the April 12–13 overnight shift).  Plaintiff's right.  A reasonable juror could agree

with her because this fact is disputed.  *See* Doc. 95-2 at 14 (Pl.'s Dep. 51:22–23) (plaintiff's

testimony that she told Ms. Wilbur that her wrist was hurting on the morning of April 13); Doc.

95-4 at 2, 3 (Wilbur Dep. 16:4–7, 18:15–17) (Ms. Wilbur's testimony that she doesn't remember

plaintiff telling her about any wrist injury at that time).

But this dispute isn't a material one.  The relevant inquiry is whether the decisionmakers

believed in good faith that plaintiff hadn't reported her injury in a timely fashion.  *Riggs*, 497

F.3d at 1119; *Young*, 468 F.3d at 1250.  So, even assuming plaintiff timely reported her injury,

Mr. Whitenack, Ms. Medaris, and Mr. Usry were under the impression that she didn't.  And,

under well-established principles for showing pretext, it's that impression that matters.  *Rivera*,

365 F.3d at 925 ("Perhaps a reasonable factfinder could observe all the witnesses and believe

Plaintiff's version of the events . . . . [But], that is not the issue."); *see also Swackhammer v.

Sprint/United Mgmt. Co.*, 493 F.3d 1160, 1170 (10th Cir. 2007) (explaining that, when analyzing

pretext, "it is not what [a decisionmaker] *should* have known that matters, but whether he acted

in good faith upon the beliefs he held"); *Benjamin v. Bd. of Trs. of Barton Cnty. Cmty. Coll.*, 810
F. App'x 691, 694–95 (10th Cir. 2020) (noting in a Kansas retaliatory discharge case that "'[t]he
pertinent question in determining pretext is not whether the employer was right to think the
employee engaged in misconduct, but whether that belief was genuine or pretextual'" (quoting
*Pastran v. K-Mart Corp.*, 210 F.3d 1201, 1206 (10th Cir. 2000))).

This principle requires the court to place itself in the shoes of Mr. Whitenack, Ms.
Medaris, and Mr. Usry. Here's what they knew: plaintiff reported a wrist injury on the night of
Tuesday, April 14 to Ms. Wilbur, who then told Mr. Whitenack. Doc. 95-2 at 31–32 (Pl.'s Dep.
83:24–84:13); Doc. 95-5 at 3, 10 (Whitenack Dep. 8:19–22, 79:2–7). Plaintiff then wrote a
statement saying that on Monday morning, April 13, she noticed that her wrist had started to
hurt. Doc. 98-14 at 2. But this statement didn't say anything about plaintiff reporting her injury
at that time. *See id.* Plaintiff argues this is so because Mr. Whitenack didn't ask her,
specifically, whether she had reported her injury to anyone. He also didn't give her the correct
Associate Incident Report—which would've asked plaintiff when she reported her injury and to
whom. For those reasons, plaintiff contends, Mr. Whitenack couldn't have believed in good
faith that plaintiff had violated Walmart policy by not timely reporting her injury. *See* Doc. 98 at
54.

But the summary judgment record rejects plaintiff's argument. Although it's not entirely
clear how Mr. Whitenack arrived at his belief that plaintiff didn't report her injury timely, his
contemporaneous text message exchange with Mr. Usry establishes that he held this belief as
plaintiff was writing her statement:

> MR. WHITENACK: Just talked to [plaintiff]. She said she hurt her wrist Sunday
> (doesn't know how) and didn't tell anyone
>
> MR. USRY: Hurt how? Can she write a statement. She only get coached if she
> describes pain

MR. WHITENACK:  Yes I'll have her write a statement

Doc. 95-11 at 1.

Mr. Whitenack also asked "How long do they [employees] have to report? EOS [End of shift]?"  *Id.*  Mr. Usry didn't respond directly to this question.  But after Mr. Whitenack sent a picture of plaintiff's statement—which again didn't mention anything about plaintiff reporting her injury earlier—Mr. Usry said:  "Yea, that would be a coaching.  Is HR on site?  Would she be termed with a written coaching?"  *Id.* at 2.  Mr. Whitenack responded: "Let me ask[.]"  *Id.* The contemporaneous text messages establish that both Mr. Whitenack and Mr. Usry believed plaintiff hadn't reported her injury in a timely fashion.

Shifting gears to Ms. Medaris, who at that point in time, knew only what Mr. Whitenack knew.  *See* Doc. 95-13 at 1–2 (Medaris Decl. ¶ 5) ("Whitenack . . . informed me that [plaintiff] had injured her wrist during her April 12–13, 2020 overnight shift . . . [but] first reported her injury to Walmart during her April 14–15, 2020 overnight shift.").  When Mr. Whitenack brought plaintiff to the HR office to meet with him and Ms. Medaris, he told plaintiff that she was "supposed to report [her] work injury . . . within 24 hours[.]"  Doc. 95-2 at 42 (Pl.'s Dep. 105:13–15).  And, he explained, because plaintiff was a temporary employee, he and Ms. Medaris could fire her without warning for violating that rule.  *Id.* at 42 (Pl.'s Dep. 105:15–18).

It's undisputed that plaintiff—at that point in time—hadn't said anything about reporting her injury to Ms. Wilbur at the end of her April 12–13 shift.  *Id.* at 42–43 (Pl.'s Dep. 108:12– 109:1).  So, Ms. Medaris had no reason to believe that plaintiff had reported her injury when it occurred.  And her contemporaneous email to Mr. Usry after firing plaintiff confirms this understanding:  "We have completed [plaintiff's] termination for late reporting."  Doc. 95-15 at 1 (noting timestamp of Wednesday, April 15, 2020 at 12:15 a.m., less than an hour after Walmart had terminated plaintiff); Doc. 93 at 3 (Pretrial Order ¶ 10) (stipulated that Walmart terminated

plaintiff on April 14, 2020 before 11:32 p.m.).  In short, the contemporaneous evidence in the

summary judgment record establishes the undisputed fact that all three decisionmakers

believed—in the moments before, during, and after plaintiff's termination—that she had violated

Walmart policy by not reporting her injury timely.

And all three decisionmakers' testimony is consistent with that contemporaneous

evidence.  Mr. Whitenack testified that when he fired plaintiff, he didn't know plaintiff allegedly

had reported her injury to Ms. Wilbur at the end of her April 12–13 shift.  Doc. 95-5 at 8

(Whitenack Dep. 77:13–20).  He testified that when he decided to fire plaintiff, he "was under

the impression that she was reporting an injury late[.]"  *Id.* at 5 (Whitenack Dep. 14:13–14).  Ms.

Medaris similarly testified that she terminated plaintiff "based on her statement that she reported

late."  Doc. 98-13 at 4 (Medaris Dep. 17:7–11).  And Mr. Usry likewise testified—as the

company's Rule 30(b)(6) representative—that Walmart terminated plaintiff's employment for

failing to report her injury in a timely manner.  *See* Doc. 98-12 at 10 (Usry 30(b)(6) Dep.

120:15–19); *see also id.* at 8 (Usry 30(b)(6) Dep. 45:19–23).

