**Case No. 22-3003**

*In the*

# United States Court of Appeals

*for the*

# Tenth Circuit

JANELL BRAXTON,
*Plaintiff-Appellant,*

v.

WALMART INC.,
*Defendant-Appellee,*

NATIONAL EMPLOYMENT LAWYERS ASSOCIATION,
KANSAS CITY CHAPTER,
*Amicus Curiae.*

---

*Appeal from the United States District Court for the District of Kansas (Kansas City),*
*Case No. 2:20-CV-02287-DDC-GEB · Honorable Daniel D. Crabtree, District Judge*

## APPELLEE WALMART, INC.'S ANSWER BRIEF
### *Oral Argument Is Not Requested*

Gerard M. D'Emilio, OBA No. 33496
GABLEGOTWALS
BOK Park Plaza
499 West Sheridan Avenue, Suite 2200
Oklahoma City, Oklahoma 73102
Telephone: (405) 235-5500
Facsimile:  (405) 235-5575
gdemilio@gablelaw.com

Amelia A. Fogleman, OBA No. 16221
GABLEGOTWALS
110 North Elgin Avenue, Suite 200
Tulsa, Oklahoma 74120-1495
Telephone: (918) 595-4800
Facsimile:   (918) 595-4990
afogleman@gablelaw.com

*Attorneys for Defendant-Appellee Walmart, Inc.*

 COUNSEL PRESS · (213) 680-2300

PRINTED ON RECYCLED PAPER 

**CORPORATE DISCLOSURE STATEMENT**

In compliance with FED. R. APP. P. 26.1 and 28(b), Defendant-Appellee Walmart, Inc., states that it is a publicly held corporation headquartered in Arkansas and is not a governmental entity. Walmart, Inc., has no parent corporation, and no publicly held corporation owns more than ten (10) percent of its stock.

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................................i

TABLE OF CONTENTS.................................................................................. ii

TABLE OF AUTHORITIES .................................................................iv

STATEMENT OF RELATED CASES ................................................. viii

STATEMENT OF THE ISSUE ..............................................................ix

STATEMENT OF THE CASE...............................................................1

     I.    Factual background .........................................................1

           Walmart hires Ms. Braxton as a JetFlex seasonal associate .................1

           Walmart's safety and reporting policies require a written warning for any associate who fails to promptly report a workplace injury ...........2

           Ms. Braxton alleges a workplace injury................................................3

           Walmart terminates Ms. Braxton for failing to timely report her alleged injury................................................................................................7

     II.    Procedural history................................................................11

STANDARD OF REVIEW ...................................................................15

SUMMARY OF THE ARGUMENT ....................................................16

ARGUMENT .......................................................................................18

     I.    The district court correctly concluded there is no evidence supporting Ms. Braxton's retaliatory discharge claim ..........................................18

          A.    Ms. Braxton has no direct evidence of retaliation ...................21

          B.    Ms. Braxton fails to show Walmart's nonretaliatory reason for terminating her is pretextual ....................................................27

1.      Walmart offered a nonretaliatory reason for terminating Ms. Braxton ...................................................................28

    a.      Walmart need only identify a nonretaliatory reason for Ms. Braxton's termination, and it did so ...................28

    b.      Walmart's safety and reporting policies do not conflict with Kansas's workers compensation statute............30

    c.      Because no Kansas court has ever held Walmart's safety and reporting policies to be unlawful, Walmart's decisionmakers were entitled to rely on them in terminating Ms. Braxton............................................33

2.      Ms. Braxton fails to show Walmart's reason for terminating her is pretextual ..........................................34

    a.      Ms. Braxton offered no evidence contradicting the testimony of Walmart's decisionmakers and contemporaneous records showing Ms. Braxton was terminated for violating Walmart's safety and reporting policies......................................................................35

    b.      The district court properly relied on the decisionmakers' honest belief that Walmart's internal policies required Ms. Braxton's termination.............38

    c.      Walmart's alleged failure to follow its own policies is not evidence of pretext .............................................43

CONCLUSION .......................................................................................50

STATEMENT REGARDING ORAL ARGUMENT .............................................50

CERTIFICATE OF COMPLIANCE.......................................................................52

CERTIFICATE OF DIGITAL SUBMISSION .......................................................52

CERTIFICATE OF SERVICE .................................................................................53

# TABLE OF AUTHORITIES

## <u>Cases</u>

*Adamson v. Multi Community Diversified Services, Inc.*,
    514 F.3d 1136 (10th Cir. 2008) ...................................................................19

*Alder v. Wal-Mart Stores, Inc.*,
    144 F.3d 664 (10th Cir. 1998) .....................................................................15

*Anderson v. Coors Brewing Co.*,
    181 F.3d 1171 (10th Cir. 1999) ...................................................................15

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)......................................................................................16

*Bausman v. Interstate Brands Corp.*,
    252 F.3d 1111 (10th Cir. 2001) .......................................................19, 34, 38

*Berry v. T-Mobile USA, Inc.*,
    490 F.3d 1211 (10th Cir. 2007) ...................................................................49

*Bones v. Honeywell International, Inc.*,
    366 F.3d 869 (10th Cir. 2004) .....................................................................15

*Bostock v. Clayton County*,
    140 S. Ct 1731 (2020)............................................................................23, 24

*Coleman v. Safeway Stores, Inc.*,
    752 P.2d 645 (Kan. 1988)............................................................................33

*Cooper v. Wal-Mart Stores, Inc.*,
    296 F. App'x 686 (10th Cir. 2008).........................................................14, 44

*DePaula v. Easter Seals El Mirador*,
    859 F.3d 957 (10th Cir. 2017) ...............................................................29, 34

*E.E.O.C. v. C.R. England, Inc.*,
    644 F.3d 1028 (10th Cir. 2011) ...................................................................28

*E.E.O.C. v. Flasher Co., Inc.*,
    986 F.2d 1312 (10th Cir. 1992) ...................................................................29

*Fassbender v. Correct Care Sols., LLC*,
  890 F.3d 875 (10th Cir. 2018) .......................................................................43

*Foster v. Alliedsignal, Inc.*,
  293 F.3d 1187 (10th Cir. 2002) ................... 15, 18, 19, 20, 21, 24, 25, 28, 38

*Frappied v. Affinity Gaming Black Hawk, LLC*,
  966 F.3d 1038 (10th Cir. 2020) ...................................................12, 28, 29, 35

*Fye v. Oklahoma Corporation Commission*,
  516 F.3d 1217 (10th Cir. 2008) ....................................................................29

*Havens v. Colorado Department of Corrections*,
  897 F.3d 1250 (10th Cir. 2018) ....................................................................20

*Hinds v. Sprint/United Management Co.*,
  523 F.3d 1187 (10th Cir. 2008) ....................................................................49

*Ibrahim v. Alliance for Sustainable Energy, LLC*,
  994 F.3d 1193 (10th Cir. 2021) ...............................................................42, 43

*Injured Workers of Kansas v. Franklin*,
  942 P.2d 591 (Kan. 1997)..............................................................................32

*Jacks v. CMH Homes, Inc.*,
  856 F.3d 1301 (10th Cir. 2017) ........................................................34, 38, 40

*Johnson v. Weld County*,
  594 F.3d 1202 (10th Cir. 2010) ...............................................................43, 49

*Jones v. United Parcel Service, Inc.*,
  674 F.3d 1187 (10th Cir. 2012) ...............................................................18, 19

*Loudermilk v. Best Pallet Co., LLC*,
  636 F.3d 312 (7th Cir. 2011) ........................................................................40

*Macon v. United Parcel Service, Inc.*,
  743 F.3d 708 (10th Cir. 2014) .............................................20, 21, 27, 28, 34

*McDonnell Douglas Corp. v. Green*,
  411 U.S. 792 (1972)....................................................................12, 27, 30

*Panis v. Mission Hills Bank, N.A.*,
　　60 F.3d 1486 (10th Cir. 1995) ........................................................29

*Pfeifer v. Federal Express Corp.*,
　　304 P.3d 1226 (Kan. 2013)...........................................................32

*Piercy v. Maketa*,
　　480 F.3d 1192 (10th Cir. 2007) ....................................................15

*Randle v. City of Aurora*,
　　69 F.3d 441 (10th Cir. 1995) ........................................................43

*Rebarchek v. Farmers Co-op. Elevator & Mercantile Association*,
　　35 P.3d 892 (Kan. 2001)................................................................27

*Reynolds v. School District No. 1*,
　　69 F.3d 1523 (10th Cir. 1995) ......................................................35

*Richison v. Ernest Group, Inc.*,
　　634 F.3d 1123 (10th Cir. 2011) ....................................................16

*Riggs v. AirTran Airways, Inc.*,
　　497 F.3d 1108 (10th Cir. 2007) ..............................................22, 46

*Sanjuan v. IBP, Inc.*,
　　275 F.3d 1290 (10th Cir. 2002) ..............................................19, 27

*Smith v. Maschner*,
　　899 F.2d 940 (10th Cir. 1990) ......................................................22

*Smothers v. Solvay Chemical, Inc.*,
　　740 F.3d 530 (10th Cir. 2014) ................................................42, 43

*Swackhammer v. Sprint/United Management Co.*,
　　493 F.3d 1160 (10th Cir. 2007) ..........................................35, 38, 39

*Sylvia v. Wisler*,
　　875 F.3d 1307 (10th Cir. 2017) ..........................................34, 38, 40

*Tabor v. Hilti*,
　　703 F.3d 1206 (10th Cir. 2013) ....................................................24

*United States v. Walker*,
    918 F.3d 1134 (10th Cir. 2019) ........................................................................20

*Vaughn v. Epworth Villa*,
    537 F.3d 1147 (10th Cir. 2008) .............................................................22, 29

*Young v. Dillon Companies*,
    468 F.3d 1243 (10th Cir. 2006) .............................................................14, 35

*Yowell v. Administrative Review Board*,
    993 F.3d 418 (5th Cir. 2021) ..................................................................25, 26

## Statutes

Kan. Stat. Ann. § 44-520 ....................................................................12, 28, 30, 31, 39

Kan. Stat. Ann. § 60-513 .........................................................................................32

## STATEMENT OF RELATED CASES

There are no prior or related appeals.

## STATEMENT OF THE ISSUE

While Ms. Braxton presents five separate issues on appeal in her opening brief, there is only one issue this Court must decide:

> Has Ms. Braxton shown reversible error in the district court's entry of summary judgment in Walmart's favor where Walmart's decisionmakers have testified consistently—and contemporaneous evidence confirms—that they terminated her not because she was allegedly injured, but because they honestly and in good faith believed she violated neutral safety and reporting policies by failing to timely report her alleged injury, and Ms. Braxton offers no probative evidence casting doubt on the sincerity of the decisionmakers' honest belief that Walmart's policies required she be terminated for her policy violation?