At bottom, nothing in the summary judgment record casts doubt on the decisionmakers'

good faith belief that plaintiff didn't report her injury timely.  "[W]hile evidence amassed during

discovery may well suggest that [Walmart's] beliefs . . . were wrong," and that plaintiff perhaps

did report her injury in a timely fashion, that evidence "do[es] not suggest [Walmart's] beliefs

were held in bad faith."  *Young*, 468 F.3d at 1251.  Nor is there any fact "suggesting that relevant

evidence was deliberately suppressed from the decision makers or ignored in order to further a

[retaliatory] purpose."  *Id.*  Instead, the summary judgment record consistently confirms that the

decisionmakers believed plaintiff didn't report her injury timely and they thus fired her on that

basis.  A reasonable juror thus would have no reason to doubt the good faith of the

decisionmakers' beliefs.  *See Rivera*, 365 F.3d at 925 (affirming summary judgment for employer because even though "a reasonable factfinder could . . . believe [p]laintiff's version of the events[,]" that evidence didn't create a genuine issue that the employer's "expressed reason for terminating [p]laintiff must have been pretextual").

Finally, on a somewhat related note, plaintiff highlights that Walmart didn't investigate plaintiff's injury further or inquire whether she actually reported her injury, thus undermining any good faith belief that she violated Walmart policy.  *See* Doc. 98 at 54–55.  Plaintiff's correct. Walmart didn't investigate her injury.  Nor does the record suggest that any of the three decisionmakers expressly asked plaintiff whether she had reported her injury when it occurred. But the record consistently establishes that all three believed she hadn't.  And plaintiff gave them no reason to believe she had.  Again, it's undisputed that when Mr. Whitenack told plaintiff that she should've reported her injury within 24 hours, plaintiff didn't give any indication that she had told Ms. Wilbur during the April 12–13 shift that her wrist was hurting her.  Her written statement didn't say as much.  And Ms. Wilbur didn't remember (and more importantly, didn't report) anything about plaintiff's injury during the April 12–13 shift.

So, while a more conscientious or careful manager might have inquired more thoroughly before determining whether plaintiff had violated Walmart's rule, the three decisionmakers here had no reason to believe that plaintiff actually had reported her injury to Ms. Wilbur shortly after it occurred.  Walmart's failure to inquire more thoroughly, or investigate more adequately, doesn't so undermine the decisionmakers' good faith belief that "a reasonable fact finder could conclude that it was not an honestly held belief but rather was subterfuge for [retaliation]." *Young*, 468 F.3d at 1250.  True, one might conclude that Walmart didn't make the savviest business judgment.  But that's beside the point, for the court's "role is . . . not to act as a 'super

personnel department,' second guessing employers' honestly held (even if erroneous) business

judgments." *Id.*

### c.  Walmart's Failing to Follow Internal Policies

The heart of plaintiff's next pretext argument is that Walmart failed to follow its internal

policies after she reported her injury.  As a reminder, Walmart's Dot Com Safety policy required

it to take several actions whenever an employee reported a workplace injury:

- provide the employee with an "Associate Incident Report," with its specific questions asking when an employee reported his or her injury and to whom;

- complete a "First Report of Injury Form" if required by the State of Kansas;

- record the incident in Walmart's "Incident Reporting System" within 24 hours of the incident;

- complete a "Safety Incident Investigation" form and follow an 8-step review and investigation process;

- and follow up with the employee for seven days after her injury.

Doc. 98-11 at 4–7.  *But see id.* at 4 (prefacing that "Associates involved in an incident will report

it to their manager immediately" and that "[f]ailure to do so may result in disciplinary action").

It's undisputed that Walmart didn't do those things.  But "the standard for establishing

pretext requires evidence of not just any procedural shortfall, but of a 'disturbing procedural

irregularity,' often exemplified by an employer's 'falsifying or manipulating of relevant

criteria[.]'"  *Cooper v. Wal-Mart Stores, Inc.*, 296 F. App'x 686, 696 (10th Cir. 2008) (first

quoting *Timmerman v. U.S. Bank, N.A.*, 483 F.3d 1106, 1122 (10th Cir. 2007); then quoting

*Plotke v. White*, 405 F.3d 1092, 1104 (10th Cir. 2005)) (affirming summary judgment for

employer because deviation from company policy was insufficient evidence of pretext).  "'[T]he

mere fact that an employer failed to follow its own internal procedures does not necessarily

suggest that the employer was motivated by illegal [retaliatory] intent or that the substantive

33

reasons given by the employer for its employment decision were pretextual.'" *Fassbender v.*

*Correct Care Sols., LLC*, 890 F.3d 875, 889 (10th Cir. 2018) (quoting *Randle v. City of Aurora*,

69 F.3d 441, 454 (10th Cir. 1995)). "The question is whether the jury could conclude that the

procedural irregularities were somehow related to the decision-maker's [retaliatory] purpose."

*Id.*

Plaintiff contends that Walmart's procedural irregularities here connected to a retaliatory

purpose. Although plaintiff highlights several of Walmart's shortcomings, she hones in on three:

(1) Walmart's failing to give her proper documents informing her of her right to file a workers'

compensation claim; (2) Walmart's failing to give her an "Associate Incident Report" that

would've asked her to specify when she reported her injury and to whom; and (3) Walmart's

failing to discipline her progressively with a "Step 1" written violation, rather than terminating

her immediately.

### i.      Walmart's Failing to Provide Proper Documents and Report Plaintiff's Injury

Plaintiff first directs attention to several documents that Walmart should have given her

to inform her about workers' compensation claims. *See* Doc. 98 at 56–57. She also highlights

that Walmart didn't report her injury to the State of Kansas, as Kansas law requires. *See id.* at

56. Plaintiff argues that Walmart's failure to create the "proper paper trail" allowed Walmart to

"deny receiving notice" of plaintiff's injury for any future workers' compensation claim she

might file. *Id.* at 57. But the court doesn't find these irregularities meaningful to the correct

pretext analysis.

The Tenth Circuit has explained repeatedly that "disturbing procedural irregularities"

refer to an employer's "falsifying or manipulating . . . criteria" for firing an employee. *Garrett v.*

*Hewlett-Packard Co.*, 305 F.3d 1210, 1217 (10th Cir. 2002); *Jaramillo v. Colo. Jud. Dep't*, 427

F.3d 1303, 1308 (10th Cir. 2005), *as modified on denial of reh'g* (Dec. 20, 2005).  Also, the

Tenth Circuit precedent cited by plaintiff instructs that the most relevant procedural irregularities

are those connected with the termination decision.  *See Fassbender*, 890 F.3d at 889

("Procedural irregularities can suggest the existence of illegal discrimination where the

disregarded procedures directly and uniquely disadvantaged a minority employee." (quotation

cleaned up)); *Plotke*, 405 F.3d at 1104 (explaining that "procedural irregularities" surrounding

plaintiff's "termination constitute relevant evidence of pretext going to the termination

decision").

    In *Fassbender*, the Tenth Circuit determined that a decisionmaker's failure to write a

narrative justifying plaintiff's termination could serve as evidence of pretext.  890 F.3d at 889.

The Tenth Circuit reasoned that a reasonable juror could conclude that this failure "allowed [the

employer] to change its explanation for firing" the plaintiff.  *Id.*  And indeed, that's what the

employer did.  *Id.*  (emphasizing, as a part of the pretext analysis, that the employer was

"inconsistent" in explaining why it fired plaintiff).  Similarly, in *Plotke*, the relevant "procedural

irregularity" was the absence of a documented justification for plaintiff's termination.  In that

case, the summary judgment record presented a genuine dispute whether the decisionmakers,

after firing plaintiff, had fabricated documents "to build a file to support the termination

decision."  405 F.3d at 1104–05.  And, in both cases, the Tenth Circuit emphasized that the

procedural irregularity was just one piece of the larger body of evidence from which a reasonable

juror could find pretext.  *Fassbender*, 890 F.3d at 890 (emphasizing the "totality" of the pretext

evidence, including the decisionmaker's discriminatory comments and the employer's shifting

explanations for terminating plaintiff); *Plotke*, 405 F.3d at 1105–07 (concluding that procedural

irregularity could show pretext, "especially when viewed in the aggregate with the other

evidence" of pretext, including evidence that the decisionmakers "contriv[ed] and grossly exaggerate[ed]" the incident leading to plaintiff's termination, as well as derogatory gender-based comments against plaintiff).