## STATEMENT OF THE CASE

### I.    Factual background

***Walmart hires Ms. Braxton as a JetFlex seasonal associate***.

Janell Braxton's brief employment with Walmart ended when she was terminated for violating Walmart's safety and reporting policies. Walmart hired Ms. Braxton in March 2020 to work in its Jet.com facility in Edgerton, Kansas. App. Vol. I at 174. She worked overnight shifts as a JetFlex QC Singles seasonal associate.[1] *Id.* at 174–75; *id.* Vol. II at 166. Ms. Braxton was hired on a temporary basis as an at-will employee—terminable for any reason or no reason. *See id.* Vol. I at 175.

As a JetFlex seasonal associate, Ms. Braxton was subject to a different disciplinary regime than non-seasonal Walmart associates. Walmart's "Conduct Disciplinary Action Guidelines" required that "Jetflex and Jet Seasonal [associates] be terminated when their coaching . . . progressed to a formal written." *Id.* Vol. II at 28. Similarly, the "Jetflex Disciplinary Action Guidelines" state that "[i]f [an] associate's conduct is severe enough for a written coaching, the Jetflex associate ***should be released immediately***." *Id.* at 195 (emphasis added); *see also id.* at 166–67.

---

[1] Walmart refers to its employees as "associates."

***Walmart's safety and reporting policies require a written warning for any associate who fails to promptly report a workplace injury.***

Walmart maintains many policies and procedures at the Edgerton facility that are intended to ensure the safety of its associates, customers, and others. At least two of these policies require Walmart associates to promptly report any workplace injury. First, **Policy 763e**, titled "General Safe Work Practices," mandates that "[a]ll known injuries, no matter how slight, will be reported to a member of management immediately"—and, "[a]t a minimum," injuries "***must be reported to a member of management by the end of the shift***." *Id.* at 148 (emphasis added); *see id.* Vol. I at 298.

The second policy, **Policy 670e**, is documented in the "Safety & Compliance Rule Violation Form," which lists various safety and compliance rules applicable to all Walmart associates. *Id.* Vol. II at 180. It also details progressive disciplinary actions for rules violations. These actions, ranked in order of severity, are (1) a "Documented Coaching," (2) a "Step 1," (3) a "Step 3," and (4) "Termination." *Id.* Under **Policy 670e**, an associate's "[f]ailure to report any known injury before the end of the shift" results in "Step 1" discipline. *Id.* "Step 1" discipline, in Walmart parlance, is synonymous with "written coaching" or a "first written warning." *Id.* at 142, 166; *see also id.* Vol. I at 298.

These safety policies exist so Walmart can promptly investigate the cause of an associate's injury and mitigate any similar risk to other associates. *Id.* Vol. I at

268. Before starting work at the Edgerton facility, Ms. Braxton "acknowledge[d] that [she] read" both policies and "agree[d]" they were effective during her employment. *Id.* Vol. II at 27, 129.

These policies are also consistent with the provisions of Walmart's "Dot Com Safety" manual ("Safety Manual") that addresses "Incident Investigation & Reporting." *Id.* at 197–207. The Safety Manual defines an "Incident" as "[a]ny unexpected, unplanned, or abnormal event or series of events that occurs and does result in an injury." *Id.* at 197 (emphasis omitted). The Manual's "Notification of Injury Incident" provision requires Walmart associates who are "involved in an incident [to] report it to their manager immediately," and "[f]ailure to do so may result in disciplinary action." *Id.* at 199. In determining the appropriate discipline, the Safety Manual requires the supervisor to "[r]efer" to the **Policy 670e** form. *Id.*

### *Ms. Braxton alleges a workplace injury.*

Ms. Braxton began working at the Edgerton facility on March 23, 2020, but she was on an unrelated medical leave from Sunday, March 29, 2020, until Saturday, April 11, 2020. *Id.* at 98–99. On April 12, 2020, at around 6:15 p.m., she reported back to work for her first shift in two weeks. *See id.* Vol. I at 175. Around 1 a.m. on April 13, 2020—still during Ms. Braxton's first shift back—she says she began feeling "throbbing pain" in her left wrist that "got progressively worse" through the rest of her shift. *Id.* at 210–11. According to Ms. Braxton, when her shift ended

3

around 5 a.m., her supervisor, Ammie Wilbur, came by Ms. Braxton's workstation to compliment her performance. *Id.* Vol. II at 101.[2] Ms. Braxton says she responded that she could not believe she was performing so well since her "wrist [was] really hurting." *Id.* By her own account, Ms. Braxton did not tell Ms. Wilbur she had ***injured*** her wrist or elaborate on the source of her alleged wrist pain. *See id.* at 102. Nor did she ask to visit the safety cubicle during that shift, though she knew she could if she needed medical attention. *See id.* Vol. I at 206–07; *id.* Vol. II at 102. She also did not seek medical attention after this shift. *See id.* Vol. II at 103.

Ms. Braxton returned for another shift the evening of April 13, 2020. *Id.* Vol. I at 176. Ms. Braxton testified that, toward the beginning of her shift, she told her supervisor[3] that her wrist was hurting. *Id.* at 176, 216. But she again failed to elaborate on the cause, allege a workplace injury, or go to the safety cubicle. *See id.* at 216–18. She left the facility at around 5 a.m. on April 14, 2020, without mentioning her wrist pain again or seeking medical attention. *See id.* at 217–19; *id.* Vol. II at 106.

---

[2] Ms. Wilbur, on the other hand, denies that Ms. Braxton reported any wrist pain to her during Ms. Braxton's first shift back to work on April 12–13. *See* App. Vol. I at 176; *see also id.* at 252.

[3] Ms. Braxton could not recall whether Ms. Wilbur was her supervisor during this second shift. *See* App. Vol. I at 176; *id.* Vol. II at 103–04.

Ms. Braxton arrived at the Edgerton facility around 6:15 p.m. on April 14, 2020, for what would be her final shift. *See id.* Vol. I at 221. At roughly 9 p.m., Ms. Braxton told Ms. Wilbur, her supervisor, that her "wrist was hurting" and asked if "there was anything that [she] could get to help it, like a brace or a wrap." *Id.* at 223–24. Ms. Wilbur immediately directed her to log off her workstation and go to the safety cubicle, where Ms. Braxton received a muscle rub for her wrist from the safety associate on duty. *Id.* Vol. II at 107–08. After informing Ms. Wilbur that she had received the ointment, Ms. Braxton returned to her workstation at 9:10 p.m. *Id.* at 109.

At around 10:34 p.m., Ms. Wilbur visited Ms. Braxton's workstation and asked if "her wrist was hurting because of something with work"—a question Ms. Braxton answered with a simple "yes," without elaboration. *Id.* Vol. I at 228–29. Within minutes, Ms. Wilbur reported Ms. Braxton's alleged injury to David Whitenack, Operations Manager for the Edgerton facility, who visited Ms. Braxton at her workstation around 10:50 p.m. *Id.* at 177, 230–33, 258, 262, 264. Mr. Whitenack asked Ms. Braxton to describe what she had been doing when her wrist pain arose; Ms. Braxton explained that she "was doing [her] job duties and . . . realized [her wrist] was hurting." *Id.* at 231. Ms. Braxton told Mr. Whitenack that "she had previously injured her wrist during the April 12–13, 2020 overnight shift." *Id.* at 86. Ms. Braxton testified that Mr. Whitenack asked her if the pain resulted

from a specific "incident," and she said "no." *Id.* Vol. II at 110. At 10:54 p.m., Mr. Whitenack asked Ms. Braxton to log off her workstation and go with him to the safety cubicle. *Id.* Vol. I at 178, 232–34.

During this time, Mr. Whitenack exchanged text messages with Quincy Usry, Environmental Health and Safety Manager for Walmart, who was not present at the Edgerton facility at the time. *See id.* at 247, 296–97. Mr. Whitenack told him that Ms. Braxton "said she hurt her wrist Sunday," during her April 12–13 shift, but that she "doesn't know how" and "didn't tell anyone." *Id.* at 296. Ms. Usry told Mr. Whitenack to have Ms. Braxton "write a statement." *Id.* Mr. Whitenack asked, "How long do they have to report? EOS [End of Shift]?" *Id.* Mr. Usry sent Mr. Whitenack a copy of the applicable policy language, but he wanted to see Ms. Braxton's statement before deciding whether Ms. Braxton had violated the policy. *See id.*

At the safety cubicle, Mr. Whitenack gave Ms. Braxton a document labeled "Jet Statement Form," which Walmart uses to obtain written statements from associates who do not "know exactly how they injured themselves." *Id.* Vol. II at 168. He asked Ms. Braxton to "write down everything that [she] was feeling, that was going on with [her] wrist," *id.* Vol. I at 234–35—including "what date and time she recalled experiencing [her wrist] pain," *id.* Vol. II at 169.[4] Consistent with these

---

[4] Mr. Whitenack testified that he "always instructed everybody who was filling out a safety form to include when the injury occurred" and "if they reported it to anyone." App. Vol. I at 264–65.

instructions, at the top left corner of the statement form, Ms. Braxton wrote, "1:00 am 4/13/2020," which was during her first shift back from medical leave, almost two days earlier. *Id.* Vol. I at 283. She confirmed in the statement that her wrist began to hurt "Monday morning," *i.e.*, April 13. *Id.* She noted, "It is my left wrist that is injured." *Id.* Nowhere in her statement did Ms. Braxton claim she had reported any injury to Ms. Wilbur during her April 12–13 shift. *See id.*

### *Walmart terminates Ms. Braxton for failing to timely report her alleged injury.*

Mr. Whitenack sent a screenshot of Ms. Braxton's statement to Mr. Usry. *Id.* at 297. After reviewing the statement, Mr. Usry confirmed that Ms. Braxton's description of the events, including the timing of her injury and her report, "would be a coaching." *Id.* Mr. Usry directed Mr. Whitenack to discuss with human resources whether Ms. Braxton, as a seasonal JetFlex associate, "[w]ould . . . be term[inat]ed with a written coaching." *Id.*

Mr. Whitenack consulted Morgan Medaris, Walmart's on-site Human Resources Coordinator. *Id.* at 87, 179, 260. Ms. Medaris "confirmed that [Ms.] Braxton's failure to report her injury during the April 12–13, 2020 overnight shift violated Policy 760e" and "warranted a First Written disciplinary action." *Id.* at 87; *id*. Vol. II at 6. She also concluded that, because Ms. Braxton was a JetFlex seasonal associate, the fact that she should receive a First Written disciplinary action required her termination. *Id.* Vol. II at 5–6. Based on their shared understanding that Ms.