Here, Walmart's actions (or lack of them) unquestionably were sloppy. But Walmart didn't falsify or fabricate any documents or policies to justify terminating plaintiff. Nor did Walmart shift its reasons for terminating plaintiff. Quite the opposite: Walmart policy requires associates to report their injuries by the end of the shift when the injury occurred. And Walmart policy directs that managers "should . . . terminate[ ]" Jet seasonal associates like plaintiff when they violate serious safety rules. Doc. 95-19 at 1. More importantly, as explained before, the summary judgment record shows contemporaneous evidence from all three decisionmakers—before, during, and after plaintiff's termination—that they fired her because they believed she didn't timely report her injury and that Walmart policy thus required her termination. In other words, Walmart's failures to report plaintiff's injury to the State or provide her with proper documents weren't connected with the *decision* to terminate plaintiff. So, no reasonable juror could conclude that Walmart's failures represent the type of disturbing procedural irregularity the Tenth Circuit requires to support a finding of pretext.

Walmart's failures and sloppy business practice here make a mess of what otherwise would be a straightforward case. But still, plaintiff's pretext evidence doesn't provide the *clear and convincing* evidence she must adduce at this stage to create a genuine dispute about Walmart's good faith belief that it fired her for violating a workplace rule. *See Foster*, 293 F.3d at 1195 (requiring a Kansas retaliatory discharge plaintiff in federal court to show clear and convincing evidence of pretext at the summary judgment stage). In other words, no reasonable juror could conclude from Walmart's failures that it was "highly probable" that Walmart's

reason for firing plaintiff was false or otherwise unworthy of belief. *In re B.D.-Y.*, 187 P.3d 594, 601 (Kan. 2008) (defining "clear and convincing evidence" as evidence establishing "that the truth of the facts asserted is 'highly probable'"). Thus, this pretext evidence fails to negate summary judgment.

### ii.    Walmart Giving Plaintiff the Wrong Form to Report Her Injury

The summary judgment record also confirms that Walmart gave plaintiff a blank statement form, and not the "Associate Incident Report" that asks specific questions about an employee's injury—including when the employee reported the injury and to whom. *Compare* Doc. 98-14 at 2 (Plaintiff's Statement Form), *with* Doc. 98-15 at 2 (Associate Incident Report). The parties dispute whether Mr. Whitenack told plaintiff to include that specific information in her statement. *Compare* Doc. 98-2 at 18 (Pl.'s Dep. 87:18–21) ("Q. Did this male manager [Mr. Whitenack] ask you if you had told anybody else . . . about the discomfort you were feeling in your wrist? A. No."), *with* Doc. 95-5 at 10–11 (Whitenack Dep. 79:24–80:3) ("I always instructed everybody who was filling out a safety form to include when the injury occurred. And then I would ask them if they reported it to anyone, to ensure that we were able to . . . follow-up with any leaders who . . . were involved in that."). But it's undisputed that plaintiff's statement never mentions whether she had reported her injury to Ms. Wilbur or anyone else during the shift when she sustained her injury. And, more importantly, it's undisputed that plaintiff doesn't claim she *had* reported timely when Mr. Whitenack later told her Walmart was firing her for failing to do so. Doc. 95-2 at 43–44 (Pl.'s Dep. 108:22–109:1) ("Q. Did you tell the male manager [Mr. Whitenack] or [Ms.] Morgan [Medaris], the HR representative in the office, that you had reported your injury on the morning of April 13th? A. No.").

But, plaintiff argues, had Walmart supplied her with the correct form, she would've informed Walmart's management that she timely reported her injury to Ms. Wilbur. Fortunately, the Tenth Circuit has supplied helpful guidance on this precise point. In a case where an employer summarily terminated an employee while she was on vacation, the Tenth Circuit held that the employer's failure to give plaintiff the chance to respond to allegations of misconduct wasn't pretext, even though the employer typically spoke with employees before firing them. *See Riggs v. AirTran Airways, Inc.*, 497 F.3d 1108, 1119 (10th Cir. 2007) (affirming summary judgment for the employer based on insufficient pretext evidence). The Tenth Circuit concluded that while "allowing [the plaintiff] to complete her side of the story would seem to be the most fair way of addressing the situation, we cannot say that [the employer's] failure to do so in these circumstances constitutes a 'disturbing procedural irregularity' sufficient to prove pretext." *Id.* Applying *Riggs*'s reasoning here, the court concludes that Walmart's failure to give plaintiff the right form—which might have elicited relevant information telling plaintiff's side of the story— isn't the kind of "disturbing procedural irregularity" sufficient to prove pretext. *Id.*; *see also Cooper*, 296 F. App'x at 696 (affirming summary judgment for employer where plaintiff hadn't "proffered evidence of a disturbing procedural irregularity based upon Wal–Mart's failure to get his side of the story before deciding to terminate him").

In short, nothing in the summary judgment record could permit a reasonable juror to draw the inference that Walmart intentionally withheld the Associate Incident Report from plaintiff to prevent her from informing the decisionmakers of a timely report of her injury. *See Hysten v. Burlington N. Santa Fe Ry. Co.*, 415 F. App'x 897, 910 (10th Cir. 2011) (concluding that plaintiff failed to show pretext where "the record contain[ed] no evidence that . . . decision-makers falsified reports of [plaintiff's] misconduct or manipulated company rules, such that

[plaintiff] was improperly found guilty of misconduct"); *cf. Plotke*, 405 F.3d at 1105 (concluding

that plaintiff established genuine issue of pretext where there was evidence that decisionmakers

fabricated documents "to build a file to support the termination decision"). So, Walmart's failure

to give her that form can't establish pretext.

### iii.   Walmart's Alleged Deviation from its Disciplinary Procedures

Finally, plaintiff argues, Walmart deviated from its policy by immediately terminating

her employment, rather than issuing her a "Step 1" violation. Walmart Form 670e notes that

"[f]ailure to report any known injury before the end of shift" is a "Step 1" violation. Doc. 95-9.

Form 670e also notes that any "repeat of the same violation within 180 calendar days"

potentially could result in termination. *Id.* Thus, plaintiff contends, Walmart shouldn't have

fired her for a Step 1 violation unless she was repeating the same violation within 180 days.

Doc. 98 at 58.

But plaintiff's argument ignores Walmart's Conduct Disciplinary Action Guidelines.

They provide that "Jetflex and Jet Seasonal [associates] should be terminated when their

coaching has progressed to a formal written[.]" Doc. 95-19 at 1. Mr. Usry testified as

Walmart's corporate representative that when one views Walmart's policies together, plaintiff's

"late reporting aligned to a Step 1 on the 670," "Step 1 was written coaching[,]" and "for

temporary associates . . . that written coaching would result in termination." Doc. 98-4 at 26

(Usry 30(b)(6) Dep. 108:14–18). Mr. Whitenack similarly testified that he relied on Form 670e

and the Conduct Disciplinary Action Guidelines in deciding to terminate plaintiff's employment.