Braxton had not reported her injury to Walmart before the end of her April 12–13 shift, **and** given her status as a JetFlex seasonal associate, both Mr. Whitenack and Mr. Usry "supported the decision to terminate [Ms.] Braxton's employment pursuant to **Policy 670e** and Walmart's Conduct Disciplinary Action Guidelines." *Id.* Vol. I at 86–87, 299.

About 15 minutes later, Mr. Whitenack returned to the safety cubicle and asked Ms. Braxton to go with him to human resources. *Id.* at 238–39. There, Ms. Medaris and Mr. Whitenack told Ms. Braxton she was being terminated for failing to timely report her workplace injury, per company policy. *See id.* at 239–40. Ms. Braxton **did not** tell Ms. Medaris and Mr. Whitenack that she had reported an injury to Ms. Wilbur during her April 12–13 shift. *Id.* at 240–41. Indeed, Ms. Braxton **never told Mr. Whitenack, Mr. Usry, or Ms. Medaris that she had made any injury report before her third and final shift**.[5] Moreover, Mr. Whitenack believed, based on his

---

[5] Mr. Whitenack responded "no" to each of these questions:

> "During the entire time that you interacted with Ms. Braxton, did she ever tell you that she had reported her injury previously to Ms. Wilbur?";

> "When you met with [Ms. Braxton], with Ms. Medaris, and informed her that her employment was going to be terminated, did she ever tell you that she had reported her injury to Ms. Wilbur?";

> "Did Ms. Braxton, at any time, tell you she reported her injury to Ms. Wilbur or anyone else?";

experience with Ms. Wilbur, that she "would have escalated the concern" if she had received an injury report from Ms. Braxton during her April 12–13 shift. *Id.* at 263–64. This belief comports with Ms. Wilbur's actions on April 14, 2020, when she immediately reported Ms. Braxton's alleged workplace injury to Mr. Whitenack upon learning of it.

Furthermore, Ms. Braxton's own contemporary statements are consistent with Walmart's belief that she had not timely reported her injury. Roughly 30 minutes after her termination, Ms. Braxton texted Walmart associate Sue Sooialo, stating, "I just got fired for not reporting my wrist on the night it started hurting." *Id.* Vol. II at 7; *see also id.* Vol. I at 182. Although she sent eight messages to Ms. Sooialo during this exchange, Ms. Braxton ***did not*** claim she had, in fact, reported her injury during the shift in which it occurred. *Id.* Vol. II at 7–15. Instead, she complained that she "couldn't remember hearing anything" about the same-shift reporting requirement during her training. *Id.* at 8.

---

"[D]uring the time that you met with [Ms. Braxton] when you told her that she was going to be terminated because she had not timely reported her injury, did she, in response, say, but I did report it on my . . . shift when I got hurt?";

"Did [Ms. Braxton] ever say words to that effect [i.e., that she had reported her injury during the shift it occurred]?"; and

"[W]hen you spoke with her, did Ms. Braxton tell you that she told anyone about her injury on the shift that [it] had occurred?"

App. Vol. I at 262–63, 265.

In addition, within hours of Ms. Braxton's termination, Ms. Medaris emailed Mr. Usry and others stating, "We have completed [Ms. Braxton's] termination *for late reporting*." *Id.* at 16 (emphasis added). Ms. Medaris also wrote that Ms. Sooialo had visited her to express a "concern[] about [Ms. Braxton's] release" because same-shift incident reporting was not covered in safety school. *Id.* Mr. Usry responded that regardless of this fact, Ms. Braxton had acknowledged receipt of two documents requiring same-shift reporting, including **Policy 670e**, which contained the provision on which Walmart's decisionmakers relied in terminating Ms. Braxton. *Id.*

Mr. Whitenack, Mr. Usry, and Ms. Medaris have been consistent and unequivocal—before and during this litigation—in explaining their decision: they terminated Ms. Braxton because of their honest, good-faith understanding that

(1) Ms. Braxton failed to timely report a workplace injury by the end of the shift in which it occurred;

(2) Her failure violated Walmart's policies, including **Policy 670e**, and warranted "Step 1" written discipline;

(3) Seasonal associates like Ms. Braxton must be terminated when they receive "Step 1" written discipline.

*See id.* Vol. I at 77–79, 86–87, 298–99; *id.* Vol. II at 5–6; *see also id.* Vol. I at 259, 261–65, 273, 275.

Except for her visit to the safety cubicle during her last shift, Ms. Braxton never sought medical treatment for her wrist injury during or after her employment with Walmart. *See id.* Vol. I at 182–83, 242–43. Ms. Braxton's wrist pain went away

a week after her termination and, as of January 2021 (the time of her deposition), had not returned. *See id.* at 242. Consistent with these undisputed facts, Ms. Braxton never filed a workers compensation claim following termination or after securing counsel, even though she remained eligible to do so given that Walmart had overlooked filing a First Report of Occupation Injury. She went on to work for Amazon, the United States Postal Service, and Best Buy, where she was employed full-time earning the same wages she earned at Walmart and never asserted that she suffered any work limitation. *See id.* at 157.

## II.    Procedural history

Ms. Braxton filed this suit in June 2020, alleging a single claim for retaliatory discharge under Kansas state law. *See id.* Vol. I at 5, 13. She claimed Walmart terminated her "based on her status as an injured worker." *See id.* at 165–66. Both parties moved for summary judgment. The district court denied Ms. Braxton's motion for partial summary judgment but later granted Walmart's motion for summary judgment, concluding (correctly) that Ms. Braxton failed to cast doubt on Walmart's nonretaliatory rationale for terminating her.

*First*, the district court properly rejected Ms. Braxton's attempt to manufacture "direct evidence" of a retaliatory motive. *Id.* Vol. III at 18. As she does on appeal, Ms. Braxton relied on "snippets of testimony from the depositions of the three decisionmakers who fired her" to argue she would not have been terminated if

she had not reported her alleged injury. *Id.* But the court found that Ms. Braxton "inaccurately excerpt[ed]" statements from Mr. Usry, Mr. Whitenack, and Ms. Medaris "in a fashion that rob[bed] them of their context." *Id.* at 18–19. Contrary to Ms. Braxton's claims, "[a]ll three decisionmakers clarified and emphasized throughout their depositions that the reason they decided to fire [her] was that she didn't *timely* report her injury." *Id.* at 19. The court held that "when read in context, the statements don't reflect retaliatory animus." *Id.* at 21.

*Second*, the court concluded Walmart offered a nonretaliatory reason for Ms. Braxton's termination, as required in the second step of the *McDonnell Douglas* framework. *Id.* at 22–26. Recognizing Walmart's "light" burden, *id.* at 26, the court held that Walmart need only "articulate a reason for [Ms. Braxton's termination] that is not, on its face, prohibited and that is reasonably specific and clear." *Id.* at 22 (quoting *Frappied v. Affinity Gaming Black Hawk, LLC*, 966 F.3d 1038, 1058 (10th Cir. 2020)). Ms. Braxton argued Walmart could not rely on its internal policies requiring prompt reporting of workplace injuries because the policies violated "Kansas public policy, as reflected in Kan. Stat. Ann. § 44-520(a)(1)(A)." *Id.* at 23. But the court found no conflict between Walmart's policies and the statute, which requires employees to report workplace injuries within 20 days to preserve workers compensations rights. *Id.* at 24. The district court held the statute does not preclude employers from imposing workplace safety policies requiring timelier reporting. *Id.*

*Finally*, the district court rejected Ms. Braxton's various pretext arguments. The court held the testimony of Mr. Whitenack, Mr. Usry, and Ms. Medaris, "taken as a whole," could not establish pretext. *Id.* at 29. Although the decisionmakers would not have known of Ms. Braxton's failure to ***timely*** report if she had not ultimately reported an injury, the court held this fact did not "weaken or contradict Walmart's cited reason for firing [her]." *Id.*

The district court also held it was immaterial whether a reasonable juror could find that Ms. Braxton did timely report her alleged injury because "[t]he relevant inquiry is whether the decisionmakers believed in good faith that plaintiff hadn't reported her injury in a timely fashion." *Id.* at 30. The court held that "nothing in the summary judgment record casts doubt on the decisionmakers' good faith belief" that Ms. Braxton did not comply with Walmart's safety and reporting policies. *Id.* at 33. The court repeatedly noted it was undisputed that Ms. Braxton did not tell Walmart's decisionmakers she had allegedly reported an injury to Ms. Wilbur at the end of her April 12–13 shift. *See id.* at 9–10, 32–34, 39. Thus, even if Ms. Braxton had, in fact, timely reported her alleged injury, Walmart's decisionmakers "were under the impression" she had not. *Id.* at 30. And "under well-established principles for showing pretext, it's that impression that matters." *Id.*

The court also rejected Ms. Braxton's claim that Walmart's failure to follow certain internal policies was proof of pretext. "[T]he standard for establishing

pretext," observed the court, "requires evidence of not just any procedural shortfall, but of a 'disturbing procedural irregularity,' often exemplified by an employer's 'falsifying or manipulating of relevant criteria.'" *Id.* at 35 (quoting *Cooper v. Wal-Mart Stores, Inc.*, 296 F. App'x 686, 696 (10th Cir. 2008) (unpublished)). The court held Walmart's use of a blank "Statement Form" to obtain Ms. Braxton's injury report and other alleged procedural errors did not satisfy this demanding standard. *See id.* at 38–40. It also held that Walmart did not "deviat[e] from its policy" when it terminated Ms. Braxton. *Id.* at 41. More importantly, Walmart's decisionmakers "*believed* they were following what Walmart policies required, which is the relevant [pretext] inquiry." *Id.* at 42. Because Ms. Braxton did not meet her burden of offering evidence from which a reasonable juror could find that Walmart's reason for firing her was pretextual, the district court properly entered summary judgment in Walmart's favor. *Id.* at 44–47.[6]

---

[6] While the district court suggested Walmart could have better handled Ms. Braxton's termination, *see, e.g.*, App. Vol. III at 34–35, 38, 44–45, it recognized this was immaterial because "the court isn't a '"super personnel department," second guessing employers' honestly held . . . business judgments.'" *Id.* at 44 (quoting *Young v. Dillon Cos., Inc.*, 468 F.3d 1243, 1250 (10th Cir. 2006)). Most importantly, the court concluded that the veracity of Walmart's nonretaliatory rationale for Ms. Braxton's discharge was not undermined or put in doubt by how Walmart handled her termination. *See id.* at 34–44.