Doc. 95-5 at 7 (Whitenack Dep. 20:3–19). Ms. Medaris reiterated this point in her testimony and

in a Declaration. *See* Doc. 95-6 at 6 (Medaris Dep. 79:1–18); *see also* Doc. 95-13 at 2 (Medaris

Decl. ¶ 8) ("Based upon my conclusion that [plaintiff's] violation of Policy 670e warranted a

First Written disciplinary action, and because [she] was a Jet Seasonal associate, I concluded that [her] employment was to be terminated pursuant to Policy 670e and Walmart's Conduct Disciplinary Action Guidelines.").

The decisionmakers thus followed Walmart policies, as those policies are set forth in the summary judgment record. And, at very least, they *believed* they were following what Walmart policies required, which is the relevant inquiry. *See Berry v. T-Mobile USA, Inc.*, 490 F.3d 1211, 1222 (10th Cir. 2007) (concluding "decisionmakers did not believe a rigid policy existed," and so their mistake in failing to follow that policy didn't show pretext). The Tenth Circuit has reminded district courts that an "employee's mere allegation that his employer deviated from company policy is insufficient to prove pretext; rather, the employee must present evidence that the employer *believed* that a relevant company policy existed, and chose to deviate from the policy in spite of that belief." *Hysten*, 415 F. App'x at 910 (citing *Berry*, 490 F.3d at 1222) (further citation omitted); *see also DePaula v. Easter Seals El Mirador*, 859 F.3d 957, 976 n.25 (10th Cir. 2017) (quoting this portion of *Hysten* for its persuasive value). The inverse of these principles applies here. It's undisputed that Walmart's decisionmakers believed that the Conduct Disciplinary Action Guidelines required them to terminate plaintiff for her Step 1 violation. And there is nothing in the summary judgment record suggesting that the decisionmakers believed some other policy applied and it would have or even could have prohibited them from firing plaintiff. Nor is there evidence that the decisionmakers chose to deviate from such a policy to terminate plaintiff's employment.

Even if the court accepted plaintiff's argument that Walmart should've disciplined her instead of terminating her, that's still not enough to create a triable issue about pretext. Perhaps plaintiff is correct that Walmart didn't have to terminate her employment. The Conduct

40

Disciplinary Action Guidelines provide that a Jet seasonal associate like plaintiff "*should* be terminated when their coaching has progressed to a formal written[.]" Doc. 95-19 at 1 (emphasis added). But that doesn't mean that Walmart was required to discipline her progressively. And "where progressive discipline is entirely discretionary, and the employer did not ignore any established company policy in its choice of sanction, the failure to implement progressive discipline is not evidence of pretext." *Lobato v. N.M. Env't Dep't*, 733 F.3d 1283, 1291 (10th Cir. 2013) (quotation cleaned up) (affirming summary judgment for employer because of insufficient pretext evidence); *see also Berry*, 490 F.3d at 1222 ("[E]ven if [the employer] fell short of [plaintiff's] expectation of progressive discipline, this fact adds little to the pretext analysis" because the "'mere fact that an employer failed to follow its own internal procedures does not necessarily suggest that . . . the substantive reasons given by the employer for its employment decision were pretextual.'" (quoting *Randle v. City of Aurora*, 69 F.3d 441, 454 (10th Cir. 1995))).

Walmart didn't ignore established company policy in terminating plaintiff, a seasonal associate who Walmart believed had violated a policy requiring a formal written violation. Instead, the summary judgment record establishes that Walmart consistently applied its Conduct Disciplinary Action Guidelines and regularly terminated seasonal associates at the Edgerton facility where plaintiff worked when they received their first written violation. Doc. 95–16 (employment records); *see also* Doc. 98 at 25–26 (plaintiff acknowledging that it's uncontroverted that "Walmart terminated 113 seasonal associates from the Edgerton facility because they received a first written discipline"). On this summary judgment record, plaintiff hasn't discharged her burden to identify clear and convincing evidence permitting a reasonable juror to conclude that it was highly probable that Walmart's reason for firing plaintiff was

pretextual.  *See Lobato*, 733 F.3d at 1290 (holding that employer's failure to discipline probationary employee progressively didn't show pretext where employer's policy permitted immediate termination of probationary employees); *see also Berry*, 490 F.3d at 1222 (affirming summary judgment for employer where record established that employer regularly fired employees "without warning or prior disciplinary measures," and so employer's failure to follow "general progressive disciplinary strategies" when it terminated plaintiff couldn't show pretext).

In the end, plaintiff argues that Walmart's decision to fire her was unfair and subjectively unreasonable.  She argues that Walmart didn't even provide proper notice of its rule requiring immediate reporting of workplace injuries.  And there is evidence in the record to support that position.  *See* Doc. 95-14 at 2 (plaintiff's text to fellow associate that she "couldn't remember hearing anything about" the rule in her training); Doc. 95-15 (Medaris email to Usry expressing concern that Walmart's safety school training didn't inform employees when to report an injury).  But a reasonable juror couldn't conclude that plaintiff has come forward with clear and convincing evidence of pretext.  In other words, none of plaintiff's pretext arguments show that it is "highly probable" that Walmart terminated plaintiff in retaliation for reporting a workplace injury.

Admittedly, the situation here presents another relatively close call—especially because Walmart made such a mess of things.  But, ultimately, the court is guided by two legal principles:  (1) plaintiff hasn't shown *clear and convincing* evidence of pretext, as she must at this stage, *see Foster*, 293 F.3d at 1195, and (2) the court isn't a "'super personnel department,' second guessing employers' honestly held (even if erroneous) business judgments," *Young*, 468 F.3d at 1250.

Perhaps Walmart's decision was unwise.  Maybe it should've investigated more thoroughly and specifically asked plaintiff whether she had reported her injury in a timely manner.  Perhaps the decision was unfair.  Maybe plaintiff deserved leniency for violating a rule she didn't know about on one of her first days on the job.  And perhaps the employer's decision was incorrect.  Maybe plaintiff did report her injury at the end of the shift when it occurred.  But the court does "not ask whether the employer's reasons were wise, fair or correct;" it asks, instead, "whether the employer honestly believed its reasons and acted in good faith upon them." *Riggs*, 497 F.3d at 1118–19; *see also Forbes v. Kinder Morgan, Inc.*, 172 F. Supp. 3d 1182, 1198 (D. Kan. 2016) (finding that employer's decision to terminate plaintiff "perhaps was unwise[,]" "unfair[,]" "and incorrect[,]" but concluding that the summary judgment evidence didn't create a genuine factual issue of "whether [the employer] made a good faith, business-oriented decision").  Here, plaintiff hasn't identified evidence of a clear and convincing nature in the summary judgment record that creates a genuine issue of material fact whether Walmart terminated plaintiff based on its good faith belief that she had violated a workplace rule.  The court thus grants summary judgment to Walmart on plaintiff's sole claim for retaliatory discharge under Kansas law.

## IV.    Conclusion

For reasons explained by this Order, the court grants defendant Walmart's Motion for Summary Judgment (Doc. 94).  The court directs the Clerk to enter Judgment in defendant's favor against plaintiff's claim and close the case.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant Walmart's Motion for Summary Judgment (Doc. 94) is granted.

IT IS SO ORDERED.

Dated this 8th day of December, 2021, at Kansas City, Kansas.

s/ Daniel D. Crabtree
Daniel D. Crabtree
United States District Judge

44

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

**JANELL BRAXTON,**

      **Plaintiff,**

v.