## STANDARD OF REVIEW

This Court "review[s] the district court's grant of summary judgment *de novo*, applying the same legal standard used by the district court." *Foster v. Alliedsignal, Inc.*, 293 F.3d 1187, 1192 (10th Cir. 2002). While the Court "view[s] the record in the light most favorable to the non-moving party, that party must still identify sufficient evidence requiring submission to the jury to survive summary judgment." *Piercy v. Maketa*, 480 F.3d 1192, 1197 (10th Cir. 2007). Thus, once the movant, Walmart, "bears [its] initial burden of making a prima facie demonstration of the absence of a genuine issue of material fact," the burden shifts to the nonmovant, Ms. Braxton, to "'set forth specific facts' that would be admissible in evidence . . . from which a rational trier of fact could find for [her]." *Alder v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670–71 (10th Cir. 1998) (quoting FED. R. CIV. P. 56(e)).

The nonmovant's evidence, however, must be sufficiently probative; "[a] mere scintilla of evidence supporting the nonmoving party's theory does not create a genuine issue of material fact." *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1175 (10th Cir. 1999). Likewise, "[u]nsubstantiated allegations carry no probative weight in summary judgment proceedings," and a nonmovant cannot defeat a motion for summary judgment with evidence based on "mere speculation, conjecture, or surmise." *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004). In short, the court inquires "whether the evidence presents a sufficient disagreement to

require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).

Finally, appellants like Ms. Braxton "always shoulder [the] heavy burden" of "show[ing] the district court's error and, when necessary, . . . explain[ing] why no other grounds can support affirmance of the district court's decision." *Richison v. Ernest Grp., Inc.*, 634 F.3d 1123, 1130 (10th Cir. 2011). So, given its "reluctance to command do-overs" and "preference for affirmance," this Court "may affirm on any basis supported by the record, even if it requires ruling on arguments not reached by the district court or even presented . . . on appeal." *Id.*

## SUMMARY OF THE ARGUMENT

This case involves an employer's legitimate, neutral application of workplace rules designed to ensure the safety of its employees and the public. Under Walmart's policies, associates must report workplace injuries during the shift in which they occur. These policies are intended to ensure that any potential hazards are quickly identified and addressed before other associates or customers can fall victim to them. Under the policies, an associate who fails to promptly report a workplace injury receives mandatory discipline, typically in the form of a written warning. But Walmart's policies also state that a subset of associates, including "seasonal associates," should be terminated when they are subject to a written warning for violating any rule. This confluence of policies is at the heart of this suit.

The key facts in this case are simple, straightforward, and undisputed. Ms. Braxton claims she injured her wrist during her April 12–13, 2020, overnight shift, but Walmart's decisionmakers did not learn of this alleged injury until two shifts later. At that time, Ms. Braxton gave a written statement, claiming she "injured" her wrist at around 1 a.m. on April 13. But she did not mention reporting the "injury" to anyone at Walmart during the April 12–13 shift. Based on Ms. Braxton's statement, Walmart's decisionmakers believed in good faith that she violated Walmart's safety policies by failing to timely report her injury. They also believed this violation required written discipline under Walmart's policies, and they understood that, because Ms. Braxton was a seasonal associate, she must be terminated for incurring written discipline. Although Walmart's decisionmakers told Ms. Braxton the reason for her termination in a face-to-face meeting, she did not challenge the basis for her termination and never once claimed that she had, in fact, timely reported her alleged injury until well after she filed this action.

Ms. Braxton brought a single claim for retaliatory discharge under Kansas law, alleging Walmart terminated her "based on her status as an injured worker." App. Vol. I at 165–66. But she *did not* allege in her Complaint or in the Pretrial Order that her claim was based on Walmart's alleged failure to adequately train her on its safety and reporting policies or to properly apply the policies itself. Nor did she bring a claim challenging the legality of the policies under Kansas law. Yet now

17

that the evidence establishes that Walmart's decisionmakers terminated Ms. Braxton based solely on their belief that she failed to follow Walmart's policies, and not because of any injury she claims to have incurred, Ms. Braxton shifts her focus to these other, irrelevant issues. This shift aims to distract the Court from the fact that Ms. Braxton has *no* evidence that Walmart's reason for terminating her was pretextual—a deficiency fatal to her claim.

As shown below, the district court properly held that Ms. Braxton offered no direct evidence that Walmart had a retaliatory intent when it terminated her for late reporting. Nor has she provided any basis from which a reasonable juror could question the sincerity of Walmart's legitimate, nonretaliatory, and well-documented reason for her discharge. Because Ms. Braxton failed to carry her burden of proof in this case, the district court rightly granted summary judgment in Walmart's favor. This Court should affirm.

## ARGUMENT

### I. The district court correctly concluded there is no evidence supporting Ms. Braxton's retaliatory discharge claim.

Ms. Braxton's sole claim against Walmart is for retaliatory discharge under Kansas law. "Kansas generally follows the employment-at-will doctrine, meaning that employment is terminable at will . . . for any reason or for no reason at all." *Foster*, 293 F.3d at 1192; *see Jones v. United Parcel Serv., Inc.*, 674 F.3d 1187, 1196 (10th Cir. 2012) ("Pursuant to [the employment-at-will] doctrine, 'an employer can

terminate an employee for good cause, for no cause, or even for a wrong cause, without incurring liability to the employee for wrongful discharge.'" (quoting *Bracken v. Dixon Indus., Inc.*, 38 P.3d 679, 682 (Kan. 2002)); *see also Adamson v. Multi Cmty. Diversified Servs., Inc.*, 514 F.3d 1136, 1153 (10th Cir. 2008) ("Employers are free to terminate at-will employees for any other reason—however unfair, unwise, or even erroneous—so long as it is not unlawful."). But Kansas recognizes a retaliatory discharge exception to this doctrine, which bars an employer from "preemptively discharging injured employees who would be likely to file [workers compensation] claims in the near future." *Bausman v. Interstate Brands Corp.*, 252 F.3d 1111, 1115 (10th Cir. 2001); *see also Jones*, 674 F.3d at 1196.

Ms. Braxton "must show clear and convincing evidence that . . . she was terminated in retaliation for exercising rights under the Workers' Compensation Act." *Sanjuan v. IBP, Inc.*, 275 F.3d 1290, 1294 (10th Cir. 2002) (quoting *Bausman*, 252 F.3d at 1116); *accord Foster*, 293 F.3d at 1193, 1195. As the district court properly recognized, "binding Tenth Circuit precedent holds 'that a plaintiff in federal court who opposes a summary judgment motion in a retaliatory discharge case based on Kansas law must set forth evidence of a clear and convincing nature that, if believed by the ultimate factfinder, would establish that plaintiff was more likely than not the victim of illegal retaliation by her employer.'" App. Vol. III at 27 n.9 (quoting *Foster*, 293 F.3d at 1195). Ms. Braxton did not challenge this standard

below. *See id.* Vol. II at 73 n.1 (noting the preponderance-of-the-evidence standard applies at summary judgment in Kansas state court, but not arguing the standard should apply in federal court). Nor does she lodge a serious challenge here. Instead, she mainly contends the district court did not properly ***apply*** the standard. *See* Aplt.'s Br. at 39–40. Although she summarily claims the district court "should have used the preponderance of evidence standard," *id.* at 40, she cites only Kansas authorities and does not question the continued validity of *Foster* or otherwise argue the district court disregarded *Erie* or its progeny. Thus, Ms. Braxton has waived any substantive challenge to the clear-and-convincing standard. *See, e.g.*, *Havens v. Colo. Dep't of Corrs.*, 897 F.3d 1250, 1259–61 (10th Cir. 2018) (holding that a litigant forfeits an argument by failing to adequately raise it in the district court, and then effectively waives that argument by failing to argue plain error on appeal); *United States v. Walker*, 918 F.3d 1134, 1151 (10th Cir. 2019) (explaining that arguments not raised or "inadequately presented" in an opening brief are "deemed waived" (citation omitted)); *see also Macon v. United Parcel Serv., Inc.*, 743 F.3d 708, 713 n.2 (10th Cir. 2014) (expressing "reluctan[ce] to address" an *Erie* issue when the parties had never briefed or raised it).

Ms. Braxton appears to have outsourced any potential *Erie* argument to her amicus. *See* Br. Amicus Curiae at 19–28. But neither the Amicus nor Ms. Braxton cite any authorities suggesting an appellant can evade this Court's preservation rules

by smuggling a waived argument into the appeal through an amicus brief. And even if it could, the Amicus cannot refute the fact that *Foster* remains binding law in this Circuit. Moreover, Ms. Braxton loses on appeal under ***either*** standard. *Cf. Macon*, 743 F.3d at 713 n.2 (ultimately sidestepping *Erie* question because appellant's claims "fail under either the clear-and-convincing or the preponderance-of-the-evidence standard").

### A.    Ms. Braxton has no direct evidence of retaliation.

Ms. Braxton concedes she must prove "her discharge was 'based on,' 'because of,' 'motivated by,' or 'due to' [Walmart's] ***intent to retaliate***." Aplt.'s Br. at 31 (emphasis added) (quoting *Foster*, 293 F.3d at 1196). Thus, she acknowledges the issue is not whether her termination was based on her alleged workplace injury[7]— rather, it is whether Walmart terminated her based on an ***intent to retaliate*** against her for sustaining an injury. On appeal, Ms. Braxton once again selectively excerpts

---

[7] Ms. Braxton suggests she did not "injure" her wrist but that it was merely "sore" from performing repetitive movements at her job. *See* Aplt.'s Br. at 16, 35–36. She also contends that Walmart's policies distinguish between "injury" and "soreness." *Id.* at 16. But in her written statement, she claimed, "It is my left wrist that is ***injured***." App. Vol. II at 223 (emphasis added). Based on this report, Walmart's decisionmakers believed she "injured" her wrist during her April 12–13 shift and did not report that injury until her April 14–15 shift. *Cf. id.* Vol. III at 24 n.7 (concluding "[n]o reasonable juror could find or infer" that Ms. Braxton's "wrist injury wasn't really an injury at all, but rather a 'soreness' that later developed into an injury" because she conceded "in her written statement" that "she had 'injured' her wrist at work").

testimony from Walmart decisionmakers as "direct evidence" of Walmart's retaliatory intent. *See id.* at 29–32. This flawed argument should again be rejected.