**WALMART INC.,**

      **Defendant.**

**Case No. 20-2287-DDC-GEB**

## <u>MEMORANDUM AND ORDER</u>

Plaintiff Janell Braxton asserts a Kansas state law claim of retaliatory discharge against defendant Walmart.[1] Plaintiff alleges that defendant retaliated against her because defendant terminated plaintiff's employment shortly after she submitted a report for a workplace injury. Doc. 20 at 1 (First Am. Comp. ¶¶ 1–2). This matter comes before the court on plaintiff Janell Braxton's Motion for Partial Summary Judgment (Doc. 47) and defendant's Motion for Leave to File a Sur-reply (Doc. 64). Plaintiff filed Suggestions in Support of her Motion for Partial Summary Judgment (Doc. 48). Defendant responded (Doc. 55) and plaintiff replied (Doc. 59). For reasons explained below, the court denies plaintiff's Motion for Partial Summary Judgment and denies defendant's Motion for Leave to File a Sur-reply.

## I.     Uncontroverted Facts

The following facts are uncontroverted, or, if controverted, are stated in the light most favorable to defendant as the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007).

---

[1]     Title 28 U.S.C. § 1332 confers subject matter diversity jurisdiction over this action because plaintiff and defendant are citizens of different states and the amount in controversy exceeds $75,000. Doc. 20 at 1–2 (First Am. Comp. ¶¶ 4, 6–9, 13); *see also* Doc. 85 (Pls.' Resp. to Show Cause Order) (alleging amount in controversy exceeds $75,000).

### A.  Defendant's Employee Policies

Defendant maintains a written policy, Policy 763e.  In pertinent part, it provides:  "All known injuries, no matter how slight, will be reported to a member of management immediately.  At a minimum, these must be reported to a member of management by the end of the shift."  Doc. 55-4 at 1.  Defendant also maintains a written Policy 670e, which states, as relevant here, that "[f]ailure to report any known injury before the end of the shift" will result in a First Written formal disciplinary action.  Doc. 55-5 at 1.  Defendant also has adopted written Conduct Disciplinary Action Guidelines, which provide that "Jetflex and Jet Seasonal [associates] should be terminated when their coaching has progressed to a formal written" disciplinary action.  Doc. 55-8 at 1.

### B.  Plaintiff's Employment and Injury

Plaintiff was employed by defendant from March 23, 2020 to April 14, 2020.  Doc. 48-1 at 4–5.  During plaintiff's employment with defendant, she was a Jet Seasonal associate.  Doc. 55-7 at 1.  Around 1:00 a.m. on April 13th, 2020 during plaintiff's April 12–13 overnight shift, plaintiff sustained an injury to her left wrist.  Doc. 55-2 at 1.  On April 14, 2020, plaintiff provided to defendant, at defendant's request, a written statement about her work injury.  Doc. 48-2 at 8.  And, as of April 14, 2020, defendant knew plaintiff had reported her injury.  *Id.*  Quincy Usry (Operations Manager at defendant's Fulfillment Center in Edgerton, Kansas), David Whitenack (Operations Manager at defendant's Fulfillment Center in Edgerton, Kansas), and Morgan Medaris (Human Resources Business Partner at defendant's facility in Edgerton, Kansas) had reason to believe and understood that plaintiff first reported her April 13th injury to Walmart during her April 14–15, 2020 overnight shift.  Docs. 55-3 at 1–2, 55-2 at 1–2, 55-7 at 1–2.

2

## C.  Plaintiff's Termination

Based upon Mr. Usry, Mr. Whitenack, and Ms. Medaris's understanding that plaintiff

failed to report her injury during the April 12–13, 2020 shift when the injury occurred, Mr. Usry,

Mr. Whitenack, and Ms. Medaris concluded that plaintiff violated Policy 670e.  Docs. 55-3 at 2,

55-2 at 2, 55-7 at 2.  Defendant terminated plaintiff's employment.  Docs. 55-3 at 2, 55-2 at 2,

55-7 at 2.

## D.  Relevant Testimony

On January 6, 2021, Quincy Usry testified on defendant's behalf about certain topics

specified in plaintiff's Fed. R. Civ. P. 30(b)(6) deposition notice.  Docs. 48-2 at 2–3, 48-3 at 2.

Mr. Usry's testimony on defendant's behalf included testimony about Topic 5 in the deposition

notice.  Doc. 48-3 at 3.  Topic 5 asked defendant to designate a witness to testify about:

> Plaintiff's report(s) of a workplace injury, all actions taken by Walmart in response, the
> Walmart employees involved, and related documents including without limitation emails,
> text messages (WM_Braxton_000103-104), and the "Statement Form" produced as
> WM_Braxton_000105.

*Id.*

## II.  Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that there is "no

genuine dispute [about] any material fact" and that it "is entitled to judgment as a matter of

law."  Fed. R. Civ. P. 56(a).  When applying this standard, the court views the evidence and

draws inferences in the light most favorable to the non-moving party.  *Nahno-Lopez v. Houser*,

625 F.3d 1279, 1283 (10th Cir. 2010) (citing *Oldenkamp v. United Am. Ins. Co.*, 619 F.3d 1243,

1245–46 (10th Cir. 2010)).  A disputed "issue of fact is 'genuine' 'if the evidence is such that a

reasonable jury could return a verdict for the non-moving party' on the issue."  *Id.* (quoting

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)).  And an "issue of fact is 'material'

'if under the substantive law it is essential to the proper disposition of the claim' or defense." *Id.* (quoting *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Anderson*, 477 U.S. at 248)).

The moving party bears "'both the initial burden of production on a motion for summary judgment and the burden of establishing that summary judgment is appropriate as a matter of law.'" *Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010) (quoting *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002)).  To meet this burden, the moving party "'need not negate the non-movant's claim, but need only point to an absence of evidence to support the non-movant's claim.'" *Id.* (quoting *Sigmon v. CommunityCare HMO, Inc.*, 234 F.3d 1121, 1125 (10th Cir. 2000)).

If the moving party satisfies its initial burden, the non-moving party "'may not rest on its pleadings, but must bring forward specific facts showing a genuine issue for trial [for] those dispositive matters for which it carries the burden of proof.'" *Id.* (quoting *Jenkins v. Wood*, 81 F.3d 988, 990 (10th Cir. 1996)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Anderson*, 477 U.S. at 248–49.  "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Adler*, 144 F.3d at 671 (citing *Thomas v. Wichita Coca-Cola Bottling Co.*, 968 F.2d 1022, 1024 (10th Cir.), *cert. denied*, 506 U.S. 1013 (1992)).

## III.   Analysis

Plaintiff has asserted a Kansas retaliatory discharge claim against defendant arising from plaintiff's employment with defendant.  Doc. 20 at 1.  Specifically, plaintiff alleges that defendant unlawfully terminated plaintiff's employment because plaintiff invoked her rights under the workers' compensation laws of Kansas.  *Id.*  Plaintiff filed a Motion for Partial

Summary Judgment, asking the court to find defendant liable as a matter of law for retaliatory discharge under Kansas law.  Doc. 47.

Before turning to the parties' arguments for and against granting partial summary judgment, the court first addresses defendant's Motion for Leave to File a Sur-reply to plaintiff's Reply.  Doc. 64.  The court then considers whether to grant the Motion for Partial Summary Judgment.

### A.  Defendant's Sur-reply

Defendant seeks leave to file a sur-reply to plaintiff's Reply, as additional support for her Motion for Partial Summary Judgment.  Under D. Kan. Rule 7.1(c), briefing on motions is limited to the motion (with memorandum in support), a response, and a reply.  Sur-replies typically aren't allowed.  *Taylor v. Sebelius*, 350 F. Supp. 2d 888, 900 (D. Kan. 2004), *aff'd on other grounds*, 189 F. App'x 752 (10th Cir. 2006).