"Direct evidence is evidence, which if believed, proves the existence of a fact in issue without inference or presumption." *Vaughn v. Epworth Villa*, 537 F.3d 1147, 1154 (10th Cir. 2008) (quoting *Hall v. U.S. Dep't of Lab.*, 476 F.3d 847, 854 (10th Cir. 2007)). In other words, evidence is not "direct evidence" of retaliation if an inference is required to establish the retaliatory motive.[8] *See Riggs v. AirTran Airways, Inc.*, 497 F.3d 1108, 1118 (10th Cir. 2007). As a result, "[a] statement that can plausibly be interpreted two different ways—one discriminatory and the other benign—does not directly reflect illegal animus, and, thus, does not constitute direct evidence." *Vaughn*, 537 F.3d at 1154–55 (quoting *Hall*, 476 F.3d at 855). Retaliation claims like Ms. Braxton's are "particularly difficult to establish by direct evidence" "[p]recisely because the ultimate fact of retaliation turns on [a decisionmaker's] state of mind." *Smith v. Maschner*, 899 F.2d 940, 949 (10th Cir. 1990).

Ms. Braxton's "direct evidence" of retaliation consists only of testimony from Mr. Usry, Mr. Whitenack, and Ms. Medaris explaining that they would not have

---

[8] Ms. Braxton argues the district court should have drawn all inferences in her favor on summary judgment and erred by failing to infer retaliatory intent from the decisionmakers' isolated statements. Aplt.'s Br. at 30. But by definition, "inferences" are not "direct evidence," and the unspecified inferences she asks this Court to draw from the decisionmakers' testimony cannot be "direct evidence" of retaliatory intent as a matter of law.

terminated Ms. Braxton had she not reported her injury. *See* Aplt.'s Br. at 29–30. Far from the "smoking gun" Ms. Braxton portrays this testimony to be, these statements simply acknowledge an unremarkable fact: Walmart did not learn of Ms. Braxton's failure to ***timely*** report her alleged wrist injury until she ultimately—and belatedly—reported the alleged injury. *See* App. Vol. I at 272–73; *id.* Vol. II at 221. As the district court properly found, the fact that her (late) injury report preceded her termination does not prove that Walmart terminated her ***in retaliation for*** sustaining a workplace injury. *Cf. id.* Vol. III at 20. To the contrary, the same Walmart decisionmakers testified repeatedly and consistently that they terminated Ms. Braxton ***because of the timing of her injury report***, not because of the report or the injury itself. *See id.* at 19 (finding that "[a]ll three decisionmakers clarified and emphasized throughout their depositions that the reason they decided to fire plaintiff was that she didn't *timely* report her injury").

Despite the decisionmakers' unequivocal testimony, Ms. Braxton urges this Court to hold that a mere causal connection between the injury report and the adverse employment action provides direct evidence of retaliatory intent. *See* Aplt.'s Br. at 31 ("Testimony admitting Braxton would not have been fired without her protected activity establishes 'but-for' causation."). But the authorities she cites for this proposition do not support it. First, she relies on *Bostock v. Clayton County*, 140 S. Ct 1731 (2020)—a case she never cited in the district court. In *Bostock*, which

addressed claims for sexual orientation and gender identity discrimination, the Supreme Court noted that, for Title VII purposes, causation "is established whenever a particular outcome would not have happened 'but for' the purported cause." *Id.* at 1739. Applying this standard, the Court held that "[s]o long as the plaintiff's sex was one but-for cause of [the termination] decision, that is enough to trigger the law." *Id.* Similarly, in *Tabor v. Hilti, Inc.*, 703 F.3d 1206 (10th Cir. 2013), this Court found direct evidence of Title VII gender discrimination where a decisionmaker made statements during the plaintiff's job interview "expressing discriminatory beliefs about whether members of the plaintiff's protected class are capable of doing the job at issue." *Id.* at 1217.

Unlike the Kansas law at issue here, Title VII does not require proof of ***retaliatory intent*** to establish liability for sexual orientation or gender discrimination. Under Title VII, a plaintiff's ***status*** as a member of the protected class is sufficient. If the employment decision would not have been made but for the plaintiff's gender or sexual orientation, Title VII applies. But, as shown above, to prevail on a claim for retaliatory discharge, Kansas law requires that the discharge was "'based on,' 'because of,' 'motivated by,' or 'due to' the employer's ***intent to retaliate***." *Foster*, 293 F.3d at 1196 (emphasis added). The mere fact that Ms. Braxton's termination would not have occurred but for her injury does not provide direct evidence that the termination occurred ***in retaliation for*** sustaining that injury.

24

The Fifth Circuit recently reached a similar conclusion in *Yowell v. Administrative Review Board*, 993 F.3d 418 (5th Cir. 2021). As in this case, the *Yowell* defendant-employer terminated the plaintiff for failing to timely report a workplace injury. The employer had a policy (similar to Walmart's) that "required reporting an injury 'immediately, no matter how small,' to the supervisor." *Id.* at 420. The plaintiff reported a knee injury a week after it occurred and was terminated for violating the reporting policy. *Id.* The plaintiff sued for retaliatory discharge under the Federal Railroad Safety Act ("FRSA"), claiming his protected activity— *i.e.*, reporting a workplace injury—was a "contributing factor" in his termination. *Id.* at 422.[9]

---

[9] Although *Yowell* involved facts "nearly identical" to the facts here, the district court was "reluctant to adopt the Fifth Circuit's reasoning" because it applied a different causation standard. App. Vol. III at 26. But the district court did not recognize that the standard in *Yowell* is actually **less stringent** than the one applicable here. To establish a *prima facie* case for FRSA retaliation, a plaintiff need only show that his protected activity "was a 'contributing factor' in th[e] unfavorable personnel action." *Yowell*, 993 F.3d at 421–22 (citation omitted). A "contributing factor" is "any factor, which alone or in combination with other factors, tends to affect in any way the outcome of the [employer's] decision." *Id.* at 422 (alteration in original) (citation omitted).

By contrast, Ms. Braxton admits she must prove "her discharge was 'based on,' 'because of,' 'motivated by,' or 'due to' [Walmart's] intent to retaliate." Aplt.'s Br. at 31 (quoting *Foster*, 293 F.3d at 1196). In other words, Ms. Braxton's claim requires that an intent to retaliate for her injury caused her termination. If the *Yowell* plaintiff's injury report was not even a "contributing factor" in his termination, then Ms. Braxton's injury certainly was not a *per se* motivating cause of her termination.

The Fifth Circuit disagreed, concluding:

> [W]hen an employee engages in a protected activity such as reporting a workplace injury, that employee is not insulated from what would otherwise be appropriate discipline for misconduct that becomes known to the employer at that time or during the course of the employer's addressing the protected activity. In simple terms, a protected activity does not by itself shield an employee from the ramifications of workplace misconduct.

*Id.* at 427; *see also id.* at 428 (Jolly, J., concurring) (endorsing the majority's "simpl[e]" and "succinct[]" holding that "[t]he protected activity provision cannot be interpreted to shield an employee from proper disciplinary action when the employee breaches a valid, established, and unchallenged work rule"). Applying this standard, the Fifth Circuit held the defendant did not violate the FRSA when it terminated the plaintiff for late reporting. *See id.* at 427–28.

 *Yowell*'s logic is persuasive here. When Ms. Braxton reported her alleged injury, Walmart first learned she had violated its safety and reporting policies by failing to timely notify Walmart of her workplace injury. But reporting her alleged injury did not shield Ms. Braxton from disciplinary action for policy violations that surfaced as a result of the report. If it did, then any discipline for late reporting would necessarily be "retaliatory" because, until a report is made, there is nothing to discipline.[10] Thus, the mere fact that the termination may not have occurred without

---

[10] As the Fifth Circuit noted, the logical—and untenable—effect of the *Yowell* plaintiff's (and Ms. Braxton's) argument is that employers "cannot require timely reporting." 993 F.3d at 427.

the injury report does not establish direct evidence that Walmart terminated her ***in retaliation for*** sustaining a workplace injury. Ms. Braxton, therefore, has offered no direct evidence of retaliatory intent that would have precluded summary judgment in Walmart's favor.

**B.    Ms. Braxton fails to show Walmart's nonretaliatory reason for terminating her is pretextual.**

Where, as here, a plaintiff lacks direct evidence of retaliation, the Court applies the burden-shifting framework from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under this framework, Ms. Braxton must first establish a *prima facie* case for retaliatory discharge: that (1) she sustained an injury that could support a future workers compensation claim; (2) Walmart knew of the injury; (3) Walmart terminated Ms. Braxton; and (4) a causal connection between the injury and her termination exists. *See Macon*, 743 F.3d at 713; *accord Rebarchek v. Farmers Co-op. Elevator & Mercantile Ass'n*, 35 P.3d 892, 894 (Kan. 2001). For purposes of this appeal, Walmart does not contest that Ms. Braxton can meet her *prima facie* burden.

Next, Walmart must articulate a legitimate, nonretaliatory rationale for Ms. Braxton's termination. *See, e.g.*, *Sanjuan*, 275 F.3d at 1294. Walmart did this by showing its decisionmakers discharged Ms. Braxton because they honestly believed (1) she failed to timely report her workplace injury; (2) this failure to timely report violated Walmart's policies and warranted "Step 1" written discipline; and (3) Ms. Braxton must be terminated for receiving written discipline, given her status as a

27

seasonal associate. As a result, the ultimate burden of persuasion shifts back to Ms. Braxton, who must prove through sufficiently probative evidence that Walmart's proffered reason for firing her is a pretext for retaliatory intent. She fails to carry this burden.

        1.    <u>Walmart offered a nonretaliatory reason for terminating Ms. Braxton.</u>

Ms. Braxton contends that Walmart's adherence to its safety and reporting policies does not provide a nonretaliatory reason for her termination because the policies allegedly conflict with Kansas law. Aplt.'s Br. at 34–38. She argues Walmart's requirement that an associate must report her workplace injury by the end of the shift in which it occurs "conflicts with the public policy established by [Kan. Stat. Ann.] § 44-520, which allows a workers' compensation claim to be made if the employee notifies the employer of an injury within 20 days." *Id.* at 34. This argument fails for at least three reasons.

        a.    <u>Walmart need only identify a nonretaliatory reason for Ms. Braxton's termination, and it did so.</u>

Walmart's burden is "exceedingly light." *E.E.O.C. v. C.R. England, Inc.*, 644 F.3d 1028, 1043 (10th Cir. 2011) (citation omitted). It need only "identify" or "articulate" a facially neutral, nonretaliatory reason for its discharge decision. *Macon*, 743 F.3d at 713; *Foster*, 293 F.3d at 1194. Unlike Ms. Braxton's ultimate burden, Walmart's burden is one of ***production***, not persuasion. *See Frappied*, 966

F.3d at 1058; *Fye v. Okla. Corp. Comm'n*, 516 F.3d 1217, 1228 (10th Cir. 2008). To carry this *de minimis* burden, Walmart "does not . . . need to litigate the merits of [its] reasoning." *Frappied*, 966 F.3d at 1058. Rather, it must only "explain its actions against the plaintiff in terms that are not facially prohibited." *E.E.O.C. v. Flasher Co., Inc.*, 986 F.2d 1312, 1317 (10th Cir. 1992); *see DePaula v. Easter Seals El Mirador*, 859 F.3d 957, 970 (10th Cir. 2017); *see also Panis v. Mission Hills Bank, N.A.*, 60 F.3d 1486, 1490–91 (10th Cir. 1995) (noting that defendants "are not required to provide evidence to justify their articulated reason or to persuade the Court that their reason was correct").