Instead, sur-replies are permitted only with leave of court and under "rare circumstances" after good cause is shown.  *Humphries v. Williams Nat. Gas Co.*, No. 96-4196-SAC, 1998 WL 982903, at *1 (D. Kan. Sept. 23, 1998) (citations and internal quotation marks omitted); *see also Ambac Assurance Corp. v. Fort Leavenworth Frontier Heritage Cmtys., II, LLC*, No. 15-CV-9596-DDC-JPO, 2017 WL 1035953, at *1 (D. Kan. Mar. 17, 2017).  For example, when a moving party uses its reply to present new material—*i.e.*, new evidence or new legal arguments—and if the court plans to rely on that new material to decide the motion, the court should give the nonmoving party an opportunity to respond.  *Green v. New Mexico*, 420 F.3d 1189, 1196 (10th Cir. 2005); *Doebele v. Sprint/United Mgmt. Co.*, 342 F.3d 1117, 1139 n.13 (10th Cir. 2003); *see also EEOC v. Int'l Paper Co.*, No. 91-2017-L, 1992 WL 370850, at *10 (D. Kan. Oct. 28, 1992).

The rules governing sur-replies "are not only fair and reasonable, but they assist the court in defining when briefed matters are finally submitted and in minimizing the battles over which side should have the last word." *Humphries*, 1998 WL 982903, at *1 (citation and internal quotation marks omitted); *see also Int'l Paper Co.*, 1992 WL 370850, at *10 (explaining that briefing between parties "must have an end point and cannot be permitted to become self perpetuating").

Defendant contends a sur-reply is warranted here because plaintiff raised new arguments in her Reply. Doc. 64 at 1. Specifically, defendant argues that plaintiff's Reply asserts for the first time that: (1) her workers' compensation retaliation claim is not subject to the *McDonnell Douglas* burden-shifting framework because she has alleged direct evidence of retaliation; and, (2) defendant's injury reporting policy is per se unlawful. The court will address the two topics in dispute below.

**(1)** In its Response, defendant assumes that the *McDonnell Douglas* burden-shifting framework applies in this case and discusses why it would prevail under a *McDonnell Douglas* analysis. Doc. 55 at 7. Defendant did not include an argument in its Response under the direct evidence standard, or explain why a direct evidence standard does not apply. *Id.* Plaintiff argues in her Reply that the *McDonnell Douglas* framework does not apply because she has presented direct evidence of retaliation. Doc. 59 at 2. In sum, plaintiff has presented a counterargument responding to defendant's assertion that it should prevail under a *McDonnell Douglas* analysis. This situation appears often in spirited litigation and is something opposing counsel could anticipate. The court is unwilling to allow a sur-reply simply to respond to a counterargument that defendant could have anticipated. The court thus denies defendant's request for leave to file

the proposed sur-reply to respond to plaintiff's argument that the *McDonnell Douglas* burden-shifting framework does not apply.

**(2)** Second, defendant argues that plaintiff's Reply makes a new legal argument that defendant's injury reporting policy is per se unlawful.  Doc. 64 at 1.  Plaintiff argues in her Reply that defendant cannot satisfy its burden under the *McDonnell Douglas* framework to articulate a legitimate, non-discriminatory reason for firing plaintiff because defendant's injury reporting policy conflicts with Kansas law.  Doc. 59 at 2.

Defendant's Memorandum in Opposition argues that plaintiff fails her burden under the *McDonnell Douglas* analysis because she hasn't cited summary judgment facts showing that defendant's legitimate, non-retaliatory reason for plaintiff's termination was pretext for retaliation.  Doc. 55 at 8, 11–13.  Plaintiff's Reply responds to that argument by asserting that defendant has failed to fulfill its burden under the *McDonnell Douglas* analysis because defendant hasn't articulated a legitimate, nondiscriminatory reason for plaintiff's termination, thereby making the prima facie case the only element that plaintiff must prove.  Doc. 59 at 9.  This is argument is not new.  Instead, it responds to an argument defendant made in its Memorandum in Opposition.  Defendant contends that it has not had an opportunity to oppose plaintiff's argument on this point (Doc. 64 at 1), but allowing defendant to file a sur-reply in response to an argument that is not "new" contradicts our standing rules governing briefing on motions.  *See* D. Kan. Rule 7.1(c) (limiting briefing on motions to the motion (with memorandum in support), a response, and a reply); *see also Humphries*, 1998 WL 982903, at *1 (the rules "assist the court in defining when briefed matters are finally submitted and in minimizing the battles over which side should have the last word." (citation and internal quotation marks omitted)).

For these reasons, the court denies defendant's Motion for Leave to File a Sur-reply to respond to plaintiff's argument that defendant's policy is unlawful.

**B. Motion for Partial Summary Judgment**

Now, the court turns to plaintiff's Motion for Partial Summary Judgment. Plaintiff asks for summary judgment in her favor on the liability issue because, she contends, she has adduced direct evidence of retaliation and it entitles her to judgment as a matter of law on her retaliatory discharge claim. Doc. 48 at 1. Plaintiff asserts that the *McDonnell Douglas* framework doesn't apply because she has come forward with direct evidence of retaliation. And, plaintiff adds, even if the *McDonnell Douglas* framework did apply, defendant fails under the framework because it cannot articulate a legitimate, nonretaliatory reason for terminating her employment. Doc. 59 at 1–2. So, she contends, these summary judgment facts establish as a matter of law that defendant is liable for retaliatory discharge under Kansas law. The court addresses these arguments below.

**1. Direct Evidence**

This court first must consider whether the *McDonnell Douglas* burden-shifting framework applies. Our Circuit has recognized: "Because [Kansas workers compensation retaliation claims] are rarely proven by direct evidence, the Kansas courts have adopted the *McDonnell Douglas* burden-shifting framework for analyzing retaliatory discharge cases." *Foster v. Alliedsignal, Inc.*, 293 F.3d 1187, 1193 (10th Cir. 2002) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) (further citations omitted)). Here, plaintiff asserts that she can prove her retaliatory discharge claim with direct evidence. And so, she claims, the court need not apply the *McDonnell Douglas* burden-shifting test.

8

As our Circuit has noted in the Title VII context, a "plaintiff bringing a retaliation claim must establish that retaliation played a part in the employment decision and may choose to satisfy this burden in two ways." *Lounds v. Lincare, Inc.*, 812 F.3d 1208, 1233 (10th Cir. 2015) (internal citations, quotation marks, and alteration omitted). Plaintiff "may either (1) offer direct evidence that retaliation 'played a motivating part' in an employment decision adverse to her interests, or (2) rely upon circumstantial evidence under 'the familiar three-part *McDonnell Douglas* framework to prove that the employer's proffered reason for its decision is a pretext for retaliation.'" *Id.* (quoting *Fye v. Okla. Corp. Comm'n*, 516 F.3d 1217, 1225 (10th Cir. 2008) (further citations omitted)).

"Direct evidence is evidence that, on its face, demonstrates that the employment decision was reached for discriminatory reasons." *Didier v. Abbott Labs.*, 614 F. App'x 366, 372 (10th Cir. 2015) (citing *Danville v. Reg'l Lab Corp.*, 292 F.3d 1246, 1249 (10th Cir. 2002)). "The classic example of direct evidence of discrimination comes from *Trans World Airlines*, where the Supreme Court held that an explicit, mandatory age requirement was direct evidence of age discrimination." *Tabor v. Hilti*, 703 F.3d 1206, 1216 (10th Cir. 2013) (citing *Trans World Airlines Inc. v. Thurston*, 469 U.S. 111, 121 (1985)).