Walmart has identified a clear, nonretaliatory reason for terminating Ms. Braxton: its decisionmakers' belief that she violated Walmart's policies. "When an employee violates an employer's policies, . . . it will often be the case that the employer can assert a legitimate, non-retaliatory reason for taking an adverse employment action against the employee." *Vaughn*, 537 F.3d at 1152 n.3. Ms. Braxton does not argue that Walmart's safety and reporting policies violate any constitutional or statutory prohibitions on retaliation or discrimination. She merely contends they conflict with the notice provision in Kansas's workers compensation laws. Even if her contention was correct—and it is not—this conflict may render the policies unenforceable, but it would not make them "retaliatory." Walmart has

identified a ***nonretaliatory*** reason for Ms. Braxton's termination and, in doing so, has satisfied its burden under the *McDonnell Douglas* test.

        b. <u>Walmart's safety and reporting policies do not conflict with Kansas's workers compensation statute.</u>

As the district court properly concluded, Ms. Braxton's argument that Walmart's safety and reporting policies impermissibly conflict with Kansas's workers compensation statute "misconstrues th[e] statute," App. Vol. III at 24, and simply makes no sense.

Ms. Braxton's argument rests on Kan. Stat. Ann. § 44-520(a)(1), which states in pertinent part:

> Proceedings for compensation under the workers compensation act shall not be maintainable unless notice of injury by accident or repetitive trauma is given to the employer by . . . 20 calendar days from the date of accident or the date of injury by repetitive trauma . . . .

Because Walmart's policies require associates to report injuries by the end of the shift in which they occur (*i.e.*, presumably within 24 hours), Ms. Braxton contends the policies conflict with this statute and cannot be enforced.

This argument seeks to compare apples to oranges. As Ms. Braxton's Amicus notes, the Kansas "statute lays out what is treated as a statute of limitations. If the notice falls outside the applicable deadline, the claim for workers compensation benefits is barred." Br. Amicus Curiae at 1. Put simply, the statute requires an

employee to notify her employer of a workplace injury within a specific timeframe *to remain eligible for workers compensation benefits*.

By contrast, Walmart's safety and reporting policies ***do not*** impact an associate's eligibility for these benefits. They merely require associates to report injuries within the shift in which they occur to ensure Walmart receives prompt notice of potentially dangerous conditions in the workplace. This prompt notice is essential to protect other associates and customers from known hazards. And while failure to provide the required notice by the end of the shift may subject an associate to discipline, it ***does not*** prevent the associate from recovering workers compensation benefits. In fact, the statute expressly recognizes that ***former*** employees like Ms. Braxton may pursue workers compensation claims for workplace injuries incurred during their employment. *See* Kan. Stat. Ann. § 44-520(A)(1)(C) (requiring notice of injury to be given within "10 calendar days after the employee's last day of actual work for the employer" "[i]f the employee no longer works for the employer against whom benefits are being sought"). Indeed, Ms. Braxton remained eligible for workers compensation benefits after her termination, though she never pursued them. Thus, Walmart's internal safety and

reporting policies and the workers compensation statute address different issues altogether, and there is no conflict between them.[11]

Finally, contrary to her suggestion, *see* Aplt.'s Br. at 37, Ms. Braxton cites ***nothing*** in the text of the statute or its legislative history suggesting the Kansas Legislature intended to create a "right" for employees to have 20 days within which to report injuries. Rather, the goal of the Kansas statute is "to speed up the claim process and to reduce fraudulent claims." *Injured Workers of Kan. v. Franklin*, 942 P.2d 591, 600 (Kan. 1997). Walmart's internal policies do not hinder this legislative purpose—they further it. Moreover, public policy ***supports*** the prompt reporting of workplace injuries to protect other workers and customers from known hazards. It is illogical for Ms. Braxton to suggest that by requiring employees to notify employers of workplace injuries within 20 days, the legislature meant to leave others at risk of similar injuries for almost three weeks.

If the legislature had intended to prohibit internal safety and reporting policies of less than 20 days, it would ***not*** have done so under the guise of creating a "statute of limitations" for workers compensation claims. The Kansas statute does not

---

[11] The Amicus relies on *Pfeifer v. Federal Express Corp.*, 304 P.3d 1226 (Kan. 2013), to support Ms. Braxton's claimed conflict. Br. Amicus Curiae at 3. But the employment contract in that case shortened the time within which a retaliatory discharge claim could be brought, squarely conflicting with Kan. Stat. Ann. § 60-513(a)(4), which permitted such claims to be brought within two years. There is no such direct conflict here.

conflict with Walmart's policies and does not undermine the fact that Walmart has met its "exceedingly light" burden to identify a nonretaliatory reason for Ms. Braxton's termination.

> c. Because no Kansas court has ever held Walmart's safety and reporting policies to be unlawful, Walmart's decisionmakers were entitled to rely on them in terminating Ms. Braxton.

Ms. Braxton concedes that no Kansas appellate court has addressed the purported conflict between Walmart's policies and the Kansas workers compensation statute. Indeed, she has simultaneously moved to certify the question to the Kansas Supreme Court. *See* Aplt.'s Mot. to Certify. Walmart shows why certification is unavailable in its response to the motion. *See* Aplee.'s Resp. to Mot.

For purposes of this case, however, the lack of any Kansas authority on the issue ends the inquiry. Walmart had every right to base its employment decisions on facially neutral safety and reporting policies that have never been declared invalid by any court. And even if a Kansas court later finds that the policies conflict with state law, that opinion would have no bearing on this case, as Walmart unquestionably relied on what it believed to be valid, nonretaliatory policies in terminating Ms. Braxton.[12]

---

[12] Ms. Braxton invites this Court to undertake a public policy analysis pursuant to *Coleman v. Safeway Stores, Inc.*, 752 P.2d 645 (Kan. 1988). *See* Aplt.'s Br. at 34–37. But she never briefed any kind of "public policy analysis" in the district court,

2.     Ms. Braxton fails to show Walmart's reason for terminating her is pretextual.

To survive summary judgment, Ms. Braxton needed to provide sufficiently probative evidence from which a reasonable juror could find that Walmart's stated reason for terminating her was pretextual. To do this, she must show "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in Walmart's reason that "a reasonable factfinder could rationally find [it] unworthy of credence." *Bausman*, 252 F.3d at 1120 (citation omitted). Ms. Braxton cannot rely on "[m]ere conjecture" that Walmart is lying. *Id.* (citation omitted).

Ms. Braxton's disagreement with the factual soundness of Walmart's decision is irrelevant, because the Court "examine[s] the facts as they appear[ed] *to the person[s] making the [employment] decision*"—here, Mr. Whitenack, Mr. Usry, and Ms. Medaris—and does "not look to [Ms. Braxton's] subjective evaluation of the situation." *DePaula*, 859 F.3d at 970–71 (citation omitted). "[T]he relevant inquiry is not whether the employer's proffered reasons were wise, fair[,] ***or correct***, but whether it honestly believed those reasons and acted in good faith upon those beliefs." *Macon*, 743 F.3d at 714 (emphasis added) (citation omitted). The Court's

---

and her engagement with *Coleman* was limited to a handful of citations, *see* App. Vol. II at 77–78. Ms. Braxton therefore waived this argument by failing to raise it in the district court and by not arguing plain error here. *See, e.g.*, *Sylvia v. Wisler*, 875 F.3d 1307, 1332 n.7 (10th Cir. 2017); *Jacks v. CMH Homes, Inc.*, 856 F.3d 1301, 1306 (10th Cir. 2017). In any event, public policy supports the prompt reporting of workplace injuries to protect others.

"role is to prevent intentional [retaliatory employment] practices, not to act as a 'super personnel department,' second guessing employers' honestly held (even if erroneous) business judgments." *Young*, 468 F.3d at 1250; *see also Frappied*, 966 F.3d at 1059 (being "mindful" that the Court "must not sit as a superpersonnel department that second-guesses [a] company's business decisions, with the benefit of twenty-twenty hindsight" (citation omitted)); *Reynolds v. Sch. Dist. No. 1*, 69 F.3d 1523, 1535 (10th Cir. 1995) ("[A]n employer's exercise of erroneous or even illogical business judgment does not constitute pretext."). Ms. Braxton's purported pretext evidence, when viewed alone or in combination, falls far short of showing that Walmart is "dissembling to cover up a [retaliatory] purpose." *Swackhammer v. Sprint/United Mgmt. Co.*, 493 F.3d 1160, 1168 (10th Cir. 2007) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000)).

> a. <u>Ms. Braxton offered no evidence contradicting the testimony of Walmart's decisionmakers and contemporaneous records showing Ms. Braxton was terminated for violating Walmart's safety and reporting policies.</u>

Ms. Braxton contends she offered evidence sufficient to show that Walmart's stated reason for her termination was pretextual. Aplt.'s Br. at 43–44. But she relies only on the same isolated, out-of-context statements from Mr. Whitenack, Mr. Usry, and Ms. Medaris that she proffered as "direct evidence." *See id.* at 44–45. As shown above, the cited testimony merely reflects the obvious fact that the decisionmakers

35

did not learn of Ms. Braxton's late reporting violation until she finally reported her alleged injury. The decisionmakers acknowledged that if Ms. Braxton had not reported the alleged injury, they would not have known she failed to *timely* report it. These honest statements do not cast doubt on the sincerity of Walmart's nonretaliatory reason for terminating Ms. Braxton. *How* they learned of Ms. Braxton's apparent policy violation does not undermine the decisionmakers' consistent and unrefuted testimony regarding *why* they terminated her: *i.e.*, because of her policy violation, and not in retaliation for her alleged injury.

Correspondence sent just before and after Ms. Braxton's termination supports the decisionmakers' testimony. Text messages between Mr. Whitenack and Mr. Usry reflect their shared understanding that Ms. Braxton did not report her alleged injury during the shift in which it occurred, and that this failure violated Walmart's safety and reporting policies and required written discipline. They also reflect the decisionmakers' belief, subject to confirmation by human resources, that Ms. Braxton should be terminated with a written warning because she was a seasonal associate. Further, in an email exchange that occurred within hours of Ms. Braxton's termination, Ms. Medaris wrote to Mr. Usry and others, "We have completed [Ms. Braxton's] termination *for late reporting*." App. Vol. II at 16 (emphasis added). These contemporaneous writings are fully consistent with and reinforce the

decisionmakers' testimony that Ms. Braxton was terminated for violating Walmart's policies.