Plaintiff argues she has adduced direct evidence of retaliation. Her argument relies on the following testimony from Mr. Usry's deposition. Specifically, he testified:

> Q.   So but for Ms. Braxton's report of a workplace injury to Walmart, Walmart would not have terminated her as it did, correct?
>
> A.   Correct.

Doc. 48-2 at 13–14 (Usry Dep. 55:24–56:2). Plaintiff argues that this statement is direct evidence of retaliation because it shows a nexus between plaintiff's protected status as an injured worker and her termination. Doc. 59 at 2.

Defendant responds, arguing that plaintiff takes this testimony out of context, and that Mr. Usry made it clear many times throughout his testimony that defendant terminated plaintiff's employment because she did not submit a *timely* report of her injury. Doc. 55 at 1. Defendant directs the court to the four preceding lines from Mr. Usry's deposition. There, defendant argues, he confirmed that but for plaintiff's failure to report her workplace injury in a timely fashion, defendant would not have terminated plaintiff's employment. Doc. 55 at 4. The relevant deposition testimony reads as follows:

> Q:    Meaning but for her report of an injury, she would not have been fired when and how she was fired, correct?
>
> A:    But for her timely report, yes.
>
> Q:    "But for" means had she have not. I'm sure you know that. If you don't understand one of my questions, let me know before you answer, okay?
>
> A:    Yes.
>
> Q:    Earlier I asked you if Mrs. Braxton hadn't reported her workplace injury, she wouldn't have been fired by Walmart as she was, meaning the same day and same time. And you agreed with that statement. Do you remember that testimony?
>
> A:    Yes.
>
> Q:    So but for Mrs. Braxton's report of a workplace injury to Walmart, Walmart would not have terminated her as it did, correct?
>
> A:    Correct.

Doc. 55-1 at 8–9 (Usry Dep. 55:8–56:2). And, as defendant correctly asserts, Mr. Usry testified many more times about the reason for plaintiff's discharge. That testimony includes the following:

> Q:    So what is—why was Mrs. Braxton terminated according to Walmart?

10

A:     For failure to report an incident by end of shift according to the 670e.

Q:     So Walmart's official position or contention in this lawsuit is that Mrs. Braxton was fired because she didn't report a workplace injury in the very shift that she first became aware of the injury; is that right?

A:     By end of shift, correct.

. . .

Q:     Can we agree that there is a connection between Mrs. Braxton's report of a work injury and her termination?

A:     When she reported the workplace injury.

. . .

Q:     Can we agree that had Mrs. Braxton never reported her workplace injury, Walmart wouldn't have fired her as it did?

A:     Correct.

Q:     Can we agree that there is some connection between Mrs. Braxton's report of a workplace injury and then her termination the same day?

A:     The timeliness of report, yes.

*Id.* at 3–4 (Usry Dep. 35:12–36:23).

Q:     And there is a connection between her report of a workplace injury and her termination that same day?

A:     Simplistically, yes.

Q:     Meaning but for her report of an injury, she would not have been fired when and  how she was fired, correct?

A:     But for her timely report, yes.

*Id.* at 8 (Usry Dep. 55:3–55:13).

11

> Q:     Walmart's official position in this lawsuit is that it terminated Mrs.
>        Braxton because, according to Walmart, she did not report her
>        workplace injury in the shift that she first became aware of it?
>
> A:     According to what she provided, yes.

*Id.* at 6 (Usry Dep. 40:5–9).

> Q:     And Walmart's contention is that had Mrs. Braxton actually
>        reported her injury on April 13th of 2020, it would not have fired
>        her; is that correct?
>
> A:     If she would have reported it by end of shift, correct.

*Id.* at 7 (Usry Dep. 45:4–8).

> Q:     Walmart's contention or position in this lawsuit is that it would not
>        have fired her had she reported her workplace injury in the shift
>        she first noticed it, correct?
>
> A:     Correct.

*Id.* (Usry Dep. 45:19–23).

> Q:     So Walmart's contention is that it terminated Mrs. Braxton because
>        of the timeliness or untimeliness of her injury report, correct?
>
> A:     Correct.
>
> Q:     Walmart in this lawsuit is contending that Mrs. Braxton knew
>        about her injury on April 13th of 2020, right?
>
> A:     Correct.
>
> Q:     And Walmart's position in this lawsuit is that it fired Mrs. Braxton
>        because she reported her workplace injury on April 14th of 2020,
>        correct?
>
> A:     Correct.

*Id.* at 10–11 (Usry Dep. 141:15–142:1).

   "'Direct evidence is evidence, which if believed, proves the existence of a fact in issue

without inference or presumption.'"  *Riggs v. AirTran Airways, Inc.*, 497 F.3d 1108, 1117 (10th

Cir. 2007) (quoting *Hall v. U.S. Dep't of Labor*, 476 F.3d 847, 855 (10th Cir. 2007)).  Plaintiff

urges the court to focus on three lines of testimony, ignoring the overall context of that

testimony.  This argument suggests that no other testimony from the deposition contradicts or

even amplifies the referenced testimony and that no other testimony is necessary to understand

the given testimony adequately.  But, the court must consider the entirety of the summary

judgment record, viewing the evidence and drawing inferences from it in the light most favorable

to the non-moving party.  *Nahno-Lopez v. Houser*, 625 F.3d 1279, 1283 (10th Cir.

2010) (citing *Oldenkamp v. United Am. Ins. Co.*, 619 F.3d 1243, 1245-46 (10th Cir. 2010)).

After reviewing the testimony as a whole, defendant's designated representative

repeatedly testified that defendant terminated plaintiff because she failed to report her workplace

injury in a timely fashion, thereby violating Policy 670e.  Mr. Usry failed to note this distinction

just once, and that is the testimony that plaintiff chooses to cite to support her motion.  "A

statement that can plausibly be interpreted two different ways—one discriminatory and the other

benign—does not directly reflect illegal animus, and, thus, does not constitute direct evidence."

*Hall v. U.S. Dep't of Labor*, 476 F.3d 847, 855 (10th Cir. 2007) (citation and internal quotation

marks omitted).  One reasonably can interpret Mr. Usry's statements benignly to mean that

defendant terminated plaintiff because of the timing of her injury report—and not because she

reported a work injury.

After reviewing the facts in the light most favorable to defendant as the non-movant, the

court concludes that plaintiff has not shown as a matter of law that she has established retaliatory

treatment by direct evidence.  As a consequence, the court cannot conclude that plaintiff has

adduced uncontroverted direct evidence of retaliatory treatment.  It thus cannot grant plaintiff

summary judgment by using the direct evidence standard.

## 2. *McDonnell Douglas* **Framework**

Having concluded that direct evidence does not entitle plaintiff to summary judgment on the liability issue, the court now turns to the alternative basis advanced by plaintiff's motion—the *McDonnell Douglas* framework. As discussed, "Kansas applies the familiar *McDonnell Douglas* burden-shifting framework for analyzing retaliatory discharge claims." *Hysten v. Burlington N. Santa Fe Ry. Co.*, 530 F.3d 1260, 1268 (10th Cir. 2008) (citations omitted). In retaliation cases, this framework begins with the prima facie case. A "plaintiff makes a prima facie claim by showing (1) that he filed a claim for workers compensation benefits or sustained an injury for which he might assert a future claim for such benefits; (2) that the employer had knowledge of the compensation claim or the fact that he sustained a work-related injury for which the plaintiff might file a future claim for benefits; (3) that the employer terminated the plaintiff's employment; and (4) that a causal connection existed between the protected activity or injury and the termination." *Sanjuan v. IBP, Inc.*, 275 F.3d 1290, 1294 (10th Cir. 2002) (citations omitted).