Recognizing the persuasiveness of these contemporaneous documents, Ms. Braxton tries to undercut them by claiming that "the truthfulness of [Mr.] Whitenack's text message[s]" to Mr. Usry is "genuinely disputed." Aplt.'s Br. at 45. But in fact, she offers no evidence questioning the veracity of the text messages, Ms. Medaris's email, or the decisionmakers' testimony about the basis for her termination. Instead, she cites only her own testimony that, during her initial meeting with Mr. Whitenack, he did not ask her when she first incurred her injury or if she had previously reported it. But even if Mr. Whitenack did not ask her these questions—which is disputed, *see* App. Vol. I at 234–35, 262–65; *id.* Vol. II at 169— it would not cast doubt on the sincerity of his belief that she had failed to timely report the injury. To the contrary, Ms. Braxton wrote in her written statement that she injured her wrist during her April 12–13 shift, and it is uncontested that she never told any of Walmart's decisionmakers she had allegedly reported the injury prior to her April 14–15 shift. As the district court concluded, the record evidence "establishes the undisputed fact that all three decisionmakers believed—in the moments before, during, and after [Ms. Braxton's] termination—that she had violated Walmart policy by not reporting her injury timely." App. Vol. III at 33. Ms. Braxton's bare conjecture does not cast doubt on this belief.

37

b.  <u>The district court properly relied on the decisionmakers'
honest belief that Walmart's internal policies required Ms.
Braxton's termination.</u>

Because Ms. Braxton has no evidence to dispute the decisionmakers'
testimony that they honestly believed she must be terminated for violating
Walmart's safety and reporting policies, she argues that the district court "[u]ndu[ly]
focused" on the decisionmakers' beliefs and ignored other relevant evidence. Aplt.'s
Br. at 41. But she cites no such evidence that the district court ignored.

*First*, Ms. Braxton faults the district court for disregarding what the
decisionmakers "*should* have known." *Id.* She asserts that Walmart's
decisionmakers could and should have learned of the injury report she allegedly
made to Ms. Wilbur on April 13. But Ms. Braxton never made this argument in the
district court—and she makes no plain error argument on appeal. This argument is
thus waived. *See Sylvia*, 875 F.3d at 1332 n.7; *Jacks*, 856 F.3d at 1306.

In any case, this argument would not warrant reversal.[13] This Court held in
*Swackhammer* that when analyzing pretext, "it is not what [a decisionmaker] *should*

---

[13] Ms. Braxton's reliance on *Foster* and *Bausman*, *see* Aplt.'s Br. at 41–42, is
misplaced. In *Foster*, the Court identified information **known by the decisionmakers
themselves** and concluded that, based on that information, they should have been
able to deduce that the plaintiff's absences were because of a work-related injury.
293 F.3d at 1194. Similarly, in *Bausman*, the Court held the employer had actual
notice that the employee's numerous absences were because of a workplace injury
and could not claim it lacked notice just because the employee had not provided
doctor's notes for all absences, as company policy required. 252 F.3d at 1121–22.

have known that matters, but whether he acted in good faith upon the beliefs he held." 493 F.3d at 1170. The factual premise for the argument is also wrong. Even construing the evidence in Ms. Braxton's favor, she did not report an "injury" to Walmart during the shift in which it allegedly occurred. Ms. Braxton relies only on her own testimony that, near the end of her April 12–13 shift, she told her supervisor, Ms. Wilbur, that her "wrist [was] really hurting." App. Vol. II at 101. But even under Ms. Braxton's account, she did not tell Ms. Wilbur that she had *injured* the wrist, much less that she did so *at work* on her first shift back after a two-week leave. *Cf. id.* at 101–02.

Moreover, Ms. Braxton's vague comment about wrist pain, if it occurred, was not enough to put Ms. Wilbur or Walmart on notice of an alleged workplace injury under Kansas law, which requires that it "be apparent from the content of the notice that the employee is claiming benefits under the workers compensation act or has suffered a work-related injury." Kan. Stat. Ann. § 44-520(a)(4) (requiring that any notice of injury for purposes of the Kansas workers compensation statutes "shall include the time, date, place, person injured and particulars of such injury"). Thus, even assuming Ms. Braxton complained to Ms. Wilbur of wrist pain, it was in no way "apparent" from that statement that she was alleging a workplace injury.

*Second*, Ms. Braxton argues that the district court failed to recognize that a "rational juror *could* decide Walmart's policy is itself a pretext for retaliation."

Aplt.'s Br. at 43.[14] In support, she cites only *Loudermilk v. Best Pallet Co., LLC*, 636 F.3d 312 (7th Cir. 2011), which she never cited in the district court—and for good reason, as it has no relevance here. The employer in *Loudermilk* gave and abandoned several explanations for the plaintiff's termination before settling on the story that he was terminated for taking photographs of the work site in violation of company policy. *Id.* at 315. The court noted that

> the "fired for photography" contention . . . is problematic not only because the no-photography policy may have been cooked up after the fact, but also because it comes close to *conceding* retaliation. If the reason that Loudermilk snapped the photos was to bolster his claim of discrimination, then forbidding picture-taking looks a lot like an attempt to block the gathering of evidence during an investigation.

*Id.*

Walmart's policies, by contrast, were longstanding and had been applied to other associates—they were not "cooked up after the fact." They also serve a clear and important purpose—namely, to protect associates and the public from known dangers. For example, if a meat slicer malfunctions in the deli and cuts an associate's finger, she should immediately report the injury both so that (1) she gets prompt medical attention and (2) the next associate to use the machine does not suffer the same fate. This is a common-sense safety measure—not a "pretext for retaliation."

---

[14] As Ms. Braxton never raised this argument in the district court, and fails to argue plain error here, the argument is waived, and Ms. Braxton cannot rely on it. *See Sylvia*, 875 F.3d at 1332 n.7; *Jacks*, 856 F.3d at 1306.

Further, the safety and reporting policies are not a pretext for terminating injured Walmart associates because termination is not a standard penalty for late reporting. Most Walmart associates receive only a written warning (*i.e.*, "Step 1" discipline) for failing to timely report a workplace injury. But because Ms. Braxton was a ***seasonal*** associate, the written warning she received for her late injury report triggered her termination. This is clear from the text messages between Mr. Whitenack and Mr. Usry, which show how the decisionmakers worked through the different policies to conclude that termination was required under those circumstances. Walmart's safety and reporting policies are ***not*** "pretext for retaliation" and did not preclude summary judgment for Walmart.

*Finally*, Ms. Braxton argues Walmart's alleged failure to investigate whether she timely reported her injury is evidence of pretext. Aplt.'s Br. at 45–46. But as the district court noted, Walmart's decisionmakers believed she had reported her injury for the first time during her April 14–15 shift, and Ms. Braxton gave the decisionmakers "no reason to believe she had" timely reported. App. Vol. III at 34. Ms. Braxton identifies no red flags Walmart should have noticed that would have suggested further inquiry was warranted.

But perhaps most importantly, Ms. Braxton passed up opportunities to prompt an investigation as to whether she made a timely injury report. When Mr. Whitenack and Ms. Medaris told Ms. Braxton she was terminated for not reporting her alleged

injury in the shift in which it occurred, Ms. Braxton said ***nothing*** about her alleged conversation with Ms. Wilbur. If she had raised the issue then, Walmart would have had reason to investigate her claim of timely reporting. But she was silent. Further, roughly 30 minutes after her termination, Ms. Braxton texted Walmart associate Sue Sooialo, stating, "I just got fired for not reporting my wrist on the night it started hurting." *See id.* Vol. II at 7; *see also id.* Vol. I at 182. Although she sent eight messages to Ms. Sooialo during this exchange, Ms. Braxton ***did not*** claim she had, in fact, reported her injury during the shift in which it occurred. *Id.* Vol. II at 7–15. If she had done so, this also could have led to an investigation of the issue and possibly to Ms. Braxton's reinstatement. But again, she said ***nothing***. Indeed, it was not until after this lawsuit was filed that Ms. Braxton informed Walmart for the first time of her alleged conversation with Ms. Wilbur. Ms. Braxton had ample opportunity to inform Walmart of her claim that she had timely disclosed her alleged injury. She did not do so. She cannot now fault Walmart for failing to unearth something she did not disclose.[15]

---

[15] Ms. Braxton's authorities are not on point. In *Smothers v. Solvay Chemical, Inc.*, 740 F.3d 530 (10th Cir. 2014), the employer terminated the plaintiff for quarreling with a co-worker based only on the co-worker's version of events and "did [not] give [the plaintiff] a chance to explain or deny those allegations." *Id.* at 542. Similarly, in *Ibrahim v. Alliance for Sustainable Energy, LLC*, 994 F.3d 1193 (10th Cir. 2021), an employer terminated a Muslim employee for making inappropriate comments to two women without letting him explain why he thought his comments were appropriate. *Id.* at 1200. Here, Walmart relied only on Ms. Braxton's own account

c. <u>Walmart's alleged failure to follow its own policies is not evidence of pretext.</u>

Ms. Braxton contends that Walmart failed to comply with its own policies in connection with her termination, Aplt.'s Br. at 47–53, but none of these alleged failures provide evidence of pretext.

This Court has repeatedly held that "not every failure to follow every directive in an employer's policy manual gives rise to an inference of pretext for [retaliation]." *Johnson v. Weld Cnty.*, 594 F.3d 1202, 1213 (10th Cir. 2010). Indeed, "[t]he mere fact that an employer failed to follow its own internal procedures does not necessarily suggest that the employer was motivated by illegal [retaliatory] intent or that the substantive reasons given by the employer for its employment decision were pretextual." *Randle v. City of Aurora*, 69 F.3d 441, 454 (10th Cir. 1995) (emphasis omitted). Rather, Ms. Braxton must point to "***disturbing procedural irregularities***" that are "somehow related to the decision-maker's [retaliatory] purpose." *Fassbender v. Correct Care Sols., LLC*, 890 F.3d 875, 889 (10th Cir. 2018) (emphasis added) (citation omitted). As the district court concluded, "the most relevant procedural irregularities are those connected with the termination decision,"

---

of the events, and its decisionmakers gave her an opportunity to tell them she had timely reported her injury when they informed her she was terminated for late reporting. Further, in both cases, the Court found other evidence of pretext based on the employers' "disparate treatment of similarly situated employees." *Smothers*, 740 F.3d at 543; *see Ibrahim*, 994 F.3d at 1197–98.