If plaintiff makes the showing for a prima facie case, the "burden then shifts to the employer to show [a] non-retaliatory reason for the discharge." *Id.* (citation and internal quotation marks omitted). "If the employer meets this burden, the burden shifts back to the plaintiff but the plaintiff must show clear and convincing evidence that he or she was terminated in retaliation for exercising rights under the Workers' Compensation Act." *Id.* (citation and internal quotation marks omitted); *see also Foster v. Alliedsignal, Inc.*, 293 F.3d 1187, (10th Cir. 2002) ("Although the presumption of discrimination drops out of the picture once the defendant meets its burden of production, the trier of fact may still consider the evidence establishing the

plaintiff's prima facie case and inferences properly drawn therefrom . . . on the issue of whether the defendant's explanation is pretextual." (citations and internal quotation marks omitted)).

### a.   Prima Facie Case

Here, plaintiff asserts that she has established, as a matter of law, all four elements for a prima facie case of retaliation.  First, plaintiff sustained a work place injury, a fact undisputed by both parties.  Second, defendant knew that plaintiff sustained a work place injury.  Third, defendant terminated plaintiff after she reported a workplace injury.  Job termination constitutes an adverse employment action.  *See Sanchez v. Denver Pub. Schs.*, 164 F.3d 527, 533 (10th Cir. 1998) (holding that a "materially adverse employment action" requires evidence that employee's employment status was affected).  Plaintiff thus has satisfied the first, second, and third parts of her prima facie case.

The final element of the prima facie case requires a causal connection between plaintiff's protected action (reporting a workplace injury to defendant) and her termination.  To prove this element, plaintiff relies primarily on the following deposition testimony from defendant's 30(b)(6) witness, Quincy Usry:

> Q.   There is a causal connection between Mrs. Braxton's report of a workplace injury and her termination?
>
> A.   Generally speaking, yes.

Doc. 48-2 at 12 (Usry Dep. 38:15–19).

Defendant argues that no causal connection exists between the fact that plaintiff reported a workplace injury and her termination.  Rather, defendant argues that a connection exists between the *timing* of plaintiff's report of a workplace injury, her corresponding violation of Walmart's work rule, and her termination.  But, defendant argues, these facts are not sufficient to prove causation as a matter of law sufficient to warrant summary judgment.

15

"A retaliatory motive may be inferred when an adverse action closely follows protected activity." *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999) (citing *Chavez v. City of Arvada*, 88 F.3d 861, 866 (10th Cir. 1996)); *see also Meiners v. Univ. of Kan.*, 239 F. Supp. 2d 1175, 1195 (D. Kan. 2002), *aff'd*, 359 F.3d 1222 (10th Cir. 2004) (holding that timing of protected activity and adverse employment action "can provide sufficient support for plaintiff's prima facie case"). Defendant terminated plaintiff's employment within 24 hours after she submitted a workplace injury report. A one-day period between protected activity and adverse action easily can establish causation. *See Meiners*, 359 F.3d at 1231 (holding that a six-week period between protected activity and adverse action, standing alone, may suffice to show causation).

Based on these undisputed summary judgment facts, the court assumes, without deciding, that plaintiff could shoulder her burden to establish her prima facie case.

### b.  Legitimate, Nonretaliatory Reason

Next, the *McDonnell Douglas* test shifts the burden to defendant to articulate a legitimate, nonretaliatory reason for terminating plaintiff. Defendant argues that it has come forward with a legitimate, nonretaliatory basis for its actions—namely, defendant's own policies governing the duty to report workplace injuries. "When an employee violates an employer's policies . . . it will often be the case that the employer can assert a legitimate, non-retaliatory reason for taking an adverse employment action against the employee." *Vaughn v. Epworth Villa*, 537 F.3d 1147, 1152 n.3 (10th Cir. 2008).

Defendant asserts that the summary judgment facts provide a basis for a reasonable jury to find that plaintiff violated defendant's Policy 670e. It required defendant to impose a First Written formal disciplinary action when plaintiff failed to report her injury by the end of the shift

16

120

in which it occurred.  Doc. 55 at 8.  Defendant argues that because plaintiff was a seasonal associate, her First Written formal disciplinary action required plaintiff's termination under defendant's written Conduct Disciplinary Guidelines.  *Id.*

Plaintiff argues that defendant's policy is unlawful and conflicts with the public policy of Kansas.  She asserts that the public policy of Kansas has made it illegal to fire an employee for sustaining a workplace injury.  Plaintiff points to Kansas law, saying it gives employees 20 days to report injuries to their employers, and the reporting requirement is waived if the employer has actual notice.  Plaintiff references Kan. Stat. Ann. § 44-520, which states in pertinent part:

> Proceedings for compensation under the workers compensation act shall not be maintainable unless notice of injury by accident or repetitive trauma is given to the employer by the earliest of the following dates:  (A) 20 calendar days from the date of accident or the date of injury by repetitive trauma[.]

Kan. Stat. Ann. § 44-520(a)(1)(A).

Plaintiff's argument misconstrues this statute.  Section 44-520 requires employees, if they wish to preserve their right to recover under Kansas's workers compensation laws, to report their injuries within 20 days after they occur.  It does not forbid employers from adopting, however, workplace policies requiring their employees to report workplace injuries on a prompter basis. Defendant's policy here required employees to report their injuries within the shift they occur.  It does not conflict with the Kansas statute.  The court thus finds that defendant has come forward with a legitimate, nonretaliatory reason for terminating plaintiff's employment.  This conclusion doesn't end the summary judgment analysis, and so, the next section addresses the final piece of the *McDonnell Douglas* framework.

### c.  Pretextual Motives

Because defendant has established a legitimate, nonretaliatory reason for plaintiff's termination, the *McDonnell Douglas* test shifts the burden back to plaintiff to show that a

rational jury could find that the stated reason is pretextual.  "Pretext can be inferred from evidence revealing 'weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions' in the employer's explanation for the termination."  *Macon v. United Parcel Serv., Inc.*, 743 F.3d 708, 714 (10th Cir. 2014) (quoting *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997)).

The court concludes that plaintiff has not carried her burden on this last part of the analysis.  Indeed, plaintiff hasn't even tried to do so.  She never identifies any basis to find that defendant's articulated reason is a pretext, designed to obscure defendant's discriminatory motive.  In sum, plaintiff's summary judgment showing falls far short of the showing she has to make to deserve summary judgment in her favor on this part of the framework; *i.e.*, she hasn't demonstrated that a reasonable jury only could conclude that defendant's articulated, non-retaliatory reason is pretextual.

### d.  Summary

While plaintiff's retaliation claim may survive for trial, she has not demonstrated that she deserves summary judgment under the *McDonnell Douglas* framework.

## IV.  Conclusion

For all these reasons, the court concludes that the summary judgment facts, when viewed in defendant's favor as the nonmovant, do not entitle plaintiff to summary judgment on the liability aspect of her Kansas common law retaliation claim.  The court thus denies plaintiff's Partial Summary Judgment Motion (Doc. 47).  Defendant's Motion for Leave to File a Sur-reply (Doc. 64) also is denied.

**IT IS THEREFORE ORDERED BY THE COURT THAT** plaintiff's Motion for Partial Summary Judgment (Doc. 47) is denied.

**IT IS FURTHER ORDERED THAT** defendant's Motion for Leave to File a Sur-reply

(Doc. 64) is denied.

**IT IS SO ORDERED.**

**Dated this 18th day of May, 2021, at Kansas City, Kansas.**

<u>**s/ Daniel D. Crabtree**</u>
**Daniel D. Crabtree**
**United States District Judge**