App. Vol. III at 37 (collecting cases), and typically refer to an employer's "falsifying or manipulating . . . criteria" for terminating an employee, *id.* at 36 (omission in original) (quoting *Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1217 (10th Cir. 2002)); *see also Cooper v. Wal-Mart Stores, Inc.*, 296 F. App'x 686, 696 (10th Cir. 2008) (unpublished) (noting that a "'disturbing procedural irregularity' [is] often exemplified by an employer's 'falsifying or manipulating . . . relevant criteria'" (citations omitted)).

The policy violations alleged by Ms. Braxton fall roughly into four categories—none of which have merit. *First*, she argues that Walmart "ignored its Safety Manual, thereby depriving Braxton of her rights as an injured worker." Aplt.'s Br. at 47. Although she lists several tasks from the manual that Walmart allegedly omitted, she fails to connect these omissions to a retaliatory purpose. For example, Ms. Braxton faults Walmart for failing to offer her medical treatment (beyond what she received at the safety cubicle), give her a form notification on injured workers' rights, or notify the State of Kansas about her injury. *See* Aplt.'s Br. at 47–48. But as the district court correctly noted, "Walmart's failure to report Plaintiff's injury to the State or provide her with the proper documents weren't connected with the *decision* to terminate [Ms. Braxton]." App. Vol. III at 38. Indeed, almost all the alleged omissions occurred *after* the termination decision was made. Contrary to Ms. Braxton's unsupported suggestion, the mere fact that the alleged

omissions relate to her claimed workplace injury does not mean they relate to her termination, and they provide no evidence that Walmart's rationale for its termination decision is pretextual.[16]

Ms. Braxton attempts to connect only one alleged omission to the termination: Walmart's failure to use an "Associate Incident Report" to obtain Ms. Braxton's statement. Aplt.'s Br. at 47–48. But according to Ms. Braxton's own testimony, Mr. Whitenack asked whether her alleged injury was caused by a specific "incident," and she told him it was not. App. Vol. II at 110. Based on her response, he gave her the "Jet Statement Form," which Walmart uses to obtain written statements from associates if they do not "know exactly how they injured themselves." *Id.* at 168. Ms. Braxton offers no evidence to rebut Mr. Whitenack's testimony that it was Walmart's practice to use this form in these circumstances, and not the "Associate Incident Report," which, as its name suggests, is used when a specific "incident" has occurred.

Ms. Braxton contends that if Walmart had given her the "Associate Incident Report Form," she would have divulged her conversation with Ms. Wilbur in response to a specific question that asks whether the injury was previously reported.

---

[16] Nor does Ms. Braxton show how these alleged omissions "depriv[ed her] of her rights as an injured worker." Aplt.'s Br. at 47. Ms. Braxton never sought medical treatment from a doctor for her alleged, short-lived wrist injury, nor did she file for workers compensation benefits. She does not claim that any of Walmart's alleged procedural shortcomings prevented her from doing either.

Aplt.'s Br. at 48. Even assuming this is true, the fact that Ms. Braxton did not receive the form did not ***prevent*** her from disclosing her alleged conversation with Ms. Wilbur. Nor was it the type of "disturbing procedural irregularity" that can constitute pretext. For example, in *Riggs*, this Court found no "disturbing procedural irregularity" where an employer terminated an employee while she was on vacation and without speaking to her, even though the employer typically spoke with employees before firing them. The Court held that, while "allowing [the plaintiff] to complete her side of the story would seem to be the most fair way of addressing the situation, we cannot say that [employer's] failure to do so . . . constitutes a 'disturbing procedural irregularity' sufficient to prove pretext." 497 F.3d at 1119. Here, even without the "right" form, Walmart still gave Ms. Braxton ample opportunity—much more than the plaintiff received in *Riggs*—to tell her side of the story when the decisionmakers terminated her face-to-face for failure to timely report. Yet she said nothing to suggest that she had, in fact, timely reported her alleged injury. Thus, even if Walmart should have used a different form, this mistake—indeed, any of Walmart's minor procedural shortcomings—suggests, at most, sloppiness, not retaliatory animus.

*Second*, Ms. Braxton contends that "Usry's text that Braxton should be punished *if she describes pain* suggests Walmart's decision was being made before it understood the situation." Aplt.'s Br. at 49. Beyond the fact that she never made

this contention in the district court, the text message merely provided guidance regarding what to look for in Ms. Braxton's statement to determine whether she was reporting an injury. There is nothing in this statement to suggest Walmart's decisionmakers were prejudging the situation.

*Third*, Ms. Braxton briefly complains that Walmart omitted training about the injury reporting policy from its "Safety School" for new associates. Aplt.'s Br. at 49. But there is no dispute that she had access to the policies before beginning her employment. And no evidence supports Ms. Braxton's suggestion that Walmart intentionally hid the policies to set a trap for injured associates. Walmart's decision not to include the policies in its Safety School curriculum provides no evidence that her subsequent termination was retaliatory. Moreover, following Ms. Braxton's termination, Walmart enhanced its training on the policies, posting an enlarged copy of **Policy 670e** in the training area and expressly covering it in Safety School. App. Vol. II at 52.

*Fourth*, Ms. Braxton argues Walmart's policies did not require that she be terminated upon a finding she had not timely reported her alleged injury. She contends the "decision to issue discipline" for failure to timely report an injury is "discretionary" under the Safety Manual. Aplt.'s Br. at 50. But the Safety Manual only governs "incidents," which by Ms. Braxton's own admission did not occur here. And even if applicable, Ms. Braxton offers no proof that the Safety Manual overrules

other policies that ***do*** mandate termination. Indeed, Walmart's "Conduct Disciplinary Action Guidelines" required that "Jetflex and Jet Seasonal [associates]"—like Ms. Braxton—"be terminated when their coaching has progressed to a formal written." App. Vol. II at 28. Further, the "Jetflex Disciplinary Action Guidelines" state that "[i]f [an] associate's conduct is severe enough for a written coaching, the Jetflex associate ***should be released immediately***." *Id.* at 195 (emphasis added).

Ms. Braxton also provides no evidence to refute testimony that under Walmart's policies, a failure to timely report an injury warrants a written coaching. *Id.* at 142, 166; *see also id.* Vol. I at 298. She merely quibbles with whether human resources should have used the Form 670e for "coaching." Aplt.'s Br. at 52. But she ignores the fact that no actual coaching would have even occurred here because, as a seasonal associate, the mere fact that Ms. Braxton ***should*** receive written coaching required her termination.

More fundamentally, the district court properly held that, "at [the] very least, [Walmart's decisionmakers] *believed* they were following what Walmart policies required, which is the relevant inquiry." App. Vol. III at 42. Ms. Braxton offers no evidence to the contrary. Indeed, the record shows that Walmart consistently applied its guidelines and "regularly terminated seasonal associates at the Edgerton facility where plaintiff worked when they received their first written violation." *Id.* at 43.

\*       \*       \*

The district court was mistaken about only two things: Walmart did not make "a mess of things," and this case does not present a "relatively close call." *Id.* at 44. It is Ms. Braxton who has intentionally made "a mess of things" by listing a barrage of Walmart's alleged policy violations without linking them in any way to a retaliatory motive or to her termination. Even if Walmart made mistakes, this Court's "job isn't to enforce employment manuals but to protect against unlawful [retaliation]." *Johnson*, 594 F.3d at 1213; *see also Hinds v. Sprint/United Mgmt. Co.*, 523 F.3d 1187, 1198–99 (10th Cir. 2008); *Berry v. T-Mobile USA, Inc.*, 490 F.3d 1211, 1222 (10th Cir. 2007) ("The mere fact that an employer failed to follow its own internal procedures does not necessarily suggest that . . . the substantive reasons given by the employer for its employment decision [a]re pretextual." (omission in original) (citation omitted)). Ms. Braxton fails to show how Walmart's alleged procedural missteps undermine its well-established and well-documented reason for her termination. This failure is fatal to her pretext showing, and it warrants summary judgment in Walmart's favor.

## CONCLUSION

Walmart's decisionmakers have been unwavering in explaining why they terminated Ms. Braxton: they believed she violated Walmart's safety and reporting policies, and that her violation required her termination. All the contemporaneous writings fully support their testimony. And in response, Ms. Braxton offers only conjecture and rank speculation about Walmart's alleged desire to rid itself of injured workers. Because there is no evidence from which a reasonable juror could infer that Walmart terminated Ms. Braxton in retaliation for her alleged injury, this Court should affirm the district court's order granting summary judgment for Walmart.

## STATEMENT REGARDING ORAL ARGUMENT

This case presents straightforward issues that were comprehensively and correctly addressed by the district court. Walmart does not believe that oral argument is necessary.

Respectfully submitted,


/s/ Amelia A. Fogleman

Amelia A. Fogleman, OBA No. 16221

**GABLEGOTWALS**

110 North Elgin Avenue, Suite 200

Tulsa, OK 74120-1495

Telephone:  918-595-4800

Facsimile:  918-595-4990

Email:        afogleman@gablelaw.com

-and-

Gerard M. D'Emilio, OBA No. 33496

**GABLEGOTWALS**

BOK Park Plaza

499 West Sheridan Avenue, Suite 2200

Oklahoma City, OK 73102

Telephone:  405-235-5500

Facsimile:  405-235-5575

Email:        gdemilio@gablelaw.com


**ATTORNEYS FOR DEFENDANT-APPELLEE, WALMART, INC.**

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of FED. R. APP. P. 32(a)(7)(B)(i), because the brief contains 12,694 words, excluding the parts of the brief exempted by FED. R. APP. P. 32(f). This brief complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type style requirements of FED. R. APP. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman style font.

*/s/Amelia A. Fogleman*
Amelia A. Fogelman


## CERTIFICATE OF DIGITAL SUBMISSION

I hereby certify that with respect to the foregoing: (1) all required privacy redactions have been made per 10th Cir. R. 25.5; (2) if required to file additional hard copies, that this ECF submission is an exact copy of those documents; and (3) the ECF submission have been scanned for viruses with the most recent version of a commercial virus scanning program, (Webroot, Version 9.0.29.62, August 27, 2021), and according to the program are free of viruses.

*/s/Amelia A. Fogleman*
Amelia A. Fogelman

## CERTIFICATE OF SERVICE

I hereby certify that on May 6, 2022, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Tenth Circuit by using the appellate CM/ECF system.

I certify that the following participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system:

Christopher R. Hedican
Michael J. Roccaforte
BAIRD HOLM LLP
1700 Farnam St., Ste. 1500
Omaha, NE 68102-2068

Kenneth D. Kinney
Thomas F. Ralston
RALSTON KINNEY, LLC
4717 Grand Avenue, Suite 300
Kansas City, Missouri 64112

/s/Amelia A. Fogleman
Amelia A. Fogelman